Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (*pro hac vice*)
George S. Cary (State Bar No. 73858)
Alan B. Freedman (*pro hac vice pending*)
lbrannon@cgsh.com
gcary@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Ave., NW
Washington, DC 20037
Telephone: (202) 974-1500
Facsimile: (202) 974-1999

Greenberg Traurig LLP
Robert J. Herrington (State Bar No. 234417)
Richard Tabura (State Bar No. 298677)
robert.herrington@gtlaw.com
richard.tabura@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

*Attorneys for Defendant Medtronic, Inc.*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION,<br><br>            Plaintiff,<br><br>    v.<br><br>MEDTRONIC, INC.,<br><br>            Defendant. | Case No. 8:23-cv-00268-CJC-DFM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT MEDTRONIC, INC.'S MOTION TO DISMISS COMPLAINT**<br><br>**HON. CORMAC J. CARNEY**<br><br>**DATE: July 17, 2023**<br>**TIME: 1:30 P.M.**<br>**CTRM: 9B** |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................... 1

II.   FACTUAL BACKGROUND ...................................................... 2

III.  LEGAL STANDARD ................................................................ 4

IV.   ARGUMENT ............................................................................. 5

    A.    Applied Lacks Standing Because It Fails to Allege Antitrust Injury ............................................................................. 6

        1.    Applied Alleges Injury Only to Itself, Not to Competition ........ 6

        2.    Applied's Allegations Establish that It Can Reach Customers Other than Through GPO Contracts ...................... 10

    B.    Applied Fails to Allege Exclusionary Conduct ................................. 11

        1.    Applied Does Not Allege Any Exclusive Contracts ............... 11

        2.    Applied Fails to Allege Unlawful Discounts ............................ 13

    C.    Applied's State Law Claims Fail for the Same Reasons as Its Federal Claims ................................................................ 16

        1.    Applied's California Antitrust Claims Are Derivative of Its Federal Claims ........................................................ 16

        2.    Applied's Tortious Interference Claim Is Based on Failed Antitrust Claims and Speculative Business Relationships ....... 17

V.    CONCLUSION ......................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
   836 F.3d 1171 (9th Cir. 2016) ..................................................................8, 13-14

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*
   592 F.3d 991 (9th Cir. 2010) .........................................................................*passim*

*Arista Networks, Inc. v. Cisco Systems, Inc.,*
   No. 16-cv-00923, 2017 WL 6102804 (N.D. Cal. Oct. 10, 2017) ...................... 14

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,*
   47 Cal. App. 4th 464 (1996) ............................................................................. 18

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................... 4, 7

*Atl. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990) ........................................................................................... 5

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................... 4

*Brooke Grp. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993) ........................................................................................5-6

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ........................................................................................... 6

*CAE Inc. v. Gulfstream Aerospace Corp.,*
   203 F. Supp. 3d 447 (D. Del. 2016) ................................................................. 10

*Cargill, Inc. v. Monfort of Colo., Inc.,*
   479 U.S. 104 (1986) ........................................................................................... 4

*Cascade Health Sols. v. PeaceHealth,*
   515 F.3d 883 (9th Cir. 2008) ....................................................................4, 6, 13

*Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (2001) ................................................................. 16

*Crocs, Inc. v. Effervescent, Inc.*,
    248 F. Supp. 3d 1040 (D. Colo. 2017) ................................................... 7

*Grant v. County of Erie*,
    542 F. App'x 21 (2d Cir. 2013) ............................................................. 15

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
    733 F. App'x 380 (9th Cir. 2018) ........................................................... 7

*Innovative Health LLC v. Biosense Webster, Inc.*,
    No. SACV 19-1984, 2020 WL 5921964 (C.D. Cal. Aug. 18, 2020) ................ 12

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
    No. 15-108, 2016 WL 264909 (D. Del. Jan. 21, 2016) ...................................... 10

*J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care*,
    999 F. Supp. 1355 (S.D. Cal. 1998) ........................................................ 4

*Kelsey K. v. NFL Enters., LLC*,
    757 F. App'x 524 (9th Cir. 2018) .......................................................... 16

*LiveUniverse, Inc. v. MySpace, Inc.*,
    No. CV 06-0994, 2007 WL 6865852 (C.D. Cal. June 4, 2007), *aff'd*, 304
    F. App'x 554 (9th Cir. 2008) ................................................................. 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...................................................................... 5, 13

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ................................................................ 5

*Omega Env't., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1170, 1162 (9th Cir. 1997) ................................................. 7, 10

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp. 2d 1347 (N.D. Cal. 2013) ................................................. 18

*Orion Tire Corp. v. Gen. Tire, Inc.*,
   No. CV 92-2391, 1992 WL 295224 (C.D. Cal. Aug. 17, 1992) ...................... 18

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009) ....................................................................................... 5

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
   103 F.3d 42 (7th Cir. 1996) ........................................................................9-10

