Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

Attorneys for Plaintiff
APPLIED MEDICAL RESOURCES CORPORATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>    Defendant. | Case No. 8:23-cv-00268-WLH-DFM<br><br>**APPLIED MEDICAL RESOURCES CORPORATION'S OPPOSITION TO MEDTRONIC, INC.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Hearing:<br>July 21, 2023<br>1:00 p.m.<br>Courtroom 9B<br><br>Hon. Wesley L. Hsu |

# TABLE OF CONTENTS

**Page No.**

I.  INTRODUCTION ................................................................................1

II.  STATEMENT OF THE CASE .........................................................3

    A.  Plaintiff Applied Medical .........................................................3

    B.  Medtronic Dominates The Relevant Markets ...........................3

    C.  Medtronic Uses Anticompetitive Conduct To Monopolize .......................................................................4

III.  ARGUMENT ....................................................................................5

    A.  Medtronic Advocates For An Incorrect Legal Standard............5

    B.  Applied Plausibly Alleges Monopolization Claims ..................7

        1.  Applied Plausibly Alleges Unlawful Bundling ...............7

            a.  Applied Alleges Unlawful Bundling In Detail ........................................................................7

            b.  Applied's Complaint Is Consistent And Plausible ..................................................................10

            c.  Medtronic's Remaining Cases Do Not Support Its Challenge to Applied's Bundling Claim ......................................................12

        2.  Applied Plausibly Alleges Unlawful Exclusive Dealing..........................................................................12

            a.  Medtronic Engages in Exclusive Dealing...........13

            b.  Medtronic Enters Long-Term Contracts .............14

            c.  Medtronic's Agreements Substantially Foreclose Competition .......................................16

            d.  Medtronic's Reliance on *Allied Orthopedic* Is Misplaced ..................................................17

    C.  Applied Plausibly Alleges Antitrust Injury .............................18

        1.  Applied Plausibly Alleges Harm to Competition...........18

        2.  Medtronic's Cited Case Law is Inapposite....................20

**TABLE OF CONTENTS**
*(cont'd)*

**Page No.**

D.   Applied Plausibly Alleges California Antitrust and Unfair Competition ................................................................21

E.   Applied Plausibly Alleges Tortious Interference ....................22

IV.   CONCLUSION .................................................................................23

# TABLE OF AUTHORITIES

**Page No(s).**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016)..................................................12, 14, 21

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991)....................................................................7

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. Ltd.*,
592 F.3d 991 (9th Cir. 2010)............................................................14, 17

*Arista Networks, Inc. v. Cisco Systems, Inc.*,
2017 WL 6102804 (N.D. Cal. Oct. 10, 2017)..............................2, 7, 8, 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................5, 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .....................................................................5, 6, 11

*Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*,
2010 WL 4366849 (C.D. Cal. Sept. 23, 2010)........................................10

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)................................................................................21

*CAE Inc. v. Gulfstream Aerospace Corp.*,
203 F. Supp. 3d 447 (D. Del. 2016) .......................................................19

*Cascade Health Solutions v. Peacehealth*,
515 F.3d 883 (9th Cir. 2008).............................................................passim

*Castro v. Sanofi Pasteur Inc.*,
2012 WL 12516572 (D.N.J. Aug. 6, 2012)............................................10

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001)............................................................21, 22

*City of San Jose v. Off. of the Com'r of Baseball*,
776 F.3d 686 (9th Cir. 2015)..................................................................22

*Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010)....................................................................7

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023)...........................................................3, 19, 22

# TABLE OF AUTHORITIES
## (cont'd)

**Page No(s).**

*FTC v. Qualcomm Inc.*,
  2017 WL 2774406 (N.D. Cal. June 26, 2017) ...................................14, 17

*Grant v. County of Erie*,
  542 F. App'x 21 (2d Cir. 2013)................................................................11

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
  733 Fed. Appx. 380 (9th Cir. 2018) .........................................................21

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*,
  164 F. Supp. 3d 1117 (D. Minn. 2016) ......................................................9

*Innovative Health LLC v. Biosense Webster, Inc.*,
  2020 WL 5921964 (C.D. Cal. Aug. 18, 2020)..........................................14

*Le v. Zuffa*,
  216 F. Supp. 3d 1154 (D. Nev. Oct. 19, 2016) ...................................18, 20

*LiveUniverse, Inc. v. MySpace, Inc.*,
  2007 WL 6865852 (C.D. Cal. June 4, 2007)............................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .................................................................................12

*Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*,
  555 U.S. 438 (2009) .................................................................................21

*Pac. Steel Grp. v. Commercial Metals Co.*,
  600 F. Supp. 3d 1056 (N.D. Cal. Apr. 26, 2022) ...............................11, 14

*Paddock Publications, Inc. v. Chicago Tribune Co.*,
  103 F.3d 42 (7th Cir. 1996) .....................................................................19

*Patt D.V.M. v. Antech Diagnostics, Inc.*,
  2020 WL 5076970 (C.D. Cal. May 18, 2020)..........................................17

*Patt D.V.M. v. Antech Diagnostics, Inc.*,
  2020 WL 5076970 (C.D. Cal. May 18, 2020)..........................................17

*PlusPass, Inc. v. Verra Mobility Corp.*,
  2021 WL 4775573 (C.D. Cal. Aug. 9, 2021) ......................................13, 19

*PNY Techs., Inc. v. SanDisk Corp.*,
  2014 WL 2987322 (N.D. Cal. July 2, 2014)............................................15

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 1977) .................................................................20, 21

*Pro Search Plus, LLC v VFM Leonardo, Inc.*,
    2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ..............................12, 13, 15

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
    614 F.3d 57 (3d Cir. 2010) .................................................................19

*Reilly v. Apple*,
    578 F. Supp. 3d 1098 (N.D. Cal. 20222) ..................................................22

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013)...........................................22

*Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*,
    213 Cal. Rptr. 3d 568 (2017)...............................................................23

*S.E. Missouri Hosp. v. C.R. Bard, Inc.*,
    642 F.3d 608 (8th Cir. 2011) ...............................................................21

*Sacco v. Mouseflow, Inc.*,
    2022 WL 4663361 (E.D. Cal. Sept. 3, 2022) ...........................................11

*Schuylkill Health Sys. v. Cardinal Health 200, LLC*,
    No. 12-7065, 2014 WL 3746817 (E.D. Pa. July 30, 2014).................6, 10

