NICHOLAS LEEFER, Cal. Bar No. 286640
ERIC BROOKS
GEOFFREY M. GREEN
ALTUMASH MUFTI
MARK J. WOODWARD
Email: nleefer@ftc.gov
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW
Washington, DC 20580
Telephone: (202) 326-3573

JOHN D. JACOBS, Cal. Bar No. 134154
Local Counsel
Email: jjacobs@ftc.gov
FEDERAL TRADE COMMISSION
10990 Wilshire Boulevard, Suite 400
Los Angeles, CA 90024
Telephone: (310) 824-4300

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORP., *Plaintiff* <br><br> v. <br><br> MEDTRONIC, INC., *Defendant* | No. 8:23-cv-00268-WLH-DFM <br><br> **AMICUS BRIEF ON BEHALF OF THE FEDERAL TRADE COMMISSION** <br><br> **HEARING:** <br> **AUGUST 4, 2023** <br> **1:00 P.M.** <br> **COURTROOM 9B** <br><br> **HON. WESLEY L. HSU** |

EXHIBIT 1

# T<small>ABLE OF</small> C<small>ONTENTS</small>

Table of Authorities ................................................................................. ii

Interest of the Federal Trade Commission............................................. 1

Background .............................................................................................. 2

Argument.................................................................................................. 3

   A.  Exclusive-dealing plaintiffs need not allege the percentage of
      the market that has been foreclosed................................................. 4

   B.  Exclusive contracts can harm competition even when they are
      short-term, and a three-year term is not short................................ 8

   C.  Exclusive dealing may be unlawful even without a binding
      contract............................................................................................ 10

   D.  Exclusive-dealing plaintiffs need not plead that there are no
      "alternative distribution channels" ................................................ 12

   E.  Plaintiffs do not need to cite specific prices in order to plead
      unlawful bundling........................................................................... 13

   F.  Bundling claims do not challenge prices that are "too low" ......... 16

Conclusion ............................................................................................. 18

E<small>XHIBIT</small> 1

i

# TABLE OF AUTHORITIES

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016) ...................................................................11

*Allied Orthopedic Appliances v. Tyco Health Care Group,*
    592 F.3d 991 (9th Cir. 2010) ....................................................................11

*Arista Networks v. Cisco,*
    2017 WL 6102804 (N.D. Cal. 2017) .........................................................16

*Blue Sky Color of Imagination v. Mead Westvaco Corp.,*
    2010 WL 4366849 (C.D. Cal. 2010) .........................................................16

*Capital Radiology v. St. Peter's Hosp.,*
    2008 WL 11415918 (D. Mont. Mar. 6, 2008) ............................................8

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) .............................................................. 13, 14

*Crocs v. Effervescent,*
    248 F. Supp. 3d 1040 (D. Colo. 2017) ........................................................7

*E.I du Pont de Nemours and Co. v. Kolon Industries, Inc.,*
    637 F.3d 435 (4th Cir. 2011) ......................................................................6

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992) ....................................................................................4

*FTC v. Brown Shoe Co.,*
    384 U.S. 316 (1966) ..................................................................................14

*FTC v. Qualcomm Inc.,*
    2017 WL 2774406 (N.D. Cal. Jun. 26, 2017) ............................................6

*FTC v. Shkreli,*
    581 F. Supp. 3d 579 (S.D.N.Y. 2022) ........................................................2

*FTC v. Surescripts,*
    424 F. Supp. 3d 92 (D.D.C. 2020) ....................................................... 2, 10

Exhibit 1

ii

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
   2016 WL 7324091 (C.D. Cal. Oct. 26, 2016) ...................................................7

*Hip Hop Beverage v. Monster Energy*,
   733 F. App'x 380 (9th Cir. 2018) ...................................................................7

*In re Epipen Antitrust Litig.*,
   2017 WL 6524839 (D. Kan. Dec. 21, 2017) ........................................... 9, 18

*In re Surescripts Antitrust Litig.*,
   608 F. Supp. 3d 629 (N.D. Ill. 2022) ..................................................... 17, 18

*Inline Packaging v. Graphic Packaging International*,
   164 F. Supp. 3d 1117 (D. Minn. 2016). ..........................................................15

*Int'l Constr. Prod. LLC v. Caterpillar Inc.*,
   2016 WL 264909 (D. Del. Jan. 21, 2016) .....................................................13

