1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

APPLIED MEDICAL RESOURCES
CORPORATION, a California
corporation

Plaintiff,

v.

MEDTRONIC, INC., A Minnesota
corporation,

Defendant.

Case No.  8:23-cv-00268-WLH-DFM

**REDACTED ORDER RE MOTION
FOR SUMMARY JUDGMENT [146]**

The Court is in receipt of Defendant's Motion for Summary Judgment.  For the
following reasons, the Court **DENIES** the Motion.

I.    **BACKGROUND**

A.    **Factual Background**

This is an antitrust action.  Both Applied Medical Resources Corporation
("Applied") and Defendant Medtronic, Inc. ("Medtronic") produce advanced bipolar
devices ("ABDs")—surgical devices "that precisely control and deliver electrical
current to cut tissue and seal vessels."  (Order re Daubert Motion, Docket No. 197 at
1).  Medtronic sells its ABD under the name "Ligasure;" Applied sells its ABD under
the name "Voyant."  (*Id.* at 2).

Some hospitals purchase ABDs and other medical devices through contracts
negotiated directly with a supplier, known as locally negotiated agreements ("LNAs").
(*Id.*)  LNAs sometimes provide discounts to hospitals in exchange for their

1  commitment to purchase a set volume of products, or percentage of needs, from the

2  supplier.  (JAF 104).  Some hospitals purchase ABDs and other medical devices

3  through contracts negotiated by Group Purchase Organizations ("GPOs").  (Order re

4  Daubert Motion at 2).  GPOs often negotiate contracts that allow members to choose

5  between different tiers of purchasing commitments which come with varying

6  discounts.  (Stip. Ex. 28, Docket No. 251-8 ("Orszag Dep. Tr.") at 124:5-126:23).

7  Applied refers to a hospital's selection of a given tier as a "GPO Tier Commitment

8  Agreement."  (Applied Supplemental Brief, Docket No. 240 at 5).  The Court adopts

9  this nomenclature.

10  Applied alleges that Medtronic uses anti-competitive LNAs and GPO Tier

11  Commitment Agreements to maintain and enlarge Medtronic's alleged monopoly over

12  ABDs.  (*Id.*; Complaint, Docket No. 1 ¶ 6).  In particular, Applied argues that

13  Medtronic engages in two types of exclusionary conduct (1) offering anti-competitive

14  bundled discounts (id.); and (2) engaging in de facto exclusive dealing which

15  forecloses a substantial share of competition in the ABD market (Order re Daubert

16  Motion at 2; Complaint ¶¶ 153-54).

17  ## B.    Procedural Background

18  Applied filed suit against Medtronic on February 14, 2023.  (Complaint).  On

19  January 17, 2025, Medtronic filed the instant Motion for Summary Judgment ("the

20  Motion").  (Mot., Docket No. 146).  The parties filed applications file under seal

21  documents related to the Motion and Applied's Reply to the Motion.  (Docket Nos.

22  144, 153).  On February 28, 2025, the Court held a hearing on the Motion and took the

23  matter under submission.  (Docket No. 189).  On April 11, 2025, the Court ordered

24  supplemental briefing on the topic of exclusive dealing.  (Docket No. 198).  In the

25  same order, the Court noted that it was inclined to deny the parties' applications to file

26  documents under seal and invited the parties to submit a joint application correcting

27  identified deficiencies.  (Docket No. 198).  The parties filed timely supplemental

28  briefs.  (Docket Nos. 240, 250).  The parties filed a renewed joint application to file

2

1  documents related to the Motion under seal.  (Docket No. 251).  The parties submitted

2  Joint Brief with newly proposed redactions (Joint Brief, Docket No. 251-4), a Joint

3  Appendix of Facts ("JAF"), which the parties sought to seal in its entirety (JAF,

4  Docket No. 251-5) and over 600 stipulated exhibits (Docket Nos. 251-8 through 251-

5  40).

6  **II.    SUMMARY JUDGMENT LEGAL STANDARD**

7         Summary judgment is appropriate when the pleadings, the discovery and

8  disclosure materials on file, and any affidavits "show that there is no genuine issue as

9  to any material fact and that the movant is entitled to judgment as a matter of law."

10  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (cleaned up).  The

11  moving party bears the initial burden of identifying the elements of the claim or

12  defense and evidence that it believes demonstrates the absence of an issue of material

13  fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322−23 (1986).  Where the record "taken

14  as a whole could not lead a rational trier of fact to find for the nonmoving party, there

15  is no genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

16  475 U.S. 574, 587 (1986) (cleaned up).

17         The Court must draw all reasonable inferences in the nonmoving party's favor.

18  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,*

19  477 U.S. at 252).  Nevertheless, it is the nonmoving party's obligation to produce

20  factual predicates from which an inference may be drawn.  *Richards v. Nielsen*

21  *Freight Lines,* 602 F. Supp. 1224, 1244−45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th

22  Cir. 1987).  "[M]ere disagreement or the bald assertion that a genuine issue of material

23  fact exists" does not preclude summary judgment.  *Harper v. Wallingford*, 877 F.2d

24  728, 731 (9th Cir. 1989); *see also Frederick S. Wyle Prof. Corp. v. Texaco, Inc.*, 764

25  F.2d 604, 612 (9th Cir. 1985) (holding that "bald assertions, absent any evidentiary

26  base, are insufficient" to preclude summary judgment).

