Joseph R. Re (SBN 134479)
Joe.re@knobbe.com
Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Joseph F. Jennings (SBN 145920)
joe.jennings@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
Cheryl T. Burgess (SBN 250101)
Cheryl.burgess@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

*Attorneys for Plaintiff*
APPLIED MEDICAL RESOURCES CORPORATION

Wilkinson Stekloff LLP
Brian L. Stekloff (pro hac vice)
Sarah Neuman (pro hac vice)
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000

Keri Arnold (pro hac vice)
karnold@wilkinsonstekloff.com
130 W 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-8910

Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (pro hac vice)
Alan B. Freedman (pro hac vice)
lbrannon@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500

*Attorneys for Defendant*
MEDTRONIC, INC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MEDTRONIC, INC., <br><br> Defendant. | Case No. 8:23-cv-00268-WLH-DFM <br><br> **COMPETING VERDICT FORMS** <br><br> HON. WESLEY L. HSU |

## APPLIED'S PROPOSED VERDICT FORM

**Instructions:** When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form and in accordance with the Jury Instructions. Your answer to each question must be unanimous. Please refer to the Jury Instructions for guidance on the law applicable to the subject matter covered by each question.

1. Has Applied proven by a preponderance of the evidence that Medtronic has engaged in monopolization in violation of Section 2 of the Sherman Act?

   *"Yes" is a finding for Applied. "No" is a finding for Medtronic.*

   Yes_____  No_____

2. Has Applied proven by a preponderance of the evidence that Medtronic has engaged in attempted monopolization in violation of Section 2 of the Sherman Act?

   *"Yes" is a finding for Applied. "No" is a finding for Medtronic.*

   Yes_____  No_____

3. Has Applied proven by a preponderance of the evidence that Medtronic has unlawfully restrained trade in violation of Section 1 of the Sherman Act?

   *"Yes" is a finding for Applied. "No" is a finding for Medtronic.*

   Yes_____  No_____

4. Has Applied proven by a preponderance of the evidence that Medtronic has engaged in exclusive dealing in violation of the Clayton Act?

   *"Yes" is a finding for Applied. "No" is a finding for Medtronic.*

   Yes_____  No_____

5. Has Applied proven by a preponderance of the evidence that Medtronic has

unlawfully restrained trade in violation of the Cartwright Act?

*"Yes" is a finding for Applied.  "No" is a finding for Medtronic.*

       Yes\_\_\_\_\_    No\_\_\_\_\_

6.    If you answered Yes to **at least one of** Questions 1, 2, 3, 4, **or** 5, what amount of damages did Applied prove by a preponderance of the evidence?

       $_____

7.    Has Applied proven by a preponderance of the evidence that Medtronic unlawfully interfered with Applied's prospective economic advantage?

*"Yes" is a finding for Applied.  "No" is a finding for Medtronic.*

       Yes\_\_\_\_\_    No\_\_\_\_\_

8.    If you answered Yes to Question 7, what amount of damages did Applied prove by a preponderance of the evidence?

       $_____

9.    Has Applied proven by a preponderance of the evidence that Medtronic engaged in unfair competition in violation of the California Business and Professions Code?

*"Yes" is a finding for Applied.  "No" is a finding for Medtronic.*

       Yes\_\_\_\_\_    No\_\_\_\_\_

**When you have completed filling out this form, please have the jury foreperson sign below.**

_____       _____

Foreperson                                                                    Date

**APPLIED'S ARGUMENT**

Applied's proposed verdict form is easy to follow and includes one question for each claim and one question for damages.  It closely tracks Applied's Complaint and other antitrust verdict forms used by Courts in this District for cases that involve claims for monopolization and attempted monopolization under Section 2 of the Sherman Act.  *See, e.g.*, *Innovative Health LLC v. Biosense Webster, Inc., No.* 8:19-cv-01984-JVS (KES), Dkt. Nos. 440, 526, (C.D. Cal. May 16, 2025); *Trendsettah USA Inc. v. Swisher Int'l Inc.*, No. 14-cv-01664-JVS-DFM (C.D. Cal. Nov. 17, 2023).  Far from an "outlier" as Medtronic suggests, courts around the country routinely adopt similar verdict forms in antitrust cases. *See Ingevity Corp. v. BASF Corp.*, 1:18-cv-01391-RGA, Dkt. No. 554 (D. Del. Sep. 15, 2021) (one question per antitrust claim and one question for damages); *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), Dkt. No. 522 (S.D.N.Y. Jul. 14, 2021) (same); *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures*, LLC, 2:18-cv-01077-CBM-E, Dkt. No. 496 (C.D. Cal. Oct. 21, 2019) (two questions for Robinson-Patman Act, one question for damages); *TransWeb, LLC v. 3M Innovative Props. Co.*, No. 2:10-cv-04413-FSH-JBC, Dkt. No. 512 (D.N.J. Nov. 30, 2012) (two questions for antitrust claim and two questions for damages).[1]

**A.  <u>Medtronic's Verdict Form Is Complex, Confusing, and Erroneous</u>**

Medtronic's proposed jury verdict form does not track Applied's

---

[1] Medtronic attempts to distinguish some (but not all) of these cases.  But Medtronic's arguments show why Medtronic's verdict form is flawed.  For example, Medtronic characterizes the defendant's proposal in *Innovative Health* as "unusually complex" and requiring handwritten findings, but Medtronic's form is even longer and also requires handwritten hospital names.  Medtronic's challenge to *U.S. Wholesale* lacks merit because the Ninth Circuit held the defendant did **not** challenge the verdict form's specificity. *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1145 (9th Cir. 2023).

Complaint and is exceedingly long and complex. Medtronic includes 16 questions spanning five pages. Medtronic also includes differing question formats, with many questions asking a "yes" or "no" answer and one question akin to a memory test asking jurors to name particular hospitals.[2] The "yes" or "no" questions also read more like a "choose your own adventure" book than a verdict form. For example, a "no" answer to some questions directs the jury to proceed no further (e.g., Question 1), proceed to the next claim (e.g., Question 7), or skip claims (e.g., Question 4). Some questions are also preceded by instructions that are inconsistent with prior instructions. For example, Question 3 instructs the jury to answer no further questions if they answer "No" but Question 10 then instructs the jury that they ***should*** answer Question 11 if they answered "No" to Question 3.

Courts in the Ninth Circuit reject such lengthy and complex verdict forms. *See, e.g.*, *MKB Constructors v. Am. Zurich Ins. Co.*, 711 F. App'x 834, 837 (9th Cir. 2017) (affirming rejection of verdict form that "spanned 11 pages" and "included 30 questions with differing answer formats"); *Varanand v. State Farm Ins. Co.*, 127 F. App'x 947, 949 (9th Cir. 2005) (affirming rejection of verdict form that was "ambiguous and overly complex"); *NMB Air Operations Corp. v. McEvoy*, 194 F.3d 1317 (9th Cir. 1999) (affirming rejection of "verdict form [that] was too lengthy and detailed."); *Maurer v. Los Angeles Cnty. Sheriffs Dep't*, 930 F.2d 28 (9th Cir. 1991) (affirming rejection of "verdict form [which] contained 45 questions, many of which were redundant and confusing" and affirming use of "a general verdict form that adequately addressed all of the issues

---

[2] Alternatively, Medtronic argues the Court should ask a series of "yes-or-no" questions, one for each hospital." Medtronic fails to cite any case ever adopting such an approach. Medtronic's own parenthetical shows the case it cites (Sitzer) asked "yes/no" questions about "various defendants' participation in alleged conspiracy"—not the third parties to which the defendant unlawfully interfered.

essential to the judgment.").  The Court should do the same here.

The Court should also reject Medtronic's proposed verdict form because it is erroneous for numerous additional reasons.  Medtronic ignores most of these arguments, addressing only a few of them at the end of its portion.

***First***, Question 1 asks whether Applied proved "there is a properly defined relevant antitrust market for advanced bipolar devices in the United States."  It then directs the jury that a "no" answer means the jury should answer no further questions, thereby finding no liability.  As explained in Applied's arguments related to Jury Instruction D2 (Monopolization General – Elements), Applied can prevail on its claims even if the market includes both advanced bipolar and ultrasonic devices.  Applied can also prevail on its unfair competition and tortious interference claims even if it does not establish ***any*** relevant market.  Thus, Question 1 is not determinative of ***any*** of Applied's claims, much less ***all*** of them.  Questions 2, 3, 5, 6, 8, 9, 10, and 11 are also erroneous because they similarly require an "advanced bipolar devices" market.

***Second,*** Question 2 asks whether Applied proved "that Medtronic sold advanced bipolar devices as part of below-cost bundled discounts that Medtronic alone had the ***exclusive capacity*** to create."  As explained in Applied's argument related to Instruction D9 (Exclusionary Bundling), Medtronic's jury instruction regarding exclusive capacity is erroneous and unsupported by the law.  Through this question, Medtronic seeks to inject its erroneous "exclusive capacity" position into the verdict form.  The purpose of the verdict form is to provide a neutral form for the jury to record its verdict.  Medtronic selectively adds (erroneous) subject matter from the jury instructions that Medtronic believes will favor Medtronic.  *See Auto. Prods., plc v. Tilton Eng'g, Inc.*, 1993 WL 660164, at *2 (C.D. Cal. Sept. 16, 1993) ("Special Interrogatory form was far too complex and was repetitive of the jury instructions. . .").

