Joseph R. Re (SBN 134479)
Joe.re@knobbe.com
Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Joseph F. Jennings (SBN 145920)
joe.jennings@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
Cheryl T. Burgess (SBN 250101)
Cheryl.burgess@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

*Attorneys for Plaintiff*
APPLIED MEDICAL RESOURCES CORPORATION

Wilkinson Stekloff LLP
Brian L. Stekloff (pro hac vice)
Sarah Neuman (pro hac vice)
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000

Keri Arnold (pro hac vice)
karnold@wilkinsonstekloff.com
130 W 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-8910

Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (pro hac vice)
Alan B. Freedman (pro hac vice)
lbrannon@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500

*Attorneys for Defendant*
MEDTRONIC, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>Defendant. | Case No.<br>8:23-cv-00268-WLH-DFM<br><br>**JOINT DISPUTED JURY INSTRUCTIONS**<br><br>Hon. Wesley L. Hsu |

Pursuant to this Court's Civil Pretrial Schedule and Trial Order dated August 28, 2023 [Dkt. 47], the Order Re Trial Schedule dated September 4, 2025 [Dkt. 258], Scheduling Notice and Order Setting Jury Trial [Dkt 280], and Local Rule 51-1, Applied Medical Resources Corporation and Medtronic, Inc. hereby submit the attached Joint Disputed Jury Instructions for Trial set on Tuesday, January 20, 2026. Pursuant to the Civil Pretrial Order (Dkt 47), below is a redlined set of the disputed jury instructions that identifies all modifications made by the parties to the relevant model jury instructions. A clean set of each parties' disputed jury instructions is attached as Exhibit 1 (Applied's Disputed Jury Instructions) and Exhibit 2 (Medtronic's Disputed Jury Instructions).

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| D1 | Purpose of the Sherman and Clayton Acts | ABA Model Jury Instructions in Civil Antitrust Cases (hereinafter "ABA Model Jury Instructions," at Chapter 1.A (2016 ed.) | 5 |
| D2 | **Applied**: Monopolization General - Elements<br><br>**Medtronic**: Sherman Act, Section 2: | ABA Model Jury Instructions 3.A.1 | 31 |

---

[1] Where the parties disagree on the title for an instruction, the competing proposals are indicated.

[2] By agreement of the parties, the attached jury instructions are based on the ABA Model Instructions except where noted. The parties identify the ABA Model Jury Instruction, or alternative source, below. Additional supporting authorities are identified immediately following the recitation of each instruction.

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | Monopolization General – Elements | | |
| D3 | **Applied**:  Monopoly Power Defined<br><br>**Medtronic**:  Sherman Act, Section 2: Monopoly Power Defined | ABA Model Jury Instructions 3.A.2 | 46 |
| D4 | **Applied**:  Relevant Market - General<br><br>**Medtronic**:  All Claims: Relevant Market - General | ABA Model Jury Instructions 3.A.3 | 53 |
| D5 | **Applied**:  Relevant Product Market<br><br>**Medtronic**:  All Claims: Relevant Product Market | ABA Model Jury Instructions 3.A.4 | 65 |
| D6 | **Applied**:  Existence of Monopoly Power—Indirect Proof<br><br>**Medtronic**: Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof | ABA Model Jury Instructions 3.A.7 | 75 |
| D7 | **Applied**:  Existence of Monopoly Power – Direct Proof<br><br>**Medtronic**:  Sherman Act, Section 2: Existence of Monopoly Power – | ABA Model Jury Instructions 3.A.8 | 89 |

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | Direct Proof | | |
| D8 | **Applied**: Willful Acquisition or Maintenance of Monopoly Power<br><br>**Medtronic**: Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power | ABA Model Jury Instructions 3.A.9 | 96 |
| D9 | **Applied**: Exclusionary Bundling<br><br>**Medtronic**: Challenged Conduct: Exclusionary Bundled Discounting | *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) | 110 |
| D10 | **Applied**: Exclusive Dealing<br><br>**Medtronic**:<br><br>Challenged Conduct: Unlawful Exclusive Dealing | ABA Model Jury Instructions 2.D.5 | 132 |
| D11 | **Applied**: Exclusive Dealing—Additional Considerations<br><br>**Medtronic**: Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations | ABA Model Jury Instructions 2.D.6 | 144 |
| D12 | **Applied**: No Proposed | ABA Model Jury Instructions | 163 |

3

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | Instruction<br><br>**Medtronic**:  Sherman Act, Section 2: Rule of Reason | 1.C.2, 1.C.3, 1.C.4 | |
| D13 | **Applied**:  Attempt to Monopolize—Elements<br><br>**Medtronic**:  Sherman Act, Section 2: Attempt to Monopolize—Elements | ABA Model Jury Instructions 3.D.1 | 168 |
| D14 | **Applied**:<br><br>No Proposed Instruction<br><br>**Medtronic**:<br><br>Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct | ABA Model Jury Instructions 3.A.9, 3.D.2 | 176 |
| D15 | **Applied**:  Specific Intent<br><br>**Medtronic**:<br><br>Sherman Act, Section 2: Attempt to Monopolize—Specific Intent | ABA Model Jury Instructions 3.D.3 | 183 |
| D16 | **Applied**:  Dangerous Probability of Success<br><br>**Medtronic**:  Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of | ABA Model Jury Instructions 3.D.4. | 197 |

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | Success | | |
| D17 | **Applied**:  Sherman Act Section 1<br><br>**Medtronic**:  No Proposed Instruction | ABA Model Jury Instructions 1.B.1 | 204 |
| D18 | **Applied**:  **No Proposed Instruction**<br><br>**Medtronic**:  Sherman Act, Section 1: Unreasonable Restraint of Trade—Elements | ABA Model Jury Instructions 1.B, 2.D.1 | 212 |
| D19 | **Applied**:  Rule of Reason—Overview<br><br>**Medtronic**:  Sherman Act Claims: Rule of Reason—Overview | ABA Model Jury Instructions 1.C.1 | 216 |
| D20 | **Applied**:  Rule of Reason—Proof of Competitive Harm<br><br>**Medtronic**:  Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm | ABA Model Jury Instructions 1.C.2 | 224 |
| D21 | **Applied**:  Rule of Reason—Evidence of Competitive Benefits<br><br>**Medtronic**:  Sherman Act, Section 1: Rule of Reason—Evidence of Competitive Benefits | ABA Model Jury Instructions 1.C.3 | 234 |

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| D22 | **Applied**:  Rule of Reason—Balancing the Competitive Effects<br><br>**Medtronic**:  Sherman Act, Section 1: Rule of Reason—Balancing the Competitive Effects | ABA Model Jury Instructions1.C.4 | 239 |
| D23 | **Applied**:  Exclusive Dealing in Violation of Section 3 of the Clayton Act<br><br>**Medtronic**:  Clayton Act, Section 3: Exclusive Dealing—Elements | O'Malley § 150:136 (6th ed.) | 245 |
| D24 | **Applied**:  Unlawful Restraint in Violation of the California Cartwright Act<br><br>**Medtronic**:  California Cartwright Act—Unlawful Restraint of Trade—Elements | Council of Cal. Civ. Jury Instructions (CACI) No. 2202 (2024) No. 3405 | 259 |
| D25 | **Applied**:  Evidence About Applied<br><br>**Medtronic**:  No Proposed Instruction | *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 (C.D. Cal. Mar. 18, 2005) | 265 |
| D26 | **Applied**: Injury and | ABA Model Jury Instructions 6.A.1 | 271 |

6

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | Causation<br><br>**Medtronic**:  Injury and Causation—Overview | | |
| D27 | **Applied**:  No Proposed Instruction<br><br>**Medtronic:**  Injury in Fact | ABA Model Jury Instructions 6.A.1 | 280 |
| D28 | **Applied**:  No Proposed Instruction<br><br><br>**Medtronic**:  Causation | ABA Model Jury Instructions 6.A.1 | 286 |
| D29 | **Applied**:  No Proposed Instruction<br><br>**Medtronic**:  Antitrust Injury | ABA Model Jury Instructions 6.A.1 | 292 |
| D30 | Antitrust Damages—Introduction and Purpose | ABA Model Jury Instructions 6.B.1 | 299 |
| D31 | **Applied**:  Causation and Disaggregation of Damages<br><br>**Medtronic**: Disaggregation of Damages | ABA Model Jury Instructions 6.B.4 | 304 |
| D32 | Mitigation | ABA Model Jury Instructions 6.B.14 | 313 |

| Instr. Number | Title[1] | Source[2] | Page Number |
|---|---|---|---|
| | | | |
| D33 | Damages for Competitors— Lost Profits | ABA Model Jury Instructions 6.B.8.<br><br>ABA Model Jury Instructions in Civil Antitrust Cases, at F-29 – F-30  (2005 ed.) | 325 |
| D34 | **Applied**: Unlawful Interference with Prospective Economic Advantage<br><br>**Medtronic**:  Unlawful Interference with Prospective Economic Advantage—Elements | CACI No. 2202 | 332 |
| D35 | Unlawful Interference with Prospective Economic Advantage—Damages | CACI No. 3900. | 344 |
| D36 | **Applied**:  Unfair Competition in Violation of California Business and Professions Code § 17200<br><br>**Medtronic**:  No Proposed Instruction | Cal. Bus. & Prof. Code §§ 17200 | 348 |

## PLAINTIFF'S PRELIMINARY STATEMENT REGARDING THE ORDER OF INSTRUCTIONS

Applied places the monopolization instructions first. This mirrors the Complaint, which begins with Section 2 monopolization claims. This is the structure used in other Section 1 and 2 cases, including *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at \*9-17 (C.D. Cal. Mar. 18, 2005).

Medtronic originally followed the same ordering as Applied. Indeed, Medtronic agreed to this order, filing with the Court numerous (1) stipulated numbered instructions that generally follow the same order as Applied's proposal and (2) disputed numbered proposed instructions that likewise follow the same order. *See* Dkt. 243-44. Medtronic also generally kept related instructions from within the Model chapters together, as Applied proposes here. *See id.*

After summary judgment, Medtronic asked Applied to agree that the parties could submit revised instructions merely "to conform to the Court's summary judgment opinion." Dkt. 257 at 3. Instead of modest clean-up (e.g., removing Medtronic's erroneous "substantial foreclosure" addition to bundling), Medtronic ***substantially*** rewrote and reordered its proposed instructions.

**Medtronic's Rewrite of the Model Rules**

Medtronic's rewrite vastly expanded the parties' disputes. The chart below shows how Medtronic reorders and mixes instructions from ABA Model chapters—Monopolization (blue), Section 1 Vertical Restraints (yellow), and Section 1 Rule of Reason (green).[3]

---

[3] The chart focuses on Applied's Section 2 and Section 1 claims as shown on the left. Applied's Clayton Act, Cartwright, tortious interference and unfair competition claims are discussed separately below.

Medtronic begins with a Section 2 market-definition instruction (blue) but rewrites it to apply to all the claims, though market definition is unnecessary for UCL or interference claims. *See Epic Games, Inc. v. Apple Inc*., 67 F.4th 946, 994, 1002 (9th Cir. 2023). Medtronic then rewrites the Model's Rule-of-Reason Overview (green), replacing "Section 1" with "Sections 1 ***and 2***," wrongly applying Section 1 instructions to all claims, including Section 2 monopolization.[4] Medtronic then jumps repeatedly across Model chapters— yellow → green → blue → yellow → green → blue → yellow—making the instructions both incorrect and confusing.[5]

Medtronic scatters the instructions to blur the line between Sections 1

_____

[4] All emphasis in Applied's section is added unless otherwise noted.

[5] Medtronic claims Applied's table is "misleading[]" but identifies no errors. Its own table likewise confirms Medtronic has significantly rearranged the instructions. Medtronic's table is inaccurate because it ignores how Medtronic's monopolization instructions direct the jury back to Section 1 instructions (shown in yellow in Applied's table after "Willful Acquisition" and "Attempted Monop."). Medtronic also omits a color for a Section 1 "Rule of Reason" instructions that it inserts into the monopolization section.

and 2. For example, Medtronic's rewrite instructs the jury to apply Section 1 Rule-of-Reason balancing even **after** finding in favor of Applied on **all** the elements of monopolization under Section 2. Medtronic also separates the Rule-of-Reason Overview (1.C.1) from the related harm/benefits/balancing instructions (1.C.2-1.C.4), placing the latter far later in order to place it after monopolization.[6]

Medtronic makes all these changes in an attempt to resuscitate arguments this Court already rejected. For example, this Court rejected Medtronic's attempt to add to the Ninth Circuit's test for bundling, explaining that *PeaceHealth* rejected adding a "substantial adverse effect" requirement to establish exclusionary bundling. *See* Dkt. 255 at 6. As discussed below, however, Medtronic now seeks to include that precise language as a requirement for anticompetitive conduct. *See* Applied's argument re: Instruction D2.

**The Rule of Reason Does Not Justify Medtronic's Rewrite**

Medtronic claims its rewrite is justified because the "Rule of Reason" applies to both Sections 1 and 2. But the Section 2 monopolization instructions already incorporate the "Rule of Reason", with language appropriate to a monopolization claim. Indeed, Medtronic previously saw no reason to inject "Rule of Reason" instructions into monopolization.

The Rule of Reason is a "rule of analysis" for analyzing conduct. *See United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013) (explaining that the analysis will fall "under one of three rules of analysis: the rule of reason, per se, or quick look"). It does not justify dramatically rewriting

---

[6] Medtronic cites the Court's order denying interlocutory certification, but the Court cited and discussed the Model's Section 1 instructions and did not state what analysis would apply under Section 2. Dkt. 278 at 4 n.2. Nor did it have briefing or redlines showing Medtronic's many changes to the Model. *Id.* The Court noted that Medtronic's own detailed instructions undercut its claim that an interlocutory appeal was needed. *Id.*

11

the claim elements and Model instructions.  Indeed, though Section 1 and Section 2 share similarities, "important differences remain." Areeda & Hovenkamp ¶ 1512.  Section 1 concerns restraints of trade that harm competition.  *See eBay, Inc.,* 968 F. Supp. 2d at 1037.  Section 2 requires monopoly power plus "anticompetitive conduct." *See MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). "Anticompetitive conduct" is behavior that impairs rivals and is not competition on the merits.  *PeaceHealth,* 515 F.3d at 894; *Aspen Skiing*, 472 U.S. at 605 n.32.

The Model thus implements the Rule of Reason differently for Section 2 claims.  Specifically, the Model's Section 2 instructions ask the jury to determine whether there is "anticompetitive conduct."  The Model's Section 2 instruction on "Willful Acquisition or Maintenance of Monopoly Power" then separately instructs the jury on ***how*** to determine whether conduct is "anticompetitive." ABA Model Jury Instr. 3.A.9.  Specifically, Applied's instruction on "Willful Acquisition or Maintenance of Monopoly Power" (ABA Model Instr. 3.A.9):

- Provides the correct definition of "anticompetitive conduct": conduct other than competition on the merits that excludes or impedes competitors.  *See PeaceHealth*, 515 F.3d at 894; *Aspen Skiing*, 472 U.S. at 605 n. 32.

- Explains that the jury must assess harm to competition, not just harm to a competitor—examples include higher prices, lower output, or reduced quality.  *See Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022).

- Instructs the jury to consider legitimate business justifications, asking whether the conduct reflects competition on the merits, whether it provides benefits, and whether "anticompetitive harm of the conduct outweighs procompetitive benefits." *See Image Technical Services, Inc. v. Eastman Kodak, Co.,* 125 F.3d 1195, 1209 (9th Cir. 1997).

Medtronic is thus incorrect that "[o]mitting the Rule of Reason from the Section 2 instructions would leave the jury at sea without any framework for assessing harm to competition under Applied's Section 2 claims."  As demonstrated above,

Applied's Section 2 instruction instructs the jury on harm to competition, procompetitive benefits, and how to weigh the harm against the benefits—all the essential elements of the "Rule of Reason" analysis.    ABA Model Jury Instr. 3.A.9.  Importantly, however, the Model does so with the appropriate language and guidance from case law regarding Section 2 ***monopolization*** cases.

Medtronic cites the Ninth Circuit's discussion of "monopolization" in *Qualcomm*, 969 F.3d at 991, but Applied's Instruction D8 for monopolization is much closer to *Qualcomm* than the Section 1 instruction Medtronic seeks to inject into monopolization.

*Qualcomm*'s discussion of monopolization focuses on whether there is an (1) "anticompetitive effect," (2) "procompetitive justification" and (3) whether "the anticompetitive harm of the conduct outweighs the procompetitive benefit." 969 F.3d at 991.    Applied's Instruction D8 for monopolization similarly (1) focuses on anticompetitive "effect," (2) whether the conduct has a "legitimate business purpose" and (3) whether "anticompetitive harm outweighs procompetitive benefits."  In contrast, Medtronic's Section 1 instruction, requires (1) "***substantial*** harm to competition," (2) says nothing of justifications or legitimate purposes, and (3) requires that the harm "***substantially*** outweighs" benefit.  *See* Instruction D19.

Despite these substantial differences, however, Medtronic's monopolization instructions repeatedly ask the jury to follow the Section 1 instructions even ***after*** finding in favor of Applied on ***all*** the elements of monopolization under Section 2.  Medtronic thus forces the jury to do the Section 2 work and then do it again under different Section 1 instructions, doubling the burden in a way *Qualcomm* does not support.

Medtronic further cites *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991), but similar to Instruction D8 for monopolization, *Bhan* calls for balancing to determine "whether the practice is unreasonable on balance."  929

1    F.2d at 1413. It does not state that a restraint must cause "**substantial** harm" and
2    is unlawful only if the harm "**substantially** outweighs" benefit, like Medtronic's
3    Section 1 instruction. *See* Instruction D19.

4        Medtronic cites no case adopting jury instructions that shuffle and mix the
5    Model instructions like Medtronic. *Applied v. Ethicon* did not inject Rule-of-
6    Reason instructions into monopolization. No. 8:03-cv-01329-JVS-MLG, ECF
7    No. 296 at 11 (C.D. Cal. 2006). Nor did *Masimo v. Tyco*, 2005 Jury Inst. LEXIS
8    224 at *9-17. Like Applied's proposal, *Tyco* addressed Section 2 first and
9    addressed Rule of Reason only with the Section 1 claims. *See id*.

10 **Medtronic's Repeated Replacement of the Words "Conduct" and**
11 **"Restraint"**

12        After summary judgment, Medtronic also expanded the parties' disputes
13    by replacing every Model reference to (1) "conduct" or "restraint" with (2)
14    "exclusionary bundled discounting and/or unlawful exclusive dealing." As
15    discussed below, this unnecessarily lengthens the instructions and incorrectly
16    characterizes the accused conduct. *See* Applied's argument re: Instruction D2.
17    Moreover, Medtronic's modification disrupts the symmetry in the Model
18    instructions. For example, the Model's instruction regarding monopolization
19    identifies "anticompetitive conduct" as an element and then explains, in a
20    separate instruction, how to determine whether conduct is "anticompetitive." *See*
21    *id*. Medtronic's modification removes "anticompetitive conduct," eliminating
22    the key element of a monopolization claim and disrupting the symmetry in the
23    instructions. Medtronic previously stipulated to the Model's use of "conduct,"
24    filing with the Court numerous (1) stipulated instructions using the term and (2)
25    disputed proposed instructions that likewise use the term. *See* Dkt. 243-44.

26 **Medtronic's Attempt to Limit Applied to the ABD Market**
27        Many of the parties' disputes below also arise from Medtronic's attempt
28    to limit every Model "market" reference to the "ABD market." Medtronic

maintains that Applied cannot succeed if it cannot establish the ABD market.  As discussed below in Applied's argument regarding Instruction 2 (Monopolization General – Elements), however, Medtronic has no answer to Applied's expert testimony and evidence showing monopoly power and anticompetitive effects even if the market includes ultrasonic devices, as Medtronic asserts.

"The Court expects the parties to *agree* on most instructions, particularly when pattern or model jury instructions exist and provide a statement of applicable law." Dkt. 47 at 10.  As discussed, the parties previously *did agree* on numerous instructions, and the order of those instructions, even filing *stipulated* instructions reflecting an approach that Medtronic now seeks to reject.  Dkt. 243-44.  Medtronic's change of course has resulted in numerous disputes below.

**The Parties' Key Disputes**

Applied respectfully submits that the Court's resolution of the following four key issues would substantially reduce the number of disputes:

- Should the instructions address Applied's claims in the same order as Applied's Complaint and generally be kept together as shown in the Model (as the parties previously agreed);

- Should the Model instructions inject Section 1 instructions into the Section 2 monopolization instructions (contrary to the parties' previous agreed-upon approach);

- Should the Model's references to "conduct" or "restraint" be left unmodified (as the parties previously agreed); and

- Should Applied be limited to establishing an advanced bipolar market only despite Applied's expert testimony and evidence regarding a broader market that includes ultrasonic devices?

The Court's guidance on these key issues would enable the parties to further meet and confer and refile a narrowed set of disputes.

**MEDTRONIC'S PRELIMINARY STATEMENT REGARDING THE
ORDER OF INSTRUCTIONS**

The parties in this case agree that the ABA model instructions should be the foundation of the instructions this Court will provide to the jury. But they fundamentally disagree about how to adapt the model to the facts of this case.

Medtronic hews closely to the model instructions. With the exception of the bundled discounting instruction, for which there is no model, Medtronic proposes not a single new instruction. Medtronic revises the language of the model instructions only to account for case-specific facts, conform to the law, and provide clarity. Medtronic orders its instructions according to these same principles.

Medtronic's approach is what the ABA intended. It envisioned that the model instructions would be "user-friendly for practitioners, who will be able to customize the instructions for their own trials," and would need to account for "differences in the law depending on the circuit in which the case is being tried." ABA Model Jury Instrs. in Civ. Antitrust Cases, Preface (June 2016 ed.) [hereinafter ABA Model Jury Instrs.]; *accord* O'Malley et al., 3A Fed. Jury Prac. & Instr. § 100:04 (6th ed. 2025) [hereinafter O'Malley] ("Each case has its own peculiar facts, and pattern instructions must be tailored to the facts and issues."). And Medtronic's approach is consistent with the Ninth Circuit's recognition that model instructions are "'prepared to help judges communicate more effectively with juries,' and they may require modification in a particular case." *Bearchild v. Cobban*, 947 F.3d 1130, 1148 (9th Cir. 2020) (quoting Manual of Model Civ. Jury Instrs. for the Dist. Cts. of the Ninth Cir., Introduction (2017 ed.) (last updated Mar. 2024) [hereinafter Ninth Cir. Model Jury Instrs.]).

Applied's approach lacks these principles. Where helpful to its case, Applied demands blind adherence to the model instructions, even when they are

16

directly contrary to the law of this Circuit or unsuited to the facts at hand. But when it finds the model less favorable, Applied freely rewrites it. *See, e.g.*, Instruction D25 (Evidence About Applied) (instruction proposed by Applied with no basis in any model); Instruction D26 (Injury and Causation) (deviating from the model to instruct the jury about what "Applied does not need to prove").

Most of the parties' disputes relate to the wording or placement of specific instructions and are discussed in the position statements related to those instructions. But there are three overarching disputes worth highlighting.

*First*, Medtronic's proposal instructs the jury that the Rule of Reason applies to both Section 1 and Section 2 of the Sherman Act as Ninth Circuit law requires. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("Regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same.").

Applied insists that Medtronic's approach is contrary to the structure and intent of the model instructions, and that "important differences remain" between Section 1 and Section 2 claims, but the Ninth Circuit in *Qualcomm* made clear that Applied is wrong. Applied offers no support to the contrary;  the treatise on which Applied relies to explain those supposed differences supports Medtronic's position, not Applied's. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1512a (5th ed. 2024) (Section 1 and Section 2 standards have effectively "converged").

Applied maintains that including instructions on the Rule of Reason for Section 2 is erroneous because Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power) provides sufficient guidance on determining whether conduct is anticompetitive. Applied Preliminary Statement Regarding the Order of Instructions. Far from it. Under the Rule of Reason, "the factfinder

must analyze the anti-competitive effects along with any pro-competitive effects to determine whether the practice is unreasonable on balance." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). The model instruction does not give the jury the guidance necessary to conduct that kind of weighing analysis. It does not walk the jurors through the Rule of Reason framework step by step, list factors the jurors may consider when analyzing harm to competition, or explain balancing procompetitive benefits against anticompetitive harm. Nor does it make clear to jurors that the same Rule of Reason standard applies to Applied's claims under both Sections 1 and 2. *See infra* Medtronic Position Statement Regarding Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power). Providing jurors with no guidance on balancing competitive harm with benefits under Section 2 would be particularly inappropriate here, where the case challenges discounting, given that "the Supreme Court has instructed that, because of the benefits that flow to consumers from discounted prices, price cutting is a practice the antitrust laws aim to promote." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

Thus, while Applied contends that Medtronic improperly "merges the separate legal standards and model instructions" of Sherman Act Sections 1 and 2, it is the Ninth Circuit, not Medtronic, that demands that approach. And where the model and Circuit precedent diverge, the latter controls.

*Second*, because the Rule of Reason applies to both Sections 1 and 2 of the Sherman Act, Medtronic proposes instructing the jury on Section 1 before Section 2. This is consistent with the structure of the Sherman Act and the model instructions. By providing the Section 1 instructions first, the Court can explain the Rule of Reason at the outset using the model language and then refer back to

those instructions when discussing Applied's Section 2 claims.[7] But Medtronic's proposal is ultimately one of substance, not form:   Whether the jury hears Section 1 or Section 2 instructions first, what matters is that both Section 1 *and* Section 2 receive full and equal application of the Rule of Reason. Applied's proposal fails to convey this critical point. It does not mention the Rule of Reason until *after* the instructions concerning Section 2, leaving the jury without the proper framework for assessing harm to competition under Section 2. Providing the same Rule of Reason instructions across Applied's Sherman Act claims is essential in conveying that the same standard governs them all.

Applied criticizes Medtronic for deviating from the order in which Applied pleaded its claims, but Applied cites no authority requiring jury instructions to follow the plaintiff's ordering of its counts—and certainly not where the plaintiff's preferred ordering conflicts with both the model and common sense. Applied also criticizes Medtronic for reordering its instructions after this Court's order on summary judgment. But that order rendered Medtronic's prior approach to incorporating the Rule of Reason into Section 2 instructions no longer viable.[8]

---

[7] To ease the Court's review, and in light of the Court's Standing Order directing that "the disputed instructions shall be organized by subject, so that instructions that address the same or similar issues are presented sequentially," Standing Order at 10, Medtronic presents its proposals below in the same order as Applied's. Attached as Exhibit 2 is a set of Medtronic's instructions reflecting Medtronic's proposed ordering.

[8] In its previously filed instructions of May 3, 2025, Dkt. No. 244, Medtronic's Section 2 instructions incorporated the Rule of Reason by requiring the jury to consider, for both bundled discounting and exclusive dealing, (1) whether Applied had proved substantial foreclosure as part of its prima facie case of competitive harm and (2) procompetitive justifications for the challenged conduct. Medtronic implemented the latter using language proposed by Applied and provided to the jury in Applied Proposed Instruction No. 14, *Applied Medical Resources Corporation v. Ethicon*, No. 8:03-cv-01329-JVS-MLG, (C.D. Cal. Aug. 17, 2006), Dkt. No. 296 at 11; *Applied v. Ethicon*, No. 8:03-cv-01329-JVS-

Medtronic now relies on the ABA model Rule of Reason instructions to instruct the jury on harm to competition across Applied's Section 1 and Section 2 claims.

*Third*, Applied dramatically overstates the extent of Medtronic's changes to the model's structure. As shown in the table below, Medtronic's changes relate to (1) placing the two relevant market instructions at the outset because they apply broadly to Applied's claims and (2) placing the substantive Rule of Reason instructions immediately after the instructions describing the conduct to which they apply, as suggested by the ABA model. *See* ABA Model Instructions 2.D.1 (Elements of Vertical Restraints) at Notes ("[T]his instruction should be accompanied by the rule of reason instructions and adapted to the allegations of the particular case.").

| MODEL INSTRUCTIONS | MEDTRONIC'S INSTRUCTIONS |
|---|---|
| **Chapter 1: Sherman Act—General** | **General Instructions** |
| A. Purpose | Introduction: Purpose of the Sherman and Clayton Acts |
| B. Sherman Act Section 1 | All Claims: Relevant Market—General |
| C. Rule of Reason | All Claims: Relevant Product Market |
| 3A. Rule of Reason—Overview | Sherman Act Claims: Rule of Reason—Overview |
| 3B. Rule of Reason—Proof of Competitive Harm | |
| 3C. Rule of Reason—Evidence of Competitive Benefits | |
| 3D. Rule of Reason—Balancing the Competitive Effects | |
| **Chapter 2: Section 1 of the Sherman Act** | **Section 1 of the Sherman Act** |
| D. Vertical Restraints | Sherman Act, Section 1: Unreasonable Restraint of Trade—Elements |
| 1. Elements of Vertical Restraints | Challenged Conduct: Exclusionary Bundled Discounting |
| 5. Elements of Exclusive Dealing | Average Variable Cost |
| 6. Exclusive Dealing—Additional Considerations | Challenged Conduct: Unlawful Exclusive Dealing |
| | Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations |
| | Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm |
| | Sherman Act, Section 1: Rule of Reason—Evidence of Competitive Benefits |
| | Sherman Act, Section 1: Rule of Reason—Balancing the Competitive Effects |
| **Chapter 3: Section 2 of the Sherman Act** | **Section 2 of the Sherman Act** |
| A. Monopolization—General | Sherman Act, Section 2: Monopolization General—Elements |
| 1. Elements | Sherman Act, Section 2: Monopoly Power Defined |
| 2. Monopoly Power Defined | Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof |
| 3. Relevant Market—General | Sherman Act, Section 2: Existence of Monopoly Power—Direct Proof |
| 4. Relevant Product Market | Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power |
| 7. Existence of Monopoly Power—Indirect Proof | Sherman Act, Section 2: Rule of Reason |
| 8. Existence of Monopoly Power—Direct Proof | Sherman Act, Section 2: Attempt to Monopolize—Elements |
| 9. Willful Acquisition or Maintenance of Monopoly Power | Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct |
| C. Monopolization—Predatory Pricing | Sherman Act, Section 2: Attempt to Monopolize—Specific Intent |
| 5. Test of Profitability | Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of Success |
| D. Attempt to Monopolize | |
| 1. Elements | |
| 2. Anticompetitive Conduct | |
| 3. Specific Intent | |
| 4. Dangerous Probability of Success | |

Medtronic's organizational decisions are limited, conform the model to precedent, promote clarity, and avoid confusion. Moreover, the model provides a

---

MLG, Dkt. No. 361 at 11 (C.D. Cal. Aug. 29, 2006), Instruction No. 17 (making willful acquisition or maintenance of monopoly power "without legitimate procompetitive reasons for engaging in such conduct" a required element of the monopolization claim) and Instruction 27 (clarifying that the same element applies to attempted monopolization).

menu of instructions, not an inflexible set. O'Malley § 100:04 ("Very few pattern instructions are intended to be copied verbatim in every case."). Other courts have recognized this, adopting instructions that change the model's ordering in the same way Medtronic proposes here. *See also, e.g.*, Jury Instructions at 24–25, *Tevra Brands LLC v. Bayer Healthcare LLC*, 5:19-cv-04312-BLF (Aug. 1, 2024), Dkt. No. 482 (instructing on market definition immediately after "Purpose of Sherman and Clayton Acts" and before Clayton Act § 3 and Sherman Act § 2); Jury Instructions at 15–18, *Regeneron Pharms., Inc. v. Amgen Inc.*, 1:22-cv-00697-JLH (May 15, 2025), Dkt. No. 481 (instructing on market definition and Rule of Reason before Sherman Act § 2, Sherman Act § 1, Clayton Act § 3, and state law claims); *id.* at 37 (using ABA Model Instr. 2.D.1 on vertical restraints as the Sherman Act § 1 overview instruction). Applied understands this too. For example, the exclusive dealing instruction it inserts into its Section 2 instructions appears in the model instructions under Section 1. Applied Position Statement Regarding Instruction D10 (Exclusive Dealing) ("Because exclusive dealing is one form of exclusionary conduct under Section 2, and the Model for Section 2 does not list every such form, Applied properly draws on the Model's Section 1 exclusive-dealing instruction to guide the jury on evaluating Medtronic's conduct.").

"Jury instructions are intended to give the jurors, in understandable language, information to make the trial more meaningful and to permit them to fulfill their duty of applying the law to the facts as they find them." Ninth Cir. Model Jury Instrs at 2. For the reasons explained below, it is Medtronic's instructions, not Applied's, that accomplish that goal.

\*   \*   \*

Medtronic respectfully submits that the Court need not resolve jury instruction disputes now, and that resolving those disputes should wait until after

the parties have presented their evidence at trial. This will allow the Court to consider the scope of evidence before the jury and tailor its rulings to the facts of this case. Nevertheless, to aid the Court, Medtronic identifies the following key questions that the Court will ultimately need to answer in crafting the jury instructions:

- Whether, under Ninth Circuit precedent, the ABA model's Rule of Reason instructions should be used for both Applied's Sherman Act Section 1 claims and its Section 2 claims;

- whether Applied must prove the alleged advanced bipolar market that it pleaded and relied on in developing its case; and

- whether the jury should be asked to issue an advisory verdict on Applied's Unfair Competition Law claim and potentially rely on that verdict to decide Applied's unlawful interference claim.

1
2          **PLAINTIFF'S PROPOSED INSTRUCTION NO. D1**
3              **Purpose of the Sherman and Clayton Acts**
4          The purpose of the Sherman Act <u>and the Clayton Act</u> is to preserve free
5  and unfettered competition in the marketplace. The Sherman ~~Act rests~~<u>and</u>
6  <u>Clayton Acts rest</u> on the central premise that competition produces the best
7  allocation of our economic resources, the lowest prices, the highest quality, and
8  the greatest material progress.
9
10
11  Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.A
12  (2016 ed.); *Tevra Brands LLC v. Bayer Healthcare LLC*, 5:19-cv-904312-BLF,
13  Dkt. 482 at 22 (August 1, 2024) (jury instructions).
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                   23

**DEFENDANT'S PROPOSED INSTRUCTION NO. D1**

**Introduction: Purpose of the Sherman and Clayton Acts**

The purpose of the Sherman Act and the Clayton Act is to preserve free and unfettered competition in the marketplace. The Sherman ~~Act rests~~and Clayton Acts rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

The antitrust laws were enacted for the protection of competition, not competitors. Applied must, therefore, establish that Medtronic's acts injured not only Applied, but competition more broadly.

Authority: ABA Model Jury Instructions in Civ. Antitrust Cases, at Chapter 1.A (2016 ed.) [hereinafter ABA Model Jury Instructions]; 3A Fed. Jury Prac. & Instructions § 150:1 note (6th ed.) [hereinafter O'Malley]; *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

24

## PLAINTIFF'S POSITION STATEMENT REGARDING
## DISPUTED INSTRUCTION NO. D1
### Purpose of the Sherman and Clayton Acts

The Court should adopt Applied's proposal, which tracks the ABA Model (the "Model") verbatim except for adding an agreed-upon reference to the Clayton Act.

Medtronic adds an unnecessary paragraph not found in the Model that declares that antitrust laws protect competition, not competitors, and prescribes what Applied "must" establish regarding broader harm to competition. This language largely repeats agreed-upon language from Instruction D26 regarding "Injury and Causation" below, which addresses antitrust injury and already specifies Applied's burden to show harm to competition rather than just harm to itself. The parties' agreed-upon language for the Instruction D8 regarding "Willful Acquisition or Maintenance of Monopoly Power" also includes this guidance: "Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition." Pursuant to this Court's Standing Order, jury instructions should "not repeat principles of law contained in any other requested instruction." Dkt. 47 at 11. Moreover, including a statement about what Applied "must" prove is inappropriate in an instruction intended to explain the "purpose" of the antitrust laws, and it risks confusing the jury.

Medtronic argues its additional paragraph is critical, but that additional paragraph does not appear in the ABA Model instruction. Medtronic claims the principle it seeks to add is axiomatic in antitrust law, but there are many antitrust principles and Medtronic provides no basis for including this one principle. The purpose of Model Instruction 1.A.1 is to introduce the jury to the case and the relevant statutes. Later instructions already include the subject matter Medtronic proposes. The Court should adopt Applied's proposal, which tracks the Model.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D1
### Introduction: Purpose of the Sherman and Clayton Acts

Applied opposes the second paragraph of this instruction, which is necessary to explain the meaning of "preserve competition," particularly in a case brought by a competitor.

No instruction on the purpose of the antitrust laws would be complete without making clear that "[t]he antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself").

Failing to instruct jurors on this fundamental principle risks a verdict that penalizes lawful conduct merely because it lowered a competitor's profits. *See* O'Malley § 150:1 (Nature of the claim) at Notes ("The jury should be clearly told that mere harm to a competitor is not a ground for relief under the antitrust laws."); *id.* (citing to instruction explaining plaintiff's burden to prove harm to competition). This would be "inimical" to the purposes of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Applied is wrong that this paragraph repeats Instruction D29 (Antitrust Injury) or Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power). Neither of those instructions explains that the purpose of the antitrust laws is to protect competition rather than competitors. This context is critical in helping jurors make sense of the antitrust laws from the outset, particularly in a case brought by a competitor arguing that "anticompetitive conduct" is "behavior

that *impairs rivals* and is not competition on the merits."  Applied Preliminary Statement Regarding the Order of Instructions (emphasis added).

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D2

### Monopolization General - Elements

~~Plaintiff~~Applied alleges that it was injured by ~~defendant's~~Medtronic's unlawful monopolization of the [*describe relevant market at issue*]advanced bipolar device or advanced bipolar device and ultrasonic market.  To prevail on this claim, ~~plaintiff~~Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged market is a valid antitrust market;
2. ~~defendant~~Medtronic possessed monopoly power in that market;
3. ~~defendant~~Medtronic willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct; and

1. ~~defendant's conduct occurred in or affected interstate [*or foreign*] commerce; and~~

4. ~~plaintiff~~Applied was injured in its business or property because of ~~defendant's~~Medtronic's anticompetitive conduct.

If you find that ~~plaintiff~~Applied has failed to prove any of these elements, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~Applied's claim~~.~~ of monopolization. If you find that ~~plaintiff~~Applied has proved each of these elements by a preponderance of the evidence, then you must find for ~~plaintiff~~Applied against ~~defendant~~Medtronic on this claim.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.A.1 (2016 ed.); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447,

28

447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); Dreamstime.com, LLC v. Google LLC, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D2**

**Sherman Act, Section 2: Monopolization General – Elements**

~~Plaintiff~~I have just instructed you on Applied's claim under Section 1 of the Sherman Act. Applied also alleges that it was injured by ~~defendant's~~ Medtronic's unlawful monopolization of the~~[describe relevant~~ advanced bipolar device market ~~at issue].~~under Section 2 of the Sherman Act. To prevail on this claim, ~~plaintiff~~Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged advanced bipolar device market is a valid antitrust market;
2. ~~defendant~~Medtronic possessed monopoly power in that market;
3. ~~defendant~~Medtronic willfully acquired or maintained monopoly power in that market, and did so by engaging in exclusionary bundled discounting and/or unlawful exclusive dealing that resulted in a substantial adverse effect on competition not outweighed by procompetitive benefits~~anticompetitive conduct;~~
~~4.~~3.   ~~defendant's conduct occurred in or affected interstate [or foreign] commerce~~; and
~~5.~~4.   ~~plaintiff~~Applied was injured in its business or property because of ~~defendant's anticompetitive conduct~~Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing.

If you find that ~~plaintiff~~Applied has failed to prove any of these elements, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~Applied's claim~~.~~ of monopolization.  If you find that ~~plaintiff~~Applied has proved each of these elements by a preponderance of the evidence, then you must find for ~~plaintiff~~Applied and against ~~defendant~~Medtronic on this claim.

30

1

2   Authority: ABA Model Jury Instructions 3.A.1; *Ohio v. Am. Express Co.*, 585

3   U.S. 529, 541-43, 543 n.7 (2018); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969

4   F.3d 974, 991 (9th Cir. 2020); Order re Mot. to Certify Order for Interlocutory

5   Appeal at 4 n.2; *Applied v. Ethicon*, No. 8:03-cv-01329-JVS-MLG, Dkt. No. 361

6   at 18 (C.D. Cal. 2006), Instruction No. 17; *Applied v. Ethicon*, No. 8:03-cv-

7   01329-JVS-MLG, Dkt. No. 296 at 11 (C.D. Cal. 2006), Applied Proposed

8   Instruction No. 14.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D2

Monopolization General - Elements

Applied's proposal closely follows the ABA Model (the "Model").  It inserts party names, identifies the relevant markets as the Model directs, and removes the undisputed "interstate commerce" element.

**Medtronic Rewrites the "Anticompetitive Conduct" Element**

Medtronic disrupts the Model's monopolization instructions by rewriting the "anticompetitive conduct" element.  The Model requires a showing the defendant "willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct."  This language is closely connected to Instruction D8 regarding "Willful Acquisition or Maintenance of Monopoly Power," ABA Model Jury Instr. 3.A.9.

The instructions work together.  The (1) "Monopolization General - Elements" instruction tells the jury that Applied needs to establish that Medtronic willfully acquired or maintained monopoly power through "anticompetitive conduct" and (2) the "Willful Acquisition or Maintenance" instruction explains to the jury ***how*** it should weigh harm to competition against procompetitive benefits to determine whether Medtronic has in fact willfully acquired or maintained monopoly power through "anticompetitive conduct."

Medtronic destroys this symmetry by replacing (1) "anticompetitive conduct" with (2) "exclusionary bundled discounting and/or unlawful exclusive dealing that resulted in a substantial adverse effect on competition not outweighed by procompetitive benefits."  Thus, Medtronic does not even ask the jury to determine whether Medtronic engaged in "anticompetitive conduct," the foundation of a monopolization claim.  *See, e.g., MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004).  Striking the Model's reference to "anticompetitive conduct" would remove a core element of Section 2 and break

symmetry with the Model's "Willful Acquisition or Maintenance of Monopoly Power" instruction, which guides the jury in how to assess whether conduct is "anticompetitive." ABA Model Instr. 3.A.9. Medtronic argues that the symmetry is not destroyed because Medtronic's proposal for "Willful Acquisition or Maintenance of Monopoly Power" likewise references "exclusionary bundled discounting and/or unlawful exclusive dealing." That misses the point. The "Willful Acquisition or Maintenance of Monopoly Power" instructs the jury on how to determine whether conduct is "anticompetitive," yet under Medtronic's approach, the jury would not even be told that anticompetitive conduct is an essential element of monopolization.

Medtronic notes that Applied used the phrase "without legitimate procompetitive reasons for engaging in such conduct" in another case. But that proposal did not seek—and the Court did not adopt—Medtronic's approach of eliminating the element of anticompetitive conduct. Nor did it permeate the monopolization instructions with Rule-of-Reason instructions. Applied merely acknowledged the jury could consider procompetitive justifications, which is already addressed in the Model's "Willful Acquisition or Maintenance" instruction. That limited, though unnecessary, clarification is nothing like Medtronic's wholesale rewrite of the Model.

Medtronic also criticizes the phrase "anticompetitive conduct" as vague and "ill-defined." That ignores decades of antitrust jurisprudence. "Anticompetitive conduct" is the bedrock of a monopolization claim. See *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Qualcomm*, 969 F.3d at 990; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (same); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022) (same); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613

F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971). Medtronic cannot eliminate this essential element simply because it prefers a Section 1 framework.

Medtronic also seeks to circumvent this Court's Summary Judgment Order and *PeaceHealth*. *See* Dkt. 255 at 6. As this Court explained, *PeaceHealth* rejected adding a "***substantial adverse effect***" requirement to establish exclusionary bundling. *Id.* Medtronic now flouts *PeaceHealth* and this Court's Summary Judgment Order by changing "anticompetitive conduct" to "exclusionary bundled discounting and/or unlawful exclusive dealing that resulted in a ***substantial adverse effect*** on competition not outweighed by procompetitive benefits."

Medtronic points to the jury instructions in *PeaceHealth*, but the Court's primary holding was that "district court's jury instruction" in that case "contained an error of law." 515 F.3d at 910. Medtronic points to an instruction stating that the plaintiff would need to establish that the harm to competition "outweighs any beneficial effect on competition." Medtronic argues this incorporated the "Rule of Reason." If that is all that is necessary to incorporate the "Rule of Reason," that could be accomplished by merely adding that the "anticompetitive conduct" must outweigh beneficial effects on competition. But that is unnecessary because Applied's "Willful Acquisition or Maintenance" Instruction D8 already provides that guidance.

Medtronic claims its language is needed to distinguish lawful from unlawful conduct, but the ABA Model's Instruction D8 already explains the "difference between anticompetitive conduct and conduct that has a legitimate business purpose." ABA Model Jury Instr. 3.A.9; *see* Applied's argument re: D8. This Court's Standing Order prohibits repeating legal principles in multiple instructions. Dkt. 47 at 11. Medtronic also argues that replacing the anticompetitive conduct element with "exclusionary bundled discounting and/or

unlawful exclusive dealing" will assist jurors in understanding what conduct they must evaluate.  But both parties' instructions regarding "Willful Acquisition or Maintenance of Monopoly Power" instruction identify the conduct at issue.  *See* Applied's Instruction D8.

As further shown below, Medtronic repeatedly replaces "conduct" or "restraint" with "exclusionary bundled discounting and/or unlawful exclusive dealing."  This unnecessarily lengthens the instruction and injects complexity into the element.  Moreover, the parties disagree regarding the characterization of the challenged restraints.  As explained below, the jury is entitled to find that Medtronic's so-called "discounts" are not discounts at all.  Rather, they are pricing **penalties** imposed on customers who do not commit to Medtronic's bundles.  *See* Applied's Argument re: Instruction D9.  Specifically, Medtronic regularly **increases** prices on non-bundled tiers in its agreements to drive customers into bundles.  Dkt. 147 at 14 (JAF 303-08).  As the FTC observed in its amicus brief at the motion to dismiss stage in this case, a "defendant's 'discount' may be a self-serving label for a pricing structure under which no consumer actually receives a lower price." Dkt. No. 27 at 10.  While Medtronic may prefer to frame the conduct to emphasize "discounting," it should not be permitted to inject its own argumentative characterizations into the instructions.  Medtronic points to *PeaceHealth*'s statement that a "bundled discount, however, it might be viewed, is a price discount on a collection of goods."  515 F.3d at 903.  But *PeaceHealth*'s description of a bundled "discount" as a price "discount," for purposes of describing cases, should not control how the jury is permitted to view Medtronic's conduct in this case.  The jury could conclude that Medtronic's practice is not actually a "bundled discount" a "price discount" given the evidence.  Medtronic fails to explain why its preferred terminology must be included to provide the jury the necessary test.

**Medtronic Attempts to Limit Applied to Establishing an ABD Market**

Medtronic's instruction also wrongly restricts Applied to proving an "advanced bipolar market." But Applied alleged from the outset that Medtronic dominates even if ultrasonic devices are included.  Dkt. 1 ¶ 53.  Moreover, the Ninth Circuit allows liability in a market broader than either party proposed.  *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023).

Medtronic claims that Applied's expert merely presented "musings" about the impact of including ultrasonic products in the market.  Not so.  Orszag expressly stated: "[E]ven if the relevant product market is defined more broadly to include ultrasonic devices, my conclusions regarding Medtronic's **monopoly power** and the **competitive effects** of the alleged conduct are **unaffected**."  Orszag Opening, Dkt. No. 183-6 Ex. 4 at 4 n.6.  He also explained: "I considered and also include analyses that take into account the possibility of a market that also includes advanced bipolar devices, as well as ultrasonic in the alternative."  *Id*. Contrary to Medtronic's argument, Orszag did not just rely on "footnotes" to assert this.  Orszag's tables confirm Medtronic dominates even if ultrasonic devices are included.  Dkt. 147-23 at 69 (Exhibit 4).  Orszag also prepared a supplemental report describing the latest market data as showing that Medtronic has a 60% share even if ultrasonic devices are included.  Medtronic will be deposing Mr. Orszag on that report on December 17.

Medtronic's own expert acknowledged that "Mr. Orszag also calculates Medtronic's share in a hypothetical market comprising ABDs **and** ultrasonic devices…."  Dkt. 147-23 at 117 n.336.  Medtronic acknowledged Orszag's broader market in its own questioning. Dkt. 147-5, Ex. 28 (Orszag Depo.) at 34:11-35:5 ("Apart from the market you identified for advanced bipolar devices sold in the United States **and your alternative that also included ultrasonic devices**, did you identify any other relevant product markets in this litigation?").  On summary judgment, Medtronic asserted as an **undisputed** fact that "Applied's expert economist considered an alternative market for ABDs and ultrasonic

1  devices…" Dkt. 147 at 14 (JAF 43).[9]  Thus, Applied can succeed on its claims

2  even if the market is broader than advanced bipolar devices.

3       Medtronic points to an Orszag opinion explaining why ultrasonic devices

4  should not be included in the market to claim Orszag cannot present opinions on

5  a broader market.  But Applied's expert is permitted to explain both (a) the market

6  should be limited to advanced bipolar devices and (b) Medtronic still has

7  monopoly power and Medtrnic's condcut still has anticompetitive effects even if

8  the market is defined more broadly (as Medtronic alleges).  "Defining the market

9  is not the aim of antitrust law; it merely aids the search for competitive injury."

10 *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

11      Medtronic also claims that Orszag cannot provide opinions on a market

12 that includes advanced bipolar devices and ultrasonic devices because he did not

13 provide sufficient testimony proving the existence of such a market.  That

14 mischaracterizes Orszag's opinions.  It is Medtronic's expert, Murphy, that

15 argued ultrasonic devices should be in the relevant market.  Orszag disagrees but

16 explains why his opinions would not change even if ultrasonic devices were

17 included.  Medtronic claims Murphy took no position on the scope of the relevant

18 market.  That is incorrect.  Dkt. 147-23 ¶ 234 ("the relevant market is broader

19 than ABDs and likely includes at least ultrasonic devices and robotic ABDs");

20 *id*. (discussing "broader market of VS&D devices"); ¶ 55 ("VS&D devices"

21 include "ABD and ultrasonic devices"); ¶ 234 (arguing data is "inconsistent with

22 a conclusion that Medtronic has monopoly power in VS&D devices").

23      Medtronic mentions that Applied's previous Memorandum of Contentions

24 of Law and Fact stated that Applied would establish "the alleged market is a valid

25 _____

26      [9] Applied disputed Medtronic's fact, but merely to make clear that "ABDs"
   referred to "hand-held ABDs."  JAF 43.  Applied agreed Orszag "analyzed an

27 alternative market that includes hand-held ABDs and hand-held ultrasonic

28 devices," *id*.

                                    37

1   antitrust market."  But the use of "the" does prevent Applied from arguing that
2   "the" relevant market is advanced bipolar devices or, in the alternative, "the"
3   relevant market includes advanced bipolar devices and ultrasonic devices.
4   Moreover, the issue is how Medtronic intends to seize on that framing to argue
5   that Applied is limited to a single market.  Medtronic cites no cases preventing a
6   plaintiff from alleging a market, but also contending its claims are unaffected
7   even if the market is slightly broader.  *See CollegeNet, Inc. v. Common*
8   *Application, Inc.,* 355 F. Supp. 3d 926, 943, 957 (D. Or. 2018) (allowing plaintiff
9   to allege multiple relevant markets and to assert a narrower "Elite Colleges"
10  market in the alternative).

## DEFENDANT'S POSITION STATEMENT REGARDING PROPOSED INSTRUCTION NO. D2
### Sherman Act, Section 2: Monopolization General—Elements

Medtronic's and Applied's monopolization instructions largely align. Medtronic adjusts the model to clarify the relevant market, the conduct the jury should consider, and how the Rule of Reason fits into the elements of monopolization. The parties disagree on the following aspects of this instruction.

*First*, rather than use the vague phrase "anticompetitive conduct," Medtronic specifies the challenged conduct—exclusionary bundled discounting and/or unlawful exclusive dealing—and what it means for the conduct to be anticompetitive. This will assist jurors in understanding what conduct they must evaluate and under what standard. Applied offers no persuasive reason to reject this clarification.

Applied complains that specifying the conduct at issue "destroys the symmetry" between this instruction and Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power), but there, too, Medtronic specifies the conduct that Applied claims is anticompetitive. *See* Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power). Applied argues that this change "would remove a core element of Section 2," but providing *more detail* regarding an element does not *remove* it. Nor does it "ignore[] decades of antitrust jurisprudence." Each of the cases Applied cites for this point analyzes specific conduct. *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (refusal to deal); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985) (refusal to deal); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 743 (9th Cir. 1979) (predatory pricing). Applied quibbles that specifying the conduct "unnecessarily lengthens the instruction and injects complexity into the element." Applied Position Statement Regarding Instruction D2 (Monopolization General—Elements). But

Medtronic uses just five additional words to clearly describe the challenged conduct. Finally, Applied asserts that the term "bundled discounting" is "argumentative." But as described in Medtronic's argument related to Instruction D9 (Exclusionary Bundled Discounting), "bundled discounting" accurately describes the conduct alleged with a term employed by the Ninth Circuit.

There is no dispute that the conduct Applied challenges is "bundled discounting and/or exclusive dealing agreements." *See, e.g.*, Joint Summ. J. Br. (J. SJ Br.) at 29 (alleging that "Medtronic has engaged in exclusionary conduct through both below-cost predatory bundling and *de facto* exclusive dealing."). This is consistent with Applied's own description. Applied Proposed Instruction D19 (Rule of Reason—Overview) (describing "the restraints challenged here" as "alleged unlawful exclusionary bundling and exclusive dealing agreements"); *see also* Order re Mot. Summ. J. at 2, Dkt. No. 255 ("Applied argues that Medtronic engages in two types of exclusionary conduct (1) offering anti-competitive bundled discounts; and (2) engaging in de facto exclusive dealing"). Jurors should not be left to speculate about what conduct is at issue. The model instructions are necessarily written in general terms and should be tailored to the facts of the case.

*Second*, Medtronic's proposal clarifies in the third element that determining whether conduct is anticompetitive requires applying the Rule of Reason. *Qualcomm*, 969 F.3d at 991. This clarification is necessary to explain how the Rule of Reason fits into the elements of monopolization and ensure the jury understands its duty to balance competitive harm against competitive benefits. In a similar lawsuit against Johnson & Johnson, *Applied itself* proposed a comparable clarification to this element that was ultimately provided to the jury. Applied Proposed Instruction No. 14, *Applied v. Ethicon*, No. 8:03-cv-01329-JVS-MLG, Dkt. No. 296 at 11 (C.D. Cal. 2006) (requiring acquisition or maintenance of monopoly power "without legitimate procompetitive reasons for

engaging in such conduct" as a required element); Instruction No. 17, *Applied v. Ethicon*, No. 8:03-cv-01329-JVS-MLG, Dkt. No. 361 at 18 (C.D. Cal. 2006) (same).

Applied characterizes Medtronic's language specifying that the conduct "resulted in a substantial adverse effect on competition" as an attempt to "circumvent this Court's Summary Judgment Order and *PeaceHealth*." Applied Position Statement Regarding Instruction D2 (Monopolization General—Elements). But there is no dispute that the Rule of Reason applies to exclusive dealing claims, *see, e.g.*, Order re Summ. J. at 9, Dkt. No. 255, and that conduct violates the Rule of Reason only if "the anticompetitive harm of the conduct outweighs the procompetitive benefit," *Qualcomm*, 969 F.3d at 991. *PeaceHealth* did not create an exception for bundled discounting: the district court incorporated the Rule of Reason in its monopolization instruction, which the Ninth Circuit left undisturbed on appeal. *See* Jury Instrs. at 25, *McKenzie-Willamette Hosp. v. PeaceHealth*, 3:02-cv-06032-HA (Oct. 28, 2003), Dkt. No. 226 ("To win on its monopolization claim, plaintiff must prove . . . the harmful effect on competition of defendant's conduct outweighs any beneficial effect on competition."). Indeed, the Ninth Circuit confirmed that a plaintiff's burden to prove "adverse effect on competition" is common to *all* private antitrust claims. *PeaceHealth*, 515 F.3d at 910 n.21 (a requirement that "the bundled discount or rebate program has had or is likely to have an adverse effect on competition" would be "superfluous" and "redundant" "because it is no different than the general requirement of 'antitrust injury' that a plaintiff must prove in any private antitrust action").

*Third*, Medtronic disagrees with the sentence that states, "Applied alleges that it was injured by Medtronic's unlawful monopolization of the advanced bipolar device market *or advanced bipolar device and ultrasonic market*." As explained in Medtronic's argument related to Instruction D5 (Relevant Product

Market), Applied has not alleged an "advanced bipolar and ultrasonic market" and cannot pivot at this late juncture.

*Fourth*, the parties disagree on the first element of the instruction, which states, "*the* alleged market is a valid antitrust market." ABA Model Instrs. 3.A.1 (emphasis added). Medtronic's proposal uses the model language, only adding "advanced bipolar device" before "market." This ensures that the description of the alleged market appears not only in the first sentence of the instruction, but in the portion of the instruction listing the facts the jury must find. Medtronic articulates additional reasons for this change in its arguments related to Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market).

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D3

### Monopoly Power Defined

To prove its monopolization claim, ~~plaintiff~~Applied must prove that ~~defendant~~Medtronic has monopoly power in a relevant antitrust market. Monopoly power is the power to control prices~~, restrict output, and~~ or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

I will provide further instructions about how you may determine whether plaintiff has met its burden of proving monopoly power in a relevant market.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.A.2 (2016 ed.); *Newport Controls, LLC v. Balboa Instruments, Inc*., 2010 WL 11509295 (C.D. Cal. Sept. 27, 2010); *Maximum Availability Ltd. v. Vision Sols*., Inc., 2010 WL 11508470 (C.D. Cal. Dec. 16, 2010); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *9 (C.D. Cal. Mar. 18, 2005); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir. 2021); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 642 F. App'x 665 (9th Cir. 2016); *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1202 (9th Cir. 1997); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D3**

**Sherman Act, Section 2: Monopoly Power Defined**

To prove its monopolization claim, ~~plaintiff~~Applied must prove that ~~defendant~~Medtronic has monopoly power in ~~a relevant antitrust~~the alleged advanced bipolar device market.  Monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.  More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time.  However, possession of monopoly power, in and of itself, is not unlawful.


~~I will provide further instructions about how you may determine whether plaintiff has met its burden of proving monopoly power in a relevant market.~~


Authority: ABA Model Jury Instructions 3.A.2;  & n.2; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D3**

**Monopoly Power Defined**

Applied's proposal follows the Model except to provide a definition of monopoly power that more closely aligns with Ninth Circuit precedent. Specifically, the Model states that monopoly power is the power to "control prices, restrict output, ***and*** exclude competition," which may confusingly suggest that all three must be shown to establish monopoly power. That is incorrect. The Ninth Circuit has repeatedly defined monopoly power as the power to "control prices ***or*** exclude competition." *See, e.g., Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997) (Monopoly power is "the power to control prices ***or*** exclude competition."); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 642 F. App'x 665 (9th Cir. 2016) (same); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021) (same); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) (same); *Newport Controls, LLC v. Balboa Instruments, Inc.*, 2010 WL 11509295 (C.D. Cal. Sept. 27, 2010) (same); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *9 (C.D. Cal. Mar. 18, 2005) (same); *Maximum Availability Ltd. v. Vision Sols., Inc.*, 2010 WL 11508470 (C.D. Cal. Dec. 16, 2010) (same). Medtronic cites no Ninth Circuit case to the contrary.

Medtronic argues that the Model considered the issue and concludes that the conjunctive "and" better reflects the law. The Model discusses the differing views of cases across the country but notably cites no Ninth Circuit cases on this issue. Moreover, the Model's reasoning was that "[p]rice and competition are so intimately intertwined that any discussion of theory must treat them as one.'" ABA Model Jury Instructions 3.A.2 & n.2. Medtronic does not intend to use this instruction to treat all three as "one." Medtronic will argue that Applied must

1    establish each of these purported requirements separately.

2         Additionally, Medtronic limits Applied's allegations to the "advanced

3    bipolar market."  The Court should reject Medtronic's position for the reasons

4    explained in Applied's Argument regarding Instruction D2 ("Monopolization

5    General – Elements").

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D3
#### Sherman Act, Section 2: Monopoly Power Defined

Medtronic's instruction closely tracks the model, with two minor changes for clarity. First, because Medtronic's relevant market instructions precede this instruction, Medtronic removes the sentence at the end of the model, which states, "I will provide further instructions about how you may determine whether plaintiff has met its burden of proving monopoly power in a relevant market," and repurposes it as the transitional sentence for Instruction D6 (Existence of Monopoly Power—Indirect Proof). Second, Medtronic specifies "the alleged advanced bipolar device market" in the first sentence to conform to the facts of this case, as discussed in Medtronic's arguments related to Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market).

Rather than adhere to the model, Applied proposes editing it to state, "Monopoly power is the power to control prices *or* exclude competition in a relevant antitrust market" rather than "control prices, restrict output, *and* exclude competition in a relevant antitrust market." Applied's suggestion was considered and expressly rejected by the ABA in drafting the model, which explains that "and" better reflects Supreme Court precedent. ABA Model Jury Instrs. 3.A.2 & n.2 ("'Price and competition are so intimately entwined that any discussion of theory must treat them as one' . . . . Consequently, this instruction adopts the conjunctive formation.") (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956)).

Applied would also excise "restrict output" from the model. But output is intimately intertwined with price and should be treated the same way. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 549 (2018) ("Market power is the ability to raise prices profitably *by restricting output*." (quoting Areeda ¶ 501) (emphasis added by the Supreme Court)).

47

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D4**

**Relevant Market - General**

~~Plaintiff~~Applied must prove, by a preponderance of the evidence, that ~~defendant~~Medtronic had monopoly power in a relevant market. Defining the relevant market is essential because you are required to make a judgment about whether ~~defendant~~Medtronic has monopoly power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain ~~defendant's~~Medtronic's freedom to set prices for or to restrict the production level of [*the products or services in question*]advanced bipolar devices.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on ~~defendant's~~Medtronic's power to set prices as it pleases because customers could switch to them if ~~defendant~~Medtronic sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether ~~plaintiff~~Applied has met its burden to prove the relevant market by a preponderance of the evidence. The first is ~~the~~a relevant product market. The second is the relevant geographic market. Here, the parties agree the relevant geographic market is the United States.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.A.3 (2016 ed.); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Aspen Highlands Skiing Corp., 472 U.S. 585,* 605 n.32 (1985); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020); *Cascade Health Sols. v.*

48

*PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Image Technical Services, Inc. v. Eastman Kodak, Co.,* 125 F.3d 1195, 1209 (9th Cir. 1997); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013); *CollegeNet, Inc. v. Common Application, Inc.,* 355 F. Supp. 3d 926, 943, 957 (D. Or. 2018); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at *9-17 (C.D. Cal. Mar. 18, 2005).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D4**

**All Claims: Relevant Market - General**

~~Plaintiff~~Applied must prove, by a preponderance of the evidence, that ~~defendant had monopoly power in a~~it has properly defined its alleged relevant market~~. Defining the~~ for advanced bipolar devices. To determine whether Applied has properly defined its relevant market ~~is essential because you are required to make a judgment about whether defendant has monopoly power in a properly defined economic market. To make this judgment~~, you must be able to determine what, if any, economic forces restrain ~~defendant's~~Medtronic's freedom to set prices for or to restrict the production level of [~~*the products or services in question*~~].advanced bipolar devices.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on ~~defendant's~~Medtronic's power to set prices as it pleases because customers could switch to them if ~~defendant~~Medtronic sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider ~~in~~when determining whether ~~plaintiff~~Applied has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market. Here, the parties agree that the relevant geographic market is the United States.

Authority: ABA Model Jury Instructions 3.A.3.

## PLAINTIFF'S POSITION STATEMENT REGARDING
## DISPUTED INSTRUCTION NO. D4

### Relevant Market - General

Applied's proposal closely tracks the ABA Model.  Applied's changes merely insert party names and note the parties' agreement that the relevant geographic market is the United States.

Medtronic departs from the Model in two important ways.  First, Medtronic limits Applied's allegations to the "advanced bipolar market."  The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").  As explained there, Applied alleged from the outset that Medtronic dominates even if ultrasonic devices are included, Applied's expert provided analysis based on a broader market, Medtronic questioned him on it, and Medtronic even asserted as undisputed fact on summary judgment that Applied's expert economist considered an alternative market for ABDs and ultrasonic devices.  *See* Applied's argument regarding Instruction 2.

Medtronic cites *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015), as stating that a plaintiff must establish the relevant geographic market.  Here, both parties' proposed instructions state that the agreed-upon geographic market is the United States. Medtronic also asserts that Applied must be limited to an advanced bipolar market because Applied must establish "the" relevant market.  But the use of "the" does prevent Applied from arguing that "the" relevant market is advanced bipolar devices or, in the alternative, "the" relevant market includes advanced bipolar devices and ultrasonic devices.  Medtronic cites no case holding that a plaintiff is not permitted to allege a market, but also contend its claims are unaffected even if the market is slightly broader.  *See CollegeNet, Inc. v. Common*

51

*Application, Inc.,* 355 F. Supp. 3d 926, 943, 957 (D. Or. 2018) (allowing plaintiff to allege multiple relevant markets and to assert a narrower "Elite Colleges" market in the alternative).

As part of its substantial reordering of the instructions, Medtronic also incorrectly places the "Relevant Market" instruction at the beginning of the instructions. Medtronic claims the instruction must come at the beginning in order for the jury to understand that market definition is required for Applied's Federal claims. That is unnecessary because the instructions themselves call for the requirement of a market. Applied's approach provides the necessary context for the market definition instruction by first identifying the element of monopoly power, then explaining that market definition is required to determine monopoly power.

Medtronic also edits the title of the instruction to refer to "All Claims." Medtronic argues that additional headings are required to help the jury "distinguish between each of Applied's many claims." They are not. As discussed in Applied's Preliminary Statement Regarding the Order of Instructions, Applied's instruction, unlike Medtronic's, closely follow the order of Applied's Complaint. This order generally keeps the relevant instructions in the Model chapters together and guides the jury through the claims and issues of the case. In contrast, Medtronic's order jumbles together instructions from different chapters in a confusing and legally erroneous manner. Potential confusion should be resolved by following Applied's order.

Medtronic's instruction also incorrectly instructs the jury that Applied must establish a product market to prevail on any of its claims, including the unfair competition and interference claims. Not so. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023) (market definition not required for unfair competition claim). The cases Medtronic cites do not support that position. For its unfair competition argument, Medtronic cites *Dixon Gas Club, LLC v.*

*Safeway Inc.*, an unpublished opinion, where the court affirmed the lower court's dismissal because the plaintiff had failed to offer ***any*** market-specific evidence that fuel pricing was unfair. No. A139283, 2015 WL 4557388, at \*4, \*6 (Cal. Ct. App. July 29, 2015) ("There are no market definitions, no market share evidence, no market structure analysis, no assessment of the extent or risk of market power, nothing, zip, nada.").

Medtronic's two other cases, *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co*. and *Drum v. San Fernando Valley Bar Assn*., support that unfair conduct includes conduct that "significantly threatens or harms competition." 20 Cal. 4th 163, 187 (1999); 182 Cal. App. 4th 247, 255–56 (2010). Applied agrees and provides this language in Instruction D36 ("Unfair Competition in Violation of California Business and Professions Code § 17200"). However, Medtronic fails to point to any language in these cases that supports its position that UCL claims require Applied to prove a relevant market. UCL claims may be established where the evidence, including evidence of market definition, does not rise to the level required to establish a Federal antitrust claim, if there is no categorical bar to the claim. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000-01 (9th Cir. 2023) (unfair competition based on "incipient" violation).

Medtronic claims that *Epic* "merely observed that some conduct not at issue in this case does not require defining a market…." Not so. *Epic* rejected the argument that "UCL mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)." *Id*. at 1002. *Epic* noted that the defendant did not "cite any California authority for this proposition" and reasoned that "such a rule runs contrary to California courts' repeated instruction that [n]o inflexible rule can be laid down as to what conduct will constitute unfair competition." *Id*.

Medtronic cites three additional cases that include no UCL claims. *See Flagship Theatres*, 269 Cal. Rptr. 446 (opinion regarding Cartwright Act claim);

53

1   *Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359 (9th Cir. 1986)

2   (opinion regarding Sherman Act Section 1 claim); *Walker Process Equip., Inc. v.*

3   *Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (opinion regarding

4   Sherman Act Section 2 claim).

5         Medtronic likewise provides no support for its assertion that Applied's

6   interference claim requires proving a relevant market.  Medtronic cites *Della*

7   *Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995) and *Korea*

8   *Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1158-59 (2003) to argue

9   that interference requires that Applied "prove a violation of one of its other

10  claims."  11 Cal. 4th 376, 393 (1995).  But such proof can include a violation of

11  unfair competition, which does not require market definition.  Moreover, the

12  court in *Della* explicitly refused to endorse a rule that anticompetitive conduct

13  must be established.  The Court stated "requiring the plaintiff to prove, for

14  example, that the defendant's conduct amounted to . . . a species of

15  anticompetitive behavior proscribed by positive law . . . can be considered on

16  another day, and in another case." 11 Cal. 4th 376, 378 (1995).

17

18

19

20

21

22

23

24

25

26

27

28

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D4
### All Claims: Relevant Market—General

Medtronic's proposal adheres closely to the model instruction, changing it only to specify Applied's alleged market, state the relevant geographic market, and excise references to monopoly power, which do not apply to all of Applied's claims. The parties disagree on the following aspects of this instruction.

*First*, Applied disputes the placement of this instruction. In Medtronic's proposal, the relevant market instructions appear directly after Instruction D1 ("Purpose of the Sherman and Clayton Acts") because they apply broadly to each of Applied's claims. *See Qualcomm*, 969 F.3d at 992 ("A threshold step in any antitrust case is to accurately define the relevant market"). Applied proposes inserting this instruction between instructions specific to monopolization. This risks giving the jury the mistaken impression that a relevant market is required *only* for Applied's monopolization claims, when it is unquestionably required for the other federal claims, as well as the Cartwright Act claim. Applied does not dispute this. When, as here, the relevant market instructions apply broadly across claims, the jury should receive them up front. *See, e.g.*, Jury Instructions at 24–25, *Tevra Brands LLC v. Bayer Healthcare LLC*, 5:19-cv-04312-BLF (Aug. 1, 2024), Dkt. No. 482 (placing relevant market instruction before instructions on Clayton Act § 3 and Sherman Act § 2 claims); Jury Instructions at 15–18, *Regeneron Pharms., Inc.*, Dkt. No. 481 (placing relevant market instructions ahead of instructions on Sherman Act §§ 1–2, Clayton Act § 3, and various state law claims).

*Second*, Applied opposes instructing the jury that Applied must prove "*the* relevant market," "its relevant market," or "its alleged relevant market for advanced bipolar devices." But Medtronic's proposed language is consistent with the model and with Applied's clearly stated position that the relevant market is

55

1  no broader than advanced bipolar devices.

2      The model instructions are clear that it is a plaintiff's "burden to prove *the*
3  *relevant market.*" ABA Model Jury Instrs. 3.A.3 (emphasis added); *see also* ABA
4  Model Jury Instrs. 3.A.1 (plaintiff must prove that "*the alleged* market is a valid
5  antitrust market") (emphasis added); ABA Model Jury Instrs. 3.D.3 (plaintiff
6  must "first prove that the market *it is talking about* . . . is a relevant market for
7  antitrust purposes") (emphasis added). Applied thus cannot hedge in the hope that
8  the jury will find that *some* relevant market exists. *See, e.g.*, *Am. Express*, 585
9  U.S. at 541–43, 543 n.7 (requiring plaintiffs to define the relevant market in order
10  to prove allegations of harm from vertical restraints); *Fount-Wip, Inc. v. Reddi-*
11  *Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir. 1978) (affirming judgment
12  notwithstanding the verdict because plaintiffs "failed to bear their burden of proof
13  in establishing the relevant market"); *Malaney v. UAL Corp.*, 2011 WL 6845773,
14  at *4–5 (N.D. Cal. 2011) (dismissing case where no jury could find liability based
15  on the plaintiff's alleged market), *aff'd*, 552 F. App'x 698 (9th Cir. 2014).

16      Applied's burden is meaningless if Applied can ask the jury to concoct its
17  own market and never tell Medtronic or the Court what it found. Applied must
18  both plead *and prove* every element of its claims. *See Saint Alphonsus Med.*
19  *Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015)
20  ("The plaintiff has the burden of establishing the relevant geographic market.").
21  Applied points to *Epic Games v. Apple, Inc.*, but that case was a bench trial, so
22  the issue was decided by the *court*, not a jury, and neither party in that case
23  appears to have contested *the court's* power to determine the market. 67 F.4th
24  946, 981  (9th Cir. 2023) (affirming the district court's "middle-ground market"
25  where the appellant argued only that the court had defined the wrong market,
26  without challenging its ability to do so). Moreover, the court explained its market
27  thoroughly, leaving a clear record for subsequent review, whereas Applied would
28  have the jury leave no record at all. *See also* Medtronic Verdict Form Argument

1   at 32–33. In the nearly three years since *Epic Games* was decided, no court has

2   interpreted it to say that a jury may devise its own market and leave no record of

3   what it found.

4          Applied has never endorsed a product market other than its claimed market

5   for advanced bipolar devices. *See* Compl. ¶ 39, Dkt. No. 1 ("The relevant product

6   market is the advanced bipolar device market."); *id.* ¶ 2 ("Applied now brings

7   claims . . . in the relevant market for advanced bipolar energy devices"); Opp. to

8   Mot. to Dismiss at 4, Dkt. No. 25 ("Medtronic engages in anticompetitive

9   conduct . . . in the market for advanced bipolar devices."); Pl.'s Am. Contentions

10  of Fact and L. at 6, Dkt. No. 281 ("Applied intends to introduce documentary and

11  testimonial evidence, including expert opinion and analysis, demonstrating that

12  there is a valid market for advanced bipolar devices ("ABDs")). Indeed, Applied

13  has specifically and repeatedly disclaimed alternative markets. *See, e.g.*, Compl.

14  ¶ 30, Dkt. No. 1 ("Advanced bipolar devices therefore lack any reasonable

15  substitute."); Pl.'s Am. Contentions of Fact and L. at 6, Dkt. No. 281 ("Applied's

16  expert opinion and analysis, and Medtronic documents and testimony, will

17  demonstrate that the market for ABDs does not include ultrasonic and robotic

18  devices.").

19         Applied now shifts its strategy, asserting that "Medtronic has monopoly

20  power even if the relevant product market includes both advanced bipolar devices

21  and ultrasonic devices." Applied Proposed Instruction D5 (Relevant Product

22  Market). But consistent with Applied's allegations, Applied's expert, Jonathan

23  Orszag, has not proposed a relevant market that includes any devices other than

24  advanced bipolar devices. *See* Orszag Rep. ¶ 9 ("The evidence indicates that other

25  surgical devices . . . are not close substitutes for advanced bipolar devices and are

26  in separate relevant product markets."); *see also id.* ¶¶ 85, 91, 94 (disclaiming

27  inclusion of ultrasonic or robotic devices in the relevant market); Orszag Reply

28  Rep. ¶¶ 33-36, 40-45, 49-56 (disclaiming any market for advanced bipolar

devices and ultrasonic devices or advanced bipolar devices and robotic advanced bipolar devices).

Applied resorts to footnotes in Mr. Orszag's expert report, snippets of deposition testimony, and Mr. Orszag's share calculations to argue that it has defined a broader relevant market. Applied Position Statement Regarding Instruction D2 (Monopolization General—Elements). These are no substitute for a market definition analysis. *See* Orszag Rep. ¶¶ 69, 93–99, Dkt. No. 136-1 (labeling SSNIP "[t]he specific test that economists use" for market definition); *see also Brown Shoe Co.*, 370 U.S. at 325 ("The outer boundaries of a product market are determined by the . . . cross-elasticity of demand between the product itself and substitutes for it."). The share calculation is not sufficient: it says nothing about substitutability, which is the touchstone of market definition. The model instructions recognize this, requiring the jury to consider the effect of "a small but significant and non-transitory increase in the price [SSNIP] of one product" in determining whether the plaintiff has defined a relevant product market. ABA Model Jury Instrs. 3.A.4. Mr. Orszag's passing suggestion that even if the market were broadened to include ultrasonic devices, there would be "virtually no head-to-head competition between brands of advanced bipolar devices and brands of ultrasonic devices," Orszag Rep. ¶ 88 n.203, Dkt. No. 183-6, further reinforces that Applied has not alleged an alternative market in which ABDs and ultrasonic devices closely constrain one another. Without having properly defined a broader relevant market, Applied cannot credibly argue anything about Medtronic's market power therein. *See Am. Express*, 585 U.S. at 543 n. 7 (explaining that market power "cannot be evaluated unless the Court first defines the relevant market").

In its argument related to Instruction 5 (Relevant Product Market), Applied effectively admits that Mr. Orszag has not defined a broader market, stating, "It is *Medtronic's expert*, Murphy, that argued ultrasonic devices should be in the

relevant market." Joint Disputed Jury Instructions at 9 (May 3, 2025), Dkt. No. 244 (emphasis added). But as Medtronic explains below, Professor Murphy did *not* define a relevant market, and the antitrust laws do not demand that a defendant establish any relevant market.

Allowing the jury to find a different market than the one Applied alleged would leave the jury unable to evaluate key aspects of Applied's claims. Mr. Orszag performed the discount attribution test, calculated substantial foreclosure, and estimated claimed damages based *only* on Applied's alleged market for advanced bipolar devices. *See* Orszag Rep. ¶¶ 175, 182 & Ex. 9, 272–77 & Ex. 16, 278–81 & Ex. 17, 285–88 & Exs. 18–19. Applied has failed to offer evidence that could establish critical elements of its claims under a theory of a broader market.

*Third*, Medtronic added labels to its instruction headers that note which instructions apply to which of Applied's eight overlapping claims. This brings clarity and structure to a roughly 90-page document with over 60 instructions and helps the jury parse each of Applied's many claims. In this instance, Applied objects, contending that not all of its claims require proof of a relevant market.

Applied does not dispute that it must prove a relevant market for its state and federal antitrust claims. But it contends that its UCL and unlawful interference claims do not require such proof. California law says otherwise. With respect to its UCL claim, Applied "has the burden of introducing evidence relating to the relevant market structure and the challenged conduct's effects or potential effects on this market structure." *Dixon Gas Club, LLC v. Safeway Inc.*, 2015 WL 4557388, at *6 (Cal. Ct. App. 2015). Applied's attempt to distinguish *Dixon* as an instance where "the plaintiff had failed to offer any *market-specific* evidence" only serves to highlight the market-definition requirement.

This conforms to the general principle that "establish[ing] the boundaries of the market in which the plaintiff maintains the defendant harmed competition"

1    is necessary to "know where to look in assessing anticompetitive and
2    procompetitive effects of a practice." *Flagship Theatres of Palm Desert, LLC v.*
3    *Century Theatres, Inc.*, 55 Cal. App. 5th 381, 269 Cal. Rptr. 446, 473 (Cal. App.
4    2020); *see also Ralph C. Wilson Indus., Inc. v. Chron. Broad. Co.*, 794 F.2d 1359,
5    1363 (9th Cir. 1986) ("To determine whether competition has been harmed, the
6    relevant market must be defined."); *Walker Process Equip., Inc. v. Food Mach.*
7    *& Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of [the relevant]
8    market there is no way to measure [defendant's] ability to lessen or destroy
9    competition."). Applied agrees that to prevail on its UCL claim, it must prove that
10   the challenged conduct "significantly threatens or harms competition." Applied
11   Position Statement Regarding Instruction D4 (Relevant Market—General); *see*
12   *also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187
13   (1999) (defining "unfair" conduct as conduct that "significantly threatens or
14   harms competition"); *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th
15   247, 255–56 (2010) (considering allegations of harm to relevant market as
16   relevant to UCL claim).

17         Applied claims that the Ninth Circuit in *Epic Games*, 67 F.4th at 946,
18   "rejected" that plaintiffs need to prove a relevant market to prove a UCL claim.
19   Applied Verdict Form Argument at 14. Not so. *Epic* merely observed that some
20   conduct not at issue in this case does not require defining a market, such as non-
21   antitrust conduct and antitrust conduct subject to quick-look review. *See* 67 F.4th
22   at 1002 (citing a deceptive advertising case and an antitrust case in which the
23   California Supreme Court "conducted something akin to quick-look review").

24         As for its interference claim, Applied must prove that the allegedly
25   interfering conduct was wrongful "by some measure beyond the fact of the
26   interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th
27   376, 393 (1995). Applied contends that *Della* "explicitly refused to endorse a rule
28   that anticompetitive conduct must be established," Applied Position Statement

Regarding Instruction D4 (Relevant Market—General), but this is misleading: *Della*'s holding was not specific to anticompetitive conduct. Instead, the court declined to define "wrongfulness," leaving for another day whether a plaintiff must prove "*for example*, that the defendant's conduct amounted to an independently tortious act, or was a species of anticompetitive behavior proscribed by positive law, or was motivated by unalloyed malice." 11 Cal. 4th at 378. *Korea Supply* later clarified the meaning of "wrongful," holding that a claim of interference with prospective economic advantage requires proof that the interference "amounts to independently actionable conduct." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158–59 (2003). To meet this requirement, Applied must prove a violation of one of its other claims, as it has not alleged any other way in which the challenged conduct could be "wrongful." Because each of Applied's other claims require proof of a relevant market, Applied's unlawful interference claim does too.

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D5**

**Relevant Product Market**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material--such as aluminum foil, cellophane, or even plastic containers--to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors [*but you may conclude in this case that some other percentage is more applicable to the product at issue*]. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given

1  you, you may also consider:

2  • ~~consumers'~~ customers' views on whether the products are

3  interchangeable;

4  • the relationship between the price of one product and sales of

5  another;

6  • the presence or absence of specialized vendors;

7  • the perceptions of either industry or the public as to whether the

8  products are in separate markets;

9  • the views of ~~plaintiff~~ Applied and ~~defendant~~ Medtronic regarding

10  who their respective competitors are; and

11  • the existence or absence of different customer groups or

12  distribution channels.

13  In this case, ~~plaintiff~~ Applied contends that the relevant product market is

14  ~~[state plaintiff's contention].~~ the market for advanced bipolar devices. By contrast,

15  ~~defendant~~ Medtronic contends that ~~plaintiff~~ Applied has failed to ~~allege~~ prove the

16  proper relevant product market. ~~Defendant~~ and that the relevant market includes

17  ultrasonic devices and robotic advanced bipolar devices. Applied contends that

18  ~~[state defendant's contention,~~ Medtronic has monopoly power even if ~~any, about~~

19  ~~the scope of~~ the relevant product market ~~and/or plaintiff's evidence].~~ includes

20  both advanced bipolar devices and ultrasonic devices.

21  If you find that ~~plaintiff~~ Applied has proven a relevant product market, then

22  you should continue to evaluate the remainder of ~~plaintiff's~~ Applied's claim.

23  However, if you find that ~~plaintiff~~ Applied has failed to prove such a market, then

24  you must find in ~~defendant's~~ Medtronic's favor on this claim.

25

26  Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter

27  3.A.4 (2016 ed.); *Tevra Brands LLC v. Bayer Healthcare LLC*, 5:19-cv-904312-

28  BLF, Dkt. 482 at 24 (August 1, 2024) (jury instructions); *Epic Games v. Apple*,

1    67 F.4th 946, 1002 (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440,

2    1446 (9th Cir. 1988).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D5**

**All Claims: Relevant Product Market**

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors *[but you may conclude in this case that some other percentage is more applicable to the product at issue]*. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given

you, you may also consider:

- ~~consumers'~~ customers' views on whether the products are interchangeable;

- the relationship between the price of one product and sales of another;

- the presence or absence of specialized vendors;

- the perceptions of either industry or the public as to whether the products are in separate markets;

- the views of ~~plaintiff~~Applied and ~~defendant~~Medtronic regarding who their respective competitors are; and

- the existence or absence of different customer groups or distribution channels.

In this case, ~~plaintiff~~Applied contends that the relevant product market is ~~[state plaintiff's contention].~~the market for advanced bipolar devices. By contrast, ~~defendant~~Medtronic contends that ~~plaintiff~~Applied has failed to ~~allege~~prove the proper relevant product market. ~~Defendant~~Medtronic contends that ~~[state defendant's contention, if any, about the scope~~Applied's proposed market is too narrow because it has not properly considered the role of ~~the relevant product market and/or plaintiff's evidence]. If you find~~other surgical devices that ~~plaintiff~~cut and seal tissue, such as ultrasonic devices and robotic advanced bipolar devices.

If you find that Applied has proven that the market for advanced bipolar devices is a relevant product market, then you should continue to evaluate the remainder of ~~plaintiff's claim.~~Applied's claims. However, if you find that ~~plaintiff~~Applied has failed to prove such a market, then you must find in ~~defendant's~~Medtronic's favor on ~~this claim.~~all claims.

1    Authority: ABA Model Jury Instructions 3.A.4; *Ohio v. Am. Express Co.*, 585

2    U.S. 529, 541-43, 543 n.7 (2018); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969

3    F.3d 974, 992 (9th Cir. 2020).

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D5

### Relevant Product Market

Applied's proposal closely tracks the ABA Model.  Its changes insert party names and state Applied's positions on the relevant market (as the Model instructs).  Specifically, Applied's proposal states that Applied alleges a market for "advanced bipolar devices" and further alleges it can establish monopoly power even if ultrasonic devices are included.

Medtronic limits Applied's allegations to the "advanced bipolar market." The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

Medtronic also introduces inappropriate and argumentative language claiming that the market is too "narrow" and that Applied has "not properly considered" other surgical devices, such as ultrasonic and robotic advanced bipolar devices.  As discussed, this language is demonstrably incorrect— Applied's expert explicitly considered these alternatives and even concluded that the inclusion of ultrasonic devices would not alter his analysis.    Applied's proposed language does not state that Medtronic "proposed an alternative market definition," as Medtronic asserts.  Applied's proposed language correctly states Medtronic's position "that the relevant market includes ultrasonic devices and robotic advanced bipolar devices."  That language almost perfectly matches the stated opinion of Medtronic's own expert.  Dkt. 147-23 ¶ 234 (opining that the "the relevant market is broader than ABDs and likely includes at least ultrasonic devices and robotic ABDs").

Medtronic    also    incorrectly    places    this    instruction    before    the monopolization elements.  Consistent with the ABA Model, Applied places this

instruction **after** the instruction introducing monopolization. Medtronic changes the label to "All Claims" to incorrectly instruct the jury that Applied must establish market definition to prevail on any of its claims. That is incorrect. As Applied explains in connection with its argument regarding Instruction D4 (Relevant Market - General), Applied can prevail on its unfair competition and interference claims without proving a relevant market.

The Court should adopt Applied's Instruction.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D5**
**All Claims: Relevant Product Market**

The parties largely agree on this instruction, disputing only its placement, title, and certain language in the last two paragraphs. Specifically, the parties disagree on the following aspects of this instruction.

*First*, Applied objects to including "All Claims" in the heading and to placing this instruction "before the monopolization elements." For the reasons articulated in response to Instruction D4 (Relevant Market—General), Medtronic submits that the relevant market instructions apply broadly to all of Applied's claims and should be placed up front.

*Second*, Applied wants to add that "Applied contends that Medtronic has monopoly power even if the relevant product market includes both advanced bipolar devices and ultrasonic devices." This language is yet another effort to flee from the market definition it pleaded and has the burden to prove. Applied opposes the addition of "the market for advanced bipolar devices" in the last paragraph for the same reason. Medtronic's arguments related to this issue are set forth in connection with Instruction D4 (Relevant Market—General).

Applied's proposal would also confuse and mislead the jury because it injects commentary about monopoly power into an instruction about market definition. Applied's proposed language muddles these two issues in a manner not condoned by the model instructions.

*Third*, Applied asserts that Medtronic misstates its own position as to the relevant product market. But the model instruction directs the parties to "state defendant's contention, if any, about the scope of the relevant product market and/or plaintiff's evidence." *See* ABA Model Jury Instrs. 3.A.4. Medtronic's instruction thus explains Medtronic's position "that Applied's proposed market is too narrow because Applied has not properly considered the role of other

70

surgical devices." Applied would prefer the instruction to state, "Medtronic contends that . . . the relevant market includes ultrasonic devices and robotic advanced bipolar devices," but Medtronic has never proposed an alternative market definition, nor does it have any legal burden to do so. *See, e.g.*, Murphy Dep. Tr. at 94:3–15 ("I didn't come up with a specific relevant market definition. I said [] what I've seen in the evidence would suggest the market is likely to be broader than just ABD."). Medtronic's position is that Applied's proposed relevant market is unduly narrow and thus Applied has failed to meet its burden. The instructions must not attribute to Medtronic a position it has not advocated.

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D6**

**Existence of Monopoly Power—Indirect Proof**

If you find that ~~plaintiff~~Applied has proven a relevant market, then you should determine whether ~~defendant~~Medtronic has monopoly power in that market. Applied alleges that Medtronic has monopoly power in a market for advanced bipolar devices or, alternatively, a market containing advanced bipolar devices and ultrasonic devices. As I instructed you earlier, monopoly power is the power to control prices ~~and~~or exclude competition in a relevant antitrust market. ~~Plaintiff~~Applied has introduced evidence of the structure of the market to show that ~~defendant~~Medtronic has monopoly power. The evidence presented by the parties includes evidence of ~~defendant's~~Medtronic's market share, ~~[include any of the following as appropriate:~~ market share trends, barriers to entry, ~~entry and exit by other companies,~~ and the number and size of other competitors~~]~~. If this evidence establishes that ~~defendant~~Medtronic has the power to control prices ~~and~~or exclude competition in ~~the~~a relevant antitrust market, then you may conclude that ~~defendant~~Medtronic has monopoly power in the market.

Market Share

The first factor that you should consider is ~~defendant's~~Medtronic's share of the relevant market. Based on the evidence that you have heard about ~~defendant's~~Medtronic's market share, you should determine ~~defendant's~~Medtronic's market share as a percentage of total sales in the relevant market ~~[or shipments, production, capacity, reserves, or other relevant measures of market share]~~. The ~~defendant~~. Medtronic must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, ~~[include any of the following as appropriate: such as market share trends,~~ the existence of barriers to entry (that is, how difficult is it for other producers to

72

enter the market and begin competing with *defendant*Medtronic for sales), the entry and exit by other companies, and the number and size of competitors.]. Along with defendant'sMedtronic's market share, these factors should inform you as to whether defendantMedtronic has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopoly power. However, if you find that the other evidence demonstrates that defendantMedtronic does, in fact, have monopoly power despite having a market share below 50 percent, you may conclude that defendantMedtronic has monopoly power.

Market Share Trends

The trend in defendant'sMedtronic's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, the costs of necessary research and development investments to enter the market, the burden to obtain regulatory approvals, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that defendantMedtronic does not have monopoly power, regardless of

73

1  ~~defendant's~~Medtronic's market share, because new competitors could enter

2  easily if ~~defendant~~Medtronic attempted to raise prices for a substantial period of

3  time.~~.~~ By contrast, evidence of high barriers to entry along with high market share

4  may support an inference that ~~defendant~~Medtronic has monopoly power.

5         Entry and Exit by Other Companies

6         The history of entry and exit in the relevant market may be helpful to

7  consider. Entry of new competitors or expansion of existing competitors may be

8  evidence that ~~defendant~~Medtronic lacks monopoly power. On the other hand,

9  departures from the market, or the failure of firms to enter the market, particularly

10  if prices and profit margins are relatively high, may support an inference that

11  ~~defendant~~Medtronic has monopoly power.

12         Number and Size of Competitors

13         You may consider whether ~~defendant's~~Medtronic's competitors are

14  capable of effectively competing. In other words, you should consider whether

15  the financial strength, market shares, and number of competitors act as a check

16  on     ~~defendant's~~Medtronic's    ability    to    price    its    products.    If

17  ~~defendant's~~Medtronic's competitors are vigorous or have large or increasing

18  market shares this may be evidence that ~~defendant~~Medtronic lacks monopoly

19  power. On the other hand, if you determine that ~~defendant's~~Medtronic's

20  competitors are weak or have small or declining market shares, this may support

21  an inference that ~~defendant~~Medtronic has monopoly power.

22         Conclusion

23         If you find that ~~defendant~~Medtronic has monopoly power in the relevant

24  market, then you must consider the remaining elements of this claim. If you find

25  that ~~defendant~~Medtronic does not have monopoly power, then you must find for

26  ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~its monopolization

27  claim.

28

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.A.7 (2016 ed.); *Forsyth v. Humana, Inc*., 114 F.3d 1467, 1475 (9th Cir. 1997); *Oltz v. St. Peter's Cnty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir. 1988); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 642 F. App'x 665 (9th Cir. 2016); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997); *Newport Controls, LLC v. Balboa Instruments, Inc.*, 2010 WL 11509295 (C.D. Cal. Sept. 27, 2010); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *9 (C.D. Cal. Mar. 18, 2005); *Maximum Availability Ltd. v. Vision Sols., Inc.*, 2010 WL 11508470 (C.D. Cal. Dec. 16, 2010).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D6**

**Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof**

I have already provided instructions on how you may determine whether Applied has met its burden of proving a relevant market for advanced bipolar devices. If you find that ~~plaintiff~~Applied has proven ~~a~~its alleged relevant market, then you should determine whether ~~defendant~~Medtronic has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market.

~~Plaintiff has introduced evidence of the structure of the market to show that defendant has monopoly power.~~ The evidence presented by the parties related to Medtronic's monopoly power or lack thereof in the alleged relevant market includes evidence of ~~defendant's~~Medtronic's market share, ~~[*include any of the following as appropriate:*~~market share trends, barriers to entry, *~~entry and exit by other companies,~~* and the number and size of other competitors~~]~~. If this evidence establishes that ~~defendant~~Medtronic has the power to control prices and exclude competition in the ~~relevant antitrust~~alleged market for advanced bipolar devices, then you may conclude that ~~defendant~~Medtronic has monopoly power in the market.

Market Share

The first factor that you should consider is ~~defendant's~~Medtronic's share of the relevant market. Based on the evidence that you have heard about ~~defendant's~~Medtronic's market share, you should determine ~~defendant's~~Medtronic's market share as a percentage of total sales in the relevant market ~~[*or shipments, production, capacity, reserves, or other relevant measures of market share*~~]. The defendant~~. Medtronic must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market,

1    [*include any of the following as appropriate:* such as market share trends, the

2    existence of barriers to entry (that is, how difficult is it for other producers to

3    enter the market and begin competing with *defendant*Medtronic for sales), the

4    entry and exit by other companies, and the number and size of competitors.].

5    Along with defendant'sMedtronic's market share, these factors should inform

6    you as to whether defendantMedtronic has monopoly power. The higher the

7    company's share, the higher the likelihood that a company has monopoly power.

8        A market share below 50 percent is ordinarily not sufficient to support a

9    conclusion that defendant has monopoly power. However, if you find that the

10   other evidence demonstrates that defendant does, in fact, have monopoly power

11   despite having a market share below 50 percent, you may conclude that defendant

12   has monopoly power.

13       Market Share Trends

14       The trend in defendant'sMedtronic's market share is something you may

15   consider. An increasing market share may strengthen an inference that a company

16   has monopoly power, particularly where that company has a high market share,

17   while a decreasing share might show that a company does not have monopoly

18   power.

19       Barriers to Entry

20       You may also consider whether there are barriers to entry into the relevant

21   market. Barriers to entry make it difficult for new competitors to enter the

22   relevant market in a meaningful and timely way. Barriers to entry might include

23   intellectual property rights (such as patents or trade secrets), the large financial

24   investment required to build a plant or satisfy governmental regulations, the costs

25   of necessary research and development investments to enter the market, the

26   burden to obtain regulatory approvals, specialized marketing practices, and the

27   reputation of the companies already participating in the market (or the brand

28   name recognition of their products).

Evidence of low or no entry barriers may be evidence that ~~defendant~~Medtronic does not have monopoly power, regardless of ~~defendant's~~Medtronic's market share, because new competitors could enter easily if ~~defendant~~Medtronic attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that ~~defendant~~Medtronic has monopoly power.

<u>Entry and Exit by Other Companies</u>

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that ~~defendant~~Medtronic lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that ~~defendant~~Medtronic has monopoly power.

<u>Number and Size of Competitors</u>

You may consider whether ~~defendant's~~Medtronic's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on ~~defendant's~~Medtronic's ability to price its products. If ~~defendant's~~Medtronic's competitors are vigorous or have large or increasing market shares this may be evidence that ~~defendant~~Medtronic lacks monopoly power. On the other hand, if you determine that ~~defendant's~~Medtronic's competitors are weak or have small or declining market shares, this may support an inference that ~~defendant~~Medtronic has monopoly power.

<u>Conclusion</u>

If you find that ~~defendant~~Medtronic has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that ~~defendant~~Medtronic does not have monopoly power, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~its monopolization

78

claim.


Authority: ABA Model Jury Instructions 3.A.7; *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434, 1438 (9th Cir. 1995).

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D6

### Existence of Monopoly Power—Indirect Proof

Applied's proposal closely tracks the ABA Model instruction. Applied inserts party names and specifies Applied's contention that it can establish monopoly power either in an advanced bipolar market or in a broader market including ultrasonic devices. Applied also identifies certain barriers to entry relevant to this case, as the Model instructs.

Medtronic's proposal significantly deviates from the Model. Medtronic deletes an entire sentence, adds another to the opening paragraph, and adds "restrict output" to the definition of monopoly power. As discussed in connection with Applied's arguments regarding Instruction D3 ("Monopoly Power Defined"), the Ninth Circuit has repeatedly defined monopoly power as the power to "control prices or exclude competition" without requiring a showing of restricting output. *See, e.g., Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997) (Monopoly power is "the power to control prices or exclude competition.").

Medtronic also inserts substantial new language into the second paragraph—including yet another restrictive reference to the "advanced bipolar market" in an improper attempt to exclude Applied's broader market theory. The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements"). Medtronic states that it references "the" alleged market for advanced bipolar devices instead of Applied's preferred "a" relevant market for a nonspecific product. But it is the *Model* that refers to "a" relevant market. Medtronic cites *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) for the uncontroversial point that plaintiff must "define the relevant market." But the

use of "the" does not prevent Applied from arguing that "the" relevant market is advanced bipolar devices or, in the alternative, that "the" relevant market includes advanced bipolar devices and ultrasonic devices. "Defining the market is not the *aim* of antitrust law; it merely *aids* the search for competitive injury." *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

Medtronic also seeks to delete the sentence "Applied has introduced evidence of the structure of the market to show that Medtronic has monopoly power." But that sentence is in the Model. Applied merely modifies the Model to reference party names. Medtronic claims the Model's sentence is biased and the jury may believe that Applied's evidence establishes that Medtronic has monopoly power. That is not correct. The Model's sentence merely states that Applied has "introduced" evidence regarding market structure, intending to show Medtronic's monopoly power. The Model's sentence is necessary because it supports that, when monopoly power is based on indirect evidence, such evidence will primarily consist of evidence regarding "the structure of the market."

Medtronic also entirely removes the Model's paragraph explaining that market share below 50% is ordinarily insufficient to establish monopoly power. Medtronic apparently does so because its own market share is well above 50%. It is unfair and prejudicial for Medtronic to selectively delete portions of the ABA Model simply because those provisions may support Applied's claims. Applied has preserved many Model instructions that favor Medtronic. Medtronic argues that the Model's instruction should be removed because it might suggest to the jury that market share alone is sufficient to determine monopoly power. Not so. The rest of the Model's instruction addresses other factors, such as "barriers to entry" and the "number and size of competitors" and provides instruction on those factors. Nothing in the Model instruction suggests that market share alone is determinative of monopoly power.

Medtronic cites cases holding that market share alone is not dispositive.

But the Model does not say otherwise.  Indeed, the Model's instruction that market share below 50% is "ordinarily insufficient" is entirely consistent with Medtronic cases holding that high share *alone* is insufficient.

Omitting this instruction risks misleading the jury into believing that monopoly power requires extremely high market shares, perhaps even approaching 100%.  Indeed, the common understanding of the word "monopoly" often suggests complete or exclusive control of a market. The Model's guidance on market share provides crucial context to prevent such a misunderstanding.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D6**
**Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof**

Medtronic hews closely to the model instruction, revising it primarily to account for its placement after the relevant market instructions, specify Applied's alleged market, and more clearly convey Ninth Circuit law on monopoly power to the jury. The parties disagree on the following aspects of this instruction.

*First*, Medtronic's instruction begins with a transitional sentence: "I have already provided instructions on how you may determine whether Applied has met its burden of proving a relevant market for advanced bipolar devices." As explained in Medtronic's argument related to Instruction D3 (Monopoly Power Defined), this sentence is taken from the last sentence of ABA Model Instruction 3.A.2 (Monopoly Power Defined) and modified to fit with the first sentence of the model for this instruction.

*Second*, Medtronic adds "restrict output" to the sentence "As I instructed you earlier, monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market." Medtronic's change conforms the definition to ABA Model Instruction "Monopoly Power Defined," to which the sentence refers. This addition will avoid confusion from multiple seemingly inconsistent definitions of "monopoly power." Applied similarly objects to Medtronic's adherence to the model instruction's use of "and" instead of "or" to define monopoly power throughout the instruction. Medtronic's argument related to Instruction D3 (Monopoly Power Defined) explains why Medtronic is correct.

*Third*, Medtronic references "the" alleged market for advanced bipolar devices instead of Applied's preferred "a" relevant market for a nonspecific product. Because jurors must first find that Applied has proven its alleged market for advanced bipolar devices before they may consider monopoly power in that market, Applied has no sound basis to object to references to "its alleged" or "the

alleged" market or "the market for advanced bipolar devices." *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (plaintiff must "(1) *define the relevant market*, (2) show that the defendant owns a dominant share of *that market*, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." (emphasis added)).

For related reasons, Medtronic disputes Applied's insertion of "Applied alleges that Medtronic has monopoly power in a market for advanced bipolar devices or, alternatively, a market containing advanced bipolar and ultrasonic devices" into the first paragraph of the model instruction. The model does not call for a recitation of Applied's allegations, and in any event Applied's change is improper for the reasons discussed in Medtronic's argument related to Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market).

*Fourth*, Medtronic removes the sentence, "Plaintiff has introduced evidence of the structure of the market to show that defendant has monopoly power." By stating that Applied "has" introduced evidence "show[ing]" that Medtronic "has monopoly power," this sentence improperly states a conclusion on a central legal question that is for the jury to decide. It also presupposes the evidence that Applied will introduce at trial and puts undue weight on that evidence. The instructions, as a general matter, do not highlight evidence introduced by one party or another. Medtronic has replaced this biased statement with a neutral one.

Applied defends this sentence as necessary to instruct the jury that indirect evidence "will primarily consist of evidence regarding the structure of the market." But the portion of the instruction providing concrete examples of indirect evidence—including market share, market share trends, barriers to entry, and number of competitors—is far more helpful to the jury in that regard. Medtronic does not modify this portion of the instruction.

*Finally*, Medtronic removes language referring to a 50 percent market share threshold because it could mistakenly convey to the jury that a company with a market share above 50 percent necessarily possesses monopoly power. *See L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (reversing judgment in favor of a plaintiff's monopolization claim, because "proof of [the defendant's] 100% market share [did] not demonstrate that it had the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants"); *DeSoto Cab Co. v. Uber Techs., Inc.*, 2018 WL 10247483, at *7 (N.D. Cal. 2018) (holding that "without barriers to entry, [a] defendant with 100% share of market lacks market power"); *Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp. 274, 291–92 (N.D. Cal. 1976) (holding that evidence suggesting a market share of 71 percent failed to establish market power); *see also United States v. Syufy Enters.*, 903 F.2d 659, 665 (9th Cir. 1990) (noting that plaintiff "attributes far too much importance to" defendant's market share).

Removing the share threshold does not risk misleading the jury into believing that monopoly power requires extremely high shares, as Applied suggests. Without a precise number, the jury is likely to holistically consider all the factors in this instruction without placing undue emphasis on any one.

85

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D7**

**Existence of Monopoly Power – Direct Proof**

~~If you find that plaintiff has proven a relevant market, then you should determine whether defendant has monopoly power in that market.~~<u>Another way to prove the existence of monopoly power is through direct proof.</u> As I instructed you earlier, monopoly power is the power to control prices ~~and~~<u>or</u> exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.

~~Plaintiff~~<u>Applied</u> has the burden of proving that ~~defendant~~<u>Medtronic</u> has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. ~~Plaintiff~~<u>Applied</u> must prove that ~~defendant~~<u>Medtronic</u> has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

~~Plaintiff~~<u>Applied</u> must also prove that ~~defendant~~<u>Medtronic</u> has the power to maintain prices above a competitive level for a significant period of time. If ~~defendant~~<u>Medtronic</u> attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then ~~defendant~~<u>Medtronic</u> does not have monopoly power.

~~Similarly, plaintiff~~<u>Alternately, Applied</u> must prove that ~~defendant~~<u>Medtronic</u> has the ability to exclude competition. For example, if ~~defendant~~<u>Medtronic</u> attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then ~~defendant~~<u>Medtronic</u> does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that ~~defendant~~Medtronic has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing *~~[expand or contract list as appropriate~~]*. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that ~~defendant~~Medtronic would lose a substantial amount of sales if it raised prices substantially, or that ~~defendant's~~Medtronic''s profit margins were low compared to its competitors, or that ~~defendant's~~Medtronic''s margins go up and down or are steadily decreasing, might be evidence that ~~defendant~~Medtronic does not have monopoly power.

If you find that ~~defendant~~Medtronic has monopoly power in the relevant market, then you must consider the remaining elements of ~~this~~Applied's monopolization claim. If you find that ~~defendant~~Medtronic does not have monopoly power, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this claim~~its monopolization claims.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.A.8 (2016 ed.); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 642 F. App'x 665 (9th Cir. 2016); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997); *Newport Controls, LLC v. Balboa Instruments, Inc.*, 2010 WL 11509295 (C.D. Cal. Sept. 27, 2010); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *9 (C.D. Cal. Mar. 18, 2005); *Maximum Availability Ltd. v. Vision Sols., Inc.*, 2010 WL 11508470 (C.D. Cal. Dec. 16, 2010); *Epic Games v. Apple*,

1    67 F.4th 946, 1002 (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440,

2    1446 (9th Cir. 1988).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D7**

**Sherman Act, Section 2: Existence of Monopoly Power – Direct Proof**

~~If you find that plaintiff has proven a relevant market, then you should determine whether defendant has monopoly power in that market.~~ Another way to prove the existence of monopoly power in the alleged advanced bipolar device market is through direct proof. As I instructed you earlier, monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.

~~Plaintiff~~Applied has the burden of proving that ~~defendant~~Medtronic has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. ~~Plaintiff~~ Applied must prove that ~~defendant~~Medtronic has the power to do so by itself — that is, without the assistance of, and despite competition from, any existing or potential competitors.

~~Plaintiff~~Applied must also prove that ~~defendant~~Medtronic has the power to maintain prices above a competitive level for a significant period of time. If ~~defendant~~Medtronic attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then ~~defendant~~Medtronic does not have monopoly power.

Similarly, ~~plaintiff~~Applied must prove that ~~defendant~~Medtronic has the ability to exclude competition. For example, if ~~defendant~~Medtronic attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then ~~defendant~~Medtronic does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that ~~defendant~~Medtronic has monopoly power.  Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or superior advertising or marketing *[expand or contract list as appropriate]*.  However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power.  By contrast, evidence that ~~defendant~~Medtronic would lose a substantial amount of sales if it raised prices substantially, or that ~~defendant's~~Medtronic's profit margins were low compared to its competitors, or that ~~defendant's~~Medtronic's margins go up and down or are steadily decreasing, might be evidence that ~~defendant~~Medtronic does not have monopoly power.

If you find that ~~defendant~~Medtronic has monopoly power in the relevant market, then you must consider the remaining elements of ~~this~~Applied's monopolization claim.  If you find that ~~defendant~~Medtronic does not have monopoly power, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~its monopolization claim.


Authority: ABA Model Jury Instructions 3.A.8; *Ohio v. Am. Express Co.*, 585 U.S. 529,  541-43, 543 n.7 (2018).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D7**

**Existence of Monopoly Power – Direct Proof**

Applied's proposal mirrors the Model. It adds party names, adds an initial sentence to provide context for this instruction in the overall instructions, and clarifies that the instruction applies to Applied's monopolization claim. Applied's proposal also makes two other minor changes. First, Applied changed the first sentence to make clear that this instruction regarding "direct proof" of monopoly power is an alternative to the earlier instruction on "indirect proof." This is necessary because this case involves allegations of both direct and indirect proof of monopoly power.

Second, Applied's proposal makes clear that monopoly power is the power to control prices *or* exclude competition. *See, e.g., Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997) (Monopoly power is "the power to control prices or exclude competition."). As discussed in connection with Applied's arguments regarding Instruction D3 ("Monopoly Power Defined"), the Ninth Circuit has repeatedly defined monopoly power as the power to "control prices *or* exclude competition." *See, e.g., Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997). Medtronic's proposal erroneously requires that Applied "must" establish evidence of both. Medtronic also erroneously adds "restrict output" to the Model language's definition of monopoly power.

Medtronic again limits Applied's allegations to the "advanced bipolar market." The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D7
### Sherman Act, Section 2: Existence of Monopoly Power—Direct Proof

Medtronic's proposal closely follows the model, adjusting it to specify Applied's alleged market and define monopoly power in a manner consistent with other instructions. The parties disagree on three aspects of this instruction.

*First*, Applied proposes modifying the ABA's definition of "monopoly power" to use the disjunctive "or" rather than the conjunctive "and" specified in the ABA model. Medtronic refers the Court to Instruction D3 (Monopoly Power Defined) for Medtronic's argument related to this issue.

*Second*, Applied disputes adding "restrict output" in the sentence: "As I instructed you earlier, monopoly power is the power to control prices, restrict output, and exclude competition in a relevant antitrust market." Medtronic included "restrict output" to match the ABA model's definition of monopoly power in Instruction D3 (Monopoly Power Defined), to which this instruction refers. For the same reasons, Medtronic opposes Applied's proposal to replace the word "Similarly" in the model with "Alternately."

*Third*, Applied argues that the instruction should not identify the alleged relevant market. Instruction D4 (Relevant Market—General) contains Medtronic's additional arguments related to this issue.

**<u>DISPUTED INSTRUCTION NO. D8</u>**

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D8**

**Willful Acquisition or Maintenance of Monopoly Power**

The next element ~~plaintiff~~Applied must prove is that ~~defendant~~Medtronic willfully acquired [or maintained] monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality. Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition [or maintenance] of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether ~~defendant's~~Medtronic's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits,

93

whether the conduct provides benefits to consumers, whether anticompetitive harm outweighs competitive benefits, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C makes printers, but also that Firm C is the world's only manufacturer of computers and that there are barriers to entry in the computer market such that no other firm will be able to enter that market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers. The only effect of the alteration is to

1  ~~exclude competing printer makers from the marketplace. It would be unlawful for~~
2  ~~Firm C to achieve monopoly power in the printer market in this way.~~

3  ~~As these examples show, the~~The acts or practices that result in the
4  acquisition [or maintenance] of monopoly power must represent something more
5  than the conduct of business that is part of the normal competitive process or
6  commercial success. They must represent conduct that has made it very difficult
7  or impossible for competitors to compete and that was taken for no legitimate
8  business reason. You may not find that a company willfully acquired [or
9  maintained] monopoly power through anticompetitive means if it has acquired
10  [or maintained] that power solely through the exercise of superior foresight and
11  skill; or because of natural advantages such as unique geographic access to raw
12  materials or markets; or because of economic or technological efficiency,
13  including efficiency resulting from scientific research; or by obtaining a lawful
14  patent; or because changes in cost or consumer preference have driven out all but
15  one supplier ~~[or because the market is so limited that it is impossible to efficiently~~
16  ~~produce the product except by a plant large enough to supply the whole demand~~].

17  Here, Applied alleges that Medtronic engaged in (1) unlawful exclusionary
18  bundling and (2) entered into unlawful exclusive dealing agreements. Applied
19  contends that either of these practices or the combination of these practices has
20  enabled Medtronic to acquire or maintain its monopoly power. Medtronic denies
21  Applied's allegations and denies that these practices were anticompetitive.

22  If you find that ~~plaintiff~~Applied has proven by a preponderance of the
23  evidence that ~~defendant~~Medtronic willfully acquired [or maintained] monopoly
24  power through anticompetitive acts, then you must consider whether
25  ~~plaintiff~~Applied has proved the remaining elements of this claim. If, however,
26  you find that ~~plaintiff~~Applied did not prove this element by a preponderance of
27  the evidence, then you must find for ~~defendant~~Medtronic and against
28  ~~plaintiff~~Applied on this claim.

1

2    Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter

3    3.A.9 (2016 ed.); *Aspen Highlands Skiing Corp., 472 U.S. 585,* 605 n.32 (1985);

4    *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 994, 1002 (9th Cir. 2023);

5    *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022);

6    *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Image*

7    *Technical Services, Inc. v. Eastman Kodak, Co.,* 125 F.3d 1195, 1209 (9th Cir.

8    1997); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir.

9    2004); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013);

10   *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at \*9-17 (C.D. Cal. Mar.

11   18, 2005); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540

12   U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48

13   (1993); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir.

14   2020); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir.

15   1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971); Order re

16   Motion for Summary Judgment (Dkt. No. 255) at 6.

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S PROPOSED INSTRUCTION NO. D8**

**Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power**

The next element ~~plaintiff~~Applied must prove is that ~~defendant~~Medtronic willfully acquired [or maintained] monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality.  Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition [or maintenance] of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals——or the achievement of these goals——unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether ~~defendant's conduct~~Medtronic's alleged bundled discounting and/or exclusive dealing was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is

97

consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

For example, suppose there are five firms that make printers for home computers and that these printers comprised a relevant product market. Suppose also that Firm A developed a more efficient manufacturing process that allowed it to sell profitably at a lower price than its competitors. If Firm A grew its market share and achieved monopoly power by selling profitably at a lower price, it would not be unlawful for Firm A to achieve monopoly power in this way. Developing more efficient processes and developing the ability to sell profitably at lower prices is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct even if it has a negative effect on competitors.

Similarly, in the same example, suppose Firm B developed and patented a revolutionary new printer and consumers so preferred Firm B's printer that Firm B achieved monopoly power. It would not be unlawful for Firm B to achieve monopoly power in this way. Firm B "built a better mousetrap," which is competition on the merits and benefits consumers, and it therefore is not anticompetitive conduct.

By contrast, in the same example, suppose not only that Firm C makes printers, but also that Firm C is the world's only manufacturer of computers and that there are barriers to entry in the computer market such that no other firm will be able to enter that market. Suppose also that Firm C altered its computers in such a way that only Firm C's printers would work with its computers, and that the alteration does not improve the design of Firm C's computers or provide any benefits to competition or consumers. The only effect of the alteration is to

1   exclude competing printer makers from the marketplace. It would be unlawful for
2   Firm C to achieve monopoly power in the printer market in this way.
3        As these examples show, The acts or practices that result in the acquisition
4   [or maintenance] of monopoly power must represent something more than the
5   conduct of business that is part of the normal competitive process or commercial
6   success. They must represent conduct that has made it very difficult or impossible
7   for competitors to compete and that was taken for no legitimate business reason.
8   You may not find that a company willfully acquired [or maintained] monopoly
9   power through anticompetitive means if it has acquired [or maintained] that
10  power solely through the exercise of superior foresight and skill; or because of
11  natural advantages such as unique geographic access to raw materials or markets;
12  or because of economic or technological efficiency, including efficiency resulting
13  from scientific research; or by obtaining a lawful patent; or because changes in
14  cost or consumer preference have driven out all but one supplier [or *because the*
15  *market is so limited that it is impossible to efficiently produce the product except*
16  *by a plant large enough to supply the whole demand*].·.

17       Here, Applied alleges that Medtronic (1) engaged in unlawful exclusionary
18  bundled discounting and (2) entered into unlawful exclusive dealing agreements.
19  Applied contends that either of these practices or the combination of these
20  practices has enabled Medtronic to acquire or maintain its monopoly power.
21  Medtronic denies Applied's allegations and denies that these practices were
22  anticompetitive.

23       If you find that plaintiffApplied has proven by a preponderance of the
24  evidence that defendantMedtronic willfully acquired [or maintained] monopoly
25  power through anticompetitive acts, then you must consider whether
26  plaintiffApplied has proved the remaining elements of this claim.  If, however,
27  you find that plaintiffApplied did not prove this element by a preponderance of
28

the evidence, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~this~~ its monopolization claim.

I have already instructed you on how to determine whether Medtronic has engaged in exclusionary bundled discounting and/or unlawful exclusive dealing under the Sherman Act. You should follow the instructions on Exclusionary Bundled Discounting [D6] and Unlawful Exclusive Dealing [D7 and D8] in that regard. You should also determine whether this conduct resulted in a substantial adverse effect on competition under the Rule of Reason. I will now remind you of the Rule of Reason.

Authority: ABA Model Jury Instructions 3.A.9; *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 896-99 (9th Cir. 2008); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D8

### Willful Acquisition or Maintenance of Monopoly Power

Applied's proposal mirrors the ABA Model.  Applied adds party names, eliminates several paragraphs that are unnecessary in the context of this case (with which Medtronic agrees), and identifies the specific anticompetitive conduct at issue.  In an effort to further address Medtronic's argument that "Rule of Reason" balancing is required, Applied also includes an instruction instructing the jury to determine "whether anticompetitive harm outweighs competitive benefits."  Applied also appropriately places this and other instructions regarding monopolization first, in accordance with Applied's Complaint, and keeps related Model instructions together.

Medtronic departs from the Model in several inappropriate ways.

First, as discussed in Applied's Preliminary Statement Regarding the Order of Instructions, Medtronic erroneously places this and other Section 2 monopolization instructions after instructions on Applied's Section 1 claims (contrary to Applied's Complaint) and mixes and matches Model instructions from Section 1 and 2.

Second, Medtronic's instruction incorrectly characterizes Applied's allegations.  Applied's proposal states: "Applied alleges that Medtronic engaged in unlawful exclusionary bundling…."  Medtronic's proposal rewrites this allegation to assert: "Applied alleges that Medtronic engaged in unlawful exclusionary bundl~~ing~~ed discounting…."  As discussed in Applied's arguments regarding Instruction D2 (Monopolization General – Elements), Applied does not agree with Medtronic's characterization of its conduct as "discounting."  Medtronic claims that the word "discounting" is necessary to distinguish the alleged "bundling" from bundling that merely offers for a single price, two or

more goods or services that could be sold separately.  But Applied's allegation does not broadly refer to any bundling.  Rather, it refers to "exclusionary bundling," consistent with Applied's Complaint.  Moreover, both parties propose a separate instruction on bundling to make clear what is necessary for bundling to be anticompetitive.

Third, Medtronic substitutes the ABA Model's phrase "conduct" with "alleged exclusionary bundled discounting and/or exclusive dealing."  This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

Fourth, Medtronic's final paragraph erroneously directs the jury to Medtronic's Rule of Reason instructions based on Model Instructions 1.2.C., 1.3.C., and 1.4.C., which apply to Section 1 of the Sherman Act.  *See* ABA Model Jury Instr. 1.C ("the rule of reason instruction has been separated into [1.C.1 through 1.C.4] four separate but interrelated instructions"); ABA Model Jury Instr. 1.C.1 ("Overview -- Under *Section 1 of the Sherman Act*, a restraint of trade is illegal only if it is found to be unreasonable. . . The challenged restraint is illegal under *Section 1 of the Sherman Act* only if you find that the competitive harm substantially outweighs the competitive benefit.").

As discussed in Applied's Preliminary Statement Regarding the Order of Instructions, although Sections 1 and 2 of the Sherman Act share some similarities, "important differences remain" between such claims.  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1512 (CCH).  Medtronic erroneously instructs the jury to consult Section 1 instructions and engage in Rule of Reason balancing even if the jury finds *all* the requirements for "anticompetitive conduct" established under the Section 2 instructions.  That is inconsistent with the ABA Model Jury Instructions and misstates the law.

102

The Model already provides guidance on the "difference between anticompetitive conduct and conduct that has a legitimate business purpose…" Applied's instruction also directs the jury to consider whether the "conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, whether anticompetitive harm outweighs competitive benefits, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors."    Thus, under the Model's framework, the jury will ***already*** consider the essential elements of the "Rule of Reason," but will do in the framework of a monopolization claim.    Pursuant to this Court's Standing Order, jury instructions should "not repeat principles of law contained in any other requested instruction."    Dkt. 47 at 11.    Medtronic claims that Ninth Circuit precedent requires Medtronic's approach.    But as discussed in Applied's Preliminary Statement Regarding the Order of Instructions and Applied's argument regarding D2 (Monopolization General – Elements), Applied's "Willful Acquisition or Maintenance" Instruction D8 is much closer to Medtronic's cited case law, such as *Qualcomm*, than Medtronic's Section 1 instruction.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D8
### Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power

Applied suggests that Medtronic substantially deviates from the model. In fact, the parties' disputes are limited to two sentences in the model instruction and Medtronic's reference to the Rule of Reason in the last paragraph, which is required by Ninth Circuit law. Specifically, the parties disagree on the following aspects of this instruction.

*First*, Applied disputes the placement of this instruction. Medtronic responds in its Preliminary Statement Regarding the Order of Instructions.

*Second*, for the reasons explained in connection with Instruction D9 (Sherman Act, Section 1—Exclusionary Bundled Discounting), Medtronic uses the term "bundled discounting" instead of "bundling."

*Third*, to help jurors understand the alleged conduct they must evaluate, Medtronic uses the phrase "exclusionary bundled discounting and/or unlawful exclusive dealing" in place of the vague term "conduct." Medtronic offers additional arguments related to this issue in connection with Instruction D2 (Monopolization General—Elements).

*Fourth*, at the end of the instruction, Medtronic directs jurors to the instructions they must consider in evaluating Applied's monopolization claim. This addition helps jurors navigate a complex document. The parties agree that the exclusionary bundled discounting and unlawful exclusive dealing instructions apply, and as explained in Medtronic's Preliminary Statement Regarding the Order of Instructions and its argument related to Instruction D2 (Monopolization General—Elements), Ninth Circuit precedent requires application of the Rule of Reason. Medtronic's Preliminary Statement Regarding the Order of Instructions also explains why this instruction is insufficient to instruct jurors on the multi-step Rule of Reason framework.

Applied's positions on this point are inconsistent. It says that the jury need not apply the Rule of Reason to Section 2. *See* Applied Preliminary Statement Regarding the Order of Instructions (anticompetitive conduct is merely "conduct other than competition on the merits that excludes or impedes competitors."); Applied Position Statement Regarding Instruction D9 (Exclusionary Bundling) (arguing that the Discount Attribution Test, not the Rule of Reason, determines legality). But it simultaneously justifies relying on Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power) because it supposedly applies the Rule of Reason to Section 2 and follows *Qualcomm*. See Applied Position Statement Regarding Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power). Neither argument is correct.

Applied's own case, *Epic Games*, explains that determining whether conduct is "anticompetitive" requires applying the Rule of Reason. 67 F.4th at 998; *see also* Medtronic Position Statement Regarding Instruction D9 (Exclusionary Bundled Discounting). In *Epic*, the Ninth Circuit painstakingly analyzed each step of the Rule of Reason, explaining the burden at each stage and the critical balancing step at the end. *See* 67 F.4th at 983–98. After it completed the analysis for Epic's Section 1 claim, it conducted an abbreviated analysis of Epic's Section 2 claim, stating, "Where, like here, the plaintiff challenges the same conduct pursuant to Section 1 and 2, we can 'review claims under each section simultaneously . . . And if 'a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2.'" *Id.* at 998 (quoting *Qualcomm*, 969 F.3d at 991).

Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power) looks nothing like the multi-step, multi-instruction Rule of Reason adopted by *Qualcomm* and the model instructions.

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D9
### Exclusionary Bundling

One form of anticompetitive conduct is exclusionary bundling.  Bundling is the practice of offering reduced prices, discounts and/or rebates for two or more goods or services that could be sold separately.  Bundling may be anticompetitive if a seller prices the bundle in a way that prevents an equally efficient competitor from competing for the sale.  The primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude a rival who is equally efficient at producing the competitive product simply because the rival does not sell as many products as the bundling firm.

To determine whether a bundle is anticompetitive, you should examine whether the pricing fails the "discount attribution test."  The discount attribution test is relevant when one of the competitors produces fewer goods or services than the other competitor.  Under this standard, the full amount of the discounts given by Medtronic on the bundle is allocated to Medtronic's advanced bipolar device, Ligasure.  If the resulting price of Ligasure is below Medtronic's average variable cost to produce it, you may find that the bundle is anticompetitive.

Authority: *Masimo Corp. v. Tyco Health Care Grp., L.P.*, 350 F. App'x 95, 97 (9th Cir. 2009); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008); *Cal.*

*Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971); Order re Motion for Summary Judgment (Dkt. No. 255) at 6-8.

### DEFENDANT'S PROPOSED INSTRUCTION NO. D9

### Challenged Conduct: Exclusionary Bundled Discounting[10],[11]

Applied alleges that Medtronic engaged in anticompetitive conduct through exclusionary bundled discounting.

Bundled discounting is the practice of offering reduced prices, discounts, and/or rebates when two or more goods that could be sold separately are purchased together. Bundled discounts generally benefit customers by lowering prices, which is a practice the antitrust laws aim to promote. It is not unlawful or improper to offer discounted prices, or to offer products in a bundle for a discount, even if the seller intends by its discounted pricing to increase its market share. However, bundled discounts can be anticompetitive if they lead to prices that are below cost and have the potential to exclude competitors from the market.

To prove that Medtronic's bundled discounting may be anticompetitive, Applied must first identify bundled discounts for which each of the following elements can be proven by a preponderance of the evidence:

1. Medtronic sold advanced bipolar devices in bundles with other devices for a lower price than if the devices were purchased separately;

---

[10] Medtronic has revised this instruction in light of the Court's summary judgment opinion and order. However, for the reasons stated in its briefs in support of its briefs in support of its *Daubert* motion (Dkt. Nos. 136-1, 150-1), summary judgment motion (Dkt. No. 147-1, 154-1, 249-1), and motion for certification of interlocutory appeal (Dkt. Nos. 259-1, 263), its April 19, 2025 contentions of law and fact (Dkt. No. 219), and May 3, 2025 position statement regarding this instruction (Dkt. No. 244), Medtronic maintains that proof of (a) substantial foreclosure and (b) monopoly power in the devices bundled with advanced bipolar devices and used in the discount attribution analysis is necessary for Applied's bundled discounting claim.

[11] Medtronic reserves the right to amend this and any other instruction based on rulings related to Medtronic's motion for certification of interlocutory appeal.

2. Medtronic had the exclusive capacity to create the bundles at issue; and

3. for those bundles, Medtronic's advanced bipolar devices were sold below cost, meaning that the price of the advanced bipolar devices in the bundle, minus the discount on the other devices in the bundle, was less than Medtronic's average variable cost of producing the advanced bipolar devices.

"Exclusive capacity" is a phrase that means no other competitor can offer the full range of items in a bundle. Medtronic's capacity to create a bundle is not exclusive if another competitor can offer the bundle at issue or can feasibly work with other suppliers to approximate it.

If you find that Applied has established each of these elements for certain bundled discounts, you will analyze those bundles under the Rule of Reason to determine if they result in a substantial adverse effect on competition in the alleged relevant market.  I will provide further instructions on how to apply the Rule of Reason in a moment.

I will now explain the meaning of average variable cost.

Authority: *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894, 895 & n.6, 896-99, 903, 906, 909, 910 n.21  (9th Cir. 2008); *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836 F.3d 1171, 1175, 1185-87 (9th Cir. 2016); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); ABA Model Jury Instructions 2.B.2, 3.C.4, 3.C.12; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990-91 (9th Cir. 2020); ; Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2; Order Re Mot. for Summ. J., Applied Med. Res. Corp. v. Medtronic, Inc., No. 8:23-cv-00268-WLH-DFM, at 4, 7-8 (C.D. Cal. Aug. 15,

1   2025), Dkt. No. 256.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D9
### Exclusionary Bundling

The Model does not include an instruction on bundling, so both parties have proposed their own. *PeaceHealth* adopted the "discount attribution test," explaining: "Under this standard, the full amount of the discounts given by the defendant on the bundle are allocated to the competitive product or products. If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, the trier of fact may find that the bundled discount is exclusionary for the purpose of § 2." *Id.* at 906. Applied's proposal closely mirrors this language and accurately reflects the law.

**Medtronic Includes One-Sided Characterizations Of Bundling**

Medtronic's instruction states that "[b]undled discounts generally benefit customers," but there is no broad antitrust endorsement of bundled discounts. *PeaceHealth* created a specific test because bundled discounts may create a "threat of anticompetitive impact by excluding less diversified but more efficient producers." *Id.* at 897. Medtronic's proposed language asserting that bundling is "not unlawful or improper" even "if the seller intends" to "increase its market share" is likewise misplaced. Legality depends on the discount-attribution test, not on presumptions in favor of bundling. Medtronic claims that statement is "derived from controlling law," but Medtronic fails to show its language appears in any case.

Medtronic's reliance on single-product predatory-pricing authority is likewise erroneous. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)); *see also Brooke Grp. v. Brown & Williamson Tobacco*, 509 U.S. 209, 223 (1993). *PeaceHealth* expressly distinguished such cases when discussing the "potential threat to consumer welfare" from below-cost bundling.

111

1  515 F.3d at 901–04.  Medtronic also cites the Court's Summary Judgment Order,
2  but that Order noted that Ninth Circuit law "is clear that discount bundling can
3  be anti-competitive, exclusionary conduct." SJ Order at 4.

4  **The Phrase "Bundled Discounting" Is Inaccurate In This Case**

5  Medtronic asserts that the term "bundled discounting" should be used
6  instead of "bundling."  But the jury is entitled to find that Medtronic's so-called
7  "discounts" are not discounts at all.  Rather, they are pricing ***penalties*** imposed
8  on customers who do not commit to Medtronic's bundles.  Specifically,
9  Medtronic regularly ***increases*** prices on non-bundled tiers in its agreements to
10 drive customers into bundles.  Dkt. 147 at 14 (JAF 303-08).  As the FTC observed
11 in its amicus brief at the motion to dismiss stage in this case, a "defendant's
12 'discount' may be a self-serving label for a pricing structure under which no
13 consumer actually receives a lower price." Dkt. No. 27 at 10.  Medtronic should
14 not be permitted to bake its preferred characterization of the conduct (as
15 "discounting") into the jury instructions.

16 Medtronic claims that *PeaceHealth* "consistently" described the
17 challenged conduct there as "bundle discounting," not "bundling."  But
18 *PeaceHealth* and other authorities have used other terminology.  *See, e.g.,*
19 *PeaceHealth* 515 F.3d 883, 906 (quoting 3 Areeda & Hovenkamp, Antitrust Law
20 ¶ 749b at 324 (Supp.2006)) (referring to the "challenged bundling practices");
21 *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,* 836 F.3d 1171, 1174 (9th Cir. 2016)
22 (referring to "price bundling"); *Masimo Corp. v. Tyco Health Care Grp., L.P.*,
23 350 F. App'x 95, 97 (9th Cir. 2009) (referring to "bundling agreements,"
24 "bundling practices," "bundling contracts," and "bundling arrangements").
25 Applied's language matches the allegations in its Complaint. *See* Dkt. 1 at 45-46
26 (referring to "bundles", "bundled agreement," and "bundled contract").

27 **Medtronic's Use of "Below-Cost" Is Vague and Misleading**

28 Medtronic's proposed statement that bundled discounts "can be

anticompetitive if they lead to prices that are below cost" is vague and risks misleading the jury because it does not identify the "prices" to which it refers. The jury could incorrectly think Medtronic's *actual* ABD prices must be below cost, rather than apply the Ninth Circuit's *PeaceHealth* discount-attribution test.

**Medtronic Presents an Erroneous Multi-Element Test**

Applied's instruction faithfully incorporates the Ninth Circuit's discount-attribution test from *PeaceHealth*, which provides that, if a bundle fails that test, "the trier of fact may conclude it is exclusionary." 515 F.3d at 906.

Medtronic introduces a complex, multi-element test that improperly imposes burdens beyond *PeaceHealth*.[12]

Medtronic's first element requires proof that "Medtronic has sold advanced bipolar devices in bundles with other devices for a lower price than if the devices were purchased separately." Thus, rather than merely require evidence showing such pricing, which can be proven in a variety of ways, Medtronic imposes an element requiring that a bundle be established in a particular way. Medtronic identifies no precedent requiring Medtronic's specific approach.

Medtronic then includes elements requiring the jury to (1) separately examine each of Medtronic's hundreds of bundles, (2) determine whether Medtronic has the "exclusive capacity" to create ***each*** of those specific bundles and then (3) apply the discount attribution test only to those bundles that

---

[12] Medtronic quotes language from the Court's order declining interlocutory certification. There, the Court observed, without the benefit of argument, that Medtronic's jury instructions contained guidance on bundling, contradicting Medtronic's argument that an interlocutory appeal was necessary to provide guidance to the jury. Dkt. 278 at 4 n.2. Applied's proposed instructions likewise provide substantial guidance: In addition to Applied's exclusionary-bundling instruction, the jury will receive extensive direction on anticompetitive conduct through the Model's "Willful Acquisition or Maintenance" instruction (D8).

Medtronic has the "exclusive capacity" to create.  Medtronic further provides a narrow definition of "exclusive capacity" stating that "Medtronic's capacity to create bundles is not exclusive if another competitor can offer the bundles" or "feasibly work with other suppliers to approximate Medtronic's bundle."

The Court should reject Medtronic's burdensome and erroneous test for at least the reasons below.

*First*, *PeaceHealth* and *Aerotec* do not require proof that "no other competitor can offer" the bundle.  Medtronic cites no case imposing such a requirement.  *PeaceHealth* explained that the "anticompetitive danger posed by a multi-product bundled discount" is the exclusion of "***a*** rival who is equally efficient at producing the competitive product simply because ***the*** rival does not sell as many products as the bundled discounter." 515 F.3d at 894.  *PeaceHealth* focused on the plaintiff's inability to "provide the same array of services" as the defendant, *id*. at 897—not on whether any other rival could offer it.

*Aerotec* reaffirmed this point: "As  [*PeaceHealth*] made clear, the discount attribution test only applies where ***one*** of the competitors produces fewer goods or services than the other competitor." 836 F.3d at 1186–87.  Aerotec repeated *PeaceHealth*'s explanation that the "primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude ***a*** rival who is equally efficient at producing the competitive product simply because ***the*** rival does not sell as many products as the bundled discounter." *Id*.  Aerotec rejected the claim because both firms sold the same bundle. *Id*.  Its reference to "exclusive capacity" described whether the plaintiff provided the same bundle; *Aerotec* did ***not*** hold that a plaintiff must show no other competitor provides or could provide the bundle.

Nor would such a rule make sense. The core *PeaceHealth* concern is excluding "***a*** rival who is equally efficient" in the primary market. 515 F.3d at 894.  The excluded rival may be the rival most able to be a competitive check

114

against the monopolist in the market at issue.   Such is the case here, where Applied offers ABDs equal or superior in quality and at substantially lower prices. Excluding *Applied*—the rival most able to provide a competitive check on Medtronic—reduces competition, raises prices, and limits choice in the ABD market, regardless of whether other parties offer, or could offer, Medtronic's bundles.  Medtronic may disagree, but that disagreement should be resolved through competing evidence and expert testimony at trial, not through jury instructions.

Applied's position would not mean, as Medtronic asserts, that "elimination of a single competitor, standing alone" establishes anticompetitive effect. Evidence and expert analysis must still establish such anticompetitive effect.  But the elimination of a rival clearly *can* harm competition.  Coke could not eliminate Pepsi and argue there can be no harm because it merely excluded a "single rival."

Here, Applied asserted substantial evidence, including multiple benchmarks, showing the harm to competition from Medtronic's bundling. Applied's evidence demonstrates what happened when Ethicon was forced to stop bundling against Applied—competition increased and prices dropped. Orszag Opening, Dkt. No. 183, Ex. 4 at ¶¶ 220-232.   Medtronic itself acknowledged this impact.   JAF 391-94.   This occurred even though other competitors, such as Medtronic, also bundle trocars and sutures.  *See* Dkt. 147 (JAF 389) (Ethicon's bundle); Orszag Reply, Dkt. No. 183-9, ¶ 13 (Medtronic bundle).  The jury could rely on this real world data to conclude that Medtronic's bundle can harm competition by excluding specific non-full line suppliers, regardless of whether other companies could or do offer similar bundles. Medtronic presents a hypothetical involving products A, B, and C, but that hypothetical illustrates why exclusionary bundling turns on fact-specific economic evidence, not on a categorical rule inserted into a jury instruction.

Medtronic cites Areeda to postulate that a better theoretical question is

whether any rival has the same bundle.  Areeda ¶ 749. But *PeaceHealth* did not quote that portion of Areeda.  *PeaceHealth* quoted the portion of Areeda advocating an approach focusing on whether "the practice will exclude ***an*** equally efficient rival." *PeaceHealth*, 515 F.3d at 907.  *PeaceHealth* also quoted and relied on Judge Posner's reasoning that "the acts of a monopolist should be deemed exclusionary if 'the challenged practice is likely in the circumstances to exclude from the defendant's market ***an*** equally or more efficient competitor." *Id.* at 907.

Consistent with the Court's focus on whether the bundling would exclude a hypothetical "equally" efficient competitor, *PeaceHealth* permits the jury to find anticompetitive conduct based on the structure of the defendant's bundle. *PeaceHealth* is clear: "If the resulting price of the competitive product or products is below the defendant's incremental cost to produce them, ***the trier of fact may find*** that the bundled discount is ***exclusionary*** for the purpose of § 2." *Id*. at 906.  *PeaceHealth* quoted Areeda's explanation that the "relevant question is not" about the efficiency of any particular plaintiff, but "whether the challenged bundling practices would have excluded ***an*** equally efficient rival, without reasonable justification." *Id*.

Medtronic's proposed interpretation would substantially weaken *PeaceHealth* and perversely encourage bundling that violates the Discount Attribution Test.  So long as some other company has engaged, or could engage in the same conduct, all such companies would be immune from liability, regardless of the actual competitive harm.  *PeaceHealth* created the Discount Attribution Test so companies could carefully avoid running "afoul" of it, 515 F.3d at 907, not to provide a roadmap for dominant firms to crush smaller rivals.

***Second*,** while this Court noted that "neither Applied nor other competitors offer the full range of items in Medtronic's bundles" (SJ Order at 8), the Court did not hold complete exclusivity is required.  As discussed, such a rule would

contradict *PeaceHealth* and *Aerotec*.   The Court found Medtronic's portfolio breadth "sufficient to defeat" its motion and did "not reach" Applied's alternative theory that Medtronic's market power over the bundled products allows it to impose higher prices on customers who refuse the bundle, thereby driving their behavior.  SJ Order at 8 n.2; Dkt. 147 (JAF 504-05).  Although the Court correctly rejected Medtronic's demand for ***monopoly power*** over ***every*** bundled product, it did not bar Applied from proving bundle power through Medtronic's market power over the bundled products.  SJ Order at 7-8 & n.2.  Indeed, this Court pointed to *PeaceHealth*'s explanation that the "DAT determines if bundling practice exclude ***a*** hypothetical equally efficient rival."  SJ Order at 20 n.8.  This Court also distinguished *Suture Express*, a tying case cited by Medtronic here, as discussing "law that may diverge from Ninth Circuit law."  SJ Order at 20 n.8.

***Third***, Medtronic never argued in discovery, summary judgment, or its prior jury instructions that Applied must prove "exclusive capacity," and it has never identified a single rival capable of doing so.  *See* Medtronic's 6/14/2024 Resp. to Interrog. No. 3, Dkt. No. 142-4; Murphy Rpt., Dkt. No. 147-23. Medtronic merely asserted that Applied could assemble its own bundles, never that some unnamed competitor could match Medtronic's portfolio or defeat Applied's claim.  *See id.*  If Medtronic intended to rely on such a theory, it should have disclosed it so Applied could take appropriate discovery.  Medtronic does not dispute that it never disclosed the factual basis for this theory during discovery.  Instead, Medtronic claims it was not required to "educate Applied on the law" that would apply in this case.  But Medtronic was required to answer Applied's interrogatory and identify the ***facts*** on which it would rely at trial. Indeed, after Medtronic initially obfuscated, Applied brought a motion to compel and the Court ***ordered*** Medtronic to answer Applied's interrogatories seeking the ***factual*** basis for Medtronic's claims.  Dkt. 64 at 2. Medtronic never disclosed the facts at issue here (that some unnamed competitor allegedly could match its

117

portfolio).  A party cannot litigate one theory through discovery, lose on summary judgment on that theory, and then pivot to a new one after discovery is closed.

*Fourth*, Medtronic proposes a confusing and legally unsupported multi-step test for "exclusive capacity" that would require the jury to evaluate hundreds of bundles against every possible rival and apply the discount-attribution test only to bundles "found nowhere else in the market," regardless of any rival's market share or power.  Even if Medtronic's onerous view of "exclusive capacity" were correct, nothing in *PeaceHealth* justifies Medtronic's complex framework, and Medtronic cites no authority for it.  Nor did this Court require anything like it at summary judgment.  The Court relied on evidence of Medtronic's overall "portfolio breadth" and whether competitors could "offer the full range of items in Medtronic's bundles." SJ Order at 8 & n.2.

Medtronic's requirement is unsupported by law and not practical, particularly in view of the limited trial time.  Such a rule is also directly contrary to the reasoning of *PeaceHealth.*  The Ninth Circuit in *PeaceHealth* carefully considered various approaches to examining bundling and adopted the Discount Attribution Test.  The Court selected that test, in part, to provide "clear guidance" so sellers can "easily ascertain" whether or not they violate that rule. *PeaceHealth*, 515 F.3d at 907.  The Court pointed to the "administrability" of the rule.  Nowhere did the Ninth Circuit adopt Medtronic's exceedingly complex test.

*Finally*, Medtronic's instruction asserts that the jury must then analyze the bundles that satisfy each of Medtronic's multi-part test and determine if they result in a "substantial adverse effect on competition in the alleged relevant market."  As discussed in Applied's Argument regarding Instruction D2 ("Monopolization General - Elements"), Medtronic improperly seeks to circumvent this Court's Summary Judgment Order, which correctly interpreted *PeaceHealth*.  Indeed, Medtronic openly states its position "it is the Rule of Reason that determines legality," even though the Ninth Circuit held that the

118

*Discount Attribution Test* controls, rejecting the argument that this required a showing of an adverse effect on competition." *See* Dkt. 255 at 6. Medtronic should not be permitted to brazenly reassert the same arguments it lost on summary judgment.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED
## INSTRUCTION NO. D9
### Challenged Conduct: Exclusionary Bundled Discounting

Because there is no model bundled discounting instruction, Medtronic drafted an instruction in the style of the ABA model, setting forth a balanced description of the conduct and clear elements the jury must find. Medtronic's instruction is drawn entirely from Supreme Court and Ninth Circuit case law. There are five key differences between Medtronic's proposed instruction and Applied's.

*First*, in addition to explaining that bundled discounting can be anticompetitive, Medtronic explains that it can have benefits. This is consistent with the ABA model's evenhanded approach to defining and contextualizing challenged conduct. *See, e.g.*, ABA Model Jury Instrs. 3.C.12 (volume discounts instruction describing discounts as "often reflect[ing] cost saving and other efficiencies"); *id.* at 3.C.4 (predatory pricing instruction describing the "beneficial results" of "[l]owering prices," "even if the firm intends by its actions to drive rivals from the market."); *id.* at 2.B.2 (pricing agreements and joint ventures instruction noting that joint ventures "often have positive effects on competition and can provide benefits to consumers"). Applied proposes a slanted approach, stressing how bundled discounting can harm competition without mentioning any of its benefits.

Medtronic's description of bundled discounting's procompetitive effects is derived from controlling law that this Court has previously acknowledged. *See, e.g.*, Order re Mot. Summ. J. at 4, Dkt. No. 255 ("bundled discounts 'generally benefit' consumers" (quoting *PeaceHealth*, 515 F.3d at 895)). Applied disputes the statement that "[i]t is not unlawful or improper to offer discounted prices, or to offer products in a bundle for a discount, even if the seller intends by its discounted pricing to increase its market share." *See* Applied Position Statement

Regarding Instruction D9 (Exclusionary Bundling) . But that statement is derived from controlling law, and Applied offers no legal basis for its objection. *See PeaceHealth*, 515 F.3d at 896 ("price cutting is a practice the antitrust laws aim to promote" (citing *Matsushita*, 475 U.S. at 594); *see also Brooke Grp. v. Brown & Williamson Tobacco*, 509 U.S. 209, 223 (1993) ("To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result.") (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117 (1986)). Applied's cursory claim that "[l]egality depends on the discount-attribution test, not on presumptions in favor of bundling" is both misplaced and inaccurate. Nowhere does Medtronic's instruction establish a presumption related to bundled discounting, and as Medtronic explains below, it is the Rule of Reason that determines legality. Applied further argues that Medtronic should not rely on predatory pricing authority, but in *PeaceHealth*, the Ninth Circuit also relied on predatory pricing authorities. *See, e.g.*, 515 F.3d at 895, 901; *see also id.* at 910 ("We see no reason to depart from these principles [of predatory pricing] in the bundled discounting context.").

*Second*, Medtronic uses the term "bundled discounting" instead of "bundling" because "bundled discounting" more accurately describes the challenged conduct. *PeaceHealth* defines both terms: "bundling" is "the practice of offering, for a single price, two or more goods or services that could be sold separately," and a "bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually." 515 F.3d at 894. It is the "discount" component of bundled discounts that Applied alleges has harmed competition. *See id.* at 896–99. In *PeaceHealth*, the Ninth Circuit consistently described the conduct

121

challenged there as "bundled discounting," not mere "bundling." *See generally* 515 F.3d 883.

Applied asserts, without support, that the jury could find Medtronic's discounts to be "pricing penalties" and thus they should not be referred to as discounts. Applied Position Statement Regarding Instruction D9 (Exclusionary Bundling). This contravenes the view of the Ninth Circuit in *PeaceHealth*: "A bundled discount, however else it might be viewed, is a price discount on a collection of goods." 515 F.3d at 903. And the jury will not be instructed on or asked to decide whether Medtronic's bundled discounts are "pricing penalties." It will be asked to decide whether, under the *discount* attribution test, Medtronic's *discounts* result in below-cost pricing. *See PeaceHealth*, 515 F.3d at 906.

*Third*, consistent with *PeaceHealth*, Medtronic's instruction states that bundled discounts can be anticompetitive "if they lead to prices that are below cost and have the potential to exclude competitors from the market." *PeaceHealth*, 515 F.3d at 906 (discount attribution standard "makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer" (emphasis omitted)); *id.* at 909 (below-cost requirement "ensures that the only bundled discounts condemned as exclusionary are those that would exclude an equally efficient producer"); *cf.* Order re Mot. Summ. J. at 4, Dkt. No. 255 (*PeaceHealth* standard "makes defendant's bundled discounts legal unless the discounts have the potential to exclude" (quoting *PeaceHealth*, 515 F.3d at 906)). Applied instead wishes to instruct the jury that "*a* bundle" or "*a* multi-product bundled discount" can be anticompetitive if it "prevents an equally efficient competitor from competing for *the* sale" (emphases added). Applied's proposal would allow the jury to find liability based on a single below-cost bundle involving one below-cost sale, and it should be rejected.

*Fourth*, Applied objects to the element requiring it to prove the most

basic aspect of its claims: that "Medtronic sold advanced bipolar devices in bundles with other devices for a lower price than if the devices were purchased separately." Applied resists the idea that it must make a specific showing as to "each of Medtronic's hundreds of bundles," but individual bundles are the basic unit of analysis in a bundled discounting case. *See, e.g.*, *PeaceHealth*, 515 F.3d at 906 & n.15. Both parties' experts applied a discount attribution analysis to *individual bundles*. *See, e.g.*, Orszag Rep. ¶ 173; Murphy Rep. ¶ 105. Applied further argues that this element is too restrictive because discounts "can be proven in a variety of ways," but nothing about this element dictates the type of evidence Applied may use to prove it.

*Fifth*, Applied makes the farfetched assertion that Medtronic's instruction requires *the jury* to "evaluate hundreds of bundles against every possible rival," determine whether Medtronic has the "exclusive capacity" to create them, and then apply the discount attribution test. Medtronic's instruction does no such thing, nor does it establish a "complex framework" as Applied claims. Rather it simply requires *Applied* to prove each element by a preponderance of the evidence, which Applied is free to do by presenting expert testimony or other competent evidence related to each element.

*Sixth*, consistent with the Court's summary judgment opinion, Medtronic's instruction requires Applied to prove that "Medtronic has the exclusive capacity to create the bundles at issue." Order re Mot. Summ. J. at 7, Dkt. No. 255 ("So long as Applied has raised a triable issue of fact that Medtronic 'has exclusive capacity' to create the bundles at issue, a trier of fact can use the DAT to determine if the bundles are anti-competitive" (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187) (9th Cir. 2016)); *id.* at 8 (requiring a finding of "a monopoly on portfolio breadth" before the fact finder can "apply the DAT and determine if Medtronic's bundling practices are anticompetitive"). As other courts have observed, if competitors "offer[] similar bundling packages,

123

competition [is] not excluded," instead taking the form of "bundle-to-bundle competition." *Suture Express, Inc. v. Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1041 (10th Cir. 2017) (affirming summary judgment for defendant on challenge to bundled discounts); *see also Aerotec*, 836 F.3d at 1187 (possibility of anticompetitive effects based on "fact that the bundling competitor has exclusive capacity to 'bundle' multiple products"). Medtronic does not present a "complex, multi-element test" associated with this element, as Applied asserts. Applied Position Statement Regarding Instruction D9 (Exclusionary Bundling). The instruction states that "Medtronic's capacity to create a bundle is not exclusive if another competitor can offer the bundle at issue or can feasibly work with other suppliers to approximate it." This neither constrains Applied's presentation of evidence to the jury nor requires jurors to adhere to a particular analytical framework.

Applied erroneously argues that there can be no "exclusive capacity" requirement because *PeaceHealth* was concerned with the exclusion of even a single rival. Applied Position Statement Regarding Instruction D9 (Exclusionary Bundling). Though bundled discounts must be capable of excluding a rival, *PeaceHealth*, 515 F.3d at 909, "elimination of a single competitor, standing alone, does not prove anticompetitive effect," *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1158 (9th Cir. 2001). Suppose, for instance, that there are 10 similarly sized firms in the industry that offer bundled discounts on products A, B, and C. If another firm enters and sells only products A and B, it might be excluded not because of anticompetitive bundled discounts, but because its two-product offer is less attractive than its rivals' three-product bundles. That competitive reality would not violate the antitrust laws. *See Suture Express*, 851 F.3d at 1043 (rejecting challenge to bundled discounts in industry where "acute care purchasers simply preferred consolidating their purchases and having fewer distributors to deal with.").

124

Applied's instruction focuses narrowly on whether "one of the competitors" produces fewer goods or services "than the other competitor," but this language is misleading. The better question is "not whether the plaintiff could match the bundle, but if any firm or group of firms in the market could do so, or is likely to do so." Areeda ¶ 749. If "the market contains at least one other significant firm who offers the same package that the defendant is discounting," then there is no competitive harm from bundled discounting. *Id.*; *see also* Order re Mot. Summ. J. at 8, Dkt. No. 255 (finding triable issue of fact as to whether Medtronic has a monopoly on portfolio breadth in part because of "analysis that Applied cannot feasibly work with other suppliers to approximate Medtronic's bundles"). Medtronic's definition of "exclusive capacity" explains this principle.

Applied also points to language in *Aerotec* indicating that "the discount attribution test *only applies* where one of the competitors produces fewer goods or services than the other competitor." *Aerotec*, 836 F.3d at 1186-87 (emphasis added). In doing so, Applied confuses a necessary condition with a sufficient one: the discount attribution test applies only to bundles where one competitor produces fewer goods or services than the other competitor, but it does not apply to *all* such bundles. It applies only to those that the defendant has the exclusive capacity to create.

As a last resort, Applied claims that it was Medtronic's obligation to alert Applied to the exclusive capacity requirement during discovery, but it cites no authority for the proposition that Medtronic must educate Applied on the law.

*Finally*, in keeping with the harm to competition requirement, Medtronic's instruction explains that after jurors have used this instruction to identify bundled discounts that *may be* anticompetitive, they must evaluate those bundled discounts under the Rule of Reason to determine their net effect on competition. *See* Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2, Dkt. No. 278 ("Medtronic's own proposed jury instructions provide a helpful multi-step

125

analysis for the jury to evaluate whether Medtronic's bundled discounting are anticompetitive. *If* the jury does find exclusionary bundling to exist, they are still required to apply the Rule of Reason to determine whether the challenged conduct results in substantial harm to competition in the relevant market *and* whether such conduct produces countervailing competitive benefits." (emphasis in original)); *see also* Areeda ¶ 749d3 ("When [the price-cost] test has been satisfied, the remaining analysis resembles that in a Rule of Reason tying or exclusive-dealing case.").

Again seeking to lighten its burden, Applied argues that it need not prove a "substantial adverse effect on competition in the relevant market" to show that Medtronic engaged in anticompetitive conduct. Applied Position Statement Regarding Instruction D9 (Exclusionary Bundling). But as Applied's own case, *Epic Games*, explains, whether conduct is "anticompetitive" turns on the Rule of Reason. *See* 67 F.4th at 998 ("[T]he plaintiff must show that the defendant acquired or maintained its monopoly through 'anticompetitive conduct.' This anticompetitive-conduct requirement is 'essentially the same' as the Rule of Reason inquiry applicable to Section 1 claims." (cleaned up)). And the Rule of Reason requires Applied to prove a "substantial anticompetitive effect that harms consumers in the relevant market." *Qualcomm*, 696 F.3d at 991 (quoting *Am. Express*, 585 U.S. at 541).

Antitrust law is not concerned with whether Medtronic's bundled discounts prevented Applied from winning sales, much less a single sale. After all, "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (citation omitted). What matters is harm to competition *as a whole*, which a plaintiff must prove as a precondition of liability. *See, e.g.*, *Am. Express*, 585 U.S. at 541 ("Under [the Rule of Reason] framework, the plaintiff has the initial burden to

prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."); *Aerotec*, 836 F.3d at 1175 (describing harm to competition as "the bellwether of antitrust"). *PeaceHealth* confirms this point. There, the Ninth Circuit did not adopt a distinct "harm to competition" requirement precisely because harm to competition is already included in "the general requirement of 'antitrust injury' that a plaintiff must prove in any private antitrust action." *PeaceHealth*, 515 F.3d at 910 n.21 (citing *Brunswick Corp.*, 429 U.S. at 489).

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D10**

**Exclusive Dealing**

Another form of anticompetitive conduct is anticompetitive exclusive dealing. Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of [~~an agreement forbidding the buyer from purchasing the product or service from the supplier's competitors,~~ a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier~~,~~ or a pricing policy that creates a substantial disincentive to purchase from competitors]. Some practices [, such as minimum purchase requirements~~, inventory requirements, or sales quotas~~] may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.

Exclusive dealing arrangements and partial exclusive dealing arrangements, whatever form they may take, are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

To establish that an exclusive dealing [or partial exclusive dealing] arrangement violates the Sherman Act, ~~plaintiff~~Applied must establish each of the following elements by a preponderance of the evidence:

(1) an agreement between the buyer(s) and the supplier that totally [or in substantial part] forecloses the buyer(s) from purchasing the product [~~or service~~] from competing suppliers;

(2) the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in a relevant market;

(1) defendant(3) Medtronic had substantial market power in the market for [*describe* relevant *product*];

the agreement occurred in or affected interstate [*or foreign*] commercemarket; and

plaintiff(4) Applied was injured in its business or property because of the agreement.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for defendantMedtronic and against plaintiffApplied on plaintiff'sApplied's exclusive dealing claim. under Section 1 of the Sherman Act. If you find that the evidence is sufficient to prove all fivefour elements as to a particular defendant, then you must find for plaintiffApplied and against defendantMedtronic on plaintiff'sApplied's exclusive dealing claim under Section 1 of the Sherman Act.


Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 2.D.5 (2016 ed.); *CoStar Grp., Inc. v. Com. Real Est. Exch.*, *Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025); *Masimo Corp. v. Tyco Health Care Grp.*, L.P., 350 F. App'x 95, 97 (9th Cir. 2009); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141 at *5 (C.D. Cal. Dec. 2, 2013).

129

**DEFENDANT'S PROPOSED INSTRUCTION NO. D10**

**Challenged Conduct: Unlawful Exclusive Dealing**

~~Sherman Act, Section 1: Unlawful Exclusive Dealing~~Applied also alleges that Medtronic engaged in anticompetitive conduct through unlawful exclusive dealing.

Exclusive dealing arrangements require a buyer of a product ~~or service~~ to obtain that product ~~or service~~ exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of [an agreement forbidding the buyer from purchasing the product ~~or service~~ from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products ~~or services~~ from the supplier, or a pricing policy that ~~creates a substantial disincentive to purchase~~in effect prevents customers from purchasing from competitors]. ~~Some practices [~~*minimum purchase*. When a contract offers a buyer a discount for purchasing a certain amount of their requirements~~, inventory requirements, or sales quotas] may operate as partial~~ for a specific product, something more than the discount itself is necessary to prove that the agreement is exclusive~~ dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers. Exclusive dealing arrangements and partial~~.

Exclusive dealing arrangements, whatever form they may take, are analyzed under the Rule of Reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller ~~supplier~~, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products ~~and services~~.

To establish that ~~an~~Medtronic entered into exclusive dealing [*or partial exclusive dealing*] ~~arrangement violates~~arrangements that violate the Sherman Act, ~~plaintiff~~Applied must establish each of the following elements by a preponderance of the evidence:

1. an agreement between the buyer(s) and ~~the supplier~~Medtronic that totally [*or in substantial part*] forecloses the buyer(s) from purchasing ~~the product [*or service*]~~advanced bipolar devices from competing suppliers; and

2. the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in ~~a~~the alleged relevant market~~;~~.

3. ~~defendant had substantial market power in the market for [describe relevant product];~~

4. ~~the agreement occurred in or affected interstate [or foreign] commerce; and~~

5. ~~plaintiff was injured in its business or property because of the agreement.~~

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for defendant and against plaintiff on plaintiff's exclusive dealing claim. If you find that the evidence is sufficient to prove all five elements as to a particular defendant, then you must find for plaintiff and against defendant on plaintiff's exclusive dealing claim.

To determine whether Medtronic entered into exclusive dealing arrangements that unreasonably restrained trade and resulted in a substantial adverse effect on competition in the alleged relevant market, you will apply the

131

Rule of Reason.

Authority: ABA Model Jury Instructions 2.D.5; Fed. Trade Comm'n v. Qualcomm Inc., 969 F.3d 974, 1003-04 (9th Cir. 2020); Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP, 592 F.3d 991, 997 (9th Cir. 2010); Order Re Mot. for Summ. J., Applied Med. Res. Corp. v. Medtronic, Inc., No. 8:23-cv-00268-WLH-DFM, at 9, 11 (C.D. Cal. Aug. 15, 2025), Dkt. No. 256.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D10

### Exclusive Dealing

Applied's proposal closely follows the ABA Model.  It adds party names and removes the undisputed interstate commerce element.  Because exclusive dealing is one form of exclusionary conduct under Section 2, and the Model for Section 2 does not list every such form, Applied properly draws on the Model's Section 1 exclusive-dealing instruction to guide the jury on evaluating Medtronic's conduct.

Medtronic distorts the Model in many ways.  ***First***, Medtronic's proposal (1) deletes the Model's recognition of "partial exclusive dealing," (2) replaces "totally or in substantial part forecloses" with a requirement of total foreclosure, and (3) rewrites "pricing policy… creating a substantial disincentive to purchase" into a policy that prevents purchasing—all reviving the argument that Applied must establish 100%-exclusivity.  This Court already rejected that argument on summary judgment. *See* Dkt. 147-1 at 26–27; SJ Order at 11–15; *Masimo*, 350 F. App'x 95, 97 (2009).

***Second***, Medtronic removes the Model's required elements of market power and injury.  Medtronic argues that "market power" should not appear because "exclusive dealing" is asserted as conduct supporting monopolization.  It is well established exclusive dealing considers whether the defendant has ***market power***.  *See Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141 at *5 (C.D. Cal. Dec. 2, 2013).  The jury will separately decide whether Medtronic has ***monopoly power*** as a distinct element of Applied's monopolization claims, as clearly set out in the Model.  Medtronic asserts that it also omits the elements of market power and injury because they are repeated in Medtronic's "Unreasonable Restraint of Trade—Elements" instruction.  But that

underscores the complexity of Medtronic's approach, which seeks to divide claim elements across two different instructions. The jury should not have to stitch together elements dispersed across multiple instructions.    As discussed, Medtronic's "Unreasonable Restraint of Trade—Elements" instruction is unnecessary because the parties already include a more specific instruction from the Model's "Vertical Restraints" chapter specifically directed to "Exclusive Dealing" and because the parties separately provide instructions on "Exclusionary Bundling."

**Third**, Medtronic adds a new sentence requiring an additional "Rule of Reason" analysis.  As discussed in Applied's Argument regarding Instruction D2 ("Monopolization General - Elements"), Medtronic improperly seeks to merge separate legal standards

**Fourth**, Medtronic insists on including **optional** bracketed Model language describing agreements that entirely forbid purchases from competitors. Such language should be used only when such agreements are at issue.  Here, Applied does **not** challenge such agreements and thus including the optional language will simply cause confusion.

**Fifth**, Medtronic asks the Court to delete the Model's language discussing "a pricing policy that creates a substantial disincentive to purchase from competitors," claiming price cutting is procompetitive.  But agreements that use so-called price reductions to prevent purchases from competitors can constitute exclusive dealing. *See* Joint Br. for Summ. J., Dkt. No. 147 at 38; *Masimo*, 350 F. App'x at 97 (finding such agreements bore "the hallmark of exclusive dealing").  Medtronic's alternative language—requiring a pricing policy that "in effect prevents" competitor purchasing—reasserts the rejected theory that Applied must establish 100% exclusivity.  *See* Dkt. 255 at 14–15.

**Sixth**, Medtronic seeks to strike the Model's recognition of "partial exclusive dealing," again seeking to revive Medtronic's rejected argument that

134

Applied must establish 100% exclusivity. Dkt. No. 255 at 14-15. None of Medtronic's cited cases supports its rewrite. *Allied Orthopedic* did not require 100% exclusivity. Neither did *Aerotec*. Moreover, *W. Parcel* and *Concord Boat* addressed programs without requirements or penalties. Here, Medtronic requires hospitals to buy 80–90% of ABDs to maintain pricing—"the hallmark of exclusive dealing." *Masimo*, 350 F. App'x at 97. *De facto* exclusive dealing is alive and well in this Circuit. *See CoStar Grp., Inc. v. Com. Real Est. Exch.*, *Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025) (amended upon denying rehearing); *see also* Amicus Brief of Antitrust Scholars, No. 23-55662, Dkt. 66-1 at 5 (August 18, 2025) (characterizing *CoStar* as first Ninth Circuit decision to expressly recognize "'de facto' exclusive dealing").

**Seventh**, Medtronic adds new language stating that discounts tied to less-than-100% requirements need "something more than the discount itself" to show the agreement prevents purchases from other sellers. Medtronic relies on *Allied Orthopedic*, but that case noted changed market conditions and found "[o]n the **facts of this case**, something more than the discount itself is necessary…." 592 F.3d at 997. The Court did not create a rule requiring "something more" whenever a commitment is below 100%.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D10**
**Challenged Conduct: Unlawful Exclusive Dealing**

Medtronic's instruction largely tracks the ABA model, making adjustments to conform with Ninth Circuit precedent and to the facts and circumstances of this case. Applied's instruction, by contrast, includes concepts from the model that are legally inaccurate and likely to confuse the jury. There are five key differences between Medtronic's proposed instruction and Applied's.

*First*, Applied includes two exclusive dealing examples from the model that are in tension with controlling law. The first is "a pricing policy that creates a substantial disincentive to purchase from competitors." This example implies that a lawful, above-cost discount could be anticompetitive because it creates a "substantial disincentive to purchase from competitors," even though "price cutting is a practice the antitrust laws aim to promote." *PeaceHealth*, 515 F.3d at 896; *see also Matsushita*, 475 U.S. at 594 ("[C]utting prices in order to increase business often is the very essence of competition."). To avoid confusion, Medtronic substitutes "a pricing policy that in effect prevents customers from purchasing from competitors," which is consistent with controlling law. *See, e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–27 (1961) (agreements are potentially exclusive only where "their practical effect is to prevent lessees or purchasers from using or dealing in the goods, etc., of a competitor or competitors of the lessor or seller"); *Qualcomm*, 969 F.3d at 1003–04 ("[A]greements that provide substantial discounts to customers that actually purchase a high percentage of their requirements from a firm are not exclusive dealing arrangements, de facto or actual, unless they prevent the buyer from purchasing a given good from any other vendor." (cleaned up)).

The second example Applied includes relates to "partial exclusive dealing," a theory that is unsupported by Ninth Circuit precedent and undefined

136

in the model instruction. The model's explanation that "[s]ome practices . . . may operate as partial exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers" fails to clarify the term. All contracts to buy "limit" a buyer's ability to purchase from another supplier. *See Omega*, 127 F.3d at 1162. Nor can "partial exclusive dealing" be understood to refer to "*de facto* exclusive dealing" because, under Ninth Circuit precedent, a *de facto* exclusive contract must still be exclusive, meaning that it "prevents the buyer from purchasing a given good from any other vendor." *See Allied Orthopedic Appliance Inc. v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010); *Aerotec*, 836 F.3d at 1181 ("A prerequisite to any exclusive dealing claim is an agreement to deal exclusively") (citation omitted); *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064–65, *aff'd*, 190 F.3d 974 (9th Cir. 1999) (without requirement that customer use only defendant's service, contracts conditioning agreed pricing discounts on maintaining certain levels of volume did not constitute exclusive dealing).

Applied's reference to *Masimo* only supports Medtronic's position. There, the district court concluded that discounts "conditioned upon customers purchasing 90-95% of their requirements" of the products at issue from the defendant "effectively prevent[] customers from dealing in the goods of competitors." 350 F. App'x 95, 97 (9th Cir. 2009). The contracts in *Masimo* thus satisfy the test laid out in *Tampa Electric*, *Allied Orthopedic*, and elsewhere because their practical effect is to prevent buyers from dealing with competitors. *See also* Order re Mot. Summ. J. at 10, Dkt. No. 255 (applying *Masimo*).

*Second*, Medtronic omits elements three and five of the model instruction because they are repeated verbatim in Instruction D18 (Unreasonable Restraint of Trade—Elements), which lays out the overarching elements of a Section 1

137

violation.[13] Applied's accusation that Medtronic "removes" these elements is baseless. Applied Position Statement Regarding Instruction D10 (Exclusive Dealing); *see* Instruction D18 (Unreasonable Restraint of Trade—Elements). Rather, to avoid confusion, Medtronic instructs the jury on the relevant level of market power when it provides the overarching elements of Applied's Section 1 and Section 2 claims, and removes those references from the elements of its conduct instructions, which apply across claims.

Medtronic omits element three from this instruction for the additional reason that "substantial market power" is not the correct standard for Applied's Section 2 claims, and jurors will be told to refer back to this instruction when assessing those claims. Applied's exclusive dealing instruction, which it has inserted into its Section 2 instructions, improperly includes this element.

*Third*, Medtronic's instruction clarifies that jurors must apply the Rule of Reason to determine whether any alleged exclusive dealing qualifies as an "unreasonable restraint of trade" under the second element. *See* Order re Mot. Summ. J. at 9, Dkt. No. 255 (explaining that courts "analyze challenges to exclusive dealing arrangements under the antitrust Rule of Reason" (quoting *Omega*, 127 F.3d at 1162) (internal quotation marks omitted)). Applied does not dispute that the Rule of Reason is the proper test but resists any reference to it in the parties' Section 2 instructions. Applied would prefer to leave "unreasonable restraint of trade" undefined until jurors reach the Section 1 instructions.

*Fourth*, Applied deletes language from the model instruction that explains that one type of exclusive dealing is "an agreement forbidding the buyer from purchasing the product from the supplier's competitors." This is the quintessential form of exclusive dealing, which the jury needs to know to understand the concept

---

[13] Both parties omit element four of the model instruction, which relates to whether the agreement affected interstate commerce.

138

of an exclusive dealing claim.

*Finally*, to help the jury understand the circumstances of this case, Medtronic's instruction explains that when an agreement gives a buyer a discount for purchasing a specified percentage of its needs for a given product from a seller, meaning that it is not exclusive by its plain terms, then "something more than the discount itself" is necessary to prove that the agreement actually prevents the buyer from purchasing that product from any other seller. *See* Order re Mot. Summ. J. at 11, Dkt. No. 255 (citing *Allied Orthopedic*, 592 F.3d at 997).

1
2

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D11
### Exclusive Dealing—Additional Considerations

3    In determining whether ~~defendant's~~Medtronic's alleged exclusive dealing

4    contracts had a substantially harmful effect on competition in the relevant market,

5    you should consider the nature and history of the use of exclusive dealing

6    contracts in the [~~describe relevant product or service~~] industry, whether buyers

7    ~~of [the relevant product or service]~~ have independent reasons for entering into

8    exclusive dealing contracts or were coerced into entering into them, whether

9    other competing suppliers also offer exclusive dealing contracts, the extent of

10    competition among competing suppliers for exclusive dealing contracts with

11    buyers, ~~defendant's~~Medtronic's position in the marketplace, the competitive

12    alternatives to ~~defendant's~~Medtronic's products ~~or services~~, the reasons

13    ~~defendant~~Medtronic and buyers entered into the exclusive dealing contracts at

14    issue, and the effect of the use of exclusive dealing contracts on the ability of new

15    firms to enter the market and on price and other competition in the market.

16    You also should consider whether the buyer is the final end user of the

17    product. If the buyer is the final end user, the exclusive dealing contract

18    forecloses competitors from that portion of the market represented by the buyer's

19    purchases and makes it more likely that competition may be harmed if the buyer

20    represents a substantial portion of the market. On the other hand, if the buyer is

21    a distributor or reseller, and there are other alternatives for competing sellers to

22    market their products to end users, then an exclusive dealing agreement may not

23    foreclose competitors' access to the market and, thus, not substantially harm

24    competition.

25    In determining the extent to which ~~defendant's~~Medtronic's exclusive

26    dealing contracts foreclose competition on the merits, it is relevant to consider

27    the percentage of the market foreclosed and the length of the foreclosure. There

28    is no set percentage for how much of the relevant market must be foreclosed.

Where the exclusive dealing contracts foreclose less than 20 percent of the market, this ~~indicates that~~may indicate the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, the less likely it is to harm competition. The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.  In determining whether Medtronic's agreements were short-term and/or easily terminable, you should consider not just the stated terms of the agreements, but also their practical effect.

In determining if ~~defendant's~~Medtronic's exclusive dealing contracts substantially harmed competition, you also should consider ~~defendant's~~Medtronic's market power. If ~~defendant~~Medtronic does not possess market power, then there cannot be substantial harm to competition from an exclusive dealing contract, and you must find for ~~defendant~~Medtronic on this claim. If you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power ~~defendant~~Medtronic might otherwise have. If ~~plaintiff~~Applied cannot show that ~~defendant~~Medtronic had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that ~~defendant~~Medtronic lacks market power.

Finally, you should consider whether the process in which ~~defendant~~Medtronic secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the

1    exclusive contracts against ~~defendant~~Medtronic, this is also evidence that
2    ~~defendant~~Medtronic does not have market power.

3        By considering all of these factors, you should determine whether the
4    exclusive dealing contracts adversely affected the price paid by buyers, output,
5    or the quality of products offered in the relevant market. Where a restraint does
6    not adversely affect price, output, or product quality, it is unlikely to substantially
7    harm competition.

8

9        Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at
10   Chapter 2.D.6 (2016 ed.); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir.
11   2023); *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1029 (9th Cir. 2003);
12   *Standard Oil Co. v. United States*, 337 U.S. 293, 305 (1949); *Omega Env't, Inc.*
13   *v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997); *Oltz v. St. Peter's Cnty.*
14   *Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *Twin City Sportservice, Inc. v.*
15   *Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1301, 1304 (9th Cir. 1982);
16   *Cornwell Quality Tools v. C.T.S. Co.*, 446 F.2d 825 (9th Cir. 1971); *McWane v.*
17   *FTC*, 783 F.3d 814, 837 (11th Cir. 2015); *American Motor Inns v. Holiday Inns,*
18   *Inc.*, 521 F.2d 1230, 1252 (3rd Cir. 1975); *Patt v. Antech Diagnostics, Inc*., No.
19   818CV01689JLSDFM, 2020 WL 5076970, at *6 (C.D. Cal. May 18, 2020);
20   Order re Motion for Summary Judgment (Dkt No. 255) at 7 (quoting *Masimo v.*
21   *Tyco Health Care Grp. L.P.*, 2006 WL 1236666 at *4 (C.D. Cal. Mar. 22, 2006),
22   aff'd 350 F. App'x 95 (9th Cir. 2009)); *CollegeNet, Inc. v. Common Application,*
23   *Inc.*, 355 F. Supp. 3d 926, 943, 953, 957 (D. Or. 2018); *Authenticom, Inc. v. CDK*
24   *Glob.*, LLC, 313 F. Supp. 3d 931, 957–58 (N.D. Ill. 2018); *Universal Hospital*
25   *Services, Inc. v. Hill–Rom Holdings, Inc.*, 2015 WL 6994438 (W.D. Tex. Oct.
26   15, 2015); *Meredith Corp. v. SESAC, LLC*, 1 F. Supp. 3d 180, 211–12 (S.D.N.Y.
27   2014).

28

**DEFENDANT'S PROPOSED INSTRUCTION NO. D11**

**Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations[14]**

In determining whether Medtronic's ~~defendant's~~ alleged exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the [*describe relevant product or service*]medical device industry, whether buyers ~~of [*the relevant product or service*]~~ have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, ~~defendant's~~Medtronic's position in the marketplace, the competitive alternatives to ~~defendant's~~Medtronic's products ~~or services~~, the reasons ~~defendant~~Medtronic and buyers entered into the alleged exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

~~You also should consider whether the buyer is the final end user of the product. If the buyer is the final end user, the exclusive dealing contract~~

---

[14] Medtronic has revised this instruction in light of the Court's summary judgment opinion and order. However, for the reasons stated in its briefs in support of its *Daubert* motion (Dkt. Nos. 136-1, 150-1), summary judgment motion (Dkt. Nos. 147-1, 15401, 249-1), and motion for certification of interlocutory appeal (Dkt. Nos. 259-1, 263), its April 19, 2025 contentions of law and fact (Dkt. No. 219), and May 3, 2025 position statement regarding this instruction (Dkt. No. 244), Medtronic maintains that Applied must prove substantial foreclosure for both its bundled discounting and exclusive dealing claims, and that foreclosure is not substantial unless it reaches approximately 40% at a minimum.

1  ~~forecloses competitors from that portion of the market represented by the buyer's~~
2  ~~purchases and makes it more likely that competition may be harmed if the buyer~~
3  ~~represents a substantial portion of the market. On the other hand, if the buyer is~~
4  ~~a distributor or reseller, and there are other alternatives for competing sellers to~~
5  ~~market their products to end users, then an exclusive dealing agreement may not~~
6  ~~foreclose competitors' access to the market and, thus, not substantially harm~~
7  ~~competition.~~
8  ~~In determining the extent to which defendant's exclusive dealing contracts~~
9  ~~foreclose competition on the merits~~You must also consider whether Medtronic's
10  alleged exclusive dealing contracts substantially foreclose competition on the
11  merits in the alleged relevant market for advanced bipolar devices. In determining
12  this, it is relevant to consider the percentage of the market foreclosed and the
13  length of the foreclosure. ~~There~~Although there is no set percentage for how much
14  of the relevant market must be foreclosed, ~~but~~ foreclosure ~~is not~~must be
15  substantial ~~unless~~enough to freeze competitors ~~are truly frozen~~ out of a market.

16  Where the exclusive dealing contracts foreclose less than 20 percent of the
17  market, this indicates that the harm from the foreclosure of competition is not
18  substantial because there are alternatives available. Similarly, the shorter the
19  duration of the contract, ~~the less likely it is to harm competition.~~ or the more
20  easily it can be terminated, the less likely it is to harm competition.  In general,
21  relatively short-term contracts or contracts that can be easily terminated will
22  rarely have an adverse effect on competition. Even a high foreclosure percentage
23  will not exclude competition if the period covered by the arrangement is short
24  and there are no other impediments to switching. A short term generally means a
25  term of three years or less.  In determining whether Medtronic's agreements were
26  short-term and/or easily terminable, you should consider not just the stated terms
27  of the agreements, but also their practical effect.

28

The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect.

In determining if ~~defendant's~~ Medtronic's exclusive dealing contracts substantially harmed competition, you also should consider whether or not Medtronic has~~defendant's~~ market power.  If Medtronic~~defendant~~ does not possess market power, then there cannot be substantial harm to competition from an exclusive dealing contract, and you must find for Medtronic~~defendant~~ on this claim.  If Medtronic does not have market power, if you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Medtronic~~defendant~~ might otherwise have.  If Applied~~plaintiff~~ cannot show that Medtronic~~defendant~~ had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that Medtronic~~defendant~~ lacks market power.

Finally, you should consider whether the process in which ~~defendant~~Medtronic secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against ~~defendant~~Medtronic, this is also evidence that ~~defendant~~Medtronic does not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

1

2

3        Authority: ABA Model Jury Instructions 2.D.6; *Omega Env't., Inc. v.*

4    *Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *W. Parcel Exp. v. United*

5    *Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998), *aff'd*, 190

6    F.3d 974 (9th Cir. 1999); *Masimo Corp. v. Tyco Health Care Group, L.P.*, 2006

7    WL 1236666, at *4 (C.D. Cal. 2006), *aff'd*, 350 F. App'x 95 (9th Cir. 2009);

8    *Tevra Brands LLC v. Bayer Healthcare LLC*, 5:19-cv-904312-BLF, Dkt. 482 at

9    30 (August 1, 2024) (jury instructions).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D11**

Exclusive Dealing—Additional Considerations

Applied's proposal follows the ABA Model. Applied primarily adds party names and clarifies, consistent with case law, that a foreclosure below 20% is not dispositive of substantial foreclosure. *See Universal Hospital Services, Inc. v. Hill–Rom Holdings, Inc.*, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ("market shares in the teens" sufficient under Clayton Act § 3); *Standard Oil Co. v. United States,* 337 U.S. 293, 305 (1949) (6.7%); *Cornwell Quality Tools v. C.T.S. Co.*, 446 F.2d 825 (9th Cir. 1971) (10%); *American Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3rd Cir. 1975) (14.7%). Medtronic attempts to distinguish Applied's cases on various procedural and factual grounds, but such variety underscores that "there is no set percentage for how much of the relevant market must be foreclosed…." SJ Order at 15 (quoting *Masimo Corp,* 2006 WL 1236666 at *4).

Applied also includes a sentence reflecting the Court's summary judgment ruling and longstanding case law that there is no fixed percentage of foreclosure required to establish exclusive dealing. Medtronic agrees with Applied's addition of that sentence.

Applied also included a sentence proposed by Medtronic stating: "In determining whether Medtronic's agreements were short-term and/or easily terminable, you should consider not just the stated terms of the agreements, but also their practical effect."

Medtronic's proposal significantly departs from the Model. ***First***, Medtronic adds a reference to the "medical device industry" in the opening paragraph, but introducing that term risks confusion regarding the alleged market. The Model's reference to the "relevant industry" is sufficient; it lets the jury consider the industry context based on the evidence.

147

*Second*, Medtronic removes the Model paragraph explaining that if the buyer is an end user, rather than a distributor, that makes it more likely that competition may be harmed.  That is because the plaintiff cannot simply bypass the defendant's distributor.  Medtronic claims "end users" has not been defined or developed in this case.  Not so.  Both parties' experts discuss the end users of the devices.  Orszag Opening Dkt. No. 183-6 Ex. 4 ¶ 27; Murphy Report, Dkt. 147-23 ¶ 323.  The jury will readily understand that hospitals and surgeons are the end users of the products at issue.  *See Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1029 (9th Cir. 2003) (court "need not define common terms that are readily understandable by the jury.")   And the point is important because deals struck with end users, as is the case here, are more likely to harm competition.  *Omega Env't, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1162 (9th Cir. 1997) ("exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern."); *Patt v. Antech Diagnostics, Inc., No.* 818CV01689JLSDFM, 2020 WL 5076970, at *6 (C.D. Cal. May 18, 2020) ("exclusive dealing arrangements imposed on end-users (here, consumers) rather than distributors require a lower standard for substantial foreclosure").

*Third*, Medtronic changes "should consider" to "must consider" when describing how the jury evaluates substantial foreclosure. But the Model consistently uses "should consider." Replacing "should" with "must" in one instance wrongly elevates one factor favored by Medtronic. There is no basis for that imbalance, and the Court should retain the Model's wording.

*Fourth*, Medtronic adds that "foreclosure is not substantial unless competitors are truly frozen out of a market."  Medtronic identifies no jury instruction that uses the ambiguous term "frozen."  Medtronic claims Applied "cherry-picks" language from *Masimo*, but Applied relies on the settled rule that there is no bright-line percentage for substantial foreclosure.  *See* Dkt. No. 27 at

148

5 (FTC *amicus* brief); *McWane v. FTC*, 783 F.3d 814, 837 (11th Cir. 2015).  That *Masimo* used the term" frozen" in describing the law does not mean the ambiguous phrase should be added to the Model instruction.  Medtronic's edits suggest it will argue Applied must show complete exclusion—an argument this Court rejected. SJ Order at 18.

Medtronic claims that, without more, Applied's "no set percentage" language might confuse the jury into thinking there is "no threshold."  But the instruction makes clear that foreclosure must be "substantial."  Courts have found that a wide range of percentages can establish substantial foreclosure.  *Standard Oil Co. v. U.S.*, 337 U.S. 293, 305 (1949) (6.7%); *Cornwell Quality Tools v. C.T.S. Co.*, 446 F.2d 825, 831 (9th Cir. 1971) (10%-15%); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1301, 1304 (9th Cir. 1982) (24%); *Amer. Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230, 1252 (3rd Cir. 1975) (14.7%); *Universal Hospital Services, Inc. v. Hill–Rom Holdings, Inc.*, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ("market shares in the teens").

**Fifth**, Medtronic adds a paragraph asserting that "short-term" contracts, which Medtronic defines as three years or less, "rarely" harm competition.  Medtronic thus ask the jury to assume Medtronic's own three-year agreements are not long term and therefore a type of contract that  "rarely" harms competition.  But Medtronic's own witnesses have called its agreements "long-term." See Dkt. 147 at 111 (JAF 230).  And Applied will present substantial evidence, including multiple benchmarks, that Medtronic's agreements have in fact harmed competition. Dkt. 147 (JAF 424-25).  It is well established that three-year contracts may be exclusionary.  *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 953 (D. Or. 2018); *Meredith Corp. v. SESAC, LLC*, 1 F. Supp. 3d 180, 211–12 (S.D.N.Y. 2014); *Authenticom, Inc. v. CDK Glob., LLC*, 313 F. Supp. 3d 931, 957–58 (N.D. Ill. 2018).  Medtronic cites *PNY Techs*, but that case confirms there "is no set formula for" evaluating

exclusive dealing.  2014 WL 2987322 at *10.  Medtronic quotes from various
cases below, but none supports Medtronic's requested instruction that three-year
contracts are "short-term" and "rarely" harm competition.  The parties' many
citations merely confirm that the issue is highly factual and for the jury, not
summarily decided in Medtronic's favor via a jury instruction.

**Sixth,** Medtronic also again limits Applied's allegations to the market for
"advanced bipolar devices."  The Court should adopt Applied's position for the
reasons explained in Applied's argument related to Instruction D4 (Relevant
Market-General).  Medtronic relies on the Court's summary of Medtronic's
summary judgment challenge that Applied had not shown foreclosure in "the
ABD market." Dkt. 255 at 9.  That Court's resolution of Medtronic's challenge
does not limit the antitrust market the jury may consider at trial.  Orszag made
clear that "even if the relevant product market is defined more broadly to include
ultrasonic devices, my conclusions regarding Medtronic's monopoly power ***and
the competitive effects of the alleged conduct*** are unaffected."  Orszag Opening,
Dkt. No. 183-6 Ex. 4 at 4 n.6.  Thus, Applied can show harm to competition even
under a broader market definition.

**Finally**, Medtronic wants to change the Model to say the jury "should also
consider whether or not Medtronic has market power," claiming the current
wording suggests the Court already found market power.  But the very next
sentence tells the jury that if Medtronic lacks market power, there can be no
substantial harm to competition and the jury must find for Medtronic.  Nothing
in the Model suggests market power is pre-determined.  Moreover, Medtronic's
own proposal uses "market power," undermining its earlier claim that the term
should not appear in Instruction D10 at all.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D11**
**Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations**

Medtronic's instruction closely follows the model, departing only where necessary to conform the instruction to the facts of this case; provide additional guidance on substantial foreclosure using Ninth Circuit law; and remove bias from statements on facts the jury must find. The parties disagree on the following aspects of this instruction.

*First*, consistent with directions in the model instruction to describe the relevant industry, Medtronic specifies that the industry at issue is medical devices. Applied ignores the instruction and leaves the relevant industry unspecified.

*Second*, Medtronic removes the paragraph discussing "end users." That term has not been defined or developed in this case, so it is unnecessary and would confuse jurors. Applied asserts that "the jury will readily understand that hospitals and surgeons are the end users of the products at issue," but this proves the point: Applied names two potential types of end users without considering which— surgeons, hospitals, or both—are properly considered the end users in this case.

*Third*, Medtronic clarifies that jurors "*must* also consider *whether* Medtronic's alleged exclusive dealing contracts *substantially* foreclose competition on the merits *in the relevant market for advanced bipolar devices*" (emphasis added). Applied, by contrast, instructs jurors that "[i]n determining the extent to which Medtronic's exclusive dealing contacts foreclose competition on the merits, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure."

Medtronic's language is more neutral. The statement "[i]n determining the extent to which Medtronic's exclusive dealing contracts foreclose competition" assumes that Medtronic has (1) entered into exclusive contracts that (2) foreclose competition to some extent. These are facts the jury must find, not assume.

1     Medtronic's language is also consistent with the law, which *requires* proof
2  of substantial foreclosure for an exclusive dealing claim. *Allied Orthopedic*, 592
3  F.3d at 996 ("Under the antitrust Rule of Reason, an exclusive dealing
4  arrangement violates Section 1 only if its effect is to 'foreclose competition in a
5  substantial share of the line of commerce affected.'" (quoting *Omega*, 127 F.3d
6  at 1162)). And in this case, substantial foreclosure must be evaluated with respect
7  to the alleged advanced bipolar market. Order re Mot. Summ. J. at 9, Dkt. No.
8  255 ("[T]he Court must answer . . . . [D]oes Applied raise a triable issue of fact
9  that Medtronic's de facto exclusive dealing forecloses competition in a
10  substantial share *of the ABD market*?") (emphases added).

11     *Fourth*, Applied cherry-picks part of a sentence in *Masimo* to claim, "There
12  is no set percentage for how much of the relevant market must be foreclosed."
13  But that case said that "[a]lthough there is no set percentage for how much of the
14  relevant market must be foreclosed, *it must be substantial enough that
15  competitors are truly 'frozen out of a market.'*" *Masimo Corp.*, 2006 WL
16  1236666, at *4 (S.D. Cal. 2006) (emphasis added) (quoting *Omega*, 127 F.3d at
17  1162)). Medtronic's instruction references the whole quotation, adding that
18  "foreclosure must be substantial enough to freeze competitors out of a market."
19  Contrary to Applied's suggestion, "frozen out" is not ambiguous. It is a common
20  phrase, and as Applied itself noted, courts "need not define common terms that
21  are readily understandable by the jury." Applied Position Statement Regarding
22  Instruction D11 (Exclusive Dealing—Additional Considerations).

23     Instructing the jury that there is "no set percentage" for foreclosure without
24  the additional context from *Masimo* is misleading. A juror could interpret "no set
25  percentage" as meaning "no set threshold." Even without a magic number,
26  foreclosure must be "substantial," or high enough that "competitors are truly
27  'frozen out of a market.'" *Id.* at *4. Although Applied is correct that "courts have
28  found that a wide range of specific percentages can establish substantial

152

foreclosure," in no case has a small percentage sufficed. *See, e.g.*, *Omega*, 127 F.3d at 1162 (38% foreclosure insufficient); *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 124 (1st Cir. 2011) ("[F]orclosure levels are unlikely to be of concern where they are less than 30 or 40 percent."); *Am. President Lines, LLC v. Matson Inc.*, 775 F. Supp. 3d 379, 402 n.4 (D.D.C. 2025) ("Courts presume foreclosure of less than 30% of the market to be insubstantial."); *Power Analytics Corp.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018) (requiring foreclosure of "40% to 50% of the relevant market"). The ABA model itself states that foreclosure of less than 20 percent "indicates that the harm . . . is not substantial." For this reason, Medtronic does not agree with Applied's addition of this sentence without the additional context from *Masimo.*

Consistent with its efforts to lighten its burden, Applied alters the model language to say "*may* indicate that the harm . . . is not substantial," but the support it cites does not justify this change. In *Universal Hosp. v. Hill-Rom Holdings, Inc.*, 2015 WL 6994438 (W.D. Tex. 2015), 12–15% foreclosure was deemed sufficient at the motion to dismiss stage because the complaint alleged foreclosure was rapidly increasing and because cases "requir[ing] a greater percentage . . . arose on summary judgment." *Id.* at *15. Neither point supports Applied here. In *Am. Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975), the Third Circuit rejected the district court's market definition and thus was "unable to assess the degree to which the [conduct] forecloses competition." *Id.* at 1253. In the half century since, the Third Circuit, like others, has required a higher standard. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 286 (3d Cir. 2012) (noting 40–50% foreclosure is generally required).

Applied's citation to *Standard Oil Co. of Cal. v. United States*, 337 U.S. 293 (1949)—and to *Cornwell Quality Tools Co. v. C.T.S. Co.*, 446 F.2d 825, 831 (9th Cir. 1971), which applied *Standard Oil*—is similarly misleading as to the modern law. "Despite some initial confusion," the Supreme Court's cases

following *Standard Oil* make clear that "exclusive dealing contracts are not disfavored by the antitrust laws." *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004); *see also Tampa Elec.*, 365 U.S. at 334 (even a 20-year exclusive may benefit customers); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 34, 44 (1984) (O'Connor, J., concurring); *Omega*, 127 F.3d at 1162 (38% foreclosure insufficient).

*Fifth*, Medtronic's instruction provides additional guidance on evaluating contract length and terminability—critical factors in an exclusive dealing analysis. *See, e.g.*, *Omega*, 127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."); Areeda ¶ 1821d3 ("[E]ven a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short and there are no other impediments to switching."). The language is adopted from the jury instructions provided in *Tevra Brands*, an exclusive dealing case from the Northern District of California.

Applied criticizes Medtronic for explaining that short-term, easily terminable contracts rarely harm competition and defining "short-term" as three years or less. Applied Position Statement Regarding Instruction D11 (Exclusive Dealing—Additional Considerations). But these propositions are well supported by Ninth Circuit law, and the jury should be instructed accordingly. *See, e.g.*, *Allied Orthopedic*, 592 F.3d at 997 ("Discounts conditioned on exclusivity in relatively short-term contracts are rarely problematic."); *id.* ("The easy terminability of an exclusive dealing arrangement negates substantially its potential to foreclose competition." (cleaned up)); *W. Parcel Exp.*, 65 F. Supp. 2d at 1064 ("Nearly all of the contracts have relatively short durations, ranging from 30 days to 3 years."); *id.* at 1064–65 (three-year contracts terminable on 30 days' notice do not support exclusive dealing claim); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. 2014) ("Courts in this circuit have

154

found contracts with terms ranging up to three, and even five, years to be acceptable."); *id.* ("If the contracts at issue are short-term or easily terminated, 'a competing manufacturer need only offer a better product or a better deal' to get contracts of its own." (citing *Omega*, 127 F.3d at 1164)); *Tevra Brands, LLC v. Elanco Animal Health Inc.*, 2025 WL 964694, at *12 (N.D. Cal. 2025) (similar).

Applied's authorities do not suggest otherwise. *See CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 953 (D. Or. 2018) (ruling on motion to dismiss that the plaintiff adequately alleged substantial foreclosure where, despite stated one-year terms, challenged contracts were not easily terminable); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 190, 205–06, 211–13 (S.D.N.Y. 2014) (not involving exclusive dealing, but rather an alleged conspiracy between a performing rights organization and certain of its affiliate composers not to license individual works); *Authenticom, Inc. v. CDK Glob.*, LLC, 313 F. Supp. 3d 931, 957–58 (N.D. Ill. 2018) (declining to dismiss an exclusive dealing claim where certain challenged exclusivity terms "purport to last forever," and further noting that "[t]he question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage." (second passage quoting *In re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig.*, 2013 WL 812143, at *19 (D.N.J. 2013)).

*Sixth*, Medtronic specifies that jurors must consider the impacts of the alleged exclusive dealing "in the alleged relevant market for advanced bipolar devices." *See, e.g.*, *Tampa Elec.*, 365 U.S. at 327 ("[T]he threatened foreclosure of competition must be in relation to the market affected."). Medtronic's additional arguments related to this issue are articulated in relation to Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market).

*Finally*, Medtronic revises "you also should consider Medtronic's market power" to the neutral phrasing "you also should consider whether or not

155

1    Medtronic has market power." Whether Medtronic has market power is a question

2    of fact for the jury.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. D12

## Sherman Act, Section 2: Rule of Reason

For the reasons explained below in Applied's argument, Applied contends that this proposed instruction is unnecessary and inappropriate for Applied's Section 2 claim.

## DEFENDANT'S PROPOSED INSTRUCTION NO. D12
### Sherman Act, Section 2: Rule of Reason

If you find that Medtronic engaged in exclusionary bundled discounting and/or exclusive dealing, then you next must apply the Rule of Reason.

First, you must determine whether Medtronic's conduct has resulted in substantial harm to competition in the alleged relevant market for advanced bipolar devices.  You should follow Instruction D20 in this regard.

Next, if you find that Applied has proven substantial harm to competition in the alleged relevant market for advanced bipolar devices, you must determine whether the restraint also benefits competition in other ways.  You should follow Instruction D21 in this regard.

Finally, if you find that the challenged bundled discounting and/or exclusive dealing was reasonably necessary to achieve competitive benefits, you must balance those competitive benefits against the competitive harm resulting from the same restraint.  You should follow Instruction D22 in this regard.


Authority: ABA Model Jury Instructions 1.C.2, 1.C.3, 1.C.4; *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020);  Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2.

## **PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D12**

### **Sherman Act, Section 2: Rule of Reason**

The Court should reject Medtronic's proposed instruction, which seeks to impose an additional hurdle to establish a Section 2 monopolization based on Medtronic's modification of a Section 1 Model instruction.  Here, after instructing the jury on Applied's monopolization claims using Section 2 Model instructions, Medtronic seeks to instruct the jury to apply Section 1 rule-of-reason analysis and balancing even if the jury has already found in favor of Applied on ***all*** the requirements for Section 2 monopolization.  The Court should adopt Applied's position for the reasons explained in Applied's argument regarding Instruction D2 (Monopolization General – Elements).

Medtronic also again limits Applied's allegations to the market for "advanced bipolar devices."  The Court should adopt Applied's position for the reasons explained in Applied's argument related to Instruction D4 (Relevant Market-General).

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D12
### Sherman Act, Section 2: Rule of Reason

As explained in Medtronic's argument related to its Preliminary Statement Regarding the Order of Instructions and Instruction D2 (Monopolization General—Elements), the Rule of Reason applies to Section 2 claims. Medtronic includes this instruction to make clear to jurors that they must proceed systematically through the same three-step process whether evaluating Section 1 or Section 2 claims.

This instruction does not create "an additional hurdle" to Section 2 liability. Applied Position Statement Regarding Instruction D12 (Section 2: Rule of Reason). As Medtronic's argument related to Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power) explains, application of the Rule of Reason determines whether conduct is "anticompetitive." Applied's argument that the jury can find "in favor of Applied on all the requirements for Section 2 monopolization" without applying the Rule of Reason puts the cart before the horse. The jury cannot find in Applied's favor on Section 2 *unless it applies* the Rule of Reason. *See Qualcomm*, 969 F.3d at 991 (Rule of Reason governs liability under Section 2).

Under Medtronic's proposed ordering of the instructions, the Section 1 Rule of Reason instructions precede this instruction. Thus, for clarity and concision, Medtronic's proposal does not repeat the Rule of Reason instructions in their entirety under Section 2 but reminds jurors of the overall framework and then refers them back to the full instructions under Section 1. If, however, the Court is inclined to provide the Section 2 instructions first, this instruction should be replaced with the Rule of Reason instructions Medtronic provides under Section 1. *See* Instruction D20 (Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm), Instruction D21 (Sherman Act, Section 1: Rule of

Reason—Evidence of Competitive Benefits), Instruction D22 (Sherman Act, Section 1: Rule of Reason—Balancing the Competitive Effects).

Applied also disputes Medtronic's clarification that the relevant market is the advanced bipolar device market. Medtronic's arguments related to this issue are articulated in relation to Instructions D4 (Relevant Market—General), D5 (Relevant Product Market), and D19 (Rule of Reason—Overview).

**<u>DISPUTED INSTRUCTION NO. D13</u>**

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D13**

**Attempt to Monopolize—Elements**

~~Plaintiff~~Applied alleges that it was injured by ~~defendant's~~Medtronic's unlawful attempt to monopolize the market for [~~*identify relevant*~~ advanced bipolar devices or, in the alternative, a market]. including both advanced bipolar devices and ultrasonic devices.   To prevail on its claim of attempted monopolization, ~~plaintiff~~Applied must prove each of the following elements by a preponderance of the evidence:

1. ~~defendant~~Medtronic engaged in anticompetitive conduct;

2. ~~defendant~~Medtronic had a specific intent to achieve monopoly power in a relevant market;

3. there was a dangerous probability that ~~defendant~~Medtronic would achieve its goal of monopoly power in the relevant market; and

~~1. defendant's conduct occurred in or affected interstate [*or foreign*] commerce; and~~

4. ~~plaintiff~~Applied was injured in its business or property by ~~defendant's~~Medtronic's anticompetitive conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~plaintiff's~~Applied's claim of attempted monopolization. If you find that the evidence is sufficient to prove all ~~five~~four elements as to ~~defendant~~Medtronic, then you must find for ~~plaintiff~~Applied and against ~~defendant~~Medtronic on ~~plaintiff's~~Applied's claim of attempted monopolization.

I already instructed you on the element of anticompetitive conduct in connection with Applied's monopolization claim.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter

3.D.1 (2016 ed.); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971); Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D13**

**Sherman Act, Section 2: Attempt to Monopolize—Elements**

I will now move on to Applied's third claim under the Sherman Act. ~~Plaintiff~~ Applied alleges that it was injured by ~~defendant's~~Medtronic's unlawful attempt to monopolize the market for ~~[*identify relevant market*].~~advanced bipolar devices. To prevail on its claim of attempted monopolization, ~~plaintiff~~ Applied must prove each of the following elements by a preponderance of the evidence:

1.  the alleged advanced bipolar device market is a valid antitrust market;

~~1.~~2.    Medtronic ~~defendant~~ engaged in exclusionary bundled discounting and/or unlawful exclusive dealing that resulted in a substantial adverse effect on competition not outweighed by procompetitive benefits~~anticompetitive conduct~~;

~~2.~~3.    Medtronic ~~defendant~~ had a specific intent to achieve monopoly power in the alleged ~~a relevant~~ market for advanced bipolar devices;

~~3.~~4.    there was a dangerous probability that Medtronic ~~defendant~~ would achieve its goal of monopoly power in the relevant market;

~~4.  defendant's conduct occurred in or affected interstate [*or foreign*] commerce; and~~

5.  Applied ~~plaintiff~~ was injured in its business or property by Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing~~defendant's anticompetitive conduct~~.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for ~~defendant~~Medtronic and against ~~plaintiff~~Applied on ~~plaintiff's~~Applied's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to

164

1 ~~defendant~~Medtronic, then you must find for ~~plaintiff~~Applied and against

2 ~~defendant~~Medtronic on ~~plaintiff's~~Applied's claim of attempted monopolization.

3

4 Authority: ABA Model Jury Instructions 3.D.1; *Ohio v. Am. Express Co.*, 585

5 U.S. 529, 541-43, 543 n.7 (2018); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S.

6 447, 459 (1993); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th

7 Cir. 2020); Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED
## INSTRUCTION NO. D13

### Attempt to Monopolize—Elements

Applied's proposal closely tracks the Model.  It adds party names, eliminates the undisputed "interstate" commerce element (which Medtronic likewise deletes), and specifies the markets at issue, as instructed by the Model. Applied also adds a sentence referring the jury to the Court's previous instruction on anticompetitive conduct.

As it does with the elements of monopolization, Medtronic deletes the element of "anticompetitive conduct" and replaces it with "exclusionary bundled discounting and/or unlawful exclusive dealing that resulted in a substantial adverse effect on competition not outweighed by procompetitive benefits." Medtronic thus (1) eliminates the key element of a monopolization claim, (2) destroys the instruction's symmetry with the "Willful Acquisition or Maintenance" instruction explaining how to determine whether conduct is anticompetitive, and (3) erroneously seeks to merge the standards of Section 1 and 2.  The Court should reject Medtronic's rewrite for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General - Elements").

Medtronic again limits the potential relevant market to "advanced bipolar devices."  The Court should adopt Applied's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").  Medtronic even adds a separate element requiring that Applied establish "the alleged advanced bipolar device market is a valid antitrust market." The Model contains no such element, nor is it necessary given the other elements requiring a relevant market.  Medtronic argues that without this separate market element, "jurors might erroneously assume" a relevant market is required only

166

for full monopolization claims. But both parties' instructions describe the attempt claim as an attempt to monopolize a relevant market and include a specific element requiring a dangerous probability that Medtronic will "achieve monopoly power in that relevant market." Because the attempt instruction already makes the relevance of the market explicit, adding Medtronic's extra element is unnecessary and risks confusion.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED
INSTRUCTION NO. D13**
**Sherman Act, Section 2: Attempt to Monopolize—Elements**

Medtronic's instruction hews closely to the model, updating it only to add party names; specify the requirement of a valid antitrust market; specify the alleged market and challenged conduct; and adjust the opening and closing transitional sentences. The parties disagree on the following aspects of this instruction.

*First*, for the reasons discussed in connection with Instruction D2 (Monopolization General—Elements), Medtronic substitutes the phrase "exclusionary bundled discounting and/or unlawful exclusive dealing" for "anticompetitive conduct." Medtronic responds to Applied's objections related to this issue in connection with connection with Instruction D2 (Monopolization General—Elements).

*Second*, for the reasons discussed in connection with Instruction D2 (Monopolization General—Elements), Medtronic clarifies that the Rule of Reason framework applies to the second element and that the jury cannot find the challenged conduct anticompetitive unless it results in a substantial adverse effect on competition not outweighed by procompetitive benefits.

*Third*, Medtronic omits Applied's language suggesting that it has alleged attempted monopolization of "a market including both advanced bipolar devices and ultrasonic devices" and clarifies that the market Applied must prove is the alleged advanced bipolar device market. Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market) contain Medtronic's arguments related to this issue.

Medtronic's instruction also explicitly states that Applied must prove its alleged market to prevail on attempted monopolization. *See Spectrum Sports*, 506 U.S. at 459 ("[D]emonstrating the dangerous probability of monopolization in an

attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."). Absent this clarification, jurors might erroneously assume that Applied need prove a relevant market only for completed, and not attempted, monopolization.

*Finally*, to instruct the jurors on the conduct relevant to attempted monopolization, Medtronic uses the ABA model instruction designed for this purpose. *See* ABA Model Instrs. 3.D.2; Instruction D14 (Attempt to Monopolize—Anticompetitive Conduct). Applied instead uses a sentence it adds to the end of this instruction, arguing that model instruction 3.D.2 is "unnecessary" because the jury has already received instructions on anticompetitive conduct. But as explained below, the model instruction does not simply repeat the anticompetitive conduct instructions Applied references: it provides context on the connection between the specific intent, anticompetitive conduct, and dangerous probability elements of attempted monopolization.

## <u>DISPUTED INSTRUCTION NO. D14</u>
## PLAINTIFF'S PROPOSED INSTRUCTION NO. D14

### Attempt to Monopolize—Anticompetitive Conduct

For the reasons described in its argument below, Applied submits that this instruction is unnecessary and should not be provided to the jury.

## DEFENDANT'S PROPOSED INSTRUCTION NO. D14

**Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct**

It is not sufficient for ~~plaintiff~~Applied to prove that ~~defendant~~Medtronic intended to monopolize the relevant market. ~~Plaintiff~~Applied must also show that ~~defendant~~Medtronic engaged in ~~anticompetitive conduct~~exclusionary bundled discounting and/or unlawful exclusive dealing, coupled with ~~an~~a specific intent to monopolize and a dangerous probability that ~~defendant~~Medtronic would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency -enhancing justification for its conduct.

[*In an attempted monopolization case, the relevant instructions concerning monopolization at parts A, B, and/or C of this chapter should be inserted here and modified to clarify that they pertain to a claim of attempt to monopolize.*]

The anticompetitive conduct alleged in support of Applied's attempted monopolization claim is the same as the conduct alleged in support of its other claims under the Sherman Act, and in determining whether Medtronic's conduct was anticompetitive or whether it was legitimate business conduct, you should use the same standard that I instructed you to apply in assessing Applied's monopolization claim. You must determine whether Medtronic's alleged bundled discounting and/or exclusive dealing is consistent with competition on the merits, whether it provides benefits to consumers, and whether it would make business sense apart from any effect it has on excluding competition or harming competitors.

I have already instructed you on how to determine whether Medtronic has engaged in exclusionary bundled discounting and/or unlawful exclusive dealing under the Sherman Act.  You should follow the instructions on Exclusionary Bundled Discounting [•] and Unlawful Exclusive Dealing [•] in that regard.  You should also determine whether this conduct resulted in a substantial adverse effect

171

on competition under the Rule of Reason, using Instructions [•].


Authority: ABA Model Jury Instructions 3.A.9, 3.D.2; *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2.

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D14**

**Attempt to Monopolize—Anticompetitive Conduct**

Applied does not propose a separate instruction for anticompetitive conduct with respect to attempted monopolization. Such an instruction is unnecessary because both parties already propose instructions on anticompetitive conduct for the monopolization claim. Rather than include an entirely separate instruction, Applied simply includes a sentence at the end of the earlier instruction on attempted monopolization referring the jury to the previous instruction on anticompetitive conduct. Pursuant to this Court's Standing Order, jury instructions should "not repeat principles of law contained in any other requested instruction." Dkt. 47 at 11.

Medtronic points to the second paragraph of the ABA Model Instruction, which states, "[I]n an attempted monopolization case, the relevant instructions concerning monopolization at parts A, B, and/or C of this chapter should be inserted here and modified to clarify that they pertain to a claim of attempt to monopolize.]." ABA Model Jury Instructions 3.D.2 (brackets in original). While that is necessary in an "attempted monopolization case," such duplication is unnecessary in a case like this that involves both monopolization and attempted monopolization because the jury will already have been instructed on anticompetitive conduct.

As it did in Instruction D2 (Monopolization General – Elements), Medtronic's last paragraph erroneously directs the jury to Medtronic's Rule Model Instructions 1.2.C., 1.3.C., and 1.4.C., which apply to Section 1 of the Sherman Act. Medtronic's final paragraph also erroneously asserts that the jury considering anticompetitive conduct must "determine whether [the] conduct resulted in a ***substantial adverse effect*** on competition under the Rule of

Reason."  The Court should adopt Applied's position for the reasons discussed in connection with Applied's argument regarding Instruction D2.  Medtronic thus again seeks to erroneously merge the Section 1 and 2 standards and circumvent *PeaceHealth*.    As this Court explained, *PeaceHealth* rejected adding a "***substantial adverse effect***" requirement to establish that bundling is anticompetitive.  *See* Dkt. 255 at 6.

Medtronic also substitutes the ABA Model's phrase "anticompetitive conduct" with "exclusionary bundled discounting and/or exclusive dealing." This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D14

### Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct

Medtronic follows the model's direction to instruct the jury on anticompetitive conduct for attempted monopolization. ABA Model Instrs. 3.D.2. Applied opposes such instruction as unnecessary. But departing from the model here risks leaving the jury with the mistaken impression that it could find attempted monopolization based on conduct different from or lesser than that required for actual monopolization. *See, e.g.*, *Transamerica Comput. Co. v. Int'l Bus. Machs. Corp.*, 698 F.2d 1377, 1382 (9th Cir. 1983) ("Conduct that does not constitute 'willful acquisition or maintenance' of monopoly power (thus precluding establishment of the offense of monopolization) *cannot* constitute the 'predatory or anticompetitive conduct' required to establish the offense of attempt to monopolize.").

The model instruction directs parties to insert the "relevant instructions concerning monopolization" into the second paragraph of the instruction. ABA Model Jury Instrs. 3.D.2. Accordingly, Medtronic adds language from Instruction D8 (Willful Acquisition or Maintenance of Monopoly Power) to explain that the anticompetitive conduct inquiry is the same for both monopolization and attempted monopolization. *See* ABA Model Jury Instrs. 3.A.9 ("In determining whether defendant's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.").[15] And to help jurors navigate these instructions, Medtronic adds

---

[15] Medtronic provisionally offers this language in the event the Court does not provide Medtronic's proposed Section 2 Rule of Reason instructions. If the Court

1    guidance directing jurors to the instructions they must consider in evaluating

2    Applied's attempted monopolization claim. Applied objects to this guidance

3    because it instructs jurors to apply the Rule of Reason, but for the reasons

4    articulated in Medtronic's Preliminary Statement Regarding the Order of

5    Instructions and its arguments related to Instruction D2 (Monopolization

6    General—Elements), this is required by Ninth Circuit precedent.

7           Medtronic's remaining revisions are modest. First, for the reasons

8    articulated in Medtronic's argument related to Instruction D2 (Monopolization

9    General—Elements), Medtronic replaces the phrase "anticompetitive conduct"

10   with "exclusionary bundled discounting and/or unlawful exclusive dealing."

11   Second, Medtronic clarifies that "intent" means specific intent. There is no

12   dispute that specific intent is required for attempted monopolization. *See*

13   Instruction D15 (Attempt to Monopolize—Specific Intent).

14

15

16

17

18

19

20

21

22

23

24

25

_____

26   does provide Medtronic's Section 2 Rule of Reason instructions, then Medtronic

27   would reduce the second paragraph of this instruction to: "The anticompetitive
     conduct alleged in support of Applied's attempted monopolization claim is the

28   same as the conduct alleged in support of its other claims under the Sherman Act."

## **<u>DISPUTED INSTRUCTION NO. D15</u>**

### **PLAINTIFF'S PROPOSED INSTRUCTION NO. D15**

### **Specific Intent**

~~The second element that plaintiff must prove is that defendant had a specific intent to monopolize a relevant market. To do so, plaintiff must first prove that the market it is talking about [*identify market*] is a relevant market for antitrust purposes. Plaintiff must then prove that defendant had a specific intent to monopolize that market. The court will begin by instructing you on the relevant market, and the court will then discuss specific intent. If plaintiff proves both that the [*describe market*] is a relevant market and that defendant had a specific intent to monopolize that market, you must find that plaintiff has proven this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that plaintiff fails to prove either of these points, then you must find for defendant on plaintiff's attempted monopolization claim.~~

~~[*Insert instructions on relevant market definition from parts A.3 through A.6 of this chapter.*]~~

To establish attempted monopolization, Applied must prove that Medtronic had a specific intent to monopolize a relevant market. I already instructed you on the relevant market. I will now discuss specific intent.

If you find that plaintiff has proven a relevant market, you must then decide whether defendant had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that defendant acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market.

There are several ways in which ~~plaintiff~~Applied may prove that ~~defendant~~Medtronic had the specific intent to monopolize. There may be evidence of direct statements of ~~defendant's~~Medtronic's intent to obtain a

monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of ~~defendant~~Medtronic at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of ~~defendant.~~Medtronic.  You must be careful, however, to distinguish between a ~~defendant's~~ lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that ~~defendant~~Medtronic actually intended to obtain a monopoly, specific intent may be inferred from what ~~defendant~~Medtronic did. For example, if the evidence shows that ~~defendant~~Medtronic lacked a legitimate business justification and the natural and probable consequence of ~~defendant's~~Medtronic's conduct in the relevant market was to give ~~defendant~~Medtronic control over prices and to exclude or destroy competition, and that this was plainly foreseeable by ~~defendant~~Medtronic, then you may (but are not required to) infer that ~~defendant~~Medtronic specifically intended to acquire monopoly power.

[*Ninth Circuit Alternative:* In this case, *plaintiff*Applied also argues that the conduct underlying the claim of attempt to monopolize also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on the basis of this conduct that *plaintiff*Applied has proven a substantial claim of restraint of trade under the instructions you have received pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that *defendant*Medtronic had the specific intent to achieve monopoly power.~~]~~.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.D.3 (2016 ed.); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981); *Syufy Enters. v. Am. Multicinema, Inc.,* 793

178

1   F.2d 990, 999 (9th Cir. 1986); *Kelco Disposal, Inc. v. Browning-Ferris Indus. of*
2   *Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988); *Ne. Tel. Co. v. Am. Tel. & Tel.*
3   *Co.*, 651 F.2d 76, 85–86 (2d Cir. 1981); *Epic Games v. Apple*, 67 F.4th 946, 1002
4   (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir.
5   1988); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S.
6   398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48
7   (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586
8   (1985); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir.
9   2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020);
10  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir.
11  2022); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir.
12  1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re
13  Motion for Summary Judgment (Dkt. No. 255) at 6.
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DEFENDANT'S PROPOSED INSTRUCTION NO. D15**

**Sherman Act, Section 2: Attempt to Monopolize—Specific Intent**

The ~~second~~next element that ~~plaintiff~~Applied must prove is that ~~defendant~~Medtronic had a specific intent to monopolize ~~a relevant~~the alleged advanced bipolar device market~~.~~ through exclusionary bundled discounting and/or unlawful exclusive dealing. To do so, ~~plaintiff~~Applied must first prove that ~~the~~its claimed market ~~it is talking about—[~~*identify market*~~]~~ of advanced bipolar devices is a relevant market for antitrust purposes. ~~Plaintiff must then prove that defendant had a specific intent to monopolize that market. The court will begin by instructing~~I have already instructed you on the relevant market~~, and the court will then discuss specific intent.~~ .

If ~~plaintiff proves both that the [~~*describe market*~~] is a relevant market and that defendant had a specific intent to monopolize that market,~~ you ~~must~~ find that ~~plaintiff~~Applied has proven ~~this element of its attempted monopolization claim and you should consider the other elements of the claim. If you find that plaintiff fails to prove either of these points, then you must find for defendant on plaintiff's attempted monopolization claim.~~

~~[~~*Insert instructions on relevant market definition from parts A.3 through A.6 of this chapter.*~~]~~

~~If you find that plaintiff has proven a relevant market,~~ the relevant market, you must then decide whether ~~defendant~~Medtronic had the specific intent to monopolize that market~~.~~ through exclusionary bundled discounting and/or unlawful exclusive dealing. In other words, you must decide if the evidence shows that ~~defendant acted~~Medtronic committed anticompetitive acts with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the ~~relevant~~alleged advanced bipolar device market.

There are several ways in which ~~plaintiff~~Applied may prove that ~~defendant~~Medtronic had the specific intent to monopolize. ~~There may be~~

180

1   ~~evidence of direct statements of defendant's intent to obtain a monopoly in the~~
2   ~~relevant market.~~ Such proof of specific intent may be established by documents
3   prepared by responsible officers or employees of ~~defendant~~Medtronic at or about
4   the time of the conduct in question or by testimony concerning statements made
5   by responsible officers or employees of ~~defendant.~~Medtronic.   You must be
6   careful, however, to distinguish between a ~~defendant's~~ lawful intent to compete
7   aggressively, which may be accompanied by aggressive language, and a true
8   intent to acquire monopoly power by using anticompetitive means. For example,
9   statements indicating a desire to increase market share or even to drive a
10  competitor out of business through vigorous competition on the merits is not
11  sufficient. Applied must show that Medtronic sought to create a monopoly by
12  circumventing the competitive process.

13          Even if you decide that the evidence does not prove directly that
14  ~~defendant~~Medtronic actually intended to obtain a monopoly, specific intent may
15  be inferred from what ~~defendant~~Medtronic did. For example, if the evidence
16  shows that ~~defendant~~Medtronic lacked a legitimate business justification and the
17  natural and probable consequence of ~~defendant's conduct~~Medtronic's alleged
18  exclusionary bundled discounting and/or unlawful exclusive dealing in the
19  relevant market was to give ~~defendant~~Medtronic control over prices and to
20  exclude or destroy competition, and that this was plainly foreseeable by
21  ~~defendant~~Medtronic, then you may (but are not required to) infer that
22  ~~defendant~~Medtronic specifically intended to acquire monopoly power.

23          In this case, Applied argues that the alleged exclusionary bundled
24  discounting and/or unlawful exclusive dealing underlying its attempted
25  monopolization claim also constitutes an unreasonable restraint of trade under
26  Section 1 of the Sherman Act.  If you find on the basis of this conduct that
27  Applied has proven an unreasonable restraint of trade under the instructions you
28  have received pertaining to Section 1 of the Sherman Act, then you may infer

from such conduct that Medtronic had the specific intent to achieve monopoly power.

Authority: ABA Model Jury Instructions 3.D.3 & Notes; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667 & n.1, 670 (9th Cir. 1980).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D15**

**Specific Intent**

Applied's proposal is based on the ABA Model. It merely adds the party names and changes the first paragraph to provide context in view of the parties' overall instructions.

Medtronic proposes numerous unnecessary and erroneous changes to the ABA Model. ***First***, Medtronic rewrites the Model's requirement of "specific intent to monopolize" to require intent "to monopolize that market through anticompetitive conduct." That erroneously tells the jury that the intent must reference specific conduct, collapsing the separate elements of intent and anticompetitive acts. Medtronic's instruction would effectively tell the jury to discount evidence Medtronic intended to monopolize the ABD market unless the document references anticompetitive conduct.

That is not the law. *See William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981) ("specific intent may be established not only by direct evidence of unlawful design, but by circumstantial evidence"). The jury may consider, for example, internal presentations and emails expressing a desire to exclude rivals and "win the market." ABA Model Jury Instructions 3.D.3 n.1; *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988)) ("'tough talk' by defendant's employees, coupled with the proof of predatory pricing, more than supports the jury's finding of a specific intent to monopolize."); *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 999 (9th Cir. 1986) (although threats to "run [AMC] out" "are arguably consistent with a simple desire to succeed in free and open competition, the jury could reasonably have inferred a specific intent to monopolize from the remarks."); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d

76, 85–86 (2d Cir. 1981) (internal documents showing desire to "win the competitive struggle" not unlawful by themselves, but may support an inference of specific intent).

Medtronic argues that attempt requires "a specific intent to commit the act and achieve the result that is unlawful under the completed offense." But the Model requires both a "specific intent to monopolize" and a showing "that defendant acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market." The Model thus already requires an intent to perform the anticompetitive conduct and an intent to monopolize.

Medtronic's cases do not support Medtronic's more restrictive proposal. Medtronic cites *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985), for its statement that it is "necessary to prove a 'specific intent' to accomplish the forbidden objective . . . ." But the Model requires a specific intent to accomplish a forbidden objective. The Model requires "a specific intent ***to monopolize a relevant market***." Medtronic distracts from the forbidden objective and adds that the intent must be to monopolize "through exclusionary bundled discounting and/or unlawful exclusive dealing." *Aspen* does not support that.

*Spectrum Sports* requires only "specific intent to monopolize," and notes that "[u]nfair or predatory conduct" can itself prove intent. 506 U.S. at 459, 447. *Blair Foods* relied on an absence of "predatory conduct." 610 F.2d at 669. *Olympia* reasoned that it was "inconceivable that Western Union could have had monopoly power" and thus statements by Western Union did not alone satisfy the elements of a Section 2 claim. 797 F.2d at 373-74. None of Medtronic's cases support departing from the Model.

***Second***, Medtronic inexplicably deletes the following sentence in its entirety: "There may be evidence of direct statements of defendant's intent to obtain a monopoly in the relevant market." Such statements are obviously

184

relevant to Medtronic's specific intent to monopolize and should not be excluded. Medtronic claims this language improperly implies that "hyperbolic" competitive statements can, by themselves, satisfy specific intent. The Model does not say that. Indeed, the Model balances this point with a cautionary sentence that Medtronic keeps: the jury must be careful to distinguish "lawful intent to compete aggressively, which may be accompanied by aggressive language," from "a true intent to acquire monopoly power by using anticompetitive means."

**Third**, Medtronic adds the following sentences: "For example, statements indicating a desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient. Applied must show that Medtronic sought to create a monopoly by circumventing the competitive process." As support, Medtronic cites *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir. 1990), but Medtronic fails to explain why this Fourth Circuit case requires a change to the Model. The Model already requires a showing "that defendant acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market." The Model also instructs the jury to "distinguish between a lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means."

**Fourth**, Medtronic limits Applied's allegations to the "advanced bipolar market." The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

**Fifth**, Medtronic substitutes the ABA Model's phrase "conduct" with "alleged exclusionary bundled discounting and/or exclusive dealing." This Court should reject that for the reasons discussed in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D15
### Sherman Act, Section 2: Attempt to Monopolize—Specific Intent

Medtronic's changes to the model are limited. It makes explicit for the jury that specific intent requires intent to monopolize through anticompetitive conduct; specifies the alleged market; and describes the challenged conduct. Applied disputes each of these changes.

*First*, Medtronic specifies that liability requires an intent to monopolize *through* anticompetitive conduct—here, exclusionary bundled discounting and/or unlawful exclusive dealing—because it is black-letter law that intent to drive a competitor out of business by lawful competition is not enough for attempted monopolization. *See, e.g.*, *Aspen Skiing Co.*, 472 U.S. at 602 ("[I]t is necessary to prove a 'specific intent' to accomplish the forbidden objective . . . , an intent which goes beyond the mere intent to do the act." (quotation omitted)); *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 670 (9th Cir. 1980) ("The mere intention of [defendant] to exclude competition . . . is insufficient to establish specific intent to monopolize *by some illegal means*." (citation omitted and emphasis added)). If it were otherwise, the specific intent element would be reduced to a formality: *all* successful businesses have the intent to prevail against their rivals. *See* ABA Model Jury Instrs. 3.A.9 ("[A]ll companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.").

To make this clear, Medtronic removes the sentence suggesting that mere intent to obtain a monopoly is sufficient. This language also improperly implies that the jury may find specific intent to monopolize based only on stray, hyperbolic statements that cannot independently establish specific intent. *See,*

*e.g.*, *Blair Foods*, 610 F.2d at 667 & n.1 (statement "indicating [defendant's] specific intention to drive [a competitor] out of business" not sufficient to show specific intent); *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986) ("That Western Union wanted to 'flush these turkeys' tells us nothing about the lawfulness of its conduct."). Medtronic's proposal would appropriately permit the jury to consider "documents prepared by responsible officers or employees of defendant at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of defendant," but without suggesting that any isolated statement is alone sufficient to prove the specific intent element of attempted monopolization.

In place of the omitted sentence, Medtronic adds the more detailed explanation that "statements indicating a desire to increase market share or even to drive a competitor out of business through vigorous competition on the merits is not sufficient. Applied must show that Medtronic sought to create a monopoly by circumventing the competitive process." *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 927 (4th Cir. 1990) (citation omitted). Applied resists the addition of this sentence, but its authorities only reinforce that statements indicating a defendant's desire to succeed in the market are not sufficient, and additional evidence of anticompetitive conduct is needed to establish specific intent. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 999 (9th Cir. 1986) (affirming a specific-intent finding where the defendant's "threat to run [the plaintiff] out of town," though "arguably consistent with a simple desire to succeed in free and open competition," was a sufficient basis on which the jury "could reasonably have inferred a specific intent to monopolize")); *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*, 845 F.2d 404, 408 (2d Cir. 1988) (upholding finding of specific intent based on defendants' expressed "goal of driving [plaintiffs] out of the Burlington market" because the jury "also heard evidence that defendants had engaged in predatory pricing, and could have

inferred intent from this fact"). Similarly, *Northeastern Telephone Co. v. AT&T* affirmed that evidence that "show[ed] only that [the defendants] wanted to win the competitive struggle" was insufficient to establish specific intent because that "desire, without more, is not unlawful." 651 F.2d 76, 85 (2d Cir. 1981). The Second Circuit thus concluded that the specific intent finding could stand only based on "circumstantial evidence of intent, i.e., that [the defendants] engaged in anticompetitive conduct." *Id.* (emphasis added).

Applied sidesteps the merits of these changes by misconstruing them, stating that they conflate specific intent and anticompetitive conduct and "demand[] that internal statements or business records explicitly show an intent to use anticompetitive conduct." Applied Position Statement Regarding Instruction D15 (Specific Intent). Both points fall flat. Clarifying that intent to monopolize must be accompanied by intent to do so through anticompetitive means does not conflate specific intent with anticompetitive conduct; it describes the substance of the intent itself. Applied's own case confirms this. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1028 (9th Cir. 1981) ("Direct evidence of intent to vanquish a rival in an honest competitive struggle cannot help to establish an antitrust violation. It also must be shown that the defendant sought victory through unfair or predatory means."). And Medtronic's instruction does not prohibit jurors from considering certain evidence in their deliberations on specific intent. It merely instructs them to determine, based on the totality of the evidence, whether Medtronic had the specific intent to monopolize *through* anticompetitive conduct.

None of this is surprising: it is how attempt always works. Attempt requires a specific intent to commit the act *and* achieve the result that is unlawful under the completed offense. *See, e.g.*, *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991); *see also Swift & Co. v. United States*, 196 U.S. 375, 402 (1905) (importing attempt principles from criminal law into attempted monopolization). The

188

Sherman Act condemns monopoly power only when achieved through anticompetitive means—to intend unlawful monopolization, then, one must intend to achieve monopoly power through such anticompetitive means. *See, e.g.*, *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 2010 WL 3521979, at *26 (E.D. Cal. 2010) ("An attempt requires a deliberate, intentional act directed toward achieving the unlawful aim of monopolization.").

*Second*, Applied opposes making clear that the relevant market is the advanced bipolar device market. Medtronic's arguments related to this issue are articulated in relation to Instruction D4 (Relevant Market—General).

*Third*, and for the reasons stated in Medtronic's argument related to Instruction D2 (Monopolization General—Elements), Medtronic's proposal also clarifies that the "conduct" at issue is alleged exclusionary bundled discounting and unlawful exclusive dealing.

## DISPUTED INSTRUCTION NO. D16

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D16

#### Dangerous Probability of Success

If you find that ~~defendant~~Medtronic had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that ~~defendant~~Medtronic would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

*[Insert instructions at part A.2 (Monopoly Power Defined) of this chapter.]*

In determining whether there was a dangerous probability that ~~defendant~~Medtronic would acquire the ability to control price in the market, you should consider such factors as *[expand or contract list or add other factors as appropriate to facts of case]*:

- ~~defendant's~~Medtronic's market share;
- the trend in ~~defendant's~~Medtronic's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on ~~defendant's~~Medtronic's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that ~~defendant~~Medtronic would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that ~~defendant~~Medtronic would ultimately acquire monopoly power.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 3.D.4 (2016 ed.); *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997); *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1027 (9th Cir. 1981); *Syufy Enters. v. Am. Multicinema, Inc.,* 793 F.2d 990, 999 (9th Cir. 1986); *Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir. 1988); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85–86 (2d Cir. 1981); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D16**

**Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of Success**

If you find that ~~defendant~~ Medtronic had the specific intent to achieve a monopoly through exclusionary bundled discounting and/or unlawful exclusive dealing ~~and engaged in significant anticompetitive~~ through that conduct, you also must determine if Applied has shown by a preponderance of the evidence ~~shows~~ the next element of attempt to monopolize: namely, that there was a dangerous probability that ~~defendant~~Medtronic would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

*[Insert instructions at part A.2 (Monopoly Power Defined) of this chapter.]* In determining whether there was a dangerous probability that ~~defendant~~Medtronic would acquire the ability to control price, restrict output, and exclude competition in the alleged advanced bipolar device market, you should consider such factors as ~~[expand or contract list or add other factors as appropriate to facts of case]~~:

- ~~defendant's~~Medtronic's market share;
- the trend in ~~defendant's~~Medtronic's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on ~~defendant's~~Medtronic's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that ~~defendant~~Medtronic would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that ~~defendant~~Medtronic would ultimately acquire monopoly power.

192

1

2    Authority: ABA Model Jury Instructions 3.D.4 .; *Ohio v. Am. Express Co.*, 585

3    U.S. 529, 541-43, 543 n.7, 549 (2018); *Spectrum Sports, Inc. v. McQuillan*, 506

4    U.S. 447, 456 (1993).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D16

### Dangerous Probability of Success

Applied's proposal mirrors the ABA Model and merely adds party names. In contrast, Medtronic substantially departs from the Model.

**First**, Medtronic rewrites the Model's initial paragraph. But that paragraph correctly identifies specific intent and anticompetitive conduct as separate elements. The Court should adopt Applied's position for the reasons explained in Applied's argument related to Instruction D15.

**Second**, rather than require a showing of a dangerous probability Medtronic will achieve the power to "control price," Medtronic adds to the Model a requirement of a showing of a dangerous probability Medtronic will achieve the power to "control price, *restrict output, and exclude competition*." As discussed in connection with Applied's arguments regarding Instruction D3 ("Monopoly Power Defined"), however, the Ninth Circuit has repeatedly defined monopoly power as the power to "control prices *or* exclude competition." *See, e.g., Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1475 (9th Cir. 1997) (Monopoly power is "the power to control prices or exclude competition.").

**Third**, Medtronic limits Applied's allegations to the "advanced bipolar market." The Court should adopt Applied's position for the reasons explained in Applied's Argument regarding D2 ("Monopolization General – Elements").

**Fourth**, Medtronic substitutes the ABA Model's phrase "anticompetitive conduct" with "exclusionary bundled discounting and/or exclusive dealing." The Court should adopt Applied's position for the reasons discussed in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D16

### Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of Success

Medtronic's proposal hews closely to the model, departing only to specify the alleged market and conduct at issue; clarify Applied's burden to prove dangerous probability of success; and make the definition of monopoly power consistent across the instructions. The parties disagree on the following aspects of this instruction.

*First*, far from "rewrit[ing] the Model's initial paragraph," Medtronic clarifies that attempt liability requires—among other factors—a specific intent to achieve a monopoly *through* anticompetitive conduct. Applied Position Statement Regarding Instruction D16 (Dangerous Probability of Success). Medtronic explains its arguments related to this issue in connection with Instruction D15 (Attempt to Monopolize—Specific Intent).

*Second*, Applied objects to adding "restrict output, and exclude competition" after "would acquire the ability to control price," but this merely conforms the definition of monopoly power to the definition in ABA Model Instruction 3.A.2 (Monopoly Power Defined). Medtronic explains its arguments related to this issue in connection with Instruction D3 (Monopoly Power Defined).

*Third*, Applied objects to Medtronic's clarification that the "market" in which Medtronic must have had a dangerous probability of success in achieving monopoly power is the "advanced bipolar device market." Medtronic explains its arguments related to this issue in connection with Instruction D4 (Relevant Market—General).

*Fourth*, Medtronic clarifies that the "anticompetitive conduct" alleged is exclusionary bundled discounting and unlawful exclusive dealing. Medtronic

1    makes this change for the reasons stated in its argument related to Instruction D2

2    (Monopolization General—Elements).

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DISPUTED INSTRUCTION NO. D17

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D17

### Sherman Act Section 1

~~Plaintiff~~Applied challenges ~~defendant's~~Medtronic's conduct under Section 1 of the Sherman Act. Section 1 prohibits contracts or ~~,~~ combinations~~, and conspiracies~~ that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, ~~plaintiff~~Applied must prove the following:

1. the existence of a contract or ~~,~~ combination~~, or conspiracy~~ between or among at least two separate entities;

2. that the contract or~~,~~ combination ~~, or conspiracy~~ unreasonably restrains trade; and

~~1.   that the restraint affects interstate or foreign commerce; and~~

3. that the restraint caused ~~plaintiff~~Applied to suffer an injury to its business or property.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.B.1 (2016 ed.).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D17**

**Sherman Act Section 1**

For the reasons described in its argument below, Medtronic submits that this Section 1 instruction is unnecessary and should not be provided to the jury.

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D17**

**Sherman Act Section 1**

Applied's proposal follows the ABA Model for Section 1 claims.  It adds party names and removes the undisputed interstate-commerce element, which Medtronic also omits elsewhere.  Applied also removes the word "conspiracy" to resolve Medtronic's argument that this term will prejudice Medtronic.  Applied's approach gives the jury the general Section 1 framework (1.B.1) followed by the Rule-of-Reason instructions (1.C.1–1.C.4), which match the Model and properly guide the jury.

Medtronic argues that Model Instruction 1.B.1 is too "generic," yet Medtronic relies on Model Instructions 1.C.1–1.C.4 without explaining why those "generic" instructions are acceptable while 1.B.1 is not.  Instruction 1.B.1 is the correct instruction for restraint-of-trade claims.  Medtronic instead proposes a lengthy instruction below from the Model's chapter on "Vertical Restraints" (2.D.1) (Unreasonable Restraint of Trade—Elements).  But Applied already includes a more specific "Exclusive Dealing" instruction from the Model's chapter regarding "Vertical Restraints" (D10).  The parties also propose specific instructions on Exclusionary Bundling (D9).  Pursuant to this Court's Standing Order, jury instructions should "not repeat principles of law contained in any other requested instruction."  Dkt. 47 at 11.

Applied also disagrees with Medtronic's "Unreasonable Restraint of Trade—Elements" instruction below for the additional reasons discussed in Applied's arguments regarding Instruction D18.

199

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D17
### Sherman Act Section 1

For the reasons explained below, Medtronic uses Instruction D18 (Unreasonable Restraint of Trade—Elements) in place of this "Sherman Act Section 1" instruction.

The ABA Model includes a generic Section 1 overview instruction (Model Instruction 1.B) and a Section 1 overview instruction tailored to vertical agreements (Model Instruction 2.D.1). The parties agree that the contracts Applied challenges are vertical agreements, which are agreements between entities at different levels of the supply chain. *See* ABA Model Instrs. 2.D.1 at Notes ("[I]n the vertical restraints instructions, the term 'supplier' is used to refer to . . . sellers that supply products or services to firms at a lower level of distribution. Participants in the lower level of distribution are referred to as 'distributors' and could be . . . other customers. These terms should be modified to reflect the allegations and parties in a particular case.").

Medtronic's Instruction D18 (Unreasonable Restraint of Trade—Elements) thus appropriately uses the instruction that is tailored to the facts of this case and to the law on vertical restraints. *See* Jury Instructions at 37, *Regeneron Pharms., Inc.*, Dkt. No. 481 (using ABA Model Instr. 2.D.1 as the Sherman Act § 1 overview instruction in a case involving bundled rebates).

The model instruction tailored to vertical restraints differs from the generic Section 1 instruction in three key ways:

1. It specifies that the challenged restraints are agreements, which accurately reflects the conduct challenged in this case and avoids irrelevant, confusing references to "combination" and "conspiracy." *Cf.* ABA Model Instrs. 2.A.1 (advising that "the terminology of the instructions should be adjusted to fit the facts of a particular case," and

recommending that "conspiracy" not be used when "agreement" or "contract" is more appropriate).

2.  It explicitly requires a plaintiff to prove "a substantial adverse effect on competition in a relevant market," which is consistent with the governing law on vertical restraints. *Am. Express*, 585 U.S. at 541 (requiring plaintiffs challenging vertical restraints to "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market"); *Qualcomm*, 969 F.3d at 991 (same).

3.  It makes explicit that a plaintiff challenging vertical restraints must prove that the defendant had market power in a specified product market. *See, e.g.*, *Am. Express*, 585 U.S. at 543 & n.7 ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."). Further, the instruction specifies that the plaintiff must prove that the defendant's market power was "substantial." *See* ABA Model Jury Instrs. 2.D.1 Notes (collecting cases); *O.S.C. Corp. v. Apple Computer, Inc.*, 601 F. Supp. 1274, 1292 n.8 (C.D. Cal. 1985), *aff'd*, 792 F.2d 1464 (9th Cir. 1986) ("Absent significant market power, a vertical restriction is reasonable as a matter of law.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DISPUTED INSTRUCTION NO. D18
### PLAINTIFF'S PROPOSED INSTRUCTION NO. D18
### Unreasonable Restraint of Trade—Elements

For the reasons described in its argument below, Applied submits that this instruction is unnecessary and should not be provided to the jury.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D18**

**Sherman Act, Section 1: Unreasonable Restraint of Trade—Elements**

~~Plaintiff has alleged~~ Applied alleges that ~~defendant~~Medtronic entered into ~~an~~ exclusionary bundled discounts and/or unlawful ~~agreement with [describe other party to the arrangement] regarding [describe alleged violation, e.g.,~~ exclusive ~~territory, territorial or customer restriction, location clause, area~~dealing arrangements that unreasonably restrained trade under Section 1 of ~~primary responsibility].~~the Sherman Act. To prevail on this claim, ~~plaintiff~~Applied must prove each of the following elements by a preponderance of the evidence:

1. ~~defendant~~the alleged advanced bipolar device market is a valid antitrust market;

2. Medtronic entered into ~~an~~exclusionary bundled discounting and/or exclusive dealing agreements for the sale of advanced bipolar devices to one or more hospital(s);

~~1.~~ the agreement ~~with [describe other party to the arrangement] regarding [describe alleged restriction];~~

~~2.~~3. the agreement ~~was~~(s) were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in ~~a relevant market;~~the alleged market for advanced bipolar devices that was not outweighed by procompetitive benefits;

~~3.~~4. ~~defendant~~Medtronic had substantial market power in the alleged market for ~~[describe relevant product];~~advanced bipolar devices; and

~~4. defendant's conduct occurred in or affected interstate [or foreign] commerce; and~~

5. ~~plaintiff~~Applied was injured in its business or property because of the ~~[alleged restriction].~~agreement(s).

203

1    If you find that the evidence is insufficient to prove any one or more of

2    these elements, then you must find for ~~defendant~~Medtronic and against

3    ~~plaintiff~~Applied on ~~plaintiff's exclusive dealing~~Applied's claim~~.~~ under Section 1

4    of the Sherman Act. If you find that the evidence is sufficient to prove all five

5    elements as to ~~a particular defendant~~Medtronic, then you must find for

6    ~~plaintiff~~Applied and against ~~defendant~~Medtronic on ~~plaintiff's exclusive~~

7    ~~dealing~~Applied's claim under Section 1 of the Sherman Act.

8    I will now instruct you on whether an agreement constitutes an

9    exclusionary bundled discounting or an unlawful exclusive dealing arrangement

10   under the Sherman Act.

13   Authority: ABA Model Jury Instructions 1.B, 2.D.1 & Notes; *Ohio v. Am.*

14   *Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Fed. Trade Comm'n v.*

15   *Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

**PLAINTIFF'S POSITION STATEMENT REGARDING DIPUSTED INSTRUCTION NO. D18**

**Unreasonable Restraint of Trade—Elements**

For the reasons described in its argument regarding Instruction D17 (Sherman Act Section 1), Applied submits that Medtronic's "Unreasonable Restraint of Trade – Elements" instruction is unnecessary and should not be provided to the jury.

Medtronic's instruction also substitutes the ABA Model's phrase "agreement" with "exclusionary bundled discounting and/or exclusive dealing." The Court should adopt Applied's position for the reason explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements). Medtronic's substitution is also duplicative in view of Applied's Instruction D19 (Rule of Reason – Overview), which instructs the jury to determine "whether the restraints challenged here – Medtronic's alleged unlawful exclusionary bundling and exclusive dealing agreements – are unreasonable."

Medtronic's instruction below also injects additional requirements, such as a "substantial adverse impact on competition" and adds the phrase "not outweighed by procompetitive benefits." These instructions are unnecessary in view of Applied's Instruction D19 (Rule of Reason – Overview).

Medtronic's instruction also adds a new element requiring Applied to prove "the alleged advanced bipolar device market is a valid antitrust market." Medtronic then modifies three more of the elements to reference "the advanced bipolar devices" or the "advanced bipolar device market." Through these changes, Medtronic limits Applied's allegations to the "advanced bipolar market." The Court should adopt Applied's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

205

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D18**
**Sherman Act, Section 1: Unreasonable Restraint of Trade—Elements**

As explained in Medtronic's argument related to Instruction D17 (Sherman Act Section 1), Medtronic relies on the ABA Model Jury Instruction "Elements of Vertical Restraints" for the elements Applied must prove to establish its Section 1 claims, making the following revisions for clarity and consistency with governing law.

*First*, as directed by the model, Medtronic tailors the introductory paragraph to Applied's allegations by stating, "Applied alleges that Medtronic entered into exclusionary bundled discounts and/or unlawful exclusive dealing arrangements that unreasonably restrained trade under Section 1 of the Sherman Act." As explained in Medtronic's argument regarding Instruction D2 (Monopolization General—Elements), Applied offers no persuasive objection to Medtronic's description of the challenged conduct.

*Second*, Medtronic clarifies in element three that an agreement is unreasonable only if it has a substantial adverse effect on competition *not outweighed by procompetitive benefits*. ABA Model Instrs. 1.C.4 ("If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable."); *see also Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020) ("A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects." (quoting *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001))). Without this clarification, the jury is invited to improperly ignore evidence of procompetitive benefits.

*Third*, for the reasons articulated in Medtronic's arguments related to

Instructions D4 (Relevant Market—General), D5 (Relevant Product Market), and D19 (Rule of Reason—Overview), Medtronic specifies the alleged relevant market as the market for advanced bipolar devices and makes explicit that Applied must prove this alleged market to prevail on this claim.

## DISPUTED INSTRUCTION NO. D19

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D19

#### Rule of Reason—Overview

Under Section l of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. You must determine, therefore, whether the ~~restraint~~restraints challenged here—[*describe it*] is Medtronic's alleged unlawful exclusionary bundling and exclusive dealing agreements—are unreasonable. In making this determination, you must first determine whether ~~plaintiff~~Applied has proven that the challenged restraint has resulted in a substantial harm to competition in a relevant product ~~and geographic~~ market. If you find that ~~plaintiff~~Applied has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether the restraint produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm ~~substantially~~ outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.C.1 (2016 ed.); *Tanaka v. University of S. Calif.*, 252 F.3d 1059, 1063; *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020); *Aspen Highlands Skiing Corp., 472 U.S. 585,* 605 n.32~~.~~ (1985); *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 994, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Image Technical Services, Inc. v. Eastman Kodak, Co.,* 125 F.3d

1195, 1209 (9th Cir. 1997); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013); *Masimo Corp. v. Tyco Health Care Grp.*, L.P., 350 F. App'x 95, 97 (9th Cir. 2009); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at *9-17 (C.D. Cal. Mar. 18, 2005).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D19**

**Sherman Act Claims: Rule of Reason—Overview**

Under ~~Section~~Sections 1 and 2 of the Sherman Act, ~~a restraint of trade~~conduct is illegal only if it is found to be unreasonable. You must determine, therefore, whether the ~~restraint~~conduct challenged here ~~[describe it]~~ Medtronic's alleged exclusionary bundled discounting and unlawful exclusive dealing agreements—is unreasonable. In making this determination, you must first determine whether ~~plaintiff~~Applied has proven that the challenged ~~restraint~~conduct has resulted in ~~a~~ substantial harm to competition in ~~a relevant product and geographic~~the alleged market~~.~~ for advanced bipolar devices. If you find that ~~plaintiff~~Applied has proven that the challenged ~~restraint~~conduct results in ~~a~~ substantial harm to competition in ~~a~~the relevant market, then you must consider whether the ~~restraint~~conduct produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged ~~restraint~~conduct is illegal under ~~Section 1 of~~ the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.

I will now review each step of the Sherman Act Sections 1 and 2 analysis in more detail.

Authority: ABA Model Jury Instructions 1.C.1; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); Order re Mot. to Certify Order for Interlocutory Appeal at 4 n.2, Dkt. No. 278.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D19

### Rule of Reason—Overview

Applied's proposal closely tracks the ABA Model.  It simply inserts party names, omits the reference to the undisputed geographic market, and specifies the challenged restraint, as instructed by the Model.  Applied also removes the word "substantially" from the instruction stating that the competitive harm must "substantially outweigh[] the competitive benefit."  Applied makes this change to be consistent with the law.  *See, e.g., Tanaka v. University of S. Calif.*, 252 F.3d 1059, 1063 ("A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects."); *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020) ("A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects.").

Medtronic erroneously places its instruction near the beginning of the jury instructions.  Although that instruction is limited to "Section 1," Medtronic simply rewrites it by adding the words "and 2."  Medtronic does so to instruct the jury that the Model instructions regarding Section 1 apply to all of Applied's claims including Applied's Section 2 claims.  As explained in connection with Applied's Preliminary Statement Regarding the Order of Instructions, that is erroneous and contrary to the structure and intent of the rules.

Medtronic's proposal also changes the ABA Model's reference to "a relevant market" to "the alleged market for advanced bipolar devices" and changes the ABA Model's reference to "a relevant market" to "***the*** relevant market."  Through these changes, Medtronic seeks to limit Applied's allegations to the "advanced bipolar market."  The Court should adopt Applied's position for the reasons explained in Applied's Argument regarding Instruction D2

("Monopolization General – Elements").  Medtronic cites *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir. 1978), but that case involved a plaintiff that failed to establish any relevant market. It did not address a situation, like here, where a plaintiff alleges and demonstrates that its claims succeed even if the market includes an additional product, as argued by the defendant.

Medtronic also cites *Ohio v. Am. Express Co.*, 585 U.S. 529, 541–43, 543 n.7 (2018), for the uncontroversial point that some market definition is necessary to examine harm to competition.  Applied asserts a market definition, but also contends that its claims succeed if one more product is identified as a reasonable alternative.  Nothing in *Ohio* precludes that.

Medtronic also describes the alleged conduct using the phrase "bundled discounting."  As discussed in Applied's argument regarding Instruction D9 ("Exclusionary Bundling"), Applied disagrees with that characterization of Medtronic's conduct. While Medtronic may prefer to frame this case to emphasize "discounting," it should not be permitted to inject its own argumentative characterizations into instructions provided by the Court.

Medtronic further substitutes the Model's phrase "restraint of trade" with "conduct."  Medtronic argues this change is necessary because "restraint of trade" is a term of art under Section 1 that has not yet introduced to the jury.  But that is only true because Medtronic reorganized the instructions compared to the Model. In Applied's proposal (and the Model), this phrase is introduced and defined in earlier instructions.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D19
### Sherman Act Claims: Rule of Reason—Overview

Medtronic's instruction mirrors the model, differing only in that it covers Section 1 and Section 2, as Ninth Circuit law requires, and specifies the alleged market and challenged conduct. The parties disagree on the following aspects of this instruction.

*First*, Medtronic objects to Applied's deletion of the word "substantially" from the model instruction. This is yet another example of Applied's selective adherence to the model.

*Second*, Applied resists the placement of this instruction near the beginning of the jury instructions. Medtronic responds in its Preliminary Statement Regarding the Order of Instructions.

*Third*, Applied objects to Medtronic's addition of the words "and 2" as a "rewrite[]" of the model. Applied Position Statement Regarding Instruction D19 (Rule of Reason—Overview). But the Rule of Reason applies to both Sections 1 and 2 of the Sherman Act, as the Ninth Circuit has clearly held. *Qualcomm*, 969 F.3d at 991 ("Regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same."); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) ("[B]ecause the legal tests used for sections 1 and 2 of the Sherman Act are similar, we can review claims under each section simultaneously . . . . If a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2." (cleaned up) (quoting *Qualcomm*, 969 F.3d at 991)); Order re Mot. to Certify Order for Interlocutory Appeal  at 4 n.2, Dkt. No. 278 ("Medtronic's own proposed jury instructions provide a helpful multi-step analysis for the jury to

evaluate whether Medtronic's bundled discounting are anticompetitive. *If* the jury does find exclusionary bundling to exist, they are still required to apply the Rule of Reason to determine whether the challenged conduct results in substantial harm to competition in the relevant market *and* whether such conduct produces countervailing competitive benefits. " (emphasis in original)).

Applied claims that Medtronic's approach is wrong because "important differences remain" between Section 1 and Section 2 claims. Applied Preliminary Statement Regarding the Order of Instructions. What these differences are, Applied never says. It points to Areeda and Hovenkamp, but the treatise chapter it cites supports Medtronic's position, not Applied's. *See* Areeda ¶ 1512a. The treatise states that the Section 1 and Section 2 standards have effectively "converged," and goes on to enumerate a few potential differences between unilateral conduct and *horizontal agreements*. *Id.* ("The main difference is that unilateral conduct is ubiquitous and unavoidable, while horizontal agreements are exceptional. To take the most obvious example, a firm acting unilaterally cannot avoid setting a price. Antitrust makes unilateral price setting per se lawful except for the rarely proven predatory price."). But this is irrelevant to Applied's challenges, which relate solely to Medtronic's vertical agreements with customers. Applied faults Medtronic for "blatantly" revising the model, but the model must yield to the law of the Circuit, not the other way around. *See* ABA Model Instrs. Preface (recognizing that the law will differ in different courts and that the model instructions will be "customize[d]" in individual cases).

*Fourth*, Applied objects to describing the relevant market as either "the relevant market" or "the alleged market for advanced bipolar devices." Applied would prefer the nonspecific "*a* relevant market," but as explained in Medtronic's arguments related to Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market), there has only ever been one market alleged in this case, and it remains Applied's burden to prove it. Further, jurors cannot properly

apply the Rule of Reason unless they know which relevant market to analyze. *See Am. Express*, 585 U.S. at 543 (finder of fact "usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

*Fifth*, Applied objects to the phrase "bundled discounting." Medtronic responds in its argument related to Instruction D9 (Exclusionary Bundled Discounting).

*Finally*, Applied objects to replacing "restraint" with "conduct" throughout the instruction. Medtronic uses "conduct" instead of "restraint" because "restraint of trade" is a term of art under Section 1 that is not introduced to the jury until Instruction D18 (Unreasonable Restraint of Trade—Elements). "Conduct" is therefore accurate and less confusing at this point in Medtronic's instructions. Applied offers no argument to the contrary.

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D20**

**Rule of Reason—Proof of Competitive Harm**

As I mentioned, to prove that the challenged restraint is unreasonable, ~~plaintiff~~Applied first must demonstrate that the restraint has resulted [or is likely to result] in a substantial harm to competition. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of ~~plaintiff~~Applied is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, ~~plaintiff~~Applied must show that the harm to competition occurred in an identified market, known as a relevant market. ~~There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is plaintiff's burden to prove the existence of a relevant market.~~ I previously instructed you on the standards to identify a relevant market.

If you find that ~~plaintiff~~Applied has proven the existence of a relevant market, then you must determine whether ~~plaintiff~~Applied also has proven that the challenged restraint has [or is likely to have] a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in [or is not likely to result in] higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced [or is likely to produce] competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;

216

- the purpose and nature of the restraint;
- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether ~~the defendant~~Medtronic possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power. An important factor in determining whether ~~defendant~~Medtronic possesses market power is ~~defendant's~~Medtronic's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether ~~defendant~~Medtronic has market power include [*list factors relevant to the facts of the case, such as* the existence of barriers to entry or potential competitors]. If ~~defendant~~Medtronic does not possess a substantial market share, it is less likely that ~~defendant~~Medtronic possesses market power. If ~~defendant~~Medtronic does not possess market power, it is less likely that the challenged restraint has resulted [or will result] in a substantial harmful effect on competition in the market.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.C.2 (2016 ed.); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003); *Aya Healthcare Servs., Inc. v. AMN*

217

1    *Healthcare*, Inc., 2018 WL 3032552, at *17 (S.D. Cal. June 19, 2018); *Masimo*

2    *Corp. v. Tyco Health Care Grp*., L.P., 350 F. App'x 95, 97 (9th Cir. 2009);

3    .

## DEFENDANT'S PROPOSED INSTRUCTION NO. D20

**Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm[16]**

As I mentioned, to prove that the challenged restraint—in this case, bundled discounting and/or exclusive dealing agreements—is unreasonable, ~~plaintiff~~Applied first must demonstrate that the restraint has resulted [~~or is likely to result~~] in a substantial harm to competition. in the alleged market for advanced bipolar devices. It is Applied's burden to prove the existence of the advanced bipolar device market. If you find that Applied has proven the existence of the advanced bipolar device market, then you must determine whether Applied also has proven that the challenged bundled discounting and/or exclusive dealing has a substantial harmful effect on competition in that market.

Although it may be relevant to the inquiry, harm that occurs merely to the individual business of ~~plaintiff~~Applied is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

~~Furthermore, plaintiff must show that the harm to competition occurred in an identified market, known as a relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. It is plaintiff's burden to prove the existence of a relevant market.~~

---

[16] Medtronic has revised this instruction in light of the Court's summary judgment opinion and order. However, for the reasons stated in its briefs in support of its *Daubert* motion (Dkt. Nos. 136-1, 150-1), summary judgment motion (Dkt. Nos. 147-1, 154-1, 249-1), and motion for certification of interlocutory appeal (Dkt. Nos. 259-1, 263), April 19, 2025 contentions of law and fact (Dkt. No. 219), and May 3, 2025 position statement regarding this instruction (Dkt. No. 244), Medtronic maintains that proof of (a) substantial foreclosure and (b) monopoly power in the devices bundled with advanced bipolar devices and used in the discount attribution analysis is necessary for Applied's bundled discounting claim.

If you find that plaintiff has proven the existence of a relevant market, then you must determine whether plaintiff also has proven that the challenged restraint has [*or is likely to have*] a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in [*or is not likely to result in*] higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraint has produced [*or is likely to produce*] competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether Medtronic~~the defendant~~ possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

220

An important factor in determining whether ~~defendant~~Medtronic possesses market power is ~~defendant's~~Medtronic's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether ~~defendant~~Medtronic has market power include [*list factors relevant to* the *facts*existence of *the case, such as*barriers to entry and the existence of ~~*barriers to entry or*~~ potential competitors~~]~~. If ~~defendant~~Medtronic does not possess a substantial market share, it is less likely that ~~defendant~~Medtronic possesses market power. If ~~defendant~~Medtronic does not possess market power, it is less likely that the challenged restraint has resulted [or will result] in a substantial harmful effect on competition in the market.

Authority: ABA Model Jury Instructions 1.C.2; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

## **PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D20**

### **Rule of Reason—Proof of Competitive Harm**

Applied's proposal mirrors the ABA Model.  It merely adds party names and refers the jury to the Court's previous instruction on the standards to identify a relevant market.   Jury instructions should "not repeat principles of law contained in any other requested instruction."  Dkt. 47 at 11.

Medtronic makes many changes to the ABA Model.  ***First***, Medtronic includes multiple sentences in the first paragraph instructing the jury that it is "Applied's burden to prove the existence of the advanced bipolar device market." Similarly, Medtronic changes the Model's later reference to "a relevant market" to "the advanced bipolar device market." Through these changes, Medtronic seeks to limit Applied to the "advanced bipolar market."  The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

***Second,*** Medtronic also adds "in this case, bundled discounting and/or exclusive dealing agreements" after the Model's phrase "challenged restraint." The Court should reject Medtronic's inaccurate characterization of the alleged conduct addition for the reasons discussed in connection with Applied's arguments regarding Instruction D9 (Exclusionary Bundling).

***Third,*** Medtronic fails to include the Model's bracketed language of "likely to produce" competitive harm, thereby requiring proof that the restraint "has produced" competitive harm.   Applied's proposal includes the Model language and the Court should adopt it.  Applied can establish a Section 1 claim based on evidence the restraint is likely to produce competitive harm. *See Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 203 (2010) (to examine the restraint the court must "ordinarily consider ... the nature of the restraint and its

222

1  effect, actual or ***probable***."); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d
2  1133 (9th Cir. 2003) ("Under the rule of reason, we look to the particular facts of
3  the case to determine whether a challenged restraint is ***likely*** to enhance or harm
4  competition."); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2018 WL
5  3032552, at *17 (S.D. Cal. June 19, 2018) (Under the "rule of reason" analysis,
6  …, a plaintiff "must show that the activity is the type that restrains trade and that
7  the restraint is ***likely*** to be of significant magnitude.").

8       Medtronic asserts that the "likely" language from the Model should be
9  stricken because the *United Food* case allegedly requires proving an "actual
10  impact on competition" rather than a "likely" impact on competition.   That
11  district court case or the 1979 Ninth Circuit case it cited cannot trump the much
12  more recent Supreme Court and Ninth Circuit authority discussed above (*Am.*
13  *Needle* and *Freeman*).   Regardless, Medtronic quotes from *United Food*'s
14  general discussion of the elements.  *United Food & Com. Workers Loc. 1776 v.*
15  *Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1166 (N.D. Cal. 2017).  The case
16  did not discuss this issue in detail, but later quoted another case stating: "The rule
17  of reason analysis is concerned with the actual ***or likely*** effects of defendants'
18  behavior…"  *Id.* at 1184 (quoting *Levine v. Cent. Florida Med. Affiliates, Inc.*,
19  72 F.3d 1538, 1552 (11th Cir. 1996)).

20      Medtronic also asserts that the "likely" language from the Model should
21  be stricken because Applied asserts that Medtronic's conduct has already
22  impacted competition.  Just because Applied asserts actual harm to competition
23  should not preclude Applied from arguing in the alternative that Medtronic's
24  conduct is likely to harm competition if it has not already done so.

25
26
27
28

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D20**
**Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm**

Medtronic makes limited changes to the model to conform it to the ordering of instructions, the facts of the case, and the law of this Circuit. The parties disagree on five aspects of the instruction.

*First*, Applied objects to moving language concerning the relevant market from the second and third paragraphs of the model into the first paragraph. This change improves the flow of the instruction. It is natural to discuss the relevant market immediately after mentioning "the alleged market for advanced bipolar devices" instead of sandwiching it between paragraphs on harm to competition.

Medtronic also adds "in the alleged market for advanced bipolar devices" after "Applied must first demonstrate that the restraint has resulted in a substantial harm to competition." Applied cannot prevail by showing "substantial harm to competition" in some unspecified market. It must show substantial harm in the market it has alleged and has the burden to prove. Medtronic's additional arguments related to this dispute are discussed in connection with Instructions D4 (Relevant Market—General), D5 (Relevant Product Market), and D19 (Rule of Reason—Overview).

*Second*, Applied objects to Medtronic's specification that the "challenged conduct" in this case is "bundled discounting and/or exclusive dealing agreements." Medtronic's arguments related to this issue are articulated in relation to Instruction D2 (Monopolization General—Elements).

*Third*, Medtronic omits optional text in the model suggesting that Applied can prevail on its Section 1 claims without proving that Medtronic's conduct has impacted competition, which is not accurate. The Rule of Reason requires a fact-specific assessment of "'market power and market structure . . . to assess the [restraint]'s *actual effect*' on competition." *Am. Express*, 585 U.S. at 541 (quoting

224

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (alteration in original) (emphasis added)). Applied's own authority explains that Applied must prove an actual impact on competition, not just a likely impact. *See, e.g.*, *United Food & Com. Workers Loc. 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1166 (N.D. Cal. 2017) ("The elements of a cause of action for an unreasonable restraint of trade under the Rule of Reason analysis [include an agreement] which actually causes injury to competition. 'Proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the Rule of Reason case.'" (internal citation omitted)) (citing *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 290–91 (9th Cir. 1979)). Applied's other authorities are inapposite. *See, e.g.*, *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 204 n.10 (2010) (identifying the Rule of Reason as the appropriate test, without applying it or considering alleged future harm); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (considering actual, not hypothetical, effects of the challenged restraint and applying per se rule, not the Rule of Reason). And Applied contends that Medtronic's conduct has *already caused* harm, not just that it might cause harm in the future. *See, e.g.*, Compl. ¶ 107 (Medtronic "continues to harm Applied"); Pl.'s Opp. to Mot. to Dismiss at 15, Dkt. No. 25 (Applied "was unable to make sales"); Orszag Rep. ¶ 9 ("Medtronic's alleged conduct has had a significant adverse competitive effect."); J. SJ Br. at 7 ("the record is filled with Applied's unsuccessful attempts to convert hospitals").

225

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D21**

**Rule of Reason—Evidence of Competitive Benefits**

If you find that ~~plaintiff~~Applied has proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways. If you find that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If ~~plaintiff~~Applied proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.C.3 (2016 ed.); *Aspen Highlands Skiing Corp.,* 472 U.S. 585, 586, 605 n.32. (1985); *Epic Games, Inc. v. Apple Inc*., 67 F.4th 946, 994, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022); *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008); *Image Technical Services, Inc. v. Eastman Kodak, Co.,* 125 F.3d 1195, 1209 (9th Cir. 1997); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at *9-17 (C.D. Cal. Mar. 18, 2005); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re Motion for Summary Judgment (Dkt. No. 255) at 6; *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988).

.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D21**

**Sherman Act, Section 1: Rule of Reason—Evidence of Competitive Benefits**

If you find that ~~plaintiff~~Applied has proven that the challenged ~~restraint~~bundled discounting and/or exclusive dealing agreements resulted in substantial harm to competition in ~~a~~the alleged relevant market for advanced bipolar devices, then you next must determine whether the challenged restraint also benefits competition in other ways. If you find that the challenged restraint does result in competitive benefits, then you also must consider whether the restraint was reasonably necessary to achieve the benefits. If ~~plaintiff~~Applied proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Authority: ABA Model Jury Instructions 1.C.3; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D21**

**Rule of Reason—Evidence of Competitive Benefits**

Applied's proposal mirrors the ABA Model and merely adds party names.

Medtronic adds the word "alleged" and limits the instruction to the "advanced bipolar market." The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

Medtronic also substitutes the Model's phrase "restraint" with "bundled discounting" and "exclusive dealing agreements." The Court should reject Medtronic's substitution for the reasons discussed in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

Medtronic also places this instruction (1.C.3) directly after the instructions on monopolization. As discussed in Applied's Preliminary Statement Regarding the Order of Instructions preliminary statement regarding the order of instructions, Medtronic does so to instruct the jury that the Model instructions regarding Section 1 apply to all of Applied's claims including Applied's Section 2 claims. That is erroneous and contrary to the structure and intent of those rules. As further discussed in Applied's Preliminary Statement Regarding the Order of Instructions preliminary statement regarding the order of instructions, Medtronic also erroneously splits up the Rule of Reason "Overview" instruction (1.C.1) from the other Rule of Reason instructions (1.C.2, 1.C.3, and 1.C.4), thereby placing them distant from each other to surround the jury instructions regarding Section 2 monopolization with Section 1 instructions.

229

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D21

**Sherman Act, Section 1: Rule of Reason—Evidence of Competitive Benefits**

Medtronic's instruction closely tracks the model, diverging only to provide more detail on the factual allegations in this case. Applied disputes three aspects of Medtronic's instruction.

*First*, Medtronic identifies the relevant market as "the alleged relevant market for advanced bipolar devices." Medtronic's explains this change in its arguments related to Instructions D4 (Relevant Market—General), D5 (Relevant Product Market), and D19 (Rule of Reason—Overview).

*Second*, Medtronic clarifies that "challenged restraint" means "bundled discounting and/or exclusive dealing agreements." Medtronic explains this change in its argument related to Instruction D2 (Monopolization General—Elements).

*Third*, Applied objects to the placement of this instruction. Medtronic responds in its Preliminary Statement Regarding the Order of Instructions and its arguments related to Instructions D19 (Rule of Reason—Overview) and D20 (Rule of Reason—Proof of Competitive Harm).

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D22**

**Rule of Reason—Balancing the Competitive Effects**

If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm ~~substantially~~ outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not ~~substantially~~ outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Applied bears the burden of proving that the anticompetitive effect of the conduct ~~substantially~~ outweighs its benefits.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.C.4 (2016 ed.); *Tanaka v. University of S. Calif.*, 252 F.3d 1059, 1063; *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020); *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586, 605 n.32 (1985); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Epic Games v. Apple*, 67 F.4th 946, 994, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re Motion for Summary Judgment (Dkt. No. 255) at 6; *Cascade Health Sols. v. PeaceHealth*, 515 U.S. 883, 894 (9th Cir. 2008); *Image Technical Services, Inc.*

*v. Eastman Kodak, Co.,* 125 F.3d 1195, 1209 (9th Cir. 1997); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037 (N.D. Cal. 2013); *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224, at *9-17 (C.D. Cal. Mar. 18, 2005).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D22**

**Sherman Act, Section 1: Rule of Reason—Balancing the Competitive Effects**

If you find that the challenged ~~restraint~~bundled discounting and/or exclusive dealing was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint.

If the competitive harm substantially outweighs the competitive benefits, then the challenged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the challenged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. ~~Plaintiff~~Applied bears the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 1.C.4 (2016 ed.).

233

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D22**

**Rule of Reason—Balancing the Competitive Effects**

Applied's proposal mirrors the ABA Model, adding party names. Applied also removes the word "substantially" from the instruction that the competitive harm must outweigh the competitive benefit. Applied makes this change to be consistent with the law. *See, e.g., Tanaka v. University of S. Calif.*, 252 F.3d 1059, 1063 ("A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects."); *Power Analytics Corp. v. Operation Tech., Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. 2018), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020) ("A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects.").

Medtronic substitutes the Model's phrase "restraint" with "bundled discounting" and "exclusive dealing agreements." The Court should reject Medtronic's substitution for the reasons discussed in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

Medtronic also places this instruction (1.C.4) after the instructions on monopolization. As discussed in Applied's Preliminary Statement Regarding the Order of Instructions, Medtronic does so to instruct the jury that the Model instructions regarding Section 1 apply to all of Applied's claims including Applied's Section 2 claims. That is erroneous and contrary to the structure and intent of those rules. As further discussed in Applied's argument regarding Instruction D2 (Monopolization General – Elements), Medtronic erroneously splits up the Rule of Reason "Overview" instruction (1.C.1) from the other Rule of Reason instructions (1.C.2, 1.C.3, and 1.C.4), thereby placing them distant from each other to surround the jury instructions regarding Section 2

1    monopolization with Section 1 instructions.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D22**

**Sherman Act, Section 1: Rule of Reason—Balancing the Competitive Effects**

Medtronic's proposal mirrors the model, modifying it only to specify the challenged conduct and that Applied is the plaintiff. Applied disputes three aspects of Medtronic's instruction.

*First*, Applied resists specifying that the "challenged restraint" at issue is "bundled discounting and/or exclusive dealing." Medtronic explains this change in its argument related to Instruction D2 (Monopolization General—Elements).

*Second*, Applied objects to the placement of this instruction. Medtronic responds in its Preliminary Statement Regarding the Order of Instructions and its arguments related to Instructions D19 (Rule of Reason—Overview) and D20 (Rule of Reason—Proof of Competitive Harm).

*Third*, Applied disagrees with the model's requirement that a challenged restraint is unreasonable only if the competitive harm "substantially" outweighs the competitive benefits. Medtronic's objects to this selective adherence to the model instruction.

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D23

### Exclusive Dealing in Violation of Section 3 of the Clayton Act

~~Plaintiff~~Applied claims ~~Defendant~~Medtronic violated Section 3 of the Clayton Act, 15 U.S.C.A. § 14. ~~Plaintiff~~Applied alleges ~~Defendant~~Medtronic used competition restraining ~~arrangements~~agreements to restrain competition in a substantial portion of the relevant market, and that it was injured as a result of these competition-_restraining ~~arrangements exclusive dealing~~ agreements. ~~Defendant~~Medtronic contends its agreements are not exclusive, do not prevent customers from buying products from ~~Defendant's~~Medtronic's competitors, and promote competition for lower prices in the market.

To prevail on this claim, ~~Plaintiff~~Applied must prove the following elements:

1. First, that there were ~~the existence of competition-restricting contracts~~ exclusive dealing agreements between ~~Defendant~~Medtronic and its customers;

2. Second, that the exclusive dealing agreements ~~the contracts or agreements~~ are likely to substantially foreclose (i.e., decrease or restrict) or have foreclosed competition in a substantial share of a relevant market; and

3. Third, that ~~Plaintiff was injured as a result foreclosure of competition by~~the exclusive dealing ~~arrangement~~agreements caused ~~Plaintiff~~Applied to suffer injury to its business or property.

~~You should follow the instructions given above for relevant market, anticompetitive conduct, and causation and antitrust injury. In addition, in determining whether the challenged GPO, hospital, and distributor agreements between Defendant and purchasers foreclosed competition in a substantial share of the market, you should follow Instruction [number of instruction] regarding those agreements.~~

~~Competition-restricting contracts Exclusive Dealing Agreements: There must be competition-restricting agreements, which are often referred to as~~

237

"exclusive dealing" agreements. The term "exclusive dealing" may be misleading in that an agreement may be an exclusive dealing agreement even when it does not require a 100% commitment from a purchaser.

To meet the first element, the challenged contract must require true exclusive dealing. Exclusive dealing occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. Contracts do not need to contain specific terms of exclusivity as long as the practical effect of the agreement is to exclude competitors and harm competition.

Defendant contends that its agreements offer price discounts that benefit end users by delivering lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit. Defendant contends that its agreements do not require customers to buy products from Defendant exclusively (or at all) and do not foreclose competition in the market.

Likelihood of substantial foreclosure: If you determine that Defendant entered into restrictive contracts in a relevant market, your next consideration should be to determine whether competition was substantially lessened in a relevant market. Exclusive dealing agreements violate the antitrust laws when they foreclose (or restrict) competition in a substantial share of the market. In the context of the antitrust laws, foreclosure really just means restricted. Competition with respect to a particular buyer is foreclosed if rival sales to that buyer are restricted by a contract that imposes conditions that make it more difficult for rivals to sell to that buyer than would otherwise be the case. In determining whether foreclosure from — or restraint on competition within — a relevant market is substantial, you should take into account the relative strength of Plaintiff and Defendant within the relevant market, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market, and

1    the provable immediate and future effects of exclusion of competitors from the
2    market on competition.

3           Additionally, you should consider the cumulative effects of (or aggregate
4    restraint or foreclosure caused by) Defendant and other firms' anticompetitive
5    conduct in determining substantial foreclosure of the relevant markets. In other
6    words, you are not limited to only considering the effects of Defendant's
7    anticompetitive actions, if any, on competition, but may also consider the effects
8    of any anticompetitive conduct by Defendant when combined with that of other
9    firms which have substantial market share. The agreements challenged do not
10   need to foreclose Plaintiff from 100% of any buyer purchases to have an
11   anticompetitive effect; Plaintiff may have some access to each buyer, but still be
12   foreclosed (or restricted) from competing as it would in a market without any
13   anticompetitive restraints.

14          A harmful effect on competition can also be inferred if the contracts
15   restrained competition by more than 20 to 30% of any market. In ascertaining the
16   share of the market restrained, the effects of one type of restraining contracts
17   should be aggregated with other types because the anticompetitive effect turns on
18   their combined effects. Additionally, Plaintiff alleges that Defendant restrained a
19   substantial share of [identification of markets] by entering into sole- and dual-
20   source contracts.

21

22   Authority: O'Malley § 150:136 (6th ed.)); *Epic Games v. Apple*, 67 F.4th 946,
23   1002 (9th Cir. 2023); *Oltz v. St. Peter's Cnty. Hosp.*, 861 F.2d 1440, 1446 (9th
24   Cir. 1988); *CoStar Grp., Inc. v. Com. Real Est. Exch.*, *Inc.*, 150 F.4th 1056, 1073
25   (9th Cir. 2025); *Masimo Corp. v. Tyco Health Care Grp.*, L.P., 350 F. App'x 95,
26   97 (9th Cir. 2009); *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL
27   6229141 at *5 (C.D. Cal. Dec. 2, 2013); *Blue Sky Color of Imagination, LLC v.
28   Mead Westvaco Corp.*, 2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010); *E.T.*

239

*Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1344 (N.D. Ga. 1987); *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987); *Smith v. Scrivner-Boogaart, Inc.*, 447 F.2d 1014, 1017 (10th Cir. 1971); *K-Flex, Inc. v. Armacell, Inc.,* 299 F. Supp. 3d 730, 736 (E.D.N.C. 2017).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D23**

**Clayton Act, Section 3: Exclusive Dealing—Elements**

~~Plaintiff claims Defendant violated Section 3 of the Clayton Act, 15 U.S.C.A. § 14. Plaintiff alleges Defendant used competition restraining arrangements to restrain competition in a substantial portion of the relevant market, and that it was injured as a result of these competition restraining arrangements exclusive dealing agreements. Defendant contends its agreements are not exclusive, do not prevent customers from buying products from Defendant's competitors, and promote competition for lower prices in the market.~~ Applied also challenges Medtronic's contracts as unlawful exclusive dealing arrangements under Section 3 of the Clayton Act.

To prevail on this claim, ~~Plaintiff~~Applied must prove the following elements~~:~~ by a preponderance of the evidence:

1.  ~~First, that~~the alleged advanced bipolar device market is a valid antitrust market;

~~1.~~2.   there were exclusive dealing agreements between ~~Defendant~~Medtronic and its customers that prevented the customer(s) from purchasing advanced bipolar devices from any other supplier;

3.  ~~Second,~~ the exclusive dealing agreements have substantially foreclosed or have the probable effect of substantially foreclosing competition in the alleged market for advanced bipolar devices; and

~~1.~~that the exclusive dealing agreements ~~the contracts or agreements are likely to substantially foreclose (i.e., decrease or restrict) foreclosed competition in a substantial share of a relevant market; and~~

~~2.~~4.   ~~Third, that Plaintiff was injured as a result foreclosure of competition by exclusive dealing arrangement~~caused ~~Plaintiff~~Applied to suffer injury to its business or property.

241

You should follow the instructions given above for relevant market, anticompetitive conduct, and causation and antitrust injury. In addition, In determining whether the challenged GPO, hospital, and distributoralleged exclusive dealing agreements between Defendant and purchasershave substantially foreclosed competition in a substantial share of the market, you should follow Instruction [number ofmy previous instruction] regarding those agreements.

Competition restricting contracts Exclusive Dealing Agreements: There must be competition-restricting agreements, which are often referred to as "exclusive dealing" agreements. The term "exclusive dealing" may be misleading in that an agreement may be an exclusive dealing agreement even when it does not require a 100% commitment from a purchaser.

To meet the first element, the challenged contract must require true exclusive dealing. Exclusive dealing occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. Contracts do not need to contain specific terms of exclusivity as long as the practical effect of the agreement is to exclude competitors and harm competition.

Defendant contends that its agreements offer price discounts that benefit end users by delivering lower prices, and that offering lower prices to customers who buy more is not a "penalty" at all, but a benefit. Defendant contends that its agreements do not require customers to buy products from Defendant exclusively (or at all) and do not foreclose competition in the market.

Likelihood of substantial foreclosure: If you determine that Defendant entered into restrictive contracts in a relevant market, your next consideration should be to determine whether competition was substantially lessened in a relevant market. Exclusive dealing agreements violate the antitrust laws when

they foreclose (or restrict) competition in a substantial share of the market. In the context of the antitrust laws, foreclosure really just means restricted. Competition with respect to a particular buyer is foreclosed if rival sales to that buyer are restricted by a contract that imposes conditions that make it more difficult for rivals to sell to that buyer than would otherwise be the case. In determining whether foreclosure from—or restraint on competition within—a relevant market is substantial, you should take into account the relative strength of Plaintiff and Defendant within the relevant market, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market, and the provable immediate and future effects of exclusion of competitors from the market on competition.

Additionally, you should consider the cumulative effects of (or aggregate restraint or foreclosure caused by) Defendant and other firms' anticompetitive conduct in determining substantial foreclosure of the relevant markets. In other words, you are not limited to only considering the effects of Defendant's anticompetitive actions, if any, on competition, but may also consider the effects of any anticompetitive conduct by Defendant when combined with that of other firms which have substantial market share. The agreements challenged do not need to foreclose Plaintiff from 100% of any buyer purchases to have an anticompetitive effect; Plaintiff may have some access to each buyer, but still be foreclosed (or restricted) from competing as it would in a market without any anticompetitive restraints.

A harmful effect on competition can also be inferred if the contracts restrained competition by more than 20 to 30% of any market. In ascertaining the share of the market restrained, the effects of one type of restraining contracts should be aggregated with other types because the anticompetitive effect turns on their combined effects. Additionally, Plaintiff alleges that Defendant restrained a substantial share of *[identification of markets]* by entering into sole and dual-

243

1    ~~source contracts~~[D8] ~~in this regard.~~

2

3    Authority: O'Malley § 150:136 (6th ed.); ABA Model Jury Instructions 2.D.1,

4    3.A.1; *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Ohio v.*

5    *Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018); *Aerotec Int'l Inc. v.*

6    *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182-83 (9th Cir. 2016); *Omega Env't, Inc.*

7    *v. Gilbarco, Inc.,* 127 F.3d 1157, 1162 (9th Cir. 1997); *Allied Orthopedic*

8    *Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 996 (9th Cir.

9    2010).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D23**

**Exclusive Dealing in Violation of Section 3 of the Clayton Act**

Applied's proposal faithfully reflects the O'Mally Model.  It merely adds party names and removes additional explanation of exclusive dealing that is unnecessary in view of the earlier instruction.  Medtronic does not dispute the removal of such paragraphs.

Medtronic dramatically alters the instruction by removing almost all of the initial paragraph explaining Clayton Act exclusive dealing claims.  Medtronic also makes substantial changes to the three elements of exclusive dealing.  ***First***, Medtronic adds a new element that unnecessarily reiterates market definition, an issue already covered in earlier instructions.  Medtronic claims that Applied "concedes" that market definition is an element of a Clayton Act §3 claim.  Applied does not, and the Model includes no such element.  While the jury will need to identify a market, consistent with the remainder of the instruction, Medtronic cites no case law elevating market definition to an "element" of the Clayton Act.

***Second***, Medtronic again requires proving the "alleged advanced bipolar device market is a valid antitrust market," again limiting Applied's allegations to the "advanced bipolar market."  The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

***Third***, Medtronic modifies the Model's first element requiring an "exclusive dealing agreements" to further require a showing the agreements "prevented the customer(s) from purchasing advanced bipolar devices from ***any*** other supplier."  The Court should adopt Applied's position for the reasons explained in Applied's Argument regarding Instruction D10 ("Exclusive Dealing").  Medtronic claims its change is consistent with *Allied Orthopedic*'s

245

definition of exclusive dealing.  But *Allied Orthopedic* was a Section 1 case and this instruction concerns ***Section 3***, which has different standards for exclusive dealing.  Indeed, Medtronic ignores the footnote in the section it cites from *Allied Orthopedic*, which distinguished the language Medtronic cites from Section 3 cases and explained "[o]ur circuit has held that 'a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section three Clayton Act violation in exclusive-dealing cases."  592 F.3d at 996, n.1.  Medtronic provides no legitimate basis to depart from the Model's recitation of the elements for a Section 3 claim.

> ***Third***, Medtronic modifies the language of the Model's second element by changing the Model's language ("that the exclusive dealing agreements ***are likely*** to substantially foreclose (i.e., decrease or restrict) or have foreclosed competition in a substantial share of a relevant market")  to "the exclusive dealing agreements ***have*** substantially foreclosed or have the probable effect of substantially foreclosing competition in the alleged market for advanced bipolar devices."  Medtronic also asserts the Model's language "substantially foreclose (i.e., decrease or restrict)" is improper.  Medtronic fails to justify these changes.  Medtronic cites *Omega*, but that case merely observed that many contracts can foreclose or exclude sellers.  *Omega*, 127 F.3d at 1162.  The next sentence explained the relevance of that observation by explaining: "We thus analyze challenges to exclusive dealing arrangements under the antitrust rule of reason."  *Id.*  The case never suggested the Model's language is somehow improper.

> Medtronic also cites *Tampa Elec.*'s use of the phrase "probable," but that case never rejected the language of the Model, which is repeated in numerous cases throughout the country.  *See, e.g.*, *Blue Sky Color of Imagination, LLC v. Mead Westvaco Corp.*, 2010 WL 4366849, at *4 (C.D. Cal. Sept. 23, 2010) ("the Clayton Act requires only that an agreement is ***likely to foreclose*** competition."); *E.T. Barwick Indus., Inc. v. Walter E. Heller & Co.*, 692 F. Supp. 1331, 1344

(N.D. Ga. 1987) ("an exclusive dealing arrangement is illegal 'only if [it is] ***likely to foreclose*** the entry into a substantial part of the market'"); *Chuck's Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1293 (4th Cir. 1987) ("exclusive dealing arrangements violate the antitrust laws only if they are ***likely to foreclose*** the entry into a substantial part of the market"); *Smith v. Scrivner-Boogaart, Inc.*, 447 F.2d 1014, 1017 (10th Cir. 1971) ("The exclusive dealing arrangement must be ***likely to foreclose*** competition in a substantial portion of the line of commerce affected."); *K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 736 (E.D.N.C. 2017) ("likely to foreclose the entry into a substantial part of the market"). The Court should follow Applied's proposal, which closely tracks the Model.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D23**
**Clayton Act, Section 3: Exclusive Dealing—Elements**

Medtronic recommends the following revisions to the O'Malley model instruction for clarity and consistency with governing law.[17]

*First*, Medtronic's proposal omits the introductory paragraph of the model instruction, which merely explains the parties' positions regarding the alleged exclusive dealing. By this point in the instructions, jurors will be familiar with the parties' contentions related to exclusive dealing. Applied objects to this streamlining, claiming that it "dramatically alters" the instruction, yet Applied offers no reason why that now-repetitive language is critical in this location.

*Second*, for consistency with the ABA model instructions, Medtronic adds language specifying that the standard of proof is the preponderance of the evidence. *See, e.g.*, ABA Model Jury Instrs. 2.D.1 (Elements of Vertical Restraints) (specifying "preponderance of the evidence" as the standard of proof); ABA Model Jury Instrs. 3.A.1 (Elements of Monopolization) (same). Applied does not dispute that the preponderance standard is applicable. *See* Instruction A3 (Burden of Proof—Preponderance of the Evidence) (stipulated).

*Third*, Medtronic's instruction clarifies that Applied must prove its alleged advanced bipolar device market to prove its Clayton Act claim. As with Applied's other claims, defining a valid antitrust market is "indispensable" to a claim under Section 3 of the Clayton Act. *See Tampa Elec.*, 365 U.S. at 327 (stating that under § 3, "the threatened foreclosure of competition must be in relation to the market affected"); *Omega*, 127 F.3d at 1162 (beginning substantial foreclosure analysis

---

[17]

 Medtronic and Applied both use O'Malley § 150:136 for this instruction because the ABA Model does not have an instruction pertaining to Section 3 of the Clayton Act.

by describing the relevant market). Omitting this element would create a discrepancy between the elements of this claim and Applied's other claims that could lead jurors to believe erroneously that market definition is not relevant here.

Applied concedes that "the jury will need to identify a market" to decide Applied's Clayton Act § 3 claim, yet it argues that explaining this in the elements of the claim is "unnecessary" because it was "already covered in earlier instructions." But the jury must be told each of the elements required to prove each claim.

*Fourth*, Medtronic's proposal rephrases the model's first element, which reads, "that there were the existence of [*sic*] competition-restricting contracts exclusive dealing agreements [*sic*] between Defendant and its customers" to make it more comprehensible and to tailor it to Applied's allegations and the Ninth Circuit's definition of an exclusive dealing contract. *See Tampa Elec.*, 365 U.S. at 326–27 (contract only exclusive if it "prevent[s] lessees or purchasers from using or dealing in the goods, etc., of a competitor"); *Allied Orthopedic*, 592 F.3d at 996 ("Exclusive dealing involves an agreement between a vendor and a buyer that *prevents the buyer from purchasing* a given good from any other vendor." (emphasis added)). Medtronic's language imposes no "further" showing, as Applied suggests, but merely provides the definition established by Ninth Circuit precedent. *See* Medtronic Position Statement Regarding Instruction D10 (Unlawful Exclusive Dealing).

*Fifth*, Medtronic's instruction adjusts the language of O'Malley's second element as follows, to align with binding law and the facts of this this case:

- Medtronic removes the model instruction's improper definition of "substantially foreclose" to mean "decrease or restrict" competition. O'Malley § 150:136. Almost all contracts decrease or restrict competition in some portion of commerce. *See Omega*, 127 F.3d at 1162 ("And, as then-Judge Breyer noted, in the analogous context of requirements contracts,

249

'virtually every contract to buy "forecloses" or "excludes" alternative sellers from some portion of the market, namely the portion consisting of what was bought.'" (quoting *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983)). That is not enough to support liability.

- Medtronic articulates the substantial foreclosure requirement using the "probable" language from the seminal Supreme Court case on exclusive dealing and substantial foreclosure. *See Tampa Elec.*, 365 U.S. at 327 ("In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected."). Applied's cases do not compare. *See* Applied Position Statement on Instruction D23 (Exclusive Dealing in Violation of Section 3 of the Clayton Act) (citing one unpublished case from the Central District of California, one Four Circuit case, one Tenth Circuit case, and two out-of-circuit district-court cases). Medtronic puts "have substantially foreclosed" before "have the probable effect of substantially foreclosing" because it is more natural to present the past effect before the future effect.

For the reasons stated in its argument related to Instruction D4 (Relevant Market—General), Medtronic specifies that it is Applied's alleged relevant market—namely, the alleged advanced bipolar devices market—that must be substantially foreclosed. *See also Tampa Elec.*, 365 U.S. at 327 ("[T]he threatened foreclosure of competition must be in relation to the market affected.").

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D24**

**Unlawful Restraint in Violation of the California Cartwright Act**

[*Name of plaintiff*]Applied claims that [*name of defendant*] agreed to [*insert unreasonable restraint of trade*].Medtronic violated the California Cartwright Act. To establish this claim, [*name of plaintiff*]Applied must prove all of the following:

1. Medtronic entered into exclusionary bundling and/or exclusive dealing agreements;That [*name of defendant*] [and [*name of alleged coparticipant[s]*]] agreed to [*describe conduct constituting an unreasonable restraint of trade*];

2. That theThe purpose or effect of [*name of defendant*]'s conductMedtronic entering these agreements was to restrain competition;

3. That theThe anticompetitive effect of the restraint[(s)] outweighed any beneficial effect on competition;

4. That [*name of plaintiff*]Applied was harmed; and

5. That [*name of defendant*]'sMedtronic's conduct was a substantial factor in causing [*name of plaintiff*]'s harmApplied's injury.

Authority: CACI No. 3405; *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979);

251

1 | *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re Motion
2 | for Summary Judgment (Dkt. No. 255) at 6; *Oltz v. St. Peter's Cnty. Hosp.*, 861
3 | F.2d 1440, 1446 (9th Cir. 1988).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D24**

**California Cartwright Act—Unlawful Restraint of Trade—Elements**

[*Name of plaintiff*]Applied claims that [*name of defendant*] agreed to [*insert unreasonable restraint of trade*].Medtronic violated the California Cartwright Act. To establish this claim, [*name of plaintiff*]Applied must prove all of the following: elements by a preponderance of the evidence:

1. That [*name of defendant*] [and [*name of alleged coparticipant[s]*]] agreed to [*describe conduct constituting an unreasonable restraint of trade*]; 2. That

1.  the alleged advanced bipolar device market is a valid antitrust market;

2.  Medtronic entered into exclusionary bundled discounting and/or unlawful exclusive dealing agreements for the sale of advanced bipolar devices to one or more hospital(s);

1.3.    the purpose or effect of [*name of defendant*]'s conductMedtronic entering these agreements was to restrain competition in the alleged market for advanced bipolar devices;

2.4.    3. That the anticompetitive effect of the restraint[(s]) outweighed any beneficial effect on competition;

3.5.    4. That [*name of plaintiff*]Applied was harmedinjured; and

6.  5. That [*name of defendant*]'s conductMedtronic's exclusionary bundled discounting and/or unlawful exclusive dealing was a substantial factor in causing [*name of plaintiff*]'s harm.Applied's injury.

Authority: CACI No. 3405; *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc*., 55 Cal. App. 5th 381, 413-414 (2020); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-43, 543 n.7 (2018).

253

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D24

### Unlawful Restraint in Violation of the California Cartwright Act

Applied's proposal mirrors the Model offered by the Judicial Council of California.  It merely adds party names and identifies the relevant restraint of trade, as instructed by the Model.  Medtronic makes multiple changes.

***First***, Medtronic unnecessarily adds an element stating that Applied must establish a valid market.  Medtronic argues that Applied cites "no support" for its position that market definition is not an element of this claim.  But Applied follows the Model, which does not identify such an element.  Medtronic fails to show why the Model is legally incorrect.

***Second***, Medtronic also repeatedly injects the phrase "alleged advanced bipolar device market," improperly limiting Applied's allegations to the "advanced bipolar market."  The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").

***Third***, Medtronic substitutes the ABA Model's phrase "conduct" with "alleged exclusionary bundled discounting and/or exclusive dealing."  This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

254

### DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED
### INSTRUCTION NO. D24
### California Cartwright Act: Unlawful Restraint of Trade—Elements

Medtronic's proposed instruction is based on the model offered by the Judicial Council of California, differing only in that it (1) includes a market definition element and names the alleged market; (2) specifies the conduct at issue; and (3) includes the standard of proof. Each of these changes aligns the model instruction to controlling law and the facts of this case.

*First*, Medtronic makes clear that proof of a properly defined antitrust market is a necessary element of a Cartwright Act claim. *See, e.g.*, *Flagship Theatres*, 55 Cal. App. at 413–14 (Rule of Reason analysis under Cartwright Act requires a plaintiff to "establish the boundaries of the market in which the plaintiff maintains the defendant harmed competition"). Without a properly defined relevant market, "the finder of fact will not know where to look in assessing anticompetitive and procompetitive effects of a practice." *Id.* Applied summarily dismisses this element as unnecessary, citing no law for its position and offering no explanation for how the jury will know that market definition is required absent an instruction to that effect.

Medtronic also clarifies the alleged market in which Applied claims Medtronic harmed competition. Medtronic explains its arguments related to this issue in connection with Instructions D4 (Relevant Market—General) and D5 (Relevant Product Market).

*Second*, Medtronic's instruction clarifies that the conduct to be evaluated is "exclusionary bundled discounting and/or unlawful exclusive dealing." Medtronic articulates its arguments related to this dispute in relation to Instruction D2 (Monopolization General—Elements).

*Third*, consistent with the ABA model instructions, Medtronic specifies that the standard of proof is a preponderance of the evidence.  Applied does not dispute this change..

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D25**

**Evidence About Applied**

During the trial, Medtronic introduced evidence of Applied's business practices in the relevant market.  Although you may consider that evidence as well as all other evidence in the case in deciding whether Medtronic's conduct was exclusionary or anticompetitive, you may not conclude that Medtronic's conduct was lawful merely because Applied allegedly engaged in similar conduct. This would be the case if you find that Medtronic possesses monopoly power because conduct that is otherwise lawful for some firms in a market may be exclusionary and anticompetitive when engaged in by a monopolist.

Authority: *Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *21-*22 (C.D. Cal. Mar. 18, 2005); Order re Motion for Summary Judgment (Dkt. No. 255) at 8; *Greyhound Computer Corp. v. Int'l Bus. Machines Corp*., 559 F.2d 488, 498 (9th Cir. 1977); *In re Google Play Store Antitrust Litig*., 2024 WL 4438249, at *5 (N.D. Cal. Oct. 7, 2024), aff'd, 147 F.4th 917 (9th Cir. 2025), and modified, 152 F.4th 1078 (9th Cir. 2025); *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd*., 2021 WL 461707, at *5 (S.D. Cal. Feb. 9, 2021).

## DEFENDANT'S PROPOSED INSTRUCTION NO. D25
### Evidence About Applied

For the reasons discussed below, Medtronic has not proposed an instruction for Evidence About Applied.

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D25**

Applied proposes the Court include a jury instruction from *Masimo v. Tyco* to make clear that the jury may not conclude that Medtronic's conduct was not anticompetitive merely because Medtronic asserts that Applied has (or should have) engaged in similar types of conduct. Medtronic clearly intends to put Applied on trial. Medtronic apparently intends to argue that it is not liable because Applied engages in the same conduct as Medtronic and, if it does not, it should do so to compete more aggressively.

While Applied will dispute those allegations, they are irrelevant to whether **Medtronic** has engaged in exclusionary conduct because the same conduct can have very different competitive effects depending on the actor and its market power. Indeed, it is black-letter antitrust law that conduct by a monopolist can be exclusionary and unlawful even if the same conduct by a non-monopolist would be lawful. *See, e.g., Greyhound Computer Corp. v. Int'l Bus. Machines Corp.*, 559 F.2d 488, 498 (9th Cir. 1977); *see also In re Google Play Store Antitrust Litig.*, 2024 WL 4438249, at *5 (N.D. Cal. Oct. 7, 2024), *aff'd*, 147 F.4th 917 (9th Cir. 2025), and modified, 152 F.4th 1078 (9th Cir. 2025) ("Some of the prohibited conduct might be legitimate when done by a company without monopoly power."); *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*, 2021 WL 461707, at *5 (S.D. Cal. Feb. 9, 2021) ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist.") (quoting *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005)).

Conduct by a firm like Medtronic—with monopoly power, and a 73% dominant market share—will broadly impact the market. By contrast, the same conduct by a firm with a 3% share, such as Applied, does not and cannot have the

same exclusionary effect. The relevant question for the jury is whether Medtronic's conduct—given its size and market dominance—had the effect of maintaining or enhancing monopoly power and harming competition. Thus, the focus of this case is Medtronic's conduct, not whether Applied engaged in similar conduct or should have "behaved more like Medtronic" or adopted more aggressive contracting tactics. Applied's proposed instruction accurately reflects settled law, will avoid confusion and will ensure the jury properly focuses on the conduct and market power of Medtronic when evaluating whether Medtronic has violated the antitrust laws.

Medtronic does not dispute any of the arguments or authority cited above. Instead, Medtronic argues that the jury should be allowed to consider if Applied could match Medtronic's offerings. But Applied's instruction does not seek to preclude such evidence. To the contrary, it specifically provides that the jury "may consider that evidence" in deciding "whether Medtronic's conduct was exclusionary or anticompetitive." Applied's instruction simply provides that the jury should not conclude that "Medtronic's conduct was lawful merely because Applied allegedly engaged in similar conduct." Medtronic does not deny that it intends to make such an argument to the jury. Medtronic should not be permitted to present such evidence without guidance to the jury on the settled difference between conduct by a monopolist and conduct by a non-monopolist.

Medtronic complains that the instruction is "untethered" from a model. But Applied's instruction is based on a nearly identical instruction from *Masimo v. Tyco*, where the defendant similarly tried to put the plaintiff on trial. Such an instruction is appropriate where, as here, it is warranted by the defendant's arguments. *See Masimo v. Tyco*, 02-4770, 2005 Jury Inst. LEXIS 224 at *21-*22 (C.D. Cal. Mar. 18, 2005).

**DEFENDANT'S POSITION STATEMENT REGARDING COURT'S INSTRUCTION NO. D25**

**Evidence About Applied**

Applied's proposed instruction is untethered from any model, unnecessary, and confusing. There is no reason to instruct the jury that it "may not conclude that Medtronic's conduct was lawful merely because Applied allegedly engaged in similar conduct." None of the parties' proposed instructions encourage the jury to focus only on Applied's conduct and ignore other evidence. Each party could offer any number of instructions about what the jury may or may not conclude based on individual pieces of evidence, but this is not the design or purpose of these instructions. *Cf.* Standing Order at 11 ("The Court seldom gives instructions derived solely from caselaw.").

Applied's instruction improperly dissuades jurors from weighing a potentially important fact. Proof that Applied engages in bundled discounting and/or exclusive dealing could suggest customer demand or other procompetitive reasons for the challenged conduct. It could also suggest that bundle-to-bundle competition exists. *Cf. Suture Express*, 851 F.3d at 1041 ("Further, since [competitors] also offered similar bundling packages, competition was not excluded in the tied market, either: it simply took the form of bundle-to-bundle competition."). Or it could bear on Applied's ability to match Medtronic's offers to customers. *Cf. Aerotec*, 836 F.3d at 1187 (possibility of anticompetitive effects based on "fact that the bundling competitor has exclusive capacity to 'bundle' multiple products"); Areeda ¶ 749 (5th ed. 2025) ("[W]e ask in a case involving bundled discounts not whether the plaintiff could match the bundle, but if any firm or group of firms in the market could do so, or is likely to do so."). Applied recognizes that this instruction will downplay evidence unhelpful to Applied, stating that the instruction will ensure the jury "focuses on the conduct and market power of Medtronic." Applied should not be permitted to use ad hoc instructions

261

to discourage jurors from considering relevant evidence that they might find persuasive.

Medtronic also objects to the phrase "in the relevant market" in the first line of this instruction. This presumes that the existence of the relevant market, which is a fact the jury must decide.

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D26
#### Injury and Causation

If you find that ~~defendant~~Medtronic has violated [~~the applicable section~~Sections 1 or 2 of the Sherman~~,~~ Act, Section 3 of the Clayton Act, or ~~Robinson-Patman~~]the California Cartwright Act, then you must decide if ~~plaintiff~~Applied is entitled to recover damages from ~~defendant~~Medtronic.

~~Plaintiff~~Applied is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

1. ~~1.   plaintiff~~Applied was in fact injured as a result of ~~defendant's~~Medtronic's alleged violation of the antitrust laws;

2. ~~2. defendant's~~Medtronic's alleged illegal conduct was a material cause of ~~plaintiff's~~Applied's injury; and

3. ~~3. plaintiff's~~Applied's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For ~~plaintiff~~Applied to establish that it is entitled to recover damages, it must prove that it was injured as a result of ~~defendant's~~Medtronic's alleged violation ~~of the antitrust laws~~. Proving the fact of damage does not require ~~plaintiff~~Applied to prove the dollar value of its injury. It requires only that ~~plaintiff~~Applied prove that it was in fact injured by ~~defendant's~~Medtronic's alleged antitrust violation. If you find that ~~plaintiff~~Applied has established that it was in fact injured, you may then consider the amount of ~~plaintiff's~~Applied's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that ~~plaintiff~~Applied has established that it was in fact injured.

~~Plaintiff~~Applied must also offer evidence that establishes by a preponderance of the evidence that ~~defendant's~~Medtronic's alleged illegal

conduct was a material cause of ~~plaintiff's~~Applied's injury. This means that ~~plaintiff~~Applied must have proved that some damage occurred to it as a result of ~~defendant's~~Medtronic's alleged antitrust violation, and not some other cause. ~~Plaintiff~~Applied is not required to prove that ~~defendant's~~Medtronic's alleged antitrust violation was the sole cause of its injury; nor need ~~plaintiff~~Applied eliminate all other possible causes of injury. It is enough if ~~plaintiff~~Applied has proved that the alleged antitrust violation was a material cause of its injury.

Finally, ~~plaintiff~~Applied must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If ~~plaintiff's~~Applied's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then ~~plaintiff's~~Applied's injuries are antitrust injuries. On the other hand, if ~~plaintiff's~~Applied's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then ~~plaintiff's~~Applied's injuries are not antitrust injuries and ~~plaintiff~~Applied may not recover damages for those injuries under the antitrust laws.

*[Insert the following if plaintiff is a competitor of defendant.* You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against——such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

However, Applied does not need to prove that it or other firms were driven out of the market, lacked profitability or failed to grow. Injury can include restricted growth resulting from Medtronic's conduct. Thus, injury can include proof that, as a result of Medtronic's conduct, Applied's market share was below

the level it would have achieved in a competitive market.

In summary, if ~~plaintiff~~Applied can establish that it was in fact injured by ~~defendant's~~Medtronic's conduct, that ~~defendant's~~Medtronic's conduct was a material cause of ~~plaintiff's~~Applied's injury, and that ~~defendant's~~Applied's injury was the type that the antitrust laws were intended to prevent, then ~~plaintiff~~Applied is entitled to recover damages for the injury to its business or property.  This is true even if Applied remained in the market, was profitable, and grew its market share.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 6.A.1 (2016 ed.); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1081 (9th Cir. 2020); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971);. Order re Motion for Summary Judgment (Dkt. No. 255) at 6, 17-19.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D26**

**Injury and Causation—Overview**

If you find that ~~defendant~~Medtronic has violated [*the applicable section*Sections 1 or 2 of the Sherman~~,~~ Act, Section 3 of the Clayton Act, or ~~Robinson-Patman~~]the California Cartwright Act, then you must decide if ~~plaintiff~~Applied is entitled to recover damages from ~~defendant~~Medtronic.

~~Plaintiff~~Applied is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

1. ~~1. plaintiff~~Applied was in fact injured as a result of ~~defendant's~~Medtronic's alleged violation of the antitrust laws;

2. ~~2. defendant's~~Medtronic's alleged ~~illegal conduct~~exclusionary bundled discounting and/or unlawful exclusive dealing was a material cause of ~~plaintiff's~~Applied's injury; and

3. ~~3. plaintiff's~~Applied's injury is an injury of the type that the antitrust laws were intended to prevent.

~~The first element is sometimes referred to as "injury in fact" or "fact of damage." For plaintiff to establish that it is entitled to recover damages, it must prove that it was injured as a result of defendant's alleged violation of the antitrust laws. Proving the fact of damage does not require plaintiff to prove the dollar value of its injury. It requires only that plaintiff prove that it was in fact injured by defendant's alleged antitrust violation. If you find that plaintiff has established that it was in fact injured, you may then consider the amount of plaintiff's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that plaintiff has established that it was in fact injured.~~

~~Plaintiff must also offer evidence that establishes by a preponderance of~~

the evidence that defendant's alleged illegal conduct was a material cause of plaintiff's injury. This means that plaintiff must have proved that some damage occurred to it as a result of defendant's alleged antitrust violation, and not some other cause. Plaintiff is not required to prove that defendant's alleged antitrust violation was the sole cause of its injury; nor need plaintiff eliminate all other possible causes of injury. It is enough if plaintiff has proved that the alleged antitrust violation was a material cause of its injury.

Finally, plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff's injuries are antitrust injuries. On the other hand, if plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiff's injuries are not antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws.

[*Insert the following if plaintiff is a competitor of defendant.* You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if plaintiff can establish that it was in fact injured by defendant's conduct, that defendant's conduct was a material cause of plaintiff's injury, and that defendant's injury was the type that the antitrust laws were intended to prevent, then plaintiff is entitled to recover damages for the injury to

its business or property.

I will now explain each element in more detail.

Authority: ABA Model Jury Instructions 6.A.1.

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D26**

**Injury and Causation**

Applied's proposal faithfully implements the ABA Model. It largely adds party names and identifies the specific claims at issue for damages. Applied also includes guidance from the Court's Summary Judgment Order that "Applied does not need to prove that it or other firms were driven out of the market, lacked profitability or failed to grow. Injury can include restricted growth resulting from Medtronic's conduct. Thus, injury can include proof that, as a result of Medtronic's conduct, Applied's market share was below the level it would have achieved in a competitive market." *See* Order re Motion for Summary Judgment (Dkt. No. 255) at 17-19. Applied also includes that it is entitled to recover damages "even if Applied remained in the market, was profitable, and grew its market share." *See id*. These changes to the Model are necessary based on Medtronic's arguments in this case and the Court's holdings rejecting those arguments. *See id*.

Medtronic unnecessarily divides the ABA Model up into three separate instructions and adds language to facilitate that division. As support, Medtronic cites a case that did not even address antitrust claims. And Medtronic cites that case for the unremarkable proposition that "clarity" is important for jury instructions. *See Ridgeway v. Walmart Inc*., 946 F.3d 1066, 1081 (9th Cir. 2020). Clarity is better served by sticking to the well-vetted ABA Model instructions that both parties have used for virtually all instructions in this case.

Medtronic substitutes the ABA Model's phrase "illegal conduct" with "alleged exclusionary bundled discounting" and "exclusive dealing." This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

269

### DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D26
### Injury and Causation—Overview

Injury in fact, causation, and antitrust injury are three distinct legal concepts and three separate elements that the jury must analyze. Medtronic proposes that they be explained in separate instructions to make them easier to understand. *Cf. Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1081 (9th Cir. 2020) (noting clarity as an important aim of jury instructions). Applied opposes this structure, but it does not explain why it believes Medtronic's proposal is inaccurate or unclear, or why it is preferable to mush three concepts together into a single, complex, multi-part instruction.

Medtronic's proposed structure does not modify the substance of the model instructions or heighten Applied's burden. It merely inserts headings into the model instruction, delineating for the jury the elements Applied must prove. These headings fit naturally into the model instruction, which has a bullet-point summary of the elements followed by clearly demarcated paragraphs describing each element.

Medtronic also specifies that the allegedly "illegal conduct" is "exclusionary bundled discounting and/or unlawful exclusive dealing." Medtronic's arguments related to this dispute are articulated in relation to Instruction D2 (Monopolization General—Elements).

270

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D27**

**Injury in Fact**

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Applied submits that Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D27**

**Medtronic's Proposal**

**Injury in Fact**

~~If you find that defendant has violated [*the applicable section of the Sherman, Clayton, or Robinson-Patman*] Act, then you must decide if plaintiff is entitled to recover damages from defendant.~~

~~Plaintiff is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:~~

~~1. plaintiff was in fact injured as a result of defendant's alleged violation of the antitrust laws;~~

~~2. defendant's alleged illegal conduct was a material cause of plaintiff's injury; and~~

~~3. plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.~~

The first element is sometimes referred to as "injury in fact" or "fact of damage." For ~~plaintiff~~Applied to establish that it is entitled to recover damages, it must prove that it was injured as a result of ~~defendant's~~Medtronic's alleged violation of the antitrust laws. Proving the fact of damage does not require ~~plaintiff~~Applied to prove the dollar value of its injury. It requires only that ~~plaintiff~~Applied prove that it was in fact injured by ~~defendant's~~Medtronic's alleged antitrust violation.~~ If you find that plaintiff has established that it was in fact injured, you may then consider the amount of plaintiff's damages.~~ It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that ~~plaintiff~~Applied has established that it was in fact injured.

~~Plaintiff must also offer evidence that establishes by a preponderance of the evidence that defendant's alleged illegal conduct was a material cause of~~

272

plaintiff's injury. This means that plaintiff must have proved that some damage occurred to it as a result of defendant's alleged antitrust violation, and not some other cause. Plaintiff is not required to prove that defendant's alleged antitrust violation was the sole cause of its injury; nor need plaintiff eliminate all other possible causes of injury. It is enough if plaintiff has proved that the alleged antitrust violation was a material cause of its injury.

Finally, plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff's injuries are antitrust injuries. On the other hand, if plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiff's injuries are not antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws.

[*Insert the following if plaintiff is a competitor of defendant.* You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if plaintiff can establish that it was in fact injured by defendant's conduct, that defendant's conduct was a material cause of plaintiff's injury, and that defendant's injury was the type that the antitrust laws were intended to prevent, then plaintiff is entitled to recover damages for the injury to its business or property.

1

2    Authority: ABA Model Jury Instructions 6.A.1; 6.A.1; *Brunswick Corp. v.*

3    *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D27

### Injury in Fact

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary.

Medtronic also erroneously makes changes to the discussion of injury in fact. Specifically, Medtronic deletes the sentence: "If you find that plaintiff has established that it was in fact injured, you may then consider the amount of plaintiff's damages." Medtronic should not be permitted to delete this instruction informing the jury that, if Applied was injured, the jury may then consider the amount of that injury. Medtronic argues this change is necessary because the Model suggests a finding of injury in fact is sufficient to award damages. Not so. The instruction merely states the order in which the jury should consider the issues: "If you find…., you may **then** consider…" Nowhere does the instruction state or suggest establishing injury "must" result in damages; it provides a condition precedent before the jury "**may** then **consider**" such damages. Medtronic's suggestion that the jury might award damages without finding harm to competition disregards the multiple instructions that expressly require such a finding. Moreover, the Model already provides extensive guidance on antitrust injury. Medtronic does not show the Model misstates the law, and its proposed revisions are unnecessary.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D27**
**Injury in Fact**

For the reasons stated in Medtronic's argument related to Instruction D26 (Injury and Causation—Overview), Medtronic proposes that injury in fact be explained in its own instruction, separate from the distinct elements of causation and antitrust injury.

Medtronic also proposes removing the sentence suggesting that a finding of injury in fact is sufficient to award damages. *See* Applied Proposed Instruction D26 (Injury and Causation) ("If you find that plaintiff has established that it was in fact injured, you may then consider the amount of plaintiff's damages."). This sentence misstates the law, because both causation and antitrust injury are prerequisites to a damages award. *See id.*; *Brunswick Corp.*, 429 U.S. at 489 (To recover under the antitrust laws, plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury."); *Rebel Oil*, 51 F.3d at 1433 ("[P]rivate plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent."). Applied's response—that its proposed instruction merely states that the jury "may" consider damages, not that it "must" award them—misses the point. In this Circuit, a jury *may not* award damages unless it first finds those required elements.

Applied reproaches Medtronic for "delet[ing] the instruction informing the jury that, if Applied was injured, the jury may then consider the amount of that injury." But the jury will understand that point regardless. There are several other instructions telling the jury to consider Applied's alleged injury and any resulting damages.

# PLAINTIFF'S PROPOSED INSTRUCTION NO. D28

## Causation

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Applied submits that Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary

**DEFENDANT'S PROPOSED INSTRUCTION NO. D28**

**Medtronic's Proposal**

**Causation**

1  ~~If you find that defendant has violated [*the applicable section of the*~~
2  ~~*Sherman, Clayton, or Robinson-Patman*] Act, then you must decide if plaintiff is~~
3  ~~entitled to recover damages from defendant.~~

4  ~~Plaintiff is entitled to recover damages for an injury to its business or~~
5  ~~property if it can establish three elements of injury and causation:~~

6  ~~1. plaintiff was in fact injured as a result of defendant's alleged violation~~
7  ~~of the antitrust laws;~~

8  ~~2. defendant's alleged illegal conduct was a material cause of plaintiff's~~
9  ~~injury; and~~

10  ~~3. plaintiff's injury is an injury of the type that the antitrust laws were~~
11  ~~intended to prevent.~~

12  ~~The first element is sometimes referred to as "injury in fact" or "fact of~~
13  ~~damage." For plaintiff to establish that it is entitled to recover damages, it must~~
14  ~~prove that it was injured as a result of defendant's alleged violation of the antitrust~~
15  ~~laws. Proving the fact of damage does not require plaintiff to prove the dollar~~
16  ~~value of its injury. It requires only that plaintiff prove that it was in fact injured~~
17  ~~by defendant's alleged antitrust violation. If you find that plaintiff has established~~
18  ~~that it was in fact injured, you may then consider the amount of plaintiff's~~
19  ~~damages. It is important to understand, however, that injury and amount of~~
20  ~~damage are different concepts and that you cannot consider the amount of~~
21  ~~damage unless and until you have concluded that plaintiff has established that it~~
22  ~~was in fact injured.~~

~~Plaintiff~~ Applied must also offer evidence that establishes by a preponderance of the evidence that ~~defendant's~~Medtronic's alleged ~~illegal conduct~~exclusionary bundled discounting and/or unlawful exclusive dealing was

278

a material cause of ~~plaintiff's~~Applied's injury. This means that ~~plaintiff~~Applied must have proved that some damage occurred to it as a result of ~~defendant's~~Medtronic's alleged antitrust violation, and not some other cause.

~~Plaintiff~~Applied is not required to prove that ~~defendant's~~Medtronic's alleged antitrust violation was the sole cause of its injury; nor need ~~plaintiff~~Applied eliminate all other possible causes of injury. It is enough if ~~plaintiff~~Applied has proved that the alleged antitrust violation was a material cause of its injury.

~~Finally, plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff's injuries are antitrust injuries. On the other hand, if plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiff's injuries are not antitrust injuries and plaintiff may not recover damages for those injuries under the antitrust laws.~~

~~[Insert the following if plaintiff is a competitor of defendant. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.~~

~~In summary, if plaintiff can establish that it was in fact injured by defendant's conduct, that defendant's conduct was a material cause of plaintiff's injury, and that defendant's injury was the type that the antitrust laws were~~

intended to prevent, then plaintiff is entitled to recover damages for the injury to its business or property.

Authority: ABA Model Jury Instructions 6.A.1.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D28

## Causation

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Applied submits that Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary.

Medtronic also substitutes the ABA Model's phrase "illegal conduct" with "exclusionary bundled discounting" and "unlawful exclusive dealing." This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D28
### Causation

For the reasons stated in Medtronic's argument related to Instruction D26 (Injury and Causation—Overview), Medtronic proposes that causation be explained in its own instruction, separate from the distinct requirements of injury in fact and antitrust injury. And for the reasons stated in Medtronic's argument related to Instruction D2 (Monopolization General—Elements), Medtronic proposes specifying that the alleged "illegal conduct" in this case is "alleged exclusionary bundled discounting and/or unlawful exclusive dealing."

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D29**

**Antitrust Injury**

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Applied submits that Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D29**

**Medtronic's Proposal**

**Antitrust Injury**

If you find that defendant has violated [*the applicable section of the Sherman, Clayton, or Robinson-Patman*] Act, then you must decide if plaintiff is entitled to recover damages from defendant.

Plaintiff is entitled to recover damages for an injury to its business or property if it can Finally, Applied must establish three elements that its injury is the type of injury and causation:

(1) plaintiff was in fact injured as a result of defendant's alleged violation of the antitrust laws;

(2) defendant's alleged illegal conduct was a material cause of plaintiff's injury; and

(3) plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element This is sometimes referred to as "injury in fact" or "fact of damage." For plaintiff to establish that it is entitled to recover damages, it must prove that it was injured as a result of defendant's alleged violation of the antitrust laws. Proving the fact of damage does not require plaintiff to prove the dollar value of its injury. It requires only that plaintiff prove that it was in fact injured by defendant's alleged antitrust violation. If you find that plaintiff has established that it was in fact injured, you may then consider the amount of plaintiff's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that plaintiff has established that it was in fact injured.

284

Plaintiff must also offer evidence that establishes by a preponderance of the evidence that defendant's alleged illegal conduct was a material cause of plaintiff's injury. This means that plaintiff must have proved that some damage occurred to it as a result of defendant's alleged antitrust violation, and not some other cause. Plaintiff is not required to prove that defendant's alleged antitrust violation was the sole cause of its injury; nor need plaintiff eliminate all other possible causes of injury. It is enough if plaintiff has proved that the alleged antitrust violation was a material cause of its injury.

Finally, plaintiff must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If plaintiff'santitrust injury." If Applied's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then plaintiff'sApplied's injuries are antitrust injuries. On the other hand, if plaintiff'sApplied's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then plaintiff'sApplied's injuries are not antitrust injuries and plaintiffApplied may not recover damages for those injuries under the antitrust laws.

[Insert the following if plaintiff is a competitor of defendant. You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against——such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers.

In summary, if plaintiffApplied can establish that it was in fact injured by defendant's conductMedtronic's alleged exclusionary bundled discounting and/or unlawful exclusive dealing, that defendant'sthis conduct was a material cause of

285

~~plaintiff's~~Applied's injury, and that ~~defendant's~~Applied's injury was the type that the antitrust laws were intended to prevent, then ~~plaintiff~~Applied is entitled to recover damages for the injury to its business or property.

Authority: ABA Model Jury Instructions 6.A.1.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D29

### Antitrust Injury

For the reasons described in its argument regarding Instruction D26 (Injury and Causation), Applied submits that Medtronic's separation of the Model's Injury and Causation into three separate instructions is unnecessary.

Medtronic further substitutes the Model's phrase "conduct" with "exclusionary bundled discounting" and "unlawful exclusive dealing." This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

As discussed above in Applied's arguments regarding Instruction D26, Applied includes guidance from the Court's Summary Judgment Order that "Applied does not need to prove that it or other firms were driven out of the market, lacked profitability or failed to grow. Injury can include restricted growth resulting from Medtronic's conduct. Thus, injury can include proof that, as a result of Medtronic's conduct, Applied's market share was below the level it would have achieved in a competitive market." *See* Order re Motion for Summary Judgment (Dkt. No. 255) at 17-19. Applied also includes that it is entitled to recover damages "even if Applied remained in the market, was profitable, and grew its market share." *See id*. Medtronic objects to these changes, but they are necessary based on Medtronic's arguments in this case and the Court's holdings rejecting those arguments. *See id*. Without clarifying the law for the jury, Medtronic will revive summary-judgment arguments the Court has already rejected.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D29
### Antitrust Injury

For the reasons stated in Medtronic's argument related to Instruction D26 (Injury and Causation—Overview), Medtronic proposes that antitrust injury be explained in its own instruction, separate from the distinct requirements of injury in fact and causation. And for the reasons stated in Medtronic's argument related to Instruction D2 (Monopolization General—Elements), Medtronic proposes specifying that the alleged "illegal conduct" in this case is "alleged exclusionary bundled discounting and/or unlawful exclusive dealing."

Medtronic objects to Applied's insertion into the model instruction a list of factors that Applied purportedly does *not* need to prove to demonstrate antitrust injury. This is a stark departure from the model's standard approach of specifying what a plaintiff *must prove*, not what it need not prove. It is also likely to confuse jurors, who could incorrectly assume that these factors are irrelevant to Applied's case. For example, exclusion from the alleged market is central to the jury's assessment of harm to competition. *See PeaceHealth*, 515 F.3d at 897 ("[T]he principal anticompetitive danger of the bundled discounts offered by [defendant] is that the discounts could freeze [plaintiff] out of the market[.]"). And harm to competition is required for antitrust injury. *Rebel Oil*, 51 F.3d at 1433 ("To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition.").

Applied also proposes to instruct the jury that injury can include proof of Applied's restricted growth or suppressed market share, and that Applied may recover damages "even if Applied remained in the market, was profitable, and grew its market share." This addition to the model—which closely follows the

discussion of antitrust injury in Applied's instruction—could give the jury the erroneous impression that (1) it need find only injury to Applied, not injury to competition writ large, and (2) Applied can recover damages merely because it would have enjoyed greater sales had Medtronic competed less vigorously. Applied's proposal flips antitrust injury on its head.

Applied's sole justification for these alterations to the model is "Medtronic's arguments in this case and the Court's holdings rejecting those arguments." But Applied overreaches in its interpretation of the Court's order and its suggestion that evidence insufficient to compel summary judgment is no longer relevant. In deciding whether Applied has proven harm to competition and antitrust injury, the jury may consider evidence that Applied is profitable and growing, and that Medtronic's conduct has not excluded Applied or any other equally efficient competitor from the market. The Court's order did not say otherwise. *See* Order re Mot. Summ. J. at 19, Dkt. No. 255 (holding that Medtronic's evidence was "not fatal" to Applied's ability to show antitrust injury, and that Applied had "raised a triable issue of fact . . . despite the facts that Medtronic's market share fell and Applied's market share grew in the relevant time period").

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D30

### Antitrust Damages—Introduction and Purpose

If you find that Medtronic violated the antitrust laws and that this violation caused injury to Applied, then you must determine the amount of damages, if any, Applied is entitled to recover. The fact that I am giving you instructions concerning the issue of Applied's damages does not mean that I believe Applied should, or should not, prevail in this case. If you reach a verdict for Medtronic on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Applied should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to Applied an amount for attorneys' fees or the costs of maintaining this lawsuit.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 6.B.1 (2016 ed.); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020);

*MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Cal. Computer Prods., Inc. v. IBM Corp.,* 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971).; Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

## DISPUTED INSTRUCTION NO. D30

### Antitrust Damages—Introduction and Purpose

If you find that ~~defendant~~Medtronic violated the antitrust laws and that this violation caused antitrust injury to ~~plaintiff~~Applied, then you must determine the amount of damages, if any, ~~plaintiff~~Applied is entitled to recover. The fact that I am giving you instructions concerning the issue of ~~plaintiff's~~Applied's damages does not mean that I believe ~~plaintiff~~Applied should, or should not, prevail in this case. If you reach a verdict for ~~defendant~~Medtronic on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that ~~plaintiff~~Applied should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the ~~conduct~~alleged exclusionary bundled discounting and/or exclusive dealing that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer——what we sometimes refer to as punitive damages——or to deter particular conduct in the future. Furthermore, you are not permitted to award to ~~plaintiff~~Applied an amount for ~~attorneys'~~attorneys' fees or the costs of maintaining this lawsuit.

Authority: ABA Model Jury Instructions 6.B.1.

292

# PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D30

## Antitrust Damages—Introduction and Purpose

Applied's proposal mirrors the ABA Model and merely adds party names. Medtronic substitutes the Model's phrase "conduct" with "exclusionary bundled discounting" and "exclusive dealing."   This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

Medtronic also substitutes the Model's phrase "injury" with "antitrust injury."  This unnecessarily lengthens the instruction and is duplicative in view of the Instruction D26 (Injury and Causation), which explains "Applied must establish that its injury is the type of injury that the antitrust laws were intended to prevent.  This is sometimes referred to as "antitrust injury."

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D30
### Antitrust Damages—Introduction and Purpose

Medtronic makes two changes to the model instruction for clarity.

*First*, Medtronic explains that the "conduct" at issue is "alleged exclusionary bundled discounting and/or exclusive dealing." Medtronic's arguments related to this dispute are articulated in relation to Instruction D2 (Monopolization General—Elements).

*Second*, to conform with applicable law, Medtronic explains that the jury may award damages only if it finds "*antitrust* injury to Applied," not merely "injury to Applied." Without this clarification, the instruction implies that injury in fact is sufficient for Applied to recover damages, which the parties agree is incorrect as a matter of law. Applied Proposed Instruction D26 (Injury and Causation) ("Applied is entitled to recover damages" if "[its] injury is an injury of the type the antitrust laws were intended to prevent"). Applied says that adding *one word* "unnecessarily lengthens the instruction" and argues that specifying "antitrust" injury is "duplicative" because Instruction D26 (Injury and Causation) said that Applied must prove "antitrust injury." Applied Position Statement Regarding Instruction D30 (Antitrust Damages—Introduction and Purpose). But as the immediately preceding instruction states that Applied must prove "antitrust injury," the defined term should be used here too to avoid confusion.

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D31

### Causation and Disaggregation of Damages

If you find that ~~defendant~~Medtronic violated the antitrust laws and that ~~plaintiff~~Applied was injured by that violation, ~~plaintiff~~Applied is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of ~~defendant. Plaintiff~~Medtronic.  Applied bears the burden of showing that its injuries were caused by ~~defendant's~~Medtronic's antitrust violation, as opposed to any other factors. If you find that ~~plaintiff's~~Applied's alleged injuries were caused in part by ~~defendant's~~Medtronic'['s alleged antitrust violation and in part by other factors, then you may award damages only for that portion of ~~plaintiff's~~Applied'['s alleged injuries that was caused by ~~defendant's~~Medtronic'['s alleged antitrust violation.

~~[*Where plaintiff is a purchaser claiming injury from an alleged overcharge:*] Plaintiff claims that it suffered injury because it paid higher prices for [*product X*] than it would have paid if the [*alleged antitrust violation*] had not occurred. Defendant claims that these higher prices occurred as a result of other factors that have nothing to do with the alleged antitrust violation. These include [*list, as appropriate, defendant's examples of ways prices could increase in the normal course of business activity*]. Plaintiff is not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean plaintiff did not suffer antitrust injury, but plaintiff is not entitled to recover for damages caused by them. Plaintiff only may recover for damages caused by the alleged antitrust violation.~~

~~[*Where plaintiff is a competitor:*]~~ ~~Plaintiff~~Applied claims that it suffered injury because it lost sales and profits as a result of Medtronic's alleged anticompetitive conduct~~defendant's [*alleged antitrust violation*]~~. ~~Defendant~~  Medtronic claims that any profits or sales lost by ~~plaintiff~~Applied occurred as a result of other

factors that have nothing to do with the alleged antitrust violation. ~~These include [list, as appropriate, defendant's examples of ways plaintiff could lose sales in the normal course of competitive business activity]. Plaintiff~~ Applied is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean ~~plaintiff~~Applied did not suffer antitrust injury, but ~~plaintiff~~Applied is not entitled to recovery for damages caused by them. ~~Plaintiff~~Applied only may recover for damages caused by the alleged antitrust violation.

~~Plaintiff~~Applied bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that ~~plaintiff~~Applied was injured by ~~defendant's~~Medtronic's alleged antitrust violation, and there is a reasonable basis to apportion ~~plaintiff's~~Applied's alleged injury between lawful and unlawful causes, then you may award damages.

If you find that ~~plaintiff's~~Applied's alleged injuries were caused by factors other than ~~defendant's~~Medtronic's alleged antitrust violation, then you must return a verdict for ~~defendant~~Medtronic. If you find that there is no reasonable basis to apportion ~~plaintiff's~~Applied's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 6.B.4 (2016 ed.); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–448 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020);

*MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971).Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D31**

**Disaggregation of Damages**

If you find that ~~defendant~~Medtronic violated the antitrust laws and that ~~plaintiff~~Applied was injured by that violation, ~~plaintiff~~Applied is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of ~~defendant. Plaintiff~~Medtronic. Applied bears the burden of showing that its injuries were caused by ~~defendant's~~Medtronic's antitrust violation, as opposed to any other factors. If you find that ~~plaintiff's~~Applied's alleged injuries were caused in part by ~~defendant's~~Medtronic's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of ~~plaintiff's~~Applied's alleged injuries that was caused by ~~defendant's~~Medtronic's alleged antitrust violation.

~~[*Where plaintiff is a purchaser claiming injury from an alleged overcharge:*] Plaintiff claims that it suffered injury because it paid higher prices for [*product X*] than it would have paid if the [*alleged antitrust violation*] had not occurred. Defendant claims that these higher prices occurred as a result of other factors that have nothing to do with the alleged antitrust violation. These include [*list, as appropriate, defendant's examples of ways prices could increase in the normal course of business activity*]. Plaintiff is not entitled to recover for changes in price that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean plaintiff did not suffer antitrust injury, but plaintiff is not entitled to recover for damages caused by them. Plaintiff only may recover for damages caused by the alleged antitrust violation.~~

~~[*Where plaintiff is a competitor:*] Plaintiff~~Applied claims that it suffered injury because it lost sales and profits as a result of ~~defendant's [*alleged antitrust violation*]. Defendant~~Medtronic's alleged exclusionary bundled discounting and/or unlawful exclusive dealing. Medtronic claims that any profits or sales lost

by ~~plaintiff~~Applied occurred as a result of other factors that have nothing to do with the alleged antitrust violation. ~~These include [*list,*~~ such as ~~*appropriate, defendant's examples of ways plaintiff could lose sales in*~~alleged failures by Applied to effectively market and sell its advanced bipolar device or lower the ~~*normal course of competitive business activity*~~]. ~~Plaintiff~~price of Voyant, or evidence, if any, suggesting surgeon preference for LigaSure. Applied is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean ~~plaintiff~~Applied did not suffer antitrust injury, but ~~plaintiff~~Applied is not entitled to recovery for damages caused by them. ~~Plaintiff~~Applied only may recover for damages caused by the alleged antitrust violation.

~~Plaintiff~~Applied bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that ~~plaintiff~~Applied was injured by ~~defendant's~~Medtronic's alleged antitrust violation, and there is a reasonable basis to apportion ~~plaintiff's~~Applied's alleged injury between lawful and unlawful causes, then you may award damages.

If you find that ~~plaintiff's~~Applied's alleged injuries were caused by factors other than ~~defendant's~~Medtronic's alleged antitrust violation, then you must return a verdict for ~~defendant~~Medtronic. If you find that there is no reasonable basis to apportion ~~plaintiff's~~Applied's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.

Authority: ABA Model Jury Instructions 6.B.4; Jury Instructions at 46, *Tevra Brands LLC*, No. 5:19-cv-04312-BLF (Aug. 1, 2024), Dkt. No. 482.

# PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D31

## Causation and Disaggregation of Damages

Applied's proposal mirrors the ABA Model.  It merely adds party names and includes specific allegations for this case as instructed by the Model.

Medtronic uses the Model's invitation to list additional "factors" to include unnecessary and prejudicial arguments that the jury may believe are established.  Indeed, while Medtronic uses "alleged" before the first item in its list, it does not include that for other items, such as "surgeon preference for LigaSure."  Instead, Medtronic's proposal suggests that the mere existence of some evidence "suggesting surgeon preference for LigaSure" requires disaggregation of damages.

Medtronic's list also makes no sense and will cause jury confusion.  For example, Medtronic includes on its list "evidence, if any, suggesting surgeon preference for LigaSure."  Medtronic fails to explain how a jury could disaggregate damages based on the existence of some evidence of surgeon preference.  Applied respectfully submits that such disputed and argumentative phrases should not be included in the jury instructions.  Medtronic claims that Applied "disputes the model."  Not so.  Applied accepts the Model but opposes Medtronic's proposed additions, which improperly steer the jury toward findings in Medtronic's favor.

Medtronic further substitutes the Model's phrase "anticompetitive conduct" with "exclusionary bundled discounting" and "unlawful exclusive dealing."  This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

300

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D31**
**Disaggregation of Damages**

Although Medtronic and Applied largely agree on this instruction, Applied disputes two common-sense aspects of Medtronic's proposal: a list of examples called for by the model and its specification of the challenged conduct. Medtronic address each in turn.

*First*, as instructed by the ABA model, Medtronic adds examples of ways Applied could lose sales in the normal course of business for reasons other than the challenged conduct, such as "surgeon preference for LigaSure." *See* ABA Model Jury Instrs. 6.B.4 ("[L]ist, as appropriate, defendant's examples of ways plaintiff could lose sales in the normal course of competitive business activity."). Applied disputes the model, asserting that "the jury may believe [that such factors] are established," even though Medtronic includes the phrases "alleged" and "if any" to make clear they are not. Applied further argues that "[i]t would be impossible for a jury to disaggregate damages based on the existence of some evidence of surgeon preference." But Applied bears the burden of providing evidence to the jury that allows it to discern whether damages have been properly disaggregated. *See* Applied Proposed Instruction D31 (Causation and Disaggregation of Damages) ("Applied bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.").

*Second*, for clarity, Medtronic's instruction specifies that the "alleged anticompetitive conduct" is "exclusionary bundled discounting and/or unlawful exclusive dealing." Medtronic's arguments related to this dispute are articulated in relation to Instruction D2 (Monopolization General—Elements).

## PLAINTIFF'S PROPOSED INSTRUCTION NO. D32

### Mitigation

~~Plaintiff~~Applied may not recover damages for any portion of its injuries that it could have avoided through ~~the exercise of~~ reasonable care and prudence. ~~Plaintiff~~ Applied is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If ~~plaintiff~~Applied failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to ~~plaintiff~~Applied than it would have suffered had it taken those steps, then ~~plaintiff~~Applied may not recover any damages for that part of the injury it could have avoided.

~~Defendant~~Medtronic has the burden of proof on this issue. ~~Defendant~~Medtronic must prove by a preponderance of the evidence that ~~plaintiff~~:

1. Applied acted unreasonably in failing to take specific steps to minimize or limit its losses;

2. ~~that~~ the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

3. the amount by which ~~plaintiff's~~Applied's loss would have been reduced had ~~plaintiff~~it taken those steps.

In determining whether ~~plaintiff~~Applied failed to take reasonable measures to limit its damages, you must remember that the law does not require ~~plaintiff~~Applied to take every conceivable step that might reduce its damages. The evidence must show that ~~plaintiff~~Applied failed to take commercially reasonable measures that were open to it. Commercially reasonable measures mean those measures that a prudent businessperson in ~~plaintiff's~~Applied's

position would likely have adopted, given the circumstances as they appeared at that time. ~~Plaintiff~~ Applied should be given wide latitude in deciding how to handle the situation, so long as what ~~plaintiff~~Applied did was not unreasonable in light of the existing circumstances.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 6.B.14 (2016 ed.); Ninth Cir. Civ. Jury 5.3; *Ramona Equip. Rental, Inc. ex rel. U.S. v. Carolina Cas. Ins. Co.,* 755 F.3d 1063, 1070 (9th Cir. 2014); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1207 (7th Cir. 1983); *Borger v. Yamaha Intern. Corp.*, 625 F.2d 390, 399 (2d Cir. 1980); *Degla Grp. for Invs., Inc. v. BoConcept USA, Inc.*, 2014 WL 3893367, at *19 (C.D. Cal. Aug. 8, 2014); Final Jury Instructions, *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 8:14-cv-01664-JVS-DFM, Dkt. No. 208 (C.D. Cal. Mar. 29, 2016); *William Goldman Theatres v. Loew's, Inc*., 69 F. Supp. 103, 104–05 (E.D. Pa. 1946).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D32**

**Mitigation**

~~Plaintiff~~Applied may not recover damages for any portion of its injuries that it could have avoided through ~~the exercise of~~ reasonable ~~care and prudence.~~ ~~Plaintiff~~attempts to compete. Applied is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If ~~plaintiff~~Applied failed to take reasonable steps available to it~~, such as improving Voyant's quality, improving its sales and marketing strategies, agreeing to do business with certain customers, or lowering the price of Voyant,~~ and the failure to take those steps resulted in greater harm to ~~plaintiff~~Applied than it would have suffered had it taken those steps, then ~~plaintiff~~Applied may not recover any damages for that part of the injury it could have avoided. Medtronic contents that Applied could have reduced its loss by, for example, improving Voyant's quality, improving its sales and marketing strategies, agreeing to do business with certain customers, or lowering the price of Voyant,

~~Defendant~~Medtronic has the burden of proof on this issue. ~~Defendant~~Medtronic must prove by a preponderance of the evidence ~~that plaintiff~~:

4. Applied acted unreasonably in failing to take specific steps to minimize or limit its losses;

5. ~~that~~ the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

6. the amount by which ~~plaintiff's~~Applied's loss would have been reduced had ~~plaintiff~~it taken those steps.

In determining whether ~~plaintiff~~Applied failed to take reasonable measures to limit its damages, you must remember that the law does not require

304

1   ~~plaintiff~~Applied to take every conceivable step that might reduce its damages.

2   The evidence must show that ~~plaintiff~~Applied failed to take commercially

3   reasonable measures that were ~~open~~available to it. Commercially reasonable

4   measures mean those measures that a prudent businessperson in

5   ~~plaintiff's~~Applied's position would likely have ~~adopted~~taken, given the

6   circumstances as they appeared at that time.  ~~Plaintiff should be given wide~~

7   ~~latitude in deciding how to handle the situation, so long as what plaintiff did was~~

8   ~~not unreasonable in light of the existing circumstances.~~

9

10

11  Authority: ABA Model Jury Instructions 6.B.14.

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D32

### Mitigation

Applied's proposal closely tracks the ABA Model and merely adds party names.  Medtronic substantially departs from the Model in several ways.

**First**, Medtronic changes the Model's language requiring "reasonable care and prudence" to "reasonable attempts to compete."   Medtronic offers no authority for this change, which distorts the standard and fails to consider that "reasonable care and prudence" might mean ***not*** seeking to compete in certain circumstances, such as where a hospital has an extensive history of being locked up in Medtronic's bundles, past efforts have been futile, and an efficient allocation of resources would focus on other hospitals.

**Second**, Medtronic adds to the Model a summary of some of its allegations regarding mitigation.  The Model does not call for a party to add its contentions. Medtronic is free to present those contentions to the jury, but fails to explain why its one-sided contentions should be added to the instructions.  Indeed, Medtronic includes the phrase "for example," indicating that Medtronic's list is not even a definitive list of those allegations.  The Court should reject Medtronic's addition to the Model, which is unnecessary and prejudicial.

Medtronic's only support for its list is that the Northern District of Illinois once gave a similar instruction in a single case more than forty years ago.  *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1207 (7th Cir. 1983) (appendix quoting instructions from district court).   Such a citation hardly justifies changing the well-established Model.  Moreover, the instruction in that case was phrased in a far more neutral manner.  *Id.* (phrasing instruction as the parties' respective contentions rather than an edict from the court).  And the Seventh Circuit did not even mention mitigation, much less approve of that

instruction.  *Id.*

     **Third**, Medtronic's proposal deletes the important final sentence in the Model that "Applied should be given wide latitude in deciding how to handle the situation, so long as what Applied did was not unreasonable in light of the existing circumstances."  This sentence provides critical context and guidance.  Its deletion unfairly tilts the instruction in Medtronic's favor.  Medtronic claims the sentence "suggests that Applied has discretion whether to attempt mitigation…"  The Model sentence suggests no such thing.  It reflects the well-established principle that plaintiffs subjected to wrongful conduct should be given wide latitude in how to respond.  Medtronic has already signaled it will attempt to put Applied on trial, underscoring the importance of this Model instruction.

     None of Medtronic's cases contradict the Model's guidance that the plaintiff should be given wide latitude in deciding how to handle situations.  Medtronic argues that sentence should not be included because it was not included in a **different** set of model instructions that neither party used.  But the parties agreed to use the ABA Model, which **does** include this sentence and which is the Model commonly used in antitrust cases.  And courts in this District have included the same language in antitrust jury instructions.  *See, e.g.*, Final Jury Instructions, *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 8:14-cv-01664-JVS-DFM, Dkt. No. 208 (C.D. Cal. Mar. 29, 2016).  The language is well-supported by case law. *See, e.g.*, *Degla Grp. for Invs., Inc. v. BoConcept USA, Inc.*, 2014 WL 3893367, at *19 (C.D. Cal. Aug. 8, 2014) ("The duty to mitigate damages is not an unlimited one and an injured party is required only to exert reasonable efforts to prevent or minimize his damages within the bounds of common sense."); *Ramona Equip. Rental, Inc. ex rel. U.S. v. Carolina Cas. Ins. Co.*, 755 F.3d 1063, 1070 (9th Cir. 2014) (Plaintiff may have "commercially reasonable justifications for choosing not to mitigate its damages" in some circumstances).

None of Medtronic's cited cases hold or suggest that the language from the parties' agreed-upon Model is improper.  In fact, many of Medtronic's cited cases (*Tampa Elec.*, *Affiliated FM Ins.*, *In re Syngenta*) use the same language.  Medtronic argues an antitrust plaintiff must exercise "best efforts" to mitigate damages while every other type of plaintiff must only exercise "reasonable" efforts to mitigate damages.  But Medtronic cites nothing to support that assertion.  To the contrary, the model jury instructions that Medtronic cites apply the "reasonable" standard and do not differentiate based on the plaintiff's cause of action.  Ninth Cir. Manual of Model Civil Jury Instructions 5.3.  Likewise, Medtronic's lead case recognized that the same standards apply for tort and antitrust claims.  *See, e.g.*, *Fishman v. Estate of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (recognizing "the tort rules regarding mitigation of damages can have their place in the law of antitrust").  That case also applied the "reasonableness" standard.  *Id.* (courts should "determin[e] whether the plaintiff's mitigation efforts were reasonable").  Two of Medtronic's other cases also required the defendant show unreasonableness or an even more difficult standard for the defendant (unreasonableness that "aggravated the harm").  *See Borger v. Yamaha Intern. Corp.*, 625 F.2d 390, 399 (2d Cir. 1980); *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 (5th Cir. 1981).

Medtronic cites two additional cases, but neither supports its position.  One case did not mention anything about the standard for mitigation, much less suggest antitrust cases have a different standard beyond "reasonableness."  *Golf City, Inc. v. Wilson Sporting Goods, Co., Inc.*, 555 F.2d 426, 436 (5th Cir. 1977).  Medtronic also cites a ***dissent*** that explained that mitigation is important in antitrust cases, but does not assert the existence of a higher legal standard than in typical tort cases.  *In re Visa Check/Mastermoney Antitrust Litigation*, 280 F.3d 124, 149–50 (2nd Cir. 2001) (Jacobs, J., dissenting).  To the contrary, the dissent cites a secondary source that explained the standard for mitigation of damages is

"reasonableness" and that it is the same for tort and antitrust cases. *See* Neil W. Hamilton, Mitigation of Antitrust Damages, 66 Or. L. Rev. 339, 360 (1987) ("In contract and tort law cases, the plaintiff need only do what is reasonable. The plaintiff need not incur any unusual, unwarranted, or disproportionate expenses to avoid damage. This same standard applies in the antitrust context.").

Medtronic's attempt to impose a "meaningful steps" standard is also unsupported by caselaw. *See Borger v. Yamaha Intern. Corp.*, 625 F.2d 390, 399 (2d Cir. 1980) (Under duty to mitigate, "it would have been remiss if [plaintiff] had not taken reasonable steps to merchandise substitute lines."); *William Goldman Theatres v. Loew's, Inc.*, 69 F. Supp. 103, 104–05 (E.D. Pa. 1946), *aff'd,* 164 F.2d 1021 (3d Cir. 1948) ("The duty to lessen damages which the law imposes on an injured party does not go beyond the exercising of ordinary care and incurring moderate expense.").

Accordingly, Medtronic has no support for striking the last sentence of the Model instruction. That sentence is well-supported by caselaw and provides important context about the requirements to mitigate damages. It is especially important in this case now that Medtronic has shown that it intends to argue that Applied failed to mitigate damages based on erroneous legal standards.

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D32
### Mitigation

Medtronic tailors this instruction to the facts of this case, making it easier for jurors to understand and properly apply. The parties' proposed mitigation instructions differ in the following ways:

*First*, Medtronic uses the phrase "reasonable attempts to compete" rather than "reasonable care and prudence." The default language of tort law is ill-suited to this case, and "reasonable attempts to compete" better describes what mitigation would entail under the circumstances of this lawsuit. Medtronic has maintained the "reasonable" qualifier to ensure that this change does not impose an unfair standard on Applied.

*Second*, the model instruction states that Applied must take "all reasonable steps" to reduce its losses and "may not recover any damages" for "injury it could have avoided." To make the concept of mitigation concrete for the jury, Medtronic's instruction lists examples of how Applied might have mitigated damages. Other courts have taken a similar approach and referenced specific actions that a plaintiff might have taken to mitigate losses. *See, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1207 (7th Cir. 1983) (instruction in a monopolization case listing specific actions that defendant claimed plaintiff could reasonably and responsibly have taken in mitigation). Merely listing these actions does not suggest that Applied has failed to take them. The sentence begins with the conditional "*If* Applied failed," making it clear that it is for the jury to decide whether Medtronic has met its burden of proof under this instruction.

*Third*, Medtronic deletes the sentence: "Plaintiff should be given wide latitude in deciding how to handle the situation, so long as what plaintiff did was not unreasonable in light of the existing circumstances." This sentence suggests

that Applied has discretion whether to attempt mitigation, which contradicts other statements in the model instruction. *See* ABA Model Instrs. 6.B.14 ("The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss."). Nothing like this sentence appears in the Ninth Circuit's model jury instruction for mitigation, *see* Ninth Circuit Manual of Model Civil Jury Instructions 5.3, and it has no support in antitrust case law.

The term "wide latitude" used with respect to the duty to mitigate appears to originate from a nearly century-old treatise on damages. *See, e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 214 F. Supp. 647, 652 (M.D. Tenn. 1963) ("As stated in McCormick, Damages, Sec. 35 (1935), 'a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him.'"). While the language appears in several common law contract and tort cases, it does not appear in antitrust cases that elaborate on the duty to mitigate damages. *See, e.g.*, *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 15 F. Supp. 3d 1116, 1129 (W.D. Wash. 2014) (stating, in a tort case, that "[a] person who has been injured by another's wrongdoing is given wide latitude and is only required to act reasonably in mitigating his or her damages." (citing *Hogland v. Klein*, 298 P.2d 1099, 1102 (Wash. 1956) (in turn citing McCormick on Damages 133 § 35))); *In re Syngenta AG MIR 162 Corn Litig. v. Syngenta AG*, 2023 WL 2266218, at *5 (D. Kan. 2023) (*quoting Kuhlman, Inc. v. G. Heileman Brewing Co.*, 266 N.W.2d 382, 384 (Wis. 1978) (in turn quoting McCormick)). Neither of Applied's authorities suggest otherwise. *See Degla Grp. for Invs., Inc. v. BoConcept USA, Inc.*, 2014 WL 3893367, at *19 (C.D. Cal. 2014) (contract case involving allegedly unlawful termination of a franchise agreement); *Ramona Equip. Rental, Inc. ex rel. U.S. v. Carolina Cas. Ins. Co.*, 755 F.3d 1063, 1070 (9th Cir. 2014) (contract case involving unpaid invoices on a federal construction project). Applied cites *one*

instance of a court in this district using Applied's preferred language. *See* Final Jury Instructions, *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 8:14-cv-01664-JVS-DFM (C.D. Cal. Mar. 29, 2016), Dkt. No. 208. But there, the defendant did not contest the language. *See* Joint Proposed Jury Instructions, *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, No. 8:14-cv-01664-JVS-DFM (C.D. Cal. Mar. 29, 2016), Dkt. No. 171.

Applied does not dispute that it must take all reasonable steps to mitigate damages. *See* Applied Proposed Instruction D32 (Mitigation). Nor does it dispute that the steps identified in Medtronic's instructions are reasonable. *See* Applied Position Statement Regarding Instruction D32 (Mitigation); *see also, e.g.*, *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 399 (2d Cir. 1980) ("Under [plaintiff's] duty to mitigate damages, it would have been remiss if it had not taken reasonable steps to merchandise substitute lines."); *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 (5th Cir. 1981) (a refusal-to-deal plaintiff "must attempt to locate suitable substitutes for the denied goods"); *Fishman v. Est. of Wirtz*, 807 F.2d 520, 558 (7th Cir. 1986) (requiring an antitrust plaintiff to "use his *best efforts* to minimize the damages caused by a defendant's wrongful conduct." (emphasis added)). Rather, Applied's argument for its preferred "wide latitude" language boils down to the claim that, because those words are in the model, they must be given to the jury. But that is no reason to give the jury a false impression of the law: Applied does not have "wide latitude" to forego commercially reasonable steps in mitigation. *Cf. In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 149–50 (2d Cir. 2001) (Jacobs, J., dissenting) ("Enforcement of the mitigation duty may be even more critical in antitrust cases than in cases sounding in contract or tort because an antitrust plaintiff seeking treble damages can profit by avoiding mitigation of loss.").

As demonstrated by the model instruction's reference to measures "a prudent businessperson in plaintiff's position would likely have adopted," the

touchstone of mitigation is objective reasonableness, not a plaintiff's subjective view. The reasonableness requirement imposes on a plaintiff a duty to take steps to mitigate. Here, the jury could properly conclude that Applied's failure to take steps to mitigate its losses was unreasonable, even if those steps were not Applied's preferred course of action.

### PLAINTIFF'S PROPOSED INSTRUCTION NO. D33
### Damages for Competitors—Lost Profits

[*Market Share Measure*] ~~Plaintiff~~Applied claims that it was harmed because it lost profits as a result of Medtronic's alleged antitrust violation. If you find that Medtronic committed an antitrust violation and that this violation caused injury to Applied, you now must calculate the profits, if any, that Applied lost as a result of Medtronic's antitrust violation. To calculate lost profits, you must calculate~~:~~ the amount by which Applied's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.

Applied has proposed to calculate the ~~net~~ profits it would have earned if there had been no antitrust violation by showing evidence of the market share it would have had in the absence of the antitrust violation. ~~If you find that plaintiff~~Applied provided two alternative benchmarks that it asserts reflect what Applied's market share would have been in the absence of the antitrust violation: a European benchmark and a trocars benchmark.  If you find that Applied has shown reliable evidence of what its market share would have been in the absence of the antitrust violation, then you may calculate ~~plaintiff's~~Applied's lost profits by considering market share, evidence of the size of the market, and evidence relating to the profit margin ~~plaintiff~~Applied would have secured on such sales. You may find, however, that ~~plaintiff~~Applied has not shown reasonable evidence of what its market share would have been in the absence of the alleged antitrust violation, such as if ~~plaintiff's~~Applied's market share were impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors ~~[*expand or contract as applicable*]~~.  You may also find that ~~plaintiff~~Applied has not shown reasonable evidence of the profit margin it would have incurred in the absence of the alleged antitrust violation.  If you find that the evidence of ~~plaintiff's~~Applied's market share and/or profit margins

314

is not reasonable, and that lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on market share or profit margins.

Authority: ABA Model Jury Instructions in Civil Antitrust Cases, at Chapter 6.B.8 (2016 ed.); ABA Model Jury Instructions in Civil Antitrust Cases, at F-29 – F-30  (2005 ed.).

**DEFENDANT'S PROPOSED INSTRUCTION NO. D33**

**Damages for Competitors— Lost Profits**

[*Market Share Measure*]    Plaintiff Applied claims that it was harmed because it lost profits as a result of Medtronic's alleged antitrust violation. If you find that Medtronic committed an antitrust violation and that this violation caused injury to Applied, you now must calculate the profits, if any, that Applied lost as a result of Medtronic's antitrust violation. To calculate lost profits, you must calculate the amount by which Applied's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. When you make this determination, you must take into account the disaggregation of damages and mitigation instructions that you previously received.

Applied has proposed to calculate the net profits it would have earned if there had been no antitrust violation by showing evidence of the market share share of advanced bipolar device sales in the United States it would have had in the absence of the antitrust violation. If you find that plaintiff Applied provided two alternative benchmarks that it asserts reflect what Applied's market share would have been in the absence of the antitrust violation: a European benchmark and a trocars benchmark. If you find that Applied has shown reliable evidence of what its market share would have been in the absence of the antitrust violation, then you may calculate plaintiff's Applied's lost profits by considering market share, evidence of the size of the market, and evidence relating to the profit margin plaintiff Applied would have secured on such sales. You may find, however, that plaintiff Applied has not shown reasonable evidence of what its market share would have been in the absence of the alleged antitrust violation, such as if plaintiff's Applied's market share were was impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors [*expand or contract as applicable*]..  You may also

316

find that ~~plaintiff~~Applied has not shown reasonable evidence of the profit margin it would have incurred in the absence of the alleged antitrust violation. If you find that the evidence of ~~plaintiff's~~Applied's market share and/or profit margins is not reasonable, and that lost profits may only be calculated using speculation or guesswork, you may not award damages for lost profits based on market share or profit margins.

Authority: ABA Model Jury Instructions 6.B.8; ABA Model Jury Instructions in Civ. Antitrust Cases, at F-29 – F-30 (2005 ed.).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D33**

**Damages for Competitors—Lost Profits**

Applied's proposal closely tracks the ABA Model by largely adding party names.  It also includes a specific instruction from a previous ABA Model that provides guidance on calculating damages based on market share.  The parties agree on this overall approach, but have two disagreements.

First, Medtronic adds the following sentence: "When you make this determination, you must take into account the disaggregation of damages and mitigation instructions that you previously received."  Such an instruction is duplicative and unnecessary because there are separate instructions that address each of those topics.  Medtronic's addition also elevates instructions that it prefers while ignoring other relevant instructions, including that Medtronic must establish its defenses by a preponderance of the evidence.  Contrary to Medtronic's argument, Applied is not asserting that Medtronic is attempting to change the burden of proof.  Applied simply explains that Medtronic is picking and choosing parts of prior instructions that it favors (mitigation) while ignoring instructions it disfavors (e.g., burdens of proof).  Medtronic states that "Applied has not explained why this clarification is inaccurate, confusing, or misleading."  But Applied follows the Model.  Medtronic fails to show any error in the Model.

Second, Medtronic again injects "advanced bipolar device" into the instruction, limiting Applied's allegations to the "advanced bipolar market."  The Court should reject Medtronic's position for the reasons explained in Applied's Argument regarding Instruction D2 ("Monopolization General – Elements").  Medtronic even adds an element requiring that Applied establish "the alleged advanced bipolar device market is a valid antitrust market."  The Model contains no such element, nor is it necessary given the other elements requiring Applied

1    to establish a relevant market.

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D33**
**Damages for Competitors—Lost Profits**

Medtronic tailors the model instruction to the facts of the case and clarifies its relationship to other relevant instructions. Applied disputes two aspects of Medtronic's instruction.

*First*, Applied opposes clarifying that when the jury calculates Applied's lost profits, it must also consider the disaggregation of damages and mitigation instructions it previously received. *Cf. Ridgeway*, 946 F.3d at 1081 (noting clarity and completeness as important aims of jury instructions). Without this clarification, jurors may focus on this instruction without considering how it interacts with other instructions relevant to their calculation. Applied has not explained why this clarification is inaccurate, confusing, or misleading. Applied argues that Medtronic should also refer to its burden of proof, but the burden of proof is clearly explained in each of the respective instructions.

*Second*, Applied objects to specifying the alleged market to which Applied's "market share" calculations refer. This clarification is consistent with, and aids the jury's understanding of, Applied's damages model. *See* Orszag Reply Rep. at 178, Dkt. No. 183-9 ("[T]he premise of my benchmarks is that Voyant would have achieved the same market share in advanced bipolar devices in the U.S. as it did in trocars, or as it did for Voyant in Europe, absent Medtronic's conduct."). As articulated in Medtronic's arguments related to Instruction D4 (Relevant Market—General), it is also consistent with Applied's allegations regarding the relevant product market.

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D34**

**Unlawful Interference with Prospective Economic Advantage**

[~~Name of plaintiff~~]Applied claims that [~~name of defendant~~]Medtronic intentionally interfered with an economic relationship between [~~him/her/nonbinary pronoun~~/it] and [~~name of~~]third-party hospitals that probably would have resulted in an economic benefit to [~~name of plaintiff~~].Applied.  To establish this claim, [~~name of plaintiff~~]Applied must prove all of the following:

1.    That [~~name of plaintiff~~]Applied and [~~name of third party~~]the hospital were in an economic relationship that probably would have resulted in an economic benefit to [~~name of plaintiff~~];Applied;

2.    That [~~name of defendant~~]Medtronic knew of the relationship;

3.    That [~~name of defendant~~]Medtronic engaged in [~~specify~~anticompetitive conduct ~~determined by the court to be wrongful~~];or unfair competition;

4.    That by engaging in this conduct, [~~name of defendant~~] [Medtronic intended to disrupt the relationship/[~~or~~] knew that disruption of the relationship was certain or substantially certain to occur];;

5.    That the relationship was disrupted;

6.    That [~~name of plaintiff~~]Applied was harmed; and

7.    That [~~name of defendant~~]'sMedtronic's conduct was a substantial factor in causing [~~name of plaintiff~~]'sApplied's harm.


Authority: CACI No. 2202; *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *CoStar Grp., Inc. v. Com. Real Est. Exch.*, *Inc.*, 150 F.4th 1056, 1073 (9th Cir.

2025); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *MetroNet Servs. Corp. v. Qwest Corp.,* 383 F.3d 1124, 1130 (9th Cir. 2004); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971); *Masimo Corp. v. Tyco Health Care Grp.*, L.P., 350 F. App'x 95, 97 (9th Cir. 2009); *Pro Search Plus, LLC v. VFM Leonardo, Inc*., 2013 WL 6229141 at *5 (C.D. Cal. Dec. 2, 2013); Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D34**

**Unlawful Interference with Prospective Economic Advantage—Elements**

[~~Name of plaintiff~~]Applied claims that [~~name of defendant~~]Medtronic intentionally interfered with an economic relationship between [~~him/her/nonbinary pronoun/it~~] and [~~name of third party~~]certain hospitals that probably would have resulted in an economic benefit to [~~name of plaintiff~~].Applied.  To establish this claim, [~~name of plaintiff~~]Applied must prove all of the following for each hospital:

1. ~~That [name of plaintiff]~~Applied and [~~name of third party~~]the hospital were in an economic relationship that probably would have resulted in an economic benefit to [~~name of plaintiff~~];Applied;

2. ~~That [name of defendant]~~Medtronic knew of the relationship;

3. Medtronic ~~engaged in~~ sold advanced bipolar devices as part of below-cost bundled discounts that it had the exclusive capacity to create and/or entered into exclusive dealing agreements that prevented hospitals from buying any advanced bipolar devices from competing suppliers;  ~~That [name of defendant] [specify conduct determined by the court to be wrongful]~~

~~3.~~4.~~That~~ by engaging in this conduct, [~~name of defendant~~] [Medtronic intended to disrupt the relationship ~~/ [or]~~ knew that disruption of the relationship was certain or substantially certain to occur~~];~~;

~~4.~~5.~~That~~ the relationship was disrupted;

~~5.~~6.~~That [name of plaintiff]~~Applied was harmed; and

~~6.~~7.~~That [name of defendant]'s conduct~~Medtronic's bundled discounting and/or exclusive dealing was a substantial factor in causing [~~name of plaintiff~~]'sApplied's harm.

Authority: Jud. Council of Cal. Civ. Jury Instructions (CACI) No. 2202 (2024).

**PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D34**

**Unlawful Interference with Prospective Economic Advantage**

Applied's proposal sticks closely to the Model.  It merely identifies the party names, identifies the third parties at issue ("hospitals"), and identifies the wrongful conduct at issue ("anticompetitive conduct or unfair competition").

Medtronic dramatically departs from the Model.  Rather than merely identify the conduct at issue, Medtronic characterizes the exclusionary bundling at issue as "below-cost bundled discounts that [Medtronic] had the exclusive capacity to create," seeking to inject Medtronic's argumentative characterizations of the conduct and "exclusive capacity" position into the instruction.  Similarly, Medtronic characterizes the exclusive dealing as "exclusive dealing agreements that prevented hospitals from buying *any* advanced bipolar devices from competing suppliers," seeking to inject Medtronic's erroneous position on exclusive dealing into the instruction.  The Court should adopt Applied's positions for the reasons explained by Applied in connection with its arguments regarding D9 (Exclusionary Bundling) and D10 (Exclusive Dealing).  Moreover, such cherry-picked substantive points should not be placed into an instruction on interference with prospective economic advantage.  The instruction should merely identify the conduct at issue in a neutral manner as Applied has done.

Medtronic adds "for each hospital" to the Model's sentence introducing the elements: "To establish this claim, <u>Applied</u> must prove all of the following <u>for each hospital</u>."  The elements, however, already focus on particular hospitals. They require Applied to show that "Applied and the hospital were in an economic relationship that probably would have resulted in an economic benefit to Applied."  Medtronic's addition is thus unnecessary.

Medtronic points out that the Model instruction directs parties to insert the

1    "name of [the] third party" with which interference is claimed.  *See* CACI No.

2    2202.  But that guidance is in the first sentence of the instruction.  Because there

3    are multiple third parties at issue, the parties' agreed-upon first sentence

4    appropriately refers to "third-party hospitals."  The Model does not suggest

5    adding "each hospital" to the second sentence, as proposed by Medtronic:

6    "Applied must prove all of the following <u>for each hospital</u>."  That addition is

7    erroneous and confusing because a separate element requires a showing that

8    "Medtronic engaged in anticompetitive conduct in violation of state or federal

9    antitrust law."  It makes no sense to require a showing of "anticompetitive

10   conduct"—which is based on a showing of harm to competition as a whole—as

11   to "each hospital."

12          Medtronic also provides no support for its assertion that this claim requires

13   an actual antitrust violation.  Engaging in anticompetitive conduct ***or unfair***

14   ***competition*** satisfies the "wrongful" requirement.  Medtronic also unnecessarily

15   adds "in violation of state or federal antitrust law" to the element requiring

16   anticompetitive conduct: "anticompetitive conduct<u> in violation of state or federal</u>

17   <u>antitrust law</u>."  That is erroneous because Applied need not establish every

18   element of an antitrust claim, including antitrust injury, to show Medtronic's

19   interference is "wrongful" by some measure other than the interference itself.

20   Medtronic also provides no support for its assertion that the violation must be a

21   violation of state or federal "antitrust law."  Medtronic apparently seeks to

22   exclude unfair competition law as providing a measure of potential "wrongful"

23   conduct.  But Medtronic quotes precedent stating that the "wrongful" element

24   encompasses "conduct that was wrongful by some legal measure other than the

25   fact of interference itself."  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11

26   Cal. 4th 376, 393 (1995).  That "legal measure" includes unfair competition.

27          Medtronic also argues that "unfair competition" should not be included

28   because it instructs the jury on a matter to be decided by the Court.  But that

325

would inappropriately eliminate one possible means by which Applied can prove the intentional interference claim. Medtronic cites a case discussing that the Section 17200 claim is "indeterminate" and should be decided by the Court. *Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 305 (2020). Medtronic should not be able to eliminate one means of liability simply because it overlaps with an issue to be decided by the Court. Indeed, the Supreme Court has held that, where there are issues common to both claims at law and in equity, courts must consider equitable relief "after the jury renders its verdict" on the claim at law. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959). Here, the issue of unfair competition is a common issue between a claim at law (intentional interference) and a claim in equity (California Business and Professions Code § 17200). Under *Beacon Theatres*, the common issue of unfair competition will have to be decided by the jury in connection with the interference claim before the Court decides the California Business and Professions Code § 17200 claim.

Medtronic argues *Beacon Theatres* does not apply because the jury has to decide whether Medtronic engaged in the challenged anticompetitive conduct rather than whether such conduct is unfair. Not so. As discussed, an interference claim can be based on unfair competition. And conduct that rises only to the level of an "incipient" antitrust violation can constitute unfair competition. For example, if the challenged conduct does not meet the legal standards for exclusive dealing or bundling under the antitrust laws, it may still rise to the level of an incipient violation for purposes of unfair competition. As a result, the jury must decide the factual question of whether Medtronic engaged in unfair competition to resolve the legal claim (intentional interference). Under the Seventh Amendment and *Beacon Theatres*, that factual determination by the jury on the legal claim ***must*** occur before the Court decides the equitable Section 17200 claim. Medtronic's suggestion to the contrary is unsupported and would

1    constitute reversible error.

2        Medtronic argues that Applied has alleged only bundling and exclusive

3    dealing as interference.  But Applied did not limit its interference claim to such

4    conduct *that violates the antitrust laws*.    Applied alleged that Medtronic

5    "intentionally and wrongfully" interfered with its relationships.  Dkt. 1 ¶ 194.

6    Applied has always alleged that any such conduct by Medtronic that does not

7    violate the antitrust laws constitutes unfair competition because it is "at least an

8    incipient violation of the antitrust laws, and a violation of the policy and spirit of

9    those laws with comparable effects."  *Id.* ¶ 205.  Applied should be entitled to

10   prove its interference claim by showing that Medtronic either violated the

11   antitrust laws or engaged in an incipient violation constituting unfair competition.

12       Moreover, as discussed below, Applied has included a question in its jury

13   verdict form on unfair competition because it suggests the Court obtain an

14   advisory verdict from the jury on this claim.  This is appropriate because, as

15   discussed above, the jury will already be deciding whether Medtronic engaged in

16   unfair competition as part of the interference with prospective business advantage

17   claim.  The Court should adopt Applied's proposal.

18       Medtronic further substitutes the Model's phrase "anticompetitive

19   conduct" with "exclusionary bundled discounting" and "unlawful exclusive

20   dealing."  This Court should adopt Applied's position for the reasons explained

21   in connection with Applied's arguments regarding Instruction D2

22   (Monopolization General – Elements).

23

24

25

26

27

28

## DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D34
### Unlawful Interference with Prospective Economic Advantage—Elements

Medtronic's proposal mirrors the model, departing only to add party names; specify the conduct at issue; and make clear that Applied must prove each element for each hospital with which interference is claimed. The parties disagree on three aspects of this instruction.

*First*, the parties disagree on the third element of the instruction. The model directs parties to "specify conduct *determined by the court* to be wrongful" (emphasis added). Jud. Council of Cal. Civ. Jury Instrs., No. 2202 (2024) [hereinafter CACI]. In other words, the jury decides whether conduct occurred, and whether the other elements of unlawful interference are met, and the Court decides "[w]hether the conduct alleged qualifies as wrongful." *Id.* ("If the court lets the case go to trial, the jury's role is not to determine wrongfulness, but simply to find whether or not the defendant engaged in the conduct.").

Consistent with this direction, Medtronic inserts a description of the conduct Applied must prove to prevail on its claims without conclusory labels like "anticompetitive" that imply that the conduct is "wrongful." *See* Instruction D9 (Exclusionary Bundled Discounting); Instruction D10 (Unlawful Exclusive Dealing); Instruction D11 (Unlawful Exclusive Dealing—Additional Considerations). Applied, by contrast, inserts "anticompetitive conduct or unfair competition" into the third element of the instruction. This improperly embeds a "wrongfulness" determination into the instruction. It also improperly asks the jury whether conduct constitutes "unfair competition," which is not a distinct category of conduct for the jury to consider.

Rather than reflecting a type of conduct, "unfair competition" reflects a determination that "[a] challenged practice meets the test of unfairness" and "should properly be considered unfair or deceptive within the meaning of the

UCL." *Nationwide Biweekly Admin., Inc. v. Superior Ct. of Alameda Cnty.*, 9 Cal. 5th 279, 302–04 (2020). As the California Supreme Court has explained, this determination is best made by a court because the standard for establishing "unfair competition" is "too indeterminate to be adequately conveyed by jury instructions or applied by a jury". *Id.* Thus, in this case, Applied's UCL and unlawful interference claims interact in a three-step process: (1) the jury will decide whether Medtronic engaged in the conduct; (2) the Court will decide whether that conduct violates the UCL; and (3) the Court will decide whether any UCL violation may serve as the predicate violation for unlawful interference.

*Beacon Theatres Inc. v. Westover* is not to the contrary. 359 U.S. 500, 503–04 (1959). *Beacon* held that when there is a factual issue common to a legal and equitable claim, the jury must decide the factual issue. That holding does not apply here because Medtronic is not asking the Court decide the facts of any jury claim. To decide Applied's tortious interference claim, the jury does not need to decide whether the challenged conduct—in this case, bundled discounting and de facto exclusive dealing—violates the UCL or is "wrongful" in any other sense. It need only decide whether the conduct *occurred* and the other elements of tortious interference are met. The Court will do the rest. *Beacon Theaters* thus plays no role.

Applied further asserts that it can prevail on its UCL claim "if the challenged conduct does not meet the legal standards for exclusive dealing or bundling under the antitrust laws." Applied Position Statement Regarding Instruction 34 (Unlawful Interference with Prospective Economic Advantage). Yet Applied has never explained how Medtronic's conduct, if not proven to be anticompetitive, could still violate the UCL. It is Applied's burden to put forth a viable theory; in nearly three years of litigation, it has never done so.

For these reasons, and the reasons explained in Medtronic's argument

329

related to Instruction D36 (Unfair Competition in Violation of California Business and Professions Code § 17200), the Court should reject Applied's proposal that the jury consider "unfair competition." *See also* Medtronic Verdict Form Argument at 37–39.

*Second*, Applied disputes Medtronic's addition of "for each hospital" in the second sentence, which it argues is a change to the model instruction. But the model instruction directs parties to insert the "name of [the] third party" with which interference is claimed. CACI No. 2202. That is, the plaintiff must prove interference *with respect to a specific third-party*. Because Applied alleges unlawful interference with multiple third parties, it is necessary to clarify that Applied must prove each element of this claim for each third party for which Applied claims unlawful interference. Otherwise, Applied could significantly reduce its burden of proof by leading jurors to believe that (1) Applied need only prove Medtronic's general interference with Applied's hospital relationships; (2) proof of Medtronic's interference with one hospital relationship is sufficient to award damages for all hospitals at which Applied claims interference; or (3) one instance of alleged interference may satisfy the first element, another the second element, and so on. None of these approaches is sufficient under the law. *Cf. Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 527 (1996) (rejecting plaintiff's "expansive view of the tort" under which it argued that interference with "unidentified buyers" was actionable).

Applied further objects to the "for each hospital" language on the ground that it "makes no sense" to require a showing of predicate conduct as to each hospital, but this misses the point. Medtronic's proposal does not require Applied to prove a new predicate antitrust violation for each hospital. What Applied must show is that by engaging in the alleged predicate conduct, Medtronic intended to disrupt Applied's prospective relationship with a particular hospital, and it must show that for each hospital for which it claims interference.

330

1    *Finally*, consistent with its arguments related to Instruction D20 (Rule of

2    Reason—Proof of Competitive Harm), Medtronic's proposal clarifies in the last

3    element that the "conduct" to be evaluated is "bundled discounting and/or

4    exclusive dealing."

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D35**

**Unlawful Interference with Prospective Economic Advantage—Damages**

If you decide that ~~[name of plaintiff]~~Applied has proved ~~[his/her/nonbinary pronoun]~~its claim for unlawful interference with prospective economic advantage against ~~[name of defendant],~~Medtronic, you also must decide how much money will reasonably compensate ~~[name of plaintiff]~~Applied for the harm. This compensation is called "damages."

The amount of damages must include an award for each item of harm that was caused by ~~[name of defendant]'s~~Medtronic's wrongful conduct, even if the particular harm could not have been anticipated.

~~[Name of plaintiff]~~Applied does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages.

~~[The following are the specific items of damages claimed by [name of plaintiff]:]~~

~~[Insert applicable instructions on items of damage.]~~

Authority: CACI No. 3900; *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 447–48 (1993); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 586 (1985); *Epic Games v. Apple*, 67 F.4th 946, 1002 (9th Cir. 2023); *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137–1138 (9th Cir. 2022); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *Cal. Computer Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 737 (9th Cir. 1979); *Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971); Order re Motion for Summary Judgment (Dkt. No. 255) at 6.

**DEFENDANT'S PROPOSED INSTRUCTION NO. D35[18]**

**Unlawful Interference with Prospective Economic Advantage—Damages**

If you decide that ~~[name of plaintiff]~~Applied has proved ~~[his/her/nonbinary pronoun]~~its claim for unlawful interference with prospective economic advantage against ~~[name of defendant],~~Medtronic, you also must decide how much money will reasonably compensate ~~[name of plaintiff]~~Applied for the harm. This compensation is called "damages."

The amount of damages must include an award for each item of harm that was caused by ~~[name of defendant]'s wrongful conduct~~Medtronic's alleged exclusionary bundled discounting and/or unlawful exclusive dealing, even if the particular harm could not have been anticipated.

~~[Name of plaintiff]~~Applied does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages.

~~[The following are the specific items of damages claimed by [name of plaintiff]:]~~

~~[Insert applicable instructions on items of damage.]~~

Authority: CACI No. 3900

---

[18] Medtronic presents this instruction as agreed-upon instruction A32, but Medtronic changed the text of that stipulated instruction, as explained in Applied's argument.

333

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D35

**Unlawful Interference with Prospective Economic Advantage—Damages**

Medtronic substitutes the Model's phrase "wrongful conduct" with "exclusionary bundled discounting" and "unlawful exclusive dealing." This Court should adopt Applied's position for the reasons explained in connection with Applied's arguments regarding Instruction D2 (Monopolization General – Elements).

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D35**
**Unlawful Interference with Prospective Economic Advantage—Damages**

Medtronic closely follows the model instructions. The parties' proposals differ only in that Medtronic's instruction substitutes "alleged exclusionary bundled discounting and/or unlawful exclusive dealing" for "wrongful conduct." The term "wrongful conduct" appears nowhere else in the instructions, and using it here will leave jurors wondering whether it differs from the alleged exclusionary bundled discounting and unlawful exclusive dealing mentioned elsewhere. Medtronic's additional arguments related to this dispute are articulated in relation to Instruction D20 (Sherman Act, Section 1: Rule of Reason—Proof of Competitive Harm).

**PLAINTIFF'S PROPOSED INSTRUCTION NO. D36**

**Unfair Competition in Violation of California Business and Professions Code § 17200**

Applied claims that Medtronic has committed acts constituting unlawful and unfair competition in violation of California's Unfair Competition Law. To succeed on this claim, Applied must prove

1.     Medtronic's conduct constitutes either (a) an unlawful business act or practice or (b) an unfair business act or practice.

2.     Applied was harmed; and

3.     Medtronic's conduct was a substantial factor in causing Applied injury.

To prove Medtronic's conduct constitutes an unlawful business act or practice, Applied must prove that Medtronic's business acts or practices were prohibited by law.

To prove Medtronic's conduct constitutes an unfair business act or practice, Applied must prove that Medtronic's conduct threatens an incipient violation of an antitrust law, violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Authority: Cal. Bus. & Prof. Code §§ 17200; *et seq.*; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal. 4th 163, 181, 187 (1999); *Konik v. Cable*, No. CV 07-763 SVW (RZX), 2009 WL 10681970, at *20 n.17 (C.D. Cal. Dec. 2, 2009); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959).

## DEFENDANT'S PROPOSED INSTRUCTION NO. D36

## Unfair Competition in Violation of California Business and Professions Code § 17200

For the reasons discussed below, Medtronic has not proposed an instruction for Applied's claim under California's Unfair Competition Law (UCL).

## PLAINTIFF'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D36

### Unfair Competition in Violation of California Business and Professions Code § 17200

Applied includes this proposed instruction for two reasons. **First**, the standard on unfair competition is relevant to one of the elements for showing interference with prospective economic advantage. As discussed above with respect to Instruction D34 on Unlawful Interference with Prospective Economic Advantage, the "wrongful" conduct element of that claim can be established by unfair competition. Where there are issues common to both claims at law and in equity, courts must consider equitable relief "after the jury renders its verdict" on the claim at law. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508 (1959). Here, the issue of unfair competition is a common issue between a claim at law (intentional interference) and a claim in equity (California Business and Professions Code § 17200). Under *Beacon Theatres*, the common issue of unfair competition will have to be decided by the jury in connection with the interference claim before the Court decides the California Business and Professions Code § 17200 claim. As discussed above, Medtronic is simply wrong to assert the jury need not decide the ***factual*** question of whether Medtronic's conduct is "unfair." The jury will be making that decision in connection with the intentional interference claim. The jury must be allowed to make that determination before the Court can decide the Section 17200 claim. Medtronic's suggestion to the contrary is unsupported and would constitute reversible error.

Second, Applied has included a question in its jury verdict form on unfair competition that it suggests the Court give to the jury on an advisory basis. This makes sense because the jury will already be deciding whether Medtronic engaged in unfair competition as part of the interference with prospective

338

1   business advantage claim.  Thus, Applied suggests the Court obtain an advisory

2   verdict from the jury on this claim.  Medtronic identifies no specific issues with

3   Applied's proposal, which closely tracks the statute.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S POSITION STATEMENT REGARDING DISPUTED INSTRUCTION NO. D36**

**Unfair Competition in Violation of California Business and Professions Code § 17200**

Medtronic has not proposed an instruction for Applied's claim under California's Unfair Competition Law (UCL) because it is not properly considered by a jury. *See, e.g.*, *Nationwide Biweekly Admin.*, 9 Cal. 5th at 305 ("[I]t is clear that the Legislature intended that a cause of action under the UCL . . . is to be tried by the court rather than by a jury."); *Netlist, Inc. v. Diablo Techs., Inc.*, 2015 WL 1887261, at *3 (N.D. Cal. 2015) ("Because a UCL claim is equitable in nature, the Court, rather than a jury, must decide whether there was a UCL violation.").

Recognizing that its UCL claim is not properly tried to a jury, Applied suggests sending it to the jury on an advisory basis. This would not be appropriate either. The California Supreme Court has warned that whether conduct is "unfair" under the UCL is a standard "too indeterminate to be adequately conveyed by jury instructions or applied by a jury" and which thus "may reasonably be applied only by a court." *Nationwide Biweekly Admin.*, 9 Cal. 5th at 302–04. Correctly applying the standard often requires "consideration of a variety of factors or circumstances identified in prior cases in California or other jurisdictions or in administrative guidelines developed by the Federal Trade Commission or other consumer protection administrative agencies—[it] is the type of decision that has traditionally been viewed as the province of courts rather than juries." *Id.* Thus, an advisory verdict on this issue would be of no use, and an unlawful interference verdict predicated on a misapplication of the "unfair" standard would be fundamentally flawed.

As explained in Medtronic's argument related to Instruction D34 (Unlawful Interference with Prospective Economic Advantage—Elements), the

340

1      jury need not decide whether Medtronic engaged in "unfair competition" in order

2      to decide Applied's unlawful interference claim, and the Court may decide the

3      UCL claim after the jury has decided Applied's other claims without holding a

4      separate trial. *See, e.g.*, *Drenckhahn v. Costco Wholesale Corp.*, 2011 WL

5      3754659, at *1 (C.D. Cal. 2011) (deciding UCL claim without a separate trial

6      where "[t]he evidence necessary to rule on the UCL Claim [had] already been

7      introduced during the jury trial"). If the Court determines that an instruction on

8      this claim should be provided to the jury, Medtronic reserves the right to propose

9      one.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: December 6, 2025        By: /s/ Cheryl T. Burgess

        Stephen C. Jensen
        Joseph R. Re
        Joseph F. Jennings
        Stephen W. Larson
        Cheryl T. Burgess
        Adam B. Powell

        Attorneys for Plaintiff
        APPLIED MEDICAL RESOURCES
        CORPORATION

WILKINSON STEKLOFF LLP

Dated: December 6, 2025        By: /s/ *Brian L. Stekloff*

        Brian L. Stekloff
        Keri Arnold
        Sarah Neuman
        Alysha Bohanon

        Cleary Gottlieb Steen & Hamilton LLP
        Leah Brannon
        Alan B. Freedman

        Attorneys for Defendant
        MEDTRONIC, INC

## **FILER'S ATTESTATION**

Pursuant to L.R. 5-4.3.4(a)(2)(i), the undersigned filer hereby attests that all of the other signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized this filing.

Dated: December 6, 2025          By: /s/ Cheryl T. Burgess