Joseph R. Re (SBN 134479)
Joe.re@knobbe.com
Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Joseph F. Jennings (SBN 145920)
Joe.jennings@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
Cheryl T. Burgess (SBN 250101)
Cheryl.burgess@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

Attorneys for Plaintiff
APPLIED MEDICAL RESOURCES CORPORATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>Defendant. | Case No.<br>8:23-cv-00268-WLH-DFM<br><br>**APPLIED'S TRIAL BRIEF**<br><br>Trial: January 20, 2026<br><br>Hon. Wesley S. Hsu |

Applied Medical Resources Corporation ("Applied") submits the following trial brief pursuant to L.R. 16-10 to reply to Medtronic's Memorandum of Contentions of Fact and Law (Dkt. 284).

**A.  Market Definition Is Not A Case Dispositive Element**

Medtronic argues that Applied must establish an advanced bipolar market to prevail on its claims.  Dt. 284 at 19.  Medtronic is incorrect.

**1.  Ninth Circuit Precedent Forecloses Medtronic's Argument**

Binding Ninth Circuit precedent squarely rejects Medtronic's argument. *See Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 978 n.9 (9th Cir. 2023).  In *Epic Games*, the Ninth Circuit held that *Epic*'s failure to establish its proposed aftermarkets did ***not*** defeat *Epic*'s federal antitrust claims.  *Id.* at 981.  Instead, the district court and the Ninth Circuit assessed Sherman Act liability in a different market supported by the record.  *Id*.  On appeal, the Ninth Circuit addressed and rejected the identical argument that Medtronic raises here.  The Ninth Circuit explained:

> We also reject Apple's suggestion that Epic's antitrust claims should have automatically failed as soon as the district court adopted a market of mobile-game transactions, instead of Epic's proposed aftermarkets.  None of the authorities Apple cites comes anywhere close to supporting its ***radical argument*** that, where parties offer dueling market definitions, the case immediately ends if the district court finds the record supports the defendant's proposed market (or a third in-between market, as was the case here) rather than the plaintiff's market.  Instead, our precedent ***squarely forecloses*** such an argument.  *See Rebel Oil*, 51 F.3d at 1421 (rejecting the plaintiff's proposed market but stating that such a rejection was "not fatal" to its claim, and remanding to determine whether the defendant possessed market power in the defendant-proposed market that the court adopted).

*Id.* at 978, n.9 (emphasis added).

This rule makes sense.  As the Ninth Circuit has explained, "[d]efining the market is not the aim of antitrust law; it merely aids the search for competitive

injury*."  Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988).
Market evidence is important, but is not an "end in itself."  *Los Angeles Mem'l
Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1394 (9th Cir. 1984)
("In the context of this case in particular, we believe that market evidence, while
important, should not become an end in itself.").  While a plaintiff must establish
a relevant market, Ninth Circuit law permits a plaintiff to allege liability under
multiple alternative markets.  *See AliveCor, Inc. v. Apple Inc.*, 592 F. Supp. 3d
904, 915-16 (N.D. Cal. 2022) (at summary judgment, considering both a market
of ECG-capable smartwatches, and in the alternative, a market of WatchOS heart
rate analysis apps); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp.
3d 926, 943, 957 (D. Or. 2018) (allowing plaintiff to allege multiple relevant
markets and assert a narrower "Elite Colleges" market in the alternative).

Medtronic cites no case to the contrary.  Medtronic's cases merely stand
for the uncontroversial principle that a plaintiff must prove a relevant market.
Dkt. 284 at 19-20.

Accordingly, Medtronic's cites no authority supporting its "radical
argument" that Applied's claims fail if the jury adopts a broader market than
Applied's primary asserted market.  *See Epic Games*, 67 F.4th at 978 n.9.

## 2. <u>Applied Has Always Asserted An Alternative Market That Includes Ultrasonic Devices</u>

While not required under *Epic Games*, Applied has also always maintained
that Medtronic is liable even if the market is broadened to include ultrasonic
devices.  Compl. ¶ 53.  Applied's initial complaint even calculated alternative
market shares and an economic index of market concentration in such an
alternative market with ultrasonic devices.  *Id.*

Applied's expert, Orszag, opined that "even if the relevant product market
is defined more broadly to include ultrasonic devices, my conclusions regarding
Medtronic's monopoly power and the competitive effects of the alleged conduct

are **unaffected**."  Orszag Opening Rep., Dkt. 183-6, Ex. 4 at 4 n.6.  Orszag's
supplemental analysis reports Medtronic retains a 60% share even if ultrasonic is
included.  Medtronic questioned Orszag on his "alternative that also included
ultrasonic devices." Dkt. 147-5, Ex. 28 (Orszag Dep.) at 34:11–35:5.  Medtronic
is also incorrect to assert Applied or Orszag "disclaimed" alternative markets.
Dkt. 284 at 21.  Orszag opined that (a) the market should be limited to advanced
bipolar devices and (b) Medtronic still has monopoly power and Medtronic's
conduct still has anticompetitive effects even if the market is defined more
broadly (as Medtronic alleges).  Orszag Opening Rep., Dkt. 183-6, Ex. 4 at 4 n.6.

