1  Wilkinson Stekloff LLP
2  Brian L. Stekloff (*pro hac vice*)
   Sarah Neuman (*pro hac vice*)
3  bstekloff@wilkinsonstekloff.com
   sneuman@wilkinsonstekloff.com
4  2001 M Street, NW
   10th Floor
5  Washington, DC 20036
6  Telephone: (202) 847-4000

7  Wilkinson Stekloff LLP
   Keri Arnold (*pro hac vice*)
8  130 W 42nd Street, 24th Floor
   New York, NY 10036
9  Telephone: (212) 294-8910
   karnold@wilkinsonstekloff.com
10

11  Cleary Gottlieb Steen & Hamilton LLP
    Leah Brannon (*pro hac vice*)
12  Alan B. Freedman (*pro hac vice*)
    lbrannon@cgsh.com
13  afreedman@cgsh.com
    2112 Pennsylvania Avenue, NW
14  Washington, DC 20037
    Telephone: (202) 974-1500
15

16  *Attorneys for Defendant Medtronic, Inc.*

17  [Additional counsel listed on signature
    page]
18

19

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

20

| | |
|---|---|
| 21  APPLIED MEDICAL RESOURCES CORPORATION, | Case No. 8:23-cv-00268-WLH-DFM |
| 22  | **MEDTRONIC'S TRIAL BRIEF** |
| 23  Plaintiff, | |
|     v. | HON. WESLEY L. HSU |
| 24  | |
| 25  MEDTRONIC, INC., | Trial Date:  January 20, 2026 |
| 26  Defendant. | |
| 27 | |
| 28 | |

i

Applied's eight claims all hinge on the same core theory: that Medtronic's bundled discounts for sales of its advanced bipolar devices (ABDs)—either on their own or in combination with "something more"—are anticompetitive. But because bundled discounts benefit consumers by lowering the prices that those consumers pay, courts have historically been wary of subjecting those discounts to antitrust scrutiny. Accordingly, courts have developed specific frameworks for assessing challenges to bundled discounts. In the Ninth Circuit, the Discount Attribution Test (DAT) controls. *See* Order re Mot. for Summ. J. (SJ Order) (Dkt. No. 256) at 4 (citing *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 910 (9th Cir. 2008)). Under that test, bundled discounts are unlawful in only the rare circumstances where the bundle is below cost and competitors are "frozen out" of the market.

Applied's own DAT result does not support liability, and despite extensive discovery, Applied has been unable to muster any evidence that Applied or any other competitor has been frozen out of the market. Recognizing this, Applied has now pivoted away from its expert's DAT result and instead focused its case on irrelevant evidence of alleged misconduct by Medtronic that has nothing to do with the contracts that Applied's expert identifies as being below cost. Most significantly, Applied's witnesses have offered hearsay story after hearsay story— allegedly from their contacts at hospitals—that Medtronic's contracts prevent hospitals from doing business with Applied. Applied does so without regard to whether any contracts Medtronic actually had with those hospitals were below cost. Such testimony is not only improper hearsay that Applied would plainly be seeking to admit for the truth; it is largely irrelevant to the narrow claims that this Court has permitted to move forward.

This Court determined that it was a question for the jury whether Applied's DAT calculation could result in substantial harm to competition. *See* SJ Order at 6–7. That is what this trial should be about. The Court should carefully police any

1

1  effort by Applied to meet its burden at trial based on rank hearsay instead of

2  controlling Ninth Circuit law.

3  **I.  Bundled Discounts Are Encouraged, Procompetitive, And Almost**

4  **Always Lawful.**

5  Like all discounts, bundled discounts are favored under the antitrust laws.

6  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 451 (2009);

7  *PeaceHealth*, 515 F.3d at 895 ("'[t]he great majority of discounting practices are

8  procompetitive' and 'reflect hard bargaining'" (quoting 3 Phillip E. Areeda &

9  Herbert Hovenkamp, *Antitrust Law* ¶ 749b at 324 (Supp. 2006))).  That's because

10  "[b]undled discounts generally benefit buyers" by "allow[ing] the buyer to get

11  more for less."  *PeaceHealth*, 515 F.3d at 895; *see also Matsushita Elec. Indus. Co.*

12  *v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) ("[C]utting prices in order to

13  increase business often is the very essence of competition.").  As the Ninth Circuit

14  has explained, "[b]undled discounts are pervasive," from "[s]eason tickets [to] fast

15  food value meals."  *PeaceHealth*, 515 F.3d at 894. "The fact that such diverse

16  sellers offer bundled discounts shows that such discounts are a *fundamental option*

17  for both buyers and sellers." *Id.* at 895 (emphasis added).  At the same time, the

18  court recognized that in rare cases, bundled discounts could be considered

19  anticompetitive if they were used to "freeze [rivals] out of the market."  *Id.* at 897.

