Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (*pro hac vice*)
Alan B. Freedman (*pro hac vice*)
lbrannon@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500

Wilkinson Stekloff LLP
Brian L. Stekloff (*pro hac vice*)
Sarah Neuman (*pro hac vice*)
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000

*Attorneys for Defendant Medtronic, Inc.*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> MEDTRONIC, INC., a Minnesota corporation, <br><br> Defendant. | Case No. 8:23-cv-00268-WLH-DFM <br><br> **MEDTRONIC'S SUPPLEMENTAL MEMORANDUM OF LAW REGARDING ITS MOTION FOR JUDGMENT AS A MATTER OF LAW** <br><br> HON. WESLEY L. HSU |

**INTRODUCTION**

For all of the reasons set forth in Medtronic's oral motion under Rule 50(a), no reasonable jury could find for Applied based on the evidence presented at trial. On the threshold question of market definition—on which every claim in the case relies—Applied has not introduced the evidence required to support a relevant antitrust market limited solely to handheld Advanced Bipolar Devices. Similarly, on its substantive claims, Applied has failed to deliver on each of the triable issues that precluded summary judgment. Applied has chosen not to press its exclusive dealing claim challenging Medtronic's "commitment" contracts for LigaSure. And, as to its bundling claim, Applied has failed to present evidence supporting the required elements, including exclusive capacity to bundle and monopoly power in the markets for other products in the bundle. Further, Applied has failed to show harm to competition, which is a required element of all of its antitrust claims. And finally, on damages, Applied's expert has not presented a model that could support a jury award. For all of these reasons and for those noted in Medtronic's oral Rule 50(a) motion, the Court should enter judgment as a matter of law for Medtronic.

This supplemental briefing provides additional support for the portion of Medtronic's Rule 50(a) motion directed specifically to Applied's exclusive dealing claim. Medtronic does not waive any of the other arguments raised under Rule 50(a) in its oral motion.[1]

---

[1] Applied's expert has admitted that his damages benchmarks cannot separate harm flowing from different types of challenged conduct—that is, Mr. Orszag took all of Applied's claims and created a model designed to measure damages on all of them collectively. 1/29/26 (Orszag) Tr. 244:6–10. Thus, judgment as a matter of law against one claim would have implications for Applied's damages claim, as explained in Medtronic's oral motion under Rule 50(a). Medtronic preserves all arguments.

## LEGAL STANDARD

Judgment as a matter of law is proper when there is no "legally sufficient evidentiary basis" for "a reasonable jury . . . to find for the [nonmoving] party on that issue." Fed. R. Civ. P. 50(a)(1). That is, before its claims can go to the jury, Applied must present "substantial evidence" as to each element of those claims. *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 734 (9th Cir. 1979) (affirming grant of judgment as a matter of law).

Only admissible evidence can support a verdict. *Weisgram v. Marley*, 528 U.S. 440, 453–54 (2000). Courts must thus disregard other evidence, including expert opinion, that is "not supported by sufficient facts to validate it in the eyes of the law"—or for which "indisputable record facts contradict or otherwise render the opinion unreasonable." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *see also, e.g., In re NFL "Sunday Ticket" Antitrust Litig.*, 2024 WL 3628118, at *3 (C.D. Cal. 2024) (granting judgment as a matter of law based on lack of record support for expert opinion).

## ARGUMENT

**I. No reasonable jury could find that Medtronic's contracts constitute anticompetitive exclusive dealing.**

### A. Applied has not presented its exclusive dealing claims.

Before trial, Applied promised to show that Medtronic's "commitment" contracts are unlawful exclusive deals. *See, e.g.*, Compl. ¶¶ 135–59; 170–90 (Count 1–3, 5–6), Dkt. No. 1; Joint Mot. for Summ. J. at 38, Dkt. No. 146-1 (arguing that Medtronic's share-based contracts are exclusive because customers make "a 'commitment' to purchase products"). But this is not how Applied presented the case to the jury. Instead, the focus of this trial has been entirely on bundled discounts.

