Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Joseph R. Re (SBN 134479)
Joe.re@knobbe.com
Joseph F. Jennings (SBN 145920)
Joe.jennings@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
Cheryl T. Burgess (SBN 250101)
Cheryl.burgess@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

Attorneys for Plaintiff,
APPLIED MEDICAL RESOURCES CORPORATION

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>Defendant. | Case No. 8:23-cv-00268-WLH-DFM<br><br>**APPLIED MEDICAL RESOURCE CORPORATION'S RESPONSE TO MEDTRONIC'S MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial: January 20, 2026<br><br>Hon. Wesley S. Hsu |

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................ 1

II.   LEGAL STANDARDS ...................................................................... 1

III.  ARGUMENT ...................................................................................... 2

      A.    Substantial Evidence Supports Applied's Exclusive Dealing Theory ........................................................................ 2

            1.    Medtronic Ignores The Court's Summary Judgment Order ................................................................ 2

            2.    Medtronic Ignores Competing Evidence ............................ 3

      B.    Medtronic's Arguments Do Not Show Otherwise ........................ 8

            1.    Applied Presented Its Exclusive Dealing Theory ............... 8

            2.    The Evidence At Trial Did Not "Disprove" Applied's Theories ................................................................ 9

      C.    Applied Presented Evidence Of Substantial Foreclosure ............. 11

      D.    Applied's Damages Theory Is Not Dependent On A Finding Of Exclusive Dealing ............................................... 15

IV.  CONCLUSION .................................................................................. 16

1

# TABLE OF AUTHORITIES

2

Page No(s).

3

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
    836 F.3d 1171 (9th Cir. 2016) ................................................ 2, 3

4

5

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ...................................................... 9

6

*City of Long Beach v. Standard Oil Co.*,
    872 F.2d 1401 (9th Cir. 1989) ................................................... 16

7

8

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690, 82 S. Ct. 1404 .................................................... 16

9

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
    141 F.4th 1075 (9th Cir. 2025) .................................................... 2

10

11

*In re Google Play Store Antitrust Litig.*,
    2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) ................................ 9

12

*Greyhound Computer Corp. v. Int'l Bus. Machines Corp.*,
    559 F.2d 488 (9th Cir. 1977) ...................................................... 9

13

14

*McWane, Inc. v. F.T.C.*,
    783 F.3d 814, 838 (11th Cir. 2015) .......................................... 12

15

16

*Masimo Corp. v. Tyco Health Care Grp., L.P.*,
    350 F. App'x 95 (9th Cir. 2009) .......................................... 2, 11

17

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ................................................... 15

18

19

*Omega Env't., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................... 13

20

*Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*,
    2021 WL 461707 (S.D. Cal. Feb. 9, 2021) .................................. 9

21

22

*PNY Techs., Inc. v. SanDisk Corp.*,
    2014 WL 2987322 (N.D. Cal. 2014) ......................................... 14

23

24

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
    2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ...................... 3, 9, 10

25

*Ryko Mfg. Co. v. Eden Services*,
    823 F.2d 1215 (8th Cir.1987) .................................................... 13

26

27

*Simon and Simon PC v. Align Technology, Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. Apr. 8, 2021) ............................ 3

28

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Tampa Elec. Co. v. Nashville. Co.*,
    365 U.S. 320 (1961) .............................................................2, 13, 14

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ....................................................... 9

*W. Parcel Exp. v. UPS of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ...................................... 14

*White v. Ford Motor Co.*,
    312 F.3d 998 (9th Cir. 2002).......................................................1

## OTHER AUTHORITIES

L.R. 11-6.1 ............................................................................................. 17

L.R. 11-6.2 ............................................................................................. 17

Rule 50 ..................................................................................................... 1

# I.  <u>INTRODUCTION</u>[1]

Medtronic's Rule 50(a) Motion should be denied in full.  Far from showing a lack of substantial evidence, Medtronic rehashes legal arguments that the Court rejected and improperly asks this Court to weigh conflicting evidence.

Medtronic relies on a fundamental misstatement of antitrust law: that its contracts cannot be exclusive because they are ostensibly "terminable at will" or labeled as "commitments."  But this Court already rejected those arguments and recognized a *de facto* theory of exclusive dealing.  As the Court explained—and Medtronic ignores—a contract is exclusive if its "practical effect" is to foreclose competition.  Medtronic has no support for its arguments to the contrary.

