**FILED**

CLERK, U.S. DISTRICT COURT

2/5/2026

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ lca _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, | Case No. 8:23-cv-00268-WLH-DFM |
| Plaintiff, | **FINAL JURY INSTRUCTIONS** |
| v. | |
| MEDTRONIC, INC., | |
| Defendant. | |

# TABLE OF CONTENTS

| Instr. Number | Title | Page |
|---|---|---|
| 19 | Duty of Jury | 4 |
| 20 | Burden of Proof—Preponderance of the Evidence | 5 |
| 21 | What is Evidence | 6 |
| 21A | Non-Hearsay Statement: Effect on the Listener | 6 |
| 22 | What is Not Evidence | 7 |
| 23 | Evidence for Limited Purpose | 8 |
| 24 | Direct and Circumstantial Evidence | 9 |
| 25 | Credibility of Witnesses | 10 |
| 26 | Corporations—Fair Treatment | 12 |
| 27 | Introduction: Purpose of the Sherman and Clayton Acts | 13 |
| 28 | All Claims: Relevant Market—General | 14 |
| 29 | All Claims: Relevant Product Market | 15 |
| 30 | Sherman Act Claims: Rule of Reason—Overview | 17 |
| 31 | Sherman Act Claims: Rule of Reason—Proof of Competitive Harm | 18 |
| 32 | Sherman Act Claims: Rule of Reason—Evidence of Competitive Benefits | 20 |
| 33 | Sherman Act Claims: Rule of Reason—Balancing the Competitive Effects | 21 |
| 34 | Sherman Act, Section 2: Monopolization General—Elements | 22 |
| 35 | Sherman Act, Section 2: Monopoly Power Defined | 23 |
| 36 | Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof | 24 |
| 37 | Sherman Act, Section 2: Existence of Monopoly Power—Direct Proof | 27 |
| 38 | Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power | 29 |
| 39 | Challenged Conduct: Exclusionary Bundled Contracting | 32 |
| 40 | Average Variable Cost | 33 |
| 41 | Challenged Conduct: Unlawful Exclusive Dealing | 34 |
| 42 | Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations | 36 |

| Instr. Number | Title | Page |
|---|---|---|
| 43 | Sherman Act, Section 2: Attempt to Monopolize—Elements | 38 |
| 44 | Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct | 39 |
| 45 | Sherman Act, Section 2: Attempt to Monopolize—Specific Intent | 40 |
| 46 | Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of Success | 42 |
| 47 | Sherman Act: Unreasonable Restraint of Trade—Elements | 43 |
| 48 | Clayton Act, Section 3: Exclusive Dealing—Elements | 45 |
| 49 | California Cartwright Act—Unlawful Restraint of Trade—Elements | 46 |
| 50 | California Cartwright Act: Anticompetitive Versus Beneficial Effects | 47 |
| 51 | Injury and Causation—Overview | 48 |
| 52 | Injury in Fact | 49 |
| 53 | Causation | 50 |
| 54 | Antitrust Injury | 51 |
| 55 | Business or Property | 52 |
| 56 | Antitrust Damages—Introduction and Purpose | 53 |
| 57 | Disaggregation of Damages | 54 |
| 58 | Mitigation | 56 |
| 59 | Damages for Competitors—Lost Profits | 57 |
| 60 | Basis for Calculating Damages | 59 |
| 61 | Damages for Competitors—Future Lost Profits | 61 |
| 62 | Duty to Deliberate | 62 |
| 63 | Consideration of Evidence—Conduct of the Jury | 63 |
| 64 | Communication with the Court | 65 |
| 65 | Return of Verdict | 66 |

## INSTRUCTION NO. 19

### Duty of Jury

Members of the Jury: Now that you have heard all of the evidence, it is my duty to instruct you as to the law of the case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions or anything that I may say or do or have said or done that I have an opinion regarding the evidence or what your verdict should be.

-4-

## INSTRUCTION NO. 20

### Burden of Proof—Preponderance of the Evidence

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

## INSTRUCTION NO. 21

### What is Evidence

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits that are admitted into evidence;

3. any facts to which the lawyers have agreed; and

4. any facts that I have instructed you to accept as proved.

## INSTRUCTION NO. 21A

Some evidence has been admitted only for a limited purpose. During the trial, you heard evidence of out-of-court statements made by customers with complaints regarding Voyant. That evidence includes the following exhibits:

JTX 1814

JTX 1862

JTX 1760

JTX 1140

JTX 1815

JTX 1846

You may consider these customer statements only for the effect they may have had on the listener, and not for any other purpose.

## INSTRUCTION NO. 22

### What is Not Evidence

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

1.    Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they said in their opening statements or may say in their closing arguments or at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2.    Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

3.    Testimony that is excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered.

4.    Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

## INSTRUCTION NO. 23

### Evidence for Limited Purpose

Some evidence was received only for a limited purpose.

When I have instructed you to consider certain evidence only for a limited purpose, you must do so, and you may not consider that evidence for any other purpose.

## INSTRUCTION NO. 24

### Direct and Circumstantial Evidence

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. For example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a turned-on garden hose, may provide a different explanation for the presence of water on the sidewalk. Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

To be clear, you should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

## INSTRUCTION NO. 25

### Credibility of Witnesses

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1. the opportunity and ability of the witness to see or hear or know the things about which the witness testified;

2. the witness's memory;

3. the witness's manner while testifying;

4. the witness's interest in the outcome of the case, if any;

5. the witness's bias or prejudice, if any;

6. whether other evidence contradicted the witness's testimony;

7. the reasonableness of the witness's testimony in light of all the evidence; and

8. any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some

-10-

1   things but told the truth about others, you may accept the part you think is true

2   and ignore the rest.

3        The weight of the evidence as to a fact does not necessarily depend on the

4   number of witnesses who testify. What is important is how believable the

5   witnesses were, and how much weight you think their testimony deserves.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INSTRUCTION NO. 26

### Corporations—Fair Treatment

The parties in this case are both corporations. All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration by you as any party.

