Stephen C. Jensen (SBN 149894)
steve.jensen@knobbe.com
Joseph R. Re (SBN 134479)
joe.re@knobbe.com
Joseph F. Jennings (SBN 145920)
joe.jennings@knobbe.com
Stephen W. Larson (SBN 240844)
stephen.larson@knobbe.com
Cheryl T. Burgess (SBN 250101)
cheryl.burgess@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Adam B. Powell (SBN 272725)
adam.powell@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
3579 Valley Centre Drive
San Diego, CA 92130
Phone: (858) 707-4000
Facsimile: (858) 707-4001

Attorneys for Plaintiff,
APPLIED MEDICAL RESOURCES CORPORATION

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>Defendant. | Case No. 8:23-cv-00268-WLH-DFM<br><br>**APPLIED MEDICAL'S OPPOSITION TO MEDTRONIC'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**<br><br>Hon. Wesley S. Hsu<br><br>Date: May 8, 2026<br>Time: 1:30 PM<br>Courtroom: 9b |

## TABLE OF CONTENTS

Page No.

I. INTRODUCTION ................................................................................... 1

II. LEGAL STANDARD ............................................................................. 2

III. ARGUMENT ......................................................................................... 3

    A. Substantial Evidence Supports Exclusionary Bundling ................ 3

        1. Medtronic's Motion Is Based On Legal Error ..................... 3

        2. Applied Demonstrated Medtronic's Market Power Over the Bundled Products ..................................................... 6

        3. Orszag's DAT Analysis Should Not Be Excluded .............. 8

    B. Substantial Evidence Supports Exclusive Dealing ....................... 10

        1. Medtronic's Challenge Is Again Based On Erroneous Rules ................................................................. 10

        2. The Jury Heard Substantial Evidence Of *De Facto* Exclusivity ........................................................................ 11

        3. Medtronic Misstates The Record On Generator Agreements And Product Trials ........................................ 13

        4. Applied Established Substantial Foreclosure ..................... 15

    C. Applied's Damages Do Not Require A Finding of Liability As To Both Bundling And Exclusive Dealing ............... 15

    D. Substantial Evidence Supports The Jury's Market Determination ............................................................................. 17

        1. The Jury Was Free To Exclude Ultrasonic Devices .......... 17

        2. The Jury Was Free To Exclude Robotic ABDs ................. 19

    E. The Court Should Reject Medtronic's Rule 702 Challenge to Applied's Damages Benchmarks ........................... 20

        1. Orszag's Trocar Benchmark Is Reliable ........................... 20

        2. Orszag's European Benchmark Is Reliable ....................... 22

    F. The Court Should Deny Medtronic's Request for a New Trial ............................................................................................. 24

**TABLE OF CONTENTS**
(*cont'd*)

**Page No.**

IV.    CONCLUSION ...................................................................................................24

**TABLE OF AUTHORITIES**

**Page No(s).**

*Accentra Inc. v. Staples, Inc.*,
   851 F. Supp. 2d 1205 (C.D. Cal. 2011), *vacated on other
   grounds,* 500 Fed. Appx. 922 (Fed. Cir. 2013) ..............................................21

*Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*,
   836 F.3d 1171 (9th Cir. 2016) .........................................................4, 6, 11

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ...............................................................10, 11

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......................................................10

*In re Capacitors Antitrust Litig.*,
   2020 WL 870927 (N.D. Cal. Feb. 21, 2020)................................................23

*Cascade Health Sols. v. PeaceHealth*,
   515 F.3d 883 (9th Cir. 2008)........................................................3, 4, 5, 6

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000).................................................11, 15, 16, 23

*Costa v. Desert Palace, Inc.*,
   299 F.3d 838 (9th Cir. 2002)...........................................................................2

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
   150 F.4th 1056 (9th Cir. 2025), *cert. denied*, No. 25-667
   (Mar. 23, 2026).....................................................................................10, 13

*D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*,
   692 F.2d 1245 (9th Cir. 1982)......................................................................22

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
   773 F.2d 1506 (9th Cir. 1985)........................................................................9

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023)...................................................................18, 19

*Escriba v. Foster Poultry Farms, Inc.*,
   743 F.3d 1236 (9th Cir. 2014).........................................................2, 14, 19

*Greyhound Comput. Corp. v. Int'l Bus. Machines Corp.*,
   559 F.2d 488 (9th Cir. 1977)........................................................................10

*In re Hanford Nuclear Reservation Litig.*,
   534 F.3d 986 (9th Cir. 2008)...........................................................................8

**TABLE OF AUTHORITIES**
(*cont'd*)

**Page No(s).**

*Harvey v. Netflix, Inc.*,
  2024 WL 4536639 (C.D. Cal. Sept. 27, 2024)................................................20

*Heckman v. Live Nation Ent., Inc.*,
  2025 WL 3780262 (C.D. Cal. Dec. 3, 2025) ................................................16

*In re HIV Antitrust Litig.*,
  2022 WL 22609107 (N.D. Cal. Sep. 27, 2022)............................................23

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
  458 F. Supp. 423 (N.D. Cal. 1978)................................................................16

*Kenney v. Lawrence*,
  2018 WL 2461491 (S.D. Cal. May 31, 2019)................................................24

*Klein v. Meta Platforms, Inc.*,
  766 F. Supp. 3d 956 (N.D. Cal. 2025) ...........................................................9

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) .............................................................................5

*Multiple Energy Techs., LLC v. Casden*,
  2025 WL 579641 (C.D. Cal. Feb. 21, 2025).............................................2, 14

*In re: NFL "Sunday Ticket" Antitrust Litig.*,
  2024 WL 3628118 (C.D. Cal. Aug. 1, 2024).....................................8, 9, 23

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co. Ltd.*,
  20 F.4th 466 (9th Cir. 2021)....................................................................17, 19

*Oracle Am., Inc. v. Google Inc.*,
  2012 WL 1945496 (N.D. Cal. May 30, 2012) .................................................4

*Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd.*,
  2021 WL 461707 (S.D. Cal. Feb. 9, 2021) ..................................................10

*Pavao v. Pagay*,
  307 F.3d 915 (9th Cir. 2002)............................................................................2

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ........................................................................................2

*Sebastian Int'l, Inc. v. Russolillo*,
  2005 WL 1323127 (C.D. Cal. 2005)..............................................................23

**TABLE OF AUTHORITIES**
(*cont'd*)

**Page No(s).**

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ......................................................................3

*Simon & Simon, PC v. Align Tech., Inc.*
533 F. Supp. 3d 904 (N.D. Cal. 2021) .......................................................13

*Skydive Arizona, Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012) ..............................................................21, 22

*Stacy v. Whittington Motors Sports, Inc.*,
2024 WL 5341331 (C.D. Cal. Dec. 5, 2024) ..............................................24

*Sumotext Corp. v. Zoove, Inc.*,
2020 WL 533006 (N.D. Cal. Feb. 3, 2020)................................................17

*Thompson v. TRW Automotive, Inc.*,
2015 WL 5474448 (D. Nev. Sept. 17, 2015) ..............................................24

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
709 F. Supp. 2d 802 (C.D. Cal. 2010)...........................................17, 18, 19

*United Food & Commer. Workers Local 1776 v. Teikoku
Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ...............................................18, 20

