UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| APPLIED MEDICAL RESOURCES CORPORATION, a California corporation<br><br>                    Plaintiff,<br><br>    v.<br><br>MEDTRONIC, INC., a Minnesota corporation,<br><br>                    Defendant. | Case No. 8:23-cv-00268-WLH-DFM<br><br>**ORDER RE MEDTRONIC'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW [410]** |

The Court is in receipt of Defendant Medtronic, Inc.'s Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b), or in the alternative, a new trial under Federal Rule of Civil Procedure 59. (Motion ("50(b) Mot."), Dkt. No. 410). The Court heard oral argument from the parties on May 8, 2026. For the reasons stated herein, the Court **DENIES** the Motion in its entirety.

## I.    BACKGROUND

As relevant to the instant Motion, the Court incorporates by reference the factual background of the case outlined in its Summary Judgment Order, dated August

15, 2025.  (Order Re: Motion for Summary Judgment ("MSJ Order"), Dkt. No. 255). Both Applied Medical Resources Corporation ("Applied") and Defendant Medtronic, Inc. ("Medtronic") produce advanced bipolar devices ("ABDs")—surgical devices "that precisely control and deliver electrical current to cut tissue and seal vessels." (*Id.* at 1).  Medtronic sells its ABD under the name LigaSure.  Applied sells its ABD under the name Voyant.  (*Id.*).

Applied primarily alleges that Medtronic uses anticompetitive locally negotiated agreements ("LNAs") and Group Purchase Organizations ("GPOs") Tier Commitment Agreements to maintain and enlarge Medtronic's alleged monopoly over ABDs.  (Compl., Dkt. No. 1 ¶ 6).  In particular, Applied argues that Medtronic engages in two types of exclusionary conduct (1) offering anticompetitive bundled discounts; and (2) engaging in de facto exclusive dealing which forecloses a substantial share of competition in the ABD market.  (*Id.*).

Trial in this action began on January 20, 2026.  (*See* Minutes of Jury Trial, Dkt. No. 340).  Applied pursued the following claims:  (1) unlawful monopolization in violation of Section 2 of the Sherman Act ("Section 2"), (2) unlawful attempted monopolization in violation of Section 2, (3) unreasonable restraint of trade in violation of Section 1 of the Sherman Act ("Section 1"), (4) unlawful exclusive dealing in violation of Section 3 of the Clayton Act and (5) violations of the California Cartwright Act.  After the close of evidence, Medtronic and Applied both moved for judgment as a matter of law under Fed. R. Civ. P. 50(a).  (2/2/2026 Trial Tr. 287:1–302:12; Medtronic's Supplemental Brief Re: Motion for Judgment as Matter of Law, Dkt. No. 346; 2/5/2026 Trial Tr. 99:17–104:19).  The Court denied both motions pending further post-trial briefing.

The Court instructed the jury on February 5, 2026, and the jurors retired to deliberate.  (*See* Final Jury Instructions ("Jury Instr."), Dkt. No. 363; Mins. of Jury Trial – 10th Day, Dkt. No. 357).  That same day, the jury rendered its verdict in favor of Applied on all claims, finding that Applied met its burden in proving a properly

2

defined antitrust market (here, the market for advanced bipolar devices) and unlawful conduct under the Sherman Act, Clayton Act and California Cartwright Act. (Verdict Form, Dkt. No. 367). In light of those findings, the jury awarded $381,705,005 in damages. (*Id.*).

Medtronic now renews its motion for judgment as a matter of law pursuant to Rule 50(b), or in the alternative, a new trial pursuant to Rule 59. (*See generally* 50(b) Mot.). Applied opposed the Motion—to which Medtronic timely replied. (*See* Opp'n, Dkt. No. 413; Reply, Dkt. No. 414).

## II.   LEGAL STANDARD

### A.   Rule 50(b) Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). Initial motions for judgment as a matter of law must be made before the case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). If, as here, a Court does not grant a motion for judgment as a matter of law, a party may renew the motion. Fed. R. Civ. P. 50(b).

The standard for granting judgement as a matter of law mirrors the standard for granting summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). A district court must review all evidence in the trial record and draw all reasonable inferences in favor of the nonmoving party. *Id.* A district court may not weigh the evidence nor make credibility determinations. *Id.* After reviewing the evidence, the district court must uphold the jury verdict if there is "substantial evidence" to support the verdict, defined as "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001).

3

"[A] proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). If a Rule 50(b) motion is made on grounds not asserted in the Rule 50(a) motion, courts are "limited to reviewing the jury's verdict for plain error, and should reverse only if such plain error would result in a manifest miscarriage of justice." *Id.* (quoting *Janes v. Wal–Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002)).