*PNY Techs., Inc. v. SanDisk Corp.*,
   No. 11-cv-04689, 2014 WL 2987322 (N.D. Cal. July 2, 2014).................8-9, 11

*PNY Techs, Inc. v. SanDisk Corp.*,
   No. 11-cv-4689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ....................... 10

*Pool Water Prods. v. Olin Corp.*,
   258 F.3d 1024 (9th Cir. 2001).......................................................................6-7

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010) ...........................................................................9-10

*Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*,
   No. C09-637Z, 2009 WL 10727790 (W.D. Wash. Nov. 16, 2009).............. 7, 10

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022)............................................................ 16

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
   No. 12-CV-05847, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)...............17-18

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
   2 Cal. 5th 505 (2017) ...................................................................................... 17

*Sacco v. Mouseflow, Inc.*,
   No. 20-cv-02330, 2022 WL 4663361 (E.D. Cal. Sept. 30, 2022)..................... 15

*Se. Missouri Hosp. v. C.R. Bard, Inc.*,
   642 F.3d 608 (8th Cir. 2011) ...................................................................... 8, 12

*Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*,
    No. 21-CV-01708, --- F. Supp. 3d ---, 2022 WL 16575199 (M.D. Pa.
    Nov. 1, 2022) ................................................................................................ 8

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................... 5-6

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
    No. CV14-05604, 2017 WL 5973279 (C.D. Cal. Mar. 7, 2017) ...................... 15

*Swingless Golf Club Corp. v. Taylor*,
    No. C 08-05574, 2009 WL 2031768 (N.D. Cal. July 7, 2009) ......................... 17

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ......................................................................................... 6

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................... 4, 8, 11

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999)
    ...................................................................................................... 8-9, 13

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ......................................................................... 18

**Statutes**

42 U.S.C. § 1320a-7b(b)(3)(C) ............................................................................. 3

Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.* ...................................... 16

Clayton Act .................................................................................................... 6, 16

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ........................ 16

**Other Authorities**

42 C.F.R. § 1001.952(j) (2021) ....................................................................... 3, 10

Complaint for Antitrust and Unfair Competition, *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923 (Feb. 24, 2016), ECF No. 1 ..................................................... 14

Fed. R. Civ. P. 12(b)(6) .............................................................................. 4

## I.  **INTRODUCTION**

Defendant Medtronic, Inc. develops, manufactures and delivers innovative medical technology, including surgical devices that reduce risks to patients, decrease recovery time, and lead to improved patient outcomes.  These include advanced bipolar devices, which "are among the most trusted and essential devices used by surgeons in the operating suite."  Compl. ¶ 19.  Plaintiff Applied Medical Resources Corp. alleges that Medtronic's trusted devices are priced *too low*, and Applied brings this antitrust lawsuit in the hopes that the Court will order Medtronic to raise its prices, increasing costs to our healthcare system.  But the antitrust laws are designed to promote low prices, not high ones, and a competitor may not use these laws to force higher prices to benefit itself.

Applied's attack on low pricing does not stop with Medtronic:  Applied also attacks the broader healthcare purchasing system endorsed by Congress.  Applied complains that hospitals use group purchasing organizations (GPOs), which exercise bargaining power against suppliers like Applied and Medtronic to lower costs for hospitals.  Applied would of course prefer to avoid negotiating against hundreds of hospitals that have joined together to drive down prices.  But the GPO model has been codified into law by Congress.  Applied's displeasure with the GPO model does not state a claim against Medtronic.

Applied's federal antitrust claims should be dismissed for two independent reasons:

*First*, the antitrust claims should be dismissed for lack of standing because Applied fails to allege antitrust injury.  To state a claim under the antitrust laws, a plaintiff must allege that it suffered antitrust injury, which requires injury flowing from harm to overall competition in the market.  Critically, Applied alleges only harm to itself:  It makes some conclusory assertions of broader harm, but it does not and cannot allege facts indicating that the relevant market has been substantially

1  foreclosed to competition.  Indeed, Applied makes factual allegations that

2  affirmatively show that competition has *not* been foreclosed.

3      *Second*, Applied's antitrust claims fail because Applied does not allege

4  exclusionary conduct.  Applied tries to allege two types of exclusionary conduct—

5  exclusive contracts and unlawful discounts.  As to the first, however, Applied does

6  not actually allege the existence of any exclusive contracts.  That is, Applied does

7  not allege contracts that require any customer to purchase exclusively from

8  Medtronic, *or even purchase from Medtronic at all*.  As to the second type of

9  conduct, Applied tries to attack purported "bundled discounts," under which

10  Medtronic allegedly offers lower prices to some hospitals that use more than one of

11  its products.  But it is settled law that bundled discounts are generally

12  procompetitive, with only a narrow exception to this rule.  Applied's weak—and

13  internally inconsistent—attempt to parrot elements of this narrow exception is

14  unavailing.  Other district courts have rejected the same types of threadbare recitals

15  that Applied presents here.