*Simon and Simon PC v. Align Technology, Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. Apr. 8, 2021) ...........................13, 16, 18

*Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*,
    2022 WL 16575199 (M.D. Pa. Nov. 1, 2022)...........................................21

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ...........................................................................20

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
    2017 WL 5973279 (C.D. Cal. Mar. 7, 2017) .....................................10, 11

*Swingless Golf Club Corp. v. Taylor*,
    2009 WL 2031768 (N.D. Cal. July 7, 2009)...........................................23

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ...........................................................................21

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Tele Atlas N.V. v. NAVTEQ Corp.*,
  2008 WL 4809441 (N.D. Cal. Oct. 28, 2008) .......................................... 14

*Twin City Sportservice, Inc. v. Finley & Co., Inc.*,
  676 F.2d 1291 (9th Cir. 1982) ....................................................... 16

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................ 6

*W. Parcel Express v. United Parcel Servs. of Am., Inc.*,
  65 F. Supp. 2d 1052 (N.D. Cal. 1998) ............................................ 14, 15

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
  42 Cal. App. 4th 507 (1996) ........................................................ 23

## I. <u>INTRODUCTION</u>

Medtronic's attempt to frame Applied's lawsuit as an "attack on low pricing" is surprising. Mot. at 1. Nothing could be further from the truth. Applied was founded in 1987 with the goal of using innovation to drive down the cost of healthcare while improving clinical outcomes. In Europe, where bundling is subject to strict regulatory scrutiny, Applied's market share for the relevant products exceeds 30%, increasing competition and driving ***down*** prices.

In contrast, Applied's market share in the United States is less than 3% and the lack of competition has resulted in prices that remain very high. Medtronic—the largest medical device company in the world—uses its extensive product portfolio to exact compliance from hospitals by implementing restrictive contractual agreements. These agreements, couched in terms of "bundled discounts," perpetuate a regime of excessive pricing. Hospitals are subjected to untenable and punitive pricing increases if they fail to adhere to Medtronic's requirements. This financial Sword of Damocles ensures hospitals cannot take competing products at any price due to the impending financial threat. Medtronic's unlawful bundling substantially forecloses competition, resulting in ***higher*** prices, less competition, and fewer consumer choices.

Accordingly, this lawsuit does not attack low prices—it seeks to lower prices by enjoining Medtronic's anticompetitive conduct. Absent Medtronic's conduct, Applied is positioned to drive prices down across the United States, just as it did in Europe. Medtronic's use of anticompetitive conduct to exclude competition and maintain monopoly power is classic unlawful monopolization.

To support its "low prices" theme, Medtronic primarily cites "predatory pricing" cases where plaintiffs alleged a defendant lowered prices on a ***single*** product with an intent to raise prices later and recoup lost profits after a competitor is excluded. Courts view such schemes as speculative and uncertain because the lost profits may never be regained. Such single-product pricing bears

no resemblance to the ***bundling*** allegations here.  Indeed, the Ninth Circuit distinguished such predatory pricing cases when explaining why unlawful "discount bundling" harms competition.  *See Cascade Health Solutions v. Peacehealth*, 515 F.3d 883, 904 (9th Cir. 2008).  The Ninth Circuit explained that unlawful bundling threatens "consumer welfare" because it ***excludes*** from the market a better and/or ***lower cost*** product merely because the seller cannot match the discounts offered over numerous product lines.  *Id.*

Medtronic's conduct is particularly harmful here because Medtronic combines such bundling with long-term agreements (featuring staggered renewal periods) with hospitals and Group Purchasing Organizations ("GPOs").  Such agreements exclude other manufacturers for many years and magnify the harm of Medtronic's anticompetitive bundling indefinitely and on an immense scale.

Looking beneath Medtronic's inapposite themes and case law reveals that Medtronic's challenge to the pleadings is quite narrow.  Medtronic does not dispute that it possesses monopoly power.  Instead, Medtronic argues Applied alleges no "exclusionary conduct."  But Medtronic does not dispute that Applied correctly invoked the Ninth Circuit's "discount attribution test" and that conduct satisfying that test is unlawful.  Medtronic cites a single bundling case (*Arista*) to argue Applied's allegations are not sufficiently detailed.  But Medtronic simply ignores the Complaint, which alleges the very information *Arista* found missing.

Medtronic also challenges antitrust injury by claiming Applied has not sufficiently alleged harm to competition.  But Medtronic ignores dozens of paragraphs explaining how Medtronic is harming competition, Applied's antitrust injury, and Applied's antitrust standing.  The Complaint explains in detail how Medtronic's conduct results in demonstrable harm to competition, including higher prices, fewer choices, and inferior products.

Medtronic also argues Applied's unfair competition claim rises and falls with Applied's Federal antitrust claims.  That is incorrect.  Just weeks ago, the

Ninth Circuit rejected the very arguments Medtronic makes here and confirmed that California's unfair competition law prohibits even "incipient" violations that do not violate Federal antitrust laws. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023). The Court should deny Medtronic's motion.

## II. STATEMENT OF THE CASE

### A. Plaintiff Applied Medical

Applied is a medical device company committed to providing affordable and accessible high-quality healthcare. Compl. ¶1. Applied's highly automated, vertically integrated manufacturing makes it one of the world's most efficient medical device manufacturers even though it manufactures its products in the United States. *Id.* ¶3.

Applied has a history of driving down costs while increasing innovation and quality. *Id.* ¶11. In the 2000s, Applied fought to prevent anticompetitive bundling in the market for "trocars" (surgical devices used during laparoscopic surgeries in the abdomen). *Id.* ¶¶1, 111, 129. When Applied succeeded, competition flourished and prices dropped by more than 25%. *Id.* ¶111.

Applied has had similar success with advanced bipolar markets overseas where bundling is less prevalent. For example, bundling is subject to strict regulatory scrutiny in Europe. *Id.* ¶119. In such markets, Applied's market share exceeds 30%, dramatically increasing competition and driving down prices. *See id.* In contrast, Applied's U.S. market share remains less than 3% and pricing remains very high because of Medtronic's conduct. *Id.* ¶¶98, 100, 110-11.