*Landers v. Quality Commc'ns, Inc.*,
   771 F.3d 638 (9th Cir. 2014) ................................................................. 6, 15

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) ........................................................................15

*Masimo Corp. v. Tyco Health Care Group, L.P.*,
   2006 WL 1236666 ........................................................................................9

*McWane v. FTC*,
   783 F.3d 814 (11th Cir. 2015) .............................................................. 5, 11

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) .......................................................................12

*Nilavar v. Mercy Health System Western Ohio*,
   142 F. Supp. 2d 859 (S.D. Ohio 2000) ..........................................................9

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) .................................................................................5

*Omega Environmental v. Gilbarco*,
   127 F.3d 1157 (9th Cir. 1997) .......................................................... 6, 12, 13

EXHIBIT 1

*Orduno v. Hendrix*,
    2017 WL 11705427 (C.D. Cal. 2017) ............................................6

*PNY Technologies v. SanDisk*,
    2014 WL 2987322 (N.D. Cal. July 2, 2014) ....................... 8, 10, 12

*Pro Search Plus v. VFM Leonardo*,
    2013 WL 6229141 (C.D. Cal. Dec. 2, 2013)...............................10

*Randy's Ring & Pinion Service v. Easton*,
    2009 WL 10727790 (W.D. Wash. Nov. 16, 2009) ................... 7, 12

*Safeway v. Abbott*,
    2010 WL 147988 (N.D. Cal. 2010) ............................................16

*Standard Oil Co. of California v. United States*,
    337 U.S. 293 (1949) ....................................................................10

*Tampa Electric Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ........................................... 5, 9, 10, 11

*Tele Atlas v. NAVTEQ*,
    2008 WL 4809441 (N.D. Cal. Oct. 28, 2008) .............................8

*United States v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005) ............................................ 11, 12

*United States v. Microsoft*,
    1998 WL 614485 (D.D.C. Sept. 14, 1998)..................................9

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)......................................... 5, 15

*Western Parcel Express v. UPS*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998).........................................8

**Statutes**

15 U.S.C. § 14 ...........................................................................10

15 U.S.C. §§ 1, 2, 14, 45 ...............................................................4

15 U.S.C. §§ 41–58 .......................................................................1

EXHIBIT 1

**<u>Other Authorities</u>**

E. Elhauge, *Tying and Bundled Discounts*,
    123 Harv. L.R. 397 (2009) ..........................................................................14

F. Scott Morton & Z. Abrahamson, *A Unifying Analytical Framework for
    Loyalty Rebates*, 81 Antitrust L.J. 777 (2017)...............................................17

N. Economides, *Loyalty Rebates*, 54 Antitrust Bulletin 259 (2009) ......................14

S. Salop, *The Flawed Incremental Price-Cost Test*,
    81 Antitrust L.J. 371 (2017) ........................................................................14

EXHIBIT 1

The free and fair functioning of health care markets is vitally important to American consumers. In the last sixty years, American health care spending has soared from 5% to 18% of GDP.[1] Yet far too often, anticompetitive practices in these markets result in higher prices, lower quality, less innovation, and fewer choices.

The allegations in this case illustrate one way that this can happen: a dominant supplier of medical devices allegedly imposes exclusive-dealing and bundling arrangements that shut out rivals. The Federal Trade Commission takes no position on whether those allegations are accurate or state a claim. But in defending the charges, Medtronic makes arguments that have broad implications for antitrust enforcement in the health care sector and beyond. Some of these arguments are wrong. The FTC submits this amicus brief to correct some of Medtronic's erroneous assertions and mistaken legal points.

## INTEREST OF THE FEDERAL TRADE COMMISSION

The FTC is an independent agency charged with enforcing competition and consumer-protection laws. *See* 15 U.S.C. §§ 41–58. For many years, the FTC has enforced competition law and studied competitive issues in the health care sector.[2] It has investigated or challenged exclusive dealing and similar conduct in diverse

---

[1] U.S. Centers for Medicare & Medicaid, *National Health Expenditure Data: Historical*, https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/
nationalhealthexpenddata/nationalhealthaccountshistorical (click "NHE Summary, including share of GDP").

[2] Federal Trade Commission, *Health Care*, https://www.ftc.gov/industry/health-care.