27

28

III.   **FEDERAL ANTITRUST CLAIMS**

Applied brings multiple causes of action under federal antitrust laws, including Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. (Complaint ¶ 15). Parties appear to agree that in order to prevail, Applied must show that Medtronic's conduct is exclusionary and that the conduct caused antitrust injury. Medtronic contends that Applied cannot show either of these elements.

A.   **Exclusionary Conduct**

Applied contends that Medtronic engages in two types of exclusionary conduct: anti-competitive bundling and exclusive dealing. Medtronic argues that it is entitled to summary judgment on both theories of exclusionary conduct. (Joint Brief at 17).

*1. Bundling*

While bundled discounts "generally benefit" consumers, Ninth Circuit case law is clear that discount bundling can be anti-competitive, exclusionary conduct. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 895-96 (9th Cir. 2008). In the Ninth Circuit, fact-finders apply the Discount Attribution Test ("DAT") to determine whether bundling discounts are exclusionary. *Id.* at 910.

> To prove that a bundled discount was exclusionary . . . the plaintiff must establish that, after allocating the discount given by the defendant on the entire bundle of products to the competitive product or products, the defendant sold the competitive product or products below its average variable cost of producing them.

*Id.* "This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product." *Id.* at 906.

The parties contest what additional requirements *PeaceHealth* imposes on a plaintiff claiming that bundled discounts constitute exclusionary conduct. Parties contest (a) whether the DAT analysis must show substantial

4

foreclosure of competitors; and (b) whether a plaintiff must show market or
monopoly power over all or some products in a bundle.

a.  Foreclosure

Medtronic argues that Applied can only prevail on its bundling theory of
anticompetitive conduct if the DAT shows substantial foreclosure of competitors,
which Medtronic defines as exclusion from at least 40% of the relevant market.  (Joint
Br. at 20 (*citing Omega,* 127 F.3d at 1162 (finding 38% foreclosure insufficient for
plaintiff to prevail on an exclusive dealing claim)*; Power Analytics,* 2018 WL
10231437 at *18 (requiring plaintiff to establish foreclosure from "40% to 50% of the
relevant market" to prevail on an exclusive dealing))).  Because Applied's expert
confirmed that, at most, ███ of ABD revenues stem from DAT-failing bundles,
Medtronic argues that Applied has not shown substantial foreclosure and that
Applied's bundled discount theory of exclusionary conduct fails as a matter of law.
(Joint Brief at 21 (citing Stip. Ex. 28 ("Orszag Dep. Tr."), Docket No. 251-8 at
209:13-19) ("Q. So your Discount Attribution Test shows that ██ percent of the
relevant market that you defined for U.S. sales of advanced bipolar devices is priced
below an equally efficient competitor's costs? A. Just looking at the Discount
Attribution Test, that is correct.")))

Applied contends that Medtronic has the law wrong.  (Joint Brief at 29).
Applied argues that Medtronic impermissibly imports a foreclosure requirement from
case law evaluating exclusive dealing claims.  (*Id.* (*citing In re Payment Card
Interchange Fee & Merch. Disc. Antitrust Litig.*, 729 F. Supp. 3d 298, 328 (E.D.N.Y.
2024) (finding that plaintiff need not show competitive foreclosure to survive
summary judgment on a discount bundling claim))).  The Court agrees.

Medtronic's cited authority discusses foreclosure only in the context of
exclusive dealing claims.  (Joint Brief at 20 (citing *Power Analytics*, 2018 WL
10231437 at *18; *Omega*, 127 F.3d at 1162; *Twin City Sportservice*, Inc. v. Charles O.
Finley & Co., 676 F.2d 1291, 1304-05 (9th Cir. 1982); *Tampa Elec. Co. v. Nashville*

5

1  *Co.*, 365 U.S. 320, 328-29 (1961))).[1]  Further, *PeaceHealth* does not require plaintiffs

2  to show substantial foreclosure of competition to prove that a bundled discount was

3  exclusionary.  *PeaceHealth*, 515 F.3d at 910 (summarizing test to prove that a bundled

4  discount was exclusionary).  Under *PeaceHealth*, if a bundle fails the DAT test, a

5  finder of fact may find that the bundle is exclusionary.  *Id.* at 906.  The Ninth Circuit

6  declined to add additional elements to this test.  *Id.* at 910 n.21 (rejecting two

7  additional elements proposed by the Antitrust Modernization Commission).  In

8  particular, the Ninth Circuit declined to require that plaintiffs demonstrate an adverse

9  effect on competition in order to show that a bundled discount program is

10 exclusionary.  *Id.* ("[W]hile adopting the [Antitrust Modernization Commision]'s

11 proposal to require below-cost sales to prove exclusionary conduct . . . we do not

12 adopt the element of 'adverse effect on competition' as we think that is superfluous in

13 light of the general and pre-existing requirement of antitrust injury under

14 *Brunswick.*").