***Third,*** Medtronic uses the phrase "below-cost bundled discounts,"

"exclusionary bundled discounting," or similar phrases in Questions 2, 4, 7, and 11-13. As explained in Applied's argument related to D2 (Monopolization General - Elements), the parties disagree regarding the characterization of the anticompetitive conduct. While Medtronic may prefer to frame this case to emphasize "discounting," it should not be permitted to inject its own argumentative characterizations into verdict questions provided by the Court.

**Fourth**, Question 3 asks whether Applied proved "that Medtronic entered into exclusive dealing agreements that prevented hospitals from buying *any* advanced bipolar devices from competing suppliers." As explained by Applied in connection with its arguments regarding D10 (Exclusive Dealing), Medtronic's position that Applied must establish that hospitals could not buy from "any" other suppliers is erroneous and was rejected by this Court on summary judgment. SJ Order at 11-15; *see also Masimo Corp. v. Tyco Health Care Group,* 350 Fed. App'x. 95, 2009 WL 3451725 at *1 (9th Cir. Oct. 28, 2009) (finding that agreements that conditioned discounts on customers purchasing 90% of requirements have "the hallmark of exclusive dealing"). Medtronic now seeks to inject that erroneous position into the jury form. Medtronic should not be permitted to add cherry-picked (and erroneous) substantive points into the verdict form. The verdict form also erroneously instructs the jury not to answer any further questions if they answer no to questions 2 and 3 even though Applied can prevail on its unfair competition and tortious interference claims without meeting the same standards for anticompetitive conduct as the antitrust claims.

**Fifth**, Question 4 asks whether Applied proved, "under the Rule of Reason balancing test, Medtronic's bundled discounts and/or exclusive dealing agreements caused competitive harm that substantially outweighed their competitive benefits." Medtronic asks this question in connection with both "Sherman Act, Sections 1 & 2." But the relevant question for Section 2

monopolization and attempted monopolization is whether the conduct is anticompetitive.  As explained in connection with Applied's arguments regarding Jury Instruction D2 (Monopolization General – Elements) and D8 (Willful Acquisition or Maintenance of Monopoly Power),  Medtronic improperly seeks to merge the Section 1 and 2 analyses to eliminate the distinctions between the claims.[3]

**Sixth**, Questions 4-5 do not track the elements for a Section 1 claim.  *See* ABA Model Jury Instructions, 1.B.1 (2016 ed.).  Similarly, Questions 11-12 do not track the elements for a California Cartwright Act claim.  *See* CACI No. 3405.  As explained in connection with Applied's arguments regarding Jury Instruction D21 (Unlawful Restraint in Violation of the California Cartwright Act), Medtronic makes multiple substantive changes to the model.  These questions also share deficiencies similar to those discussed throughout.

**Seventh,** Question 9 asks whether Applied proved "Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing created a dangerous probability that Medtronic would achieve monopoly power . . ."  By framing the question as to whether Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing "created" the dangerous probability, Medtronic minimizes whether other relevant surrounding facts support that conclusion.  For example, as explained by the Model, the jury should consider Medtronic's current market share, market share trends, and whether barriers to entry made it difficult for competitors to enter the market.  ABA Model Jury Instr. 3.D.4.

---

[3] Medtronic's assertion that Applied "does not even cite" to *Qualcomm* is false.  Applied addresses that case in its jury instruction arguments addressing the same issue, explaining that *Qualcomm* undermines Medtronic's position.  Applied did not repeat its argument again because Medtronic has already made these filings far longer than they should have been.

None of Medtronic's cases support its position.  Medtronic's quote from *Spectrum* addressed a monopolization claim not an attempted monopolization claim.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  The *Spectrum* decision explained what was necessary to show a dangerous probability of success and notably did ***not*** require that the anticompetitive conduct "created" that dangerous probability.  *See id.* ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.").  The *Portney* case focused on a different issue (whether the defendant is a competitor), which Medtronic removed from its quote using an ellipsis.  *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1128 (C.D. Cal. 2008).  The *Alaska Airlines* case dealt with a monopoly leveraging case and never suggested the sort of requirement Medtronic proposes here.  *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 546 (9th Cir. 1991).  *FutureLogic* held that certain allegations in the claim were ***sufficient*** to state a claim, but never suggested an attempt claim "requires" such allegations, as Medtronic falsely represents.  *FutureLogic, Inc. v. TransAct Techs., Inc.*, 2007 WL 9700696, at *17 (C.D. Cal. Oct. 30, 2007)

***Eighth,*** Question 10 asks whether Applied proved "that Medtronic entered into unlawful exclusive dealing agreements with customers that substantially foreclosed, or have the probable effect of substantially foreclosing, competition in the relevant market for advanced bipolar devices."  Medtronic again injects substantive content into the jury verdict form.  Even if it were appropriate to include such subject matter from the jury instructions, Medtronic rewrites the Model instructions.  Medtronic fails to explain why it changes "likely" to "have the probable effect of."  Question 10 also includes a preamble instructing the jury to answer Question 10 only if it answered "yes" to Question 3.  This language is confusing and contradictory because Question 3 (erroneously) states that failing

to answer "yes" to Question 3 means the jury should answer no further questions.

**Ninth**, Question 13 asks whether Applied proved "Medtronic's conduct caused Applied to suffer antitrust injury to its business or property." It then directs the jury that a "no" answer means the jury should answer no further questions, thereby finding no liability. As discussed in detail below, Applied's non-antitrust claims (interference with prospective business advantage and unfair competition) do not require a showing of antitrust injury. Thus, Question 13 is not determinative of all of Applied's claims. Question 13 also includes a preamble with a confusing web of questions instructing the jury when they should or should not answer the question, which is likely to cause confusion.

**B.   Medtronic Wrongly Suggests The Verdict Form Must Be Complex**

Applied's verdict form includes separate questions for each claim and two separate damages questions. Medtronic argues such a form is "atypical" in antitrust cases. That is incorrect. As discussed above, many courts in this District and throughout the country have used similar jury verdict forms for antitrust cases.

Medtronic dismisses most of Applied's cited cases as including "cursory" analysis, even though Medtronic primarily cites bare verdict forms with no analysis at all (*see* Medtronic footnote 9). Medtronic then dismisses other cases as "unpublished" or "non-antitrust" cases. But Medtronic does not deny that the many cases that Applied cited support Applied's proposed verdict form.

Medtronic also cites no persuasive authority to support its bold assertion that complex verdict forms with many factual questions are somehow "standard" procedure in antitrust cases. Medtronic's lead case is a nearly forty-year-old district court case that cited the Second Circuit. That case is not persuasive authority.

Medtronic cites the Manual for Complex Litigation for purported advantages of complex forms, but omits later discussion of the disadvantages.

*See* Manual for Complex Litigation 161 (4th ed. 2004) (explaining such forms "increase the length and complexity of deliberations and are more likely to produce inconsistencies"). And Medtronic omits the same source's recognition that Applied's proposal is perfectly acceptable. *Id.* at 160 (recognizing verdict forms can simply "require separate verdicts on each claim and on damages"). Medtronic also includes a "see also" citation to a footnote from a Ninth Circuit case explaining that special verdicts are preferred in criminal cases involving the *entrapment* defenses due to special circumstances applying to such a defense. *United States v. Poehlman*, 217 F.3d 692, 698 (9th Cir. 2000). That obviously does not apply here. And Medtronic's other cited cases recognized that special verdicts often lead to a complicated process to try to resolve inconsistencies. *See A.H.D.C. v. City of Fresno*, 2004 WL 5866233, at *3 (E.D. Cal. 2004), *aff'd*, 433 F.3d 1182 (9th Cir. 2006).

Medtronic also cites *Floyd* as supposedly requiring courts to "monitor the jurors' thinking processes or test their understanding of the law." *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991). Far from setting forth such a requirement, *Floyd* recognized courts have "complete discretion over whether to have the jury return a special verdict or a general verdict." *Id.* at 1395 (citing *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1990)). Neither *Floyd* nor any other case cited by Medtronic held the sort of form proposed by Applied is improper or disfavored. To the contrary, courts routinely cite the case on which *Floyd* relies (*Mateyko*) in affirming verdict forms like Applied proposes that have a question on each claim and a question on damages. *See, e.g.*, *Dugan v. Nance*, 2013 WL 6633072, at *14 (C.D. Cal. Dec. 16, 2013); *Steffens v. Regus Grp., PLC*, 2013 WL 4499112, at *9 (S.D. Cal. Aug. 19, 2013). Courts likewise cite *Mateyko* in affirming general verdict forms. *See, e.g.*, *Cahill v. Edalat*, 2021 WL 2850588, at *4 (9th Cir. July 8, 2021); *Rios v. City of Los Angeles*, 2022 WL 18284890, at *5 (C.D. Cal. Dec. 1, 2022). And Medtronic's own cited authority shows the dangers of overly

complex forms.  *See Larson v. Neimi*, 9 F.3d 1397, 1401 (9th Cir. 1993) (discussing an ambiguity caused by a complex special verdict form that the court "fortunately" was able to fix by recognizing the ambiguity before the jury discharged).

Medtronic also argues Applied's form improperly addresses only the "ultimate legal result" of each claim.  But the case Medtronic cites acknowledges the line is not so clear and, regardless, affirmed a verdict form similar to Applied's proposal.  *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003) (acknowledging some forms have "no precise label" but affirming verdict where jury addressed each claim and separately decided damages).  Medtronic's other cited case merely discussed the form of verdicts in a footnote and never suggested that the general verdict in that case was improper.  *Williams v. Gaye*, 895 F.3d 1106, 1132 n.21 (9th Cir. 2018).