Medtronic never moved to exclude any of these expert opinions.  Nor did
Medtronic move for summary judgment on the alternative market including
ultrasonic devices.  Instead, Medtronic's summary judgment briefing asserted as
an **undisputed fact** that "Applied's expert economist considered an alternative
market for ABDs and ultrasonic devices…." Dkt. 147 at 14 (JAF 43).  And
Medtronic's expert, Murphy, responded to Orszag.  *See* Dkt. 147-5, Ex. 414
(Murphy Expert Rep.) ¶¶ 55, 234 (opining "the relevant market is broader than
ABDs and likely includes at least ultrasonic devices and robotic ABDs," and
discussing a broader "VS&D" market including ABD and ultrasonic devices).

Further, one of Medtronic's primary bases for opposing Applied's claims
is that the market should be broadened to include ultrasonic devices.  Dkt. 284 at
14.  It would be manifestly unfair for Medtronic to make such an argument while
barring Applied from responding and showing that including ultrasonic devices
does not change Orszag's opinions regarding monopoly power and
anticompetitive effects.

**B.**  **Section 2 Elements Already Implement The Rule Of Reason**

Medtronic is correct that the Rule of Reason applies to Section 2 claims.
Dkt. 284 at 22.  But that does not permit Medtronic to reframe Applied's Section
2 monopolization claims as though they were Section 1 restraint-of-trade claims.

1   The Rule of Reason is a ***rule of analysis***, not a separate add-on that must
2   be layered on top of Section 2's elements.  See *United States v. eBay, Inc.*, 968 F.
3   Supp. 2d 1030, 1037 (N.D. Cal. 2013).  And while Section 1 and Section 2 share
4   some analytical similarities, "important differences remain." Areeda &
5   Hovenkamp ¶ 1512.  Section 1 addresses restraints of trade while Section 2
6   requires monopoly power plus "anticompetitive conduct" (conduct that impairs
7   rivals and is not competition on the merits).  *MetroNet Servs. Corp. v. Qwest*
8   *Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004); *PeaceHealth*, 515 F.3d at 894; *Aspen*
9   *Skiing*, 472 U.S. at 605 n.32.

10   More importantly, the core elements of Section 2 monopolization already
11   incorporate the essence of Rule-of-Reason analysis in the monopolization
12   context.  Medtronic's reliance on *Qualcomm* underscores this point.  *Qualcomm*
13   explains that the Rule of Reason as applied to Section 2 focuses on (1)
14   anticompetitive effect, (2) procompetitive justification, and (3) whether
15   anticompetitive harms outweigh procompetitive benefits.  969 F.3d at 991.  That
16   is how Section 2 monopolization is evaluated: exclusionary conduct must produce
17   anticompetitive effects in the relevant market.  Conduct is not unlawful if justified
18   as competition on the merits or if procompetitive benefits outweigh harm.  Section
19   2 thus already implements Rule-of-Reason principles through its own substantive
20   requirements.  Rather than embrace this clear existing law, Medtronic attempts to
21   treat the Rule of Reason as an additional separate hurdle for Section 2.

22   Moreover, Medtronic attempts to further heighten Applied's burden by
23   requiring a showing of "***substantial*** harm to competition" and harm that
24   "***substantially*** outweighs" benefit.  Dkt. 284 at 23 (emphasis added). This is
25   inconsistent with *Qualcomm*'s characterization of the Rule of Reason as applied
26   to monopolization.  *Qualcomm,* 969 F.3d at 991.  In *Qualcomm*, the Ninth Circuit
27   explained that "the plaintiff must demonstrate that the anticompetitive harm of
28   the conduct ***outweighs*** the procompetitive benefit."  969 F.3d at 991.  Medtronic

-4-

cites no authority imposing a "substantial" requirement at both the initial step of demonstrating anticompetitive effects ***and*** the final step of showing that harms outweigh procompetitive benefits.