20  Accordingly, the Ninth Circuit in *PeaceHealth* established a bright-line rule

21  known as the DAT to determine whether bundled discounts could constitute

22  exclusionary conduct.[1]  The DAT asks whether an equally efficient producer of the

23  competitive product or products in a challenged bundle could profitably match the

24

25  _____

[1] Medtronic has conformed its arguments in this trial brief to the Court's Summary

26  Judgment Opinion and Order, but it maintains and expressly preserves its position that

27  proof of (a) substantial foreclosure and (b) monopoly power in the devices bundled with advanced bipolar devices and used in the discount attribution analysis is necessary for

28  Applied's bundled discounting claim, for the reasons explained in Medtronic's prior briefing and arguments.

defendant's discount on the entire bundle. *PeaceHealth*, 515 F.3d at 906, 910. If so, the discount is not exclusionary and cannot be the basis for liability. Thus, as this Court recognized at summary judgment, to determine whether Medtronic's bundled discounts could be anticompetitive, the jury *must* apply the DAT to the bundles that Medtronic "has 'exclusive capacity' to create." SJ Order at 4, 7–8.[2] Only bundled discounts that fail the DAT may constitute anticompetitive conduct, provided that the jury also finds that those discounts resulted in a substantial harm to overall competition in the alleged market for ABDs after applying the Rule of Reason.[3]

## II.    Applied's Claims Rise And Fall With The DAT.

In permitting Applied's claims to proceed to trial, the Court clarified the material issues Applied must prove to establish its claims based on either exclusionary bundled discounting or unlawful exclusive dealing. Because both theories of anticompetitive conduct depend on Medtronic's bundled discounts harming competition in the alleged market for ABDs—whether as the basis for liability or as all or part of Applied's foreclosure calculation—under either theory,

---

[2] *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1186–87 (9th Cir. 2016) ("It is the fact that the bundling competitor has exclusive capacity to 'bundle' multiple products and absorb the cost of the total discount without experiencing a decline in profits that gives rise to the possibility that it could force out a 'hypothetical equally efficient producer of the competitive product." (quoting *PeaceHealth*, 515 F.3d at 906) (emphasis omitted)).

[3] *See, e.g.*, Order Setting Trial Readiness Conf. (Dec. 31, 2025) (Dkt. No. 307) at 3 ("Although the jury must apply the Discount Attribution Test (DAT) to Applied's bundling claim to determine if it was in fact exclusionary, that finding is still subject to the Rule of Reason per Ninth Circuit precedent."); Order re Mot. to Certify Order for Interlocutory Appeal (Dkt. No. 278) at 4 n.2 ("*If* the jury does find exclusionary bundling to exist, they are still required to apply the Rule of Reason to determine whether the challenged conduct results in substantial harm to competition in the relevant market *and* whether such conduct produces countervailing competitive benefits."); *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020) ("Regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same.").

Applied must rely on the DAT as part of its burden to show that the bundled discounts are exclusionary under *PeaceHealth*. *See* SJ Order at 4, 15; *see also* Applied's Suppl. SJ Br. (Dkt. No. 240) at 6 (relying on Orszag's DAT result to attempt to establish substantial foreclosure for unlawful exclusive dealing).

First, as to exclusionary bundled discounting, the Court permitted Applied's claims to proceed to trial based on its determination that Applied raised triable issues of fact as to (1) whether Medtronic "'has exclusive capacity' to create the bundles at issue," SJ Order at 7–8, and (2) whether, based on the DAT, Medtronic engaged in below-cost bundled discounting that substantially harmed competition in the alleged ABD market, SJ Order at 6–7. *See also* Order Setting Trial Readiness Conf. (Dec. 31, 2025) (Dkt. No. 307) at 1–3. In doing so, the Court acknowledged that Applied's expert confirmed that, at most, 17% of ABD revenues stem from DAT-failing bundles, but the Court determined that whether this amounted to anticompetitive conduct was an issue for the jury. SJ Order at 5 (citing Orszag Dep. Tr. (Dkt. No. 251-8) at 209:13–19).