**At trial, all witnesses agreed that commitment contracts are not exclusive**. An exclusive contract requires the buyer to buy a product from the

-2-

seller and "prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Healthcare Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010); *Aerotec Int'l Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) ("A prerequisite to any exclusive dealing claim is an agreement to deal exclusively."). In this case, the jury heard consistent testimony from witnesses for both Applied and Medtronic that contracts under which customers receive a discount in return for committing to try to buy a target amount of a product (say, 80% of their ABDs) from the supplier *do not require* the customer to buy at that level, much less require it to buy from the supplier exclusively. 1/29/26 (Orszag) Tr. 219:6–8 (a commitment is not a guarantee); 2/2/26 (Anderson) Tr. 144:6–8 (commitments are "never a guarantee"); Corley Tr. 325:10–326:20 (customer is "not required" to purchase the percentage commitment specified). Further, all witnesses agreed that, if a customer chooses not to buy the volume specified in the contract, the only potential consequence is that the customer might lose its volume discount on that product moving forward. 1/28/26 (Popma) Tr. 137:08–24 (customer might move to a different price "bracket in the year after" if it was not in compliance); 2/2/26 (McDaniel) Tr. 218:4–6 (only potential consequence is possible change in forward-looking pricing); *id.* at 236:7–237:22 (Medtronic did not raise prices on other products when Ascension fell out of compliance on purchases of another Medtronic product and did not attempt to recover past discounts).

Not only did the jury hear that commitment contracts are not exclusive, it also heard that **commitment contracts are industry standard**. 1/28/26 (Popma) Tr. 136:13–23 (Applied has contracts for "80% commitment"); 1/21/26 (Johnson) Tr. 180:7–21 (Applied "typically" has committed pricing on its contracts); 2/2/26 (McDaniel) Tr. 277:17–20 (tiered commitments are industry standard). The fact that other suppliers, including Applied, also use commitment contracts is telling—where firms that plainly lack market power also engage in such behavior,

there are likely efficiency gains from the practice.  *Cf., e.g., Cascade Health Sols. v. PeaceHealth,* 515 F.3d 883, 899–900 (9th Cir. 2008) ("efficiencies, and not schemes to acquire or maintain monopoly power, likely explain the use of bundled discounts because many firms without market power offer them") (citing Antitrust Modernization Committee Report);  *United States v. Microsoft*, 253 F.3d 34, 92–93 (D.C. Cir. 2001) ("ubiquity of bundling," including "among firms without market power," "should give courts reason to pause before condemning such behavior").  And, in fact, the evidence is uncontroverted that commitment contracts do have benefits, including helping suppliers to predict production needs, which reduces waste and creates efficiencies that are shared with customers in the form of discounts.  2/2/26 (Anderson) Tr. at 143:23–144:5 (volume discounts are "basic economics"); 1/21/26 (Johnson) Tr. 181:15–23 (agreeing that volume discounts are "a basic business principle").

Finally, Applied has not presented evidence to the jury to support a finding that Medtronic entered into a sufficient volume of exclusive contracts to substantially foreclose competition in the alleged market.  For all of these reasons, Applied's Count 4—for exclusive dealing—fails as a matter of law.

### B. The evidence at trial affirmatively disproves Applied's pre-trial claims that Medtronic's contracts are exclusive.

Applied's exclusive dealing claims independently fail for another reason: At summary judgment, this Court recognized that Medtronic's contracts are not by their terms exclusive.  *See* Order re Mot. for Summ. J. at 11, Dkt. No. 256. The Court allowed Applied to proceed to trial to attempt to show that "something more than the discount itself" caused Medtronic's commitment contracts to become *de facto* exclusive agreements.  *Id.*  This Court identified two possible issues: (1) Medtronic's generator agreements might "lock customers in" to purchasing LigaSure, or (2) the contracts might prevent hospitals from trialing competing ABDs.  *See* Order re Mot. for Summ. J. at 11, Dkt. No. 256.  But the

evidence is now in, and no reasonable jury could find either predicate.