Medtronic also incorrectly asserts Applied failed to support its exclusive dealing theory.  Contrary to Medtronic's argument, Applied presented abundant evidence that Medtronic's contracts are (a) long-term agreements, (b) not easily terminable, (c) include staggered expiration dates to prevent switching, (d) target competitors and customers with whom competitors are making progress, (e) prevent hospitals from conducting clinical trials, (f) work in tandem with generator agreements to limit switching, and (g) substantially foreclose competition.  The Court should deny Medtronic's Motion.

# II.  <u>LEGAL STANDARDS</u>

"Judgment as a matter of law is proper only if the evidence and all reasonable inferences in favor of the verdict could lead a reasonable person to only one conclusion, that the moving party was entitled to judgment."  *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).  The Court must not weigh the evidence or assess the credibility of witnesses.

---

[1] Medtronic begins its motion by reiterating its "kitchen sink" oral Rule 50(a) motion.  Br. at 1.  That portion of Medtronic's motion is devoid of support and contradicted by the trial record.  Applied limits this responsive brief to the substantive points raised in Medtronic's written Rule 50(a) motion.

# III.  ARGUMENT

## A.  Substantial Evidence Supports Applied's Exclusive Dealing Theory

Medtronic incorrectly asserts Applied did not present its exclusive dealing "claims."[2]  Br. 2.  Medtronic argues that because its contracts are "commitments," they cannot be exclusive.  *Id.* at 2-3.  This is legally and factually incorrect.

### 1.  Medtronic Ignores The Court's Summary Judgment Order

On summary judgment, this Court held that caselaw counsels in favor of a *de facto* theory of exclusive dealing that looks to the "practical effect" of contracts.  Dkt. 255 at 8.  The Court's opinion was well-reasoned and aligns with Ninth Circuit and Supreme Court precedent.  *See id.* (citing *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016); *Tampa Elec. Co. v. Nashville. Co.*, 365 U.S. 320, 328-29 (1961)); *see also Masimo Corp. v. Tyco Health Care Grp., L.P.*, 350 F. App'x 95, 97-98 (9th Cir. 2009) (upholding exclusive dealing verdict when defendant entered into market share agreements that constituted de facto exclusive dealing); *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 141 F.4th 1075, 1091 (9th Cir. 2025) ("To dismiss an exclusive dealing claim just because a contract does not expressly require exclusivity would be the type of overly formalistic rule that the Supreme Court has cautioned against in antitrust cases.")

As the Ninth Circuit explained, purported discounts "conditioned on a promise of exclusivity or on purchase of a specified quantity or market share of the seller's goods or services may be understood as '*de facto*' exclusive dealing contracts because they coerce buyers into purchasing a substantial amount of their

---

[2] Medtronic repeatedly characterizes exclusive dealing as a "claim," but it is actually a theory of anticompetitive conduct.  Applied's Section 2 claims are premised on anticompetitive conduct comprising bundling, exclusive dealing, or combinations thereof.  Dkt. 281 (memorandum of contentions of fact and law) at 6-7; *id.* at 11 (same for Section 1 claim).  Indeed, the Court's summary judgment recognized the combined effect of bundling and exclusive agreements.  Br. at 13.

needs from the seller." *Aerotec*, 836 F.3d at 1182; *see also Simon and Simon PC v. Align Technology, Inc.*, 533 F. Supp. 3d 904, 916-18 (N.D. Cal. Apr. 8, 2021) ("even without an explicit agreement of exclusivity, a monopolist can violate section 2 by entering arrangements that have the '***practical effect***' of preventing buyers from doing business with the monopolist's competitors").[3]  Medtronic's arguments to the contrary are unsupported.

### 2. Medtronic Ignores Competing Evidence

There is "no set formula" for evaluating exclusive dealing, but courts generally look for "significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects." *Pro Search Plus, LLC v. VFM Leonardo, Inc.,* 2013 WL 6229141 at *5 (C.D. Cal. Dec. 2, 2013).  Here, Applied presented substantial evidence that Medtronic's agreements are de facto exclusive and have the "practical effect" of preventing customers from purchasing from competitors.

***First***, Applied put forward substantial evidence that Medtronic has significant market power, and indeed monopoly power, in a market for advanced bipolar devices or, in the alternative, a market for advanced bipolar devices and ultrasonic devices.  *See, e.g.,* Trial Tr. (Jan. 28, 2026) at 192:1-195:7 (unrebutted expert testimony establishing that Medtronic has monopoly power), 202:8-22 (Medtronic has monopoly power even if ultrasonic devices are included); JTX.318.0001; JTX 102.0013-14; JTX 524.0001; JTX 322.0004; JTX-18.0013.