-12-

## INSTRUCTION NO. 27

### Introduction: Purpose of the Sherman and Clayton Acts

The purpose of the Sherman Act and the Clayton Act is to preserve free and unfettered competition in the marketplace. The Sherman and Clayton Acts rest on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

## INSTRUCTION NO. 28

### All Claims: Relevant Market—General

Applied must prove by a preponderance of the evidence that it has properly defined an alleged relevant market. To determine whether Applied has properly defined a relevant market, you must be able to determine what, if any, economic forces restrain Medtronic's freedom to set prices for or to restrict the production level of advanced bipolar devices.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Medtronic's power to set prices as it pleases because customers could switch to them if Medtronic sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Applied has met its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market. Here, the parties agree that the relevant geographic market is the United States.

-14-

## INSTRUCTION NO. 29

### All Claims: Relevant Product Market

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes. Thus, for example, if consumers seeking to cover leftover food for storage considered certain types of flexible wrapping material—such as aluminum foil, cellophane, or even plastic containers—to be reasonable alternatives, then all those products may be in the same relevant product market.

To determine whether products are reasonable substitutes for each other, you must consider whether a small but significant and non-transitory increase in the price of one product would result in enough customers switching from that product to another product such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn? Generally speaking, a small but significant and non-transitory increase in price is approximately a 5 percent increase in price not due to cost factors. If you find that customers would switch and that the price increase would not be profitable, then you must conclude that the products are in the product market. If, on the other hand, you find that customers would not switch, then you must conclude that the products are not in the product market.

In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have just given you, you may also consider:

-15-

- customers' views on whether the products are interchangeable;
- the relationship between the price of one product and sales of another;
- the presence or absence of specialized vendors;
- the perceptions of either industry or the public as to whether the products are in separate markets;
- the views of Applied and Medtronic regarding who their respective competitors are; and
- the existence or absence of different customer groups or distribution channels.

In this case, Applied contends that the relevant product market is the market for advanced bipolar devices. By contrast, Medtronic contends that Applied has failed to prove the proper relevant product market and that the relevant market includes ultrasonic devices and robotic advanced bipolar devices. Applied contends that Medtronic has monopoly power even if the relevant product market includes both advanced bipolar devices and ultrasonic devices.

If you find that Applied has proven that the market for advanced bipolar devices is a relevant product market, then you should continue to evaluate the remainder of Applied's claims. However, if you find that Applied has failed to prove such a market, then you must find in Medtronic's favor on all claims.

## INSTRUCTION NO. 30

### Sherman Act Claims: Rule of Reason—Overview

Under Sections 1 and 2 of the Sherman Act, conduct is illegal only if it is found to be unreasonable. You must determine, therefore, whether the conduct challenged here—Medtronic's allegedly exclusionary bundled contracting and unlawful exclusive dealing agreements—is unreasonable. In making this determination, you must first determine whether Applied has proven that the challenged conduct has resulted in substantial harm to competition in the relevant market. If you find that Applied has proven that the challenged conduct results in substantial harm to competition in the relevant market, then you must consider whether the conduct produces countervailing competitive benefits. If you find that it does, then you must balance the competitive harm against the competitive benefit. The challenged conduct is illegal under the Sherman Act only if you find that the competitive harm outweighs the competitive benefit.

I will now review each step of the analysis in more detail.

-17-

## INSTRUCTION NO. 31

### Sherman Act Claims: Rule of Reason—Proof of Competitive Harm

As I mentioned, to prove that the alleged unlawful conduct—in this case, exclusionary bundled contracting and/or exclusive dealing agreements—is unreasonable, Applied first must demonstrate that the conduct has resulted in a substantial harm to competition in the relevant market. Although it may be relevant to the inquiry, harm that occurs merely to the individual business of Applied is not sufficient, by itself, to demonstrate harm to competition generally. That is, harm to a single competitor or group of competitors does not necessarily mean that there has been harm to competition.

Furthermore, Applied must show that the harm to competition occurred in an identified market, known as the relevant market. It is Applied's burden to prove the existence of a relevant market.

If you find that Applied has proven the existence of a relevant market, then you must determine whether Applied has also proven that the challenged restraint has a substantial harmful effect on competition in that market. A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged bundled contracting and/or exclusive dealing has produced competitive harm, you may look at the following factors:

- the effect of the restraint on prices, output, product quality, and service;
- the purpose and nature of the restraint;

-18-

- the nature and structure of the relevant market;
- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and
- whether Medtronic possesses market power.

The last factor mentioned, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

An important factor in determining whether Medtronic possesses market power is Medtronic's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Medtronic has market power include the existence of barriers to entry and the existence of potential competitors. If Medtronic does not possess a substantial market share, it is less likely that Medtronic possesses market power. If Medtronic does not possess market power, it is less likely that the challenged conduct has resulted or will result in a substantial harmful effect on competition in the market.

## INSTRUCTION NO. 32

### Sherman Act Claims: Rule of Reason—Evidence of Competitive Benefits

If you find that Applied has proven that the challenged bundled contracting and/or exclusive dealing agreements resulted in substantial harm to competition in the alleged relevant market, then you next must determine whether the challenged conduct also benefits competition in other ways. If you find that the challenged conduct does result in competitive benefits, then you also must consider whether the conduct was reasonably necessary to achieve the benefits. If Applied proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the conduct.

## INSTRUCTION NO. 33

**Sherman Act Claims: Rule of Reason—Balancing the Competitive Effects**

If you find that the challenged bundled contracting and/or exclusive dealing was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the challenged conduct is unreasonable. If the competitive harm does not outweigh the competitive benefits, then the challenged conduct is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Applied bears the burden of proving that the anticompetitive effect of the conduct outweighs its benefits.

## INSTRUCTION NO. 34

### Sherman Act, Section 2: Monopolization General—Elements

I have just instructed you on the Rule of Reason. I will now instruct you on the claims you will analyze under the Rule of Reason, starting with Applied's claim under Section 2 of the Sherman Act.