*United Food Grp., LLC v. Cargill, Inc.*,
2015 WL 13868984 (C.D. Cal. June 8, 2015)...........................................8, 21

*United States v. J-M Mfg. Co., Inc.*,
2020 WL 4196880 (C.D. Cal. June 5, 2020)..............................................8, 23

*Venegas v. Wagner*,
831 F.2d 1514 (9th Cir. 1987)...............................................................2, 24

*Virgin Atlantic Airways Ltd v. British Airways PLC*,
69 F. Supp. 2d 571 (S.D.N.Y. 1999)...........................................................6

*Visa U.S.A. Inc. v. First Data Corp.*,
2006 WL 1310448 (N.D. Cal. May 12, 2006) ...................................3, 13, 15

*W. Parcel Express v. United Parcel Serv. of Am., Inc.*,
190 F.3d 974 (9th Cir. 1999)...................................................................11

**TABLE OF AUTHORITIES**
(***cont'd***)

**Page No(s).**

**OTHER AUTHORITIES**

Rule 50............................................................................................................14

Rule 59.........................................................................................................2, 24

Rule 702...........................................................................................................20

# I. <u>INTRODUCTION</u>

Trial established that Medtronic leveraged its unmatched portfolio to block competition. Medtronic's documents described its strategy: leverage the portfolio, mitigate competitive threats, and make it "impossible" for rivals to compete. The result was higher prices, less competition, and less customer choice. Rather than grapple with this record, Medtronic advances erroneous legal arguments this Court already rejected.

Medtronic first argues Applied had to prove monopoly power over every product in the bundle. This Court already rejected that argument: "there is simply **no support** in Ninth Circuit case law for such a requirement." Dkt. 256 at 7.[1] Under the Ninth Circuit's controlling standard, "if a bundle fails the DAT test, a finder of fact may find that the bundle is exclusionary." *Id.* at 6. Here, Medtronic entered DAT-failing agreements at **hundreds** of hospitals. The record firmly establishes exclusionary bundling.

Medtronic next argues that exclusive dealing requires complete exclusivity. This Court likewise rejected that argument and recognized that Applied can rely on *de facto* exclusive dealing. Dkt. 256 at 8-12 & n.3. The record amply satisfies that standard. Medtronic's contracts operate as *de facto* exclusive arrangements through multi-year terms, staggered expirations, generator lock-ins, and active blocking of competitive trials.

Medtronic's other arguments simply ignore the record. After insisting that the jury find a specific market, Medtronic now asks the Court to second-guess the jury's decision. But the jury's market definition was well supported by detailed expert testimony, numerous documents, and extensive factual testimony. The jury was free to reject Medtronic's broader market, especially given Murphy's tenuous opinions. 2/4/2026 Tr. 151:12-16 ("I don't – I **can't say** for sure it's

---

[1] All emphases are added unless otherwise noted.

broader"). Medtronic cannot carry the extraordinary burden of JMOL when its own expert "can't say for sure" Medtronic is correct. *Id.*

Medtronic's challenge to damages is equally meritless. Orszag's damages analysis was well supported and indeed undisputed. Medtronic chose not to call its damages expert and instead allowed the jury to decide damages based on Orszag's analysis alone. Having lost that gamble, Medtronic now resorts to unfounded post-trial *Daubert* challenges. Those challenges are untimely and deeply flawed for many reasons.

In sum, Medtronic asks the Court to rewrite the law, ignore evidence, and reweigh a voluminous record in its favor. The Court should decline that invitation. The jury did exactly what it was tasked to do: evaluate the evidence under the governing law. The jury's verdict should stand.

## II. <u>LEGAL STANDARD</u>

JMOL is appropriate "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014) (cleaned up); *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 859 (9th Cir. 2002) (describing the standard as "very high" and a "high hurdle"). "The court must 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Multiple Energy Techs., LLC v. Casden*, 2025 WL 579641 at *3 (C.D. Cal. Feb. 21, 2025) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000)). Courts "may not make credibility determinations or weigh the evidence." *Id.* at *3 (citing *Reeves,* 530 U.S. at 150).

Courts likewise apply a "stringent" standard in determining whether the movant met its heavy burden of justifying a new trial under Rule 59. *See Venegas v. Wagner*, 831 F.2d 1514, 1519 (9th Cir. 1987). "A trial court may grant a new trial only if the verdict is against the clear weight of the evidence…." *Pavao v.*

*Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). A new trial may not be granted "simply because [the Court] would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001).

### III. ARGUMENT

Medtronic presents no basis to disturb the verdict. Medtronic divides Applied's evidence into two "theories" (bundling and exclusive dealing) and attacks each in isolation. Br. at 3-16. That is error because Medtronic's conduct must be examined as a whole. *See Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448, at *11 (N.D. Cal. May 12, 2006). Nevertheless, Applied's opposition tracks Medtronic's brief.

### A.    Substantial Evidence Supports Exclusionary Bundling

As this Court explained, "[u]nder *PeaceHealth*, if a bundle fails the DAT test, a finder of fact may find that the bundle is exclusionary." Dkt. 256 at 6 (citing *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008)). Applied showed Medtronic entered exclusionary DAT-failing agreements at **hundreds** of hospitals. 1/29/2026 Tr. 34:8-15; *see, e.g., id.* 27:9-28:16, 31:11-34:7; JTX-2233, JTX-2273, JTX-2314, JTX-2353, JTX-2448, JTX-2765, JTX-2778. Medtronic's JMOL ignores this evidence and instead asserts a legally erroneous rule.

### 1.    Medtronic's Motion Is Based On Legal Error

Medtronic argues Applied had to show monopoly power over every bundled product. Br. at 4-5.[2] This Court already rejected that argument:

---

[2] Medtronic does not consistently articulate its supposed element. *Compare* Br. at 5 ("monopoly power over the bundled products") *with id.* at 1 ("monopoly power in **any** of the products"), 1 ("monopoly or market power"), 10 (same). An element that shifts that much is no element at all.

-3-

> As established in the Court's *Daubert* order, the Court agrees that Applied need not show monopoly or significant market power over every item in a bundle; there is simply no support in Ninth Circuit case law for such a requirement. (Order re Daubert Motion at 16-17). Instead, Ninth Circuit case law and persuasive authority clarify that the DAT test is relevant when "one of the competitors produces fewer goods or services than the other competitor."

Dkt. 256 at 7 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836 F.3d 1171 (9th Cir. 2016) and citing *PeaceHealth*, 515 F.3d at 909).

As a result of the ruling, the jury instructions did not contain Medtronic's erroneous element. *See* Dkt. 363 (Jury Instr.) at 32. That defeats Medtronic's argument because "both sides are bound by the jury instructions as the exclusive statement of the governing law for the instant action." *Oracle Am., Inc. v. Google Inc.*, 2012 WL 1945496 at *2 (N.D. Cal. May 30, 2012). Medtronic also dropped its erroneous element from its Memorandum of Contentions of Fact and Law (Dkt. 284 at 1 n.1, 6:13-23) and the Pretrial Conference Order, which specified "the issues remaining to be litigated" and "govern[ed] the course of the trial" (Dkt. 293-1 at 6 & n.3, 31). Thus, monopoly power over every product was not an "essential element" or a "key question" at trial, as Medtronic contends. *See* Br. at 1, 4. It was not an issue at all.