### B.    Rule 59 Motion for New Trial

Rule 59 permits a court to grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although Rule 59 does not specify the grounds on which a motion for a new trial may be granted, a court is "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). In considering a motion for a new trial, courts have discretion to weigh the evidence and assess the credibility of witnesses. *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 190 (9th Cir. 1989). The grant of a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980) (per curiam).

A court may grant a new trial if, in its view, the verdict is against the clear weight of the evidence, and the evidence adduced at trial is insufficient to support the jury's verdict. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). A court may also grant a new trial if the damages awarded at trial are excessive or if the trial was otherwise unfair. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). Authority to grant a new trial "is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp.*, 449 U.S. at 36.

Pursuant to Rule 61, "[u]nless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial." Fed. R. Civ. P. 61. Accordingly, an erroneous evidentiary ruling *may* warrant a new trial, but only if it

"substantially prejudiced a party." *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (quotations omitted).

### C. Federal Rule of Evidence 702

Under Federal Rule of Evidence 702, expert testimony is only admissible if the "the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires district courts to "gatekeep" expert testimony to ensure that all proffered testimony is both relevant and reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The Court's task, however, is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharms., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995). In evaluating the basis for "technical" or "other specialized" expert testimony, the trial court "may" consider "one or more" of the factors the Supreme Court outlined in *Daubert*, including "testing, peer review, error rates, and 'acceptability' in the relevant scientific [or technical] community." *Id.* (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–94 (1993)).

With respect to reliability, the test is "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co., Ltd.*, 526 U.S. at 149 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)). And an expert cannot "make claims that are unsupported by the expert's basis and methodology." Fed. R. Evid. 702 advisory committee's note 2 to 2023 amendment. "To evaluate reliability, the district court 'must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general

acceptance.'" *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014)). "These factors are nonexclusive, and 'the trial court has discretion to decide how to test an expert's reliability based on the particular circumstances of the particular case.'" *Id.* (quoting *City of Pomona*, 750 F.3d at 1044) (cleaned up).

Though district courts must act as gatekeepers of evidence, "a judge must be cautious not to overstep its role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility . . ." because such tasks are reserved for the jury. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [remain] the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. 579 at 596. As such, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

## III.   DISCUSSION

In its 50(b) Motion, Medtronic moves for "a ruling under Federal Rule of Civil Procedure 50(b) that (1) Applied's bundled-discount theory fails as a matter of law; (2) Applied's exclusive-dealing theory fails as a matter of law; (3) if either of Applied's theories of competitive harm fails, then Plaintiff cannot prove any damages; (4) no reasonable jury could find a relevant market for advanced bipolar devices only; and (5) Applied's damages models are unreliable and do not satisfy Federal Rule of Evidence 702 . . . . [I]n the alternative, [Medtronic moves] for a new trial under Rule 59" on the ground that "the jury's verdict is against the clear weight of the evidence." (*See generally* 50(b) Mot.).  The Court will address each in turn.

**A. Reliability of Applied's Damages Models Under FRE 702**

The Court first turns to Medtronic's Fed. R. Evid. 702 challenge to the reliability of the damages benchmarks produced by Applied's expert, Jonathan Orszag. Medtronic specifically contends that Mr. Orszag's discount attribution test ("DAT") analysis fails Rule 702 for three reasons: (1) Mr. Orszag "ignored the overwhelming evidence that Medtronic *lacks* monopoly power in the products bundled with LigaSure," (2) his "failure to even *inquire* into the issue of monopoly or market power shows that [his] findings of harm from bundling are based only on his *ipse dixit*" and (3) he failed to investigate whether hospitals looked for other suppliers of the bundled products or whether that was even possible. (50(b) Mot. at 10).

To the extent Medtronic relies on arguments lodged in their earlier *Daubert* motion (*see id.* at 19–20) the Court declines to consider them in connection with this instant Motion. Medtronic's reliance on previously briefed arguments "is an improper attempt to incorporate [them] by reference to circumvent the page limit." *Harvey v. Netflix, Inc.*, No. 2:24-CV-04744-RGK-AJR, 2024 WL 4536639, at *10 n.4 (C.D. Cal. Sept. 27, 2024). But even as to those objections presented in the 50(b) Motion (namely that Mr. Orszag, in his calculation of the European and trocar benchmarks for damages purposes, neglected to control for "key differences" between those benchmarks and the but-for world), the Court is skeptical of Medtronic's ability to lodge those attacks on evidence it claims Mr. Orszag failed to incorporate into his analysis, or rather, "ignored." (*See* 50(b) Mot. at 20). Raising such "objections to expert testimony after the close of all the evidence harms the truth-seeking function of the court in two ways: first, it smacks of 'sandbagging,' and second, it both deprives the court of an opportunity to conduct a meaningful analysis and the opposing party the opportunity to bolster its proof." *FMS, Inc. v. Volvo Const. Equip. N. Am., Inc.*, No. 00 C 8143, 2007 WL 844899, at *8 (N.D. Ill. 2007); *see also United Food Grp., LLC v. Cargill, Inc.*, No. CV 11-7752 SS, 2015 WL 13868984, at *3 (C.D. Cal. June 8, 2015).