16      Applied's other claims fail as well:  Its state-law antitrust and unfair

17  competition claims mirror or are derivative of its federal antitrust claims and should

18  be dismissed for the same reasons.  And Applied's tortious-interference claim fails

19  because it also depends on Applied's antitrust claims and is based on speculation

20  rather than established business relationships.

21      For all of these reasons, Applied's Complaint should be dismissed in full.

22  **II.   FACTUAL BACKGROUND**

23      Medtronic and Applied compete in the manufacture and sale of advanced

24  bipolar devices, which seal and dissect blood vessels during surgery.  Compl. ¶¶ 3,

25  12, 19.

26      Unlike many industries in which suppliers negotiate prices only with

27  individual customers, hospitals often use one of a small set of GPOs to negotiate on

28  their behalf with suppliers.  *Id.* ¶¶ 32–33.  These GPOs leverage the buying power

of hundreds or thousands of member hospitals to drive down the price of medical supplies. *Id.* ¶ 32. Each GPO negotiates with suppliers and agrees on a price list that is available to the GPO's member hospitals. The GPO also requires the supplier to pay the GPO a fraction of the supplier's sales to cover administrative expenses. *Id.* ¶¶ 36–38. This GPO business model has been enshrined in federal law for decades; Applied does not (and cannot) suggest that Medtronic is responsible for it. 42 U.S.C. § 1320a-7b(b)(3)(C); 42 C.F.R. § 1001.952(j) (2021).

Nearly every hospital in the country is a member of a GPO and is thus entitled to purchase products at prices negotiated by that GPO. Compl. ¶ 32. Hospitals are not required to use the GPO-provided prices, however: They may engage in their own direct negotiations with suppliers. *Id.* ¶¶ 93, 104, 121. As the Complaint explains, hospitals may choose to negotiate directly with suppliers either to seek even lower prices than the GPO obtained, or because the hospitals prefer to buy products not covered by the GPO contract. *Id.* ¶¶ 46, 87, 104.

Applied alleges that Medtronic has entered into contracts with GPOs that "essentially" make Medtronic the "sole source" of advanced bipolar devices. *Id.* ¶¶ 6, 81. But, conversely, the Complaint then proceeds to allege that hospitals are not restricted by GPO contracts and in fact can and do buy directly from manufacturers. *Id.* ¶¶ 93, 104, 106, 120–22.

The Complaint also alleges that Medtronic provides bundled discounts when customers buy a particular set of three products from Medtronic: advanced bipolar devices, monopolar devices, and stapling devices. *Id.* ¶ 75. Applied alleges that these discounts have an "enormous impact" on hospitals' "overall financial bottom lines." *Id.* ¶ 7. Applied says that large, diversified competitors such as Johnson & Johnson offer a similar range of products in competition with Medtronic. *Id.* ¶¶ 42–43. Applied does not say whether these other competitors offer bundled discounts. Applied does allege, however, that each of the products at issue in this case is "separately marketed, sold, and distributed." *Id.* ¶ 46. And Applied alleges that

many customers who buy advanced bipolar devices and other products from Medtronic do so without receiving any bundled discount at all. *Id.* ¶¶ 7, 9, 10, 105 (alleging that Medtronic's discounts are "illusory").

### III.  LEGAL STANDARD

To survive a motion under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted).  Antitrust claims in particular must be scrutinized carefully at the pleading stage because antitrust litigation is burdensome and because false condemnation of competitive conduct threatens to "chill the very conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (citation omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (courts must carefully review allegations in light of "the costs of modern federal antitrust litigation").

Such careful review is especially important here for two reasons:  the antitrust claims are brought by a competitor, and that competitor asserts that prices are too low.  Courts are widely skeptical of antitrust claims brought by competitors, who may be attempting to use the antitrust laws to insulate themselves from the impact of competition. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) (it would be "perverse" to use antitrust law to "protect competitors from the loss of profits" caused by "any decision by a firm to cut prices in order to increase market share"); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2008) ("[A]ntitrust laws protect the process of competition, and not the pursuits of any particular competitor."); *J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care*, 999 F. Supp. 1355, 1360 (S.D. Cal. 1998) (courts "must be particularly sensitive to the antitrust injury requirement" where the plaintiff "is a competitor, not a consumer").

Courts are also skeptical of claims that prices are too low.  The Supreme Court has "carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009).  That is because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (citation omitted); *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 339–40 (1990).  Indeed, the Supreme Court has repeatedly recognized that cutting prices to increase output "is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

## IV.  ARGUMENT

Applied brings monopolization claims against Medtronic.  To state such a claim, Applied must sufficiently allege that Medtronic "(1) possessed **monopoly power in the relevant market**, (2) willfully acquired or maintained that power through **exclusionary conduct** *and* (3) caused **antitrust injury**." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004) (emphasis added) (citation omitted).[1]  Here, among other serious flaws, Applied's complaint fails on both the antitrust injury and exclusionary conduct requirements.[2]

---

[1] Applied styles Medtronic's alleged exclusive contracts and discounts as five monopolization claims (monopolization, attempted monopolization, restraint of trade, bundled discounts, and exclusive dealing).  All require exclusionary conduct and antitrust injury but, for attempted monopoly, instead of showing monopoly power the plaintiff must show a "dangerous probability" of monopoly power in the relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

[2] For purposes of this motion, Medtronic treats the factual allegations in the complaint—including as to the purported relevant market—as true, even where they are inaccurate.