### B. Medtronic Dominates The Relevant Markets

Medtronic does not dispute any of Applied's allegations demonstrating that Medtronic has monopoly power. For example, Medtronic does not challenge Applied's detailed allegations establishing the relevant market. *Id.* ¶¶39-47; *see also id.* ¶¶19-31. Nor does Medtronic challenge Applied's detailed allegations showing Medtronic's domination of that market. *Id.* ¶¶48-73. One independent

report shows Medtronic commands more than 78% of sales in the advanced bipolar device market. *Id.* ¶50.  Medtronic also does not challenge Applied's detailed allegations of substantial barriers to entry. *Id.* ¶¶54-63.  Medtronic also does not dispute that other market participants do not assert competitive discipline on Medtronic. *Id.* ¶¶67-68.  Nor does Medtronic dispute that, absent Medtronic's conduct, Applied's ability to make a better product at a lower cost uniquely positions Applied to serve as a competitive check on Medtronic. *Id.* ¶¶69-73.

Medtronic also does not challenge Applied's allegations of Medtronic's control over other markets in which Applied does not compete. *Id.* ¶¶74-79.  As Applied explains, Medtronic has a "large, diverse, and expanding product portfolio covering numerous types of medical devices that it leverages to exclude competition." *Id.* ¶74.  For example, Medtronic has a dominant 73% share of the market for monopolar energy devices (another type of surgical device). *Id.* ¶76.

## C.    <u>Medtronic Uses Anticompetitive Conduct To Monopolize</u>

Medtronic engages in anticompetitive conduct to maintain and enlarge its monopoly power in the market for advanced bipolar devices. *Id.* ¶¶80-108.  Medtronic offers "discounts" to hospitals only if they purchase a bundle of products that includes advanced bipolar energy devices ***and*** other devices. *Id.* ¶¶95-96.  The term "discount" conceals the harsh reality: Medtronic's bundle is an ever-looming financial peril for any hospital that dares to defy compliance. *Id.*

Due to the volume of other products in the bundle, the overall discount across the bundle dwarfs any price reduction that competitors can offer on individual products. *Id.* ¶96.  Medtronic is thus offering its advanced bipolar devices below cost after allocating the exclusionary "discount" from the entire bundle to the advanced bipolar devices. *Id.* ¶¶94-97.  Indeed, "hospitals have informed Applied that whatever price Applied offered would not make up for the bundled exclusionary discount." *Id.* ¶97.  Medtronic's unlawful bundling thus "forces Medtronic's smaller competitors out of the market." *Id.* ¶100.

Medtronic combines its bundling arrangements with long-term agreements that require hospitals to purchase all or nearly all advanced bipolar devices from Medtronic. *Id.* ¶¶93-94. Medtronic also uses long-term sole-source agreements with Group Purchasing Organizations ("GPOs"). *Id.* ¶¶81-92. Such agreements exclude other manufacturers and magnify the competitive harm of Medtronic's anticompetitive bundling. *Id.* ¶¶103-107.

Medtronic's agreements with GPOs also represent a watershed change in which GPOs are abandoning prior commitments. In response to media scrutiny and Congressional investigations, GPOs previously agreed to avoid sole-source agreements and limit kickback fees to 3%. *Id.* ¶¶82-83. Recently, Medtronic pressured GPOs to enter sole-source agreements in exchange for exorbitant kickbacks, magnifying the harm of Medtronic's other conduct. *Id.* ¶¶82, 91.

The Complaint explains how Medtronic's conduct forecloses competition in at least 70% of the market. *Id.* ¶¶53, 117-121, 154. Medtronic's conduct harms competition and consumers through supracompetitive prices, fewer choices, inferior products, and reduced innovation. *Id.* ¶¶109-116. Applied has suffered antitrust injury (*id.* ¶¶122-126) and has antitrust standing (*id.* ¶¶127-134). Enjoining Medtronic's anticompetitive behavior "will open the market for advanced bipolar devices, allowing Applied and other competitors to compete fairly." *Id.* ¶131.

## III.  ARGUMENT

### A.  Medtronic Advocates For An Incorrect Legal Standard

A complaint must plead a plausible claim, but "[t]he plausibility standard is not akin to a 'probability requirement[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Rather, Rule 8(a) "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Medtronic's "legal standard" deviates from these basic principles in several ways.

First, Medtronic asserts "[a]ntitrust claims in particular must be scrutinized carefully at the pleading stage," Mot. at 4. But Medtronic cites no case applying a different standard for antitrust pleadings. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 4 (2004), did not create a different standard. *Verizon* considered whether to add an exception to "the proposition that there is no duty to aid competitors." *Id.* at 411. Medtronic also cites *Twombly*, 550 U.S. at 558, but that case provides the "plausibility" requirement for ***all*** pleadings. *See Iqbal,* 556 U.S. at 678-79.

Second, Medtronic claims courts are "widely skeptical of antitrust claims brought by competitors." Mot. at 4. Again, Medtronic's cases do not support Medtronic's assertion. Competitors commonly bring antitrust cases. As support, Medtronic cites cases that uncontroversially required harm to competition, not merely a competitor. Mot. at 4 (citing *Cargill*, *PeaceHealth*, *J. Allen Ramey*). As discussed below, Applied alleges harm to competition in great detail.

Third, Medtronic claims that courts "are also skeptical of claims that prices are too low." Mot. at 4. As support, however, Medtronic cites cases that addressed discounted prices on ***single*** products. *See id.* at 5 (citing *Brooke Grp.*, *Atlantic Richfield*, and *Matsushita*). The Ninth Circuit distinguished such cases when explaining the "potential threat to consumer welfare" that arises when bundling excludes equally efficient competitors. *See Peacehealth*, 515 F.3d at 901-04. Such bundling results in ***higher***—not lower—prices in the relevant market. *See, e.g., Schuylkill Health Sys. v. Cardinal Health 200, LLC,* No. 12-7065, 2014 WL 3746817 at *5 n.6 (E.D. Pa. July 30, 2014) (denying motion to dismiss based on allegations that bundling "produced anticompetitive effects, including artificially ***inflating prices*** for sutures and endo distribution services for all consumers.").[1]

---

[1] All emphasis is added unless noted otherwise.

**B.      Applied Plausibly Alleges Monopolization Claims**

Monopolization has "two elements: [1] 'the possession of monopoly power in the relevant market and .... [2] the acquisition or perpetuation of this power by illegitimate 'predatory' practices.'"  *Coalition For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991)) (brackets added).[2]  Medtronic does not dispute the first element.  Medtronic challenges only the second element: "predatory" conduct.   As detailed below, Applied alleges two categories of predatory conduct, each of which is sufficient to establish monopolization.