EXHIBIT 1

1

health care markets, including markets for medical devices. *See, e.g.*, *FTC v. Surescripts*, 424 F. Supp. 3d 92 (D.D.C. 2020); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 625 (S.D.N.Y. 2022).[3] The FTC has also submitted amicus briefs in private health care antitrust cases to address legal arguments that, if widely credited, would improperly shield anticompetitive practices from antitrust scrutiny.[4] The FTC does so here too.

## BACKGROUND

Applied Medical and Medtronic both sell "advanced bipolar energy devices," a type of surgical equipment. Compl. ¶ 2.[5] Medtronic is the dominant U.S. seller, and Applied alleges that Medtronic's contracting practices violate the antitrust laws.

First, Applied objects to Medtronic's contracts with Group Purchasing Organizations (alliances of hospitals that "aggregate their purchasing power" to bring down costs). ¶6. Applied claims that Medtronic and certain GPOs have agreed that Medtronic shall be the GPOs' "'sole source' of advanced bipolar devices." ¶6. Hospitals, for their part, allegedly "face financial penalties" and other burdens under these contracts if they circumvent the GPOs. ¶87. So Medtronic's

---

[3] The FTC conducted a preliminary investigation of conduct in the markets at issue here. This should not be construed as a determination that violations did or did not occur.

[4] *See* Federal Trade Commission, *Legal Library: Amicus Briefs*, https://www.ftc.gov/legal-library/browse/amicus-briefs?field_industry=1357.

[5] D.E. 1.

EXHIBIT 1

2

exclusive contracts allegedly impede Applied from competing for hospitals' business. ¶91.

Second, Applied challenges Medtronic's bundling practices. ¶93. Apart from bipolar devices, Medtronic has a much larger business in other surgical products. ¶74. And Medtronic allegedly conditions discounts for these products on a hospital's also buying Medtronic's bipolar devices. ¶95. According to Applied, because it does not sell these other products, it cannot match Medtronic's bundled discounts and so cannot compete in the bipolar-device market, even though it offers a better product. ¶¶96,163.

**ARGUMENT**

Medtronic has moved to dismiss Applied's claims. In addition to case-specific arguments (which we do not address), Medtronic relies on artificial distinctions and flawed proposed pleading standards. Contrary to Medtronic's arguments:

- A plaintiff alleging unlawful exclusive dealing need not plead a numerical percentage of sales foreclosed.

- Exclusive contracts are not conclusively legal just because they are "short term" – and even if that were true, exclusive contracts that last three years are not short term.

- A contract can constitute exclusive dealing even if it is not formally binding. What matters, under Supreme Court precedent, is the contract's "practical effect."

EXHIBIT 1

3

- An exclusive-dealing plaintiff need not allege that there are no "alternative distribution channels."

- To plead unlawful bundling, an antitrust plaintiff need not specify the defendant's exact prices and costs.

- When an antitrust plaintiff challenges a defendant's bundled "discounts," it is not complaining that the defendant's prices are too low. A defendant's "discount" may be a self-serving label for a pricing structure under which no consumer actually receives a lower price.

In sum, antitrust law is fact-bound and turns on "actual market realities," not "formalistic distinctions." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 466–467 (1992).[6] The Court should reject the formalistic distinctions that Medtronic offers here.

### A. Exclusive-dealing plaintiffs need not allege the percentage of the market that has been foreclosed

Applied claims that Medtronic has engaged in unlawful exclusive dealing. In an exclusive-dealing scheme, a firm arranges for its customers or suppliers to limit their dealings with the firm's rivals. When an exclusive arrangement harms competition, it may violate Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission Act. 15 U.S.C. §§ 1, 2, 14, 45.

---

[6] Unless otherwise noted, this brief omits internal quotation marks, citations, and alteration marks in its quotations of court decisions.

EXHIBIT 1

4

In an exclusive-dealing case, "foreclosure" refers to potential transactions that the defendant has made unavailable to its rivals. Foreclosure evidence is not strictly necessary to show competitive harm, since a plaintiff can always rely on "direct evidence" of "reduced output, increased price, or decreased quality." *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018). But it becomes important when a plaintiff relies on "indirect evidence" to establish competitive harm: in an exclusive-dealing case, the most important indirect "proxy for anticompetitive harm" is "substantial fore-closure." *McWane v. FTC*, 783 F.3d 814, 835 (11th Cir. 2015); *see Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–28 (1961). In *United States v. Microsoft*, for example, the Government established its prima facie case of "harm to competition" by showing that Microsoft had monopoly power and "clos[ed] to rivals a substantial percentage of the available opportunities" in the browser market. 253 F.3d 34, 70–71 (D.C. Cir. 2001).