15        Because Applied need not show substantial foreclosure on its bundling claim,

16 the Court cannot grant summary judgment to Medtronic on the grounds that Applied's

17 DAT failed to demonstrate substantial foreclosure.  Applied has raised a triable issue

18 of fact that hundreds of Medtronic's bundled discounts fail the DAT.  (Orszag Reply

19

20

21        _____

22 [1] After the Court took the Motion for Summary Judgment under submission,
   Medtronic filed a Notice of Supplemental Authority regarding *American President*
23 *Lines, LLC v. Matson*, No. 21-CV-2040 (CRC), 2025 WL 870383 (D.D.C. Mar. 19,
   2025).  A footnote suggests that the District Court of the District of Columbia
24 assumed that a plaintiff must show substantial foreclosure to prevail on a bundling
   claim.  *Id.* at *23 n.6 (noting that the court need not reach the issue of whether a
25 bundled discount must be below cost to be anticompetitive because plaintiff "has not
   shown substantial foreclosure.").  Given the terse treatment of the issue in *American*
26 *President Lines* and the fact that Ninth Circuit's DAT varies from that of its sister
27 Circuits, *American President Lines* has limited persuasive value.

28

1  Report, Docket No. 182-13 ¶ 18; *id.* n. 159).  Under *PeaceHealth*, a trier of fact could

2  find that these bundled discounts are exclusionary.

3                                        b.  Market power

4       Medtronic next argues that Applied cannot, as a matter of law, show that

5  Medtronic's bundled discounts are exclusionary because Applied cannot demonstrate

6  that Medtronic has monopoly or market power over products bundled with ABDs.

7  (Joint Brief at 24).  Applied concedes that it cannot show that Medtronic has

8  monopoly or market power over the relevant market for every item in the bundle but

9  argues that it need not make such a showing.  (Joint Brief at 32).

10      As established in the Court's *Daubert* order, the Court agrees that Applied need

11  not show monopoly or significant market power over every item in a bundle; there is

12  simply no support in Ninth Circuit case law for such a requirement.  (Order re Daubert

13  Motion at 16-17).  Instead, Ninth Circuit case law and persuasive authority clarify that

14  the DAT test is relevant when "one of the competitors produces fewer goods or

15  services than the other competitor."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836

16  F.3d 1171, 1186–87 (9th Cir. 2016); *see also PeaceHealth*, 515 F.3d at 909 ("[T]he

17  primary anticompetitive danger posed by a multi-product bundled discount is that

18  such a discount can exclude a rival who is equally efficient at producing the

19  competitive product simply because the rival does not sell as many products as the

20  bundled discounter."); Antitrust Law: An Analysis of Antitrust Principles and Their

21  Application (CCH) 749(d) ("When no significant rival produces the full range of

22  products that are subject to the package discount, then the package can be said to

23  'exclude' if the price of the 'tied' component is below average variable cost when the

24  discounts on all elements are attributed to that component.").

25      So long as Applied has raised a triable issue of fact that Medtronic "has exclusive

26  capacity" to create the bundles at issue, a trier of fact can use the DAT to determine if

27  the bundles are anti-competitive.  *See Aerotec*, 838 F.3d at 1187 ("It is the fact that the

28  bundling competitor has exclusive capacity to 'bundle' multiple products and absorb

the cost of the total discount without experiencing a decline in profits that gives rise to the possibility that it could force out a 'hypothetical equally efficient producer of the competitive product.") (quoting *PeaceHealth*, 515 F.3d at 906).

Orszag's expert report and reply report present evidence that neither Applied nor other competitors offer the full range of items in Medtronic's bundles. (Stip. Ex. 4 ("Orszag Report"), Docket No. 251-8 ¶¶ 261-264; Orszag Reply Report ¶¶ 25-26). Orszag further provides analysis that Applied cannot feasibly work with other suppliers to approximate Medtronic's bundles. (Orszag Report ¶¶ 261-264; Orszag Reply Report ¶¶ 25-26). The Court finds that Applied raises a triable issue of fact that Applied has a monopoly on portfolio breadth such that a fact finder can apply the DAT and determine if Medtronic's bundling practices are anticompetitive. [2]

Because Applied raises a triable issue of fact that Medtronic has a monopoly over portfolio breadth, the Court cannot grant the Motion as to the bundling claims on the grounds that Applied failed to show sufficient market of monopoly power.

### 2. Exclusive Dealing

Applied's second theory of exclusionary conduct is that Medtronic has engaged in de-facto exclusive dealing through its LNAs and its GPO Tier Commitment Agreements.[3] (Applied Supplemental Brief at 1). "Exclusive dealing involves an

---

[2] Given the finding that Applied has raised a triable issue of fact as to portfolio breadth, which is sufficient to defeat Medtronic's Motion on the bundling claim, the Court does not reach Applied's argument that it raises triable issues of material fact that Medtronic holds market power in three relevant markets or that Applied raises triable issues of material fact that Applied holds monopoly power over the relevant ABD market.

[3] While the Ninth Circuit has "not explicitly recognized a 'de facto' exclusive dealing theory," *Aerotec*, at 1182, case law counsels that an agreement's formal terms need not specify exclusivity—what matters is the contract's "practical effects." *Tampa Elec.*, 365 U.S. at 326; *see also Masimo Corp. v. Tyco Health Care Grp., L.P.*, 350 F. App'x 95, 97-98 (9th Cir. 2009) (upholding exclusive dealing jury verdict against defendant when defendant entered into market share agreements that constituted *de facto* exclusive dealing); *CoStar Grp., Inc. v. Com. Real Est. Exch.*, Inc., 141 F.4th

1   agreement between a vendor and a buyer that prevents the buyer from purchasing a

2   given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health*

3   *Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "In certain limited situations,

4   discounts and rebates conditioned on a promise of exclusivity or on purchase of a

5   specified quantity or market share of the seller's goods or services may be understood

6   as 'de facto' exclusive dealing contracts because they coerce buyers into purchasing a

7   substantial amount of their needs from the seller." *Aerotec*, 836 F.3d at 1182.