Medtronic next argues its complex form facilitates "ease of use" because it is "standard practice" to instruct the jury when they should not answer later questions based on earlier answers instructions.  That is true in some cases, such as when a finding of no liability means the jury should not consider damages.  But Medtronic does not and cannot contest that its form includes a complicated web of often contradictory questions, as discussed above.  Medtronic also argues its form "reduces the chance of error and confusion" compared to following the lengthier jury instructions.  Medtronic cites no authority for its suggestion that the jury may so freely disregard the Court's instructions, which set forth the controlling law that the jury must follow.  Moreover, as discussed above, Medtronic's form invites error with its confusing array of instructions and adding elements not present in various claims.

Finally, Medtronic argues its form facilitates "meaningful review."  As discussed above, Medtronic's complex web of questions creates a high risk of

inconsistent verdicts that would stifle rather than facilitate meaningful review. Contrary to Medtronic's argument, Medtronic's proposal would *increase* the risk of a retrial. For example, Medtronic's form instructs the jury not to decide the attempted monopolization claim if it finds monopolization. That would result in a retrial if a monopolization verdict were overturned on appeal. Medtronic's form also instructs the jury not to decide various claims unless it finds various other facts not required by those claims, which would also require a retrial.

None of Medtronic's cited cases suggest such a complicated form reduces the probability of retrial. Contrary to Medtronic's assertion, the *Snake River* case never held or suggested that a special verdict form "streamline[d]" issues for appeal. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1047, 1053–54 (9th Cir. 2004). It simply affirmed the jury's defense verdict on plaintiff's claim and then found it unnecessary to review purported errors on a superfluous affirmative defense. *Id.* The result would have been the same for a "general" verdict form.

Medtronic's other two cases also do not support its position. As discussed, the first case is a forty-year-old district court case addressing unique circumstances in which the Court was "especially concerned" about "legal errors" because "the Supreme Court has explicitly declined to decide" key legal issues. *Pac. W. Cable*, 672 F. Supp. at 1326. The second case is an *eighty*-year-old Ninth Circuit decision that addressed a general verdict on a fraud claim alleging both constructive fraud and actual fraud when the constructive fraud instruction was erroneous. *Pac. Greyhound Lines v. Zane*, 160 F.2d 731, 737 (9th Cir. 1947). Neither case suggested a general preference for complex special verdicts, much less one as complex as Medtronic's proposal here.

Moreover, courts routinely reject verdict forms requiring special findings on "each element" of a claim as unnecessary and confusing. *See, e.g., Steffens v. Regus Grp., PLC*, 2013 WL 4499112, at *7 (S.D. Cal. Aug. 19, 2013)

1    (analogizing such a form to an "S.A.T. test" and explaining "[a]t best it was
2    superfluous, and at worst it sets up a series of forks in the jury's deliberations that
3    prevent it from reaching a verdict"); *Cooper v. Paychex, Inc.*, 960 F. Supp. 966,
4    973 (E.D. Va. 1997) (explaining verdict forms are "intended to assist the jury in
5    analyzing and presenting its decision" and the multi-part form at issue "would
6    have failed that goal due to its length and its confusing structure"), *aff'd*, 163 F.3d
7    598 (4th Cir. 1998); *Gourdeau v. City of Newton*, 238 F. Supp. 3d 179, 182–83
8    (D. Mass. 2017) (explaining "general verdicts are the norm" and the "risks" of
9    special verdicts are "fairly obvious" because "[c]omplex special verdicts may
10   bore jurors and allow their minds to wander").

11   **C.    Medtronic's Other Challenges To Applied's Verdict Form Fail**

12   Medtronic also raises three additional meritless objections.

13   **1.    Relevant Market**

14   Medtronic first asserts that Applied's form is erroneous because it does not
15   include a threshold question requiring a finding that the relevant market is one for
16   advanced bipolar devices.   As Applied explains in its argument related to Jury
17   Instruction D2 (Monopolization General – Elements), Applied can prevail on its
18   claims even if the market includes both advanced bipolar and ultrasonic devices.
19   The Ninth Circuit recently confirmed this approach is correct by affirming a
20   district court evaluating antitrust claims under an alternative market defined by
21   ***neither*** party. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1002 (9th Cir. 2023),
22   cert. denied, 144 S. Ct. 681 (2024) and 144 S. Ct. 682 (2024) ("The district court's
23   middle-ground market . . . thus stands on appeal, and it is that market in which
24   we assess whether Apple's conduct is unlawful pursuant to the Sherman Act.").[4]

25   _____

26   [4] Medtronic argues *Epic* was "decided by the court, not the jury."   That is
27   irrelevant to whether an antitrust plaintiff must prove the existence of its preferred
     relevant market.  Medtronic also argues no party contested the issue on appeal.
28   Not so.  The plaintiff argued the "district court incorrectly defined the relevant

1    Medtronic's cited cases (*Am. Express*, *Fount-Wip*, *Malaney*, and

2  *Alphonsus*) merely address the "relevant market" of various claims.  None suggest

3  that a plaintiff may not allege an antitrust violation regardless of whether the

4  market is broadened to include an additional product category.

5    Medtronic argues that defining the relevant market is "meaningless if

6  Applied can ask the jury to concoct its own market."  Applied is not asking the

7  jury to "concoct" anything.  Applied simply argues it can prevail even if the

8  market is defined to include ultrasonic devices, which has been Applied's

9  allegation since the onset of this case.  *See* Dkt. 1 ¶ 53.  As the Ninth Circuit

10  explained, "[d]efining the market is not the aim of antitrust law; it merely aids the

11  search for competitive injury."  *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440,

12  1448 (9th Cir. 1988).  Thus, a defendant cannot escape liability merely by

13  showing the market should be expanded if the competitive harm is the same.

14    Medtronic also argues other courts "routinely ask" the jury if the plaintiff

15  had met its burden of proving its alleged market.  But Medtronic merely cites

16  unpublished verdict forms without any explanation as to the rationale for adopting

17  such forms.  Nothing suggests those forms are the "better path" or that they

18  involved similar facts here, where the plaintiff alleges it prevails on alternative

19  market definitions.  Medtronic should not be allowed to use verdict form

20  arguments to foreclose entire theories of Applied's case.

21    Medtronic also asserts that Applied's expert will present evidence about

22  "Applied's alleged advanced bipolar device market."  As explained in Applied's

23  arguments on the jury instructions, Orszag analyzed the market including

24  ultrasonic devices and explained why his conclusions "regarding Medtronic's

25  _____

26  market" by adopting its own limited market.  *Epic*, 67 F.4th at 973.  Likewise,

Medtronic's assertion that the appellate court "scrutinized" the district court's

27  factual findings is irrelevant because, unlike juries, district courts must issue

28  findings of fact and conclusions of law.  Fed. R. Civ. P. 52(a)(1).

1    monopoly power *and the competitive effects of the alleged conduct* are

2    unaffected" if the market were to include ultrasonic devices.  Orszag Opening,

3    Dkt. No. 183-6 Ex. 4 at 4 n.6 (emphasis added).   As Applied explains,

4    Medtronic's assertions that Orszag analyzed "only" a market excluding ultrasonic

5    devices are false.   Likewise, Medtronic's arguments about foreclosure and

6    benchmarks are also wrong as described in Applied's arguments on the jury

7    instructions.

8        Medtronic also asserts that a prior version of Applied's verdict form

9    "implied" that only the Section 2 claims require a relevant market because it

10   mentioned the term "relevant market" in only the Section 2 questions (e.g., "Has

11   Applied proven by a preponderance of the evidence that Medtronic monopolized

12   a relevant market in violation of the Sherman Act").   To remove this dispute,

13   Applied changed its verdict form to not use the term "relevant market" in those

14   questions (e.g., "Has Applied proven by a preponderance of the evidence that

15   Medtronic has engaged in monopolization in violation of Section 2 of the

16   Sherman Act").   Those questions are intended to ask about the Section 2 claims,

17   not define or "imply" the elements of any claim.   The jury instructions provide

18   more than sufficient instructions as to the elements of each claim.

19       Moreover, as explained in Applied's Argument regarding Instruction D4

20   (Relevant Market-General), Applied can prevail on its unfair competition and

21   interference claims without proving a relevant market.  Indeed, the Ninth Circuit

22   recently rejected a defendant's argument that courts must "define a relevant

23   market" in deciding if an "incipient" violation of the antitrust laws constitutes

24   unfair competition.  *Epic*, 67 F.4th at 1002.  Medtronic argues *Epic* "merely

25   observed" that conduct "not at issue in this case" does not require defining a

26   market.  Not so.  *Epic* specifically held such a requirement "runs contrary to

27   California courts' repeated instruction that '[n]o inflexible rule can be laid down

28   as to what conduct will constitute unfair competition.'"  *Id.*  The Court then

offered an independent basis for rejecting such a rule: it "*also* contradicts" a California Supreme Court decision applying "something akin to quick-look" for a certain claims. *Id.* The Ninth Circuit never limited its holding to UCL claims based on such "quick-look" claims. *See id.*[5]

As explained in Applied's jury instruction arguments, the cases Medtronic cites do not support its position. For its unfair competition argument, Medtronic cites *Dixon Gas Club, LLC v. Safeway Inc.*, an unpublished opinion, where the court affirmed the lower court's dismissal because the plaintiff had failed to offer any market-specific evidence that fuel pricing was unfair. No. A139283, 2015 WL 4557388, at *4, *6 (Cal. Ct. App. July 29, 2015) ("There are no market definitions, no market share evidence, no market structure analysis, no assessment of the extent or risk of market power, nothing, zip, nada.").