## C.   Medtronic Misstates The Standard For De Facto Exclusionary Dealing

Medtronic improperly characterizes exclusive dealing as purportedly requiring that agreements completely prevent the buyer from purchasing from rivals.  Dkt. 284 at 23.  That is not the law.  In fact, this Court already rejected Medtronic's argument at summary judgment.  *See* Dkt. 147-1 at 26–27; SJ Order at 11–15; *Masimo Corp. v. Tyco HealthCare Grp., L.P.*, 350 F. App'x 95, 97 (9th Cir. 2009).  Medtronic cites *Tampa Electric*, *Qualcomm*, and *Aerotec*, but none requires total foreclosure or a complete bar on rival purchases.  Dkt. 284 at 23.  Rather, exclusive dealing turns on the practical effect—whether the arrangement substantially forecloses rivals by preventing meaningful switching.  *See Masimo*, 350 F. App'x at 97.  For example, conditioning pricing on meeting high purchase thresholds of 90% is "the hallmark of exclusive dealing."  *Id.*

Indeed, the Ninth Circuit recently reaffirmed that de facto exclusive dealing is viable in this Circuit.  *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073 (9th Cir. 2025) (as amended); *see also* Amicus Brief of Antitrust Scholars, No. 23-55662, Dkt. 66-1 at 5 (Aug. 18, 2025) (describing *CoStar* as expressly recognizing "'de facto' exclusive dealing").  Medtronic's rule would improperly immunize precisely the kind of arrangements that operate as exclusive dealing in the real world and that the Ninth Circuit and this Court recognize as actionable.

## D.   Medtronic Misstates The Ninth Circuit's Test For Exclusionary Bundling

Medtronic claims that Applied must show that no other competitor could, individually or in collaboration with others, offer the same bundle.  Dkt. 284 at

23-24. Medtronic cites no case imposing such a requirement. *PeaceHealth* explained that the "anticompetitive danger posed by a multi-product bundled discount" is the exclusion of "*a* rival who is equally efficient at producing the competitive product simply because *the* rival does not sell as many products as the bundled discounter." 515 F.3d at 894 (emphasis added). *PeaceHealth* focused on the plaintiff's inability to "provide the same array of services" as the defendant—not on whether any other rival could offer it. *Id.* at 897.

Aerotec reaffirmed this point: "As [*PeaceHealth*] made clear, the discount attribution test only applies where *one* of the competitors produces fewer goods or services than the other competitor." 836 F.3d at 1186–87 (emphasis added). *Aerotec* repeated *PeaceHealth*'s explanation that the "primary anticompetitive danger posed by a multi-product bundled discount is that such a discount can exclude *a* rival who is equally efficient at producing the competitive product simply because *the* rival does not sell as many products as the bundled discounter." *Id.* (emphasis added). *Aerotec* rejected the claim because both firms sold the same bundle. *Id.* Its reference to "exclusive capacity" described whether the plaintiff provided the same bundle; *Aerotec* did *not* hold that a plaintiff must show no other competitor could provide the bundle.

Nor would such a rule make sense. The core *PeaceHealth* concern is excluding "*a* rival who is equally efficient" in the primary market. 515 F.3d at 894. The excluded rival may be the rival most able to be a competitive check against the monopolist in the market at issue. Such is the case here, where Applied offers ABDs equal or superior in quality and at substantially lower prices. Excluding *Applied*—the rival most able to provide a competitive check on Medtronic—reduces competition, raises prices, and limits choice in the ABD market. That is true even if a third party could offer a large bundle. Such a third party may be unable to hold the monopolist in check for any number of reasons, including inefficiencies or a poorly performing product. Medtronic may

-6-

1  disagree, but that disagreement should be resolved through competing evidence
2  and expert testimony at trial, not through jury instructions.  Dkt. 284 at 23-24.

3  Medtronic cites Areeda to postulate that a better theoretical question is
4  whether any rival has the same bundle.  Areeda ¶ 749.  But *PeaceHealth* did not
5  quote that portion of Areeda.  *PeaceHealth* quoted the portion of Areeda
6  advocating an approach focusing on whether "the practice will exclude ***an***
7  equally efficient rival."  *PeaceHealth*, 515 F.3d at 907.  *PeaceHealth* also quoted
8  and relied on Judge Posner's reasoning that "the acts of a monopolist should be
9  deemed exclusionary if 'the challenged practice is likely in the circumstances to
10  exclude from the defendant's market ***an*** equally or more efficient competitor."
11  *Id.* at 907.

12  Consistent with the Court's focus on whether the bundling would exclude
13  a hypothetical "equally" efficient competitor, *PeaceHealth* permits the jury to
14  find anticompetitive conduct based on the structure of the defendant's bundle.
15  *PeaceHealth* is clear: "If the resulting price of the competitive product or
16  products is below the defendant's incremental cost to produce them, ***the trier of***
17  ***fact may find*** that the bundled discount is ***exclusionary*** for the purpose of § 2."
18  *Id*. at 906.  *PeaceHealth* quoted Areeda's explanation that the "relevant question
19  is not" about the efficiency of any particular plaintiff, but "whether the
20  challenged bundling practices would have excluded ***an*** equally efficient rival,
21  without reasonable justification."  *Id*.