Next, the Court also permitted Applied's unlawful exclusive dealing claims to proceed to trial, based in part on the same alleged 17% of ABD sales flowing through DAT-failing bundles. *See* SJ Order at 15. More specifically, the Court determined that Applied raised triable issues of fact as to (1) whether the challenged bundled agreements, if paired with "something more than the discount itself,"[4] force customers to purchase ABDs from Medtronic; and (2) whether the

---

[4] At summary judgment, the Court identified two categories of purported evidence that, if proven, could potentially constitute "something more than the discount itself": (1) alleged evidence that Medtronic's generators and generator financing agreements "lock" customers into purchasing Medtronic's ABDs; and (2) alleged evidence that Medtronic precludes hospitals with bundled discounts from conducting trials of other ABDs. SJ Order at 11–15. At a hearing before this Court on January 13, 2026, Applied sought to jerry-rig a third option, arguing that Medtronic's bundled discounts are not "discounts" at all. But there is no support for Applied's argument. Its expert did not offer such an opinion, much less conduct *any* economic analysis to support it. And whatever word

4

challenged agreements are in practice *not* terminable on short notice. SJ Order at 11–12. If Applied proves both of these factual issues, it must then additionally show that the challenged agreements foreclose competition in a substantial share of the ABD market—for which Applied relies, at least in part, on its expert's 17% DAT calculation. SJ Order at 9, 15–16; Applied's Suppl. SJ Br. at 6 (asserting that Orszag's 17% DAT result "raise[s] a triable issue of fact on foreclosure" for purposes of unlawful exclusive dealing).

To be clear, the evidence at trial will show that none of this is true. Far from harming competition, Medtronic's bundled discounts and other contract provisions are standard in the medical device industry precisely because they benefit both buyers and sellers, and Applied and other competitors have ample opportunities to compete against Medtronic's discounts. Nor do Medtronic's pricing agreements constitute de facto exclusive dealing—hospitals are free to terminate their agreements on short notice, and Applied has never seriously disputed that the only thing a hospital stands to lose if it switches to competitors' ABDs is a contracted discount on Medtronic's devices. Instead, all of Applied's arguments come down to price. *See, e.g.*, Applied's Mem. of Contentions of Fact & Law (Dkt. No. 281) at 8 (arguing only that hospitals that "fail to satisfy their commitments to Medtronic face termination [of their pricing agreements] and punitive pricing").

But putting aside the merits of Applied's claims, because both of Applied's theories of anticompetitive conduct rest on the impact of Medtronic's bundled discounts, Applied must rely on the DAT as it is calculated in *PeaceHealth* to prove those discounts are exclusionary. SJ Order at 4 ("This standard makes the defendant's bundled discounts legal unless the discounts have the potential to exclude a hypothetical equally efficient producer of the competitive product."

Applied prefers to use, it still must prove that it was excluded from its alleged market by something *more* than Medtronic's pricing. *See also PeaceHealth*, 515 F.3d at 894 ("A bundled discount occurs when a firm sells a bundle of goods or services for a lower price than the seller charges for the goods or services purchased individually.").

(quoting *PeaceHealth*, 515 F.3d at 906)).  Indeed, this Court permitted Applied's claims to proceed to trial after determining that it was a question for the jury whether a DAT result of 17% is sufficient to freeze a competitor out of the market.  *See* SJ Order at 6–7.  That is the evidence the jury should hear.

### III.    Applied Cannot Establish Anticompetitive Conduct Through Inadmissible Hearsay.

At the same time that Applied backs away from the DAT, its witnesses' deposition testimony and its Contentions of Fact and Law suggest an intent to steer its case toward uncorroborated anecdotes about so-and-so telling so-and-so that a particular hospital could not convert to Applied's ABD, Voyant, because of Medtronic's contracts.  Applied is not bringing a single hospital employee to trial to relay these stories.  Instead, this "evidence" will come in, if at all, through Applied's own witnesses' hearsay testimony.  To take a couple of examples, one of Applied's key witnesses, Vice President of Sales Tim McLaughlin, offered the following testimony during his deposition:

> Q.    So ██████ asked ██████ to release it from its contract?
>
> A.    Yes.
>
> Q.    And ██████ said no?
>
> A.    Yes.
>
> Q.    Did Applied talk to ██████ about that?
>
> A.    Yes.
>
> Q.    Did you have that conversation?
>
> A.    No.
>
> . . .
>
> Q.    So ██████ made the decision not to allow ██████ to buy from Applied?
>
> A.    Because of the

| | | |
|---|---|---|
| 1 | | Medtronic/█████ contract. |
| 2 | Q. | So did you see a Medtronic/█████ contract? |
| 3 | | |
| 4 | A. | I have not seen that contract. |
| 5 | **Q.** | **But your understanding is that someone at █████ told someone at** |
| 6 | | **█████ that they could not be released** |
| 7 | | **from their contract, and then someone at** |
| 8 | | **█████ told someone at Applied?** |
| 9 | **A.** | **Yes.** |