**Generators**.  Medtronic's generator contracts do not convert its LigaSure contracts to exclusive deals.  To the contrary, the limited evidence at trial related to generators, including the testimony that Professor Murphy will offer on Tuesday, affirmatively shows that generators are a minor financial consideration for hospitals compared to ABD handsets, which generally cost in total more than ten times as much as generators.  Murphy Rpt. ¶¶ 269–73, Dkt. No 252 (Joint App'x of Evid. Vol. 17, Ex. 414).

Applied's Gary Johnson asserted broadly that he believes Medtronic's generator contracts can make it difficult to switch to Voyant. 1/21/26 (Johnson) Tr. 144:14–145:9.  But Mr. Johnson also testified that he has never seen a Medtronic generator contract, and neither he nor any other Applied witness offered testimony disputing that generator costs are a small fraction of ABD pricing. *Id.* at 140:11–13.[2]  Every generator agreement in the record is terminable for convenience by the hospital.[3]  Mr. Orszag offered some very conclusory testimony about generators, but acknowledged that he performed no expert analysis: instead, he simply offered "anecdotal evidence" that some of Medtronic's contracts have longer terms than others. 2/2/26 (Orszag) Tr. 60:1–17.  Mr. Orszag suggested based on this anecdotal evidence that, if a customer switches ABD suppliers, it might need to finish paying for a generator early.  *Id.*  Or not.  *See, e.g.,* 2/2/26 (Anderson) Tr. at 98:01–10 ("large majority" of generators are purchased directly by hospitals up front, meaning that customers "value the technology").  And if hospitals buy Medtronic generators and stop

---

[2] ("Q. Have you personally seen any Medtronic agreements? A. No, I have not.").

[3] TX2486 (University of Chicago Medical Center, "Either party may terminate this Agreement by giving thirty 30 days written notice to the other party"), TX2608 (Baylor Scott & White Medical Center Lake Pointe) (same), 2389 (Mount Sinai Hospital) (same).

buying LigaSure, they can continue using those generators to power reprocessed ABDs or other surgical devices.  2/2/26 (Anderson) Tr. 155:13–18 (reprocessed devices use the same generator); *id.* (Medtronic generator powers other surgical devices); *accord* 1/21/26 (Johnson) Tr. 213:17–20 (admitting that Medtronic's generators power monopolar, standard bipolar, and advanced bipolar devices).[4]

**Finally, and perhaps most important, Applied presented no evidence from *any* hospital that it wished to buy a different ABD but was prevented from doing so by a Medtronic generator contract.**  Applied could have deposed any hospital witness in the country, but chose not to do so.  And the evidence introduced at trial shows that numerous LigaSure customers in fact switched between different ABD suppliers.  *See, e.g.*, Montgomery Tr. 81:07–19 (HPG customers switching to Voyant); 1/27/26 (Carpenter) Tr. 42:09–12 (Baystate); *id.* 189:22–190:21 (Princeton); 1/27/26 (McLaughlin) Tr. 95:24–96:05 (Univ. of Tennessee); 1/27/26 (McLaughlin) Tr. at 136:17–20 (ProMedica); TX10.0044 (sales strategy aimed at "Reclaim[ing] Lost Business (business that has been lost due to . . . reprocessing); TX10.0050 (sales strategy targeting "surgeon(s) who recently switched to Enseal").  Under these circumstances, the evidence introduced at trial cannot support the conclusion that Medtronic's generators "forced customers to purchase" Medtronic's ABDs.  *Allied Orthopedic*, 592 F.3d at 997.