***Second***, Applied presented substantial evidence that Medtronic's contracts are long-term agreements of three to five years.  *See, e.g.*, JTX-135 (seeking "5 year agreement" because "***long term protection*** in this day and age is paramount"); Trial Tr. 24:2-7 (Jan. 29, 2026) (Medtronic's agreements "range

---

[3] All emphasis in quotations is added unless noted otherwise.

-3-

from ***three to five years***"); Corley Depo. Tr. 94:2-5 (agreeing "it is common for contracts between Medtronic and customers to last multiple years"); Trial Tr. 150:25-151:1 (Jan. 21, 2026) (MDT is "going to recover from the business [it] lost during the backorder, [through] the strength of [its] long-term contract"); JTX-531.0001 ("Take a moment and enjoy this win as one of our biggest customers is ***locked down for years to come***"); Trial Tr. 137:9-13 (Jan. 26, 2026); Trial Tr. (Feb. 2, 2026) 223:2-4; JTX-155.0001; McGovern Depo. Tr. 264:08-19.

***Third***, Applied presented substantial evidence that Medtronic's agreements are not easily terminable.  *See, e.g.*, Trial Tr. (Jan. 29, 2026) 74:20-75:6 (terminating agreement "***sounds a lot easier than it is in reality***, because of that penalty pricing"); JTX-276.0002 (Medtronic "Call to Action" includes using "economic levers" that "layer[] in additional contractual barriers to assist in averting competitive threat"); JTX-280.0001 (listing as a "success story" an "agreement that ties in all [classes of trade] into one large agreement.  Creep on any of them puts their 5% wrap in serious jeopardy.  As '***iron clad***' as an agreement can get"); JTX-282.0002 (a team of sales people "share their new skills and strategies in an effort to ***build a fortress*** around their accounts").

***Fourth***, Applied also presented substantial evidence that Medtronic staggers the expiration of its agreements to prevent hospitals from easily switching.  *See, e.g.*, JTX-135 ("I want to stay with the 5 year agreement as it will transcend the end of the current NPC Endo and the end of any new 3 year agreement"); Trial Tr. (Jan. 21, 2026) 144:14-145:9 ("So if you win the business, but if they still owe money on the generators, they may not be able to switch to you anyways, because they have to use the disposable device to keep their generators in the hospital, or pay for the generators" and "that non-coterminous arrangement puts another wrinkle in trying to move to a new supplier in this area"); Trial Tr. (Feb. 2, 2026) 59:20-60:17 (if customer decided to terminate "what in certain circumstances could happen is they would then be facing a

generator agreement.").

**Fifth**, Applied also presented substantial evidence that Medtronic amplifies the preclusive effect of Medtronic's agreements by targeting customers with whom competitors like Applied are making progress. *See, e.g.*, Trial Tr. (Jan. 29, 2026) 72:21-74:5 ("***targeting plays a really important role***. And you have to factor that in . . . ."); JTX-58.0007 ("Broad Mitigant" against Applied includes "Aggressive contracting w/ Applied accounts"); JTX-91.0069 ("***We Can Not Allow Energy Market To Be The Next Win For Applied***"); JTX-94.0006–0131 ("Winning Against the Competition: Focus on Applied Medical" presentation instructs focusing on account "pain points"); JTX.152.0001 ("no Applied, Olympus, etc… is the objective"); JTX-78.0006 ("Overarching objectives" include "Leverage the full portfolio to maximize ability to ***mitigate losses and realize gains in key accounts***"), 0007 ("Key portfolio/programmatic priority areas" include "Portfolio leverage across iOUs (w/ILS, Visualization) in both top priority ***at-risk accounts and targeted conversion accounts***"); JTX.153.0002; JTX-154.0001; JTX-155.0001; JTX-158.0002; JTX-327.0001; JTX-330.0001; JTX-457.0004; R. Murphy Depo. Tr. 46:01-05, 46:15-18; JTX-176.0001; JTX-183.0003; JTX-189.0001; JTX-328.0001; JTX-329.0001; JTX-341.0001; JTX-447.0001; JTX-514.0001; JTX-110.0001–0008; Shipman Depo. Tr. at 139:14-19; JTX-115.0002–0045; Trial Tr. 47:3-48:14 (Jan. 29, 2026); Trial Tr. 48:20-49:3 (Jan. 29, 2026); Trial Tr. 273:21-274:12 (Jan. 29, 2026); Trial Tr. 194:24-195:3 (Feb. 2, 2026).