Applied alleges that it was injured by Medtronic's unlawful monopolization of the relevant market under Section 2 of the Sherman Act. To prevail on this claim, Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged relevant market is a valid antitrust market;

2. Medtronic possessed monopoly power in that market;

3. Medtronic willfully acquired or maintained monopoly power in that market, and did so by engaging in anticompetitive conduct in the form of allegedly exclusionary bundled contracting and/or unlawful exclusive dealing; and

4. Applied was injured in its business or property because of Medtronic's anticompetitive conduct.

If you find that Applied has failed to prove any of these elements, then you must find for Medtronic and against Applied on Applied's claim of monopolization. If you find that Applied has proved each of these elements by a preponderance of the evidence, then you must find for Applied and against Medtronic on this claim.

## INSTRUCTION NO. 35

### Sherman Act, Section 2: Monopoly Power Defined

To prove its monopolization claim, Applied must prove that Medtronic has monopoly power in the relevant market. I previously instructed on how you may determine whether Applied has met its burden of proving the relevant market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a significant period of time. However, possession of monopoly power, in and of itself, is not unlawful.

## INSTRUCTION NO. 36

**Sherman Act, Section 2: Existence of Monopoly Power—Indirect Proof**

I have already provided instructions on how you may determine whether Applied has met its burden of proving a relevant market.. If you find that Applied has proven its alleged relevant market, then you should determine whether Medtronic has monopoly power in that market. As I instructed you earlier, monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market.

The evidence presented by the parties includes evidence of Medtronic's market share, market share trends, barriers to entry, and the number and size of other competitors. If this evidence establishes that Medtronic has the power to control prices and exclude competition in the relevant market, then you may conclude that Medtronic has monopoly power in the market.

Market Share

The first factor that you should consider is Medtronic's share of the relevant market. Based on the evidence that you have heard about Medtronic's market share, you should determine Medtronic's market share as a percentage of total sales in the relevant market. Medtronic must have a significant share of the market in order to possess monopoly power.

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, such as market share trends, the existence of barriers to entry (that is, how difficult is it for other producers to enter the market and begin competing with Medtronic for sales), the entry and exit by other companies, and the number and size of competitors. Along with Medtronic's market share, these factors should inform you as to whether Medtronic has monopoly power. The higher the company's share, the higher the likelihood that a company has monopoly power.

Market Share Trends

The trend in Medtronic's market share is something you may consider. An increasing market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

Barriers to Entry

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include intellectual property rights (such as patents or trade secrets), the large financial investment required to build a plant or satisfy governmental regulations, the costs of necessary research and development investments to enter the market, the burden to obtain regulatory approvals, specialized marketing practices, and the reputation of the companies already participating in the market (or the brand name recognition of their products).

Evidence of low or no entry barriers may be evidence that Medtronic does not have monopoly power, regardless of Medtronic's market share, because new competitors could enter easily if Medtronic attempted to raise prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Medtronic has monopoly power.

Entry and Exit by Other Companies

The history of entry and exit in the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Medtronic lacks monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Medtronic has monopoly power.

### Number and Size of Competitors

You may consider whether Medtronic's competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a check on Medtronic's ability to price its products. If Medtronic's competitors are vigorous or have large or increasing market shares this may be evidence that Medtronic lacks monopoly power. On the other hand, if you determine that Medtronic's competitors are weak or have small or declining market shares, this may support an inference that Medtronic has monopoly power.

### Conclusion

If you find that Medtronic has monopoly power in the relevant market, then you must consider the remaining elements of this claim. If you find that Medtronic does not have monopoly power, then you must find for Medtronic and against Applied on its monopolization claim.

## INSTRUCTION NO. 37

### Sherman Act, Section 2: Existence of Monopoly Power—Direct Proof

Another way to prove the existence of monopoly power in the relevant market is through direct proof. As I instructed you earlier, monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise or maintain prices substantially above the competitive level for a significant period of time.

Applied has the burden of proving that Medtronic has the ability to raise or maintain the prices that it charges for goods or services in the relevant market above competitive levels. Applied must prove that Medtronic has the power to do so by itself—that is, without the assistance of, and despite competition from, any existing or potential competitors.

Applied must also prove that Medtronic has the power to maintain prices above a competitive level for a significant period of time. If Medtronic attempted to maintain prices above competitive levels, but would lose so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn, then Medtronic does not have monopoly power.

Similarly, Applied must prove that Medtronic has the ability to exclude competition. For example, if Medtronic attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Medtronic does not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Medtronic has monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products or services, low costs, or

-27-

superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Medtronic would lose a substantial amount of sales if it raised prices substantially, or that Medtronic's profit margins were low compared to its competitors, or that Medtronic's margins go up and down or are steadily decreasing, might be evidence that Medtronic does not have monopoly power.

If you find that Medtronic has monopoly power in the relevant market, then you must consider the remaining elements of Applied's monopolization claim. If you find that Medtronic does not have monopoly power, then you must find for Medtronic and against Applied on its monopolization claim.

## INSTRUCTION NO. 38

### Sherman Act, Section 2: Willful Acquisition or Maintenance of Monopoly Power

The next element Applied must prove is that Medtronic willfully acquired or maintained monopoly power through anticompetitive acts or practices. Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition. Some examples of harm to competition include increased prices, decreased production levels, and reduced quality. Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. The acquisition or maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.

A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws. A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.

The difference between anticompetitive conduct and conduct that has a legitimate business purpose can be difficult to determine. This is because all companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as a company does not use anticompetitive means to achieve these goals.

In determining whether Medtronic's allegedly exclusionary bundled contracting and/or exclusive dealing was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is

consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors. You should apply the Rule of Reason per my previous instructions in this regard.

The acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages such as unique geographic access to raw materials or markets; or because of economic or technological efficiency, including efficiency resulting from scientific research; or by obtaining a lawful patent; or because changes in cost or consumer preference have driven out all but one supplier.