And for good reason. As the Court explained, Medtronic's cited "pages [of *PeaceHealth*] do not establish that a plaintiff must show monopoly power in each product included in a discount attribution analysis." Dkt. 197 at 16. The Court correctly held "there is simply ***no support*** in Ninth Circuit case law for such a requirement." Dkt. 256 at 7. *PeaceHealth* refutes Medtronic's rule by explaining that a firm can exclude an equally efficient rival if it has a monopoly in "one" product but "faces competition on others." 515 F.3d at 896 (quotation omitted).

-4-

As this Court observed, *PeaceHealth* even considers the harm by firms merely "on the verge" of monopoly power.  Dkt. 197 at 17.

Medtronic claims *PeaceHealth* "agreed" with *LePage*'s that "leveraging monopoly power in one market to freeze out competition in another market is necessary to show anticompetitive bundling…."  Br. at 4.  But Medtronic cites nothing to support that assertion and it is not true.  The defendant in *LePage's*, like Medtronic here, had monopoly power in the market in which the plaintiff competed (transparent-tape).  *LePage's Inc. v. 3M*, 324 F.3d 141, 144 (3d Cir. 2003).  *LePage*'s never suggested the plaintiff had to show the defendant had monopoly power over its "extensive" lines of other bundled products.  *See id.* at 154 (listing bundled products), 157.  Nor did Medtronic's out-of-circuit district court cases.  Br. at 4-5 n.1 (citing *Shire* and *Castro*).

*PeaceHealth*'s analysis of *LePage'*s likewise does not support Medtronic's erroneous rule.  *PeaceHealth* addressed a jury instruction based on *LePage's* that allowed liability where a firm with monopoly power, like Medtronic, employed an unmatched bundle.  *PeaceHealth,* 515 F.3d at 898.  The defendant argued the jury instruction should include a price-cost test, which prompted *PeaceHealth* to adopt the DAT.  *Id.* at 899-903.  Nothing suggests *PeaceHealth* adopted Medtronic's erroneous rule, much less relied on *LePage's* to do so.

Indeed, *PeaceHealth* discussed a requirement of market power only in its ***tying*** analysis.  515 F.3d at 912.  This Court correctly distinguished bundling from tying.  Dkt. 197 at 16-17 n.10.  Unlike tying, which requires market power over the tying product, bundling is anticompetitive when it "exclude[s] a rival" who "does not sell as many products."  *PeaceHealth,* 515 F.3d at 909.  Medtronic's reliance on tying case law thus lacks merit.  Br. at 5 (citing *Suture Express*).

Medtronic's other arguments all fail.  First, Medtronic misreads *PeaceHealth*'s "shampoo-and-conditioner" hypothetical.  Br. at 5.  The reference to conditioner being made "only" by A does not indicate a 100% monopoly by A.

-5-

It contrasts A and B by explaining that "the latter [conditioner] [was] made **only** by A and the former [shampoo] by **both** A and B." 515 F.3d at 897.

Second, Medtronic claims that *Aerotec* reasons that a bundler's **monopoly power** would enable it to absorb the cost of the total discount without a decline in profits. Br. at 5-6. *Aerotec* says no such thing. It explains that a "bundling competitor [that] has **exclusive capacity** to 'bundle' multiple products" can absorb the cost of the total discount without a decline in profits. *Aerotec*, 836 F.3d at 1187. That aligns with *PeaceHealth*, 515 F.3d at 906, and this Court's summary judgment ruling. Dkt. 256 at 7-8 (finding issue of fact as to exclusive capacity). The verdict here fits squarely within that framework.[3]

### 2. Applied Demonstrated Medtronic's Market Power Over the Bundled Products

At trial, Applied presented the same "exclusive capacity" evidence this Court relied on to deny summary judgment. *Compare* Dkt. 256 at 7-8 (citing Orszag Rpt. [Dkt. 147-23, Ex. 413] ¶¶261-64; Reply [Dkt. 147-23, Ex. 415] ¶¶25-26), *with* 1/29/2026 Tr. 82:24-84:12; 271:1-10. Medtronic acknowledged its "**monopoly**" on "portfolio breadth." JTX-324.0004; *see* 1/21/2026 Tr. 141:13-142:13; JTX-295.0003 ("**monopolize** Energy Endo ES Hernia Legacy GSP and yes EVEN Suture"); *see also* Dkt. 363 (Jury Instr.) at 32 (bundling may be anticompetitive if rival "does not offer the same array of products"). The jury instruction and law required no additional showing of market power.

Nonetheless, Orszag specifically addressed Medtronic's market power over the bundled products. Medtronic claims Orszag "did not offer an opinion" on "market power in the other product markets." Br. at 8. Not so. Orszag opined

---

[3] Medtronic also cites *Virgin Atlantic Airways Ltd v. British Airways PLC*, 69 F. Supp. 2d 571 (S.D.N.Y. 1999), but that case likewise did not adopt Medtronic's erroneous rule. It rejected bundling for lack of evidence on consumer needs, incentives, and costs. *Id.* at 580-81. No such defect exists here.

that "Medtronic possesses the type of ***market power*** that allows them to impose these kind of penalty prices in these other products." 2/4/2026 Tr. 170:7-171:19. Specifically, Orszag showed Medtronic could raise bundled prices to the GPO "***access price***," the baseline both experts used to measure penalties. 1/29/2026 Tr. 79:21-82:23. That demonstrates the power of Medtronic's bundle: customers rejecting it face higher prices. *Id*. at 82:19-23. Murphy agreed the question is whether Medtronic has sufficient "market power" to impose penalty prices. 2/4/2026 Tr. 59:17-60:23, 170:7-171:19; Dkt. 147-24, Ex. 428 (Murphy Depo.) at 238:10-239:4 (rejecting Medtronic's rule), 244:12-245:6.

Orszag presented detailed quantitative analysis, including a scatter chart analysis, demonstrating Medtronic has the power to raise prices to the access price. 1/29/2026 Tr. 79:21-82:23, 270:18-271:16; Dkt. 393, Ex. B at 49-50 (PDX4.48-4.49); 2/4/2026 Tr. 130:21-131:5. As Orszag explained, assembling alternative bundles is impractical because it would require negotiating contracts, ensuring product quality, and risking reputational harm. 1/29/2026 Tr. 83:8-24. Medtronic's staggered contracts also impose penalties and further entrench barriers to switching. 2/2/2026 Tr. 59:9-60:17.[4]

Medtronic's own documents confirm its power to raise prices to the access price. JTX-44.0001 ("[I]f they ***slip $1 below*** the 85% commitment, ***take them to Access***."); JTX-43.0001-0002 (if customer "not compliant to the 85% agreement - do we have the ability ***punitively*** raise their pricing…Yes, you do"); JTX-503.0001; JTX-158.0002 ("Drive additional economic leverage by applying price increases to the ***access tiers***"); JTX-153.0002 ("Additional economic leverage created by implementing a price increase to the ***access tiers***"); JTX-167.0002; JTX-139.0011 ("if accounts begin competitive trials" then "take them

---

[4] Medtronic claims Orszag's analysis of market power was insufficient because he did not sufficiently "define markets" for each bundled product. Br. at 7. This Court already rejected that argument. Dkt. 197 at 17-18.

to ***access/list tier***”); JTX-349.0001; Dkt. 371-10 (LaCasse Dep.) 161:16-162:5. Medtronic does in fact increase non-bundled prices to drive customers to bundles. JTX-157.0007; JTX-442.0002; JTX-153.0002.