Medtronic cites no authority to persuade the Court against considering these arguments untimely and thus waived. *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1114 (9th Cir. 2012) (Plaintiff "waived its ability to challenge the substance of [expert] testimony by failing to object before, or at, trial.").[1] Implicit in holding otherwise is that the Court considers this to be a "rare circumstance when the court may exclude evidence after the close of the parties' cases." *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1013 (9th Cir. 2008). By just now raising the issue of Mr. Orszag ignoring "contrary" evidence such as (1) Applied's 2013 SEC filing (*see* JTX-1368.0018) in his trocars benchmark and (2) the cost-conscious and price-sensitive nature of the European market in his European benchmark, Applied is left without the opportunity to "provide a curative response" to the exclusion of the damages models. *In re Hanford Nuclear Reservation Litig.*, 534 F.3d at 1013. Applied is also divested of the "chance to present the testimony in another fashion, such as calling an additional witness." *Id.* The Court was able and willing to entertain these objections before or during trial. Not now.

Indeed, even if the Court considered these arguments properly lodged, Medtronic's assertions ultimately go to the weight to be afforded to Mr. Orszag's benchmarks, not their admissibility. *See In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2022 WL 22609107, at *39 (N.D. Cal. Sept. 27, 2022). The Court will address the propriety of the jury's damages award and its underlying evidentiary support,

---

[1] Medtronic's citation to the post-trial exclusion of expert testimony under FRE 702 in *In re: NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKx), 2024 WL 3628118, at *4 (C.D. Cal. Aug. 1, 2024) is inapposite. The trial court previously denied Defendants' *Daubert* motion and motion *in limine* related to the impropriety of the "but-for world" employed by the plaintiffs' expert. Those arguments were not raised for the first time in a post-trial motion, as Medtronic does here. Medtronic's pre-trial motion *in limine* to exclude evidence and argument regarding Johnson & Johnson's carve-out and Applied's trocar benchmark (Dkt. No. 209) did not address the reliability of the benchmark models and their potential disregard for "key differences" between those benchmarks and the but-for world. That motion is insufficient to overcome the waiver issue.

which Medtronic contends was against the weight of the evidence, in its judgment as a matter of law analysis.  The Court, however, finds it prudent to briefly address Medtronic's unavailing critiques of Mr. Orszag's DAT analysis.  *First*, Mr. Orszag explicitly discussed Medtronic's market power and its relation to his DAT analysis.  (2/4/2026 Trial Tr. 170:7–171:19 ("Medtronic possesses the type of market power that allows them to impose these kind [sic] of penalty prices in these other products.")).  Mr. Orszag also discussed the difficulty hospitals face in assembling alternative bundles related to contract negotiations, product quality and reputational harm.  (1/29/2026 Trial Tr. 83:8–24).  *Second*, as Medtronic's own expert identified at trial, the DAT "itself assumes" no switching.  (2/4/2026 Trial Tr. 69:4–23, 137:8–10, 17–21).  Medtronic also cross-examined Mr. Orszag on this very point, asking him to "step out of the discount attribution test."  (1/29/2026 Trial Tr. 203:19–204:23 ("Q: I'm not asking about the test.")).  *Third,* and most importantly, Medtronic fails to identify how Mr. Orszag's analysis went awry of the DAT as outlined in *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 906 (9th Cir. 2008).  Notably, Medtronic's expert assumed, under his calculations, that Orszag "did the math correctly" (2/4/2026 Trial Tr. 138:20–139:13) and "did a pretty good job of explaining" the DAT.  (*Id.* at 54:8–17).  A reasonable juror could hear his testimony and draw the conclusion that Medtronic's bundled discounting was in fact exclusionary under the Sherman Act.

Accordingly, the Court finds Medtronic's Rule 702 arguments not only waived—but also lacking merit.

**B.     Judgment as a Matter of Law**

In its renewed Motion, Medtronic contends that (1) Applied's bundled discount theory fails as a matter of law, (2) Applied's exclusive dealing theory fails as a matter of law and (3) no reasonable jury could find a relevant market for ABDs only.  (*See generally* 50(b) Mot.).