**A.    Applied Lacks Standing Because It Fails to Allege Antitrust Injury**

**1.  Applied Alleges Injury Only to Itself, Not to Competition**

It is axiomatic that the antitrust laws protect competition, not competitors. *See, e.g.*, *Spectrum Sports*, 506 U.S. at 458 (the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself") (citations omitted).  Applied has standing to pursue an antitrust claim only if it can demonstrate that it suffered antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1033–34 (9th Cir. 2001) (the "most important limitation" for antitrust standing is the requirement to "prove the existence of *antitrust* injury") (emphasis in original) (citation and internal quotation marks omitted); *PeaceHealth*, 515 F.3d at 910 n.21 (antitrust injury required for "any private antitrust action").

Critically, it is not enough for a plaintiff to allege that it suffered commercial harm by losing some customers or business opportunities. *See, e.g.*, *Brooke Grp.*, 509 U.S. at 224 ("That below-cost pricing may impose painful losses on its target is of no moment to the antitrust laws if competition is not injured.").  Instead, the plaintiff must allege harm to "competition generally." *LiveUniverse, Inc. v. MySpace, Inc.*, No. CV 06-0994, 2007 WL 6865852, at *15 (C.D. Cal. June 4, 2007), *aff'd*, 304 F. App'x 554 (9th Cir. 2008) ("Although purporting to address the impact on competition generally, [plaintiff] really complains about the impact on [plaintiff] itself.").  Specifically, there must be allegations that the challenged conduct has "substantially foreclosed" the relevant market to competition. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market."); *Allied Orthopedic*, 592 F.3d at 996 (similar).  If a plaintiff alleges only individual injury, it has failed to plead antitrust injury. *See*

*Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018).

Yet individual loss is all that Applied has alleged here:  Applied alleges only that Medtronic's agreements with hospitals and GPOs harm *Applied's business*. Compl. ¶¶ 122–26.  That is not antitrust injury.  *See Pool Water*, 258 F.3d at 1035–36 (affirming dismissal because a competitor's lost profits due to lower prices are not antitrust injury).  Applied also makes some conclusory assertions that it has been unable to expand its U.S. market share as quickly as it would like, and that Medtronic's low prices are to blame.  Compl. ¶¶ 11–12.  Again, however, it is well established that injuries to a plaintiff from decreased prices and low market share are not antitrust injuries.  *Pool Water*, 258 F.3d at 1035–36.

Applied offers some high-level, conclusory assertions that Medtronic "forecloses competition."  Compl. ¶¶ 117–18.  Conclusory allegations, however, do not satisfy Applied's burden of pleading antitrust injury.  *Iqbal*, 556 U.S. at 678–81. Properly alleging that a defendant has foreclosed competition requires the plaintiff to offer factual allegations regarding the *portion of market-wide sales* that were foreclosed by the alleged conduct.  *See Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1170 (9th Cir. 1997) (courts must consider "the proportion of affected commerce in comparison to the entire market"); *Hip Hop Beverage*, 733 F. App'x at 381 (affirming dismissal of complaint where plaintiff offered "conclusory assertion[s]" of total amount of "foreclosed competition").  Applied utterly fails to allege any such facts, and this is fatal to its federal antitrust claims.  *See Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1058–59 (D. Colo. 2017) (granting motion to dismiss antitrust claim where plaintiff failed to allege that a "substantial share of the relevant market" was foreclosed); *Randy's Ring & Pinion Serv. Inc. v. Eaton Corp.*, No. C09-637Z, 2009 WL 10727790, at *5 (W.D. Wash. Nov. 16, 2009) (same).

This omission may be intentional:  If Applied disclosed the share of sales it believes are foreclosed to it, that allegation would not work in its favor—of the thousands of hospitals in the United States, Compl. ¶ 33, Applied alleges only that it was unable to make sales to approximately two dozen, *id.* ¶ 121.  This does not come remotely close to supporting an assertion of substantial market-wide foreclosure of competition.

Rather than allege what share of the market is supposedly foreclosed by unlawful conduct, Applied instead claims that Medtronic has high market share and labels that foreclosure.  *Id.* ¶¶ 117–18.  But having a high market share is not a violation of the antitrust laws, *Trinko*, 540 U.S. at 407 (opportunity for success "attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth"), and making a sale is not the same thing as foreclosing competition.  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) (market share insufficient to show foreclosure); *Se. Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 616 (8th Cir. 2011) (similar); *Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, No. 21-CV-01708, --- F. Supp. 3d ---, 2022 WL 16575199, at *5 (M.D. Pa. Nov. 1, 2022) (dismissing complaint because allegation of market share is not "sufficient factual content that would allow the court to draw the reasonable inference that there was substantial foreclosure").