**1.      Applied Plausibly Alleges Unlawful Bundling**

In *Cascade Health Sols. v. PeaceHealth*, the Ninth Circuit adopted the discount attribution test for bundling cases.  515 F.3d 883, 906 (9th Cir. 2008).  That test provides that a bundled discount is exclusionary if, after allocating "the full amount of the discounts given by the defendant on the bundle" to "the competitive product or products," the "resulting price of the competitive product or products is below the defendant's incremental cost to produce them."  *Id.*  Medtronic acknowledges the unlawfulness of such discounts under *PeaceHealth*.  *See* Mot. at 13-14.   Medtronic simply argues Applied's allegations are too conclusory.  *Id*. at 14.  As discussed below, Medtronic is incorrect.

**a.      Applied Alleges Unlawful Bundling In Detail**

Medtronic claims that Applied's Complaint is the "same" as *Arista Networks, Inc. v. Cisco Systems, Inc.*, 2017 WL 6102804 (N.D. Cal. Oct. 10, 2017), which rejected a bundling claim that included no "allegations on ***what kind***

---

[2]  Medtronic does not challenge the separate elements for attempted monopolization.  *See* Mot. at 5 n.1.  Medtronic also fails to bring any unique challenge to Applied's Section 1 claims.  *See id*. Medtronic is incorrect that Applied "styled" these claims as Section 2 "monopolization claims."  *Compare id*., *with* Compl. ¶¶ 150-80.

-7-

or amount of discount" was offered to customers. *Id.* at *14. Applied's Complaint is nothing like the complaint in *Arista*.

Applied's Complaint explains in detail that Medtronic's agreements "expressly require a hospital to purchase a set percentage of its advanced bipolar devices from Medtronic," typically between 80-100%. Compl. ¶94. Medtronic "audits compliance to ensure hospitals do ***not*** purchase from competitors, like Applied." *Id.* Medtronic conditions so-called "discounts" on the purchase of many devices, including advanced bipolar devices, monopolar devices, stapling and more. *Id.* ¶95. The products are sold at a purported "discount" when purchased as "part of a customer's overall high market-share compliance." The "quantities and revenue of advanced bipolar devices" is "much smaller than the quantities and revenue of the other devices," *id.* Thus, the "total exclusionary discount on Medtronic's devices is very significant because of the high volume and total cost of such devices." *Id.* ¶96. "[H]ospitals obtain that discount" only if they agree to "purchase advanced bipolar devices from Medtronic." *Id.* "[H]ospitals thus decline to purchase advanced bipolar devices from competitors, like Applied, because the competitor cannot offer a low enough price to offset the entire total bundled exclusionary discount." *Id.*

Applied has a highly automated, vertically integrated manufacturing environment that makes it one of the world's most efficient medical device manufacturers. *Id.* ¶3. "Because Applied is more efficient than Medtronic and nonetheless cannot sell its devices for a profit, Medtronic must be effectively selling its advanced bipolar devices below its average variable costs when allocating the exclusionary discount given by Medtronic on the entire bundle to the advanced bipolar devices." *Id.* ¶97.

Applied even cites "hospital statements that they will not purchase advanced bipolar devices from Applied—a more efficient competitor—at any price because of the exclusionary discounts that would be lost on other products."

*Id*.  Hospitals have explained that "whatever price Applied offered would not make up for the bundled exclusionary discount." *Id*.  Applied provides specific examples of hospital interactions supporting Applied's allegations. *Id*. ¶121.  For example, "[d]espite a savings exceeding $1 million from switching to Voyant, [a] hospital could not purchase from Applied because of its contractual obligations to Medtronic.  Moving a product in any category away from Medtronic would result in the hospital falling out of compliance and losing its entire Medtronic rebate exceeding 20% for all products." *Id*.

Accordingly, Applied's allegations are nothing like those in the *Arista* case on which Medtronic relies.  Indeed, Applied provides the very information *Arista* said was missing, including the "kind" of agreements and information from customers.  *See Arista*, 2017 WL 6102804 at *14 ("Arista must have obtained some information, for example, from its customers, to make it believe that Cisco is pricing below incremental costs.").

This case is more like *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.,* 164 F. Supp. 3d 1117, 1129 (D. Minn. 2016), where Inline satisfied the Ninth Circuit's "discount attribution test" by alleging it was "more efficient than Graphic in manufacturing susceptor packaging, yet Inline cannot profitably offer susceptor food packaging at a price sufficiently low to compete with the discounts provided in Graphic's bundles."  The Court found such allegations:

> lead to the logical inference that Graphic is selling below its cost; if Inline is more efficient than Graphic at making susceptor packaging and cannot sell the packaging for a profit to compete with Graphic's bundles, Graphic too must be selling below cost because it is less efficient than Inline. At this stage, the Court must construe the Complaint and all reasonable inferences arising therefrom in Inline's favor and will do so here.

*Id*. at 1129 (internal quotations omitted).  Here, Applied alleges it is equally efficient—and indeed "more efficient"—than Medtronic and yet cannot compete.

-9-

1    Compl. ¶¶8, 97.  In fact, hospitals have told Applied they cannot purchase

2    Applied's devices at any price because of Medtronic's exclusionary bundles.  *Id.*

3           Applied's allegations far exceed those that courts have held sufficient.  *See,*

4    *e.g., Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.,* 2010 WL

5    4366849, at *4 (C.D. Cal. Sept. 23, 2010) ("The FAC further alleges that Mead

6    uses a bundling pricing scheme to sell dated goods below cost. (FAC ¶ 10.) These

7    allegations of anticompetitive conduct are not bare legal conclusions, and are

8    sufficient to withstand a motion for dismissal."); *see also Schuylkill,* 2014 WL

9    3746817 at *5 n.6 (denying motion to dismiss based on allegations that

10    "competitors would have to sell suture and endo distribution services at a loss");

11    *Castro v. Sanofi Pasteur Inc.,* 2012 WL 12516572 at *9 (D.N.J. Aug. 6, 2012)

12    (plaintiff plausibly alleged monopolization based on allegation "Sanofi used its

13    monopoly power and the extraordinarily high barriers to market entry to impose

14    bundled contracts on" physician buying groups).

15           **b.**    **Applied's Complaint Is Consistent And Plausible**

16           Medtronic next attacks Applied's allegation that Medtronic's discounts are

17    "illusory" and sometimes do not result in the promised "discounts."  Mot. at 15.