Medtronic argues (at 7)[7] that, to allege substantial foreclosure, an exclusive-dealing plaintiff must "offer factual allegations regarding the *portion of market-wide sales* that were foreclosed by the [defendant's] alleged conduct." This is incorrect. Indeed, an exclusive-dealing plaintiff need not "place an exact number on the percentage foreclosed" at *any* stage of the case. *McWane*, 783 F.3d at 837. The plaintiff can always rely on qualitative evidence, like evidence that the exclusive arrangement "tied up the key dealers" in the market. *Id.* at 838.

---

[7] All page references are to Medtronic's brief in support of its motion to dismiss, Doc. 19-1.

Exhibit 1

5

1    Even when a plaintiff does ultimately rely on a numerical figure, it need not

2    include the number in its complaint. Before discovery, "a plaintiff is not neces-

3    sarily required to allege a specific percentage of foreclosure." *FTC v. Qualcomm*

4    *Inc.*, 2017 WL 2774406, at *24 (N.D. Cal. Jun. 26, 2017) (quoting *E.I du Pont de*

5    *Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 452 n.12 (4th Cir.

6    2011)). After all, a complaint must offer "facts demonstrating" a legal wrong, not

7    "mathematical precision." *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 646

8    (9th Cir. 2014). The district court in *Qualcomm* thus rejected the argument that the

9    case should be dismissed because the plaintiff did not allege the percentage of the

10   market that was foreclosed. 2017 WL 2774406, at *24.

11   Demanding mathematical precision is especially improper at the pleading

12   stage because exact numbers are likely to be within the defendant's control. *See*

13   *generally Orduno v. Hendrix*, 2017 WL 11705427, at *11 (C.D. Cal. 2017). To

14   plead a foreclosure percentage, a plaintiff would need to know the defendant's

15   sales figures and contract terms. But "at the pre-discovery, motion-to-dismiss

16   stage," plaintiffs—especially private plaintiffs like Applied—"likely ha[ve] insuf-

17   ficient information to calculate" "a specific percentage of market foreclosure."

18   *Kolon*, 637 F.3d 435, 452 n.12. Demanding that plaintiffs allege a precise figure at

19   the pleading stage would thus conflict with federal pleading standards and be

20   "problematic." *Id.*

21   Medtronic's cited cases do not say otherwise. Medtronic first quotes from a

22   dissent to an opinion upholding a *trial* ruling. *Omega Environmental v. Gilbarco*,

23   127 F.3d 1157, 1167, 1170 (9th Cir. 1997) (Pregerson, C.J., dissenting). Neither

24

25   EXHIBIT 1

*Omega*'s majority nor the dissent rests on pleading standards or hints at Medtronic's proposed rule. In *Hip Hop Beverage v. Monster Energy*, the plaintiff's only relevant allegation was that "(at most) four brokers refused to do business with [it] due to [the defendant's] conduct." 733 F. App'x 380, 381 (9th Cir. 2018). So the court faulted the plaintiff for not alleging facts indicating substantial foreclosure. *Id.* The court did not require the plaintiff to allege a foreclosure percentage, and certainly did not announce a rule for all plaintiffs. *See also Hip Hop Beverage Corp. v. Monster Energy Co.*, 2016 WL 7324091, at *5 (C.D. Cal. Oct. 26, 2016) (dismissing the complaint because the claims were contradictory).

In Medtronic's other two cases, the complaints offered even fewer details about the challenged conduct. In one, the counterclaim plaintiff did not say what the defendant's policy was and alleged "no facts" about the amount of commerce foreclosed. *Crocs v. Effervescent*, 248 F. Supp. 3d 1040, 1058–1059 (D. Colo. 2017). In the other, the plaintiff did not clearly state that its sales were affected at all by the defendant's policies. *Randy's Ring & Pinion Service v. Easton*, 2009 WL 10727790, at *2 & n.1, *5 & n.5 (W.D. Wash. Nov. 16, 2009). Also, the plaintiff offered "little or no information" about the market, strength of the parties, or volume of commerce affected. *Id* at *5. Neither case faulted the plaintiff merely for omitting the portion of sales that was foreclosed.