8       Because there are "well-recognized economic benefits to exclusive dealing

9   arrangements," exclusive dealing is not *per se* illegal. *Omega Env't, Inc. v. Gilbarco,*

10  *Inc*., 127 F.3d 1157, 1162 (9th Cir. 1997). Courts thus "analyze challenges to

11  exclusive dealing arrangements under the antitrust rule of reason." *Id.* (*citing Twin*

12  *City*, 676 F.2d at 1302). In applying the rule of reason to exclusive dealing claims, the

13  Ninth Circuit has emphasized, "[o]nly those arrangements whose 'probable' effect is

14  to 'foreclose competition in a substantial share of the line of commerce affected'

15  violate Section 3." *Id.*; *Allied*, 592 F.3d at 996 (stating the same for Section 1

16  exclusive dealing claims). A critical inquiry regarding substantial foreclosure is

17  whether the challenged contracts are *in practice* terminable on short notice. *Omega*,

18  127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements

19  negate substantially their potential to foreclose competition.").

20      To resolve the instant Motion, the Court must answer two intertwined questions.

21  First, does Applied raise a triable issue of fact that Medtronic's LNA and GPO Tier

22  Commitment Agreements constitute de facto exclusive dealing? If so, does Applied

23  raise a triable issue of fact that Medtronic's de facto exclusive dealing forecloses

24  competition in a substantial share of the ABD market? Two cases decided by the

_____

27  1075, 1091 (9th Cir. 2025) ("To dismiss an exclusive dealing claim just because a
    contract does not expressly require exclusivity would be the type of overly formalistic

28  rule that the Supreme Court has cautioned against in antitrust cases.").

1    Honorable Mariana R. Pfaelzer of this Court which evaluated similar discount
2    programs at two points of time are instructive.

3        In *Masimo*, this Court sustained a jury's finding that market share discount
4    agreements constituted anticompetitive exclusive dealing.  Through the agreements,
5    defendant Tyco Health Care Group ("Tyco") rewarded hospitals' commitments to buy
6    greater percentages of their oximetry needs with increased discounts on pulse
7    oximetry sensors.  *Masimo Corp. v. Tyco Health Care Grp.*, L.P., No. CV 02-4770
8    MRP, 2006 WL 1236666, at *4 (C.D. Cal. Mar. 22, 2006), *aff'd*, 350 F. App'x 95 (9th
9    Cir. 2009).  At the time period relevant to the claims, Tyco's pulse oximetry monitors
10   only worked with Tyco pulse oximetry sensors.  *Id.*  This meant that some hospitals
11   were "locked into" the purchase of Tyco pulse oximetry sensors "for the duration of
12   the useful life of their installed Tyco monitors."  *Id.*  Despite provisions in the market
13   share discount agreements allowing hospitals to terminate their agreement on short
14   notice, *id.* at *5, the "fixed demand for Tyco sensors for an extended period of time,
15   when combined with the market share discounts, effectively prevented the hospitals
16   from purchasing sensors outside of the market share discount agreements on short
17   notice." *Id.* at *6.  The jury, therefore, could have reasonably concluded that market
18   share discount agreements constituted de facto exclusive dealing.  *Id.*

19       The Court further found that the jury could have reasonably concluded that
20   Tyco's de facto exclusive dealing foreclosed a substantial share of the market.  *Id.*
21   The Court explained that while "there is no set percentage for how much of the
22   relevant market must be foreclosed," *id.* at *4, the Ninth Circuit had previously found
23   that 24% market foreclosure was sufficient to trigger antitrust liability when an
24   exclusionary agreement was not terminable on short notice.  *Id* at *6 (citing *Twin City,*
25   676 F.2d at 1298).  Because the jury in *Masimo* could conclude that competitors were
26   foreclosed from greater than 24% of the market, the Court upheld the jury's verdict of
27   liability as to market share discounts agreements.  *Id.*  The Ninth Circuit affirmed the
28   opinion.  *Masimo*, 350 F. App'x at 97-98.

10

1       About two years later, in *Allied*, the Court found as a matter of law that Tyco's
2   market share discount agreements no longer constituted exclusive dealing.  *Allied*
3   *Orthopedic Appliances, Inc. v. Tyco Health Care Grp. L.P.*, No. CV, 2008 WL
4   7346921, at \*4-6 (C.D. Cal. July 9, 2008), *aff'd sub nom. Allied Orthopedic*
5   *Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010).  The
6   Court's finding was premised on changed conditions regarding the pulse oximeter
7   monitors.  In the time period relevant to the claims in *Allied*, Masimo "gained the
8   technological ability to convert whole hospitals from Tyco to Masimo oximetry
9   products."  *Id.* at \*4.  Further, given the expiration of relevant patents, Tyco's pulse
10  oximeter monitors became compatible with generic pulse oximetry sensors.  *Id.*  Due
11  to these changes, hospitals were no longer "locked" into purchasing Tyco sensors for
12  use with their Tyco monitors.  *Id.*

13      Under these changed conditions, the Court found that hospitals were free to walk
14  away from market share discount agreements for a better deal such that the
15  agreements were, in practice, terminable on short notice.  *Id.*  The Court, therefore,
16  concluded that agreements did not constitute exclusive dealing.  *Id.* at \*5-6.  As with
17  *Masimo*, the Ninth Circuit affirmed the Court's decision.  *Allied*, 592 F.3d at 996-68
18  (affirming relevant portion of lower court order).  In doing so, the Ninth Circuit
19  emphasized that "[o]n the facts of this case, something more than the discount itself is
20  necessary to prove that Tyco's market-share discount agreements forced customers to
21  purchase its sensors rather than generics."  *Id.* at 997.