Medtronic cites two other cases *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* and *Drum v. San Fernando Valley Bar Assn.* to support that unfair conduct includes conduct that "significantly threatens or harms competition." 20 Cal. 4th 163, 187 (1999); 182 Cal. App. 4th 247, 255–56 (2010). Applied agrees and provides this language in Instruction D36 ("Unfair Competition in Violation of California Business and Professions Code § 17200"). However, Medtronic fails to point to any language in these cases that supports its position that UCL claims require Applied to prove a relevant market.

Medtronic also provides no support for its assertion that Applied's interference claim requires proving a relevant market. Medtronic cites *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, to argue that interference requires that Applied "prove a violation of one of its other claims." 11 Cal. 4th 376, 393

---

[5] Medtronic also cites *Zef Sci*, but that case merely found allegations in a complaint were mere legal conclusions and insufficient to state a claim. *Zef Sci., Inc. v. Shimadzu Sci. Instruments, Inc.*, 2016 WL 1255787, at *6 (S.D. Cal. 2016). It did not address whether conduct was an "incipient" violation.

(1995).  However, the court in *Della* explicitly refused to endorse Medtronic's position explaining that "requiring the plaintiff to prove, for example, that the defendant's conduct amounted to . . . a species of anticompetitive behavior proscribed by positive law . . . can be considered on another day, and in another case." 11 Cal. 4th 376, 393 (1995) (emphasis added).  *Id.* at 378.  Instead, as discussed in connection with Applied's arguments regarding Instruction D34 ("Unlawful Interference with Prospective Economic Advantage—Elements"), unfair-competition liability may stand even when a federal antitrust claim fails, so long as the conduct threatens or harms competition.

### 2.  <u>Unfair Competition</u>

Medtronic incorrectly argues the jury will not have to decide unfair competition in connection with the unlawful interference claim.  The intentional interference claim requires "wrongful" conduct.  CACI No. 2202.  And Medtronic has cited precedent explaining the "wrongful" element encompasses "conduct that was wrongful by some legal measure other than the fact of interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).  That "legal measure" includes unfair competition.[6]

Medtronic cites *Nationwide* in arguing that submitting unfair competition to the jury would be confusing.  As Applied explains in its arguments on the jury instructions, *Beacon Theatres*—and the extensive body of subsequent caselaw—requires ***factual questions*** common to legal and equitable claims be decided by the jury in connection with the legal claim before the Court decides the equitable

---

[6] Medtronic falsely represents that Applied "recently" agreed unfair competition is insufficient to show unlawful interference.  As support, Medtronic cites to a recent document in which Applied ***did*** include "unfair competition" as an element of the interference claim.  *See* Dkt. 281 at 5.  Medtronic apparently intended to cite an earlier filing that inadvertently omitted this element while ignoring many later correct filings.  Dkt. 231-1 (draft pretrial conference order) at 12; Dkt. 244 (jury instructions) at 220; Dkt. 281 (amended memo of contentions)) at 5.

claim. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959). Thus, the jury must address unfair competition as part of the interference claim before the Court decides the Section 17200 claim. Medtronic does not argue the Court should resolve the ***factual question*** of unfair competition for the Section 17200 claim without the jury first resolving the same question for the interference claim. Nor could it. Doing so would violate the Seventh Amendment and binding Supreme Court precedent. Medtronic completely ignores this issue.[7]

Because the jury will be addressing the issue anyway, Applied respectfully submits that an advisory verdict would be helpful. Such an advisory verdict is specifically contemplated by the Federal Rules. Fed. R. Civ. P. 39(c) (allowing an "advisory jury" on "an action not triable of right by a jury").

The unfair competition claim—and applying unfair competition to the interference claim—is important because conduct that does not give rise to an antitrust violation can still constitute unfair competition. *See, e.g.*, *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999) (holding an unfair competition claim may be based on "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition"). Indeed, the Ninth Circuit recently affirmed an unfair competition finding of an "incipient" violation of the antitrust laws despite the antitrust claim "suffer[ing] from a proof deficiency." *Epic*, 67 F.4th at 1002. The Ninth Circuit specifically rejected the defendant's attempt to "import" "Sherman Act Principles" into the unfair competition analysis. *Id*. The Ninth Circuit affirmed the district court without

---

[7] Notably, Medtronic ***did*** respond to Applied's arguments about *Beacon Theatres* in its prior draft. *See* Dkt. 242 at 26. Medtronic appears to now recognize its response was wrong, so it now ignores *Beacon Theatres* entirely.

any discussion of the plaintiff having to establish the formal requirements of antitrust injury. *See id.* (finding plaintiff suffered "irreparable injury" for purposes of an injunction).

### 3.    <u>Damages</u>

Medtronic also contends that Applied's damages questions are flawed because they do not mention injury or causation in the question itself. But Medtronic cites no requirement that the verdict form question itself must include all requirements for a claim or theory of relief. Indeed, Medtronic's only cited case addressed general causation requirements and said nothing about the requirements for verdict forms. *Rebel Oil Co.*, 51 F.3d at 1433. Instructing the jury on such requirements is the purpose of jury instructions—not the verdict form. Thus, Medtronic is wrong to suggest Applied is attempting to circumvent any requirements for establishing damages.

Medtronic also asserts that including two separate damages questions on the verdict form risks double recovery. Applied included one question for the antitrust claims and a second question for tortious interference because tortious interference is not subject to automatic treble damages. Thus, Applied's version ensures the Court can determine what damages number should be trebled. Applied would agree to include a single question if Medtronic agrees that any damages award will be trebled if the jury also finds an antitrust violation.

Accordingly, the Court should reject Medtronic's exceedingly long, confusing, and erroneous jury verdict form. The Court should adopt Applied's straightforward form.

# MEDTRONIC'S PROPOSED VERDICT FORM

**Instructions:** When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Please refer to the Jury Instructions for the law applicable to each question.

We, the jury, unanimously find as follows:

## I.    Market Definition

1.  Did Applied prove that there is a properly defined relevant antitrust market for advanced bipolar devices in the United States?

    Yes_____    No_____

*If you answered "Yes," go to the next question. If you answered "No," do not answer any further questions. Go to the last page to sign and date the form.*

## II.    Challenged Conduct

2.  Did Applied prove that Medtronic sold advanced bipolar devices as part of below-cost bundled discounts that Medtronic alone had the exclusive capacity to create?

    Yes_____    No_____

*Please go to the next question.*

3.  Did Applied prove that Medtronic entered into exclusive dealing agreements that prevented hospitals from buying any advanced bipolar devices from competing suppliers?

    Yes_____    No_____

*If you answered "Yes" to Question 2 **or** 3, go to the next question. Otherwise, do not answer any further questions. Go to the last page to sign and date the form.*

### III.    Rule of Reason Balancing (Sherman Act, Sections 1 & 2)

4.  Did Applied prove that, under the Rule of Reason balancing test, Medtronic's bundled discounts and/or exclusive dealing agreements caused competitive harm that substantially outweighed their competitive benefits?

        Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Question 10.*

### IV.    Market Power (Sherman Act, Section 1)

5.  Did Applied prove that Medtronic has substantial market power in the relevant antitrust market for advanced bipolar devices?

        Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Question 8.*

### V.    Monopolization (Sherman Act, Section 2)

6.  Did Applied prove that Medtronic has monopoly power in the relevant antitrust market for advanced bipolar devices?

        Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Question 8.*

7.  Did Applied prove that Medtronic willfully acquired or maintained monopoly power through exclusionary bundled discounting and/or unlawful exclusive dealing?

        Yes_____    No_____

*Please go to the next question.*

## VI.    Attempted Monopolization (Sherman Act, Section 2)

8.  Did Applied prove that Medtronic had the specific intent to achieve monopoly power in the relevant market for advanced bipolar devices?

Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Section VII and follow the instructions.*

9.  Did Applied prove that Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing created a dangerous probability that Medtronic would achieve monopoly power in the relevant market for advanced bipolar devices?

Yes_____    No_____

*Please go to the next instruction.*

## VII.    Unlawful Exclusive Dealing (Clayton Act, Section 3)

*If you answered "Yes" to Question 3 above, proceed to Question 10.  If you answered "No" to Question 3, go to Question 11.*

10. Did Applied prove that Medtronic entered into unlawful exclusive dealing agreements with customers that substantially foreclosed, or have the probable effect of substantially foreclosing, competition in the relevant market for advanced bipolar devices?

Yes_____    No_____

*Please go to the next question.*

## VIII.    California Cartwright Act

11. Did Applied prove that Medtronic entered into exclusionary bundled discounting and/or unlawful exclusive dealing agreements with customers with the purpose or effect of restraining competition in the relevant antitrust market for advanced bipolar devices?

-23-

Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Section IX and follow the instructions.*

12. Did Applied prove that the anticompetitive effect of the exclusionary bundled discounting and/or unlawful exclusive dealing agreements outweighed the beneficial effects on competition?

Yes_____    No_____

*Please go to the next instruction.*

## IX.    Antitrust Injury

*If you answered "Yes" to any of Questions 5, 7, 9, 10, **or** 12, proceed to Question 13.  Otherwise, go to Question 14.*

13. Did Applied prove that Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing agreements caused Applied to suffer antitrust injury to its business or property?

Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," do not answer any further questions.  Go to the last page to sign and date the form.*

## X.    Unlawful Interference with Prospective Economic Advantage

14. Did Applied prove each element of its claim of unlawful interference with prospective economic advantage with respect to one or more hospitals?

Yes_____    No_____

*If you answered "Yes," go to the next question.  If you answered "No," go to Section XI and follow the instructions.*

15. For which hospitals, if any, did Applied prove each element of its claim for unlawful interference with prospective economic advantage?