22  Medtronic cites the Court's Order on Summary Judgment.  Dkt. 284 at 24.
23  While the Court noted that "neither Applied nor other competitors offer the full
24  range of items in Medtronic's bundles" (SJ Order at 8), the Court did not hold
25  complete exclusivity is required.  As discussed, such a rule would contradict
26  *PeaceHealth* and *Aerotec*.

27  The Court found Medtronic's portfolio breadth "sufficient to defeat" its
28  motion and did "not reach" Applied's alternative theory that Medtronic's market

1   power over the bundled products allows it to impose higher prices on customers
2   who refuse the bundle, thereby driving their behavior.  SJ Order at 8 n.2; Dkt.
3   147 (JAF 504-05).  Although the Court correctly rejected Medtronic's demand
4   for **monopoly power** over **every** bundled product, it did not bar Applied from
5   proving bundle power through Medtronic's market power over the bundled
6   products.  SJ Order at 7-8 & n.2.  Indeed, this Court pointed to *PeaceHealth*'s
7   explanation that the "DAT determines if bundling practice exclude *a* hypothetical
8   equally efficient rival."  SJ Order at 20 n.8.  This Court also distinguished *Suture*
9   *Express*, a tying case cited by Medtronic, as discussing "law that may diverge
10  from Ninth Circuit law."  SJ Order at 20 n.8.

11          Medtronic's proposed rule would substantially weaken *PeaceHealth* and
12  perversely encourage bundling that violates the Discount Attribution Test.  So
13  long as some other company has engaged, or could engage in the same conduct,
14  all such companies would be immune from liability, regardless of the actual
15  competitive harm.   *PeaceHealth* created the Discount Attribution Test so
16  companies could carefully avoid running "afoul" of it, 515 F.3d at 907, not to
17  provide a roadmap for dominant firms to crush smaller rivals.

18          Moreover, Medtronic never argued in discovery, summary judgment, or its
19  prior jury instructions that Applied must prove "exclusive capacity."  *See*
20  Medtronic's 6/14/2024 Resp. to Interrog. No. 3, Dkt. No. 142-4; Murphy Rpt.,
21  Dkt. No. 147-23.  Nor has Medtronic ever identified a single rival capable of
22  doing so.  Medtronic asserted that Applied could assemble its own bundles, but
23  never that some unnamed competitor could match Medtronic's portfolio or defeat
24  Applied's claim.  *See id*.  If Medtronic intended to rely on such a theory, it should
25  have disclosed it so Applied could take appropriate discovery.  Indeed, after
26  Medtronic initially obfuscated, Applied brought a motion to compel and the
27  Court ordered Medtronic to answer Applied's interrogatories seeking the factual
28  basis for Medtronic's claims.  Dkt. 64 at 2.  Medtronic never disclosed the facts

1  supporting a theory that some unnamed competitor could allegedly match its

2  portfolio.   A party should not be permitted to litigate one theory through

3  discovery, lose on summary judgment on that theory, and then pivot to a new one

4  after discovery is closed.

5  **E.    Unfair Competition Will Be Addressed By The Court Later**

6       Medtronic's memorandum addresses unfair competition in several places.

7  Dkt. 284 at 20, 25-26.   In an effort to narrow disputes, Applied is no longer

8  asserting its tortious interference claim can be based on unfair competition.  The

9  Court will address unfair competition after trial.  Thus, Applied does not address

10  Medtronic's arguments regarding unfair competition in this trial brief.

11

12                              Respectfully submitted,

13                              KNOBBE, MARTENS, OLSON & BEAR, LLP

14

Dated: January 13, 2026         By: */s/ Joseph R. Re*

15                                  Joseph R. Re
                                    Stephen C. Jensen
16                                  Joseph F. Jennings
                                    Stephen W. Larson
17                                  Cheryl T. Burgess
                                    Adam B. Powell
18
                                    Attorneys for Plaintiff
19                                  APPLIED MEDICAL RESOURCES
                                    CORPORATION
20

21

22

23

24

25

26

27

28

## CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2

The undersigned, counsel of record for Plaintiff Applied Medical Resources Corporation, certifies that this brief contains 2,628 words, which complies with the word limit of L.R. 11-6.1.

Dated: January 13, 2026          By: /s/ Joseph R. Re
                                                    Joseph R. Re

                                                Attorneys for Plaintiff,
                                                APPLIED MEDICAL RESOURCES CORPORATION