Stekloff Decl. Ex. A, McLaughlin Dep. Tr. 194:11–21, 195:12–25 (emphasis added).  This is double hearsay.  Likewise, Applied's President of Energy Gary Johnson provided the following testimony:

| | | |
|---|---|---|
| 14 | Q. | [...] Are there any hospitals that have |
| 15 | | personally told you that they can't buy Voyant because |
| 16 | | of their contracts with Medtronic? |
| 17 | A. | Me personally? |
| 18 | Q. | Yes. |
| 19 | A. | Yes. |
| 20 | Q. | Okay. Which hospitals are those? |
| 21 | A. | ████████████████████ |
| 22 | | These are the ones that I met with most recently. |
| 23 | Q. | Any others? |
| 24 | A. | More than likely, I just can't -- █████ |
| 25 | | Trying to go through all my trips in my mind. Those are the ones that are coming to mind. |

Stekloff Decl. Ex. B, Johnson Dep. Tr. 235:22–236:10; *see also* Applied's Compl. (Dkt. No. 1) ¶¶ 120–21, 124 ("[M]any hospitals have informed Applied that they could not purchase Voyant because of contracts with Medtronic.").

The record is replete with other similar tales, which have no plausible non-hearsay purpose. If allowed, these stories would come in solely for the truth of the matter asserted. What is more, in many instances, the stories are also irrelevant because they come (allegedly) from hospitals where Applied's expert determined that Medtronic's bundled discount contract *passed* the DAT or simply did not report any DAT result at all.[5] Accordingly, the stories Applied may seek to tell about those hospitals are hearsay, and irrelevant, and should not be allowed.[6]

## IV.   Conclusion

Ever since its expert calculated the DAT and found that at most 17% of Medtronic's ABD contracts included below-cost discounts, Applied has attempted to run away from that number. Applied sought to bolster the 17% with a higher figure the Court deemed inadmissible under *Daubert*. Applied filled its pretrial materials with irrelevant and inadmissible hearsay. It watered down its proposed jury instructions to try to leave undefined the nature of the alleged anticompetitive conduct in the case so that the jury could proceed without guidance about the role of bundled discounts or the DAT in the case. And it will likely seek to ask the jury to rule against Medtronic, not because of the legal implications of Medtronic's bundled discounts, but rather based on uncorroborated, irrelevant hearsay. But it is Applied's burden to prove harm to competition in the alleged market for ABDs

---

[5] Of the nine hospitals and health systems cited in the above testimony by Mr. McLaughlin and Mr. Johnson, seven are not relevant based on Applied's own calculations. Specifically, Medtronic's bundled discount contract at ███████████ passed the DAT, and Mr. Orszag did not bother to report the results of his DAT for ██████████████████████████████████████. *See* Stekloff Decl. Ex. C, Orszag Report App'x F.

[6] Mr. McLaughlin himself acknowledged that this hearsay is unreliable, for example because surgeons might "say[] one thing to Applied and another thing to [the hospital] administration." Stekloff Decl. Ex. A, McLaughlin Dep. Tr. 257:7–259:15.

1   under the parameters set by the Ninth Circuit in *PeaceHealth*. That, in turn,
2   requires proof that Medtronic's contracts fail the DAT and freeze out competition.
3   The Court should not allow Applied to run from that central analysis in favor of
4   self-serving, unreliable, uncorroborated hearsay.

Dated: January 13, 2026

Respectfully submitted,

By: */s/ Brian L. Stekloff*

Wilkinson Stekloff LLP
Brian L. Stekloff (*pro hac vice*)
Sarah Neuman (*pro hac vice*)
Alysha Bohanon (*pro hac vice*)
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
abohanon@wilkinsonstekloff.com
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000

Wilkinson Stekloff LLP
Keri Arnold (*pro hac vice*)
130 W 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8910
karnold@wilkinsonstekloff.com

Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (*pro hac vice*)
Alan B. Freedman (*pro hac vice*)
lbrannon@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500

Liang Ly LLP
Jason L. Liang (SBN 251235)
John K. Ly (SBN 247477)
jliang@lianglyllp.com
jly@lianglyllp.com
601 South Figueroa Street, Suite 1950
Los Angeles, CA 90017
Telephone: (213) 262-8000

*Attorneys for Defendant Medtronic, Inc.*