**Voyant Evaluations**.  The other potential factor that the Court identified in denying summary judgment on the exclusive dealing claim is that Applied

---

[4] Applied, unlike other ABD suppliers, offers generators that power only its own devices.  1/21/26 (Johnson) Tr. 213:21–25.  A hospital using Applied's generator thus *needs* another generator to power its monopolar and standard bipolar devices.  *Id.* at 213:26–27; 1/27/26 (Carpenter) Tr. 37:4–38:4.  Applied mentioned only under cross-examination that it is currently in the process of launching a new generator that powers other devices, in response to customer demand.  1/21/26 (Johnson) Tr. 215:22–216:17.

might produce evidence showing that Medtronic prevents hospitals from trialing Voyant. Summ. J. Order at 11, Dkt. No. 256. But the evidence at trial showed that, in fact, Applied does conduct trials for Voyant, including at hospitals that have LigaSure contracts. 1/27/26 (McLaughlin) Tr. 168:23–169:03 (conducting a successful trial at a hospital with an 80% "commitment" contract for LigaSure); 1/21/26 (Johnson) Tr. 137:20–24 (describing "successful evaluations"), 143:11–144:13 (acknowledging "20 percent window in [LigaSure contracts] in which you can go in and do these evaluations"); TX1857 (Applied's "Loyalty List" noting ongoing and upcoming Voyant trials at numerous hospitals). Applied has seen success in trials. *See* TX1820 (discussing Applied's success with having individual surgeons try Voyant as a way of "opening the doors" at hospitals, because "[a]s we all know, [s]urgeons are extremely effective in getting what they want, and also quite effective in keeping out what they[] don't want.").

As with generators, **Applied has introduced no testimony from any hospital that it wanted to conduct an evaluation of Voyant but was unable to do so because of Medtronic's contracts**. Applied bears the burden of proof and, again, it could have deposed any hospital witness in the country, but chose to offer none. Thus, no hospital testimony has been presented to the jury. And every surgeon to testify at trial—including Applied's own witnesses—stated that he or she has access to Voyant. Naffziger Tr. 18:04–21:9 ("My hospital does have both [Voyant and Ligasure] available"); Cepeda Tr. 25:17–27:12 ("We have the LigaSure . . . and the Voyant."); 2/2/26 (Arthur) Tr. 31:7–32:19.

Applied also complains that, where it has run trials, Medtronic has in some cases responded by competing to try to keep the business. *See, e.g.*, Corley Tr. 305:11–307:10 (Phelps Health). But that is competition at work. Applied also complained that some customers ran Voyant trials and "used" Applied to get better pricing from Medtronic with what Applied believes was no real intention to switch suppliers. *See* 1/26/26 (Johnson) Tr. 84:01–86:20 (discussing TX1854

and complaining that customer "made us jump through a lot of hoops without, I don't believe, the full intention of converting to us"). But this does not prove that contracts prevented customers from evaluating Voyant, and Applied chose not to introduce testimony from a single hospital witness saying otherwise. In fact, it shows just the opposite: being used for leverage by customers is likewise competition, not exclusivity. On this record, no reasonable jury could find that Medtronic's contracts systematically prevented customers from conducting trials of Voyant and that this converted Medtronic's contracts to exclusive contracts.

**No Other Support.** Finally, for the sake of completeness, the evidence at trial does not resemble other cases in which defendants have been found to have engaged in *de facto* exclusive dealing. Applied's evidence does not match the fact pattern in *Masimo*, in which "[t]o get out of an agreement with Tyco, a member hospital would either have to leave the GPO or ask the GPO to terminate its agreement with Tyco." *Masimo Corp. v. Tyco Corp.*, 2006 WL 1236666, at *14 (C.D. Cal. 2006). No such evidence has been presented to suggest that GPO contracts control hospital decisions here. Indeed, Applied has introduced evidence showing the opposite. *See, e.g.,* 1/26/26 (Weaver) Tr. at 136:01–08 (GPO agreements do not guarantee any sales and hospitals make their own choices). Similarly, this case lacks evidence that nominally nonexclusive contracts became exclusive because the defendant refused to sell to customers that buy from rivals. *Cf., e.g.*, *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *2 (C.D. Cal. 2013) ("[Defendant] has told hotels that unless they work with [it] on an exclusive basis, they will lose all of their content distribution through [defendants]'s vast network of locked-in distribution channels." (cleaned up)); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282–83 (3d Cir. 2012) (defendant threatened to cut off all sales to customers that dealt with a rival, and no customer "could afford to lose [defendant] as a supplier"). There is no evidence in this case that Medtronic has ever refused to sell LigaSure

to any customer.