**Sixth**, Applied presented substantial evidence that Medtronic leverages its agreements to prevent hospitals from conducting product trials. *See, e.g.*, Trial Tr. (Jan. 26, 2026) 182:12-183:4 (Bundling from the competition "makes it very challenging and "sometimes we can't even start a trial and give the opportunity to the surgeons to trial the product"); 188:21-23 (Jan. 26, 2026); Trial Tr. 24:14-25:4 (Jan. 29, 2026) ("In order to bring in a new product you need to trial the

product" and "these agreements make trials difficult"); JTX-139.0011 ("*If accounts begin competitive trials communicate violation* of our pricing agreements and be prepared to take them to access/list tier"); JTX-176.0001 ("We moved the customer to Access pricing *midway through the trial* motivating them to expedite making a decision / wrap up the trial"); JTX-183.0003 ("We are trying to *eliminate the competition from getting a window that would allow for a trial* of their energy portfolio and believe we have a critical opportunity to close that shut."); JTX-187.0001 ("I want to have HPG notify [the hospital] to stop" trialing Voyant); JTX-189.0001 ("If someone is using [Voyant], tell them it is off contract and *threaten to move price* for using a non-contracted supplier."); JTX-341.0001 ("Setting proper expectations, *if MSK threatens to trial Applied again, we default to their current Exact pricing*."); JTX-447.0001; JTX-514.0001; JTX-528.0003; Trial Tr. 179:14-180:14 (Jan. 26, 2026).

**_Seventh_**, Applied presented evidence that Medtronic's generator agreements work in concert with its agreements and other provisions to limit switching. *See, e.g.*, Trial Tr. 59:14-19 (Feb. 2, 2026) ("There is an array of agreements that make it more difficult for a hospital to switch from the LigaSure product to the Voyant product, and the generator agreements are part of that."); JTX 2389; JTX 2486; JTX 2608; JTX 2741.

**_Eight_**, Applied presented evidence of substantial foreclosure. Trial 45:3-6 (Jan. 29, 2026); Trial 45:21-46:6 (Jan. 29, 2026); Trial 46:9-46:21 (Jan. 29, 2026) ("on the 22 percent number, you would multiply that and you get 17 percent of the overall market. And if I take the far right-hand side, the 68 percent, you would end up with a number of 47 percent foreclosure on a market-wide basis."); JTX-295.0003 ("Sell Everything, look to *monopolize* Energy, Endo, ES, Hernia, Legacy GSP, and yes EVEN Suture); JTX-180.0001 (customer complains about "[b]undling of product lines in an attempt to force conversion on one product line in order to obtain savings on another. Unacceptable when the conversion would

result in a cost increase wiping out the savings"); JTX-654 ("I have re-run the savings and usage, and although there is savings, we would be putting our overall contract at risk and we cant have that happen.  The loss would be so much larger than the smaller savings."); JTX-152.0001; JTX-153.0002; JTX-514.0001; JTX-531.0001; JTX-330.0001; JTX-155.0001; JTX-154.0001; JTX.153.0002;

**_Ninth,_** Applied put forward substantial evidence of the anticompetitive effects of Medtronic's agreements.  Mr. Orszag explained that, absent Medtronic's conduct, there would be lower prices, more innovation and greater customer choice.  Trial Tr. (Jan. 29, 2026) at 63-68.  Mr. Johnson explained how Applied's business model allows it to lower costs as its sales expand.  Trial Tr. (Jan. 21, 2026) at 156-57.  Mr. Orszag explained how that puts price pressure on the market and lowers prices.  *See, e.g.,* Trial Tr. (Jan. 29, 2026) at 63 (if there were "more competition and you had the ability for Applied to get lower costs, they would come in and be able to offer even lower prices to bring down the market price."); *id*. at 63-64 ("they are a lower-priced option today and there are **_contracts that they can't bid for_**, and you can't have that direct competition as a result of that."); *id*. at 68 (explaining that Medtronic's conduct has resulted in non-price effects such as less innovation and customer choice); *id*. at 265 ("if Applied were able to have higher sales and could get the higher -- the more economies of scale that could result, that would produce benefits to this market…").  Orszag also showed that the anticompetitive harm of Medtronic's contracts outweighed any alleged procompetitive benefits.  Trial Tr. (Jan 29, 2026) at 69-71 (explaining overall opinion on procompetitive benefits and why Medtronic could still offer its contracts to customers even if it allowed a carveout for non-full-line suppliers like Applied).