Here, Applied alleges that Medtronic engaged in unlawful exclusionary bundled contracting and/or unlawful exclusive dealing. Applied contends that either of these practices or the combination of these practices has enabled Medtronic to acquire or maintain its monopoly power. Medtronic denies Applied's allegations and denies that these practices were anticompetitive.

If you find that Applied has proven by a preponderance of the evidence that Medtronic willfully acquired or maintained monopoly power through anticompetitive acts, then you must consider whether Applied has proved the remaining elements of this claim. If, however, you find that Applied did not prove this element by a preponderance of the evidence, then you must find for Medtronic and against Applied on its monopolization claim.

I will now instruct you on how to determine whether Medtronic has

engaged in exclusionary bundled contracting and/or unlawful exclusive dealing under the Sherman Act. If you find that Medtronic has engaged in such conduct, you should also determine whether this conduct resulted in a substantial adverse effect on competition under the Rule of Reason. You should follow Instructions 30 through 33 in this regard.

## INSTRUCTION NO. 39

### Challenged Conduct: Exclusionary Bundled Contracting

Applied alleges that Medtronic engaged in anticompetitive conduct through exclusionary bundled contracting.

Bundled contracting is the practice of offering reduced prices, discounts, and/or rebates when two or more goods that could be sold separately are purchased together. Bundled contracting generally benefit customers by lowering prices, which is a practice the antitrust laws aim to promote. It is not unlawful or improper to offer discounted prices, or to offer products in a bundle for a discount, even if the seller intends by its discounted pricing to increase its market share. However, bundled contracting can be anticompetitive if such a price can exclude a rival who is equally efficient at producing the competitive product because the rival does not offer the same array of products and therefore could possibly not be able to match the discount offered by the bundler.

To prove that Medtronic's bundled contracting is anticompetitive, Applied must prove that the bundled contracting fails the "discount attribution test." Under this standard, the full amount of the discounts given by Medtronic on the bundle is allocated to Medtronic's advanced bipolar device, Ligasure. If the resulting price of Ligasure is below Medtronic's average variable cost to produce it, you may find that the bundle is anticompetitive.

If you find that Applied has established each of these elements for certain bundled contracts, you will analyze those bundles under the Rule of Reason as instructed previously to determine if they result in a substantial adverse effect on competition in the alleged relevant market.

I will now explain the meaning of average variable cost.

-32-

## INSTRUCTION NO. 40

### Average Variable Cost

A seller's costs in making and selling a product are divided into two categories: costs that the seller will have whether or not it manufactures a particular product or makes a particular sale, and costs that the seller has only in connection with the manufacture and sale of a specific unit of its product.

The first kind of cost is referred to as fixed or indirect cost—a cost that the seller would bear in any event. An example of a fixed cost might be the rent on the seller's plant or store. This rent probably will be the same whether the firm sells one unit or one thousand units of its product. This type of cost is not to be considered in deciding whether Medtronic's price was exclusionary.

The second kind of cost is referred to as "variable cost." Variable costs, as the name suggests, are those costs that increase with the production of each additional unit of the product. Variable costs typically include such things as the materials that go into the product, fuel needed to produce the product, and wages paid to the workers who make the product. "Average variable cost" is the sum of all variable costs, divided by the total number of units expected to be produced and sold.

-33-

## INSTRUCTION NO. 41

### Challenged Conduct: Unlawful Exclusive Dealing

Applied also alleges that Medtronic engaged in anticompetitive conduct through unlawful exclusive dealing.

Exclusive dealing arrangements require a buyer of a product to obtain that product exclusively from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement forbidding the buyer from purchasing the product from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products from the supplier, or a pricing policy that in effect prevents customers from purchasing from competitors. When a contract offers a buyer a discount for purchasing a certain amount of their requirements for a specific product, something more than the discount itself is necessary to prove that the agreement is exclusive.

Exclusive dealing arrangements, whatever form they may take, are analyzed under the Rule of Reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market. From the standpoint of either the buyer or the seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products.

To establish that Medtronic entered into exclusive dealing arrangements that violate the Sherman Act, Applied must establish each of the following elements by a preponderance of the evidence:

1. an agreement between the buyer(s) and Medtronic that totally forecloses the buyer(s) or in substantial part forecloses the buyer(s) from purchasing advanced bipolar devices from competing suppliers; and

-34-

2. the agreement was an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged relevant market.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Medtronic and against Applied on Applied's exclusive dealing claim. If you find that the evidence is sufficient to prove all of these elements, then you must find for Applied and against Medtronic on Applied's exclusive dealing claim.

To determine whether Medtronic entered into exclusive dealing arrangements that unreasonably restrained trade and resulted in a substantial adverse effect on competition in the alleged relevant market, you will apply the Rule of Reason.

## INSTRUCTION NO. 42

### Challenged Conduct: Unlawful Exclusive Dealing—Additional Considerations

In determining whether Medtronic's alleged exclusive dealing contracts had a substantially harmful effect on competition in the relevant market, you should consider the nature and history of the use of exclusive dealing contracts in the medical device industry, whether buyers have independent reasons for entering into exclusive dealing contracts or were coerced into entering into them, whether other competing suppliers also offer exclusive dealing contracts, the extent of competition among competing suppliers for exclusive dealing contracts with buyers, Medtronic's position in the marketplace, the competitive alternatives to Medtronic's products, the reasons Medtronic and buyers entered into the alleged exclusive dealing contracts at issue, and the effect of the use of exclusive dealing contracts on the ability of new firms to enter the market and on price and other competition in the market.

You must also consider whether Medtronic's alleged exclusive dealing contracts substantially foreclose competition on the merits in the alleged relevant market. In determining this, it is relevant to consider the percentage of the market foreclosed and the length of the foreclosure. Although there is no set percentage for how much of the relevant market must be foreclosed, foreclosure must be substantial enough to freeze competitors out of a market.