Medtronic's documents even admit its bundle made it “***impossible***” for Applied to win MSK (JTX-330.0001), confirming Orszag's DAT analysis showing Applied could not compete there (1/29/2026 Tr. 29:7-13). Medtronic then replicated the same strategy nationwide. Dkt. 371-8 (Robertson Dep.) 145:13-173:2; JTX-327-329. Orszag's analysis showed that rivals would have to pay hundreds or thousands of dollars per ***unit*** to overcome Medtronic's penalties. 1/29/2026 Tr. 30:11-33:9 ($6,000 at Univ. of Pittsburgh). Customers did not purchase from Applied because of Medtronic's penalties across the bundle. *See* JTX-654.0001 (“the loss would be so much larger than the smaller savings”). Even Murphy claimed only a “couple”—“not a lot”—of hospitals ever switched. 2/4/2026 Tr. 82:25-83:8. And Medtronic boasted of recreating the “ultimate gorilla,” which would make no sense if customers could simply walk away. JTX-504.0002.

### 3.    Orszag's DAT Analysis Should Not Be Excluded

Medtronic next attempts to exclude Orszag's DAT analysis. Medtronic invokes a supposed “continuing duty” to scrutinize expert testimony after trial. Br. at 9-11. That misstates the law. “It is a ***rare*** circumstance when the court may exclude evidence after the close of the parties' cases.” *United Food Grp., LLC v. Cargill, Inc.*, 2015 WL 13868984 at *4 (C.D. Cal. June 8, 2015) (quoting *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1013 (9th Cir. 2008)). The reasons are “clear”: once parties have rested, they cannot cure defects or rebuild the record. *See id.* Medtronic relies on rare cases where, unlike here, trial exposed fatal expert flaws. *See In re: NFL “Sunday Ticket” Antitrust Litig.*, 2024 WL 3628118, at *4 (C.D. Cal. Aug. 1, 2024); *United States v. J-M Mfg. Co., Inc.*, 2020 WL 4196880, at 26 (C.D. Cal. June 5, 2020).

Medtronic seeks to exclude Orszag's DAT analysis for purportedly "failing to consider the scope of competition for the bundled products or the other options hospitals have," Br. at 9.  As discussed above, however, Orszag **did** address the factual issue of potential switching.  Contrary to Medtronic's arguments, Orszag (1) considered competition for other products, (2) addressed market power within the bundle, and (3) analyzed whether customers could turn to alternatives.  *Supra* Section III.A.2.

To support its claim that Orszag ignored switching, Medtronic points to Orszag's DAT testimony.  Br. at 6 (citing 1/28/2026 Tr. 211:11-212:1).  As Murphy admitted, however, the DAT "*itself* assumes" no switching.  2/4/2026 Tr. 69:4-23, 137:8-10, 17-21  Medtronic's cross-examination of Orszag regarding switching asked him to "step *out* of the discount attribution test."  1/29/2026 Tr. 203:19-204:23 ("Q: I'm not asking about the test.").  Orszag's faithful application of the DAT was not error.  It was what the law required.  In fact, Murphy agreed Orszag "did the math correctly" and "did a pretty good job of explaining" the DAT.  2/4/2026 Tr. 54:8-17, 138:20-139:13.

Medtronic's cases are thus inapposite.  *See Sunday Ticket*, 2024 WL 3628118 at *4-6 (rejecting numerous but-for worlds untethered to evidence; appeal pending);[5] *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. 2025) (rejecting "fanciful" theory "untethered to real-world evidence"); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1512-13 (9th Cir. 1985) (reversing summary judgment despite evidentiary "deficiencies"); *In*

---

[5] At oral argument, the Ninth Circuit expressed skepticism about the district court's ruling.  *See* https://courthousenews.com/ninth-circuit-skeptical-of-nfls-win-in-sunday-ticket-trial/.

*re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig*., 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert for cherry picking studies).[6]

**B.    Substantial Evidence Supports Exclusive Dealing**

**1.    Medtronic's Challenge Is Again Based On Erroneous Rules**

Medtronic's challenge to exclusive dealing also relies on legal errors. Medtronic first argues the law requires complete exclusivity by preventing customers from buying "from any other vendor."  Br. at 11 (citing *Allied Orthopedic* and *Aerotec*); *see also id.* at 11-12 (arguing contracts must expressly prevent purchases).  As Medtronic acknowledges, however, this Court agreed Applied can pursue a "*de facto*" theory that looks to the "practical effect" of contracts.  Dkt. 256 at 8-9 & n.3.  Moreover, the Ninth Circuit has now recognized *de facto* exclusive dealing as a valid theory.  *See CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1073-74 (9th Cir. 2025), *cert. denied*, No. 25-667 (Mar. 23, 2026).

Medtronic claims its agreements cannot be anticompetitive if others employ agreements with some similar terms.  Br. at 11-12.  But it is well established that "[b]ehavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."  *Pac. Surf Designs, Inc. v. Whitewater W. Indus., Ltd*., 2021 WL 461707, at *5 (S.D. Cal. Feb. 9, 2021) (cleaned up); *Greyhound Comput. Corp. v. Int'l Bus. Machines Corp*., 559 F.2d 488, 498 (9th Cir. 1977) ("[i]t is no answer" for a monopolist to assert its practices are "the kind an ordinary enterprise might utilize").  As Orszag explained, "[e]lephants" must "walk softly."  1/29/2026 Tr. 188:3-10.

---

[6] Medtronic asserts for "preservation purposes" that 17% foreclosure was insufficient.  Br. at 9.  The Court rejected a foreclosure requirement for bundling. Dkt. 256 at 6-7.  And Applied established foreclosure far higher than 17%. *Infra* Section III.B.4.

Medtronic also argues that contracts cannot be anticompetitive if a failure to comply merely results in losing a discount.  Br. at 12.  But Medtronic's own case rejects that argument.  *Aerotec*, 836 F.3d at 1182 (conditioning "discounts and rebates" on market share can be "'de facto' exclusive dealing").  Medtronic's other cases also do not support its argument.  *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (requiring "something more" on "the facts of this case"); *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) (addressing volume discounts that, unlike Medtronic's contracts, did not limit purchases from others); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059-60 (8th Cir. 2000) (no foreclosure on specific facts).

**2.      <u>The Jury Heard Substantial Evidence Of *De Facto* Exclusivity</u>**

The jury heard overwhelming evidence of *de facto* exclusivity.  First, Applied presented evidence that Medtronic's contracts last three to five years.  *See, e.g.*, JTX-135.0001 ("5 year agreement" because "*[l]ong term protection* in this day and age is paramount"); JTX-531.0001 (touting how "one of our biggest customers is *locked down for years to come*"); 1/29/2026 Tr. 24:2-7; Dkt. 371-12 (Corley Dep.) 94:2-5; 1/21/2026 Tr. 150:25-151:1 (Medtronic's CEO touted the "strength of our long-term contracts"); 2/2/2026 Tr. 223:2-4; JTX-155.0001; Dkt. 371-7 (McGovern Dep.) 264:8-19.