*1. Monopoly Power in Applied's Bundled-Discount Theory*

9

Medtronic primarily contests whether sufficient evidence was adduced at trial for a reasonable jury to find that Medtronic's bundled contracting was in fact anticompetitive. Such a finding, Medtronic asserts, is dependent on Applied meeting its evidentiary burden in demonstrating that Medtronic in fact held monopoly power in the markets of the "products bundled with LigaSure such that hospitals could not shop elsewhere for those products and thus had no choice but to accept Medtronic's pricing." (50(b) Mot. at 4).

As established at trial, bundled contracting employed by Medtronic is a common form of price cutting, particularly in the healthcare space. (2/3/2026 Trial Tr. 161:25–162:12, 164:7–24, 183:14–21). The Court instructed the jury that this bundled contracting is "the practice of offering reduced prices, discounts, and or rebates when two or more goods that could be sold separately are purchased together." (Jury Instr. No. 39). If such a bundle fails the DAT, the jury could find the bundle anticompetitive, or exclusionary. (*See id.*; *PeaceHealth*, 515 F.3d at 906. The jury, with its verdict in favor of Applied, implicitly found that the bundled contracting at issue was in fact anticompetitive and exclusionary. (*See generally* Verdict Form). Medtronic appears to once again take issue with this Court's reading of the relevant antitrust law governing bundled contracting within the Ninth Circuit. But as the Court has established time and again in its *Daubert* order and MSJ Order, Applied need not demonstrate monopoly or significant market power over every item in a bundle. Such a monopoly power requirement is without support in Ninth Circuit case law, no matter how strenuously Medtronic attempts to import it.[2] (*See* MSJ Order at 7 (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l Inc.*, 836 F.3d 1171, 1186–87 (9th Cir. 2016) and

---

[2] The Court agrees with Applied's contention at oral argument that Medtronic's reading of *PeaceHealth* is incorrect. *PeaceHealth* concerned bundling as it related to an attempted monopolization claim, *see PeaceHealth*, 515 F.3d at 893, which necessarily does not require a finding of monopoly power over every bundled product. In fact, *PeaceHealth* supports the Court's conclusion that liability can lie even in the absence of Medtronic's monopoly power over every product within its bundle.

citing *PeaceHealth*, 515 F.3d at 909)). Medtronic's contention—that Applied offered no evidence addressing whether Medtronic had monopoly power in any of the products part of the bundled contract—is founded on the faulty assumption that monopoly power across all products *is* a requirement for Applied to succeed on its bundling claims. The final jury instructions omitted such a requirement for a reason. [3]

Medtronic also relies primarily on out-of-circuit case law that this Court has reviewed and previously rejected. As one example, Medtronic claims the Ninth Circuit's citation to *Virgin Atl. Airways Ltd. v. British Airways PLC*, 69 F. Supp. 2d 571, 580 n. 8 (S.D.N.Y. 1999) in *PeaceHealth* lends credence to this requirement of monopoly power in the other products in a bundled contract. Rather, the Circuit simply cited to *Virgin Atlantic* as an example of another district court employing the DAT when "dealing with allegedly exclusionary bundled discounts." *PeaceHealth*, 515 F.3d at 907. In no part of its opinion did the Circuit approve of trial courts importing a monopoly power requirement into its handling of a bundled contracting case. Whether Medtronic had the "exclusive capacity" to create the bundles at issue was a question of fact for the jury to decide. Inflating that inquiry into an actual legal element of monopoly power to prove an exclusionary bundled contracting claim is untethered to the law binding this Court. [4]

Medtronic also raised at oral argument the impermissibility of a "monopoly broth" theory as furthered by Applied at trial with respect to its exclusive bundling

---

[3] The Court agrees with Applied that "Medtronic does not consistently articulate its supposed element" of monopoly power. (*See* Opp'n at 3 n.2). In some instances, Medtronic refers to the requirement as "monopoly power over the bundled products," and in others as "monopoly power in any of the products." (*See* 50(b) Mot. at 1, 5, 10). Such inconsistencies are further evidence that such an element lacks a firm footing in the legal framework for evaluating bundled contracting claims.

[4] To be clear, the Court instructed the jury to *consider* market power as part of the Rule of Reason analysis applicable to claims under Sections 1 and 2 of the Sherman Act. (Jury Instr. No. 31). That is not the same as importing a stringent requirement that a plaintiff prove the defendant exercised monopoly power over all products included in a bundled contract.

11

claim.  Under the theory of monopoly broth, "[t]here are kinds of acts which would be lawful in the absence of monopoly but, because of their tendency to foreclose competitors from access to markets or customers or some other inherently anticompetitive tendency, are unlawful under Section 2 if done by a monopolist." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012) (citing *City of Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980)) (internal quotations omitted).  That argument fails for two reasons.  First, such a theory is in fact permitted by circuit precedent, as the Ninth Circuit has explicitly found it "[im]proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* (citing *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)).  Second, the Court disagrees with Medtronic that jurors should have specifically been instructed regarding this "monopoly broth" theory as it relates to bundled discounting.  That is not what *PeaceHealth* requires.  Rather, *PeaceHealth* sets forth the DAT for a jury to employ where bundled discounting is at issue—which is precisely what the Court instructed the jury to do at trial.  (*See* Jury Instr. No. 39).