Applied's allegations regarding GPO contracts further undercut any assertion of substantial foreclosure.  Applied alleges that Medtronic's contracts with GPOs are no longer than three years, Compl. ¶ 81, but a three-year term is a "relatively short duration."  *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064–65 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999); *see also PNY Techs., Inc. v. SanDisk Corp.*, No. 11-cv-04689, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) ("Courts in this circuit have found contracts with terms ranging up to three, and even five, years to be acceptable.").  The allegations also

show that the challenged GPO contracts do not prevent others from competing.
Compl. ¶¶ 50, 84, 87.  There are *no* allegations that GPOs' contracts prevent GPOs
from adding or changing suppliers when a term ends.  Applied makes a vague
allegation that Medtronic is "applying pressure" to persuade GPOs to renew
contracts, *id.* ¶ 92, but Applied offers no factual support detailing any unlawful
pressure, and thus these allegations describe nothing other than "competition for the
contract."  *See, e.g.*, *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47
(7th Cir. 1996); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83
(3d Cir. 2010) (encouraging "competition among businesses to serve as an
exclusive supplier").  Nor does the Complaint allege any contractual restriction on
GPOs terminating their agreements with Medtronic at will.  *Cf. Allied Orthopedic
Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010)
("The 'easy terminability' of an exclusive dealing arrangement 'negates
substantially its potential to foreclose competition.'") (citation and brackets
omitted); *W. Parcel Express*, 65 F. Supp. 2d at 1064–65 (similar).  Where
purportedly exclusive contracts are terminable, courts grant motions to dismiss.
*PNY Techs.*, 2014 WL 2987322, at *6–7 (granting motion to dismiss even where
the complaint alleged that no customer had ever terminated due to the cost of
termination).

Applied alleges facts about just one GPO—Premier—but those allegations
further demonstrate that Applied cannot state an antitrust claim.  Applied alleges
that Premier visited Applied in 2019 to discuss the terms of a possible agreement
and, at Premier's request, in 2020 Applied submitted a bid for advanced bipolar
devices—that is, a contract for a single product.  Compl. ¶¶ 83–84.  Applied alleges
that Premier rejected Applied's bid because Applied would not meet Premier's
demand on the administrative fee.  These allegations do not show foreclosure:
They merely describe competition at the behest of Premier.  *Id.* ¶ 84.  Applied also
complains about the size of the administrative fee that Premier allegedly sought

from it, which Applied argues was improperly high, but this allegation is not about conduct by Medtronic and it ignores the fact that the GPO system codified into law does not cap administrative fees. *See* 42 C.F.R. § 1001.952(j)(1)(ii) (2021) (approving administrative fees greater than 3 percent).

The Complaint's allegation that Applied and Medtronic competed for a contract with Premier reflects competition for the contract, which is "a form of competition that antitrust laws protect rather than proscribe, and it is common." *Paddock Publ'ns*, 103 F.3d at 45. Competing for short-term contracts is procompetitive, both when those contracts are exclusive and, as in this case, when they are not. *See Race Tires Am.*, 614 F.3d at 83 ("It is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*.") (emphasis in original); *CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 454–55 (D. Del. 2016) (dismissing complaint that alleged exclusivity of at least three-and-a-half years where "exclusive provider is chosen through a competitive process").

### 2. Applied's Allegations Establish that It Can Reach Customers Other than Through GPO Contracts

To plead substantial foreclosure, Applied must further allege that there are no true alternative channels of distribution beyond those that were allegedly foreclosed. *Omega Env't*, 127 F.3d at 1163. Courts in this and other circuits dismiss antitrust claims that fail to allege this core aspect of substantial foreclosure. *See, e.g.*, *PNY Techs, Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7–8 (N.D. Cal. Apr. 25, 2014) (dismissing antitrust claim for failure to allege a lack of alternative channels of distribution); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, No. 15-108, 2016 WL 264909, at *5–7 (D. Del. Jan. 21, 2016) (same); *Randy's Ring*, 2009 WL 10727790, at *4–5 (same).

Here, Applied's Complaint makes clear that there *are* true channels of distribution available other than GPO agreements—namely, direct negotiation with

hospitals.  Applied alleges that over the *eight years* it has been selling advanced bipolar devices, Compl. ¶ 3, it has negotiated directly with hospitals and engaged in product trials, *id.* ¶¶ 106, 120–22 ("making inroads" with customers).  These allegations directly refute Applied's vague assertion that Medtronic's contracts prevent hospitals from evaluating competing products.  *Id.* ¶ 101.  Furthermore, Applied acknowledges that advanced bipolar products are "separately marketed, sold and distributed," *id.* ¶ 46, and purchased outside of contracts based on "surgeon preference," *id.* ¶ 104.  *Cf., e.g., PNY Techs.*, 2014 WL 2987322, at *4–8 (dismissing antitrust claim where plaintiff had not adequately pleaded that it was unable to compete for contracts with defendants' customers).