18    But Medtronic never explains why ***higher*** prices from illusory promises

19    somehow make Medtronic's conduct less anticompetitive.  Medtronic's bundling

20    excludes competition regardless of whether the hospital ultimately receives the

21    promised "discounts."

22           Medtronic claims sophisticated hospitals would not accept such "illusory"

23    discounts.  Mot. at 15.  That is a factual contention that directly contradicts the

24    pleadings, which must be accepted as true.  Compl. ¶105.  Medtronic ignores

25    Applied's allegations explaining, for example, that "confidentiality provisions"

26    prevent "Medtronic's rivals from exposing Medtronic's illusory promises."  *Id*.

27           Medtronic cites *Surf City Steel, Inc. v. Int'l Longshore & Warehouse*

28    *Union*, 2017 WL 5973279 at *9 (C.D. Cal. Mar. 7, 2017), to ask the Court to

dismiss Applied's allegations as purportedly making "no economic sense."  Mot. at 15.  *Surf City* rejected allegations of a scheme by an organization to limit competition in a manner that would have harmed the organization's members "themselves."  2017 WL 5973279 at *10.  *Surf City* provides no basis to disregard Applied's plausible allegation that Medtronic's discounts "may not be realized…."  Compl. ¶105.

Indeed, a "fundamental problem" with Medtronic's factual arguments is that they are "brought at the wrong stage of this litigation."  *See Pac. Steel Grp. v. Commercial Metals Co.*, 600 F. Supp. 3d 1056, 1077 (N.D. Cal. Apr. 26, 2022).  "A motion to dismiss is simply not the right vehicle to resolve fact-intensive inquiries…."  *Id*.  Applied must merely present sufficient allegations "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 556 (internal citations omitted).  Applied's allegations more than satisfy that standard.

Medtronic also cites *Sacco v. Mouseflow, Inc.*, 2022 WL 4663361 at *2-3 (E.D. Cal. Sept. 3, 2022), to argue Applied's allegations are inconsistent.  Mot. at 15.  *Sacco* granted a motion to dismiss for lack of personal jurisdiction because the complaint was "riddled with factual irregularities" that prevented "any finding" of jurisdiction.  2022 WL 4663361 at *4-5.  Here, there is nothing inconsistent about Applied's allegation that (1) Medtronic coerces hospitals into long-term bundled "discount" agreements and (2) "such discounts may not be realized," resulting in the hospital paying even high prices.  Compl. ¶105.

Medtronic also cites *Grant v. County of Erie*, 542 F. App'x 21, 23 (2d Cir. 2013).  In *Grant*, the Second Circuit "recognized an exception to the rule that a court must accept all factual assertions as true" when "a claim is based on wholly conclusory and inconsistent allegations."  *Id*.  As discussed, Applied's allegations are neither conclusory nor inconsistent.

c.    **Medtronic's Remaining Cases Do Not Support Its**
**Challenge to Applied's Bundling Claim**

Medtronic's remaining cases are likewise inapposite. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016), found allegations implausible because the plaintiff offered the "same bundle" as the defendant and repeatedly "outbid" the defendant. *Id*. No such facts exist here.

Medtronic vaguely references "antitrust claims about discounts" and cites *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986), to argue such claims are "rarely successful." Mot. at 13. But *Matsushita* did not address discount bundling. Rather, it explained why "predatory pricing" schemes are rarely successful. *See id.* at 589. As discussed, the Ninth Circuit distinguished predatory pricing cases like *Matsushita* when explaining why unlawful bundling harms competition. *See Peacehealth*, 515 F.3d at 901.

Medtronic also cites *PeaceHealth* to argue bundled discounts are "almost always procompetitive and lawful." Mot. at 13. But *PeaceHealth* says no such thing. *PeaceHealth* explained that bundling **can** result in "benefits" to consumers, but may also unlawfully "exclude an equally or more efficient competitor and thereby **reduce** consumer welfare in the long run." *Peacehealth*, 515 F.3d at 895-96. Applied plausibly alleges that Medtronic engages in such unlawful predatory conduct. Applied thus states valid monopolization claims.

2.    **Applied Plausibly Alleges Unlawful Exclusive Dealing**

Medtronic also engages in a second, related category of predatory conduct: unlawful exclusive dealing. "There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Pro Search Plus, LLC v VFM Leonardo, Inc.*, 2013 WL

-12-

6229141 at *5 (C.D. Cal. Dec. 2, 2013) (internal quotations omitted).

Here, Applied plausibly alleges Medtronic has monopoly power and enters long-term agreements that exclude competitors and substantially foreclose competition. *See* Compl. ¶¶49, 81-102, 117-121. Applied also alleges the market is highly concentrated and that Medtronic eliminates the availability of viable, cost-effective alternatives, including through unlawful bundling. Compl. ¶¶49, 95-101; *see, e.g.*, *PlusPass, Inc. v. Verra Mobility Corp.*, 2021 WL 4775573 at *7 (C.D. Cal. Aug. 9, 2021) (denying motion to dismiss where plaintiff alleged monopoly power, substantial foreclosure, long-term agreements, harm to competition, and unavailability of viable cost-effective alternatives).

None of Medtronic's arguments below establish any flaw in the Complaint.

### a.    <u>Medtronic Engages in Exclusive Dealing</u>

Medtronic first claims Applied "does not allege any exclusive contracts" because "Medtronic's challenged  agreements with GPOs and hospitals do not contractually obligate anyone to purchase anything." Mot. at 12. That simply contradicts the Complaint, which alleges Medtronic's agreements "expressly *require* a hospital to purchase a set percentage of its advanced bipolar devices from Medtronic," typically between 80-100%. Compl. ¶94.

Medtronic nonetheless argues "[w]here, as here, there is no obligation to buy at all, there is no obligation to buy exclusively, and the plaintiff cannot state an exclusive dealing claim." Mot. at 13. That purported rule is unsupported and wrong. Numerous cases confirm that exclusive dealing claims may be based on volume or market share targets. *See, e.g., Simon and Simon PC v. Align Technology, Inc.*, 533 F. Supp. 3d 904, 916 (N.D. Cal. Apr. 8, 2021) ("even without an explicit agreement of exclusivity, a monopolist can violate section 2 by entering arrangements that have the 'practical effect' of preventing buyers from doing business with the monopolist's competitors," such as "quantity discount programs" and other "de facto" agreements); *Pro Search Plus*, 2013 WL

-13-

6229141 at *5 ("[D]e facto exclusive dealing claims are cognizable under the antitrust laws" and "[a]n express exclusivity requirement, however, is not necessary, because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world") (internal quotations omitted); *FTC v. Qualcomm Inc.*, 2017 WL 2774406 at *23 (N.D. Cal. June 26, 2017) ("[D]e facto exclusive dealing claims are cognizable under the antitrust laws") (internal quotations omitted).