The question for the Court is whether Applied's allegations plausibly suggest "substantial foreclosure." If they do, then whether Applied has also alleged a precise number is irrelevant.

EXHIBIT 1

7

## B. Exclusive contracts can harm competition even when they are short-term, and a three-year term is not short

Medtronic next argues (at 8) that it cannot have substantially foreclosed competition because its exclusive "contracts with GPOs are no longer than three years," which it labels a "relatively short duration."

The premise is wrong: exclusive contracts can harm competition even when they are short-term, and three years is not necessarily a "short duration" for an exclusive contract. Medtronic's quote comes from a summary-judgment decision involving contracts "ranging from 30 days to 3 years" that could be "terminate[d] for any reason" on "7, 10, or 30 days['] notice." *Western Parcel Express v. UPS*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998). In Medtronic's other case, the contracts were mostly "a year long," with only two contracts "more than two years long" and all "easily terminable" on at most "45-days' notice." *PNY Technologies v. SanDisk*, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014).

Indeed, courts often rule that three-year exclusive contracts can be illegal. In one case, for instance, the court found that three-year contracts for map data may have harmed competition given the "rapidly evolving market for personal navigation devices." *Tele Atlas v. NAVTEQ*, 2008 WL 4809441, at *17–18, 21 (N.D. Cal. Oct. 28, 2008). In *Capital Radiology v. St. Peter's Hospital*, the court found that a three-year contract for medical services was plausibly anticompetitive given the defendant's market power. 2008 WL 11415918, at *2, 4–5 (D. Mont. Mar. 6, 2008). Ditto for even shorter contracts: In *Nilavar v. Mercy Health System Western Ohio*, a radiology practice signed a two-year exclusive contract with a hospital. 142 F.

EXHIBIT 1

Supp. 2d 859, 878 (S.D. Ohio 2000). The arrangement plausibly harmed competition, the court held, because competing radiologists might not be able to wait around two years for another shot at winning the contract. *Id.*; *see also In re Epipen Antitrust Litig.*, 2017 WL 6524839, at *17 (D. Kan. Dec. 21, 2017) (rejecting motion to dismiss a challenge to contracts of one- to two-years' duration).

In any case, even relatively short exclusive contracts can be unlawful. Exclusive dealing is illegal when its "practical effect" is to foreclose commerce. *Tampa Electric*, 365 U.S. at 326. One way to foreclose commerce is to expressly lock up customers for a long stretch. But a dominant firm can use nominally short-term contracts to achieve the same end by, for example, employing its market power to force customers to keep renewing. Such a contract may appear "terminable on short notice on [its] face" but not be "in practice." *Masimo Corp. v. Tyco Health Care Group, L.P.*, 2006 WL 1236666, at *6 (C.D. Cal. Mar. 22, 2006), *aff'd*, 350 F. App'x 95 (9th Cir. 2009). Short-term contracts can harm competition just as much as long-term ones.

Short-term exclusive contracts can thus be illegal. In *United States v. Microsoft*, for instance, the court rejected the argument that "short-term" exclusive arrangements "cannot unreasonably restrain trade." 1998 WL 614485, at *20 (D.D.C. Sept. 14, 1998). While the contracts' length might be "appropriate to consider in a final determination," it did "not admit of, much less compel summary judgment." *Id.* Likewise, in *Pro Search Plus v. VFM Leonardo*, the court found that "short duration" exclusive contracts that "c[ould] be terminated upon short notice" were plausibly anticompetitive. 2013 WL 6229141, at *6–8 (C.D. Cal. Dec. 2,

Exhibit 1

9

2013). And in *Surescripts*, the court explained that "[e]ven if the [defendant's exclusive] contracts were short term and easily terminable," this had to be weighed against the "nature of the … relevant markets" and the defendant's "dominant monopoly position." *Surescripts*, 424 F. Supp. 3d at 104; *see also Standard Oil Co. of California v. United States*, 337 U.S. 293, 296 (1949) (condemning contracts that could be terminated twice a year, on 30 days' notice). By contrast, when courts do dismiss challenges to short-term contracts, they do so not merely because of the contracts' formal duration but because the plaintiff did not adequately plead that the contracts had "the 'practical effect' of unreasonably suppressing competition." *PNY Technologies*, 2014 WL 2987322, at *4.