22                  a.   De facto exclusive dealing

23      Here, the Court finds that there is a triable issue of fact that "something more
24  than the discount itself" forces customers to purchase ABDs from Medtronic.  There is
25  likewise a triable issue of fact regarding whether Medtronic's LNAs and Tier
26  Commitments are terminable on short notice.  In sum, there is a triable issue of fact
27  that Medtronic's challenged agreements constitute de facto exclusive dealing.  Two
28  categories of evidence inform this finding.  First, the summary judgment record raises

1    a triable issue of fact that Medtronic's generators, and financing agreements regarding

2    those generators, lock customers into purchasing Medtronic's ABDs.  Second, the

3    summary judgment record raises a triable issue of fact that Medtronic precludes

4    hospitals from conducting trials of other ABDs.

5        Medtronic's generators only power LigaSure devices, including ABDs.  (Orszag

6    Report ¶ 207).  LigaSure ABDs, in turn, can only be powered by Medtronic

7    generators.  (*Id.*)[4]  Hospitals procure Medtronic generators through two types of

8    capital equipment agreements offered by Medtronic.  (*Id.* ¶¶ 207-210).  First, under

9    the Royalty Free License Agreement ("RFA") program, Medtronic provides

10    generators with royalty-free licenses on the condition of hospitals committing to a

11    minimum annual spend on certain products, ▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 208).  If

12    hospitals fail to meet the committed minimum spends, they must pay fees *and* return

13    generators to Medtronic.  (*Id.*).  Alternatively, under the Capital Purchase Program

14    Agreement ("CPP"), hospitals hold the title to generators and pay for them in annual

15    installments.  (*Id.* ¶ 209).  Hospitals earn discounts on the generators based on their

16    commitment to minimum spends in other categories of devices.  (*Id.*)  If a hospital

17    fails to meet its minimum spend commitment, it is liable for penalties as large as

18    ▮▮▮▮ of the purchase price of the generator.  (*Id.* ¶ 210).  T

19        The summary judgment record further reflects that Medtronic staggers its various

20    agreements with hospitals, such that some capital equipment agreements with

21    hospitals remain active after bundled discounts on ABDs expire.  (*Id.* ¶ 203).  Emails

22    between Medtronic employees reflect that at least some Medtronic employees

23    believed that capital equipment agreements preclude competition from hospitals.  (*Id.*

24    ¶ 211 N. 529 (email reflecting that CPP program used to keep "Applied ▮▮▮

25

26    _____

27    [4] Two competitors, Medline and Stryker, sell reprocessed LigaSure ABDs which, by
     virtue of being LigaSure ABDs, are compatible with the generators.  (Orszag Report ¶

28    33 N. 59).

1  ███████ out of" a certain health system); Stip. Ex. 471, Docket No 252-26 at ECF

2  Pg 37 (email reflecting that Applied's presentation of Voyant System at a hospital

3  "won't go anywhere" because of "Co-Op [CPP] and recently signed Energy

4  Agreement")).

5      To summarize, Medtronic Generators only power LigaSure ABD devices,

6  hospitals procure Medtronic Generators through capital equipment agreements which

7  impose high penalties for failure to meet minimum spend requirements for ABDs and

8  other device, and, in at least some cases, Medtronic staggers its capital equipment

9  agreements and other purchasing agreements such that a capital equipment agreement

10 might remain in place even after an LNA or Tier Commitment agreement expires.

11 There is a triable issue of fact that these conditions—when paired with the bundled-

12 discounting practice summarized earlier in the order—"lock" hospitals into continuing

13 to purchase LigaSure ABDs and prevent hospitals from easily terminating their LNAs

14 or Tier Commitment agreements.  In other words, there is a triable issue of fact as to

15 whether Medtronic's LNAs and Tier Commitment agreements are de facto exclusive.

16      An additional category of summary judgment evidence raises a trial issue of fact

17 that Medtronic's challenged agreements constitute de facto exclusive dealing.  It is

18 undisputed that "hospitals are unlikely to convert in the absence of a product trial."

19 (JAF ¶ 276).  The summary judgment record raises a question of fact regarding

20 whether Medtronic blocks hospitals with bundled discounts from trying other ABDs.

21 Internal Medtronic records suggest that Medtronic may attempt to block competitive

22 trials.  A slide from a strategy meeting in Arizona titled notes "[i]f accounts begin

23 competitive trials, communicate violation of our pricing agreements and be prepared

24 to take them to access/list tier."  (Stip. Ex. 422, Docket No. 252-22 at ECF No. 781).