*Please go to the next instruction.*

## XI.    Damages

*If you answered "Yes" to Questions 13 **or** 15, proceed to Question 16. Otherwise, skip this question and sign and date the form.*

16. What amount of lost profits, if any, did Applied prove it is entitled to as damages as a result of Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing?

$_____

*Please sign and date the form.*

**When you have completed filling out this form, please have the jury foreperson sign below.**

_____        _____

Foreperson                                                              Date

**MEDTRONIC'S ARGUMENT**

Applied pursues eight claims against Medtronic, all based on two categories of alleged conduct: bundled discounting and de facto exclusive dealing. Medtronic proposes a verdict form that streamlines Applied's multiple claims while retaining the questions necessary to guide jury deliberations and permit meaningful post-trial and appellate review. Applied's form, by contrast, asks the jury no questions about factual elements essential to Applied's claims, undermining clarity in juror deliberations and needlessly complicating future review by this Court and the Ninth Circuit. Applied's cursory form would be an outlier in complex antitrust cases like this one.[8]

**A.** **Medtronic's form helps jurors organize their deliberations and allows meaningful review.**

"[I]n large and complex cases" that "involve[e] many novel legal issues, the better practice [is] to require special verdicts or the submission of interrogatories to the jury." *Pac. W. Cable Co. v. City of Sacramento*, 672 F.

---

[8] *Compare* Medtronic's Proposed Verdict Form (16 questions for 8 claims), *with, e.g.*, Verdict Form, *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 5:19-cv-04312-BLF, (N.D. Cal. 2024), Dkt. No. 487-1 (10 questions for 2 claims); Verdict Form, *In re: Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668-PSG-SK, (C.D. Cal. 2024), Dkt. No. 1481 (12 questions for 2 claims); Verdict Form, *Sidibe v. Sutter Health*, No. 3:12-cv-04854-LB (N.D. Cal. Mar. 11, 2022), Dkt. No. 1530 (10 questions for 2 claims); Verdict Form, *Sumotext Corp. v. Zoove, Inc.*, No. 16-cv-01370-BLF (N.D. Cal. Mar. 6, 2020), Dkt. No. 470 (17 questions for 2 claims); Verdict Form, *ZF Meritor LLC v. Eaton Corp.*, No. 1:06-cv-00623-SLR (D. Del. Oct. 8, 2009), Dkt. No. 217 (14 questions for 4 claims); Verdict Form, *SmithKline Beecham Corp. v. Abbott Lab'ys*, No. 4:07-cv-05702-CW (N.D. Cal. Mar. 24, 2011), Dkt. No. 486 (25 questions for 3 claims); Verdict Form, *Pac. Surf Designs, Inc. v. WhiteWater W. Indus., Ltd.*, No. 3:20-cv-01464-BEN (S.D. Cal. Aug. 28, 2023), Dkt. No. 313 (12 questions for 2 claims); Verdict Form, *United Nat'l Maintenance Inc. v. San Diego Convention Ctr. Corp.*, No. 3:07-cv-02172 (S.D. Cal. May 4, 2011) (52 questions for 4 claims).

Supp. 1322, 1326 (E.D. Cal. 1987). Special verdict forms "simplify [the] instructions, help jurors organize their deliberations, facilitate partial verdicts, isolate issues for possible appellate review, and reduce the costs and burdens of a retrial." Manual for Complex Litigation 160 (4th ed. 2004); *id.* at 123 ("Special verdict forms and interrogatories can help the jury understand and decide the issues while minimizing the risk of inconsistent verdicts."); *see also, e.g.*, *United States v. Poehlman*, 217 F.3d 692, 698 n.7 (9th Cir. 2000) (noting that a special verdict form "ease[s] the process of appellate review" and "encourages juries to focus their deliberations"). Special verdict forms also "serve to emphasize the jury's findings of facts and to remove elements of personalities and prejudice." *A.H.D.C. v. City of Fresno*, 2004 WL 5866233, at *3 (E.D. Cal. 2004), *aff'd*, 433 F.3d 1182 (9th Cir. 2006).

To the extent Applied implies that its form is not a general verdict form, Applied is incorrect. Competing Verdict Forms at 11 (separating "general verdict forms" from "verdict forms like Applied proposes"); *see also* Joint Verdict Form Filing at 8, (May 2, 2025), Dkt. No. 242 ("Applied did not submit the sort of 'general' verdict form that some courts disfavor."). Applied's form contains only a single question deciding each claim, which does nothing to address the Ninth Circuit's concern with verdict forms that provide "no way to monitor the jurors' thinking processes or test their understanding of the law." *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991). And "the key" to whether a verdict form is "general" "is not the number of questions on the verdict form, but whether the jury announces the ultimate legal result of each claim" without enumerating any specific factual findings. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1031 (9th Cir. 2003); *see also Williams v. Gaye*, 895 F.3d 1106, 1132 n.21 (9th Cir. 2018) (describing the verdict forms used in *El-Hakem v. BJY Inc.*, 262 F. Supp. 2d 1139, 1146 (D. Or. 2003), which asked one question as to the ultimate legal result for each claim, as "functionally general verdict forms"). Regardless of the

label the form bears, Applied's proposal would inhibit efficient deliberations and meaningful post-trial and appellate review.

    ***Ease of Use***. Medtronic's form makes it easier for the jurors to understand their obligations. It walks them through the factual elements of Applied's claims, and it ensures that they do not consider the same element multiple times under different claims.[9] Far from a "choose your own adventure" book, as Applied contends, Medtronic's form guides jurors' deliberations in accordance with the law and prevents them from accidentally wandering into claims or questions precluded by prior findings. These kinds of instructions are standard practice. *See Larson v. Neimi*, 9 F.3d 1397, 1401 (9th Cir. 1993) (failure to include "the usual 'stop here, if your answer is no' direction," when only a "yes" could support liability, produced an inconsistent verdict that required resubmission of a corrected form to the jury).[10] Medtronic's approach reduces the chance of error and confusion as jurors parse approximately 90 pages of instructions covering Applied's eight claims.

---

[9] Applied selectively misreads Medtronic's form. Applied claims that Medtronic's form is contradictory because it instructs jurors to stop if they answer "No" to Question 3 and instructs them to skip Question 10 if they checked "No" at Question 3. Competing Verdict Forms at 5, 9. Medtronic's form says no such thing, as Applied recognizes elsewhere in its argument: Medtronic's "verdict form . . . instructs the jury not to answer any further questions if they answer no to questions 2 *and* 3." Competing Verdict Forms at 7 (emphasis added). In other words, the jury stops after Question 3 only if they find Medtronic engaged in *neither* budling discounting (Question 2) nor exclusive dealing (Question 3). Question 10 deals with the Clayton Act, which does not regulate bundled discounting. The direction Applied highlights thus ensures that jurors only evaluate whether Medtronic violated the Clayton Act if they find that Medtronic engaged in exclusive dealing.

[10] Every verdict form cited in note 8, for example, features similar directional instructions.

Applied's form, by contrast, forces jurors to maintain their own checklists of elements for each claim, fails to identify elements common to multiple claims, and lets jurors resolve the same elements differently for different claims. Far from promoting simplicity and efficiency, rolling up elements into one question per claim increases the mental load on jurors and risks inconsistency in their decision-making.

**Meaningful review**. Medtronic's form asks the jury to make clear findings on potentially dispositive issues, including whether Applied has proven its proposed market for advanced bipolar devices and whether the jury's findings rest on bundled discounting, de facto exclusive dealing, or both. Specific questions on essential factual elements are more likely to streamline the matters addressed in post-trial briefing and narrow the issues for potential appeal. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1047, 1053–54 (9th Cir. 2004) (finding "no need to address" challenges to jury instructions where jury's findings on special verdict form rendered those arguments moot).

Applied's form, by contrast, would fail to capture the jury's findings on potentially dispositive issues. It would produce an opaque verdict, preventing the Court from assessing whether the jury found all facts necessary to support its verdict. And it would increase the risk of retrial by obscuring whether any potentially erroneous instruction is harmless error. *See Pac. W. Cable Co.*, 672 F. Supp. at 1326 (use of special verdicts or interrogatories reduces "the probability of a laborious and expensive retrial"); *see also Pac. Greyhound Lines v. Zane*, 160 F.2d 731, 737 & n.7 (9th Cir. 1947) (remanding for new trial following an erroneous jury instruction, and lamenting that, "[h]ad there been a special or fact-verdict, or if the general verdict had been coupled with answers to fact-interrogatories . . . we would know to a certainty that . . . [the erroneous instruction] was harmless error"). For instance, if the jury finds only that Applied proved Medtronic monopolized "a" relevant market, then a ruling on appeal that

-29-

1  Applied needed to prove its advanced bipolar device market could require a
2  retrial.

3        Applied does not seriously dispute the reasons to prefer a special verdict.
4  It asserts that courts "routinely" reject special verdict forms, Competing Verdict
5  Forms at 13, but offers essentially no support for that bold proposition. Applied
6  cites only (1) a case *adopting* a special verdict form, *Gourdeau v. City of Newton*,
7  238 F. Supp. 3d 179, 183 (D. Mass. 2017); (2) another case appearing to adopt a
8  special verdict form, *Cooper v. Paychex, Inc.*, 960 F. Supp. 966, 973, No. 1:96-
9  cv-00054-JCC (E.D. Va. 1997), Dkt. Nos. 59–60 (docket entries reflecting
10  "Return of verdict (special interrogatories)" and entry of judgment "in accordance
11  with the Special Interrogatories submitted to the jury"); and (3) a one-count
12  wrongful discharge case in which the court chose to use a general verdict form,
13  *Steffens v. Regus Grp., PLC*, 2013 WL 4499112, at *7 (S.D. Cal. 2013), Dkt. Nos.
14  144, 147 (defendant proposed an eight-question form for a one-count trial with a
15  single substantive jury instruction). Applied also criticizes the age of Medtronic's
16  authorities, but that courts have rejected Applied's approach for over 75 years
17  suggests a well-settled preference for special verdicts. *See, e.g.*, *Pac. Greyhound
18  Lines v. Zane*, 160 F.2d 731, 738 n.7 (9th Cir. 1947) (remarking that the Federal
19  Rules "were designed to encourage and facilitate the use of the special verdict").