### C. Applied has not shown Medtronic's contracts substantially foreclose competition.

Applied's exclusive dealing claim independently fails because it has produced no evidence from which a reasonable jury could find that Medtronic used exclusive contracts that substantially foreclosed competition. *Omega Env't., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 334 (1961).

Here, the evidence presented at trial shows that Medtronic's LigaSure contracts are short term and in practice readily terminable. Even contracts that are exclusive are not actionable if they are short term or terminable on short notice. *Omega*, 127 F.3d at 1163–64. At trial, the evidence showed that Medtronic, like Applied, generally has ABD contracts with three-year terms, 1/21/26 (Johnson) Tr. 142:14–143:6.[5] Under the law, three years is short term particularly where, as here, it is undisputed that the contracts contain a formal right to terminate for convenience on short notice, and customers can buy a lower volume than a commitment target or indeed stop buying entirely at any time. *See W. Parcel Exp. v. UPS of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) (describing contracts up to three years as short term); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. 2014) (noting that contracts of three to five years have been deemed acceptable). Specifically, the uncontroverted evidence, including forthcoming testimony from Prof. Murphy, shows that Medtronic's contracts with hospitals are virtually *all* terminable by the hospital at will generally on 30 days' notice, and as noted above all witnesses agree that

---

[5] The evidence shows that, out of many thousands of contracts, Medtronic and Applied have a handful that have terms up to five years. *See* TX2280 (Parkview Health); TX2314 (UC Davis); TX2353 (UC Irvine); 1/21/26 (Johnson) Tr. 177:1–2 (Applied has some contracts longer than three years).

-9-

customers retain the right to buy less than a commitment target at any point. 1/29/26 (Orszag) Tr. 206:20–24; *see W. Parcel Exp.*, 65 F. Supp. 2d at 1064–65 (three-year contracts terminable on 30 days' notice do not support exclusive dealing claim); *see also supra* at 3 (witnesses agreeing that "commitments" are not a guarantee).  Under these circumstances, no reasonable jury could find that Medtronic's contracts are exclusive deals that substantially foreclose competition. To the contrary, to win over the sales at issue "a competing manufacturer need only offer a better product or a better deal." *Omega*, 127 F.3d at 1163–64.

## CONCLUSION

The Court should grant judgment as a matter of law to Medtronic on all claims for the reasons noted in Medtronic's oral Rule 50(a) motion.

Dated: February 2, 2026                  Respectfully submitted,


By: */s/ Leah Brannon*

Cleary Gottlieb Steen & Hamilton LLP
Leah Brannon (*pro hac vice*)
Alan B. Freedman (*pro hac vice*)
lbrannon@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: (202) 974-1500

Wilkinson Stekloff LLP
Brian L. Stekloff (*pro hac vice*)
Sarah Neuman (*pro hac vice*)
bstekloff@wilkinsonstekloff.com
sneuman@wilkinsonstekloff.com
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000

Liang Ly LLP
Jason L. Liang (SBN 251235)
John K. Ly (SBN 247477)
jliang@lianglyllp.com
jly@lianglyllp.com

1            601 South Figueroa Street, Suite 1950
               Los Angeles, CA 90017
2            Telephone: (213) 262-8000

3            *Attorneys for Defendant Medtronic, Inc.*

**Local Rule 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Medtronic, Inc., certifies that this brief contains 3039 words, which complies with the word limit of L.R. 11-6.1.

Dated:        February 2, 2026        CLEARY GOTTLIEB STEEN & HAMILTON LLP


By: *Leah Brannon*
Leah Brannon (*pro hac vice*)
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037-3229

*Attorney for Defendant Medtronic, Inc.*