Moreover, during the cross-examination of Medtronic's corporate representative yesterday, the jury heard a video from Medtronic's Chairman & CEO where he explained Medtronic's restrictive contracts as follows:

The contracting we do a lot of that is directly between us and the hospital. So we have ***very tight contracts*** that have been tested over time, y'know, like if we have a supply shortage and then – y'know, and a competitor takes up that and we get it back, y'know, we get our --we get that supply back. We're right back to where we were ***based on the contract.*** So these contracts with the hospitals are ***pretty tight*** as well*.*

Trial Tr. 192:12-17 (Feb. 2, 2026).

Accordingly, Applied presented substantial evidence of the "practical effect" of Medtronic's contracts. The jury is entitled to find that Medtronic's "tight contracts" and its repeated threats to punish customers who seek to trial competing products have the practical effect of excluding competitors.

## B.   **Medtronic's Arguments Do Not Show Otherwise**

Medtronic raises a series of arguments, none of which have merit.

### 1.   **Applied Presented Its Exclusive Dealing Theory**

Medtronic begins with the unsupported assumption that Applied has somehow failed to present any exclusive dealing theory and instead has focused entirely on bundling. Medtronic is incorrect as shown above. While much of the evidence ***also*** concerns bundling, that does not make the evidence irrelevant to exclusive dealing. For example, Medtronic's bundled contracts are typically long-term contracts with high market share commitments as to ABDs. *See, e.g.*, Trial 24:1-24:13 (Jan. 29, 2026); JTX 2273 (three-year agreement with 90% vessel sealing commitment). Such contracts have the "practical effect" of foreclosing competition for ABDs independent of whether they also constitute unlawful bundling under the Discount Attribution Test ("DAT").

Medtronic also argues that "all witnesses agreed that commitment contracts are not exclusive." Br. at 2. Medtronic's argument is incorrect and simply ignores the Court's ruling that Applied can properly pursue a theory of *de facto* exclusive dealing. *Supra* Section III.A.1. Medtronic also argues that JMOL is appropriate because "commitment contracts are industry standard." Br. at 3. But

-8-

1   "[i]t is no answer to the charge to say that these practices are not 'predatory' but

2   'honestly industrial' that is, of a kind an ordinary enterprise might utilize with

3   impunity." *Greyhound Computer Corp. v. Int'l Bus. Machines Corp.*, 559 F.2d

4   488, 498 (9th Cir. 1977). A company with monopoly power can be "precluded

5   from employing otherwise lawful practices that unnecessarily excluded

6   competition" from the market. *Id.*; *In re Google Play Store Antitrust Litig.*, 2024

7   WL 4438249, at *5 (N.D. Cal. Oct. 7, 2024) ("Some of the prohibited conduct

8   might be legitimate when done by a company without monopoly power"); *Pac.*

9   *Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*, 2021 WL 461707, at *5 (S.D.

10  Cal. Feb. 9, 2021); *Pro Search Plus,* 2013 WL 6229141 at *5 (There is "no set

11  formula" for evaluating exclusive dealing, but courts generally look for

12  "significant market power by the defendant").

13          Medtronic cites two cases, but neither supports its position. The portion of

14  *PeaceHealth* that Medtronic cites criticized the Third Circuit's bundling standard.

15  *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 899–900 (9th Cir. 2008).

16  Medtronic also cites *Microsoft*, but that case explained why a tying theory of

17  bundling should not be analyzed under the ***per se*** rule. *See United States v.*

18  *Microsoft Corp.*, 253 F.3d 34, 92-93 (D.C. Cir. 2001). Neither case suggested a

19  monopolist's anticompetitive behavior is somehow immunized from scrutiny if

20  others with no such power engage in some similar practices.[4]

21          **2.      The Evidence At Trial Did Not "Disprove" Applied's Theories**

22          Medtronic claims Applied failed to present sufficient evidence on "two

23  possible issues" with Medtronic's exclusive contracts: (1) generator agreements

24  prevent switching and (2) hospitals are unable evaluate competing ABDs. Br. at