Where the exclusive dealing contracts foreclose less than 20 percent of the market, this indicates that the harm from the foreclosure of competition is not substantial because there are alternatives available. Similarly, the shorter the duration of the contract, or the more easily it can be terminated, the less likely it is to harm competition.

The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition

on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty. In such a case, the stated length of the exclusive contract is not the period in which it has a competitive effect. In determining whether Medtronic's agreements were short-term and/or easily terminable, you should consider not just the stated terms of the agreements, but also their practical effect.

In determining if Medtronic's exclusive dealing contracts substantially harmed competition, you also should consider whether or to what extent Medtronic had market power. If Medtronic does not possess market power, then there cannot be substantial harm to competition from an exclusive dealing contract, and you must find for Medtronic on this claim. If you decide that the buyers are sophisticated businesses themselves which have countervailing power in negotiating contracts, this may offset any market power Medtronic might otherwise have. If Applied cannot show that Medtronic had the power to force buyers to enter into exclusive contracts they did not want, this would be an indication that Medtronic lacks market power.

Finally, you should consider whether the process in which Medtronic secured exclusive contracts itself involved competition. If you determine that the buyers formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against Medtronic, this is also evidence that Medtronic does not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market. Where a restraint does not adversely affect price, output, or product quality, it is unlikely to substantially harm competition.

## INSTRUCTION NO. 43

### Sherman Act, Section 2: Attempt to Monopolize—Elements

I will now move on to Applied's second claim under the Sherman Act. Applied alleges that it was injured by Medtronic's unlawful attempt to monopolize the relevant market. To prevail on its claim of attempted monopolization, Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged relevant market is a valid antitrust market;

2. Medtronic engaged in exclusionary bundled contracting and/or unlawful exclusive dealing;

3. Medtronic had a specific intent to achieve monopoly power in the alleged market;

4. there was a dangerous probability that Medtronic would achieve its goal of monopoly power in the alleged relevant market; and

5. Applied was injured in its business or property by Medtronic's anticompetitive conduct. Here, Applied alleges that Medtronic engaged in anticompetitive conduct in the form of exclusionary bundled contracting and/or unlawful exclusive dealing.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Medtronic and against Applied on Applied's claim of attempted monopolization. If you find that the evidence is sufficient to prove all five elements as to Medtronic, then you must find for Applied and against Medtronic on Applied's claim of attempted monopolization.

# INSTRUCTION NO. 66

## Clarification on Instruction No. 44

I previously instructed with respect to Instruction No. 44 that you should refer to Instruction D4 through D7 for the Rule of Reason. That sentence referred to the incorrect jury instruction numbers. The correct instruction is as follows:

You should also determine whether this conduct resulted in a substantial adverse effect on competition under the Rule of Reason, using **Instructions 30 through 33**.

## INSTRUCTION NO. 44

**Sherman Act, Section 2: Attempt to Monopolize—Anticompetitive Conduct**

It is not sufficient for Applied to prove that Medtronic intended to monopolize the relevant market. Applied must also show that Medtronic engaged in exclusionary bundled contracting and/or unlawful exclusive dealing, coupled with a specific intent to monopolize and a dangerous probability that Medtronic would succeed. Generally, a firm engages in anticompetitive conduct when it attempts to exclude rivals without an efficiency enhancing justification for its conduct.

The anticompetitive conduct alleged in support of Applied's attempted monopolization claim is the same as the conduct alleged in support of its other claims under the Sherman Act, and in determining whether Medtronic's conduct was anticompetitive or whether it was legitimate business conduct, you should use the same standard that I instructed you to apply in assessing Applied's monopolization claim. You must determine whether Medtronic's alleged bundled contracting and/or exclusive dealing is consistent with competition on the merits, whether it provides benefits to consumers, and whether it would make business sense apart from any effect it has on excluding competition or harming competitors.

I have already instructed you on how to determine whether Medtronic has engaged in exclusionary bundled contracting and/or unlawful exclusive dealing under the Sherman Act.  You should follow the instructions on Exclusionary Bundled Contracting (39) and Unlawful Exclusive Dealing (41 and 42) in that regard.  You should also determine whether this conduct resulted in a substantial adverse effect on competition under the Rule of Reason, using Instructions D4 through D7.

## INSTRUCTION NO. 45

### Sherman Act, Section 2: Attempt to Monopolize—Specific Intent

The next element that Applied must prove is that Medtronic had a specific intent to monopolize the alleged relevant market through exclusionary bundled contracting and/or unlawful exclusive dealing. To do so, Applied must first prove that its claimed market is a relevant market for antitrust purposes. I have already instructed you on the relevant market.

You must then decide whether Medtronic had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that Medtronic committed anticompetitive acts with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the alleged relevant market.

There are several ways in which Applied may prove that Medtronic had the specific intent to monopolize. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Medtronic at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Medtronic. You must be careful, however, to distinguish between a lawful intent to compete aggressively, which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Medtronic actually intended to obtain a monopoly, specific intent may be inferred from what Medtronic did. For example, if the evidence shows that Medtronic lacked a legitimate business justification and the natural and probable consequence of Medtronic's alleged exclusionary bundled contracting and/or unlawful exclusive dealing in the relevant market was to give Medtronic control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Medtronic, then you may (but are not required to) infer that Medtronic

specifically intended to acquire monopoly power.

In this case, Applied argues that the alleged exclusionary bundled contracting and/or unlawful exclusive dealing underlying its attempted monopolization claim also constitutes an unreasonable restraint of trade under Section 1 of the Sherman Act. If you find on the basis of this conduct that Applied has proven an unreasonable restraint of trade under the instructions you will receive pertaining to Section 1 of the Sherman Act, then you may infer from such conduct that Medtronic had the specific intent to achieve monopoly power.