Second, Applied presented ample evidence that Medtronic's agreements are not easily terminable.  *See, e.g.*, 1/29/2026 Tr. 74:20-75:6 (terminating agreements "*sounds a lot easier than it is in reality*, because of that penalty pricing"); JTX-276.0002 (discussing how to "layer[] in additional contractual barriers to assist in averting competitive threat"); JTX-3173 at 1:05-1:31 (Medtronic CEO touting "tight" contracts that prevent customers from permanently switching even in response to supply shortages); JTX-280.0001; JTX-282.0002.

-11-

Third, Medtronic staggers its agreements to prevent switching. *See, e.g.*, JTX-135.0001 (term would "transcend the end" of other contracts); 1/21/2026 Tr. 144:14-145:9 ("non-coterminous arrangement [that] puts another wrinkle in trying to move to a new supplier in this area"); 2/2/2026 Tr. 59:20-60:17.

Fourth, Medtronic targets customers where rivals like Applied are gaining traction. *See, e.g.*, 1/29/2026 Tr. 72:21-74:5 ("***targeting*** plays a really important role. And you have to factor that in"); JTX-78.0006 ("portfolio leverage" in "at-risk accounts and ***targeted*** conversion accounts"); JTX-330.0001-0002 (Medtronic made it "impossible for Applied to close the deal"); 1/29/2026 Tr. 47:3-49:3, 273:21-274:12 (Orszag discussing Medtronic's targeting); JTX-58.0007; JTX-94.0006-0131; JTX-110.0001-0004; Dkt. 371-16 (Shipman Dep.) 139:14-19; JTX-152.0001; JTX-158.0002; JTX-176.0001; JTX-183.0003; JTX-189.0001; JTX-327.0001; JTX-328.0001; JTX-329.0001; JTX-341.0001; JTX-447.0001; JTX-457.0004; Dkt. 371-1 (R. Murphy Dep.) 46:01-77:02.

Fifth, Medtronic actively prevents product trials. *See, e.g.*, JTX-139.0011 ("***If accounts begin competitive trials communicate violation***" and "be prepared to take them to access/list tier"); JTX-176.0001 (increased pricing "***midway through the trial***" to stop trial); JTX-183.0003 ("eliminate the competition from getting a window that would allow for a trial"); JTX-187 (seeking to have HPG "stop" trial); JTX-341.0001 ("[I]f MSK threatens to trial Applied again, we default to their current Exact pricing."); JTX-189.0001 ("threaten to move price" to stop trial); JTX-447.0001 ("shut down Applied evaluation"); JTX-528.0003 ("advocating a price change" once "trial begins"); 1/26/2026 Tr. 182:12-183:4, 188:21-23; 1/29/2026 Tr. 24:14-25:4 (lack of trials leads to "lot of Medtronic renewals").

Sixth, Applied presented evidence that Medtronic's generator agreements limit switching. *See, e.g.*, 1/21/2026 Tr. 144:14-145:9; 2/2/2026 Tr. 59:14-60:17; JTX-2389; JTX-2486; JTX-2608; JTX-2741.

### 3. <u>**Medtronic Misstates The Record On Generator Agreements And Product Trials**</u>

Medtronic ignores much of the above evidence and focuses only on: (1) generator agreements and (2) Medtronic's strategy to prevent product trials. Br. at 12-13. Medtronic contends the Court's MSJ Order required Applied to prove "Medtronic's generator agreements or alleged 'targeting' of Voyant trials" made "the challenged contracts in practice not terminable on short notice." *Id*. Medtronic then argues Applied must show substantial foreclosure for each independently. *Id.* at 13-15.

Medtronic mischaracterizes the Court's Order. The Order cited generator agreements and trial interference as examples of "something more," not the only relevant evidence. Dkt. 256 at 11 (the "two categories of evidence ***inform***" its ruling). The Court evaluated Medtronic's conduct as a whole. *Id*. at 12-13 (considering staggering agreements, and generator agreements "***when paired*** with the bundled-discounting practice"). The Court's analysis reflects the law. *See Simon & Simon, PC v. Align Tech., Inc.* 533 F. Supp. 3d 904, 913 (N.D. Cal. 2021) (improper to focus on individual acts while ignoring overall combined effect); *Visa*, 2006 WL 1310448, at *11 (courts do not "tightly compartmentaliz[e]" intertwined conduct); *CoStar*, 150 F.4th at 1073-74 (considering how terms and agreements work together). In addition to generators and product trials, the record shows multiple forms of "something more"— lengthy terms, difficult termination, staggered agreements, and targeting. *Supra* Section III.B.2. Regardless, Medtronic misstates the evidence on generators and product trials.

**<u>Generator Agreements</u>.** Medtronic claims it presented "uncontroverted evidence" that generator agreements are a "minor" financial consideration. Br. at 13. Not so. Orszag explained why Medtronic's generators and generator agreements make switching difficult. 2/2/2026 Tr. 59:14-60:17. Medtronic's

generators work only with Medtronic instruments and thus make it more difficult to switch. *Supra* Section III.B.2; *see* 2/2/2026 Tr. 97:8-15. Applied's evidence was based on Orszag's analysis of hundreds of agreements and their market effects. 2/2/2026 Tr. 59:14-60:17; 1/29/2026 Tr. 21:9-10; *see, e.g.,* JTX-2389; JTX-2486; JTX-2608; JTX-2741. Medtronic argues hospitals can use reprocessed LigaSure devices with Medtronic generators (Br. at 13), but does not dispute its generators do not work with other ABD brands. Moreover, the Court acknowledged reprocessed LigaSure devices work with Medtronic generators when denying summary judgment. Dkt. 256 at 12 n.4.

**Product Trials.** Medtronic claims Applied presented "two theories related to product trials: (1) Applied conducted a 'successful' trial that did not result in a contract for Voyant; or (2) Applied was unable to conduct a trial at all." Br. at 14. That misstates Applied's allegations and the record. Medtronic actively stopped trials altogether. *Supra* Section III.B.2. Medtronic **raised** prices mid-trial to shut trials down and warned that even **initiating** trials violated agreements. *See* JTX-176.0001; JTX-139.0011; JTX-287.0001 (stopping Applied trial). Applied also showed Medtronic prevented hospitals from converting after successful Voyant evaluations. *See, e.g.*, 1/21/2026 Tr. 137:5-141:12; 1/26/2026 Tr. 182:6-184:16; 1/27/2026 Tr. 85:11-23; JTX-330.0001. And Applied presented the very evidence the Court relied on in its MSJ Order. *Compare* Dkt. 256 at 13-14, *with* JTX-139.0011; JTX-341.0001; JTX-183.0003.

Rather than identify gaps in Applied's proof, Medtronic asks the Court to draw inferences in its favor by arguing Applied presented "self-serving testimony" and speculating hospital witness testimony would have supported Medtronic. Br. at 14-15. But Rule 50 considers whether substantial evidence supports the verdict, not whether a particular type of witness testified or the jury could have viewed the evidence differently. *See Casden*, 2025 WL 579641 at *3; *Escriba*, 743 F.3d at 1242.