In the Court's view, evidence of a "monopoly broth" is instead relevant to Medtronic's general ability to reduce competition and maintain its monopoly power. It provided detailed instructions to the jurors on determining the existence of monopoly power as such.  (*See* Jury Instr. Nos. 36 –38).  Accordingly, Medtronic's "monopoly broth" arguments are unpersuasive.

   *2. Mr. Orszag's Assumptions Re: Switching Purchases of Bundled Products*

Medtronic also contends that Applied "never substantiated that foundational assumption" leveraged by Mr. Orszag that if a hospital, under a bundled contract, were to switch its ABD from Medtronic to Applied, the hospital would be forced to lose all the discounts on the other products in the bundle.  (50(b) Mot. at 7).  To the extent Medtronic seeks to attack the reliability of the assumptions underlying Mr. Orszag's analysis and testimony, the Court, for the reasons stated previously, finds

such arguments untimely and thus waived.  Medtronic was free to make those evidentiary objections before the close of evidence to provide Applied with an opportunity to rebut and tailor its expert testimony accordingly.  It did not. Accordingly, the Court declines to exclude Mr. Orszag's DAT analysis and related testimony.

The Court is also hesitant to agree with Medtronic that Mr. Orszag had no basis for assuming that "switching" to a new product was unfeasible for hospitals contracting with Medtronic.  At trial, Mr. Orszag explained the challenges of hospitals forming alternative bundles, since it would require negotiating contracts, ensuring product quality and risking reputational harm.  (1/29/2026 Trial Tr. 83:8–24).  A reasonable jury could certainly find that such barriers amounted to a hospital's practical inability to switch products.  Thus, the Court cannot find that this purported evidentiary insufficiency warrants judgment as a matter of law on Applied's bundled contracting claims.

### 3. Applied's Exclusive Dealing Theory

Medtronic also moves for judgment as a matter of law on the basis that Applied failed to present substantial evidence to support their *de facto* exclusive dealing claim. (50(b) Mot. at 11).  Because "the evidence at trial showed that the only consequence of falling short of a commitment target was a potential loss of a discount," Medtronic argues that this cannot establish exclusivity.  (*Id.* at 12 (citing *Allied Orthopedic Appliances v. Tyco Health Care Grp.*, 592 F.3d 991, 997 (9th Cir. 2010) (the customer retains the right to "forego the discount offered by [defendant] and purchase from a . . . competitor."))).  Medtronic specifically contends that Applied failed to prove that "something more than the discount itself" was fueling the anticompetitive conduct—either through Medtronic's generator agreements or their "targeting" of hospitals pursuing Voyant trials.  (50(b) Mot. at 12–13).  The Court will address each category of evidence separately.

13

### a. Generators and Generator Agreements

Regarding generators, the parties dispute whether adequate evidence was adduced to demonstrate that Medtronic's generators and generator agreements made switching difficult for hospitals.  Applied cursorily cites one instance at trial where Mr. Orszag explained that Medtronic's generators work only with Medtronic instruments and thus make it difficult to switch.  (Opp'n at 13 (citing 2/2/2026 Trial Tr. 59:14–60:17)).  Medtronic, on the other hand, views Applied as having abandoned that generator argument at trial, since it offered no evidence that these agreements were a barrier to customers seeking to buy ABDs from Applied or another rival supplier.  (50(b) Mot. at 13).  Applied offered no lay witness to testify to this being the case.  Rather, Medtronic's expert, Professor Murphy, testified that generators are a much smaller financial outlay for hospitals.  (*See* 2/4/2026 Trial Tr. 74:2–13).  Although the Court concurs with Medtronic that Applied failed to introduce substantial evidence that these generator agreements in fact prevented customers from buying ABDs from Applied or another rival supplier, this alleged tool of exclusivity was not the only one presented to the jury.

### b. Medtronic's Influence on Voyant Trials

With respect to Medtronic's influence on Applied's trials of Voyant, Medtronic argues that Applied "failed to establish that Medtronic's conduct or contract terms caused even a single hospital to abandon a preferred course of contracting with Applied following a Voyant evaluation."  (50(b) Mot. at 14).  Applied cites several pieces of evidence introduced at trial demonstrating that Medtronic (1) raised prices in the middle of a Voyant trial to induce hospitals to end the trials, (2) warned hospitals that even the initiation of trials violated their contracts and (3) disincentivized hospitals from switching to Voyant even after successful Voyant trials.  (*See* JTX-176.0001; JTX-139.0011; JTX-287.0001 (stopping Applied trial); 1/21/2026 Trial Tr. 137:2–141:12; 1/26/2026 Trial Tr. 182:6–184:16; 1/27/2026 Trial Tr. 85:11–23; JTX-330.0001).