Because antitrust injury is required for standing to pursue an antitrust claim, Applied's failure to allege antitrust injury is fatal to its antitrust claims.

### B.   Applied Fails to Allege Exclusionary Conduct

Applied's antitrust claims also fail for the independent reason that Applied has not alleged exclusionary conduct.  "To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."  *Trinko*, 540 U.S. at 407.  Applied tries to allege two types of exclusionary conduct in support of its antitrust claims:  (1) unlawful exclusive contracts, Compl. ¶¶ 170–80; and (2) unlawful bundled discounts, *id.* ¶¶ 160–69.  Applied's allegations are not sufficient to support either theory.

### 1. Applied Does Not Allege Any Exclusive Contracts

An exclusive agreement is one that "prevents the buyer from purchasing a given good from any other vendor."  *Allied Orthopedic*, 592 F.3d at 996.  The Ninth Circuit has rejected exclusive dealing claims when the relevant contract "did not contractually obligate … customers to purchase anything."  *Id.* at 996–97.  Yet that is the exact case here:  the Complaint itself is clear that Medtronic's challenged

agreements with GPOs and hospitals do not contractually obligate *anyone* to purchase anything.

Applied asserts that Medtronic has entered into agreements with GPOs that "are *effectively* 'sole-source' agreements." Compl. ¶ 81 (emphasis added). Applied does not define "sole-source," hoping that this healthcare-procurement term of art will be read as synonymous with exclusivity. It is not. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 996; *C.R. Bard, Inc.*, 642 F.3d at 610–11. In *Allied Orthopedic,* the Ninth Circuit noted that defendant Tyco's actual—not "effectively"—sole-source agreements with GPOs were not ***exclusive*** agreements because they simply provided GPO members an optional price on Tyco's products if the GPO members chose to purchase those products. To obtain this option for its members, the *GPO itself* agreed not to enter into a similar agreement with competing suppliers, but that was the only form of "exclusivity" in the entire transaction. *Id.* at 995. These agreements did "not contractually obligate GPO members to purchase *anything*" from a supplier. *Id.* at 996 (emphasis added); *see also C.R. Bard, Inc.*, 642 F.3d at 610–13. The GPO's member hospitals remained free to purchase products from any suppliers, and the contracts were not exclusive as a matter of law. *Allied Orthopedic*, 592 F.3d at 997.

Here, as in *Allied Orthopedic*, the Complaint acknowledges that hospitals operating under a GPO contract can and do purchase the products at issue outside of the GPO agreement. *See* Compl. ¶ 87 (admitting that this in fact happens but qualifying it as "difficult"). Courts have dismissed similar claims that fail to allege exclusivity. *See, e.g.*, *Innovative Health LLC v. Biosense Webster, Inc.*, No. SACV 19-1984, 2020 WL 5921964, at *6–7 (C.D. Cal. Aug. 18, 2020) (dismissing exclusive dealing claim because allegations "do not show substantial foreclosure or a requirement to purchase services only from service providers with an exclusive contract").

As to hospitals, Applied alleges that Medtronic has "essentially" exclusive contracts with some individual hospitals that "require the hospital to purchase between 80–100% of its advanced bipolar devices from Medtronic."  Compl. ¶ 94.  But Applied does not allege what the consequences of violating those purported terms are, and the Complaint makes clear that this is really just Applied's challenge to Medtronic's discounts, as discussed further below.  *See* Compl. ¶¶ 93–100.  As the Complaint makes clear, these hospitals can purchase as much or as little from Medtronic as they want:  if the hospital wishes to buy less and thus does not qualify for a discount under its own contract with Medtronic, it can buy the volume of Medtronic products it wishes under a GPO contract at predetermined discounted prices.  *Id.* ¶¶ 32, 91 (most hospitals that purchase advanced bipolar devices do so "through the GPO contract").  Where, as here, there is no obligation to buy at all, there is no obligation to buy exclusively, and the plaintiff cannot state an exclusive dealing claim.  *Allied Orthopedic*, 592 F.3d at 995–97; *W. Parcel Express*, 65 F. Supp. 2d at 1065.

## 2. Applied Fails to Allege Unlawful Discounts

What Applied really seems to be challenging is Medtronic's low pricing.  Applied alleges that Medtronic at times offers "bundled discounts."  Bundled discounts "allow the buyer to get more for less" and therefore are almost always procompetitive and lawful.  *PeaceHealth*, 515 F.3d at 894–96 (courts "should not be too quick to condemn price-reducing bundled discounts as anticompetitive, lest we end up with a rule that discourages legitimate price competition") (citation omitted).  Unsurprisingly, then, antitrust claims about discounts are "rarely successful."  *Matsushita*, 475 U.S. at 589.