Indeed, Medtronic's own cited cases contradict Medtronic's asserted rule. For example, *Aerotec*, 836 F.3d at 1182, acknowledged conditioning discounts and rebates on the purchase of a "specified quantity or market share" may constitute "de facto" exclusive dealing "because they coerce buyers into purchasing a substantial amount of their needs from the seller."   Further, *Innovative Health LLC v. Biosense Webster, Inc.*, 2020 WL 5921964 at *6-7 (C.D. Cal. Aug. 18, 2020), observed that courts "***typically*** focus on whether there are requirements terms," including "volume or market share targets" such as those at issue here.  Medtronic cites *Allied Orthopedic* and *W. Parcel Express*, Mot. at 13, but neither case held market share agreements cannot constitute exclusive dealing.  As discussed below, those cases found no foreclosure on the specific facts presented.

### b.   Medtronic Enters Long-Term Contracts

Medtronic mischaracterizes the Complaint as alleging "Medtronic's contracts with GPOs are ***no longer*** than three years."  Mot. at 8.  The Complaint actually alleges Medtronic's agreements "typically have an ***initial*** term of three years," but because of extensions, the "***actual*** terms of the agreements are six years or more."  Compl. ¶81.  Six years is a "relatively lengthy" term and "exacerbate[s]" market foreclosure.  *See Pac. Steel Grp.*, 600 F. Supp. 3d at 1076. Moreover, even a three-year term can support a claim for exclusive dealing.  *See, e.g., Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4809441 at *17, 21 (N.D. Cal.

-14-

Oct. 28, 2008) (denying summary judgment on three-year agreements because "a jury could conclude that these three contracts create exclusive dealing arrangement"). Such agreements are particularly problematic in "highly concentrated" markets like the market here. Compl. ¶49; *see Pro Search Plus*, 2013 WL 6229141 at *5.

Medtronic crops a quote from *W. Parcel Express v. United Parcel Servs. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064-65 (N.D. Cal. 1998), to argue a three-year term is a "relatively short duration." Mot. at 8. *W. Parcel* actually observed that "[n]early all of the contracts [in that case had] relatively short durations, ranging *from 30 days* to 3 years." 65 F. Supp. 2d at 1064. *W. Parcel* is also distinguishable for many other reasons, including: (1) the court addressed summary judgment; (2) the plaintiff failed to define a relevant market, show defendant had market power, or demonstrate substantial foreclosure; and (3) customers were free to select another product at a better price. *Id.* at 1060-65. Here, Medtronic does not challenge Applied's market or market-power allegations and Applied plausibly alleges Medtronic exclusive dealing prevents customers from selecting lower-priced products, including by anticompetitive bundling. Compl. ¶¶93-102.

Medtronic also cites *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322 at *4 (N.D. Cal. July 2, 2014), but in that case (1) the plaintiff never alleged it failed to win a contract despite offering better terms; (2) no retailer said that its relationship with defendant prevented the retailer from accepting a better deal and (3) retailers tested competing products. *Id.* at *4-7. Here, Applied alleges (1) it was unable to make sales despite offering better products at lower prices; (2) hospitals told Applied they cannot purchase Applied's devices at any price because of Medtronic's agreements; and (3) Medtronic's deals are so onerous that hospitals cannot even *evaluate* competing products. Compl. ¶¶8, 81, 84, 98, 100, 101, 110, 120-21.

-15-

### c.   Medtronic's Agreements Substantially Foreclose Competition

Medtronic claims Applied merely points to Medtronic's "market share" rather than the portion of the market foreclosed by Medtronic's agreements.  Mot. at 8.  That mischaracterizes Applied's complaint.  Applied alleges Medtronic's market share is 78% but estimates that Medtronic's practices have foreclosed competition in 70% of the market. *Compare* Compl. ¶137 *with id*. ¶¶119, 154. Applied explains in detail why Medtronic's conduct foreclosed competition for the vast majority of hospitals that purchase products from Medtronic.  *Id*. ¶94. For example, Medtronic's agreements "expressly require a hospital to purchase a set percentage of its advanced bipolar devices from Medtronic," typically between 80-100%.  *Id*.  Medtronic "audits compliance to ensure hospitals do ***not*** purchase from competitors, like Applied." *Id*.

Medtronic's unlawful bundling causes hospitals to "decline to purchase advanced bipolar devices from competitors, like Applied, because the competitor cannot offer a low enough price to offset the entire total bundled exclusionary discount."  *Id*. ¶96.  Medtronic's "hospital agreements have the practical effect of preventing hospitals from evaluating competitive products during the term of the agreement."  *Id*. ¶104 (explaining "hospitals often use what little leeway there is to purchase a small number of other products for specialty procedures or surgeon preference").  Indeed, in the "Substantial Foreclosure" section, the Complaint identifies numerous hospitals who "told Applied that they could not purchase Voyant because of Medtronic contracts" and reports the reasons provided by the hospitals.  *Id*. ¶¶ 120-21.  Thus, Medtronic's cases finding no substantial foreclosure are inapposite.  Mot. at 7 (citing *Crocs*, *Randy's*, *Hip Hop Beverage*).

Moreover, Medtronic never explains why Applied's claims would fail if the estimated foreclosure were less than 70%.  The Ninth Circuit has held "a contract restricting as little as 24% of the relevant market resulted in a cognizable

foreclosure." *Simon,* 533 F. Supp. 3d at 917 (citing *Twin City Sportservice, Inc. v. Finley & Co., Inc.*, 676 F.2d 1291, 1304 (9th Cir. 1982); *see also Patt D.V.M. v. Antech Diagnostics, Inc.*, 2020 WL 5076970 at *6 (C.D. Cal. May 18, 2020) (denying motion to dismiss because foreclosure of 45% was "sufficiently significant for a Section 2 claim"). In fact, "courts have recognized that, at the motion to dismiss stage, a plaintiff is ***not*** necessarily required to allege a specific percentage of foreclosure." *Qualcomm*, 2017 WL 2774406 at *24.