### C. Exclusive dealing may be unlawful even without a binding contract

In the same vein, Medtronic argues (at 11, 12) that its contracts with GPOs are "not exclusive as a matter of law" because they do not "contractually obligate anyone to purchase anything." Medtronic likewise says (at 13) that if "there is no obligation to buy at all," then "the plaintiff cannot state an exclusive dealing claim."

These assertions defy decades of settled law. What matters under Supreme Court precedent, again, is not an arrangement's formal terms but its "practical effects." *Tampa Electric*, 365 U.S. at 326. This is plain from the text of the Clayton Act, which directs courts to assess all sorts of arrangements: not just express contracts, but also "price[s]," "discount[s]," or "rebate[s]" made "on the condition … that the [customer] shall not use or deal in the goods … of a competitor." 15 U.S.C. § 14. An arrangement can thus be illegal even if it "does not contain

EXHIBIT 1

specific agreements not to use the goods of a competitor." *Tampa Electric*, 365 U.S. at 326.

In *United States v. Dentsply*, for instance, the defendant manufacturer threatened to punish its dealers if they also dealt in rival products. 399 F.3d 181, 185 (3d Cir. 2005). This was illegal exclusive dealing because "the economic elements involved … realistically ma[d]e the agreements [t]here as effective as those in written contracts." *Id.* at 196. In *McWane* too, the defendant violated the law by penalizing disloyal distributors. 783 F.3d at 820–21.

The Court of Appeals said nothing different in *Allied Orthopedic Appliances v. Tyco Health Care Group*, 592 F.3d 991 (9th Cir. 2010). Although *Allied Orthopedic* did not feature a binding contract, that fact was hardly dispositive. Rather, the court affirmed summary judgment for the defendant because "on the facts of this case"—which included "no evidence" that consumers lost access to rivals—the plaintiff needed to show "something more." *Id.* at 997. The court never said that this "something more" must be a binding contract. And more recently, the Ninth Circuit suggested (without deciding) that nonbinding contracts "may be understood as 'de facto' exclusive dealing contracts." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016).

Medtronic's claim that exclusive dealing requires a binding contract that bars purchasing from a rival is thus inconsistent with the case law.

EXHIBIT 1

11

### D. Exclusive-dealing plaintiffs need not plead that there are no "alternative distribution channels"

Medtronic claims that the GPOs it deals with, and that are allegedly foreclosed to rivals, are "channels of distribution" from device makers to hospitals. From that premise, Medtronic reasons (at 10) that the Complaint should be dismissed for failing to "allege that there are no true alternative channels of distribution beyond [the GPOs]."

Even assuming that GPOs are a "channel of distribution," Medtronic is wrong. Exclusive dealing can harm competition by foreclosing *effective* channels. "The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market." *Dentsply*, 399 F.3d at 196; *cf. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015) ("For there to be an antitrust violation, generics need not be barred from all means of distribution if they are barred … from the cost-efficient ones.").

Medtronic's citations do not set out a different rule. In those cases, a substantial and sufficient alternative channel existed, or the plaintiff did not attempt to show otherwise. *See Omega*, 127 F.3d at 1163 (defendant made 30% of its sales without the allegedly foreclosed distributors, and another firm made 73%); *PNY Tech. Inc. v. SanDisk Corp.*, 2014 WL 1677521, at *7–8 (N.D. Cal. April 25, 2014) (defendant "ha[d] not articulated any reason why consumers would prefer" buying from the allegedly foreclosed retailers); *Randy's Ring*, 2009 WL 10727790, at *5 (plaintiff was not clearly foreclosed from even the "*defendant's* distribution network" (emphasis added)); *Int'l Constr. Prod. LLC v. Caterpillar*

Exhibit 1

12

*Inc.*, 2016 WL 264909, at *6 (D. Del. Jan. 21, 2016) (complaint identified rivals that had managed to "establish[] their own dealerships").

Even if the GPOs count as a distribution channel, the Complaint is not doomed just because hospitals can, in theory, incur a penalty and circumvent the GPOs. While this fact could be "relevant to assessing market foreclosure," the Court would still need to decide whether the existence of an alternative channel "eliminate[s] substantially any foreclosure effect." *Omega*, 127 F.3d at 1163.

### E. Plaintiffs do not need to cite specific prices in order to plead unlawful bundling

Medtronic argues (at 14) that to plead a bundling claim, Applied had to allege "the price [that the parties] charge and the discounts Medtronic offers." But that heightened pleading standard is not the law and would make bundling claims nearly impossible to bring.