25 As another example, in an email between Medtronic employees discussing potential

26 contract terms to propose to a hospital, a Medtronic employee conveyed: "[s]etting

27 proper expectations, if [the hospital] threatens to trial Applied again, we default to

28

1   ███████████████████████[5] (Stip. Ex. 474, Docket No. 252-26 at ECF No. 58).  An

2   additional email exchange between Medtronic employees suggests that Medtronic's

3   contracts may preclude trials.  (Stip. Ex. 516, Docket No. 251-32 at ECF No. 46).  In

the exchange, one Medtronic employee asks for help facilitating a contract with a

healthcare system before the departure of Medtronic's main point of contact at the

system.  (*Id.*)  The email notes "[w]e are trying to eliminate the competition from

getting a window that would allow for a trial of their energy portfolio and believe we

have a critical opportunity to close that shut."  (*Id.*)

The summary judgment record further reflects that hospitals have communicated

to Applied that they cannot try Applied's ABDs and other products due to contractual

commitments with Medtronic.  (Stip. Ex. 577, Docket No. 252-36 at ECF No. 69-73

(representatives of hospital system reflecting that not even one doctor in system can

trial Applied's ABD due to contract with Medtronic); Stip. Ex. 574, Docket No. 251-

38 at ECF No. 26 (Applied representative noting that he heard from an interested

doctor that the trial of Applied product at a hospital was "rejected due to contractual

commitments"); Stip. Ex. 575, Docket No. 252-36 at ECF No. 63 (Applied

representative's email to health system representative noting "Applied was informed

that [health system's] supply chain requested the trial stop, citing negotiations with

Medtronic, ███████████████ and the possibility of moving away from

███████ towards a bundle with Medtronic.").  This evidence, when read in tandem

with the Medtronic records summarized above, raises a triable issue of fact that at

least some hospitals which have bundled discounts with Medtronic are precluded from

_____

[5] Medtronic argues that this sentence merely refers to a potential contract term and
there is no evidence that the term was ever incorporated into the contract.
(Defendant's Response to JAF ¶ 278).  The Court finds that the sentence can also
fairly be read to be providing an instruction beyond the discussion of proposed
contract terms.  Even if the sentence is construed by the jury as a proposed contract
term, it could be circumstantial evidence of Medtronic's practices regarding trials.

1    trying other ABDs.  Because "hospitals are unlikely to convert in the absence of a

2    product trial," (JAF ¶ 276), this conduct could render LNAs and Tier Commitment

3    agreements de facto exclusive and not terminable on short notice.

4                        b.    Substantial Foreclosure

5        Exclusive dealing only violates antitrust laws when it forecloses a substantial

6    portion of the relevant market.  While "there is no set percentage for how much of the

7    relevant market must be foreclosed," *Masimo Corp,* 2006 WL 1236666 at *4, the

8    Ninth Circuit has previously found that 24% market foreclosure is sufficient to trigger

9    antitrust liability when an exclusionary agreement was not terminable on short notice.

10   *Id* at *6 (citing *Twin City,* 676 F.2d at 1298).  As explained above, Applied has raised

11   a triable issue of fact that LNAs and Tier Commitment agreements are exclusionary

12   and not, in practice, terminable on short notice.  Because a jury could infer that at least

13   24% of the market has been foreclosed, the Court finds that the Applied's exclusive

14   dealing claim survives summary judgment.

15       Orszag calculates that ███ of ABDs flow through bundles which fail the DAT.

16   (Orszag Dep. Tr. At 209:13-19).  The figure provides a potential floor, but not a

17   ceiling, for a foreclosure estimate.[6]  The Court is aware of no authority which limits

18   the jury to find that Medtronic has foreclosed only the portion of the market which

19   flows through DAT-failing bundles.  This is particularly true for Applied's exclusive

20   dealing claims, which are premised on Applied's arguments that factors beyond

21   bundled discounts render Medtronic's agreements de facto exclusive.

22

23

24   _____

25   [6] To be clear, the Court does not hold that the jury must ultimately find that Orszag's
26   DAT calculation to correct.  The Court also does not hold that the jury must calculate
     a specific foreclosure percentage.  "[A]n exclusive-dealing plaintiff need not 'place an
27   exact number on the percentage foreclosed' at *any* stage of the case."  (Amicus Brief
     on Behalf of the Federal Trade Commission, Docket No. 27-1 at 5 (quoting *McWane,*
28   *Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015)).

1    The summary judgment record would allow the jury to infer that Medtronic's

2    exclusive dealing forecloses at least 24% of the ABD market.  Orszag's sensitivity

3    analysis, which the Court detailed in a prior order (Order re: *Daubert* Motion at 11-

4    12), raises a triable issue of fact that Medtronic forecloses a larger share of the ABD

5    market than the percentage of sales which flow through DAT-failing bundles.

6    (Orszag Report ¶¶ 56-61, 185-87).  Other parts of the summary judgment record

7    suggest that hospitals with contracts that do not fail the DAT may still be foreclosed

8    from purchasing non-Medtronic ABDs.  The record raises triable issues of facts that

9    some hospitals cannot switch ABDs due to their reliance on generators and

10   Medtronic's capital equipment agreements (Section III(A)(2)(a), *supra*) and that some

11   hospitals are precluded from trying new ABDs due to their contracts with Medtronic

12   (*id.*).  Orszag's Reply Report provides further support for the conclusion that

13   competitors are foreclosed from sales beyond those that flow through DAT-failing

14   bundles: Orszag explains that Medtronic's contracts may have a "chilling" effect on

15   both customers and competitors, the former which may forego exploring other

16   products for fear of violating their agreements (Orszag Reply Report ¶ 18) and the

17   latter which cannot effectively target potential customers given the confidentiality of