20        The only cases Applied offers addressing the propriety of using a general
21  verdict form are unpublished, cursory affirmances of individual general verdicts
22  outside of the antitrust context. *See Varanand v. State Farm Ins. Co.*, 127 F.
23  App'x 947, 949 (9th Cir. 2005) (one-sentence discussion of the verdict form in
24  an insurance dispute); *NMB Air Operations Corp. v. McEvoy*, 194 F.3d 1317, at
25  *5 (9th Cir. 1999) (two sentences in an unpublished table decision related to a
26  civil rights dispute); *Maurer v. L.A. Cnty. Sheriffs Dep't*, 930 F.2d 28, at *1–2
27  (9th Cir. 1991) (three sentences in an unpublished table decision related to fraud
28  claims); *MKB Constructors v. Am. Zurich Ins. Co.*, 711 F. App'x 834, 837 (9th

Cir. 2017) (one paragraph affirming district court's rejection of verdict form that "easily could have misled the jury" in an insurance dispute).

Applied also identifies a handful of antitrust cases that used general verdict forms, but these forms are outliers in antitrust actions like this one and do nothing to show that a general verdict form is wise or desirable here. *See* Competing Verdict Forms at 4, 14. In *Trendsettah*, for example, the defendant did not propose a verdict form, and in *Innovative Health*, the defendant's proposed form was unusually complex.[11] Applied's only other example from this District was reversed on appeal after the district court, when deciding plaintiff's claim for injunctive relief, erroneously divined an "implicit factual finding" from the general verdict form. *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1145 (9th Cir. 2023). In this Circuit, special verdict forms remain the predominant approach in complex antitrust cases for good reason. *See supra* note 8.[12]

───────────

[11] *See* Proposed Jury Verdict, *Trendsettah USA Inc. et al v. Swisher Int'l Inc.*, No. 8:14-cv-01664 (C.D. Cal. 2016), Dkt. No. 180; Redacted Jury Verdict, *id.* (C.D. Cal. 2016), Dkt. No. 206; Joint Proposed Verdict Forms, *Innovative Health LLC v. Biosense Wester, Inc.*, No. 8:19-cv-01984-JVS-KES, (C.D. Cal. Apr. 14, 2025), Dkt. No. 440 at 7–10 (asking the jury to hand-write "each catheter(s) you find to have been tied to the clinical support" and to write down the relevant market three separate times).

[12] Courts in other circuits also endorse special verdict forms in complex cases. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2022 WL 3971006, at *7 (S.D.N.Y. 2022) (referring to a special verdict form as "sound case management"); *Jones v. Miles*, 656 F.2d 103, 108 (5th Cir. Unit B Aug. 1981) ("Had special verdicts been submitted to the jury, this error could have been localized thereby permitting the valid portions of the original verdict to be salvaged. But this single fault completely destroys the general verdict, because such a verdict is an inseparable and inscrutable unit." (quotation omitted)); *Stewart & Stevenson Services, Inc. v. Pickard*, 749 F.2d 635, 644 (11th Cir. 1984) (the "purpose of a Rule 49(a) special verdict is to avoid confusion, appellate uncertainty and the need for additional proceedings by identifying the bases on

**B.**    Applied's form asks improper questions and invites error.

Applied's form also asks the jury improper questions on the relevant market, California's Unfair Competition Law ("UCL"), and damages.

*Relevant Market: Applied's Burden.* Applied fails to ask the jury whether Applied proves its alleged relevant market and further refuses to specify its alleged market in the jury instructions. *See, e.g.*, Applied's Position Statement Regarding Instruction D2 (Monopolization General—Elements). Applied's proposed form thus erroneously invites the jury to find a market other than the market Applied actually alleged and has the burden to prove. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (under the Rule of Reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) ("The plaintiff has the burden of establishing the relevant geographic market."); *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir. 1978) (affirming judgment notwithstanding the verdict because plaintiffs "failed to bear their burden of proof in establishing the relevant market"); *Malaney v. UAL Corp.*, 2011 WL 6845773, at *4–5 (N.D. Cal. 2011) (dismissing case where no jury could find liability based on the plaintiff's alleged market), *aff'd*, 552 F. App'x 698 (9th Cir. 2014).

Applied's burden is meaningless if Applied can ask the jury to concoct its own market. The only support Applied offers for its approach is *Epic Games, Inc.*

---

which the jury rendered its verdict"); *United States v. Kim*, 111 F.3d 1351, 1360 (7th Cir. 1997) (similar); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 279 (2d Cir. 1979) (encouraging use of special verdict forms in complex cases and noting, "[c]ertainly the already difficult task of reviewing a case of this magnitude would have been eased somewhat for this court if we knew precisely what the jury's findings were on several specific factual issues.").

*v. Apple, Inc.*, but that case was decided by the court, not a jury, and neither party in that case appears to have contested the court's power to find a market of its own design. 67 F.4th 946, 981 (9th Cir. 2023) (affirming the district court's "middle-ground market" where the appellant argued only that the court had defined the wrong market, without challenging its ability to do so). Courts routinely ask juries whether a plaintiff has met its burden of proving its alleged market.[13]

Letting the jury find a market other than the one alleged is particularly inappropriate here. Applied has never endorsed a product market other than its claimed advanced bipolar device market. *See* Compl. ¶¶ 2, 39, Dkt. No. 1; Opp'n to Mot. to Dismiss at 4, Dkt. No. 25 ("Medtronic engages in anticompetitive conduct . . . in the market for advanced bipolar devices."); Joint Summ. J. Br. at 4–5, Dkt. No. 147-1 (Applied's introduction referring to "the ABD market" and "the relevant ABD market"). Indeed, Applied has specifically and repeatedly disclaimed alternative markets. *See, e.g.*, Compl. ¶ 31 ("Advanced bipolar devices therefore lack any reasonable substitute."); Orszag Rep. ¶ 9 ("The evidence indicates that other surgical devices . . . are not close substitutes for advanced bipolar devices and are in separate relevant product markets."); Pl.'s

---

[13] *See, e.g.*, Verdict Form at 1, *In re: Nat'l Football League's "Sunday Ticket" Antitrust Litig.*, No. 2:15-ml-02668-PSG-SK (C.D. Cal July 2, 2024), Dkt. No. 1481 (asking the jury, post-*Epic Games*, to first answer whether plaintiff had proven the relevant market "for professional football telecasts in the United States" and, if not, to conclude deliberations); Verdict Form at 1, *Tevra Brands*, No. 5:19-cv-04312-BLF (N.D. Cal. 2024), Dkt. No. 487-1 (same, also post-*Epic Games*, for the alleged market for "topical imidacloprid flea and tick products for dogs and cats in the United States"); Verdict Form at 2, *ZF Meritor LLC v. Eaton Corp.*, No. 1:06-cv-00623-SLR (D. Del. Oct. 8, 2009), Dkt. No. 217 (same, for the alleged geographic market); Verdict Form at 3, *Applied Med. Res. Corp. v. Ethicon Inc.*, No. SACV 03-1329-JVS (C.D. Cal. Aug, 29, 2006), Dkt. No. 351 (requiring jury to find, e.g., monopoly power "in the market for disposable trocars" which had been alleged by Applied).

-33-

1   Contentions of Fact and L. at 6, Dkt. No. 281 ("Applied intends to . . .
2   demonstrat[e] that there is a valid market for advanced bipolar devices . . . .
3   Applied's expert opinion and analysis, and Medtronic documents and testimony,
4   will demonstrate that the market for ABDs does not include ultrasonic and robotic
5   devices."). In a footnote, Applied suggests that Mr. Orszag defined a market
6   broader than Applied alleged. But Applied cites no economic analysis defining
7   an alternative market. Applied has made abundantly clear throughout this case
8   that it alleges only the advanced bipolar device market. *See* Medtronic's Position
9   Statement Regarding Instruction D4 (Relevant Market—General).

10      Applied attempts to escape its prior disclaimers by arguing that it can
11  prevail "*if* the market is defined to include ultrasonic devices." Competing
12  Verdict Forms at 15 (emphasis added) (citing Compl. ¶ 53 ("As discussed
13  throughout, ultrasonic devices are not reasonable alternatives to advanced bipolar
14  devices.")). But Applied never answers the obvious question. *Who is defining*
15  *such a market*? Medtronic proposes no such market. And neither does Applied.
16  Applied thus asks the jury to invent for itself a market alleged by neither party.