25  4. Medtronic is incorrect. As explained above, Applied presented substantial

26  

27  [4] Medtronic includes a cursory paragraph on substantial foreclosure at the end of
    this section of its brief. Br. at 4:14-17. Applied responds below when responding

28  to Medtronic's separate section on substantial foreclosure. *Infra* Section III.C.

evidence on both points. *Supra* Section III.A.2. Medtronic overreads the Court's summary judgment order, which did not limit Applied's exclusive dealing theory to only these two facts. *See* Dkt. 255 at 11 (explaining these categories "inform[ed]" its finding that Applied had raised a triable issue of fact as to whether "Medtronic's challenged agreements constitute de facto exclusive dealing"). Indeed, the Court specifically identifies other facts addressed above in its order. *Id.* at 12 (discussing evidence staggering various agreements). Regardless, Medtronic's arguments on each issue lack merit.

**Generators**. Medtronic argues Applied's evidence on generators are a "minor financial consideration," many hospitals purchase them up front, and generator agreements are "terminable" by the hospital. Br. at 5. That simply ignores the evidence. Trial Tr. 59:14-19 (Feb. 2, 2026) ("There is an array of agreements that make it more difficult for a hospital to switch from the LigaSure product to the Voyant product, and the generator agreements are part of that."); *See, e.g.*, JTX-2486 (Three-year contract with yearly payment of $14,297).

Medtronic argues that Applied's evidence is insufficient because Mr. Johnson had not himself seen a Medtronic generator agreement and Mr. Orszag analyzed some but not all agreements. But Medtronic points to no evidence that is inconsistent with Mr. Johnson's understanding of the agreements and Mr. Orszag's analysis of exemplary agreements.

Medtronic claims the "most important" fact on the generator issue is that no hospital testified that they wished they could buy a different ABD but were precluded by a generator agreement. Br. at 6. Medtronic cites no case requiring such specific testimony. Courts do not require an express exclusivity requirement and instead examine the agreement's real-world effects. *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *5 (C.D. Cal. Dec. 2, 2013). Medtronic also argues that some customers have been able to switch suppliers, but that does not defeat an exclusive dealing claim. This Court already rejected

the argument that 100% foreclosure is required on summary judgment. *See* Dkt. 147-1 at 26–27; SJ Order at 11–15; *Masimo*, 350 F. App'x 95, 97 (2009).

**Evaluations**.  Medtronic claims the evidence at trial shows "Applied does conduct trials for Voyant, including at hospitals that have LigaSure contracts." Br. at 7.  Again, the fact that some hospitals have conducted evaluations does not mean that Medtronic's efforts to stop competitive product trials has not harmed competition.  *See* Dkt. 147-1 at 26–27; SJ Order at 11–15; *Masimo*, 350 F. App'x 95, 97 (2009).

Medtronic argues the "most important" fact on this issue is that Applied did not call any hospital witness to testify that they were unable to conduct an evaluation due to Medtronic's contracts.  Again, that is not required.  And, as discussed above, the record contains ample evidence of Medtronic's contracts preventing hospitals from conducting trials.

Medtronic also argues that it is not improper for Medtronic to "compet[e] to try to keep the business" after Applied gets a trial.  Br. at 7.  But fairly competing for the business is not the issue.  As discussed above, the jury heard substantial evidence showing that Medtronic leverages its agreements to foreclose trials from even occurring in the first place.

**C.    Applied Presented Evidence Of Substantial Foreclosure**

At the end of its brief, Medtronic argues Applied's exclusive dealing theory fails because no reasonable jury could find substantial foreclosure.  Br. at 9-10. Medtronic is incorrect.   But Mr. Orszag provided unrebutted testimony on substantial foreclosure.  Trial 45:3-6 (Jan. 29, 2026); Trial 45:21-46:6 (Jan. 29, 2026); Trial 46:9-46:21 (Jan. 29, 2026) (identifying foreclosure percentages of at least "17 percent" and, in the alternative, "47 percent").

As the Court explained on summary judgment, Orszag's calculation that 17% of ABDs flow through bundles which fail the DAT" provides "a potential floor, but not a ceiling, for a foreclosure estimate." Dkt. 255 at 15 ("The Court is

aware of no authority which limits the jury to find that Medtronic has foreclosed only the portion of the market which flows through DAT-failing bundles.").[5] Medtronic's evidence of targeted bundling, in particular, supports a number far higher than 17%. As Mr. Orszag explained at trial:

> Imagine a monopolist, they had 100 percent of the market. Let's just make it very simple. And a new entrant came in and had a great product at a great price. And it goes to a hospital and says, "Here is our great product, great price" -- say it goes to five hospitals – "buy it." The monopolist comes in and offers this kind of bundled pricing and fails the discount attribution test for all five, blocks that -- those five from entering the market. Now, if you looked at the average discount attribution test, five out of the hundred hospitals would fail. And you would show a 5 percent number. But if all five that were competed for, it failed in 100 percent of those circumstances.