## INSTRUCTION NO. 46

## Sherman Act, Section 2: Attempt to Monopolize—Dangerous Probability of Success

If you find that Medtronic had the specific intent to achieve a monopoly through exclusionary bundled contracting and/or unlawful exclusive dealing, you also must determine if Applied has shown by a preponderance of the evidence the next element of attempt to monopolize: namely, that there was a dangerous probability that Medtronic would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.

In determining whether there was a dangerous probability that Medtronic would acquire the ability to control prices or destroy competition in the relevant market, you should consider such factors as:

- Medtronic's market share;
- the trend in Medtronic's market share;
- whether the barriers to entry into the market made it difficult for competitors to enter the market; and
- the likely effect of any anticompetitive conduct on Medtronic's share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Medtronic would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Medtronic would ultimately acquire monopoly power.

## INSTRUCTION NO. 47

### Sherman Act, Section 1: Unreasonable Restraint of Trade—Elements

I have just instructed you on Applied's claims under Section 2 of the Sherman Act. Applied also alleges that Medtronic entered into exclusionary bundled contracting and/or unlawful exclusive dealing arrangements that unreasonably restrained trade under Section 1 of the Sherman Act. To prevail on this claim, Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged relevant market is a valid antitrust market;

2. Medtronic entered into exclusionary bundled contracting and/or exclusive dealing agreements for the sale of advanced bipolar devices to one or more hospital(s);

3. the agreement(s) were an unreasonable restraint of trade that resulted in a substantial adverse effect on competition in the alleged relevant market;

4. Medtronic had substantial market power in the alleged relevant market; and

5. Applied was injured in its business or property because of the agreement(s).

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Medtronic and against Applied on Applied's claim under Section 1 of the Sherman Act. If you find that the evidence is sufficient to prove all five elements as to Medtronic, then you must find for Applied and against Medtronic on Applied's claim under Section 1 of the Sherman Act.

I have previously instructed you on whether an agreement constitutes an exclusionary bundled contracting or an unlawful exclusive dealing arrangement

-43-

1  under the Sherman Act.  You should follow the instructions on Exclusionary
2  Bundled Contracting (39) and Unlawful Exclusive Dealing (41 and 42) in that
3  regard.  You should also determine whether this conduct resulted in a substantial
4  adverse effect on competition under the Rule of Reason.  You should follow
5  Instructions 30 through 33 in this regard.

-44-

## INSTRUCTION NO. 48

### Clayton Act, Section 3: Exclusive Dealing—Elements

Applied also challenges Medtronic's contracts as unlawful exclusive dealing arrangements under Section 3 of the Clayton Act. Applied alleges Medtronic used agreements to restrain competition in a substantial portion of the relevant market, and that it was injured as a result. Medtronic contends its agreements are not exclusive, do not prevent customers from buying products from Medtronic's competitors, and promote competition for lower prices in the market.

To prevail on this claim, Applied must prove each of the following elements by a preponderance of the evidence:

1. the alleged relevant market is a valid antitrust market;

2. there were exclusive dealing agreements between Medtronic and its customers;

3. the exclusive dealing agreements have substantially foreclosed or have the probable effect of foreclosing competition in a substantial share of the alleged relevant market; and

4. the exclusive dealing agreements caused Applied to suffer injury to its business or property.

You should also determine whether this conduct resulted in a substantial adverse effect on competition under the Rule of Reason as previously instructed.

-45-

## INSTRUCTION NO. 49

### California Cartwright Act: Unlawful Restraint of Trade—Elements

Applied claims that Medtronic violated the California Cartwright Act. To establish this claim, Applied must prove all of the following elements by a preponderance of the evidence:

1. Medtronic entered into exclusionary bundled contracting and/or unlawful exclusive dealing agreements for the sale of advanced bipolar devices to one or more hospital(s);

2. the purpose or effect of Medtronic entering these agreements was to restrain competition in the relevant market;

3. the anticompetitive effect of the restraint(s) outweighed any beneficial effect on competition;

4. Applied was injured; and

5. Medtronic's allegedly exclusionary bundled contracting and/or unlawful exclusive dealing was a substantial factor in causing Applied's injury.

## INSTRUCTION NO. 50

### California Cartwright Act: Anticompetitive Versus Beneficial Effects

In deciding whether the challenged restraint had an anticompetitive or beneficial purpose or effect on competition, you should consider the results the restraint was intended to achieve or actually did achieve. In balancing these purposes or effects, you also may consider, among other factors, the following:

- The nature of the restraint;
- The probable effect of the restraint on the business involved;
- The history of the restraint;
- The reasonableness of the stated purpose for the restraint;
- The availability of less restrictive means to accomplish the stated purpose;
- The portion of the market affected by the restraint; and
- The extent of Medtronic's market power, if any.

-47-

## INSTRUCTION NO. 51

### Injury and Causation—Overview

If you find that Medtronic has violated Sections 1 or 2 of the Sherman Act, Section 3 of the Clayton Act, or the California Cartwright Act, then you must decide if Applied is entitled to recover damages from Medtronic.

Applied is entitled to recover damages for an injury to its business or property if it can establish three elements of injury and causation:

1. Applied was in fact injured as a result of Medtronic's alleged violation of the antitrust laws;

2. Medtronic's allegedly exclusionary bundled contracting and/or unlawful exclusive dealing was a material cause of Applied's injury; and

3. Applied's injury is an injury of the type that the antitrust laws were intended to prevent.

I will now explain each element in more detail.

-48-

## INSTRUCTION NO. 52

### Injury in Fact

The first element is sometimes referred to as "injury in fact" or "fact of damage." For Applied to establish that it is entitled to recover damages, it must prove that it was injured as a result of Medtronic's alleged violation of the antitrust laws. Proving the fact of damage does not require Applied to prove the dollar value of its injury. It requires only that Applied prove that it was in fact injured by Medtronic's alleged antitrust violation. If you find that Applied has proven the elements of its claims and established that it was in fact injured due to those claims, you may then consider the amount of Applied's damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Applied has established that it was in fact injured.