-14-

#### 4.    Applied Established Substantial Foreclosure

Medtronic also argues Applied failed to show foreclosure exceeding 40-50%.  Br. at 15 (citing *Omega Env't* and *Power Analytics*).  But this Court held "there is no set percentage" for foreclosure and "the Ninth Circuit has previously found that 24% market foreclosure" is sufficient.  Dkt. 256 at 10.

Here, Applied showed foreclosure levels of at least 17% to 47%.  1/29/2026 Tr. 45:3-46:21, 48:20-49:3.  And Orszag explained why Medtronic's targeting supports a substantially higher foreclosure percentage.  1/29/2026 Tr. 48:20-49:3.  This Court also cited Orszag's sensitivity analysis, Medtronic's generators, and Medtronic stopping product trials to deny summary judgment on foreclosure.  Dkt. 256 at 16-17.  Applied presented that same evidence at trial.  1/29/2026 Tr. 53:10-54:4; *supra* Section III.B.2-3.

Medtronic argues Applied was required to quantify hospitals impacted by (1) just Medtronic's generators agreements or (2) just Medtronic's interference with product trials.  Br. at 15.  But the foreclosure inquiry evaluates the impact of Medtronic's ***overall*** conduct—not one aspect of the conduct.  Dkt. 363 (Jury Instr.) at 36 ("consider whether Medtronic's alleged exclusive dealing contracts substantially foreclose competition…."); *id*. at 45.  Indeed, Medtronic waived this argument by not objecting to the Court's jury instruction on foreclosure.  *See Concord Boat*, 207 F.3d at 1054.

### C.    Applied's Damages Do Not Require A Finding of Liability As To Both Bundling And Exclusive Dealing

Medtronic argues Applied is entitled to no damages unless it proves both exclusionary bundling ***and*** exclusive dealing.  Br. at 16-17.  That is incorrect.  Courts give plaintiffs the "full benefit of [their] proof" and assess the "overall combined effect" of the conduct.  *Visa*, 2006 WL 1310448, at *11.

Here, Orszag properly used "benchmarks" to model "what the market would have looked like" absent the challenged conduct.  1/29/2026 Tr. 87:23-

-15-

89:4.  Orszag's analysis makes sense because the evidence would be the same if Applied's claims were based only on bundling or only on exclusive dealing.  In a bundling case, the long-term and exclusive nature of Medtronic's bundled agreements would still lock out rivals and magnify harm beyond a single lost sale.  *See* 1/21/2026 Tr. 143:7-10.   In an exclusive-dealing case, the bundling provisions in Medtronic's exclusive contracts would still prevent switching and magnify Medtronic's exclusivity.  2/2/2026 Tr. 58:25-59:8; 1/29/2026 Tr. 27:9-28:5, 24:14-25:18; 1/21/2026 Tr. 143:11-144:13.

The jury instructions confirm the relevant inquiry was exclusionary conduct—whether shown by bundling, exclusive dealing, or both.  Dkt. 363 at 30:17-20.  That distinguishes *ILC Peripherals Leasing Corp. v. IBM Corp.,* 458 F. Supp. 423, 434 (N.D. Cal. 1978), where the expert failed to address the impact of numerous factors other than the challenged conduct on damages.  And *Concord Boat* is inapposite because Orszag did not rely on any time-barred category of conduct.  207 F.3d at 1053-54.  Moreover, although it raised other objections to the damages question on the verdict form, Medtronic never argued for disaggregation between bundling and exclusive dealing.  *See* Dkt. 348 at 5-6.  To the contrary, Medtronic lumped them together in a question asking about damages "as a result of Medtronic's exclusionary bundled discounting and/or unlawful exclusive dealing." *Id.* at 2.  Medtronic thus waived its argument.  *See Concord Boat*, 207 F.3d at 1054.

Orszag properly measured the resulting harm by modeling a market in which customers could freely choose Applied.  In doing so, he captured the real-world effects of Medtronic's exclusionary conduct, regardless of the legal label applied to that conduct.  *See Heckman v. Live Nation Ent., Inc.*, 2025 WL 3780262, at *24 (C.D. Cal. Dec. 3, 2025) (plaintiffs need not "disaggregate the effects of Plaintiffs' three conduct theories"—i.e., "exclusive dealing, tying, and coercion"—that do not produce separate damages); *Sumotext Corp. v. Zoove, Inc.*,

2020 WL 533006, at *7 (N.D. Cal. Feb. 3, 2020) ("Where certain conduct is unlawful under multiple theories of liability, a plaintiff need not—and indeed, could not—disaggregate damages across each theory.").

**D.      Substantial Evidence Supports The Jury's Market Determination**

### 1.      The Jury Was Free To Exclude Ultrasonic Devices

Applied presented substantial evidence that ultrasonic devices are not in the relevant market.  First, Orszag analyzed the issue and explained why ultrasonic devices are in a different market.  1/28/2026 Tr. 187:11-190:9, 199:20-202:7; 2/2/2026 Tr. 61:3-24 (explaining why hospitals would not switch in response to a small but significant non-transitory increase in price ("SSNIP")).  Such testimony alone is sufficient to support the verdict.  *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co. Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021) (expert's testimony established market).

Second, Medtronic repeatedly describes the products as being in separate markets.  JTX-230.0001 (describing ultrasonics and ABDs as "***two markets*** [that] are ***moving in different directions***"); JTX-232.0006 (Medtronic "own[s] the RF vessel sealing market" but needs to "bust into ultrasonic world");  JTX-300.0009 ("Medtronic owns RF market; Ethicon owns Ultrasonic market").   Indeed, Medtronic repeatedly characterizes ABDs as a distinct market.  JTX-285.0004; JTX-318.0002; JTX-322.0004.  Such evidence alone is likewise sufficient.  *See TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 816 (C.D. Cal. 2010) (internal emails and memos describing market were "sufficient").

Third, trial demonstrated the significant technical differences between ABDs and ultrasonics.  1/21/2026 Tr. 98:13-21 (different indications for use); 2/3/2026 Tr. 145:20-146:5 (same); 1/28/2026 Tr. 155:4-156:2 (ultrasonics coagulate and ABDs seal); 1/26/2026 Tr. 101:2-102:11 (same); Dkt. 371-14 (Kaup Dep.) 137:2-137:9; Dkt. 371-11 (Rainieri Dep.) 110:18-111:17; JTX-21.0012 (numerous technical differences); JTX-300.0016.

Fourth, Medtronic's own contracts treat ABD "vessel *sealing* products" and "ultrasonic *cutting* products" as separate categories when measuring compliance. *See, e.g.,* JTX-157.0024; JTX-2233.0001; JTX-2273.0001; JTX-2280.0001; JTX-2317.0001-0002; JTX-2353.0001; JTX-2765.0001; JTX-2778.0001; 1/29/2026 Tr. 17:18-18:12.

Fifth, Medtronic witnesses testified that ABDs and ultrasonics are separate product categories with different competitors. 2/2/2026 Tr. 228:20-229:8 ("*very separate stand-alone categories*"); Dkt. 371-5 (Goodall Dep.) 121:14-19; Dkt. 371-14 (Kaup Dep.) 128:6-13. Indeed, Medtronic's Strategy Director testified that Medtronic's ABDs are market leaders while Medtronic's ultrasonic products are not. Dkt. 371-16 (Shipman Dep.) 24:13-24:22, 39:4-13, 52:6-13. That is why Medtronic conducted "*Defense* Workshops" for ABDs and "*Accelerator* Workshops" for ultrasonic devices. *See id.*; JTX-104.0007; JTX-106.0001-0004.