The Court ultimately finds Medtronic's arguments unavailing, in large part because they require the Court to turn its head to the greater context of Applied's exclusive dealing theory.  The jury was specifically instructed of "additional considerations" as it reached a verdict on Applied's exclusive dealing claims.  (*See* Jury Instr. No. 42).  That explicit instruction required the jury to consider, among other factors, the length of the contract's duration, "the process in which Medtronic secured exclusive contracts" and whether the "exclusive dealing contracts adversely affected the price paid by buyers, output, or the quality of products offered in the relevant market." (*Id.*).  In determining whether Medtronic's agreements were easily terminable for purposes of deciding whether such agreements harmed competition, the Court instructed the jury to consider "not just the stated terms of the agreements, but also their practical effects." (*Id.*).  "The longer the contract's duration, the more likely that the harm to competition will be greater, unless it is clear that there was vigorous competition on the merits to win the longer contract or the buyer as a practical matter can terminate the agreement on short notice without cause and without significant penalty." (*Id.*).

The Court agrees with Medtronic that the evidence on the generators' impact on switching ABDs was sparse and in and of itself insufficient to prove *de facto* exclusive dealing.  But setting that evidence aside, a reasonable jury could have surveyed the evidence introduced by Applied on Medtronic's interactions with hospitals trialing Voyant, the terminability of Medtronic's contracts, and the general "targeting" by Medtronic of Applied as indicated in its internal emails (*see* JTX-78.0006)[5] and found that other conduct *beyond* just Medtronic's bundled discounts rendered Medtronic's agreements *de facto* exclusive.

---

[5] At oral argument, Applied argued that the Memorial Sloan Kettering emails were a singular instance of Medtronic's alleged interference with the hospital's purchasing of Voyant.  The Court, however, declines to view that evidence in a silo; rather, the totality of Medtronic's conduct—as evidenced by Applied's case-in-chief—could lead a reasonable juror to find in favor of Applied on its exclusive dealing claim.

c. Substantial Foreclosure

Finally, on the issue of market foreclosure, Medtronic also contends that no reasonable jury could find that the Medtronic contracts at issue "substantially foreclosed" competition. (50(b) Mot. at 15). As relevant here, exclusive dealing violates antitrust laws only when it forecloses a *substantial* portion of the relevant market. This Court has already found there to be "no set percentage" for foreclosure and noted that the "the Ninth Circuit had previously found that 24% market foreclosure" is sufficient. (MSJ Order at 10). "[A]n exclusive-dealing plaintiff need not 'place an exact number on the percentage foreclosed' at *any* stage of the case." (Amicus Brief on Behalf of the Federal Trade Commission, Dkt. No. 27-1 at 5 (quoting *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015)).

Applied presented at trial, through Mr. Orszag's testimony, that 17% to 47% of ABDs flowed through bundles which fail the DAT. (1/29/2026 Trial Tr. 45:3–46:21, 48:20–49:3). Mr. Orszag went on to explain why Medtronic's targeting of hospitals trialing Voyant supports an even higher foreclosure percentage. (*See id.* 48:20–49:24). On the element of substantial foreclosure, the Court instructed the jury to evaluate several factors (Medtronic's position in the marketplace, the competitive alternatives to Medtronic's products, etc.) in addition to considering the percentage of the market foreclosed and the length of the foreclosure. (Jury Instr. No. 42). Although there is no threshold, substantial foreclosure "must be substantial enough to freeze competitors out of a market." (*Id.*). At trial, Applied supplemented Mr. Orszag's DAT finding of foreclosure with evidence of Medtronic's conduct related to product trials of Applied's ABD. (*See* JTX-176.0001; JTX-139.0011; JTX-287.0001 (illustrating Medtronic's efforts to derail an Applied trial)). Applied also showed Medtronic prevented hospitals from converting after successful Voyant evaluations. (*See, e.g.*, 1/21/2026 Trial Tr. 137:5–141:12; 1/26/2026 Trial Tr. 182:6–184:16; 1/27/2026 Trial Tr. 85:11–23; JTX-330.0001). In this Rule 50(b) posture, the fact that Mr. Orszag "did not explain how many hospitals were subject to generator agreements

16

or had difficulty trialing Voyant" (*see* 50(b) Mot. at 15) is merely one of many factors that the jury *could* have considered while evaluating the evidence presented.