In very rare circumstances bundled discounts may be unlawful.  *Aerotec*, 836 F.3d at 1186–87; *PeaceHealth*, 515 F.3d at 906–07.  Among other things, this exception requires that the magnitude of the discount offered by the defendant lead to below-cost pricing on the competitive product in the bundle when the entire

discount on the whole bundle is applied to the competitive product.  *See Aerotec*, 836 F.3d at 1186–87.  Applied "recites the elements" of part of this test in conclusory terms, Compl. ¶ 97, but that is not sufficient.  *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923, 2017 WL 6102804, at *13 (N.D. Cal. Oct. 10, 2017) (granting motion to dismiss bundling claim).

Much like Applied does here, in a recent bundled discount case in this circuit the plaintiff, Arista, alleged that "[i]f the [bundled] price discount were attributed to [defendant] Cisco's Ethernet switch sales as a discount, Cisco would be selling Ethernet switches … below its incremental costs."  Complaint for Antitrust and Unfair Competition ¶ 106, *Arista Networks, Inc. v. Cisco Systems, Inc.*, No. 16-cv-00923 (Feb. 24, 2016), ECF No. 1 (cited in *Arista*, 2017 WL 6102804, at *13).  But Arista did not plausibly allege a bundling claim because it included no "allegations on *what kind or amount* of discount … was offered to customers who had the temerity to purchase or attempt to purchase non-Cisco switches."  *Arista*, 2017 WL 6102804, at *14.  Applied's Complaint is the same:  it simply concludes, with no support, that Medtronic "must be" selling advanced bipolar devices below cost.  Compl. ¶¶ 8, 72, 97, 163.  But without providing supporting factual allegations, like the "amount of [the] discount," this is not enough.  *Arista*, 2017 WL 6102804, at *13–14.

Applied tries to further paper over its failure to allege below-cost pricing by making the vague claim that "whatever price" it offered would not allow Applied to overcome Medtronic's alleged discounts.  Compl. ¶ 97.  But this allegation is meaningless without any supporting allegations about the prices Applied and Medtronic charge and the discounts Medtronic offers.  Rather than allege that Medtronic is pricing below cost, Applied merely offers a litany of instances in which Medtronic won sales by competing against Applied with a lower price.  *Id.* ¶¶ 120–21, 124.  These allegations describe the kind of lawful competition that

businesses engage in every day and do not give rise to a plausible inference that Medtronic priced below its costs.

Applied's conclusory assertion of below-cost pricing is also contradicted by other allegations in its Complaint.  For instance, Applied makes the following allegations, all of which undercut its assertion that Medtronic is charging below-cost prices:

- Medtronic's "'discounts' still result in high prices." *Id.* ¶ 7.
- Medtronic's bundled discounts are "illusory." *Id.* ¶ 105.
- Medtronic's bundled discounts are "very difficult to realize." *Id.* ¶ 9.

These allegations are fundamentally inconsistent with a claim of below cost pricing, and this is fatal to Applied's Complaint.  *See Sacco v. Mouseflow, Inc.*, No. 20-cv-02330, 2022 WL 4663361, at *2–3 (E.D. Cal. Sept. 30, 2022) ("[T]he Court need not accept inconsistent allegations in a complaint as true."); *Grant v. County of Erie*, 542 F. App'x 21, 23 (2d Cir. 2013) (dismissal is appropriate "when a claim is based on wholly conclusory and inconsistent allegations").  If Medtronic is not providing real discounts at all, then it certainly is not pricing below its costs in a way that destroys competition.

Applied's bundled discount allegations are also implausible:  According to Applied, highly sophisticated hospitals negotiate with Medtronic to secure bundled discounts, sign contracts containing those discounts, purchase products under those contracts, do not actually receive those "illusory" discounts, then renew their contracts anyway, and *this process repeats every three years* in perpetuity.  Compl. ¶¶ 9, 55, 92, 104.  This is not plausible.  *See Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, No. CV14-05604, 2017 WL 5973279, at *9 (C.D. Cal. Mar. 7, 2017) (claims that depend on allegations of agreements that "make[] no economic sense … must be dismissed").

In sum, Applied has not properly alleged either the antitrust injury or exclusionary conduct elements of its federal antitrust claims, and these claims should be dismissed.

## C.    Applied's State Law Claims Fail for the Same Reasons as Its Federal Claims

Applied asserts claims under California law, but each claim depends on Applied's federal antitrust claims and should be dismissed for the same reasons. Applied's tortious interference claim also fails because it is purely speculative.

### 1.    Applied's California Antitrust Claims Are Derivative of Its Federal Claims

Applied brings claims under California's Cartwright Act, Cal. Bus. & Prof. Code § 16700, *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* These state law claims mirror or are derivative of Applied's federal antitrust claims, and they fail for the same reasons.