### d.    Medtronic's Reliance on *Allied Orthopedic* Is Misplaced

Medtronic cites *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. Ltd.*, 592 F.3d 991, 996 (9th Cir. 2010), to challenge Applied's allegations regarding Medtronic's agreements with GPOs.  But *Allied Orthopedic* reviewed summary judgment based on an extensive factual record—not the pleadings on a motion to dismiss.  *Id*.  Moreover, *Allied Orthopedic* faulted the plaintiff's expert for failing to consider the recent entry of lower-cost generic sensors into the market.  *Id.* at 997.  The court reasoned that a hospital desiring to avoid Tyco's agreements could simply switch to the newly available generic sensors.  *Id.*  The court reasoned that "on the ***facts of this case***, ***something more*** than the discount itself is necessary to prove that Tyco's market-share discount agreements forced customers to purchase its sensors rather than generics."  *Id*.

This case presents different facts and includes the "something more" that was missing in *Allied Orthopedic*.  Among other things, Applied alleges Medtronic employs the above unlawful "bundled exclusionary discount arrangements in its agreements" to prevent hospitals from selecting a low-cost alternative from Applied.  Compl. ¶95.  Thus, Applied's allegations are not like the facts of *Allied Orthopedic*, where there was "no evidence" that "customers were unable to access less expensive" products.   592 F.3d at 997.  Through its unlawful bundling, Medtronic ensures such options are unavailable.

Medtronic also ignores Applied's allegations regarding the competitive

harm of Medtronic's ***overall*** conduct, including how Medtronic's GPO agreements magnify and contribute to the harm from Medtronic's other conduct. *See, e.g.,* Compl. ¶¶103-107; *see Le v. Zuffa*, 216 F. Supp. 3d 1154, 1168 (D. Nev. Oct. 19, 2016) ("The Court disagrees with the contention that a single element of a scheme, if legal, makes legal the conduct as a whole."); *Simon,* 533 F. Supp. 3d at 918 ("exclusive dealing allegations" combined with other allegations "ma[de] a strong overall section 2 claim").    Applied pleads multiple categories of predatory conduct and thus states valid monopolization claims.

**C.    Applied Plausibly Alleges Antitrust Injury**

**1.    Applied Plausibly Alleges Harm to Competition**

Many of Medtronic's arguments about antitrust injury merely challenge the merits of Applied's claim.    For example, Medtronic argues Applied has not sufficiently alleged that there is substantial foreclosure or that Medtronic enters long-term agreements. Mot. at 8. As discussed above, both arguments lack merit.

Medtronic argues more broadly that Applied merely alleges harm to Applied and not harm to "competition generally."    Mot. at 6.    That ignores Applied's Complaint, which includes extensive allegations of such harm. Compl. ¶¶109-21.    Applied explains how Medtronic's conduct results in "demonstrable harm to competitive processes," including "an adverse effect on prices, fewer choices, inferior products, and limiting rivals' market penetration." *Id*. ¶109; ¶¶110-21.    While Applied's Complaint discusses Applied's own experiences, the Complaint does so to explain Medtronic's anticompetitive conduct, establish antitrust injury, and explain why excluding Applied harms competition as a whole.  *Id.* ¶¶67-73, 122-26.

For example, Medtronic does not dispute that, absent Medtronic's conduct, Applied's ability to make a better product at a lower cost uniquely positions Applied to serve as a competitive check on Medtronic. *Id*. ¶¶69-73.  Nor does Medtronic dispute that other market participants do ***not*** presently assert

competitive discipline on Medtronic.  *Id.* ¶¶67-68.  Nor does Medtronic dispute that the advanced bipolar device market is highly concentrated and comprises a small number of firms.  *Id.* ¶49.  Medtronic thus harms competition as a whole by, among other things, excluding the company that could provide a competitive check on Medtronic and displace Medtronic's monopoly.  *Id.* ¶¶69-72.  Absent Medtronic's conduct, Applied is positioned to substantially increase competition and decrease prices, just as it did in Europe.  *Id.* ¶119.[3]

Medtronic argues that competing "for short-term contracts is procompetitive…"  Mot. at 10.  But Medtronic's anticompetitive bundling eliminates such competition on the merits.  *See* Compl. ¶¶95-102.  Medtronic's long-term agreements then substantially foreclose competition for many years.  *Id.* ¶¶81, 117-18.  Medtronic's cited cases do not address such allegations.  *See CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 454-55 (D. Del. 2016) (airplane manufacturer selected plaintiff's competitor as training provider); *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996) (distinguishing distributorship agreements at issue in that case from exclusive dealing contracts that may harm competition); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 82 (3d Cir. 2010) (citing "record" evidence of "ample justifications" for "single tire rule").

Medtronic also briefly attacks Applied's allegation that Premier began "entering agreements with dominant suppliers that are effectively sole source and began charging fees higher than 3%, returning to the practices that were the catalyst for Congress's investigation twenty years ago."  Compl. ¶37.  Medtronic claims such conduct is "not about conduct by Medtronic," Mot. at 10, but that

---

[3] Notably, Medtronic does not challenge Applied's allegations that Medtronic has market power, which further supports that the challenged conduct has anticompetitive effects.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023); *PlusPass*, 2021 WL 4775573 at *7.

ignores Applied's allegation that Medtronic is pressuring GPOs to enter such agreements to further foreclose competition. *Id*. ¶92.

Medtronic also argues "the GPO system codified into law does not cap administrative fees." Mot. at 10. That a particular statute does not forbid conduct does not immunize such conduct from scrutiny under the antitrust statutes, nor make such conduct irrelevant to Medtronic's overall scheme and the harm caused by that scheme. *See Zuffa*, 216 F. Supp. 3d at 1168. Here, Applied provides detailed allegations explaining why the above GPO conduct harms competition and magnifies the harm caused by Medtronic's predatory conduct. Compl. ¶¶103-07; *see also id*. ¶¶6-7, 32-38, 81-92.

Medtronic also claims Applied fails to allege the absence of alternative distribution channels. Mot. at 10. But Applied's allegations plausibly show alternative distribution channels are not available. *See, e.g.*, Compl. ¶117 ("Medtronic's conduct thus forecloses competition and prevents customers from having the choice of, and **access** to, better surgical devices" and "forecloses competitors from **reaching** hospital purchasers"). Thus, Medtronic's cases identifying alternative distribution channels are inapposite. Mot. at 10 (citing *Omega*, *PNY Techs.*, *Int'l Constr. Prods.* and *Randy's Ring*).