"A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Bundling may be anticompetitive and violate the antitrust laws. *Id.* at 896. It is most concerning when a dominant firm sells a full bundle, while a smaller firm sells only some products in that bundle. Even if the smaller firm's products are better or cheaper, consumers may buy from the dominant firm in order not to lose the bundled price. Bundling can thus harm competition by excluding less diversified rivals. *Id.* at 897.

Exhibit 1

13

In the Ninth Circuit, to challenge bundled pricing under the Sherman Act, a private plaintiff must show that the defendant fails the "incremental" price-cost test, also known as the "discount-attribution" test.[8] *Id.* at 906. Suppose the defendant sells product A (which no one else sells) for $100; product B (which a rival does sell) for $60; and both together for $120, a $40 "discount." Consumers who want A must buy it from the defendant for $100. If they choose to buy product B from the defendant as well, then because of the $40 "discount," their effective price for B is $20, not the $60 list price. If the defendant's cost of making and selling B is less than this incremental price of $20, then the defendant passes the test and the claim fails. The logic is that if the defendant can make B for less than $20, then so can a rival who is as efficient as the defendant. Accordingly, the bundled pricing would not exclude an equally efficient rival.

The incremental price-cost test is controversial. *See, e.g.*, E. Elhauge, *Tying and Bundled Discounts*, 123 Harv. L.R. 397, 462–64 (2009); S. Salop, *The Flawed Incremental Price-Cost Test*, 81 Antitrust L.J. 371, 400, 403–05 (2017); N. Economides, *Loyalty Rebates*, 54 Antitrust Bulletin 259, 268–272 (2009). Excluding even a less-efficient rival from a concentrated market can harm competition and consumers. And yet the incremental price-cost test gives no protection to less-efficient rivals, even if the only reason they are less efficient is that they cannot operate at scale due to the very bundling at issue. *See* Elhauge, supra, at 463. Perversely, then, the test rewards the defendants whose bundling harms rivals the

---

[8] The Ninth Circuit has not addressed the test for bundling under the broader FTC Act, which the FTC enforces. *See FTC v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966).

EXHIBIT 1

14

most. It also gives "monopolists free rei[n] to squash nascent, albeit unproven, competitors at will"—something "inimical to the purpose of the Sherman Act." *Microsoft*, 253 F.3d at 79. For these and similar reasons, the FTC does not endorse the test. Nor does the Third Circuit. *See LePage's Inc. v. 3M*, 324 F.3d 141, 151–52 (3d Cir. 2003).

The test, of course, binds private plaintiffs in the Ninth Circuit. But given that the test already under-protects competition, the Court should be especially wary of endorsing a mistakenly high pleading standard. Yet Medtronic proposes just that. Medtronic faults Applied (at 14) for omitting "supporting allegations about the price [that the parties] charge and the discounts Medtronic offers." Its objection seems to be that Applied does not allege numerical values. But such allegations are not required. As discussed above, a complaint does not need "mathematical precision." *Landers*, 771 F.3d at 646. A private plaintiff like Applied will rarely know its rival's prices or costs. If it had to allege those facts to state a claim, then challenging anticompetitive bundling would be nearly impossible.

Many bundling claims have survived a motion to dismiss without offering numerical evidence. In one case, the plaintiff alleged that "it [wa]s more efficient than [the defendant]" but could not "profitably offer [its product] at a price sufficiently low to compete with the discounts provided in [the defendant's] bundles." *Inline Packaging v. Graphic Packaging International*, 164 F. Supp. 3d 1117, 1129 (D. Minn. 2016). This was enough. *Id.* Another plaintiff adequately stated a bundling claim by alleging a "substantial" bundled discount that left the incremental "resulting price" below the defendant's "average variable cost." *Safeway v.*

EXHIBIT 1

15

*Abbott*, 2010 WL 147988, at *5 (N.D. Cal. 2010). And for a third plaintiff, it was enough to allege that the defendant "use[d] a bundling pricing scheme to sell dated goods below cost." *Blue Sky Color of Imagination v. Mead Westvaco Corp.*, 2010 WL 4366849, at *4–5 (C.D. Cal. 2010).