18   Medtronic's LNAs and GPO Tier Commitment Agreements.  (Orszag Reply ¶ 130).

19   In sum, the summary judgment record provides sufficient grounds for a jury to

20   infer that Medtronic's alleged de facto exclusive dealing substantially forecloses at

21   least 24% of the ABD market.  Given that there is a triable issue of fact regarding

22   whether Medtronic's agreements are terminable on short notice, Applied has raised a

23   triable issue that Medtronic's practice have foreclosed a substantial share of the ABD

24   market.  *Twin City,* 676 F.2d at 1298 (finding that 24% market foreclosure is

25   sufficient to trigger antitrust liability when an exclusionary agreement was not

26   terminable on short notice).  To be clear, the summary judgment record might support

27   a finding Medtronic's contracting practices have not foreclosed a substantial share of

28   the ABD market.  But, Applied need not prove its case at this stage of litigation.

16

1  Applied has met its burden to raise a triable issue of fact regarding substantial

2  foreclosure.  The Court, therefore, turns to Medtronic's final argument: that Applied

3  fails, as a matter of law, to show antitrust injury.

4      **B.    Anti-trust injury**

5      "Antitrust injury is a heightened standing requirement that applies to private

6  parties suing to enforce the antitrust laws. To satisfy the antitrust-injury requirement, a

7  plaintiff must show 'injury of the type the antitrust laws were intended to prevent and

8  that flows from that which makes defendants' acts unlawful.'"  *O'Bannon v. NCAA*,

9  802 F.3d 1049, 1066 (9th Cir. 2015) (quoting *Brunswick Corp. v. Pueblo Bowl-O-*

10  *Mat, Inc*., 429 U.S. 477, 489 (1977)); *see also Brunswick Corp.*, 429 U.S. at 489

11  ("The injury should reflect the anticompetitive effect either of the violation or of

12  anticompetitive acts made possible by the violation. It should, in short, be 'the type of

13  loss that the claimed violations . . . would be likely to cause.'").[7]

14      Medtronic argues that Applied cannot show antitrust injury for three reasons:

15  (1) Applied has not been driven out of the ABD market and enjoys financial health;

16

17  _____

18  [7] Commentators have noted that the term "anti-trust injury" has also been used by
courts to refer to "to actual or threatened market injury as a substantive element of a

19  non-per se antitrust claim."  Standing—Antitrust injury, Holmes and Mangiaracina,
Antitrust Law Handbook § 9:6.  That courts have used the term "antitrust injury" to

20  refer to two related concepts has created some confusion in the briefings and in the
case law.  For example, in *Ellis* the Ninth Circuit cites to a case discussing market

21  injury when explaining the standard for anti-trust injury for standing.  *Ellis v. Salt
River Project Agric. Improvement & Power Dist*., 24 F.4th 1262, 1274 (9th Cir. 2022)

22  (citing *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 990 (9th Cir. 2020)).  Medtronic's

23  briefing cites to cases discussing both anti-trust injury for standing and market injury
as a substantive element.  *Compare Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

24  U.S. 477, 489 (1977*), and Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th
Cir. 2001) (evaluating anti-trust injury for standing) *with Brooke Grp. Ltd. v. Brown &*

25  *Williamson Tobacco Corp.,* 509 U.S. 209, 224 (1993) (evaluating market injury as a

26  substantive element).  But based on the bulk of authority cited and the tests outlined
by Medtronic, the Court construes Medtronic's arguments regarding anti-trust injury

27  to be arguments that Applied cannot show "antitrust injury" in the traditional,
heightened-standing sense.

28

(2) Medtronic's competitors have won a collective ten points of the U.S. ABD sales in the past five years; and (3) Applied admits to being an equally efficient competitor. (Joint Brief at 40). Because these three arguments fall short, the Court may not grant summary judgment to Medtronic on the grounds that Applied cannot show antitrust injury.

### 1. Applied need not show that Applied or other competitors have been driven out of the ABD market

Medtronic argues that because Applied and other competitors have not been driven out of the ABD market, Applied cannot show antitrust injury and Medtronic is entitled to summary judgment. (Mot. at 42). Medtronic's argument appears to rely on misreading of *PeaceHealth*. *PeaceHealth* outlines the DAT, which informs whether a bundled discount is *exclusionary*, not whether a bundled discount causes antitrust injury. *See PeaceHealth*, 515 F.3d at 909 (describing DAT). Further, Ninth Circuit case law is clear that a party can show antitrust injury even if the party has not been driven out of a market:

> Contrary to Defendants' argument, the Supreme Court has long recognized that competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened. And we recently reaffirmed that a plaintiff need not allege that the exclusionary conduct has succeeded in displacing all competition to adequately plead antitrust injury.

*PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840–41 (9th Cir. 2022) (cleaned up and citations omitted). The Court, therefore, cannot grant summary judgment in favor of Medtronic on the grounds that Applied and its competitors have not been driven out of the market.

1        *2. Applied and competitors' growth does not preclude Applied from*
2            *showing market injury*

3        Medtronic further argues that Applied and other competitors' growth precludes

4    Applied from showing antitrust injury.  (Mot. at 41-42).  The parties agree that

5    Applied's unit share of ABD sales increased ███████████████████████ and

6    that Medtronic's unit share of ABD sales fell ████████████████████

7    ████████████████  Given other evidence in the summary judgment record, these facts

8    are not fatal to Applied's claim that it suffered antitrust injury.