17      Letting the jury find a market other than the one alleged, however, would
18  leave it with an unworkable task. Although Applied argues it can prevail
19  "regardless of whether the market is broadened," it cannot prove key elements of
20  its case based on any other market. For example, to prevail on exclusive dealing,
21  Applied must establish that Medtronic has foreclosed competition in a substantial
22  share of the relevant market. *See* Order re Mot. to Exclude or Strike Certain
23  Opinions and Test. of Applied's Expert Jonathan Orszag [137], Dkt. No. 197 at
24  12; Order re Mot. Summ. J., Dkt. No. 255 at 9.[14] And Applied's expert analyzed

25  ────────────
26      [14] Medtronic has revised its verdict form and this argument in light of the
    Court's Summary Judgment Opinion and Order. But for the reasons stated in its
27  briefs in support of its *Daubert* Motion (Dkt. Nos. 136-1 and 150-1), Summary
    Judgment Motion (Dkt. Nos. 147-1, 154-1, 249-1), and Motion for Certification
28

substantial foreclosure *only* in Applied's claimed advanced bipolar device market. *See, e.g.*, Orszag Rep. ¶ 9. A verdict form that does not ask the jury about Applied's alleged advanced bipolar device market cannot ensure a match between Applied's evidence and the market the jury found.

The same is true of the benchmarks Applied offers as proof of harm to competition and any related damages. Applied's expert designed these benchmarks as supposed estimates of Applied's share *of the alleged advanced bipolar device market* in the but-for world without the challenged conduct. *See, e.g.*, Orszag Reply Rep. ¶ 178 ("[T]he premise of my benchmarks is that Voyant would have achieved the same market share in advanced bipolar devices in the U.S. as it did in trocars, or as it did for Voyant in Europe, absent Medtronic's conduct."). If the jury were to find a relevant market other than *the alleged advanced bipolar device market*, the benchmarks would be irrelevant and could not appropriately be considered by the jury during its deliberations. Applied has no response to these concerns.[15]

Even if Applied were correct that the jury could define its own market, that would not support Applied's general verdict form. In *Epic*, the Ninth Circuit was able to provide meaningful appellate review only because the district court made clear its finding of a market for "mobile-game transactions." 67 F.4th at 973. The

---

of Interlocutory Appeal (Dkt. Nos. 259-1, 263), its April 19, 2025 Contentions of Law and Fact (Dkt. No. 219), and its May 3, 2025 position statements regarding the Disputed Jury Instructions (Dkt. No. 244), Medtronic maintains that proof of substantial foreclosure is also necessary for Applied's bundled discounting claim.

[15] Applied asserts, without any support, that a plaintiff can prevail based on harm in a market it has not proven so long as "the competitive harm is the same." Competing Verdict Forms at 15. But harm to competition is assessed *in the relevant market*. *See Qualcomm*, 969 F.3d at 992 (noting that, "without an accurate definition of the relevant market," "there is no way to measure the defendant's ability to lessen or destroy competition." (quotation omitted and alteration adopted)).

Ninth Circuit scrutinized that finding in depth. *Id.* at 973–81. Applied's form would not even have the jury state the market it finds, confounding the Court's ability to assess the verdict under Federal Rule of Civil Procedure 50 and preventing meaningful appellate review.

**Relevant Market**: **All Claims**. Applied's form would allow the jury to find for Applied on its UCL and unlawful interference claims without finding that Applied has proven its relevant market. That is not the law: Applied must prove its relevant market for *each* of its claims. *See, e.g.*, *Am. Express*, 585 U.S. at 543 & n.7 (requiring plaintiffs to define a relevant market in order to prove allegations of harm from vertical restraints).

Applied's UCL and unlawful interference claims are no exception. To succeed on its UCL claim, Applied must "introduc[e] evidence relating to the relevant market structure and the challenged conduct's effects or potential effects on this market structure." *Dixon Gas Club, LLC v. Safeway Inc.*, 2015 WL 4557388, at *6 (Cal. Ct. App. 2015). Applied's attempt to distinguish *Dixon* as an instance where "the plaintiff had failed to offer any *market-specific* evidence" serves only to highlight the market-definition requirement.

To show that conduct is "unfair" under the UCL, Applied must establish that it "significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999). As a general matter, harm to competition cannot be reliably identified without first identifying a relevant market. *See Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359, 1363 (9th Cir. 1986) ("To determine whether competition has been harmed, the relevant market must be defined."); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant] market there is no way to measure [defendant's] ability to lessen or destroy competition."); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App.

4th 247, 255–56 (2010) (considering allegations of harm to relevant market as relevant to UCL claim).

       Applied claims that the Ninth Circuit in *Epic Games* "rejected" the need to prove a relevant market to prove its UCL claim. Applied Proposed Verdict Form at 19. Not so. Apple asked the Ninth Circuit to hold, as a matter of law, that proving a UCL violation requires proving a relevant market. *See* 67 F.4th at 1000–02. *Epic* merely observed that some conduct not at issue in this case does not require defining a market, such as non-antitrust conduct and antitrust conduct subject to quick look or *per se* review. *See* 67 F.4th at 1002 (citing a deceptive advertising case and an antitrust case in which the California Supreme Court "conducted something akin to quick-look review").

       As for its unlawful interference claim, Applied must prove that the alleged conduct is unlawful under one of Applied's other claims, each of which in turn requires that Applied successfully prove its alleged relevant market. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 954 (Cal. 2003) ("To establish a claim for interference with prospective economic advantage, therefore, a plaintiff must plead that the defendant engaged in an independently wrongful act. . . . [A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.").

       ***California Unfair Competition Law Claim***. "Because a UCL claim is equitable in nature, the Court, rather than a jury, must decide whether there was a UCL violation." *Netlist, Inc. v. Diablo Techs., Inc.*, 2015 WL 1887261, at \*3 (N.D. Cal. 2015). Applied does not contest this point, but nonetheless requests an advisory UCL verdict based on its assertion that "unfair competition" is a factual question common to Applied's unlawful interference and UCL claims. Competing Verdict Forms at 18–20. Far from it: "Unfair competition" is neither

an element of Applied's unlawful interference claim,[16] nor a distinct type of challenged conduct the jury may analyze. Instead, it merely a label used to identify conduct that violates the UCL. *See Nationwide Biweekly Admin., Inc. v. Super. Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 303–04 (2020) ("unfair competition" reflects a determination that "[a] challenged practice meets the test of unfairness" and "should properly be considered unfair or deceptive within the meaning of the UCL"). And thus whether the alleged conduct constitutes "unfair competition" is an equitable issue the Court, not the jury, must decide.[17]

Whether conduct constitutes "unfair competition" under the UCL is not a question a jury can properly evaluate, even in an advisory capacity. The California Supreme Court has warned that whether conduct is "unfair" under the UCL is a standard "too indeterminate to be adequately conveyed by jury instructions or applied by a jury" and which thus "may reasonably be applied only by a court." *Nationwide Biweekly Admin.*, 9 Cal. 5th at 302–04. Correctly applying the standard often requires "consideration of a variety of factors or

---

[16] Until recently, Applied agreed. *See* Pl.'s Mem. of Contentions of Fact and L. at 5, Dkt. No. 223 (Apr. 22, 2025) ("unfair competition" not among the elements of Applied's unlawful interference claim); *see also* CACI No. 2202 (elements of unlawful interference do not include "unfair competition").

[17] The only conduct for the jury to analyze is the challenged conduct underlying *all* of Applied's claims: bundled discounting and exclusive dealing. It is then for the Court to determine whether such conduct can serve as the predicate for unlawful interference, including assessing whether it constitutes "unfair competition" under the UCL. *See* Joint Proposed Jury Instructions, Medtronic Argument re Instruction D34 (Unlawful Interference with Prospective Economic Advantage—Elements). Applied criticizes Medtronic for not citing *Beacon Theaters Inc. v. Westover*, Competing Verdict Forms at 19 n.7, which holds that when there is factual issue common to a legal and an equitable claim, the jury must decide the factual issue, 359 U.S. 500 (1959). But because "unfair competition" is not a fact the jury must find to decide Applied's unlawful interference claim, *Beacon* is inapposite.

circumstances identified in prior cases in California or other jurisdictions or in administrative guidelines developed by the Federal Trade Commission or other consumer protection administrative agencies—[it] is the type of decision that has traditionally been viewed as the province of courts rather than juries." *Id.* Thus, an advisory verdict on this issue would be of no use, and an unlawful interference verdict predicated on a misapplication of the "unfair" standard would be fundamentally flawed and at risk of reversal.

***Damages***. Applied's jury questions on damages are insufficiently specific because they ask only "what amount of damages" Applied proved. The role of the jury is not so freewheeling: it must decide the amount of Applied's *lost profits*, if any, *flowing from Medtronic's alleged anticompetitive conduct*. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("[A] plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition."). Applied's questions inappropriately invite the jury to award damages without distinguishing injury caused by lawful competition from injury caused by anticompetitive conduct.

Applied's questions also invite the jury to award duplicative damages. First, Applied appears to include separate damages questions for its antitrust claims (Question 6) and its unlawful interference claim (Question 8). But across each of its claims, Applied alleges only one type of damages: "lost profits" suffered "as a result of Medtronic's alleged antitrust violation." *See* Applied Proposed Instruction No. D33 (Damages for Competitors—Lost Profits); *see also* Orszag Rep. ¶ 268 n.636 ("[T]he damages estimates are based solely on Applied's lost profits resulting from Medtronic's alleged wrongful conduct."). Applied's alleged antitrust damages, which are purported lost profits market-wide, already include any damages from unlawful interference, which are lost

profits related to individual hospitals. Thus, any damages for unlawful interference would be duplicative of damages awarded for Applied's antitrust claims. Second, Applied asks the jury the same question twice: "what amount of damages did Applied prove by a preponderance of the evidence." This invites the jury again to double-count, recording all antitrust damages in response to Question 6 and then that amount *plus* some additional award for unlawful interference in response to Question 8. For these reasons, Medtronic offers one straightforward damages question, which Applied offers no reason to reject.

**C.    Applied's objections to Medtronic's form are meritless.**

Applied mounts numerous objections to the substance and the structure of Medtronic's proposed verdict form. Each is misplaced.