> Now imagine that entity with low prices, great product goes out to another five hospitals. Does the same thing, offers them the product. And the monopolist comes in and says, "We are going to give this new bundled pricing, and there is huge penalties if you don't buy from us." And so they fail the DAT again. Now you have 10 percent of the market failing the DAT, but it's 100 percent of the increment. And that is why, in some sense, if you think about targeting, the LNAs are a better approximation or proxy for the targeting, which has a much higher foreclosure rate, that 44 percent. And one way to think about it in terms of economics, we use a word called "contestable," what share of the market is contestable. That is, where can they compete. And if you think about the contestable share, that better approximates than the overall number.

Trial Tr. 47:11-48:14. Mr. Orszag's testimony is unrebutted and explains both the force of Medtronic's bundled pricing and why competitors are unable to break into hospitals in long term contracts with Medtronic.

---

[5] The Court also explained a specific foreclosure percentage is unnecessary because "[a]n exclusive-dealing plaintiff need not 'place an exact number on the percentage foreclosed' at *any* stage of the case." Dkt. 255 at 15 (quoting Amicus Brief on Behalf of the Federal Trade Commission, Docket No. 27-1 at 5 & *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015)).

The Court further held that Orszag's sensitivity analysis, which Mr. Orszag presented at trial, "raises a triable issue of fact that Medtronic forecloses a larger share of the ABD market than the percentage of sales which flow through DAT-failing bundles." Dkt. 255 at 16; *see* Trial Tr. 53:23-54:1 (Jan. 29, 2026). The Court also held a jury could infer a higher foreclosure percentage due to other evidence presented at trial and discussed above, including generator agreements, preclusion of clinical trials, targeting potential customers, and customers' fears of violating the agreements. *Id.*

Medtronic ignores Orszag's opinions and argues Applied cannot establish substantial foreclosure because its contracts "are short term and in practice readily terminable." Br. at 9. Medtronic simply ignores evidence to the contrary. As explained above, Applied introduced ample evidence that Medtronic's contracts are three-to-five years long and are not easily terminable. *See* Section III.A.2.

Medtronic also argues that, "[u]nder the law, three years is short term" for contracts with a termination clause and commitment pricing. Br. at 9. None of Medtronic's cases support its argument. The *Omega Env't., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163–64 (9th Cir. 1997), decision involved distribution agreements covering only retail petroleum dispensers, where the only barrier to switching was the text of the contract itself. *Id.* at 1159-63. Further, contrary to Medtronic's argument, the Ninth Circuit in *Omega* recognized that a ***lower*** standard of proof for foreclosure applies where the exclusive dealing restraint operates at the consumer level—as it does in this case. *Id.* at 1163 (quoting *Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215, 1235 (8th Cir.1987)). Here, unlike in *Omega*, the jury has heard ample evidence that barriers to switching exist beyond the mere 30-day termination term to which Medtronic refers.

Medtronic cites *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 334 (1961) for the general legal standard that a plaintiff must prove substantial foreclosure of the relevant market. But *Tampa Electric* explicitly directs courts

to weigh the "probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties," *id.* at 329, not just the contract's text. Here, Applied has shown the practical effects of Medtronic's agreements while Medtronic asks the Court to ignore those effects.

Finally, Medtronic cites a pair of inapposite cases from the Northern District to argue that contracts terminable on 30 days' notice cannot support an exclusive dealing claim. Br. at 9-10 (citing *W. Parcel Exp. v. UPS of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998) ("WPX") and *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. 2014)). *PNY* is inapposite because it was decided at the motion to dismiss stage, after the plaintiff failed to allege sufficient facts showing that the contracts effectively barred competitors from the market. 2014 WL 2987322, at *1. The court in *PNY* dismissed the claim because plaintiff had "not pleaded (beyond naked assertions) facts showing that it failed to win contracts despite offering better terms or that [defendant] somehow thwarted [plaintiff's] efforts to secure business through conduct other than competition on the merits." *Id.* at *6. But as demonstrated above, Applied has offered abundant evidence that it failed to win contracts despite offering better terms and that Medtronic's contracts kept Applied from competing on the merits.