## INSTRUCTION NO. 53

### Causation

Applied must also offer evidence that establishes by a preponderance of the evidence that Medtronic's allegedly exclusionary bundled contracting and/or unlawful exclusive dealing was a material cause of Applied's injury. This means that Applied must have proved that some damage occurred to it as a result of Medtronic's alleged antitrust violation, and not some other cause. Applied is not required to prove that Medtronic's alleged antitrust violation was the sole cause of its injury; nor need Applied eliminate all other possible causes of injury. It is enough if Applied has proved that the alleged antitrust violation was a material cause of its injury.

**INSTRUCTION NO. 54**

**Antitrust Injury**

Finally, Applied must establish that its injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Applied's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Applied's injuries are antitrust injuries. On the other hand, if Applied's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Applied's injuries are not antitrust injuries and Applied may not recover damages for those injuries under the antitrust laws.

You should bear in mind that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against—such as where a competitor offers better products or services, or where a competitor is more efficient and can charge lower prices and still earn a profit. The antitrust laws do not permit a plaintiff to recover damages for losses that were caused by the competitive process or conduct that benefits consumers. In summary, if Applied can establish that it was in fact injured by Medtronic's alleged exclusionary bundled contracting and/or unlawful exclusive dealing, that this conduct was a material cause of Applied's injury, and that Applied's injury was the type that the antitrust laws were intended to prevent, then Applied is entitled to recover damages for the injury to its business or property. This may be true even if Applied remained in the market, was profitable, and grew its market share.

## INSTRUCTION NO. 55

### Business or Property

Applied must establish that the injury it claims to have suffered was an injury to its business or property. The term "business" includes any commercial interest or venture. Applied has been injured in its business if you find that it suffered injury to any of its commercial interests or enterprises as a result of Medtronic's alleged antitrust violation. The term property includes anything of value Applied owns, possesses, or in which Applied has a protectable legal interest. Applied has been injured in its property if you find that anything of value that it owns, possesses, or has a legal interest in has been damaged as a result of Medtronic's alleged antitrust violation. Applied has been injured in its property if you find that it has paid an inflated price for goods, services, any legal interest of value, or has lost money as a result of Medtronic's alleged antitrust violation.

## INSTRUCTION NO. 56

### Antitrust Damages—Introduction and Purpose

If you find that Medtronic violated the antitrust laws and that this violation caused antitrust injury to Applied, then you must determine the amount of damages, if any, Applied is entitled to recover. The fact that I am giving you instructions concerning the issue of Applied's damages does not mean that I believe Applied should, or should not, prevail in this case. If you reach a verdict for Medtronic on the issue of liability, you should not consider the issue of damages, and you may disregard the damages instruction that I am about to give.

The law provides that Applied should be fairly compensated for all damages to its business or property that were a direct result or likely consequence of the allegedly exclusionary bundled contracting and/or exclusive dealing that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to Applied an amount for attorneys' fees or the costs of maintaining this lawsuit.

**INSTRUCTION NO. 57**

**Disaggregation of Damages**

If you find that Medtronic violated the antitrust laws and that Applied was injured by that violation, Applied is entitled to recover for such injury that was the direct result or likely consequence of the unlawful acts of Medtronic. Applied bears the burden of showing that its injuries were caused by Medtronic's antitrust violation, as opposed to any other factors. If you find that Applied's alleged injuries were caused in part by Medtronic's alleged antitrust violation and in part by other factors, then you may award damages only for that portion of Applied's alleged injuries that was caused by Medtronic's alleged antitrust violation.

Applied claims that it suffered injury because it lost sales and profits as a result of Medtronic's allegedly exclusionary bundled contracting and/or unlawful exclusive dealing. Medtronic claims that any profits or sales lost by Applied occurred as a result of other factors that have nothing to do with the alleged antitrust violation. Applied is not entitled to recover for lost profits that resulted solely from these or other causes arising from the normal course of business activity. The presence of these factors does not mean Applied did not suffer antitrust injury, but Applied is not entitled to recovery for damages caused by them. Applied only may recover for damages caused by the alleged antitrust violation.

Applied bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that Applied was injured by Medtronic's alleged antitrust violation, and there is a reasonable basis to apportion Applied's alleged injury between lawful and unlawful causes, then you may award damages.

If you find that Applied's alleged injuries were caused by factors other than Medtronic's alleged antitrust violation, then you must return a verdict for Medtronic. If you find that there is no reasonable basis to apportion Applied's

-54-

1  alleged injury between lawful and unlawful causes, or that apportionment can
2  only be accomplished through speculation or guesswork, then you may not award
3  any damages at all.

## INSTRUCTION NO. 58

### Mitigation

Applied may not recover damages for any portion of its injuries that it could have avoided through reasonable attempts to compete. Applied is not entitled to increase any damages through inaction. The law requires an injured party to take all reasonable steps it can to avoid further injury and thereby reduce its loss. If Applied failed to take reasonable steps available to it, and the failure to take those steps resulted in greater harm to Applied than it would have suffered had it taken those steps, then Applied may not recover any damages for that part of the injury it could have avoided.

Medtronic has the burden of proof on this issue. Medtronic must prove by a preponderance of the evidence:

1. Applied acted unreasonably in failing to take specific steps to minimize or limit its losses;

2. the failure to take those specific steps resulted in its losses being greater than they would have been had it taken such steps; and

3. the amount by which Applied's loss would have been reduced had it taken those steps.

In determining whether Applied failed to take reasonable measures to limit its damages, you must remember that the law does not require Applied to take every conceivable step that might reduce its damages. The evidence must show that Applied failed to take commercially reasonable measures that were available to it. Commercially reasonable measures mean those measures that a prudent businessperson in Applied's position would likely have taken, given the circumstances as they appeared at that time. Applied should be given latitude in deciding how to handle the situation, so long as what Applied did was not unreasonable in light of the existing circumstances.