Medtronic argues its documents have "no bearing" on the relevant market. Br. at 18. The law is the opposite. *See TYR Sport,* 709 F. Supp. 2d at 816 (internal documents describing market sufficient to defeat summary judgment). The jury was entitled to consider how Medtronic, a major market participant, categorized and evaluated the products. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023) ("Courts also consider … industry or public recognition of the [market] as a separate economic entity.").

Medtronic argues ABDs and ultrasonic devices can be used in some of the same types of procedures to "stop bleeding." Br. 17-18. But "[p]roducts are not reasonably interchangeable merely because they share similar forms or functions…." *United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1171 (N.D. Cal. 2017) ("even where products are essentially identical, that alone is insufficient" to establish they are in the same market). Orszag accounted for alleged similarities in defining the relevant market. 1/28/2026 Tr. 199:20-200:18.

Medtronic also claims the jury had to include ultrasonics because (1) Medtronic tests LigaSure against ultrasonic for marketing materials, (2) a single surgeon switched devices during a procedure because of a product failure, and (3) ultrasonic use decreased as ABD use increased.  Br. 17-18.  Cherry-picking evidence does not establish JMOL.  *See Escriba*, 743 F.3d at 1242.

Finally, Medtronic incorrectly asserts Applied's claims fail if ultrasonics were included.  Br. at 17-18.  The Court correctly held market definition is not a claim element.  *See* 2/4/2026 Tr. 3:25-4:17; *see Epic Games,* 67 F.4th at 978 n.9.  And Orszag confirmed his opinions hold even if ultrasonics are included.  1/28/2026 Tr. 202:8-22; 1/29/2026 Tr. 68:14-21, 127:22-128:13.

### 2. <u>The Jury Was Free To Exclude Robotic ABDs</u>

The jury also heard ample evidence that robotic ABDs are not in the market.  First, Orszag analyzed the issue and explained why robotic ABDs are in a different market.  1/28/2026 Tr. 195:19-199:19; 2/2/2026 Tr. 61:3-24.  As discussed, that alone is sufficient.  *See Optronic Techs*., 20 F.4th at 482.

Second, Medtronic's documents repeatedly describe the ABD market as not including robotics.  JTX-300.0008 ("robotic not included" in ABD chart); JTX-318.0001 (ABD market excluded "robotics"); JTX-327.0057 ("excluding robotics").  Such evidence alone is likewise sufficient.  *See TYR Sport,* 709 F. Supp. 2d at 816.

Third, fact witnesses characterized handheld ABDs and robotic ABDs as being incompatible and in separate categories.  *See, e.g.,* 1/21/2026 Tr. 111:25-112:19; Dkt. 371-11 (Rainieri Dep.) 51:6-15 (Medtronic "diverted funds from flagship projects, such as energy" to "fund robotics").

Medtronic argues robotic ABDs are in the market because one of its witnesses testified that 80% of large hospitals own a robot.  Br. at 19.  But the existence of a single robot at some hospitals does not mean they can readily switch their handheld ABD users (or surgery types) to robots.  1/28/2026 Tr. 195:19-

196:7. Robotic ABDs require a substantial investment in robots, each costing "between $700,000 and $2,000,000." 1/28/2026 Tr. 195:19-197:18. As Orszag explained, a hospital facing a SSNIP would not switch given the "much, much bigger cost[s]." 1/28/2026 Tr. 195:19-197:12; 198:19-199:19.

Medtronic also asserts that surgeons use handheld and robotic ABDs to perform the same tasks. Br. at 19. But similar functionality is not sufficient to place products in the same market. *See United Food*, 296 F. Supp. 3d at 1171. Medtronic also argues that it loses sales to robotic ABDs. Br. at 19. As Orszag explained, the data at most reflects a technology shift (like flip phones to smart phones), not a price-driven switch between products in the same market. 1/28/2026 Tr. 195:19-197:12, 198:3-199:12.

Thus, the jury was free to reject Medtronic's broad market, especially given Murphy's hesitant rebuttal. *See* 2/4/2026 Tr. 151:12-16 ("You know, I don't -- I ***can't say for sure*** it's broader, but certainly you can't say it's limited to that. And I think it's ***probably*** broader than advanced bipolar.").

**E.    The Court Should Reject Medtronic's Rule 702 Challenge to Applied's Damages Benchmarks**

Medtronic's Rule 702 challenges to both of Orszag's benchmarks fail.[7]

**1.    Orszag's Trocar Benchmark Is Reliable**

Medtronic argues the trocar benchmark is "irrational" (Br. at 20), but the jury heard ample evidence otherwise. The trocar carveout addressed Ethicon's bundling, which makes it a textbook "but-for" benchmark. 1/29/2026 Tr. 70:13-71:14, 87:9-89:4, 90:8-95:16, 97:7-98:22. Medtronic's documents confirm Applied's "[g]rowth [was] ***fueled*** by GPO 'carve-out' language that protect[ed] non-full line suppliers." JTX-91.0069. Medtronic tied Applied's success in

---

[7] Medtronic's attempt to incorporate by reference its prior *Daubert* arguments (Br. at 20) is improper and should be disregarded. *See Harvey v. Netflix, Inc.,* 2024 WL 4536639, at *10 (C.D. Cal. Sept. 27, 2024).

trocars to ABDs by warning: "We Can Not Allow [the] Energy Market To Be The Next Win For Applied." *Id.*; *see* JTX-57.0012.  Thus, Medtronic itself relied on the benchmark to predict what might happen in the ABD market.

Medtronic claims Orszag "ignored contrary evidence," pointing to Applied's 2013 SEC filing.  Br. at 20 (citing JTX-1368.0018).  But Medtronic never brought a *Daubert* challenge on this ground.  Thus, Medtronic's argument is waived.  *See Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113-14 (9th Cir. 2012) (failure to raise *Daubert* challenge "before, or at, trial" waives objection); *Accentra Inc. v. Staples, Inc.*, 851 F. Supp. 2d 1205, 1227 (C.D. Cal. 2011) ("the specific grounds advanced for exclusion must have been raised"), *vacated on other grounds,* 500 Fed. Appx. 922 (Fed. Cir. 2013).  New *Daubert* challenges after trial "smack[] of sandbagging" because they deprive "the opposing party the opportunity to bolster its proof."  *United Food Grp.,* 2015 WL 13868984 at *3-4 (cleaned up).

Regardless, the SEC filing does not contradict Orszag's opinions.  The SEC filing confirmed the trocar carve-out "significantly contributed" to Applied's growth.  JTX-1368.0018.  It also stated that growth could be attributed to additional "factors," but identified those factors as of 2013.  *Id*.  The trocar benchmark is based on sales ending in 2009.  1/29/2026 Tr. 254:9-17.  The jury was free to conclude that the SEC filing's later-identified "factors" were downstream effects of Applied's growth following the carve-out.  1/21/2026 Tr. 156:14-157:11, 158:4-20.