Having considered this evidence and drawing all inferences in Applied's favor, the Court finds it reasonable for a jury to have concluded that the confluence of Medtronic's conduct—taken as a whole—constituted substantial foreclosure. Even if a contrary finding was possible, the Court may not disturb a jury finding supported by such substantial evidence. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).

### 4. *Applied's Ability to Prove Damages*

Next, Medtronic contends that if either of Applied's theories of competitive harm (bundled contracting or exclusive dealing) fails, Applied cannot prove any damages. Because the Court previously found that both theories are supported by substantial evidence, it declines to evaluate the merits of these arguments. The Court is not inclined to adopt Medtronic's view that a disaggregation of damages by type of exclusionary conduct is required. *See Heckman v. Live Nation Ent., Inc.*, No. CV 22-0047-GW-DSRx, 2025 WL 3780262, at *24 (C.D. Cal. Dec. 3, 2025) (plaintiffs need not "disaggregate the effects of Plaintiffs' three conduct theories"—i.e., "exclusive dealing, tying, and coercion"—that do not produce separate damages). At minimum, Mr. Orszag's benchmark provided the floor on which the jury could award damages, given that the exclusive dealing claim rested in part on the bundled contracting "discounts" and results of the DAT as they relate to foreclosure. *See Sumotext Corp. v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2020 WL 533006, at *7 (N.D. Cal. Feb. 3, 2020) ("[O]nce the fact of an antitrust violation is established, the jury has broad latitude in assessing the amount of damages caused by that violation."); *see also D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). Medtronic was free to present an alternative measure of damages. It did not— and cannot now argue that the measures of damages used by Mr. Orszag are "fatally speculative." *D & S Redi-Mix*, 692 F.2d at 1249. Further, as in *Sumotext*, the

17

"disaggregation rule pertains to *conduct*, not *legal theories*. The point is that damages may be awarded only for conduct that is unlawful. Where certain conduct is unlawful under multiple theories of liability, a plaintiff need not—and indeed, could not— disaggregate damages across each theory." 2020 WL 533006, at *7.

Nevertheless, because the Court already found both theories of competitive harm were adequately supported by substantial evidence, the Court declines to wade further into the merits of Medtronic's arguments on this issue.

### 5. ABDs as the Relevant Market

As a threshold issue in the case, the jury was required to determine whether Applied properly defined a relevant market for antitrust purposes. The parties agreed that the relevant geographic market is the United States, so the primary question for the jury was whether Applied established a relevant *product* market. The Court instructed the jury that the relevant product market "includes the products that a consumer believes are reasonably interchangeable or reasonable substitutes for each other." (Jury Instr. No. 29). In making that decision, the jury was also permitted to consider "the views of Applied and Medtronic regarding who their respective competitors are" and "customers' views on whether the productions are interchangeable." (*Id.*). The jury ultimately found that the relevant antitrust market in this action is ABDs—not ABDs and ultrasonic devices, or ABDs, robotic ABDs and ultrasonic devices. (*See* Verdict Form at 1). Medtronic now asserts that Applied did not introduce sufficient evidence to show either ultrasonics or robotic ABDs are outside the relevant market. (*See* 50(b) Mot at 17–19).

On the issue of ultrasonics, Medtronic asserts that the evidence at trial "demonstrated that ultrasonics are not only a reasonable substitute for handheld ABDs, but are in fact regularly substituted for ABDs in the real world." (*Id.* at 17). Medtronic supports that claim with citations to evidence showing that surgeons often use ultrasonic devices in the same types of cases as ABD users and that Medtronic considers LigaSure's performance against ultrasonics in its marketing. (JTX-1446;

18

2/3/2026 Trial Tr. 16:5–17:6, 19:22–20:10).  Although the Court finds this evidence probative of the relevant market determination, it does not find that it significantly outweighs the countervailing and substantial evidence introduced by Applied at trial. Applied persuasively cites (1) the testimony of Mr. Orszag, who discussed why ultrasonic devices fall outside of the relevant market,[6] (2) evidence of Medtronic's treatment of the two products as part of distinct markets[7] and (3) evidence of that fact that Medtronic's contracts treat ABD "vessel sealing" products and "ultrasonic cutting" products as separate categories for compliance purposes.[8]  Taken together, the Court finds this to be sufficient "evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence."  *Johnson*, 251 F.3d at 1227; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021) (an expert's testimony can help establish a relevant market); *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 816 (C.D. Cal. 2010) (internal documents can sufficiently support a finding of relevant market).  Medtronic asks this Court to infer—from the occasional use of ultrasonics in the same types of cases as ABDs and Medtronic's consideration of ultrasonics in marketing—that ABDs could constitute its own antitrust market. Rather, the Court must do the opposite and draw all reasonable inferences in favor of the verdict.  *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).