*First*, Applied alleges the same conduct violates both the Sherman Act and the Cartwright Act. *Compare* Compl. ¶¶ 181–89 (Cartwright Act claim), *with id.* ¶¶ 170–79 (nearly verbatim language for exclusive dealing claim). "[T]he requirements to plead a claim under California's Cartwright Act are 'patterned after section 1 of the Sherman Act'" and cannot stand if the related Sherman Act claims fail. *Kelsey K. v. NFL Enters., LLC*, 757 F. App'x 524, 527 (9th Cir. 2018) (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476–77 (9th Cir. 1986)) (affirming grant of motion to dismiss). Accordingly, Applied's Cartwright Act claim should be dismissed for the reasons discussed above.

*Second,* Applied's UCL claim is derivative of its federal antitrust claims, alleging only violations of the antitrust laws. Compl. ¶ 204. When the UCL claim is derivative of antitrust claims that are dismissed, "the UCL claim falls with those claims." *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 2022). This is so even when the complaint invokes the word "unfair," Compl. ¶ 205. *Chavez v.*

*Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) ("If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restraints competition and harms consumers—the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' towards consumers.").

## 2. Applied's Tortious Interference Claim Is Based on Failed Antitrust Claims and Speculative Business Relationships

Under California law, claims of intentional interference with prospective economic advantage require "(1) the existence, between the plaintiff and some third party, of an economic relationship that contains the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm proximately caused by the defendant's action." *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017) (citation omitted).  Among other flaws, Applied fails to allege the first and third elements of this claim.

Regarding the existence of a relationship between Applied and its alleged prospective customers, "it is well settled in California that a plaintiff must establish an existing economic relationship or a protected expectancy with a third person, not merely a hope of future transactions." *Swingless Golf Club Corp. v. Taylor*, No. C 08-05574, 2009 WL 2031768, at *4 (N.D. Cal. July 7, 2009).  Applied lists a handful of hospitals that it alleges *might* have considered buying from Applied until Medtronic offered them lower prices.  Compl. ¶¶ 120–22, 193.  The allegation that Applied was competing to win the named hospitals' business provides no reason to believe that this was anything more than a hope of future transactions.  Tortious interference claims cannot be based on such "speculative expectancies." *Roy Allan*, 2 Cal. 5th at 518 (citation omitted); *see also Rheumatology Diagnostics Lab'y, Inc.*

1  *v. Aetna, Inc.*, No. 12-CV-05847, 2013 WL 5694452, at *20–21 (N.D. Cal. Oct. 18,

2  2013) (granting motion to dismiss for failure to allege "existing relationship").

3       Nor is Applied helped by its vague speculation that it could "captur[e] a

4  material share of the advanced bipolar devices market." Compl. ¶ 192.  Courts

5  routinely dismiss these kinds of broad, nonspecific allegations of "interference with

6  the market." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th

7  507, 527 (1996); *see also Rheumatology Diagnostics*, 2013 WL 5694452, at *20–

8  21 (dismissing allegation of interference with all of defendants' customers as "too

9  speculative and hypothetical").

10      As to the intentional wrongful acts, Applied must allege that Medtronic's

11  conduct was "wrongful by some *legal* measure other than the fact of interference

12  itself." *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*, 47 Cal. App. 4th

13  464, 476 (1996) (emphasis added) (citation omitted).  Moreover, Medtronic is

14  entitled to a "broad privilege afforded to a competitor to divert a prospective

15  relationship to itself." *Orion Tire Corp. v. Gen. Tire, Inc.*, No. CV 92-2391, 1992

16  WL 295224, at *3 (C.D. Cal. Aug. 17, 1992).  But competition—offering lower

17  prices to win customers away from other suppliers—is all that Applied alleges here.

18  For the reasons described above, Medtronic's conduct does not violate the antitrust

19  laws, which is the only allegation of wrongfulness Applied offers.  *See* Compl.

20  ¶ 194 (alleging that Medtronic approached hospitals and offered them discounts if

21  they chose Medtronic's products).  The failure of Applied's antitrust claims is

22  therefore fatal to its tortious interference claim.  *See, e.g.*, *Orchard Supply*

23  *Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1365 (N.D. Cal.

24  2013) (dismissing tortious interference claim with antitrust claims where complaint

25  "hinges its allegations of wrongful conduct on the claimed antitrust violations").

26  **V.   CONCLUSION**

27      For the foregoing reasons, Medtronic respectfully requests that Applied's

28  Complaint be dismissed in its entirety.

Dated: April 24, 2023                    CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: /s/ Leah Brannon
Leah Brannon (*pro hac vice*)
2112 Pennsylvania Ave., NW
Washington, DC 20037
*Attorney for Defendant Medtronic, Inc.*


**Local Rule 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Medtronic, Inc., certifies that this brief contains 5,762 words, which complies with the word limit of L.R. 11-6.1.


Dated: April 24, 2023                    CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: /s/ Leah Brannon
Leah Brannon (*pro hac vice*)
2112 Pennsylvania Ave., NW
Washington, DC 20037
*Attorney for Defendant Medtronic, Inc.*