## 2. Medtronic's Cited Case Law is Inapposite

Medtronic cites *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993), but the Court in *Spectrum Sports* reversed judgment following a jury verdict because there was no "proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market." 506 U.S. at 459. Here, Medtronic does not challenge Applied's allegations of market definition, monopoly power, or a dangerous probability Medtronic will achieve monopoly power. Mot. at 5 n.1-2.

Medtronic also cites *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 1977), to argue a competitor's lost profits due to lower prices are not antitrust

injury.  Mot. at 7.  But *Pool Water* did not address bundling.  Instead, it addressed alleged predatory pricing.  258 F.3d at 1035.  As discussed, the Ninth Circuit distinguished predatory pricing cases when explaining the harm caused by anticompetitive bundling.  *See PeaceHealth*, 515 F.3d at 901.

Medtronic also cites *Aerotec*, 836 F.3d at 1182, but that case affirmed summary judgment because "[a]t this stage of the litigation, after extensive discovery," the plaintiff "needed to do something more than offer conclusory statements" about the market.  That case does not address pleading standards.  Regardless, as discussed, Applied provides detailed allegations regarding the market and harm to competition.

Medtronic's remaining cases are likewise inapposite and unhelpful.  *See Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993) (single-product low prices were not anticompetitive); *Pac. Bell Tel. Co. v. LinkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (rejecting single-product "price squeeze claim"); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 Fed. Appx. 380, 381 (9th Cir. 2018) (plaintiff failed to show defendant "foreclosed competition"); *LiveUniverse, Inc. v. MySpace, Inc.*, 2007 WL 6865852 at *1, 15 (C.D. Cal. June 4, 2007) (plaintiff complained social networking website precluded competitor video); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333 (1961) (relevant foreclosure of "1%" was "insubstantial"); *S.E. Missouri Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (affirming summary judgment based on the plaintiff's failure to identify a relevant submarket); *Smart Commc'ns Holding, Inc. v. Glob. Tel-Link Corp.*, 2022 WL 16575199 at *5 (M.D. Pa. Nov. 1, 2022) (plaintiff erroneously combined market share of two companies, one of which was not a defendant).

**D.    <u>Applied Plausibly Alleges California Antitrust and Unfair Competition</u>**

Medtronic cites *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375

(2001), to argue conduct that does not violate the Federal antitrust laws "necessarily" is not unfair competition under California law.  Mot. at 16-17.  The Ninth Circuit recently rejected that argument, explaining that *Chavez* applies to antitrust claims that fail because of categorical safe harbors, as opposed to a failure on the merits.  *See Epic Games,* 67 F.4th at 1000-01.[4]  The Ninth Circuit confirmed that a plaintiff can establish an unfair competition claim by showing an "incipient" violation that does not violate Section 2.  *See id.* (upholding "incipient" violation despite finding of no liability under Federal antitrust laws); Compl. ¶92 ("Medtronic's conduct also constitutes an incipient violation that will cascade and substantially harm competition even more if it is not stopped").  Medtronic identifies no categorical rule that bars Applied's claims.

**E.**   **Applied Plausibly Alleges Tortious Interference**

Medtronic fails to show any flaw in Applied's allegations of unlawful interference with prospective economic advantage.  Medtronic does not dispute that a violation of the antitrust laws, as demonstrated above, satisfies the requirement of conduct "wrongful by some legal measure other than the fact of interference itself."  Mot. at 18.  Medtronic cites inapposite cases that did not plausibly allege such conduct.  *See id*. (citing *Orion Tire*, *Orchard Supply*, *Arntz*).  Applied alleges such conduct and thus states valid claims.  *See, e.g.,* Compl ¶194.

Medtronic also cites *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452 at *20-21 (N.D. Cal. Oct. 18, 2013), but the plaintiff in *Rheumatology* identified no specific individuals.  Mot. at 17-18.  In contrast, Applied identifies numerous specific hospitals with which Applied was communicating.  Compl. ¶¶120-21.  Applied had previous relationships with such

---

[4] Medtronic also cites *Reilly v. Apple*, 578 F. Supp. 3d 1098, 1111 (N.D. Cal. 20222), Mot. at 16.  But *Reilly* cited *City of San Jose v. Off. of the Com'r of Baseball*, 776 F.3d 686, 689 (9th Cir. 2015), which *Epic Games* likewise distinguished as relying on a "categorical" rule.  67 F.4th at 1000-01.

hospitals and was negotiating to offer them a better product at a lower price. *Id.* ¶¶110, 120-21, 192-94. Such facts plausibly show an economic relationship and a probability of future benefit. Thus, Applied does not merely allege "interference with the market" as in Medtronic's cited case, *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996).

Medtronic also cites *Swingless Golf Club Corp. v. Taylor*, 2009 WL 2031768 at *4 (N.D. Cal. July 7, 2009), but that decision **denied** a motion to dismiss because "[a]lthough the complaint does not point to any single contract, it does allege a specific class of existing contracts that defendants purportedly induced the breach thereof." Here, Applied goes far beyond pointing to a "class" and instead points to specific hospitals. Compl. ¶¶120-21.

Finally, Medtronic cites *Roy Allan Slurry Seal, Inc. v. Am. Asphalt S., Inc.*, 213 Cal. Rptr. 3d 568 (2017), but that decision held there could be no tortious interference in biddings to a public entity because "each bidder is considered a stranger," "the bidding was sealed [and] there were no negotiations." *Id.* at 579. No such facts exist here. Applied plausibly alleges each element of tortious interference. Compl. ¶¶ 110, 120-21, 191-200.

## IV. <u>CONCLUSION</u>

For the reasons discussed above, the Court should deny Medtronic's motion.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: June 26, 2023            By: /s/ *Stephen W. Larson*
                                                 Stephen C. Jensen
                                                 Stephen W. Larson
                                                 Adam B. Powell

Attorneys for Plaintiff
APPLIED MEDICAL RESOURCES
CORPORATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Applied Medical Resources Corporation, certifies that this brief contains 6,683 words, which [choose one]:

✓ complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].


Dated:  June 26, 2023                    By: /s/ *Stephen W. Larson*
                                                   Stephen W. Larson