Medtronic has not identified any case endorsing its heightened pleading standard. In its only citation for this point (at 14), *Arista Networks v. Cisco*, the plaintiff offered no support at all for its bundling claim, even though it "must have obtained some information, for example, from its customers, to make it believe that [the defendant] [wa]s pricing below incremental costs." 2017 WL 6102804, at *14 (N.D. Cal. 2017). *Arista* did not say that a plaintiff must plead the "amount" of the discount; it said merely that the plaintiff must give some supporting facts, which could be the amount "or" something else. *Id.* at *13–14.

The incremental price-cost test is demanding enough after full discovery. If private plaintiffs had to plead numerical pricing evidence to even get discovery, then bundling by monopolists would be nearly per se legal. That is not the law.

### F. Bundling claims do not challenge prices that are "too low"

Finally, Medtronic asserts (at 1, 4–5, 13) that Applied, in challenging Medtronic's bundling tactics, is faulting Medtronic for offering "prices [that] are too low." But this assertion misunderstands the economic theory of a bundling claim. In a bundling claim, the plaintiff does not challenge the absolute level of the defendant's prices. Rather, it objects to a *pricing differential* between "loyal" customers who buy the full bundle from the monopolist and "disloyal" customers

EXHIBIT 1

16

who do not. A bundling claim challenges the condition that customers must satisfy to get the best deal.

Such *conditional* pricing is far more suspect than an across-the-board price cut. Indeed, conditional pricing need not result in any consumer getting a lower price. As every consumer knows, "discount" can be a self-serving, misleading label. For example, a firm might originally charge $80 for staples and $40 for bipolar devices. It could then raise its prices to $100 for staples and $40 for bipolar devices, but offer a $20 "discount" for customers who buy both products. Despite the nominal discount, no consumer is better off. Loyal customers pay the same $120 that they paid before. Only now, disloyal customers—those who want to buy bipolar devices elsewhere—must pay $20 more for the staples than they did before. There is a "discount" compared only to the defendant's new higher baseline.

In other words, bundling can "induce[] the buyer to purchase additional units … not by offering the buyer direct savings" but by charging "a penalty for disloyalty." F. Scott Morton & Z. Abrahamson, *A Unifying Analytical Framework for Loyalty Rebates*, 81 Antitrust L.J. 777, 786 (2017); *cf. In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 637 (N.D. Ill. 2022) (upholding a complaint claiming that a "differential between [the defendant's] loyalty rate and its non-loyalty rate" was a "penalty for using a rival's [product]" that helped consolidate its monopoly). In the short run, no buyer gets a lower price, while some pay more. And in the long run, the firm might starve the competition, force exit, and be able to charge everyone more. A true unconditional discount cannot work this way.

Exhibit 1

17

Courts are thus skeptical of defendants who label their conditional prices a "discount." In the Illinois *Surescripts* case, for instance, the court recognized that a loyalty "discount" can induce exclusivity that ultimately leads to "higher market prices." *Id.* at 646. In another case, the court explained that "conditional rebates" can amount to "anticompetitive conduct—beyond [low] pricing itself" by excluding rivals and "protect[ing] [a] monopoly." *In re EpiPen*, 2017 WL 6524839, at *7. These cases involved *single*-product, not bundled, "discounts," but the point is the same: not every self-described "discount" leads to lower prices for consumers. The Court should reject that framing of the case.

**CONCLUSION**

The FTC submits these points for the Court's consideration.

EXHIBIT 1

1

2 Dated: July 3, 2023                    Respectfully submitted,

3                                         /s/ *Nicholas Leefer*
   HOLLY VEDOVA                           NICHOLAS LEEFER
4  *Director*                             ERIC BROOKS
                                          GEOFFREY M. GREEN
5  RAHUL RAO                              ALTUMASH MUFTI
   *Deputy Director*                      MARK J. WOODWARD
6                                         *Attorneys*
7  Federal Trade Commission              Federal Trade Commission
   Bureau of Competition                 Bureau of Competition
8                                         600 Pennsylvania Avenue, NW
                                          Washington, DC 20580
9                                         Telephone: (202) 326-3573
                                          Email: nleefer@ftc.gov
10
11                                        JOHN D. JACOBS
                                          Federal Trade Commission
12                                        10990 Wilshire Boulevard, Suite 400
                                          Los Angeles, CA 90024
13                                        Telephone: (310) 824-4300
                                          Email: jjacobs@ftc.gov
14
15                                        *Attorneys for Amicus Federal Trade*
                                          *Commission*
16
17
18
19
20
21
22
23
24
25 EXHIBIT 1