9        Applied has put forth evidence that, absent Medtronic's allegedly exclusionary

10   conduct, the relevant ABD market would be more competitive, ABDs would be priced

11   lower and Applied would have a greater share of the market. (Orszag Report ¶¶ 233-

12   37, 245-46 (discussing Europe benchmark); *Id.* ¶¶ 230-32, 238-60 (discussing Trocar

13   benchmark); Orszag Report ¶¶ 9, 238 (noting that Applied would have obtained

14   greater economies of scale absent alleged conduct); *see also* Orszag Report ¶¶ 165-66

15   (discussing evidence that Medtronic's decline in market share is due to supply chain

16   issues)).  Restricted growth caused by anti-competitive behavior can constitute

17   antitrust injury.  *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 790 (6th Cir.

18   2002) (finding that restricted growth can constitute antitrust injury); *see also McWane,*

19   *Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015) (finding that restricted growth can

20   constitute *market* injury).  Applied has thus raised a triable issue of fact that it has

21   suffered antitrust injury despite the facts that Medtronic's market share fell and

22   Applied's market share grew in the relevant time period.[8]

23       ——————————————

24

25   [8] The Court finds Medtronic's citations unavailing.  (Mot. at 42 (citing *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 122-23 (1st Cir. 2011)).  *Sterling* is distinguishable because the plaintiff there provided no evidence of injury to the
26   market—including no evidence that consumer prices increased or output decreased.
27   (*Id.* at 122-23).  In the present case, by contrast, Applied has put forth analysis that prices have risen as a result of Medtronic's actions.  The cited portion of *Pool Water*
28   only underscores that antitrust injury can only stem from activity forbidden by

1       *3. That Applied may be an equally efficient producer does not preclude a*

2           *finding of anti-trust injury*

3      Medtronic next argues that Applied cannot show antitrust injury because Applied

4  has admitted to being an equally efficient producer.  Medtronic notes that it is "not

5  aware of any court allowing a case to proceed to trial to challenge bundled discounts

6  after the plaintiff has admitted to being an equally efficient competitor."  (Joint Br. at

7  42).  Medtronic, however, provides no authority for the proposition that an equally

8  efficient producer cannot show antitrust injury, and Medtronic, as the moving party,

9  has the burden of proof.  Such a rule appears conceptually inconsistent with

10 *PeaceHealth*, which instructs that discounts which have the potential to exclude an

11 equally efficient producer of a competitive product can be exclusionary.

12 *PeaceHealth*, 515 F.3d at 906.  As such, the Court cannot grant summary judgment on

13 the grounds that Applied admits to being an equally efficient producer of ABDs.

14 **IV.  STATE CLAIMS**

15     Medtronic moves for summary judgment on Applied's state law claims on the

16 grounds that the state law claims are derivative of deficient federal law claims.  (Joint

17 Brief at 45).  Because the Court denies summary judgment as to the federal law

18 claims, the Court **DENIES** summary judgment as to the state law claims.

19 **V.  LACHES FOR INJUNCTIVE AND DECLARATORY RELIEF**

20     Finally, Medtronic argues that laches precludes injunctive and declaratory relief.

21 In antitrust cases, the four-year statute of limitations for damages is used as a

22 _____

23

24 antitrust law.  *Pool Water Prods. v. Olin Corp*., 258 F.3d 1024, 1035-36 (9th Cir.
2001).  The cited portion of *Suture Express* explains why the Court denies plaintiff's

25 motion for summary judgment and discusses law that may diverge from Ninth Circuit

26 law.  *Compare PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840–41 (9th
Cir. 2022) (requiring plaintiff to show that bundling practices excluded all rivals) *with*

27 *PeaceHealth*, 515 F.3d at 909 (explaining that DAT determines if bundling practices
exclude a hypothetical equally efficient rival).

28

1     "guideline" for the defense of laches. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085-86

2     (9th Cir. 2014). If a plaintiff files suit within an analogous statute of limitations

3     period, there is a strong presumption that laches are inapplicable. *In re Beaty*, 306

4     F.3d 914, 926 (9th Cir. 2002) (collecting cases).

5        Medtronic does not argue that Applied's damage claims are barred by the statute

6     of limitations. (*See generally* Mot.). Such an argument would not be successful given

7     that Applied challenges Medtronic's conduct from 2019 to 2023. (*See* Complaint

8     (reflecting a file date of February 14, 2023); *Oliver*, 751 F.3d at 1085-86 (explaining

9     that a new statute of limitation runs each time a new act inflects a new and

10    accumulating injury to the plaintiff). Because Applied's damage claims against

11    Medtronic fall within the statute of limitations and Medtronic fails to overcome the

12    "strong presumption" that laches are therefore inapplicable, the Court **DENIES** the

13    Motion as to Applied's claims for injunctive and declaratory relief.

14    **VI.    CONCLUSION**

15        For the foregoing reasons, the Motion is **DENIED** in its entirety. The Court

16    **ORDERS** the parties to meet and confer and file, within 14 days of this Motion, a

17    status report proposing at least two potential trial dates and corresponding pre-trial

18    deadlines.

19

20

21        **IT IS SO ORDERED.**

22

23    Dated: August 15, 2025

24                       HON. WESLEY L. HSU
                          UNITED STATES DISTRICT JUDGE

25

26

27

28