**1.    Medtronic's form accurately states Applied's claims.**

*Relevant Market*. Applied objects to the requirement that it prove its alleged relevant market. Competing Verdict Forms at 6. But Medtronic's instruction accords with the law and the evidence developed in this case. *See supra* at 32–36; Joint Proposed Jury Instructions, Medtronic Argument re Instruction D5 (Relevant Product Market).

*Rule of Reason*. Applied objects to language in Question 4 of Medtronic's form making clear that the Rule of Reason applies to Applied's Sherman Act § 2 claims. Competing Verdict Forms at 7. But the Ninth Circuit has unambiguously answered this question. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("[W]hether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same."); *see also* Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2, Dkt. No. 278 ("Medtronic's own proposed jury instructions provide a helpful multi-step analysis for the jury to evaluate whether Medtronic's bundled

discounting are anticompetitive. *If* the jury does find exclusionary bundling to exist, they are still required to apply the Rule of Reason to determine whether the challenged conduct results in substantial harm to competition in the relevant market *and* whether such conduct produces countervailing competitive benefits." (emphasis in original)); Joint Proposed Jury Instructions, Medtronic Argument re Instruction D2 (Monopolization General—Elements). Applied offers no reason for this Court to ignore *Qualcomm*.

 **Attempted Monopolization**. Applied argues, without any authority, that it is improper to ask the jury whether Medtronic "created" a dangerous probability of monopoly power. Competing Verdict Forms at 8. But conduct is unlawful under Section 2 only when *that conduct* threatens monopolization. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 457 (1993) ("The conduct of a single firm, governed by § 2, is unlawful only when it threatens actual monopolization." (cleaned up)). It is thus "axiomatic in antitrust law that a defendant may not be found liable for monopolizing or attempting or conspiring to monopolize a market unless . . . his conduct creates a dangerous probability that he will gain a dominant share of the market." *Portney v. CIBA Vision Corp.*, 593 F. Supp. 2d 1120, 1128 (C.D. Cal. 2008) (quoting *Transphase Sys. v. S. Cal. Edison Co.*, 839 F. Supp. 711, 717 (C.D. Cal. 1993)). While other considerations such as market share trends are relevant in assessing the effect of the challenged conduct, it is the challenged conduct that must create the dangerous probability of monopoly power. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549 (9th Cir. 1991) ("If there is a dangerous probability that a monopoly will be created *by leveraging conduct*, then the conduct will be reached under the doctrine of attempted monopoly." (emphasis added)); *FutureLogic, Inc. v. TransAct Techs., Inc.*, 2007 WL 9700696, at *17 (C.D. Cal. 2007) (dangerous probability requires pleading that the defendant "could achieve . . . monopoly power through its allegedly unlawful conduct").

*Antitrust Injury*. Applied contends that the jury should reach Applied's unlawful interference claim regardless of whether the jury finds antitrust injury. Competing Verdict Forms at 9, 17. Applied is incorrect for the reasons stated in Medtronic's Mem. of Contentions of Fact and L. at 25–26, Dkt. No. 284. *See also Zef Sci., Inc. v. Shimadzu Sci. Instruments, Inc.*, 2016 WL 1255787, at *6 (S.D. Cal. 2016) (granting motion to dismiss claim of unlawful interference with prospective economic advantage because "Plaintiff's antitrust allegations did not factually allege an antitrust injury as required for its claims under the Sherman Act, Cartwright Act, and UCL"). Applied's late-breaking argument that *Epic Games implicitly* relieves Applied of its burden to prove antitrust injury with respect to its UCL claim also fails. In *Epic Games*, the defendant appears never to have argued that the plaintiff's UCL claims failed for lack of antitrust injury, and neither the district court nor the Ninth Circuit analyzed whether antitrust injury was required. *See* Joint Submission Regarding Trial Elements, Legal Framework and Remedies at 88–97, No. 4:20-cv-05640-YGR (Jan. 22, 2021), Dkt. No. 276.

*Other Disputes*. Applied objects that Medtronic's proposed questions "do not track" the elements of Applied's Sherman Act and Cartwright Act claims. Competing Verdict Forms at 7. Applied further objects that Medtronic "selectively adds (erroneous) subject matter from the jury instructions" to the verdict form, or else uses "argumentative characterizations" of those instructions. Competing Verdict Forms at 6. Medtronic's verdict form closely tracks the jury instructions regarding the elements of Applied's claims. To the extent that Applied believes that those instructions are incorrect, Applied's objection is to the instructions, not to Medtronic's verdict form. Medtronic explains in its arguments in support of its proposed jury instructions why its instructions are correct. Joint Proposed Jury Instructions, Medtronic Argument re Instruction D18 (Unreasonable Restraint of Trade—Elements); *id.*, Medtronic Argument re

Instruction D24 (California Cartwright Act: Unlawful Restraint of Trade—Elements); *id.*, Medtronic Argument re Instruction D34 (Unlawful Interference with Prospective Economic Advantage—Elements). Finally, Applied asserts that it can prevail on its UCL claim "without meeting the same standards for anticompetitive conduct as the antitrust claims." Competing Verdict Forms at 7. Yet Applied has never explained how Medtronic's conduct, if not proven to be anticompetitive, could still violate the UCL. It is Applied's burden to put forth a viable theory; in nearly three years of litigation, it has never done so.

## 2. Medtronic's form is properly structured.

***Open-Ended Question***. Applied criticizes Question 15, which asks jurors to list the hospitals for which Applied has proven unlawful interference. Competing Verdict Forms at 4 n.1. Question 15 is necessary because Applied "must identify *specific* third parties with whom it had an economic relationship." *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071 (C.D. Cal. 2017) (emphasis added); *see also Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996) (rejecting plaintiff's "expansive view" that interference with "unidentified buyers" was actionable). And to date, Applied has not clearly identified the hospital relationships with which it contends Medtronic unlawfully interfered. If Applied is prepared to specify those relationships, Medtronic is willing to replace Question 15's open-ended structure with a series of yes-or-no questions, one for each hospital. *See, e.g.*, Verdict Form at 13–15, *United Nat'l Maintenance Inc. v. San Diego Convention Ctr. Corp.*, No. 3:07-cv-02172 (S.D. Cal. May 4, 2011) (yes/no checkboxes for each economic relationship with which the plaintiff alleged the defendant had unlawfully interfered). Otherwise, an open-ended question is needed to ensure that the jury finds unlawful interference for *only* those relationships as to which Applied meets its burden of proof. Without that, there is no way to seriously evaluate the jury's findings under Rule 50 or at the appellate level.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Form Length**. Finally, Applied complains that Medtronic's proposed form is "exceedingly long." Competing Verdict Forms at 18. Medtronic's proposed form covers eight claims plus damages using only 16 questions. This is an appropriate length in light of the case Applied seeks to try to the jury. *See supra* note 8 (listing questions per claim in other complex antitrust cases).

1

2  Dated: December 5, 2025          Respectfully submitted,

3

4  By: /s/ Joseph R. Re            By: /s/ Brian L. Stekloff__

5  Knobbe, Martens, Olson & Bear,   Wilkinson Stekloff LLP
   LLP                              Brian L. Stekloff (*pro hac vice*)
6  Joseph R. Re (SBN 134479)        Sarah Neuman (*pro hac vice*)
   Joe.re@knobbe.com                Alysha Bohanon (pro hac vice)
7  Stephen C. Jensen (SBN 149894)   stekloff@wilkinsonstekloff.com
   steve.jensen@knobbe.com          sneuman@wilkinsonstekloff.com
8  Joseph F. Jennings (SBN 145920)  abohanon@wilkinsonstekloff.com
   joe.jennings@knobbe.com          2001 M Street, NW
   Stephen W. Larson (SBN 240844)   Washington, DC 20036
9  stephen.larson@knobbe.com        Telephone: (202) 847-4000
   Cheryl T. Burgess (SBN 250101)
10 Cheryl.burgess@knobbe.com        Keri Arnold (pro hac vice)
   2040 Main Street Fourteenth Floor karnold@wilkinsonstekloff.com
11 Irvine, CA 92614                 130 W 42nd Street
   Phone: (949) 760-0404            24th Floor
12 Facsimile: (949) 760-9502        New York, NY 10036
                                    Telephone: (212) 294-8910
13 Adam B. Powell (SBN 272725)
   adam.powell@knobbe.com           Cleary Gottlieb Steen & Hamilton
14 3579 Valley Centre Drive         LLP
   San Diego, CA 92130              Leah Brannon (*pro hac vice*)
15 Phone: (858) 707-4000            Alan B. Freedman (*pro hac vice*)
   Facsimile: (858) 707-4001        lbrannon@cgsh.com
16                                  afreedman@cgsh.com
   *Attorneys for Applied Medical*  2112 Pennsylvania Avenue, NW
17 *Resources Corp.*                Washington, DC 20037
                                    Telephone: (202) 974-1500
18
                                    Liang Ly LLP
19                                  Jason L. Liang (SBN 251235)
                                    John K. Ly (SBN 247477)
20                                  jliang@lianglyllp.com
                                    jly@lianglyllp.com
21                                  601 South Figueroa Street, Suite 1950
                                    Los Angeles, CA 90017
22                                  Telephone: (213) 262-8000

23                                  *Attorneys for Medtronic, Inc.*

24

25

26

27

28

                                   -45-

**FILER'S ATTESTATION**

Pursuant to Local Rule 5-4.3.4 regarding signatures, I hereby attest that concurrence in the filing of this document has been obtained from all signatories above.

Dated: _December 5, 2025_    By: _/s/ Joseph R. Re_____