In *WPX*, the court stated: "The duration and termination terms of the [contracts] do not support WPX's contentions that they are exclusive dealing contracts in violation of Section One. . . . A competitor could obtain one of UPS's customers by offering better prices or services and having the customer provide UPS with the contractually stated notice." 65 F. Supp. 2d at 1065. In contrast, the jury here has heard from Medtronic's own witnesses that its contracts create an all-or-nothing financial cliff where failing to meet targets causes great financial penalties. This financial Sword of Damocles creates a degree of economic coercion and lock-in that was absent in *WPX*.

-14-

**D.    Applied's Damages Theory Is Not Dependent On A Finding Of
Exclusive Dealing**

In a footnote, Medtronic argues "Mr. Orszag took all of Applied's claims
and created a model designed to measure damages on all of them collectively."
Br. at 1, n.1.    According to Medtronic, that alleged failure to disaggregate
damages means that granting its motion would completely eliminate damages.

Medtronic's premise is factually incorrect because Mr. Orszag's damages
are not based on a specific legal theory, but rather on Medtronic's conduct.
Medtronic's bundled pricing, associated contract terms and related conduct (such
as stopping product trials) are all relevant to a finding of anticompetitive conduct
regardless of whether they are analyzed under the legal theories of bundling or
exclusive dealing.  *See* Applied's Memorandum of Fact & Law, Dkt. 281 at 7-10
(outlining evidence supporting each legal theory).  To establish monopolization,
for example, Applied must establish "exclusionary conduct," which can be shown
under either legal theory or both.  *See MetroNet Servs. Corp. v. Qwest Corp.*, 383
F.3d 1124, 1130 (9th Cir. 2004) (identifying elements of monopolization).

Mr. Orszag explained that his damages calculation compared the actual
world to a but-for world with a carveout in which "Applied's sales would not
have counted towards whatever provisions are in the contract."  Trail Tr. (Jan. 29,
2026) at 87:15-22.  He compared two different "yardsticks" to see "what the
market would have looked like if there was not the conduct at issue in this case."
*Id.* at 88:7-25, 102:25-103:18, 119:3-9.  On cross, Mr. Orszag maintained that he
was measuring "what the but-for world would look like if there was a carveout
with regard to non-full-line suppliers with regard to ABD products." *Id.* at 243:6-
16.   Such a carveout remedies any legal theory of anticompetitive conduct
(bundling, exclusive dealing, or combinations thereof) because it eliminates the
force of Medtronic's conduct.

Medtronic's  argument  is  also  legally  incorrect.    Courts  should  give

1  plaintiffs the "full benefit of their proof" without "tightly compartmentalizing the
2  various factual components." *Continental Ore Co. v. Union Carbide & Carbon*
3  *Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404, 1410 (cleaned up); *City of Long Beach*
4  *v. Standard Oil Co.*, 872 F.2d 1401, 1404–05 (9th Cir. 1989) (same).
5  Disaggregation is not required when the conduct is intertwined.   Medtronic
6  identifies no authority requiring a plaintiff to separate damages artificially among
7  anticompetitive conduct that operates as a single system.

## IV.  **CONCLUSION**

9       Accordingly, the Court should deny Medtronic's motion for judgment as a
10  matter of law for at least the above reasons.

12                              Respectfully submitted,

13                              KNOBBE, MARTENS, OLSON & BEAR, LLP

15  Dated: February 3, 2026          By: /s/ *Adam B. Powell*
16                                   Joseph R. Re
                                     Stephen C. Jensen
17                                   Joseph F. Jennings
                                     Stephen W. Larson
18                                   Cheryl T. Burgess
                                     Adam B. Powell

19                                   Attorneys for Plaintiff,
20                                   APPLIED MEDICAL RESOURCES
                                     CORPORATION

## <u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>

The undersigned, counsel of record for Plaintiff Applied Medical Resources Corporation, certifies that this brief contains 4,955 words, which [choose one]:

 X  complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].

Dated: <u>February 3, 2026</u>          By: <u>/s/ Adam B. Powell</u>
                                                        Adam B. Powell

                                                        Attorneys for Plaintiff,
                                                        APPLIED MEDICAL RESOURCES
                                                        CORPORATION

-17-