**INSTRUCTION NO. 59**

**Damages for Competitors—Lost Profits**

Applied claims that it was harmed because it lost profits as a result of Medtronic's alleged antitrust violation. If you find that Medtronic committed an antitrust violation and that this violation caused injury to Applied, you now must calculate the profits, if any, that Applied lost as a result of Medtronic's antitrust violation. To calculate lost profits, you must calculate the amount by which Applied's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues. When you make this determination, you must take into account the disaggregation of damages and mitigation instructions that you previously received.

Applied has proposed to calculate the profits it would have earned if there had been no antitrust violation by showing evidence of the share of advanced bipolar device sales in the United States it would have had in the absence of the antitrust violation. Applied provided two alternative benchmarks that it asserts reflect what Applied's market share would have been in the absence of the antitrust violation: a European benchmark and a trocars benchmark. If you find that Applied has shown reliable evidence of what its market share would have been in the absence of the antitrust violation, then you may calculate Applied's lost profits by considering market share, evidence of the size of the market, and evidence relating to the profit margin Applied would have secured on such sales. You may find, however, that Applied has not shown reasonable evidence of what its market share would have been in the absence of the alleged antitrust violation, such as if Applied's market share was impacted by changed economic conditions, mismanagement, increased competition, changing technology, or other factors. You may also find that Applied has not shown reasonable evidence of the profit margin it would have incurred in the absence of the alleged antitrust violation. If you find that the evidence of Applied's market share and/or profit margins is not

-57-

1   reasonable, and that lost profits may only be calculated using speculation or
2   guesswork, you may not award damages for lost profits based on market share or
3   profit margins.

## INSTRUCTION NO. 60

### Damages for Competitors—Future Lost Profits

Applied claims that it was harmed because, had it not been for Medtronic's alleged antitrust violation, Applied would have earned profits for three years into the future. If you find that Medtronic committed an antitrust violation and that this violation caused injury to Applied, you now must calculate the future profits, if any, that Applied lost as a result of Medtronic's antitrust violation.

To calculate future lost profits, you must make a reasonable estimate of (1) the amount of profits, if any, that Applied would have earned in future years, and (2) the length of time for which it would have earned those profits. In making this calculation, you are not required to calculate future lost profits with absolute mathematical certainty or precision, but you must not engage in guesswork or speculation. In making this determination, you must consider the various factors that could affect the future success of Applied's business, such as general market or economic conditions, lawful competition Applied would face in the future, Applied's management of business, changes in technology or other business conditions, and other factors affecting Applied's future performance.

Your determination of future lost profits must have a reasonable basis in the evidence and cannot be speculative. If there is no evidence from which you can make a reasonable estimate of lost future profits, you may not award damages for future lost profits.

In calculating future lost profits, you must determine Applied's gross revenues minus all of the costs and expenses that would be necessary to produce those revenues. You may calculate future lost profits by using the same measures I instructed you on with respect to lost profits.

If you award damages for future lost profits, you must discount the amount to its present value, using a discount rate of interest that you find reasonable. This is because the right to receive a certain sum of money at a future date is worth

less than the same amount of money in hand today—this is known as the time value of money. For example, if you had a choice to receive $1,000 today or a year from now, you would be better off receiving the money today and earning interest on it for a year—you would then have something more than $1,000 in a year from now. Similarly, if you had a right to $1,000 a year from now and you asked for the money today, the person owing you the money a year from now could properly give you a lower amount, reflecting the value that could be earned on that money over the next year. This lower amount is known as an amount discounted to present value.

## INSTRUCTION NO. 61

### Basis for Calculating Damages

You are permitted to make just and reasonable estimates in calculating Applied's damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Applied must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that Applied has provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

If you find that Applied has failed to carry its burden of providing a reasonable basis for determining damages, then you may not award damages or you may award nominal damages, not to exceed one dollar.

## INSTRUCTION NO. 62

### Duty to Deliberate

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

## INSTRUCTION NO. 63

### Consideration of Evidence—Conduct of the Jury

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves. Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via email, via text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, X (formerly Twitter), Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your family members, your employer, the media or press, and the people involved in the trial. If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the court.

Do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own. Do not visit or view any place discussed in this case, and do not use Internet programs or other devices to search for or view any place discussed during the trial. Also, do not do any research about this case, the law, or the people involved—including the parties, the witnesses, or the lawyers—until you have been excused as jurors. If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

1   These rules protect each party's right to have this case decided only on
2   evidence that has been presented here in court. Witnesses here in court take an
3   oath to tell the truth, and the accuracy of their testimony is tested through the trial
4   process. If you do any research or investigation outside the courtroom, or gain
5   any information through improper communications, then your verdict may be
6   influenced by inaccurate, incomplete, or misleading information that has not been
7   tested by the trial process. Each of the parties is entitled to a fair trial by an
8   impartial jury, and if you decide the case based on information not presented in
9   court, you will have denied the parties a fair trial. Remember, you have taken an
10  oath to follow the rules, and it is very important that you follow these rules.

11  A juror who violates these restrictions jeopardizes the fairness of these
12  proceedings. If any juror is exposed to any outside information, please notify the
13  court immediately.

## **INSTRUCTION NO. 64**

### **Communication with the Court**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the clerk, signed by any one or more of you. No member of the jury should ever attempt to communicate with me except by a signed writing. I will not communicate with any member of the jury on anything concerning the case except in writing or here in open court. If you send out a question, I will consult with the lawyers before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including the court—how the jury stands, whether in terms of vote count or otherwise, until after you have reached a unanimous verdict or have been discharged.

## INSTRUCTION NO. 65

### Return of Verdict

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you are ready to return to the courtroom.

1

## INSTRUCTION NO. 66

2

### Clarification on Instruction No. 44

3   I previously instructed with respect to Instruction No. 44 that you should
4   refer to Instruction D4 through D7 for the Rule of Reason. That sentence
5   referred to the incorrect jury instruction numbers. The correct instruction is as
6   follows:

7   You should also determine whether this conduct resulted in a substantial
8   adverse effect on competition under the Rule of Reason, using **Instructions 30**
9   **through 33**.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28