Moreover, Orszag considered the SEC filing and addressed it in his report, deposition, and at trial.  *See* Dkt. 147-23, Ex. 413 (Orszag Rpt.) at 154 n.568; Dkt. 163 (Notice of Lodging of Orszag Depo) at 400:4-21; 403:1-407:13; 1/29/2026 Tr. 174:18-179:6, 249:18-254:23.  Before trial, Orszag addressed the "factors" in the SEC filing.  Dkt. 163 (Orszag Depo) at 404:2-407:13.  At trial, Orszag rebutted Medtronic's critiques based on the SEC filing.  1/29/2026 Tr. 174:18-

-21-

179:6, 249:18-254:23.   Orszag explained that Applied's licensed "seal" technology was "available to all the players in the market" and thus "wouldn't have a differential effect." 1/29/2026 Tr. 249:18-25, 250:3-13, 105:2-23; *see also* 1/29/2026 Tr. 253:8-254:1; 1/21/2026 at 116:6-7, 121:21-123:18, 128:2-129:2, 129:27-130:28.  Orszag also accounted for Applied's 2009 balloon innovation by explaining that is why he "cut off their market share at 22 percent." 1/29/2026 Tr. 254:2-17, 105:2-23.

Orszag further addressed the increase in Applied's sales force by explaining that, once Applied had success following the carve out, Applied could "fund more sales people, the salespeople help to fund more sales, and you create a virtuous cycle." *Id*. at 251:3-14.  He explained that, if anything, accounting for the size of the sales force would ***increase*** damages given Applied's larger team today. *Id.* at 250:14-20.

Orszag's analysis is more than sufficient, especially since "[a]n antitrust plaintiff is required only to provide the jury with some basis for a reasonable estimate of damage." *D & S Redi-Mix v. Sierra Redi-Mix and Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982).  In fact, Orszag was the ***only*** expert to cite and discuss the document in his report and at trial.  Medtronic did not even present its damages expert at trial. *See* 2/4/2026 Tr. 96:2-20.  "Given [Medtronic's] refusal to present a reasonable alternative measure [of damages], [it] may not now argue that those used are fatally speculative." *D & S*, 692 F.2d at 1249.

### 2.    Orszag's European Benchmark Is Reliable

Medtronic's challenge to the European benchmark also fails.  Medtronic argues that Orszag failed to account for Europe purportedly being more cost-conscious and price sensitive.  Br. at 21.  That argument is new and likewise waived. *See Skydive*, 673 F.3d at 1113-14.  Medtronic is also wrong.  Orszag explained that U.S. hospitals vary widely in cost sensitivity. 1/29/2026 Tr. 119:12-22.  European tenders weigh quality by as much as 80%, which

undermines Medtronic's claim that price drives outcomes in Europe. 1/28/2026 Tr. 81:25-86:2, 100:1-11, 157:2-158:1. Orszag analyzed Europe pricing and found it does not explain share variation. 1/29/2026 Tr. 121:13-122:1; Dkt. 147-23, Ex. 415 (Orszag Reply) at ¶209. He further showed Applied performs strongly in markets like South Korea, where price is irrelevant. 1/29/2026 Tr. 78:15-79:20, 119:23-120:7; *see also* 1/21/2026 Tr. 155:7-155:26.

Medtronic also claims that Orszag ignored the absence of reprocessed ABDs in Europe. Br. at 21. Not so. He addressed that issue and explained that other low-cost competition offsets that difference. 1/29/2026 Tr. 122:2-17; *see* 1/28/2026 Tr. 95:7-13. Orszag further explained that Europe is a conservative benchmark because it is not entirely free of bundling. 1/29/2026 Tr. 110:12-111:4. Applied's share would be even higher in a wholly unbundled market. *See id*.

Medtronic's reliance on *Sebastian Int'l, Inc. v. Russolillo*, 2005 WL 1323127, at *7-8 (C.D. Cal. 2005), is thus misplaced. That case excluded a benchmark for unsupported assumptions. *Id.* Courts recognize benchmarks "will seldom approach the 'Utopian ideal' of identifying the perfect clone," *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *39 (N.D. Cal. Sep. 27, 2022) (cleaned up). Medtronic's own authority confirms the law "certainly does ***not***" require a "perfect[]" but-for world. *See Sunday Ticket*, 2024 WL 3628118 at 4. And Medtronic's remaining cases are also inapposite. *See J-M Mfg.*, 2020 WL 4196880, at *26-*37, *39-40 (numerous methodological failures); *Concord Boat*, 207 F.3d at 1057 (model failed to reflect market realities). Even Murphy admitted a benchmark must only "reasonably approximate[]" what would happen absent the accused conduct. 2/4/2026 Tr. 97:1-13.

Moreover, what an expert considers goes to cross-examination, not exclusion. *See In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (N.D. Cal. Feb. 21, 2020). Medtronic's critiques thus go to weight, not admissibility.

-23-

*See In re HIV*, 2022 WL 22609107, at \*39.  Medtronic spent hours cross-examining Orszag.  *See* 1/29/2026 Tr. 125:17-262:14.  The jury fully heard Medtronic's criticisms and correctly rejected them.  *Sumotext*, 2020 WL 533006, at \*7 ("once the fact of an antitrust violation is established, the jury has ***broad*** latitude in assessing the amount of damages caused by that violation.").

### F.    The Court Should Deny Medtronic's Request for a New Trial

Finally, Medtronic "reframes" its "judgment-as-a-matter-of-law arguments as reasons for a new trial.  They are no more persuasive with this new label." *Thompson v. TRW Automotive, Inc.*, 2015 WL 5474448 at \*9 (D. Nev. Sept. 17, 2015).  Medtronic never attempts to satisfy the "stringent" standard of Rule 59. *See Venegas*, 831 F.2d at 1519.  Medtronic's citation to *Kenney v. Lawrence*, 2018 WL 2461491 at \*2 (S.D. Cal. May 31, 2019) adds nothing of consequence. That case *denied* a motion for a new trial.  *See id*.

Medtronic's complaint about the length of jury deliberations is irrelevant. Br. at 22.  If anything, that demonstrates the strength of Applied's evidence. Because "the jury's verdict was not against the clear weight of the evidence, and [Medtronic] raises no other indicia of an unfair trial, a new trial is not warranted." *See Stacy v. Whittington Motors Sports, Inc.*, 2024 WL 5341331 at \*6 (C.D. Cal. Dec. 5, 2024).

### IV.  CONCLUSION

Accordingly, the Court should deny Medtronic's Motion.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: April 9, 2026

By: /s/ *Stephen W. Larson*
Joseph R. Re
Stephen C. Jensen
Joseph F. Jennings
Stephen W. Larson
Cheryl T. Burgess
Adam B. Powell

Attorneys for Plaintiff,
APPLIED MEDICAL RESOURCES
CORPORATION

-25-

**<u>CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2</u>**

The undersigned, counsel of record for Plaintiffs' Applied Medical Resources Corporation, certifies that this brief contains 6,965 words, which [choose one]:

 <u>X</u> complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated [date].

Dated: <u>April 9, 2026</u>                By: <u>/s/ *Stephen W. Larson*</u>
                                                    Stephen W. Larson

                                                    Attorneys for Plaintiff,
                                                    APPLIED MEDICAL RESOURCES
                                                    CORPORATION

-26-