The same goes for the issue of whether robotic ABDs should be treated as part of the relevant market.  Medtronic relies on the fact that it regularly loses sales to Intuitive's robotic ABDs in head-to-head competition.  (50(b) Mot. at 19 (citing

[6] *See* 1/28/2026 Trial Tr. 187:11–190:9, 199:20–202:7; 2/2/2026 Trial Tr. 61:3–24.
[7] *See, e.g.*, JTX-230.0001 (describing ultrasonics and ABDs as "two markets [that] are moving in different directions")); JTX-232.0006 (Medtronic "own[s] the RF vessel sealing market" but needs to "bust into ultrasonic world");  JTX-300.0009 ("Medtronic owns RF market; Ethicon owns Ultrasonic market"); 2/2/2026 Trial Tr. 228:20–229:8 ("very separate stand-alone categories").
[8] *See, e.g.*, JTX-157.0024; JTX-2233.0001; JTX-2273.0001; JTX2280.0001; JTX-2317.0001-0002; JTX-2353.0001; JTX-2765.0001; JTX2778.0001; 1/29/2026 Trial Tr. 17:18–18:12.

2/4/2026 (Murphy) Trial Tr. 44:10–25)). Additionally, it cites to the testimony of Applied's own witnesses that that robotic ABDs are substitutes for handheld ABDs. (*See, e.g.*, 1/26/2026 (Carpenter) Trial Tr. 203:15–17 (agreeing "a hospital might reduce its needs for [handheld] ABDs if robots are being used in surgical procedures"); 1/28/2026 (Popma) Trial Tr. 120:4–121:5 (agreeing that robotic ABDs are "a direct competitor with Voyant"); *cf.* JTX-1453 ("With more robots coming to the market in more specialties it is a given that we will lose business to robots.")). But as Applied highlights, Medtronic's own documents repeatedly describe the ABD market as not including robotics. (*See, e.g.,* JTX-300.0008 ("robotic not included" in ABD chart); JTX-318.0001 (ABD market excluded "robotics"); JTX-327.0057 ("excluding robotics")). Mr. Orszag also testified to the issue and explained why robotic ABDs are in a different market. (1/28/2026 Trial Tr. 195:19–199:19; 2/2/2026 Trial Tr. 61:3–24). Applied's own fact witnesses also characterized handheld ABDs and robotic ABDs as being incompatible and in separate categories. (*See* 1/21/2026 Trial Tr. 116:2–116:21).

The Court recognizes the conflicting nature of some of this evidence regarding the relevant product market. However, the jury was free to weigh the evidence accordingly and reach a verdict based on the Court's instructions and substantial evidence. Here, a jury could reasonably infer from the evidence that ABDs, ultrasonics and robotic ABDs were not interchangeable "merely because they share similar forms or functions." *United Food & Commer. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1171 (N.D. Cal. 2017). For these reasons, the Court finds it unwarranted to issue judgment as a matter of law with respect to the jury's determination of the relevant market.

### C.    **Motion for New Trial**

Medtronic, in the alternative, seeks a new jury trial pursuant to Rule 59. (50(b) Mot. at 21). A district court may grant a new trial on any grounds that have historically been established to warrant a new trial in the federal court system. Fed. R.

20

Civ. P. 59(a)(1)(A). Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward*, 311 U.S. at 251. The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000). In this case, Medtronic argues that it is entitled to a new trial because the "jury's verdict is contrary to the clear weight of the evidence because Applied failed to prove the core elements of its claims: anticompetitive conduct, a relevant antitrust market, and damages." (50(b) Mot. at 22).

As previously discussed, the record contains sufficient evidence for a jury to have found for Applied on its identification of the relevant market and exclusive dealing and bundling contract theories. The jury's damages award was also sufficiently rooted in the expert testimony of Mr. Orszag, as also explained previously. The mere fact that the jury deliberated for under two hours, as Medtronic notes (*see* 50(b) Mot. at 22), is insufficient to warrant such an extraordinary remedy. Medtronic produces no legal or factual basis for finding otherwise. Thus, the Court does not find that the verdict is against the weight of the evidence, that the damages are excessive or that the trial was otherwise unfair to Defendants. The Court therefore **DENIES** Medtronic's request for a new trial.

## IV. CONCLUSION

Drawing all reasonable inferences in favor of Applied and the verdict, the Court concludes there was sufficient evidence to sustain the entirety of the jury's verdict. Accordingly, Medtronic's Motion is **DENIED**.

//

//

//

The Court **ORDERS** the parties to submit a briefing schedule to address the remaining injunctive/equitable claims and defenses within thirty (30) days of this Order.

**IT IS SO ORDERED.**

Dated:  July 06, 2026

_____
HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE